**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **STUDENTS AND PARENTS FOR PRIVACY**, a voluntary unincorporated association; **C.A.**, a minor, by and through her parent and guardian, **N.A.**; **A.M.**, a minor, by and through her parents and guardians, **S.M.** and **R.M.**; **N.G.**, a minor, by and through her parent and guardian, **R.G.**; **A.V.**, a minor, by and through her parents and guardians, **T.V.** and **A.T.V.**; and **B.W.**, a minor, by and through his parents and guardians, **D.W.** and **V.W.**, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) |
| **UNITED STATES DEPARTMENT OF EDUCATION**; **JOHN B. KING, JR.,** in his official capacity as United States Secretary of Education; **UNITED STATES DEPARTMENT OF JUSTICE**; **LORETTA E. LYNCH**, in her official capacity as United States Attorney General, and **SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS**. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**VERIFIED COMPLAINT FOR**
**INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Students and Parents for Privacy, along with the plaintiffs identified

by their initials in the caption above (the "Plaintiffs"), state as follows:

1

# INTRODUCTION

1.     This is a civil rights action to stop the Department of Education ("DOE") and Township High School District 211 ("District 211" or "District") from continuing to trample students' privacy and other constitutional and statutory rights by forcing 14- to 17-year-old girls to use locker rooms and restrooms with biological males; and to set aside DOE's *ultra vires* legislative rule redefining "sex" in Title IX to include gender identity which, despite originating in a non-binding guidance document and being adopted without following the procedures mandated by the Administrative Procedure Act, is being enforced against schools across the country; and, to enjoin DOE's enforcement of this rule against District 211 to the detriment of Plaintiffs.

2.     The DOE threatened District 211 with the loss of $6 million of federal funding if it did not give a biologically male student ("Student A"), who perceives himself[1] to be female, the right of entry to, and use of, the girls' locker rooms.

3.     District 211 entered into an agreement with DOE that grants Student A the right to enter and use all girls' locker rooms at District 211 schools. OCR Case No. 05-14-1055, Agreement to Resolve, December 2, 2015, *available at*

---

[1] Both Title IX and the legal precedent regarding bodily privacy recognize that distinctions based on biological sex are necessary to protect privacy. Therefore, although Plaintiffs are aware that Student A identifies as a female, it is his biological status as a male, as both the November 2, 2015, Letter of Findings from the DOE's Office of Civil Rights and the Plaintiffs' personal knowledge confirm, that is relevant to determining whether Plaintiffs' rights have been violated by Defendants' actions.  Therefore, to reflect the biological facts that are necessary knowledge for this Court's adjudication of Plaintiffs' claims, Plaintiffs use masculine pronouns throughout this Complaint.

2

http://www2.ed.gov/documents/press-releases/township-high-211-agreement.pdf.

(last visited May 3, 2016) (the "Locker Room Agreement").

4.     Previously, the District granted Student A, and all other students, permission to use school restrooms according to the students' perceived gender identity. (the "Restroom Policy").

5.     Because of the Locker Room Agreement and the Restroom Policy, Student A currently uses both the girls' locker rooms and the girls' restrooms at William Fremd High School ("Fremd").

6.     This creates an intimidating and hostile environment for the girl members of Students and Parents for Privacy, some of whom are as young as 14, because Student A—who is biologically a male—actively uses their private facilities at the same times as Plaintiffs.

7.     As a direct result of Defendants' Policies and actions, every day these girls go to school, they experience embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity because they will have to use the locker room and restroom with a biological male.

8.     Because of Defendants' Policies and actions, they are afraid of being seen by, and being forced to share intimate spaces with, a male while they are in various states of undress.

9.     Because of Defendants' Policies and actions, these girls are also afraid they will have to see a male in a state of undress.

10. Because of Defendants' Policies and actions, the girls are afraid of having to attend to their most personal needs, especially during a time when their body is undergoing often embarrassing changes as they transition from childhood to adulthood, in a locker room or restroom with a male present.

11. The embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity these girls experience because of Defendants' Policies and actions are heightened because as adolescents they are at a time in their lives when they are the most shy, embarrassed, and aware of their bodies and the differences between their bodies and the bodies of their male classmates.

12. The Locker Room Agreement and Restroom Policy have had and continue to have a profoundly negative effect on the girls' access to educational opportunities, benefits, programs, and activities at their schools:

  a. some girls actively avoid the locker rooms at school;

  b. one girl has started wearing her gym clothes underneath her regular clothes all day, so she only has to peel off a layer instead of exposing her unclothed body in the presence of a biological male in the locker room;

  c. other girls are changing as quickly as possible in the locker room, avoiding all eye contact and conversation, all the while experiencing great stress and anxiety over whether a biological male will walk in while they are unclothed;

    d. some girls are avoiding the restroom altogether, and others are waiting as long as possible to use the restroom, so they won't have to share it with a biological male, thus risking certain health problems; and

    e. still other girls are risking tardiness by running to the opposite end of the school, during short 5 minute passing periods, to try to find an empty restroom.

13. These negative effects on the girls' access to educational opportunities, benefits, programs, and activities at their school are a direct result of DOE's adoption and enforcement of the legislative rule redefining the term "sex" in Title IX to include gender identity, the Locker Room Agreement following from that rule, and District 211's Restroom Policy.

14. The DOE's action violates the Administrative Procedure Act; and, the Locker Room Agreement and Restroom Policy violate the Plaintiffs' right to privacy, discriminate on the basis of sex under Title IX by creating a hostile environment, and violate additional constitutional and statutory rights of Plaintiffs. They therefore seek redress from this Court.

## JURISDICTION AND VENUE

15. This action arises under 42 U.S.C. §§ 1983 et seq. (the "Civil Rights Act"), 5 U.S.C. §§ 500 et seq. (the "Administrative Procedure Act" or the "APA"), 20 U.S.C. §§ 1681 et. seq. ("Title IX"), the First and Fourteenth Amendments to the United States Constitution, the Illinois Religious Freedom Restoration Act, 775 Ill.

Comp. Stat. Ann. §§ 35/1 et seq., and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb et seq.

16.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1361, and 1367.

17.    The Court has jurisdiction to issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

18.    The Court has jurisdiction to award the requested injunctive relief under 5 U.S.C. §§ 702 and 703, 20 U.S.C. § 1683, 42 U.S.C. § 20000bb-1(c), 28 U.S.C. § 1343(a)(3), 775 Ill. Comp. Stat. Ann. § 35/20, and Federal Rule of Civil Procedure 65.

19.    The Court has jurisdiction to award nominal and compensatory damages under 28 U.S.C. § 1343(a)(4).

20.    The Court has jurisdiction to award reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

21.    Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and (e), because a substantial part of the events or omissions giving rise to all claims occurred in this district where Township High School District 211 is located.

## PLAINTIFFS

22.    All Plaintiffs are citizens of the United States and residents of Cook County, Illinois.

6

### *Students and Parents for Privacy*

23.     Plaintiff Students and Parents for Privacy is a voluntary unincorporated association of 51 families (136 individuals – 73 parents and 63 students), who are directly impacted by the DOE's adoption and enforcement of the legislative rule redefining the term "sex" in Title IX to include gender identity, and also the Locker Room Agreement and/or the Restroom Policy.

24.     Members of Students and Parents for Privacy include both students and their parents.

25.     Student Plaintiffs object to being required to share restrooms, locker rooms, and shower rooms with students of the opposite biological sex.

26.     The Student Plaintiffs currently attend a District 211 high school or will attend a District 211 high school starting in Fall 2016. These schools include William Fremd High School ("Fremd"), Palatine High School, James B. Conant High School, and Schaumburg High School.

27.     Nineteen of the student members of Students and Parents for Privacy are girls who attend Fremd, and so are currently subject to both the Locker Room Agreement and the Restroom Policy, while another eight student members are girls who will attend Fremd beginning in Fall 2016 and so will be subject to those policies.

28.     In addition, there are seven girl members of Students and Parents for Privacy who attend other District 211 schools and so are subject to the Restroom Policy.

29.    There are also 16 boy members of Students and Parents for Privacy who attend District 211 schools or will attend District 211 schools beginning Fall 2016, and so are subject to the Restroom Policy.

30.    Each plaintiff who is individually identified by initials is also a member of Students and Parents for Privacy.

### The Individually Identified Plaintiffs

31.    Plaintiff C.A., a minor, currently attends Fremd and is subject to the Locker Room Agreement and the Restroom Policy.  Plaintiff N.A. is her parent and guardian.

32.    Plaintiff A.M., a minor, currently attends Fremd and is subject to the Locker Room Agreement and the Restroom Policy. Plaintiffs S.M. and R.M. are her parents and guardians.

33.    Plaintiff N.G., a minor, currently attends Palatine High School and is subject to the Restroom Policy. Plaintiff R.G. is her parent and guardian.

34.    Plaintiff A.V., a minor, will attend Fremd starting in the Fall of 2016, and at that time will be subject to the Locker Room Agreement and the Restroom Policy. Plaintiffs T.V. and A.T.V. are her parents and guardians.

35.    Plaintiff B.W., a minor, currently attends Fremd and is subject to the Restroom Policy. Plaintiffs D.W. and V.W. are his parents and guardians.

36.    The factual statements and allegations of law below may apply to a number of individual plaintiffs. For clarity, when used below: **"Student Plaintiffs"** refers to all students who are part of Students and Parents for Privacy (including

8

those who are individually identified by initials); **"Parent Plaintiffs"** refers to all parents who are part of Students and Parents for Privacy (including those who are individually identified by initials); and **"Girl Plaintiffs"** refers to all girl students who attend Fremd, or will attend Fremd in fall 2016, and are part of the Students and Parents for Privacy (including those who are individually identified by initials). Girl Plaintiffs are subject to the Locker Room Agreement and the Restroom Policy. Student Plaintiffs are subject to the Restroom Policy.

## DEFENDANTS

### *Defendant Department of Education*

37.     Defendant Department of Education ("DOE") is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of Title IX, 20 U.S.C. §§ 1681-1688, and its implementing regulation at 34 C.F.R. Part 106.

38.     The DOE, through its Office for Civil Rights ("OCR"), exercised its authority to promulgate, administrate, and enforce its new legislative rule for Title IX in the instant matter against District 211, to the detriment of the Girl Plaintiffs.

### *Defendant Secretary John B. King, Jr.*

39.     Defendant John B. King, Jr., is the United States Secretary of Education.  In this capacity, he is responsible for the operation and management of the DOE. King is sued in his official capacity only.

### *Defendant Department of Justice*

40.     Defendant Department of Justice ("DOJ") is an executive agency of the United States government and is responsible for the enforcement of Title IX, 20 U.S.C. §§ 1681-1688, and its implementing regulation at 34 C.F.R. Part 106. Pursuant to Executive Order 12250, the DOJ has authority to bring enforcement actions to enforce Title IX.

### *Defendant Attorney General Loretta E. Lynch*

41.     Defendant Loretta E. Lynch is the United States Attorney General. In this capacity she is responsible for the operation and management of the DOJ. Lynch is sued in her official capacity only.

### *Defendant School Directors of Township High School District 211, County of Cook and State of Illinois*

42.     District 211 is organized under the laws of the State of Illinois, and pursuant to those laws it may be sued in all courts including this one.  105 Ill. Comp. Stat. Ann. 5/10-2.

43.     District 211 is comprised of public educational institutions that provide a high school education to both male and female students.

44.     The schools that comprise District 211 receive federal funds and so are subject to the requirements of Title IX.

45.     Defendant District 211 is charged with the formulation, adoption, implementation, and enforcement of its policies for its schools, including the Locker Room Agreement and Restroom Policy challenged herein.

46.    Defendant District 211 is responsible for the enforcement of its policies by its Superintendent, administrators, teachers, and all its other employees.

## STATEMENT OF FACTS

### *The DOE Mandates An Unlawful Policy*

<u>*Title IX and its meaning*</u>

47.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681.

48.    The regulations implementing Title IX provide, in relevant part, that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular…or other education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.31(a).

49.    The implementing regulations also provide that a funding recipient shall not, on the basis of sex: "Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; … Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; … Deny any person any such aid, benefit, or service; … Subject any person to separate or different rules of behavior, sanctions, or other treatment; …[or] Otherwise limit any

person in the enjoyment of any right, privilege, advantage, or opportunity." 34 C.F.R. § 106.31(b).

50.     Nothing in Title IX's text, structure, legislative history, or accompanying regulations addresses gender identity.

51.     The term "gender identity" does not appear in the text of Title IX.

52.     The term "gender identity" does not appear in the regulations accompanying Title IX.

53.     Indeed, recognizing that Title IX does not protect against discrimination because of "gender identity" (but only against discrimination because of biological sex), beginning in 2011, Senator Al Franken has repeatedly introduced legislation modeled after Title IX that would protect against gender identity discrimination in the education context.

54.     That legislation has failed to pass every year it has been introduced.

55.     Title IX, and the accompanying regulations, use the term "sex," not "gender identity," in describing the type of discrimination prohibited.

56.     The term "sex" as used in Title IX and its implementing regulations means male and female, under the traditional binary conception of sex consistent with one's birth or biological sex.

57.     Title IX also states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes[,]" 20 U.S.C. § 1686, indicating that Congress intended that Title IX should respect student privacy

12

rights, and not violate them by compelling introduction of opposite-sex students into private areas designated for one biological sex.

58.     Title IX's accompanying regulations confirm that schools "may provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

59.     Preventing the mixing of biological boys and girls in intimate environments like restrooms, locker rooms, and showers is the very reason Congress allowed for separate living facilities, and that Title IX regulations allow for separate restrooms, locker rooms, and changing areas, for the different sexes.

### _DOE acts without legal authority by adopting and enforcing a legislative rule redefining "sex" in Title IX to include gender identity_

60.     Under the Administrative Procedure Act, any "rules which do not merely interpret existing law or announce tentative policy positions but which establish new policy positions that the agency treats as binding must comply with the APA's notice-and-comment requirements, regardless of how they initially are labeled." 72 Fed. Reg. 3433.

61.     Regulations enacted under Title IX must also be "approved by the President" before they become effective. 20 U.S.C. § 1682.

62.     The DOE has declared that the term "sex" as used in Title IX's prohibition on sex discrimination now means, or at least includes, "gender identity."

63.     The DOE announced this new legislative rule redefining "sex" to schools nationwide in several DOE guidance documents published over the last few

years, including the following: U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, 5 (Apr. 2014); U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities,* 25 (Dec. 2014); U.S. Department of Education, Office for Civil Rights, *Title IX Resource Guide,* 1, 15, 16, 19, 21-22 (Apr. 2015).

64.     DOE's new rule requires schools to treat students consistently with their perceived gender identity, regardless of biological sex.

65.     OCR issued a Letter of Findings against District 211 in November 2015 that informed the District that when OCR investigates Title IX complaints, it looks for evidence of "discrimination based on sex, gender identity, or gender nonconformity." OCR Case No. 05-14-1055, Letter of Findings, November 2, 2015, *available at* http://www2.ed.gov/documents/press-releases/township-high-211-letter.pdf (last visited May 3, 2016).

66.     OCR then informed District 211 that it discriminated on the basis of gender identity, in violation of Title IX, by refusing a biological male, who perceives himself to be female, access to the girls' locker and shower rooms.

67.     DOE threatened District 211 with the loss of $6 million dollars in federal funds if it failed to grant a biologically male student access to the girls' locker and shower rooms.

14

68.     DOE is treating its declaration that Title IX bars gender identity discrimination as a legislative rule that is binding on all schools that are subject to Title IX.

69.     The DOE is actively enforcing its legislative rule that Title IX includes gender identity against schools across the country, not just District 211.

70.     DOE did not comply with APA's notice-and-comment requirements when it adopted its legislative rule redefining "sex" in Title IX to include gender identity and mandating that schools give students seeking access to opposite sex facilities based on their gender identity the access they desire.

### District 211's Locker Room Agreement

71.     Student A is currently an 11th grade student at Fremd High School.

72.     He was born a boy and is anatomically male.

73.     Throughout most of his school career, Student A identified to his classmates, including Student Plaintiffs, as a boy, consistent with his biological sex.

74.     He used the restrooms and locker rooms consistent with his biological sex prior to high school.

75.     At some point during middle school, Student A decided to publicly identify himself as female.

76.     When he entered high school, although he had been using the boys' facilities in middle school, Student A and his parents requested that he be allowed to use the girls' locker rooms.

77.     District 211 initially refused.

15

78. The District told Student A that he could not use girls' locker rooms because his presence would invade the privacy of female students.

79. From approximately the summer of 2013 to January 14, 2016, District 211 refused to give Student A access to the girls' locker rooms.

80. In December 2013, Student A (or his representatives) filed a complaint with OCR, alleging that District 211 violated his rights under Title IX, when it denied him use of the girls' locker rooms.

81. OCR commenced an investigation of District 211's locker and shower room policies as applied to Student A.

82. District 211 defended its policy.

83. District 211 told OCR that it "based its decision" not to allow Student A to use the girls' locker and shower rooms "on the needs of all students," explaining that it came to this decision after "balancing Student A's rights and interests with the privacy concerns of . . . female students."

84. Student A asked to use a private stall to change, but District 211 said that would not be practicable in part because there are too few stalls and too many students.

85. When word of OCR's investigation became public, District 211 informed parents in a public newsletter that the District's goal was "to protect the privacy rights of all students when changing clothes or showering before or after physical education and after-school activities."

86.    Superintendent Cates stated that the District would continue to provide "individual accommodations" to students seeking access to opposite sex facilities based on their gender identity "in a manner that does not infringe on the privacy concerns of other students."

87.    District 211 provided Student A with several private facilities to change his clothes for physical education and athletics from the fall of 2013 through January 14, 2016.

88.    Student A expressed dissatisfaction with the private arrangements.

89.    In response to Student A's complaints, District 211 provided different options and installed lockers, mirrors, and other equipment in the private rooms for Student A's use.

90.    When Student A complained about changing alone, District 211 offered to put lockers in the restroom adjoining the PE locker room so Student A could invite his friends to change with him.

91.    Student A spoke with several friends but no girls would agree to change with him.

92.    Despite District 211's policy prohibiting any biological males from entering the female locker rooms, Student A entered girls' locker rooms on at least six occasions.

93.    He entered the girls' PE locker room during his PE class.

94.    He entered the girls' swim locker room during the swim unit in PE, while girls were present and using the swim locker room.

95.    He entered the girls' gymnastics' locker room on at least four occasions, while he was on the girls' gymnastics team and while girls were present and using the locker room.

96.    At least once, Student A undressed and changed his clothes in the girls' gymnastics locker room while girls were present.

97.    Four girls and one parent contacted the coach and expressed how embarrassed, anxious, uncomfortable, and distressed the girls felt using a locker room and being forced to change with a biological male.

98.    District 211 responded by again instructing Student A to use one of the private facilities designated for his use.

99.    In July 2015, OCR informed District 211 that its investigation of Student A's complaint was complete and that he was entitled to use the girls' locker rooms pursuant to Title IX.

100.    On October 12, 2015, District 211 informed OCR it would not voluntarily resolve the alleged Title IX violation, but would continue to provide Student A an accommodation so he would not have to use the boys' locker rooms if he did not want to do so.

101.    The District again cited concerns for the girls' privacy.

102.    Despite the District's privacy concerns, on November 2, 2015, OCR issued a Letter of Findings against District 211 stating that it had violated Title IX by not granting Student A access to the girls' locker rooms.

103.    The letter also stated that District 211 had "30 calendar days [from] the date of this Letter of Findings" to give Student A access to the locker rooms, or OCR would "issu[e] a Letter of Impending Enforcement Action."

104.    DOE's announcement of its intent to issue a Letter of Impending Enforcement Action was a threat to begin proceedings to remove millions of dollars in federal funding if the District did not give Student A right of entry to and use of the girls' locker rooms and shower rooms.

105.    On December 2, 2015, despite public outcry from Plaintiffs and many other parents and students, District 211 signed an agreement with OCR by which the District agreed, among other things, to give Student A right of entry to and use of any and all of the girls' locker rooms and shower rooms in Fremd High School and all of the girls' locker rooms and shower rooms throughout the District when he visits other schools. (The "Locker Room Agreement").

106.    The Agreement states that Student A represented that he would change in private changing stations in the locker rooms, but nothing in the agreement requires him to do so.

107.    There is also no penalty under the Agreement if Student A decides not to change in the private stalls.

108.    The Locker Room Agreement took effect on January 15, 2016.

109.    The Locker Room Agreement is an official policy of District 211.

### *The Damaging Effects of the Locker Room Agreement on Girls*

110.   Because of the Locker Room Agreement, Student A is currently using the girls' locker rooms while female students are present, including some of the Girl Plaintiffs.

111.   He has right of entry to and use of all three girls' locker rooms: the locker room near the main gymnasium, used for physical education ("PE locker room"); the locker room used for particular athletic sports, including girls' gymnastics ("gymnastics locker room"); and the locker room near the pool, used for swimming activities ("swim locker room").

112.   There are Girl Plaintiffs who use each of the three locker rooms to change their clothes.

113.   There are Girl Plaintiffs who regularly use the showers in the swim locker room.

114.   Girl Plaintiffs live in constant anxiety, fear, and apprehension that a biological boy will walk in at any time while they use the locker rooms and showers and see them in a state of undress or naked.

115.   This anxiety, fear, and apprehension stays with the Girl Plaintiffs throughout the day as they anticipate having to use the locker rooms again.

*The Damaging Effect on Girls: the PE Locker Room*

116.   Girl Plaintiffs cannot escape forced interactions with Student A in the locker rooms because physical education ("PE") is a mandatory, daily course, all four years of school in District 211, and is a requirement to graduate.

117.    The PE locker room is a long rectangular room with several banks of lockers and a long row of lockers along the periphery wall.

118.    There are approximately 130 students in physical education classes during a given class period.

119.    At a minimum, 65 girls must change their clothing in the locker rooms at one time.

120.    It is mandatory that girls in PE class change into clothing appropriate for PE class.

121.    Some Girl Plaintiffs also change into sports bras, resulting in even greater bodily exposure while in the locker rooms.

122.    Currently, three of the Girl Plaintiffs have physical education during the same class period as Student A, and so must use the PE locker room with him.

123.    These Girl Plaintiffs object to being forced to use a locker room with any male.

124.    All three Girl Plaintiffs are afraid of, and embarrassed and humiliated by, changing their clothing in the same locker room as Student A, because he is a biological male.

125.    The dread, anxiety, stress, and fear these three Girl Plaintiffs feel over having to use the same PE locker room as a biological male is an ever-present distraction throughout the school day, including during class instruction time.

126. All Girl Plaintiffs, including the three who currently must share the Locker Room with Student A, are afraid and embarrassed to be seen in a state of undress by him, because he is a biological male.

127. These three girls, and all Girl Plaintiffs, are also afraid to see Student A in a state of undress because he is a biological male, and are embarrassed and anxious worrying that they might see him in such a state.

128. So, all three Girl Plaintiffs in Student A's PE period change their clothing as quickly as possible, while trying not to look at anyone.

129. Because of the Defendants' actions, all three experience humiliation, embarrassment, stress, anxiety, and fear while changing.

130. Because of the Defendants' actions that allow a male into the girls' locker room, all three have come to view the PE locker room as a scary and intimidating environment.

131. One of these Girl Plaintiffs has started wearing her gym clothes underneath her regular clothes all day at school so she can avoid undressing in the locker room.

132. When it is time for physical education, she goes to the locker room, removes her outer layer as fast as possible while looking at her feet, and then leaves as quickly as possible.

133. She then repeats this process after class, putting the layer back on and leaving as quickly as possible, wearing her dirty gym clothes underneath her street clothes for the rest of the day.

134.   Even with this method of changing, the Defendants' actions have resulted in this Girl Plaintiff being forced to have direct interactions with a biological male in the PE locker room, which makes her very scared and uncomfortable.

135.   On one recent occasion, Student A stood next to her while she was using the mirror and repeatedly lifted his shirt, presumably to look at his body in the mirror.

136.   Girl Plaintiffs who are not in Student A's gym period are also afraid, anxious, stressed, and apprehensive when they use the locker rooms because, pursuant to the Defendants' actions, a biological male has permission to enter and use any of the girls' locker rooms at any time of the school day.

137.   Therefore, because of Defendants' actions, Girl Plaintiffs know that a biological male could walk in on them when they are undressing for PE.

*The Damaging Effect on Girls: The Privacy Stalls Do Nothing to Stop the Harm*

138.   District 211 constructed five stalls in the PE locker room where students could change their clothes.

139.   These five stalls do nothing to address the Girl Plaintiffs' fears about sharing a locker room with a biological male for numerous reasons.

140.   First, students who use the stalls are ridiculed and harassed by other students to such an extent that the stalls are not a practical option.

141.   Because students know that their use of the stalls will subject them to ridicule and harassment, they generally do not use the stalls to change for PE class.

23

142. A Girl Plaintiff in Student A's PE period used one of the changing stalls on a single occasion because she is uncomfortable changing in the same locker room with a biological boy.

143. While she was in the changing stall, other girls who were in the locker room began calling her names, including "transphobic" and "homophobic."

144. Word spread that she had used the stall to change during PE class and she began being harassed by other students in the hallways.

145. Both boys and girls called her names, yelled derogatory, slang words for female body parts at her, and accused her of being transphobic and homophobic.

146. As a result of the ridicule and harassment this Girl Plaintiff received over her use of the stalls, she has not used them again.

147. This Girl Plaintiff is the student described above who now wears two sets of clothes to school so as to avoid having to undress at all in the locker room.

148. Second, District 211 has, through various announcements to the students at Fremd, and also through community meetings on gender identity that the District has organized and sponsored, conveyed to the Student Plaintiffs the message that any objection to the Locker Room Agreement (or the Restroom Policy) will be viewed by District administration as intolerance and bigotry.

149. For example, District 211 has organized and sponsored "community education meetings" for each of its schools.

150. The District represents the speakers at these meetings as experts on gender identity issues.

24

151. These speakers have exclusively supported the Locker Room Agreement and Restroom Policy and condemned any objection to these policies.

152. The message the District conveys to parents and students in these community education meetings is that any restriction on Student A's use of opposite sex facilities is discrimination and that any objection to sharing a restroom or locker room with a person seeking access to the opposite sex's facilities based on gender identity is born of bigotry, ignorance, and a lack of education.

153. Because of the District's message that differing views will not be tolerated, most of the Student Plaintiffs have not asked for a separate, private locker room or restroom.

154. Because of the District's message, the Student Plaintiffs are afraid to be named publicly in this lawsuit, for fear that other students and their schools will retaliate against them.

155. Third, even if the Girl Plaintiffs could use the stalls without suffering ridicule and harassment, they do not remedy the privacy violation caused by the presence of a biological male sharing the same small, intimate settings where Girl Plaintiffs are naked or in other various states of undress.

156. The five stalls in the PE locker room also do nothing to address the Girl Plaintiffs' fears about being seen in a state of undress by a biological male.

157. The stalls are located in the middle of the locker room such that, if Student A chooses to use the stalls, he must walk past girls who are in a state of undress to go to and from the stalls.

158.    The stalls do not fully shield the Girl Plaintiffs from being seen in a state of undress because there are large gaps above and below the stall doors, and gaps along the sides of the door that another student could see through even inadvertently.

159.    Nor do the stalls guarantee that Girl Plaintiffs will not see Student A in a state of undress if he chooses not to use the stalls for undressing and changing.

160.    While Student A said he planned to use the stalls when the Agreement was signed, nothing in the Agreement prevents him from deciding later that he does not want to use the stalls.

161.    Also, there are no changing stalls in the gymnastics and swimming locker rooms, which the Agreement gives Student A permission to use.

162.    Fourth, even if Student A uses the privacy stalls, this is still not a satisfactory option and does not guarantee that he will not see the Girl Plaintiffs in a state of undress.

163.    Because the stalls are located in the middle of the locker room, Student A must walk through the locker room to reach them.

164.    There is no requirement that Student A enter a privacy stall before the girl students begin changing their clothes.

165.    There is also no requirement that Student A remain in a privacy stall until the girl students have finished changing their clothes.

166.    Under the terms of the Locker Room Agreement, Student A may enter the locker rooms at any time, including after the girl students begin changing clothes.

167.    And, since the Locker Room Agreement does not require Student A to use a privacy stall, if he chooses to use one he may exit it any time he likes, including while the girl students are in various stages of undress or fully unclothed.

168.    Thus, even if Student A uses a privacy stall, the Girl Plaintiffs are still at risk of being seen in stages of undress, or fully unclothed, by a biological male.

169.    Every Girl Plaintiff uses the PE locker room with the fear that a male will see her in state of undress or that she will see a male in a state of undress.

170.    The stress and anxiety the three Girl Plaintiffs feel over having to use the locker room with Student A is an ever-present distraction throughout the school day, including during class instruction time.

_The Damaging Effect on Girls: Girls in Gymnastics and Other Athletics_

171.    The girls' gymnastics locker room is a separate room, where girls, including at least one Girl Plaintiff, change into leotards for gymnastics.

172.    The girls' gymnastics locker room is small and open, with a few banks of lockers and an open shower area with two poles with showerheads attached.

173.    In the girls' gymnastics locker room, girls must change in the open room, fully in view of each other.

174.    There are no private changing stalls in the girls' gymnastics locker room.

27

175.    Girl Plaintiffs (and any other girls) who take part in gymnastics must remove all of their clothing to change into leotards.

176.    Student A has taken part in girls' gymnastics in the past.

177.    The team is "no cut" so any student who wants to participate can join the team.

178.    One Girl Plaintiff was on the girl's gymnastics team in 2015-16 and plans to be on the team again in 2016-17.

179.    Student A was on the girls' gymnastics team in 2013-14 and 2015-16.

180.    On information and belief, Student A intends to participate in gymnastics in 2016-17.

181.    In 2013-14, Student A was not allowed in the locker room because the Locker Room Agreement had not yet been adopted.

182.    The school gave Student A a separate, private place to change for gymnastics because he is biologically male.

183.    In 2015-16, Student A left the team before the Locker Room Agreement took effect in January.

184.    The Locker Room Agreement permits Student A to change with the other gymnasts in the girls' locker room.

185.    The Girl Plaintiff, with her friends on the gymnastics team, do not want to change into leotards in front of a biological male.

186.    They are anxious and afraid that they will have to expose their fully unclothed bodies in front of a biological boy.

28

187.    They are also anxious and afraid that Student A will fully expose his unclothed body to change into his leotard in front of them.

188.    Absent an injunction from this Court, a male student will be allowed to use the gymnastics locker room to change his clothing and these girls' fears will be realized.

189.    In addition to gymnastics, Girl Plaintiffs participate in a number of extracurricular athletics, including cheerleading, track and field, cross country, water polo, swimming, lacrosse, volleyball, badminton, and soccer.

190.    Each of these activities requires students to change their clothing in the girls' locker rooms that, because of Defendants' actions, are open to a male student's use.

191.    This makes all of the Girl Plaintiffs who participate in extracurricular athletics apprehensive and fearful.

*The Damaging Effect on Girls: Swimming Activities*

192.    Swimming is a required part of PE for freshman and sophomore students.

193.    There are also elective swim classes available to junior and senior students, like Student A.

194.    The Girl Plaintiffs who are freshman or sophomores and who are enrolled in mandatory swim class must use the swimming locker room.

195. The Girl Plaintiffs who are eighth graders will also be required to use the swimming locker rooms for their mandatory swim class during their Freshman year.

196. The girls' swim locker room contains an open area with lockers in the middle and mirrors, shelves, dryers, and benches along the outside.

197. There are no private changing stalls in the girls' swim locker room.

198. Girl Plaintiffs who take swimming class or participate in water-related athletics must change into and out of their swimsuits in this open area where they are visible to anyone in the locker room.

199. Many girls shower.

200. In order to rinse off the chlorine from the pool, girls regularly pull the top half of their bathing suits down to their waist when they shower.

201. This is done in open showers visible to other students in the locker room.

202. Students do not have enough time to use the bathroom stalls to change into and out of their swimsuits before and after PE.

203. Girl Plaintiffs in swimming activities must be fully unclothed at some point in the locker room.

204. The Locker Room Agreement allows Student A to access the girl's swim locker room at anytime, including when girls are present, regardless of whether he is taking a swimming class or involved in a swimming sport.

205.   Because of Defendants' actions, Girl Plaintiffs experience anxiety, stress, fear and apprehension when they have to use the swim locker room and throughout their day, knowing they will have to use the swim locker room again.

*The Damaging Effect on Girls: 8th Grade Girls*

206.   Some of the Girl Plaintiffs are eighth graders who will attend Fremd next year and who face the likelihood, like the other Girl Plaintiffs, that they may be assigned to Student A's physical education period and so may have to use the PE locker room while he is present.

207.   Specifically, Plaintiff A.V. is an eighth grade girl who will attend Fremd next year.

208.   A.V. is fearful, uncomfortable, and apprehensive about using restrooms, locker rooms, and showers with a biological male.

209.   A.V., along with several of her friends, told her mother, A.T.V., that they are "petrified" of changing or taking care of private matters, including feminine hygiene needs, in restrooms or locker rooms with a biological male.

210.   These eighth graders are already experiencing stress, fear and apprehension because of both the Locker Room Agreement and the Restroom Policy, because they know that next year their privacy will be invaded and their dignity will be violated as a direct result of Defendants' actions.

### The Restroom Policy

211.   Prior to the summer of 2013, all of the schools in District 211 separated their restrooms by biological sex.

31

212.    Only biological females were allowed to use the restrooms designated for girls, and only biological males were allowed to use the restrooms designated for boys.

213.    This policy protected the privacy and safety of all children.

214.    This policy was changed sometime in summer 2013.

215.    When Student A started high school and he and his parents requested access to the girls' locker rooms, they also requested access to the girls' restrooms.

216.    District 211 agreed to give him the same access to the girls' restrooms as is enjoyed by biological girls.

217.    District 211 then extended this new policy to all students and all schools in the District, so that every District 211 student may use the restroom that is consistent with his or her perceived gender identity, irrespective of his or her biological and anatomical sex ("Restroom Policy").

### The Damaging Effects of the Restroom Policy

218.    District 211 did not notify parents or students of the new Restroom Policy.

219.    Some Girl Plaintiffs found out about the new policy when they walked into their restroom and came face-to-face with Student A.

220.    They were startled, shocked, embarrassed, and afraid by the sight of a biological male in the girls' bathroom.

221.    Currently, there are biological males who perceive themselves to be female at a number of schools in District 211.

222.    There are also biological females who perceive themselves to be male at a number of schools in District 211.

223.    There is at least one student attending a District 211 school who self-identifies as "gender fluid."[2]

224.    Because of the Restroom Policy these students who identify as transgender or gender fluid are permitted to use restrooms with students of the opposite sex.

225.    That means all Student Plaintiffs must use the restroom with the knowledge that a student of the opposite biological sex could walk in on them at any time.

226.    This causes Student Plaintiffs to experience embarrassment, humiliation, anxiety, intimidation, fear, apprehension, stress, degradation, and loss of dignity.

227.    Using the toilets in the stalls does not resolve the embarrassment, humiliation, anxiety, intimidation, fear, apprehension, and stress produced by using the restroom with students of the opposite sex, because the stalls are not fully private; and, besides, the Student Plaintiffs are still attending to private bodily needs in the immediate presence of the opposite sex.

---

[2] "Gender fluidity" is generally defined to mean that one's gender identity can change day-to-day, or even moment-to-moment, and is not limited to the two binary genders (i.e., to "male" or "female"). So, for example, one may identify as female one moment, as male the next, and as neutrois (a neutral gender that is neither male nor female) the next. *See, e.g., Gender Diversity*, "Gender Fluidity," *available at* http://www.genderdiversity.org/resources/terminology/; *Nonbinary.org*, "Genderfluid," *available at* http://nonbinary.org/wiki/Genderfluid (both websites last visited May 3, 2016).

228.   In both the boys' and girls' restrooms, there are large gaps above and below the stall doors, and gaps along the sides of the door, that another student could see through even inadvertently.

229.   These gaps mean that the Student Plaintiffs, both boys and girls, must risk exposing themselves to the opposite sex every time they use the restroom.

230.   District 211 cannot guarantee that Student Plaintiffs' partially unclothed bodies will not be exposed to members of the opposite biological sex while using the restroom.

231.   Girl Plaintiffs frequently run into Student A when they use the schools' restrooms.

232.   One Girl Plaintiff saw Student A four times in one week in the restrooms.

233.   Other Girl Plaintiffs have experienced Student A staring at them in the restroom, which makes them uncomfortable.

234.   One Girl Plaintiff has experienced Student A walking into a restroom while she was washing her hands and staring at her in a way that made her feel very awkward and uncomfortable.

235.   As a consequence, some Girl Plaintiffs are using the restroom as little as possible while at school so they will not have to risk using the restroom with a male student present.  This may increase their risk for various health conditions, like bladder infections.

236. Some girls risk tardiness by running to the opposite end of the school, during short 5 minute passing periods, to try to find a restroom not likely to be used by a male student.

237. The stress and anxiety some Girl Plaintiffs feel over having to use the restroom with biological males is an ever-present distraction throughout the school day, including during class instruction time.

### *The Policies' Additional Harms*

238. Each Parent Plaintiff who has a daughter or daughters adamantly objects to their daughters using locker rooms and shower rooms with a biological male.

239. All of the Parent Plaintiffs also adamantly object to their sons and daughters using restrooms with students of the opposite sex.

240. These Parent Plaintiffs do not want their children exposed to a student of the opposite biological sex while that student is in a state of undress.

241. These Parent Plaintiffs do not want their children's bodies to be exposed to a student of the opposite biological sex while naked or otherwise in a state of undress, nor do they want their children to attend to their private bodily needs in the presence of the opposite biological sex.

242. Some Parents have asked the District for private options for their daughters to change their clothes and use the restroom.

243. The options offered are inadequate and inferior to the facilities provided to boys in the school.

35

244. The options offered are inadequate and inferior to the girls' facilities now open to Student A.

245. Additionally, the options offered are also unworkable in terms of the practical locker room needs of the Girl Plaintiffs.

246. In response to the request for a private locker room facility, the Fremd Principal told Parent Plaintiffs that their daughters could use the stalls in the PE locker room, the swimming or athletic locker rooms, or the nurses' office.

247. None of these are acceptable alternatives.

248. The stalls in the PE locker room are no alternative at all for the reasons described above. *See supra* at ¶¶ 138-170.

249. The swimming and athletic locker rooms also are not alternatives because Student A has access to them at all times, including when the Girl Plaintiffs use them to change clothes.

250. Additionally, to use the swim/athletic locker rooms or the nurse's office, Girl Plaintiffs would have to go into the PE locker room, get their clothes, walk over to the swim/athletic locker rooms or nurse's office some distance away, change, go back to the PE locker room to stow their clothing, and then go to class.

251. With 5 minute passing periods between classes, there is not enough time to use the swim/athletic locker rooms or nurse's office and get to class on time.

252. In response to the request for a private restroom facility, the Fremd Principal told Parent Plaintiffs that if their daughters walk into a restroom where a

male student is present, their daughter's option is to leave and use a different restroom in the school.

253. This suggested solution is not acceptable for several reasons.

254. First, Girl Plaintiffs have 5 minutes between classes to: gather their things from the class they are leaving; walk to their locker to put things away and get their things for their next class; take care of extra things that may need to do, such as using the restroom; and walk to the next class, unload their things, and be ready for class to start.

255. Depending on the classes a student has, this can mean that they must walk all the way across the school to go from one class to another.

256. Restrooms are a distance apart and there are no restrooms in some areas of the school, such as the music wing and applied technology wing.

257. Therefore, there is not enough time for a Girl Plaintiff who is uncomfortable sharing a restroom with a biological male to leave the restroom she already walked into, walk to another restroom a distance away, attend to her personal needs, and then get to class on time.

258. This is even more unworkable if there are lines in the girls' restrooms, as there almost always are, or if there is a need to use the restroom immediately.

259. Secondly, the District's suggested solution does nothing to alleviate the stress and anxiety of having a male student walk in while a Girl Plaintiff is already using the restroom.

260. Such a situation is exactly what Parent Plaintiffs object to.

261.   It is also what makes the restroom environment so hostile to the Girl Plaintiffs, since each time they use the restroom they must do so knowing that a biological male can walk in on them.

262.   The Locker Room Agreement and Restroom Policy interfere with the Parent Plaintiffs' preferred moral and/or religious teaching of their children concerning modesty and nudity.

263.   The Locker Room Agreement and Restroom Policy interfere with the Parent Plaintiffs' right to control whether their children will be exposed to the opposite sex in intimate, vulnerable settings like restrooms, locker rooms, and showers.

264.   The Locker Room Agreement and Restroom Policy interfere with the Parent Plaintiffs' right to control whether their children will be exposed to the partially or fully unclothed body of opposite sex persons.

265.   The Locker Room Agreement and Restroom Policy interfere with Parent Plaintiffs' right to control whether their children's partially or fully unclothed body is exposed to the opposite sex.

266.   Because of the Locker Room Agreement and Restroom Policy, at least one Parent Plaintiff has decided to send his daughter to private school, instead of a District 211 school, when she starts high school next fall.

267.   Some of the student and parent members of Students and Parents for Privacy are devout Christians whose faith requires that they preserve their modesty and not use the restroom, shower, or undress, in the presence of the opposite sex.

268.    These students and parents also believe that they should not be in the presence of a member of the opposite sex while that person is using the restroom, showering, or undressing.

269.    The Restroom Policy and Locker Room Agreement are particularly likely to cause emotional and psychological trauma to girls who have been sexually assaulted, for whom the presence of a biological male in their private facilities can be especially unnerving, or even terrifying.

270.    The Centers for Disease Control (the "CDC") has observed that almost 12% of high school girls reported that they had already experienced the horror of rape.  Center for Disease Control, *Sexual Violence: Facts at a Glance* (2012), *available at* http://www.cdc.gov/violenceprevention/pdf/sv-datasheet-a.pdf.

271.    This means that nearly 1 out of every 8 high school girls is likely to have suffered sexual assault.

272.    That statistic compounds the problem with the Restroom Policy and the Locker Room Agreement.

273.    Whereas these policies cause stress, fright, embarrassment, humiliation, and anxiety for the Student Plaintiffs, they are likely traumatizing to other students who have been sexually assaulted.

## ALLEGATIONS OF LAW

274.    All of the student members of Students and Parents for Privacy suffer the loss of their constitutionally-guaranteed right to bodily privacy, as well as their right under Title IX to an education that is free from a hostile environment based

39

on sex, because of the Defendants' actions, including the Locker Room Agreement and/or Restroom Policy.

275.   Additionally, all of the student members of Students and Parents for Privacy suffer embarrassment, humiliation, anxiety, intimidation, fear, apprehension, stress, degradation, and loss of dignity as a result of the Defendants' actions, including the Locker Room Agreement and/or Restroom Policy.

276.   Defendants' actions and the Locker Room Agreement and Restroom Policy negatively impact Student Plaintiffs' ability to receive an education.

277.   The Locker Room Agreement and Restroom Policy create a hostile environment where Student Plaintiffs experience sexual harassment and loss of dignity at the hands of their school every day.

278.   The Federal Defendants have grossly exceeded their statutory authority, acted arbitrarily and capriciously, and violated Plaintiffs' constitutional rights by adopting a legislative rule redefining "sex" under Title IX to include gender identity and enforcing that rule in a manner that requires District 211 to allow students to use the locker rooms and restrooms of the opposite sex.

279.   The Federal Defendants have acted without observing the proper administrative procedure for adopting and enforcing such a new legislative rule, which includes notice and comment under the APA and presidential approval under Title IX.

280.   It is a violation of the right to bodily privacy to force students to have their partially or fully unclothed bodies viewed by students of the opposite sex.

40

281. The right to bodily privacy also bars the government from forcing students into situations where they risk exposure of their unclothed body to the opposite sex.

282. Minors have a fundamental right to be free from compelled intimate exposure of their bodies to members of the opposite sex, which is violated when the Defendants force them to use the restrooms and locker rooms with students of the opposite sex.

283. The Defendants are violating the parental right to control the upbringing and education of one's child by exposing Parent Plaintiffs' children to the opposite sex in intimate, vulnerable settings like restrooms, locker rooms, and showers, especially where their children, the opposite-sex children, or both, may be in a state of undress or even naked.

284. Providing single-sex restrooms, locker rooms, and shower facilities does not violate Title IX, so long as the facilities provided for one sex are comparable to the facilities provided to the other sex.

285. Defendants' actions and the Locker Room and Restroom Policies violate Plaintiffs' free exercise rights under the United States Constitution and state statutory law.

286. Plaintiffs are suffering and continue to suffer irreparable harm.

287. Plaintiffs have no adequate remedy at law.

## FIRST CAUSE OF ACTION AGAINST FEDERAL DEFENDANTS:
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

288.   Plaintiffs reallege all matters set forth in paragraphs 1 through 287 and incorporate them herein.

289.   The Federal Defendants promulgated, and are enforcing, a new legislative rule that redefines the term "sex" in Title IX and its accompanying regulations to mean, or at least include, "gender identity."

290.   The DOE has enforced this new redefinition of "sex" as a legislative rule against District 211.

291.   The DOE's new legislative rule contradicts the text, structure, legislative history, and historical judicial interpretation of Title IX, all of which confirm that "sex" means male and female in the binary and biological sense.

292.   According to the DOE's new legislative rule, Title IX requires schools to permit students to use restrooms, locker rooms, and showers based on their gender identity, rather than their biological sex.

293.   The DOE has communicated this new legislative rule to school districts nationwide and stated that their failure to comply with it will result in investigation and enforcement action up to and including withdrawal of millions of dollars in federal funding.

294.   The DOE's promulgation and enforcement of this new legislative rule are reviewable actions under the Administrative Procedure Act ("APA").

295.   These DOE actions are reviewable pursuant to 20 U.S.C § 1683.

42

296. The DOE's actions are also final and there is no other adequate remedy because the Locker Room Agreement binds District 211 such that Plaintiffs cannot get relief unless the Agreement is set aside and the Federal Defendants are enjoined from continuing to communicate and enforce the new rule changing the meaning of "sex."

297. Plaintiffs have suffered a legal wrong as a direct result of the DOE's actions, because Plaintiffs' constitutional and statutory rights were and continue to be violated by the Locker Room Agreement, which is the direct result of the DOE's enforcement of its new rule.

298. Under the APA, a reviewing Court must "hold unlawful and set aside agency action" in four instances that apply to this case:

- One: if the agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C);

- Two: if the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A);

- Three: if the agency action is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); and

- Four: if the agency action is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

299. DOE's action here violates all four of these standards and so should be held unlawful and set aside.

300.   Plaintiffs ask this Court (1) to set aside all three guidance documents, (*see supra* at ¶ 63), to the extent that they incorporate gender identity within the meaning of "sex" for purposes of Title IX, as well as the Locker Room Agreement, and (2) to enjoin the DOE and DOJ from further enforcing Title IX in a manner that requires District 211 to give any students the right of entry to, and use of, the private facilities (locker rooms and restrooms) designated for students of the opposite sex.

### *The DOE's Action Is Unlawful Under the APA Because It Is In Excess of Statutory Jurisdiction, Authority, or Limitations*

301.   The DOE's actions in promulgating and enforcing its new rule are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," because they redefine the unambiguous term "sex" and add gender identity to Title IX without the authorization of Congress.

302.   Congress has not delegated to the DOE the authority to define, or redefine, unambiguous terms in Title IX.

303.   Title IX states that "[n]o person in the United States shall, on the basis of ***sex***, be excluded from participation in, be denied the benefits of, or be subjected to discrimination…"  20 U.S.C. § 1681(a) (emphasis added).

304.   The term "sex" as used in Title IX means male and female, under the traditional binary conception of sex consistent with one's birth or biological sex.

305.   This definition is not ambiguous.

306.   Title IX makes no reference to "gender identity" in the language of the statute.

44

307. The enacting regulations, which interpret Title IX, likewise make no reference to "gender identity."

308. Title IX's implementing regulations are not ambiguous in their instruction that a school district may separate restrooms, locker rooms, and shower facilities on the basis of biological sex.

309. Title IX permits schools receiving federal funds to "maintain[] separate living facilities for the different sexes." 20 U.S.C. § 1686.

310. The regulations implementing Title IX state that schools receiving federal funding "may provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

311. Title IX does not require that District 211 or any other school open its girls' restrooms, locker rooms and shower rooms to biological males who identify as female. Nor does it require that they open their boys' facilities to biological females who identify as male.

312. The DOE's unilateral decree that "sex" in Title IX means, or includes, "gender identity," which requires schools to allow males who identify as female to use the girls' facilities, and vice versa, requires District 211 to give Student A the right of entry and use of opposite sex locker and shower rooms, and requires District 211 to give all students right of entry and use of the restrooms that correspond to their gender identity, irrespective of their biological sex.

45

313.   This new rule is not supported by Title IX's text, implementing regulations, or legislative history.

314.   The new rule is contradicted by the fact that every court to consider the question for the past four decades, prior to the DOE's April 2015 Guidance Document equating sex discrimination with gender identity discrimination, had concluded that Title IX did not require cross-sex restrooms or locker rooms, even when students who identify as the opposite sex are involved.

315.   The new rule is contradicted by the fact that Congress has repeatedly rejected attempts to amend Title IX, or create new law, that would be consistent with the DOE's rule and application.

316.   The new rule is contradicted by the fact that Congress has considered proposed legislation that would add Title IX style protections for gender identity discrimination, but has declined to enact it.

317.   Therefore, the DOE's rule was promulgated and enforced "in excess of statutory jurisdiction, authority or limitations, or short of statutory right[,]" *See* 5 U.S.C. § 706(2)(C).  This Court should hold that it is unlawful and set it aside.

318.   Additionally, even if the DOE's rule was interpretive, it would still be in excess of statutory authority and due to be declared unlawful and set aside.

### *The DOE's Action Is Unlawful Under the APA Because It Is Arbitrary, Capricious, An Abuse of Discretion, or Not In Accordance With Law*

319.   The DOE's actions in promulgating and enforcing its new rule are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

46

320.    Congress requires that whenever an agency takes action it do so after engaging in a process by which it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Veh. Mfrs. Ass'n. v. State Farm Ins.*, 463 U.S. 29, 43 (1983) (quotation omitted).

321.    An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or product of agency expertise." *State Farm*, 463 U.S. at 43.

322.    The DOE gave no explanation whatsoever for its redefinition of "sex" in Title IX, whereby the DOE unilaterally decreed that the term, "sex," in Title IX means, or includes, gender identity; requires District 211 to give Student A right of entry and use of opposite sex locker and shower rooms; and requires District 211 to give all students access to the facilities that correspond to their gender identity, if the students desire to use them.

323.    Nor did the DOE give any explanation of the relevant factors that were the basis of its actions.

324.    The DOE failed to consider important aspects of the problems caused by mixing biological boys and girls in intimate settings, including the language and structure of Title IX and its regulations; the congressional, and judicial histories of

Title IX and its regulations; the practical and constitutional harms created by its unlawful application of Title IX; and, the violation of Title IX caused by this unlawful application.

325.   The DOE's action was also made without a rational explanation, inexplicably departed from established policies, or rested on other considerations that Congress could not have intended to make relevant.

326.   DOE offered no explanation for its rule redefining "sex;" the rule departed from the established Title IX policy that allowed schools to maintain private facilities separated by biological sex; and, it rested on considerations related to "gender identity," despite the fact that the legislative history indicates Congress did not intend "sex" to mean anything other than biological sex.

327.   The DOE's action was also made even though it is contrary to law or regulation.

328.   The DOE's rule purporting to redefine Title IX violates Title IX as it applies to the very group Title IX was created to protect, girls, by creating a hostile environment for the Girl Plaintiffs.

329.   The DOE's promulgation and enforcement of its rule is thus arbitrary, capricious, an abuse of discretion, and not in accordance with law.  This Court should therefore hold that it is unlawful and set it aside.

330.   Additionally, even if the DOE's rule was interpretive, it would still be arbitrary, capricious, an abuse of discretion, and not in accordance with law, and so is due to be declared unlawful and set aside.

### *The DOE's Action Is Unlawful Under the APA Because It Is Contrary to Constitutional Right, Power, Privilege, or Immunity*

331. The DOE's actions are "contrary to constitutional right, power, privilege, or immunity." *See* 5 U.S.C. § 706(2)(B).

332. The DOE's legislative rule is an unlawful application of Title IX contrary to the Constitution because it violates the privacy rights of Student Plaintiffs, their parents' fundamental liberty interest in controlling their children's upbringing and education, and the rights of some Student Plaintiffs and their parents to freely live out their religious beliefs. *See* Second, Third, Fifth, Sixth, and Seventh Causes of Action.

333. Also, the DOE's legislative rule is in violation of the Spending Clause of the United States Constitution, under which Title IX was enacted.

334. When Congress uses its Spending Clause power, it generates legislation much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.

335. Congress must clearly and unambiguously state the conditions to which the States are agreeing in exchange for federal funds, so that the States can knowingly decide whether to accept the funding.

336. The crucial inquiry is whether Congress spoke so clearly that it can be fairly said that the State could make an informed choice.

337. Requiring schools to allow biological males access to facilities designated for girls cannot pass this test, no matter how the males identify.

338. As already explained, the plain language of the text, along with the legislative history, clearly indicates that Congress intended that (1) "sex" means "biological sex;" (2) Title IX prevents discrimination based on biological sex; and (3) Title IX allows sex-separated restrooms and locker rooms.

339. Further, the implementing regulations specifically allow schools to maintain restrooms and locker rooms separated by biological sex.

340. Thus, for the over 40 years of Title IX's existence, it has been universally understood by schools that receive federal education funding that Title IX's definition of "sex" does not include gender identity.

341. It has likewise been universally understood by schools that received federal education funding that maintaining separate restrooms, locker rooms, and other private facilities on the basis of biological sex is consistent with Title IX.

342. No school could have possibly made an informed choice, because no school could have known that the funds it agreed to accept were conditioned on allowing cross-sex private facilities, or otherwise recognizing gender identity as within the meaning of the term "sex."

343. For these reasons, this Court should hold the DOE's actions unlawful, set aside its guidance documents and the Locker Room Agreement, and enjoin it, along with the DOJ, from further communicating the new rule that "sex" in Title IX includes "gender identity" to District 211.

344.    Additionally, even if the DOE's rule was interpretive, it would still be contrary to constitutional right, power, privilege, or immunity, and so is due to be declared unlawful and set aside.

### The DOE's Action Is Unlawful Under the APA Because It Is Without Observance of Procedure Required By Law

345.    The DOE's actions were done "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

346.    As explained above, the DOE has promulgated a new rule, unilaterally declaring that Title IX's term, "sex," means, or includes, "gender identity," and so Title IX prohibits discrimination based on gender identity.

347.    The DOE's new rule also requires schools, including District 211, to allow biological males entry and usage of restrooms and locker rooms designated for girls, and vice versa.

348.    Further, the Federal Defendants have given this rule the full force of law, investigating and enforcing it against District 211 to require the Locker Room Agreement.

349.    The rule imposes rights and obligations, and through administrative enforcement actions, binds school districts.

350.    The rule also applies generally to all school districts.

351.    Under the Administrative Procedure Act, any "rules which do not merely interpret existing law or announce tentative policy positions but which establish new policy positions that the agency treats as binding must comply with

the APA's notice-and-comment requirements, regardless of how they initially are labeled." 72 Fed. Reg. 3433.

352.   The Supreme Court has additionally ruled that all legislative rules, which are those having the force and effect of law and are accorded weight in agency adjudicatory processes, must go through the notice-and-comment requirements. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015).

353.   "Notice-and-comment rulemaking" requires that the DOE (1) issue a general notice to the public of the proposed rule-making, typically by publishing notice in the Federal Register; (2) give interested parties an opportunity to submit written data, views, or arguments on the proposed rule, and consider and respond to significant comments received; and (3) include in the promulgation of the final rule a concise general statement of the rule's basis and purpose.

354.   Notice-and-comment rulemaking also requires that the DOE consider all the relevant comments offered during the public comment period before finally deciding whether to adopt the proposed rule.

355.   Additionally, under Title IX, final rules, regulations, and orders of general applicability issued by the DOE must be approved by the president of the United States.

356.   The DOE promulgated and enforced its new rule redefining "sex" in Title IX to include gender identity without notice and comment as required by law. 5 U.S.C. § 553. It promulgated this new legislative rule without signature by the president as required by Title IX. 20 U.S.C. § 1682.

357.     Simply stated, the DOE did not follow the required procedure when it adopted its new rule defining "sex" in Title IX to mean, or include, gender identity. This Court should therefore hold that it is unlawful and set it aside.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## SECOND CAUSE OF ACTION AGAINST DISTRICT 211 AND THE FEDERAL DEFENDANTS: VIOLATION OF THE FUNDAMENTAL RIGHT TO PRIVACY

358.     Plaintiffs reallege all matters set forth in paragraphs 1 through 357 and incorporate them herein.

359.     "Fundamental rights" are grounded in the Fourteenth Amendment's Due Process Clause.

360.     They are rights that are deeply rooted in this Nation's history and tradition and are implicit in the concept of ordered liberty.

361.     Numerous courts, including the Seventh Circuit, have recognized a fundamental right to bodily privacy.

362.     This right includes a right to privacy in one's fully or partially unclothed body.

363.     It also includes the right to be free from State-compelled risk of intimate exposure of oneself to the opposite sex.

364.     The Student Plaintiffs, like everyone else, enjoy the fundamental right to bodily privacy.

365.    The right to be free from State-compelled risk of intimate exposure of oneself to the opposite sex, while part of the right to bodily privacy, is also separately and deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty.

366.    Throughout its history, American law and society has had a national commitment to protecting citizens, and especially children, from suffering the risk of exposing their bodies, or their intimate activities, to the opposite sex.

367.    From colonial times, the law allowed civil actions against "Peeping Toms."

368.    As American law developed after the Founding, it criminalized surreptitiously viewing others while they reasonably expect privacy.

369.    This protection is heightened for children.

370.    While pornography involving only adults is legal and cannot be constitutionally banned, federal law makes it a crime to possess, distribute, or even view images of naked children.

371.    Nearly every state has a law criminalizing "sexting," which is when someone (often a minor) sends a naked picture of herself via email, text messaging, or other electronic means.

372.    The state of Illinois has such a law. *See* 720 Ill. Comp. Stat. Ann. § 5/11-21 (crime for anyone to transmit nude photo to minor).

54

373.    In the late 1800s, as women began entering the workforce, the law developed to protect privacy by mandating that work place restrooms and changing rooms be separated by sex.

374.    Massachusetts adopted the first such law in 1887.

375.    By 1920, 43 of the (then) 48 states had similar laws protecting privacy by mandating sex-separated facilities in the workplace.

376.    Because of our national commitment to protect our citizens, and especially children, from the risk of being exposed to the anatomy of the opposite sex, as well as the risk of being seen by the opposite sex while attending to private, intimate needs, sex-separated restrooms and locker rooms are ubiquitous in public places.

377.    Using public restrooms and locker rooms separated by sex are an American social and modesty norm.

378.    Historically, purposefully entering a restroom or locker room designated for the opposite biological sex has been considered wrongful, and even criminal, behavior.

379.    Sex-separated restrooms and locker rooms are also ubiquitous in public schools.

380.    Historically, there has been no mixing of the biological sexes in school restrooms or locker rooms.

55

381.   A girls' locker room or restroom has always been a place that by definition is to be used exclusively by girls and where biological males are not allowed.

382.   Freedom from the risk of compelled intimate exposure to the opposite sex, especially for minors, is deeply rooted in this Nation's history and tradition.

383.   It is also implicit in the concept of ordered liberty.

384.   The ability to be clothed in the presence of the opposite biological sex, along with the freedom to use the restroom and locker room away from the presence of the opposite biological sex, is fundamental to most people's sense of self respect and personal dignity.

385.   If the government were granted the far-reaching and extreme power to compel its citizens to disrobe or risk being unclothed in the presence of the opposite sex, then little personal liberty involving our bodies would be left.

386.   Because freedom from the risk of compelled exposure to the opposite biological sex, especially for minors, is deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, it is a fundamental right.

387.   Specifically: minors have a fundamental right to be free from State-compelled risk of exposure of their bodies, or their intimate activities, such as occur within restrooms and locker rooms, to the opposite biological sex.

388.   The government may not infringe fundamental rights, unless the infringement satisfies strict scrutiny review, which requires that the government

demonstrate that the law or regulation furthers a compelling interest in the least restrictive means available.

389.    The Locker Room Agreement allows Student A, a biological male, the right of entry to, and use of, the girls' locker rooms any time he wants.

390.    The Restroom Policy allows biologically male students who identify as female access and use of the girls' restrooms.

391.    The Restroom Policy also allows biological female students who identify as male access and use of the boys' restrooms.

392.    The Locker Room Agreement and the Restroom Policy both require the Student Plaintiffs to risk being intimately exposed to those of the opposite biological sex.

393.    The Locker Room Agreement and the Restroom Policy both infringe the Student Plaintiffs' fundamental right to privacy in their unclothed bodies, as well as their fundamental right to be free from government-compelled risk of intimate exposure to the opposite sex, without any compelling justification.

394.    Defendants have no compelling interest to justify forcing school children to share restrooms and locker rooms with opposite sex classmates.

395.    Also, Defendants have not used the least restrictive means of serving any interest they may have.

396.    Accordingly, the Locker Room Agreement and Restroom Policy both fail the required strict scrutiny review and are unconstitutional as applied to any minor, including the Student Plaintiffs.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

### THIRD CAUSE OF ACTION AGAINST DISTRICT 211 AND THE FEDERAL DEFENDANTS: VIOLATION OF PARENTS' FUNDAMENTAL RIGHT TO DIRECT THE EDUCATION AND UPBRINGING OF THEIR CHILDREN

397.    Plaintiffs reallege all matters set forth in paragraphs 1 through 396 and incorporate them herein.

398.    The right of parents to make decisions concerning the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment's Due Process Clause.

399.    Included within that parental fundamental right is the power to direct the education and upbringing of one's children.

400.    It gives parents the right, as well as the duty, to instill moral standards and values in their children.

401.    Parents' right and duty to instill moral standards and values in their children, and to direct their education and upbringing, encompasses the right to determine whether, and when, their minor children endure the risk of being exposed to members of the opposite sex in intimate, vulnerable settings like restrooms, locker rooms, and showers.

402.    Parents also have a fundamental right to determine whether their children will have to risk being exposed to opposite sex nudity at school and a fundamental right to determine whether their children, while at school, will have to

risk exposing their own undressed or partially unclothed bodies to members of the opposite sex.

403.   It is not for the Defendants to say whether, and when, minor children will risk being exposed to the opposite sex in such settings: it is each parents' right to decide for his or her own child.

404.   Nor is it for the Defendants to say that minor children must risk being exposed to opposite-sex nudity, when those children's parents object.

405.   Nor is it for the Defendants to say that minor children must risk exposing their own bodies to members of the opposite sex, when those children's parents object.

406.   All of the Parent Plaintiffs object to the Locker Room Agreement and the Restroom Policy.

407.   All of the Parent Plaintiffs agree that they do not want their minor children to endure the risk of being exposed to the opposite sex in intimate, vulnerable settings like restrooms, locker rooms, and showers, nor do they want their minor children to attend to their personal, private bodily needs in the presence of members of the opposite sex.

408.   All of the Parent Plaintiffs desire to raise their children with a respect for traditional modesty, which requires that one not undress or use the restroom in the presence of the opposite sex.

409. All of the Parent Plaintiffs desire to prevent their children from enduring the risk of being observed while undressing by members of the opposite sex.

410. All of the Parent Plaintiffs also desire to prevent their children from enduring the risk of being exposed to the unclothed body of members of the opposite sex.

411. Some of the Parent Plaintiffs object to the Locker Room Agreement and Restroom policy for religious reasons because of their sincerely held religious beliefs about modesty and other religious doctrines.

412. The Locker Room Agreement and Restroom Policy, instituted and enforced by the Defendants, make it impossible for the Parent Plaintiffs to direct the upbringing and education of their children.

413. Accordingly, the Locker Room Agreement and Restroom Policy infringe the Parent Plaintiffs' fundamental right to direct the education and upbringing of their children.

414. Defendants may not infringe fundamental rights, including parents' fundamental right to direct the education and upbringing of their children, unless the infringement satisfies strict scrutiny review, which requires that Defendants demonstrate that the law or regulation furthers a compelling interest in the least restrictive manner available.

415. Defendants have no compelling interest to justify forcing school children to share restrooms and locker rooms with opposite sex classmates.

416. Also, Defendants have not used the least restrictive means of serving any interest they may have.

417. Accordingly, the Locker Room Agreement and Restroom Policy both fail the required strict scrutiny review and are unconstitutional infringements on parents' fundamental right to direct the education and upbringing of their children.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## FOURTH CAUSE OF ACTION AGAINST DISTRICT 211: VIOLATION OF TITLE IX

418. Plaintiffs reallege all matters set forth in paragraphs 1 through 417 and incorporate them herein.

419. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

420. Courts have given Title IX broad effect in order to combat sex discrimination in the educational setting.

421. Title IX is a broadly written general prohibition on discrimination based on sex, and so it does not explicitly list every discriminatory act that it prohibits.

422. There is an implied right of action under Title IX.

423. There is no requirement that a claimant exhaust administrative remedies before bringing a Title IX cause of action.

424.    Allowing people to use restrooms or locker rooms that are designated for the opposite biological sex violates privacy and creates a sexually harassing hostile environment.

425.    Exposure to opposite-sex nudity creates a sexually harassing hostile environment.

426.    The Locker Room Agreement and Restroom Policy allow some students to use locker rooms and restrooms that are designated for the opposite biological sex.

427.    The Locker Room Agreement and Restroom Policy needlessly subject the Student Plaintiffs to the risk that their partially or fully unclothed bodies will be exposed to the opposite sex and that they will be exposed to opposite-sex nudity.

428.    As a result, the Student Plaintiffs experience embarrassment, humiliation, anxiety, intimidation, fear, apprehension, stress, degradation, and loss of dignity.

429.    Some of the Student Plaintiffs are avoiding the restroom as a result of the embarrassment, humiliation, anxiety, intimidation, fear, apprehension, stress, degradation, and loss of dignity they experience because of the Restroom Policy.

430.    Some of the Student Plaintiffs are not able to concentrate as well in school as they did before because of these policies.

431.    All of the Student Plaintiffs find that school has become intimidating and stressful as a result of the Locker Room Agreement and/or the Restroom Policy,

and the Girl Plaintiffs find that the locker rooms have become intimidating and stressful as a result of the Locker Room Agreement.

432. The Locker Room Agreement and Restroom Policy violate Title IX because they produce unwelcome sexual harassment and create a hostile environment on the basis of sex.

433. There are five elements necessary to make out a Title IX claim: (1) plaintiff belongs to a protected group; (2) plaintiff was subjected to harassment; (3) the harassment was based on sex; (4) the harassment was so pervasive or severe that it altered the conditions of plaintiff's education; and (5) knowledge by school officials.

434. The Student Plaintiffs satisfy all five elements.

435. First, the Student Plaintiffs belong to a protected group because they are female and male students at an educational institution that receives federal funds.

436. Second, the Student Plaintiffs are subjected to harassment because the Locker Room Agreement and Restroom Policy allow biological males to use girls' locker rooms and restrooms, and also allow biological females to use the boys' restrooms, which creates a sexually harassing hostile environment.

437. Third, this harassment is based on sex.

438. There are real and significant differences between the biological sexes.

439. These differences include, among other things, differences in anatomy and physiology.

440.    These differences do not disappear when biological males identify as female, and vice versa.

441.    The biological and anatomical differences between the sexes is the reason that Title IX and its implementing regulations allow for separate living facilities, restrooms, locker rooms, and changing areas for each biological sex.

442.    The allowance for separate facilities is based on Title IX and its implementing regulations' recognition that each biological sex has unique needs and vulnerabilities when using these facilities.

443.    Title IX and its implementing regulations allow for separate living facilities, restrooms, locker rooms, and changing areas for each biological sex based on the recognition that permitting a biological male to enter and use such facilities designated for females would be sexually harassing to the females.

444.    The Locker Room Agreement and Restroom Policy, which open the girls' restrooms and locker rooms to biological males, is harassment based on the girls' sex.

445.    Title IX and its implementing regulations allow for separate living facilities, restrooms, locker rooms, and changing areas for each biological sex based on the recognition that permitting a biological female to enter and use such facilities designated for males would be sexually harassing to the males.

446.    The Restroom Policy, which opens the boys' restrooms to biological females, is harassment based on the boys' sex.

64

447. Moreover, both male and female Student Plaintiffs experience humiliation, anxiety, intimidation, fear, apprehension, stress, degradation, and loss of dignity as a result of the Locker Room Agreement and/or Restroom Policy permitting the opposite sex to be in locker rooms and restrooms designated for their biological sex.

448. It is the significant and real differences between the biological sexes that creates the hostile environment, which is harassment.

449. Fourth, the harassment is sufficiently severe or pervasive.

450. To satisfy this fourth element, the harassment need only be severe _or_ pervasive.

451. The harassment created by the Locker Room Agreement and Restroom Policy is both.

452. The harassment is ongoing and continuous, occurring every time the female Student Plaintiffs use the locker room, and every time any of the Student Plaintiffs use the restroom.

453. This satisfies the pervasiveness prong.

454. Letting biological males use the girls' restrooms and locker rooms, and allowing biological females to use the boys' restrooms, places the bodily privacy of both sexes at risk, and so is sufficiently egregious to satisfy the severity prong.

455. The environment is one that a reasonable person would find hostile or abusive, and one that the Student Plaintiffs in fact perceive to be so.

456. The sexually harassing hostile environment is threatening and humiliating, and altered the conditions of the Student Plaintiffs' educational opportunities, benefits, programs, and/or activities.

457. Fifth, school officials are aware of the hostile environment.

458. In fact, District 211's official policies—the Locker Room Agreement and Restroom Policy—are the direct cause of this hostile environment.

459. Some of the Student Plaintiffs, and some of the Parent Plaintiffs, have alerted District 211 officials about the hostile environment.

460. Those officials have authority to stop the hostile environment.

461. These officials include Fremd High School's principal, as well as the District superintendent.

462. Despite their knowledge that their policies are creating a hostile environment based on sex, the Defendants have not remedied the situation.

463. Instead, these officials have advised that, if the students perceive the environment to be hostile, the students should remove themselves from it by accepting an "accommodation" or using a different restroom.

464. Schools cannot escape liability for Title IX violations by requiring the victim of harassment to remove herself from the hostile environment or otherwise suggesting that she is responsible for the harassment she endures.

465. Additionally, the accommodations themselves violate Title IX.

466. Some of the Girl Plaintiffs have been told that instead of using the locker room to change for PE class, they may change their clothing in a nurse's office located on the other side of the school.

467. This facility for changing is inferior to the locker room facilities provided for boy students.

468. This violates 34 C.F.R. § 106.33, which provides that schools receiving federal funding "may provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex."

469. Additionally, some of the Student Plaintiffs have been told that, if they are uncomfortable using a restroom because a member of the opposite sex is present, they may find another restroom.

470. Because there are only five minutes between classes, any student leaving one restroom to hunt for another is almost certain to be tardy.

471. The students will also miss instructional time.

472. The Locker Room Agreement and Restroom Policy violate Title IX by creating a hostile environment on the basis of sex.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

### FIFTH CAUSE OF ACTION AGAINST DISTRICT 211:
### VIOLATION OF THE
### ILLINOIS RELIGIOUS FREEDOM RESTORATION ACT

473.    Plaintiffs reallege all matters set forth in paragraphs 1 through 472 and incorporate them herein.

474.    The Illinois Religious Freedom Restoration Act ("RFRA") provides in pertinent part:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 ILCS 35/15.

475.    Many of the Student Plaintiffs have a religious requirement that they practice modesty. These students have the sincere religious belief that they must not undress, or use the restroom, in the presence of the opposite biological sex, and also that they must not be in the presence of the opposite biological sex while the opposite biological sex is undressing or using the restroom.

476.    Many of the Parent Plaintiffs have the sincere religious belief that they must teach their children to practice modesty. Their religious faith also requires them to protect the modesty of their children. These parents have the sincere religious belief that their children must not undress, or use the restroom, in the presence of a member of the opposite biological sex, and also that they must not be in the presence of the opposite biological sex while the opposite biological sex is undressing or using the restroom.

477. The Restroom Policy requires the Student Plaintiffs to use the restroom while knowing that a member of the opposite biological sex could enter the restroom while they are using it.

478. The Locker Room Agreement requires the Girl Plaintiffs to use the locker rooms and shower rooms, knowing that a biological male either is present with them, or could enter while they are using these private facilities.

479. The Restroom Policy and Locker Room Agreement prevent the Student Plaintiffs from practicing the modesty that their faith requires of them.

480. The Restroom Policy and Locker Room Agreement prevent the Parent Plaintiffs from teaching their children traditional modesty, and insisting that their children practice modesty, as their faith requires of the Parent Plaintiffs.

481. Complying with the requirements of the Restroom Policy and Locker Room Agreement thus places a substantial burden on the Plaintiffs' exercise of religion.

482. It is a substantial burden to require Plaintiffs' to choose between the benefit of a free public education and violating their religious beliefs.

483. The state has no "compelling interest" that would justify burdening the Plaintiffs' exercise of religion in this manner.

484. Additionally, the state has not used the "least restrictive means" to achieve its purported interest in burdening the Plaintiffs' exercise of religion in this manner.

485.    The Locker Room Agreement and Restroom Policy accordingly violate the Plaintiffs' rights under the Illinois Religious Freedom Restoration Act.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## SIXTH CAUSE OF ACTION AGAINST THE FEDERAL DEFENDANTS: VIOLATION OF THE RELIGIOUS FREEDOM RESTORATION ACT 42 U.S.C. § 2000bb

486.    Plaintiffs reallege all matters set forth in paragraphs 1 through 485 and incorporate them herein.

487.    Many of the Student Plaintiffs have a religious requirement that they practice modesty.  These students have the sincere religious belief that they must not undress, or use the restroom, in the presence of the opposite biological sex, and also that they must not be in the presence of the opposite biological sex while the opposite biological sex is undressing or using the restroom.

488.    Many of the Parent Plaintiffs have the sincere religious belief that they must teach their children to practice modesty.  Their religious faith also requires them to protect the modesty of their children.  These parents have the sincere religious belief that their children must not undress, or use the restroom, in the presence of a member of the opposite biological sex, and also that they must not be in the presence of the opposite biological sex while the opposite biological sex is undressing or using the restroom.

489.    The Locker Room Agreement—which was mandated by the federal Defendants—requires the Girl Plaintiffs to use the locker rooms and shower rooms,

knowing that a biological male either is present with them, or could enter while they are using these private facilities.

490.  The Locker Room Agreement prevents the Student Plaintiffs from practicing the modesty that their faith requires of them.

491.  The Locker Room Agreement prevents the Parent Plaintiffs from teaching their children traditional modesty, and insisting that their children practice modesty, as their faith requires of the Parent Plaintiffs.

492.  Complying with the requirements of the Locker Room Agreement thus places a substantial burden on the Plaintiffs' exercise of religion.

493.  It is a substantial burden to require Plaintiffs' to choose between the benefit of a free public education and violating their religious beliefs.

494.  The federal Defendants have no "compelling interest" that would justify burdening the Plaintiffs' exercise of religion in this manner.

495.  Additionally, the federal Defendants have not used the "least restrictive means" to achieve their purported interest in burdening the Plaintiffs' exercise of religion in this manner.

496.  The Locker Room Agreement accordingly violates the Plaintiffs' rights protected by the Religious Freedom Restoration Act.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

<u>SEVENTH CAUSE OF ACTION AGAINST DISTRICT 211</u>
<u>AND THE FEDERAL DEFENDANTS:</u>
**VIOLATION OF THE FIRST AMENDMENT'S GUARANTEE OF**
**FREE EXERCISE OF RELIGION**

497. Plaintiffs reallege all matters set forth in paragraphs 1 through 496 and incorporate them herein.

498. The First Amendment provides that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

499. The Restroom Policy and Locker Room Agreement burden the free exercise rights of some of the Plaintiffs. *See supra*, Fifth and Sixth Causes of Action.

500. Laws that burden free exercise, but are not neutral or generally applicable, are subject to strict scrutiny.

501. The Restroom Policy is not generally applicable because it does not allow all students to use the opposite-sex restrooms, but only students who perceive themselves as a different gender than their biological sex.

502. Similarly, the Locker Room Agreement is not generally applicable.

503. The Locker Room Agreement applies only to one student, Student A.

504. The Locker Room Agreement does not apply to all students, allowing them to access whatever locker and shower rooms they want.

505. The Locker Room Agreement does not even apply to all students who perceive their gender identity to be different than their biological sex.

506.     Because the Restroom Policy and Locker Room Agreement are not generally applicable, they are subject to strict scrutiny, which they fail.  *See supra*, Fifth and Sixth Causes of Action.

507.     Additionally, the Restroom Policy and Locker Room Agreement are subject to strict scrutiny because, in addition to burdening free exercise rights, the policies also burden other constitutional rights.

508.     Both the Locker Room Agreement and the Restroom Policy violate the Student Plaintiffs' fundamental right to be free from compelled risk of exposure of their bodies to the opposite biological sex. *See supra*, Second Cause of Action.

509.     Additionally, both the Locker Room Agreement and the Restroom Policy violate the Student Plaintiffs' fundamental right to privacy in their unclothed bodies.  *See id*.

510.     Additionally, both the Locker Room Agreement and the Restroom Policy violate the Parent Plaintiffs' fundamental right to direct the education and upbringing of their children.  *See supra*, Third Cause of Action.

511.     Accordingly, both the Restroom Policy and Locker Room Agreement are subject to strict scrutiny, which they fail.  *See supra*, Fifth and Sixth Causes of Action.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment as follows and request the following relief:

A.    That this Court enter a preliminary and permanent injunction restraining all Defendants, their officers, agents, employees, and all other persons acting in concert with them, from enforcing the Locker Room Agreement, and District 211, their officers, agents, employees, and all other persons acting in concert with them, from enforcing the Restroom Policy, and ordering them to permit only biological females to enter and use District 211's girls' locker rooms and restrooms and only biological boys to enter and use District 211's boys' restrooms;

B.    That this Court hold unlawful and set aside the federal Defendants' new rule that redefines the word "sex" in Title IX to mean, or include, gender identity, which it announced in at least the following documents—U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence,* 5 (Apr. 2014); U.S. Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities,* 25 (Dec. 2014); U.S. Department of Education, Office for Civil Rights, *Title IX Resource Guide,* 1, 15, 16, 19, 21-22 (Apr. 2015);

C.    That this Court enter a preliminary and permanent injunction restraining the federal Defendants, their officers, agents, employees, and all other persons acting in concert with them, from taking any action based on DOE's new

rule that redefines the word "sex" in Title IX, including implementing the revocation of funding as indicated in the Letter of Findings sent to District 211 and from communicating to District 211 through these documents or in any other manner that the term "sex" means, or includes, gender identity or that Title IX bars gender identity discrimination or mandates that regulated entities allow students to use restrooms, locker rooms, and showers based on their gender identity;

D.      That this Court enter a declaratory judgment declaring that the Locker Room Agreement and Restroom Policy impermissibly burden the Student Plaintiffs' constitutional right to privacy; impermissibly burden the Student Plaintiffs' constitutional right to be free from State-compelled risk of intimate exposure of themselves and their intimate activities to members of the opposite sex; impermissibly burden the Parent Plaintiffs' constitutional right to direct the upbringing and education of their children; violate Title IX; violate the rights of some of the Student Plaintiffs and Parent Plaintiffs under the Illinois Religious Freedom Restoration Act; violate the rights of some of the Student Plaintiffs and Parent Plaintiffs under the federal Religious Freedom Restoration Act; and violate the constitutional guarantee to free exercise of religion for some of the Student Plaintiffs and Parent Plaintiffs under the Free Exercise Clause.

E.      That this Court award nominal damages in the amount of one (1) dollar, and compensatory damages, for the violation of Plaintiffs' constitutional and statutory rights, except those claimed under the Administrative Procedure Act;

F.    That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders;

G.    That this Court award Plaintiffs costs and expenses of this action, including a reasonable attorneys' fees award, in accordance with 775 ILCS 35/20, 28 U.S.C. § 2412, and 42 U.S.C § 1988;

H.    That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiffs; and

I.    That this Court grant such other and further relief as the Court deems equitable and just in the circumstances.

Respectfully submitted this 4th day of May, 2016.

By: /s/ Jocelyn Floyd
THOMAS L. BREJCHA, IL 0288446
PETER BREEN, IL 6271981
JOCELYN FLOYD, IL 6303312
THOMAS MORE SOCIETY
19 S. La Salle Street, Suite 603
Chicago, IL 60603
(312) 782-1680
(312) 782 -1887 Fax
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
jfloyd@thomasmoresociety.org

JEREMY D. TEDESCO, AZ 023497*
JOSEPH E. LaRUE, AZ 031348*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jtedesco@adflegal.org
jlarue@adflegal.org

76

J. Matthew Sharp, GA 607842*
**Alliance Defending Freedom**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@adflegal.org

*Attorneys for Plaintiffs*

***Pro Hac Vice Applications Forthcoming***

THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED

## DECLARATION UNDER PENALTY OF PERJURY

I, V.W., a citizen of the United States and a resident of the State of Illinois, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _29th_ day of April, 2016, at Palatine, Illinois.

_____

V. W., PRESIDENT
STUDENTS AND PARENTS FOR PRIVACY

## DECLARATION UNDER PENALTY OF PERJURY

I, N.A., a citizen of the United States and a resident of the State of Illinois, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _30_ day of April, 2016, at _PALATINE_ , Illinois.

_____

N.A., individually and on behalf of C.A.

## DECLARATION UNDER PENALTY OF PERJURY

We, S.M. and R.M., citizens of the United States and residents of the State of Illinois, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of our knowledge.

Executed this 29th day of April, 2016, at Rolling Meadows, Illinois.

_____
S.M., individually and on behalf of A.M.

_____
R.M., individually and on behalf of A.M.

## DECLARATION UNDER PENALTY OF PERJURY

I, R.G., a citizen of the United States and a resident of the State of Illinois, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this _29_ day of April, 2016, at _PALATINE_, Illinois.

R.G., individually and on behalf of N.G.

**DECLARATION UNDER PENALTY OF PERJURY**

We, T.V. and A.V., citizens of the United States and residents of the State of Illinois, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of our knowledge.

Executed this _27_ day of April, 2016, at _Bolling Melws,_ Illinois.

T.V., individually and on behalf of A.V.

A.V., individually and on behalf of A.V.

82

## DECLARATION UNDER PENALTY OF PERJURY

We, D.W. and V.W., citizens of the United States and residents of the State of Illinois,

hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true

and correct to the best of our knowledge.

Executed this 29ᵗʰ day of April, 2016, at Palatine, Illinois.

_____

V. W., individually and on behalf of B.W.

_____

D. W., individually and on behalf of B.W.