# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **STUDENTS AND PARENTS FOR PRIVACY**, a voluntary unincorporated association; **C.A.**, a minor, by and through her parent and guardian, **N.A.**; **A.M.**, a minor, by and through her parents and guardians, **S.M.** and **R.M.**; **N.G.**, a minor, by and through her parent and guardian, **R.G.**; **A.V.**, a minor, by and through her parents and guardians, **T.V.** and **A.T.V.**; and **B.W.**, a minor, by and through his parents and guardians, **D.W.** and **V.W.**, | **Case No. 1:16-cv-04945** **The Honorable Jorge L. Alonso** |
| Plaintiffs, | |
| vs. | **Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction** |
| **UNITED STATES DEPARTMENT OF EDUCATION**; **JOHN B. KING, JR.,** in his official capacity as United States Secretary of Education; **UNITED STATES DEPARTMENT OF JUSTICE**; **LORETTA E. LYNCH**, in her official capacity as United States Attorney General, and **SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS**. | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

# Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

RULE 7.1 DISCLOSURE STATEMENT ............................................................... x

INTRODUCTION .................................................................................................. 1

FACTS ................................................................................................................... 1

ARGUMENT ......................................................................................................... 3

I.     The Plaintiffs Will Likely Succeed on the Merits ........................................ 3

     A.     DOE's Action Violates the Requirements of the Administrative Procedure Act ................................................................................ 3

          1.     DOE's Legislative Rule Is In Excess of Statutory Authority. .......................... 5

               a.     Congress Has Not Delegated DOE Authority to Define "Sex." .......... 5

                    i.     Sex" in Title IX and Its Regulations Mean Biological Sex ................................... 5

                    ii.     DOE Lacks Statutory Authority to Issue Its Rule Redefining "Sex." ................... 9

               b.     DOE's Redefinition of "Sex" Contravenes Congressional Intent ....... 9

          2.     DOE's Rule Is Arbitrary, Capricious, an Abuse of Discretion, and Not in Accordance with Law. ................................ 9

          3.     DOE's Legislative Rule Is Contrary to Constitutional Right ......................... 10

          4.     DOE's Legislative Rule Is Without Observance of Procedural Requirements ................................ 11

          5.     DOE's Rule Is Also Unlawful Under the Test for Interpretive Rules ........... 12

     B.     The Policies Violate The Fundamental Right to Privacy In One's Unclothed Body and Also Minors' Fundamental Right to Be Free From State Compelled Risk of Intimate Exposure to the Opposite Sex. ........................... 13

          1.     Our History and Tradition: We Protect Minors from Risk of Intimate Exposure ................................ 14

          2.     The Policies Infringe Student Plaintiffs' Fundamental Privacy Rights. ......... 15

               a.     Compelled Cross-Sex Restroom and Locker Room Use Violates Privacy ................................ 15

i

b.     Transgender Identification Does Not Alter the Analysis ................. 16

3.     The Policies Fail Strict Scrutiny Review. ......................................... 18

C.     The Policies Violate Title IX. ................................................................. 18

1.     Objecting Girls at Fremd Lack Comparable Facilities to Boys. ..................... 18

2.     The Policies Create a Hostile Environment. ...................................... 19

a.     Student Plaintiffs Belong to a Protected Group. ................................. 19

b.     Student Plaintiffs Are Subjected to Unwelcome Sexual Harassment. .................................................................................... 19

c.     The Harassment Is Based on Sex. ...................................................... 20

d.     The Harassment Is Sufficiently Severe Or Pervasive. ........................ 21

i.     The Conduct Was Frequent and Severe. ................................ 22

ii.     The Conduct Was Threatening Or Humiliating ................... 22

iii.     The Conduct Altered the Conditions of Education .............. 22

iv.     Reasonable Students Would Find a Hostile Environment ............................................................................ 23

e.     School Officials Have Requisite Knowledge of the Hostile Environment. ................................................................................... 23

II.     Plaintiffs Will Suffer Irreparable Harm Without an Injunction of the Policies. ..................... 24

III.     The Balance of Hardships Sharply Favors the Plaintiffs. ......................................... 24

IV.     The Public Interest Favors a Preliminary Injunction. .............................................. 25

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

*Cases:*

*Arizona Dream Act Coalition v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ...................................................24

*Beard v. Whitmore Lake School District,*
    402 F.3d 598 (6th Cir. 2005). ...................................................14

*Black Citizens for a Fair Media v. F.C.C.,*
    719 F.2d 407 (D.C. Cir. 1983)...................................................5, 9

*Bullock v. Dart,*
    599 F. Supp. 2d 947 (N.D. Ill. 2009).........................................20

*Califano v. Sanders,*
    430 U.S. 99 (1977)....................................................................12

*Canedy v. Boardman,*
    16 F.3d 183 (7th Cir. 1994) .................................................13, 15

*Chaney v. Plainfield Healthcare Center,*
    612 F.3d 908 (7th Cir. 2010) ...................................................14

*Charles v. Verhagen,*
    348 F.3d 601 (7th Cir. 2003). ..................................................10

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971)..................................................................12

*City of Los Angeles, Department of Water & Power v. Manhart,*
    435 U.S. 702 (1978)..................................................................20

*City of Philadelphia v. Pennsylvania Human Relations Commission,*
    300 A.2d 97 (Pa. Commw. Ct. 1973).....................................15, 22

*Commonwealth v. Daniel,*
    243 A.2d 400 (Penn. 1968).......................................................20

*Cornfield v. Consolidated High School District No. 230,*
    991 F.2d 1316 (7th Cir. 1993) .............................................13, 15

*Dauven v. George Fox University,*
    No. CV.09-305-PK, 2010 WL 6089077 (D. Or. Dec. 3, 2010) ................22

*Davis Next Friend LaShonda D. v. Monroe County Board of Education,*
    526 U.S. 629 (1999)..................................................................10

*Deerfield Medical Center v. City of Deerfield Beach,*
    661 F.2d 328 (5th Cir. 1981) .................................................................................24

*Doe ex rel. Doe v. Dallas Independent School District,*
    No. CIV.A.3:01-CV-1092-R, 2002 WL 1592694 (N.D. Tex. July 16, 2002) ........................13

*Doe v. Clark County School District*, No. 206,
    CV-1074-JCM-RJJ, 2008 WL 4372872 (D. Nev. Sept. 17, 2008) ....................................4, 17

*Equity in Athletics v. DOE,*
    639 F.3d 91 (4th Cir. 2011) ................................................................................11

*Etsitty v. Utah Transit Authority,*
    502 F.3d 1215 (10th Cir. 2007) ...........................................................................17

*Faulkner v. Jones,*
    10 F.3d 226 (4th Cir. 1993). ..............................................................................14

*G & V Lounge, Inc. v. Michigan Liquor Control Commission,*
    23 F.3d 1071 (6th Cir. 1994) ..............................................................................25

*G.G. ex rel. Grimm v. Gloucester County School Board,*
    No. 15-2056, 2016 WL 1567467 (4th Cir. Apr. 19, 2016) ..........................................8, 17

*Gebser v. Lago Vista Independent School District,*
    524 U.S. 274 (1998) ........................................................................................23

*Hendrichsen v. Ball State University,*
    107 F. App'x 680 (7th Cir. 2004) ......................................................................21, 22

*Hendricks v. Commonwealth,*
    865 S.W.2d 332 (Ky. 1993) ................................................................................15

*In re R.M.A. v. Blue Springs R-IV School District,*
    477 S.W.3d 185 (Mo. Ct. App. 2015) ..................................................................4, 17

*Indiana Family & Social Services Administration v. Thompson,*
    286 F.3d 476 (7th Cir. 2002) ..............................................................................10

*Jeldness v. Pearce,*
    30 F.3d 1220 (9th Cir. 1994) ............................................................................4, 17

*Joelner v. Village of Washington Park,*
    378 F.3d 613 (7th Cir. 2004) ..............................................................................24

*Johnston v. University of Pittsburgh of Commonwealth System of Higher Education,*
    97 F. Supp. 3d 657 (W.D. Pa. 2015) ..................................................................4, 17

*Lee v. Downs,*
    641 F.2d 1117 (4th Cir. 1981) .......................................................................... 13

*Lewis v. Triborough Bridge & Tunnel Authority,*
    31 F. App'x 746 (2d Cir. 2002) ...................................................................... 19

*Littell v. Morton,*
    445 F.2d 1207 (4th Cir. 1971) ...................................................................... 10

*Livingwell (North) Inc. v. Pennsylvania Human Relations Commission,*
    606 A.2d 1287 (Pa. Commw. Ct. 1992)........................................................ 16

*Mary M. v. N. Lawrence Community School Corporation,*
    131 F.3d 1220 (7th Cir. 1997) ................................................................ 19, 22

*Metropolitan School District of Wayne Township, Marion County, Indiana v. Davila,*
    969 F.2d 485 (7th Cir. 1992) ................................................................... 3, 11

*Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance Co.,*
    463 U.S. 29 (1983)................................................................................... 9, 10

*N.K. v. St. Mary's Springs Academy of Fond Du Lac Wisconsin, Inc.,*
    965 F. Supp. 2d 1025 (E.D. Wis. 2013) ........................................................ 22

*National Family Planning & Reproduction Health Association, Inc. v. Sullivan,*
    979 F.2d 227 (D.C. Cir. 1992)................................................................. 11, 12

*New Jersey Division of Youth & Family Services v. M.R.,*
    No. A-5931-11T3, 2014 WL 1977014 (N.J. Super. Ct. App. Div. May 16, 2014)................ 22

*Norwood v. Dale Maintenance System, Inc.,*
    590 F. Supp. 1410 (N.D. Ill. 1984)...................................................15, 16, 19, 23

*Passananti v. Cook County,*
    689 F.3d 655 (7th Cir. 2012) ....................................................................... 19

*People v. Grunau,*
    No. H015871, 2009 WL 5149857 (Cal. Ct. App. Dec. 29, 2009) ...................... 15, 23

*Perez v. Mortgage Bankers Association*
    135 S. Ct. 1199 (2015)................................................................................ 11

*Public Service Co. of New Hampshire v. Town of West Newbury,*
    835 F.2d 380 (1st Cir. 1987)........................................................................ 24

*Reno v. Flores,*
    507 U.S. 292 (1993)............................................................................... 16, 18

*Rider v. Commonwealth of Pennsylvania*,
    850 F.2d 982 (3d Cir. 1988) ......................................................................... 18

*Roland Machinery Co. v. Dresser Industrial, Inc.*,
    749 F.2d 380 (7th Cir. 1984) ....................................................................... 24

*Rouse v. Duke University*,
    869 F. Supp. 2d 674 (M.D.N.C. 2012) ....................................................... 24

*Safford Unified School District No.1 v. Redding*,
    557 U.S. 364 (2009) ..................................................................................... 13

*Saint John's Home for Children v. West Virginia Human Rights Commission*,
    375 S.E.2d 769 (Vir. 1988) .......................................................................... 14

*Sammartano v. First Judicial District County, in & for County of Carson City*,
    *Schonauer v. DCR Entertainment, Inc.*,
    905 P.2d 392 (Wash. Ct. App. 1995). .......................................................... 20

*Seiwert v. Spencer-Owen Community School Corp.*,
    497 F. Supp. 2d 942 (S.D. Ind. 2007) ......................................................... 23

*Smith v. Executive Director of Indiana War Memorials Commission*,
    742 F.3d 282 (7th Cir. 2014) ......................................................................... 3

*Smith v. Metropolitan School District Perry Township*,
    128 F.3d 1014 (7th Cir. 1997). .................................................................... 19

*Smith v. Nebraska Illinois University*,
    388 F.3d 559 (7th Cir. 2004). ...................................................................... 21

*Sommers v. Budget Marketing, Inc.*,
    667 F.2d 748 (8th Cir. 1982) ....................................................................... 17

*State v. Lawson*,
    340 P.3d 979 (Wash. App. 2014) ................................................................. 14

*Torres v. Wisconsin Department of Health & Social Services*,
    859 F.2d 152 (7th Cir. 1988) ....................................................................... 16

*Trudeau v. Federal Trade Commission*,
    456 F.3d 178 (D.C. Cir. 2006) ..................................................................... 10

*United States v. Raines*,
    362 U.S. 17 (1960) ....................................................................................... 25

*United States v. Raupp*,
    677 F.3d 756 (7th Cir. 2012) ....................................................................... 12

vi

*Ulane v. Eastern Airlines, Inc.*,
    742 F.2d 1081 (7th Cir. 1984) ...............................................................5, 6, 7, 8, 9, 17

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)................................................................................................13

*Washington v. White*,
    231 F. Supp. 2d 71 (D.D.C. 2002). ......................................................................20

*Zepik v. Tidewater Midwest, Inc.*,
    856 F.2d 936 (7th Cir. 1988) ...................................................................................3


**Statutes:**


18 U.S.C.A. § 2251 ..........................................................................................................14

5 U.S.C. § 500 ....................................................................................................................3

5 U.S.C. § 551(10)(A) .......................................................................................................3

5 U.S.C. § 551(4) ...............................................................................................................3

5 U.S.C. § 553 ...............................................................................................................3, 11

5 U.S.C. § 553(b), (c) ........................................................................................................4

5 U.S.C. § 701(2) ...............................................................................................................3

5 U.S.C. § 702 ....................................................................................................................3

5 U.S.C. § 704 ....................................................................................................................4

5 U.S.C. § 706(2) ...............................................................................................................4

5 U.S.C. § 706(2)(B). .......................................................................................................11

5 U.S.C. § 706(2)(C) ..........................................................................................................5

20 U.S.C. § 1681(a). ...................................................................................................18, 19

20 U.S.C. § 1681(8). ..........................................................................................................6

20 U.S.C. § 1682 ................................................................................................................5

20 U.S.C. § 1683 ................................................................................................................4

28 U.S.C. § 1681(2). ..........................................................................................................6

28 U.S.C. § 1681(8). ..........................................................................................................6

28 U.S.C. § 1686 ................................................................................................................6

42 U.S.C. § 2000bb ..........................................................................................................10

720 Ill. Comp. Stat. Ann. 5/11-21 ...................................................................................14

720 Ill. Comp. Stat. Ann. 5/26-1(a)(11) ..........................................................................14

775 Ill. Comp. Stat. Ann. 5/5-10 .....................................................................................16

***Rules and Regulations:***

34 C.F.R. §§106.32-106.33 .................................................................5, 6

34 C.F.R. § 106.32(b)(2) ......................................................................8

34 C.F.R. § 106.33............................................................................*passim*

34 C.F.R. § 106.37(a)(3) ......................................................................8

34 C.F.R. § 106.41(b) ..........................................................................8

***Legislative Materials:***

117 Cong. Rec. 30407 (1971) ...............................................................4, 6

118 Cong. Rec. 5807 (1972) .................................................................4, 7

157 Cong. Rec. S1548-01 (2011) ..........................................................7

***Other Authorities:***

9 *Oxford English Dictionary* 578 (1961). .............................................6

*American Heritage Dictionary* 1187 (1976)..........................................6

Centers for Disease Control, *Sexual Violence: Facts at a Glance* (2012),
    http://www.cdc.gov/violenceprevention/pdf/sv-datasheet-a.pdf ......................................21

Christopher Slobogin, *Peeping Techno-Toms and the Fourth Amendment: Seeing Through*
    *Kyllo's Rules Governing Technological Surveillance*, 86 MINN. L. REV. 1393, 1420
    (2002) .......................................................................................14

Ferdinand Schoeman, *Adolescent Confidentiality and Family Privacy*, in PERSON TO PERSON
    213, 219 (George Graham & Hugh Lafollette eds., 1989)......................................15

Samuel T. Summers, Jr., *Keeping Vermont's Public Libraries Safe*, 34 Vt. L. Rev. 655, 674
    (2010) .......................................................................................15

Student Non-Discrimination Act of 2011, H.R. 998, 112th Cong., (2011),
    https://www.congress.gov/bill/112th-congress/house-bill/998 ...................................7

Student Non-Discrimination Act of 2011, S. 555, 112th Cong., (2011),
    https://www.congress.gov/bill/112th-congress/senate-bill/555...................................7

Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013),
    https://www.congress.gov/bill/113th-congress/house-bill/1652 ..................................7

Student Non-Discrimination Act of 2013S. 1088, https://www.congress.gov/bill/113th-
    congress/senate-bill/1088 ..................................................................7

Student Non-Discrimination Act of 2015 , H.R. 848, 114th Cong., (2015),
    https://www.congress.gov/bill/114th-congress/house-bill/846/related-bills.............................7

Student Non-Discrimination Act of 2015, S. 439, 114th Cong., (2015),
    https://www.congress.gov/bill/114th-congress/senate-bill/439..................................................7

Terry Kogan, *Sex-Separation in Public Restrooms*, 14 Mich. J. Gender. & L. 1, 39-49 (2007)..........14

*The American College Dictionary* 1109 (1970) ......................................................................................6

*The Random House College Dictionary* 1206 (rev. ed.1980) ................................................................6

U.S. Dep't of Educ. and Township High School Dist. 211, *Agreement to Resolve, OCR
    Case No. 05-14-1055* (December 2, 2015),
    https://www2.ed.gov/documents/press-releases/township-high-211-agreement.pdf ...........2

U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Single-
    Sex Elementary and Secondary Classes and Extracurricular Activities*, 25 (Dec. 1,
    2014), http://www2.ed.gov/about/offices/list/ocr/docs/faqs-title-ix-single-sex-
    201412.pdf ...........................................................................................................................3

U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual
    Violence*, 5 (Apr. 29, 2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-
    201404-title-ix.pdf ...............................................................................................................3

U.S. Dep't of Educ., Office for Civil Rights, *Title IX Resource Guide*, 1, 15-16, 19, 22-23
    (Apr. 2015), http://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-
    guide-201504.pdf .............................................................................................................3, 4

U.S. Dep't of Justice, Civil Rights Division, and U.S. Dep't of Educ., Office for Civil Rights,
    *Dear Colleague Letter on Transgender Students*, *passim* (May 13, 2016),
    http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-
    transgender.pdf ....................................................................................................................3

U.S. DOE., Office for Civil Rights, *"Letter of Findings," OCR Case No. 05-14-1055*, 13
    (Nov. 2, 2015), https://www2.ed.gov/documents/press-releases/township-high-211-
    letter.pdf ........................................................................................................................3, 4, 9

*Webster's New Collegiate Dictionary* 1054 (1979) .............................................................................6

*Webster's Third New International Dictionary* 2081 (1971).................................................................6

**RULE 7.1 DISCLOSURE STATEMENT**

Plaintiff Students and Parents for Privacy is a non-incorporated, non-stock expressive association.  It has no parent corporation.

## INTRODUCTION

This case is brought by girls and boys who are in a state of near-constant anxiety, stress, and embarrassment because their school forces them to use the restroom and locker room with opposite-sex students. They must perform their most intimate bodily functions knowing that opposite-sex classmates may be present—and so may be able to see them, and hear them. And it is even worse for the girls. They must also use the locker room with a biological male. They must change their clothes, knowing at times that he is present. When they shower, they do so knowing he could be nearby. Their dignity is violated. Their modesty is stripped away. They are embarrassed and afraid.

The Department of Education, which enforces Title IX to ensure girls receive an education with access to facilities comparable to boys, has created a hostile learning environment, and the school is complicit. Ignoring legally required procedures, DOE created a rule that, for the first time, requires schools to let students use facilities according to their perceived gender, no matter their biological sex. And it enforced that rule on the District. Both DOE and the District ignore the violation of Plaintiffs' and other students' constitutional privacy rights. Boys who perceive themselves as girls are still biologically, and anatomically, male. It violates and humiliates the girls that a boy might see them undressed, or that they might see him undressed, and that they have to share such intimate settings as a locker room or restroom. Children are not guinea pigs, and they should not be subjected to social experimentation to further political agendas as the price for a public education.

## FACTS

As set out more fully in the Verified Complaint, DOE threatened the District with the loss of $6 million if it did not let a biologically male student ("**Student A**"),[1] use the girls' locker rooms. V. Compl. ¶¶ 2, 103-04. Because of this threat, the District agreed to give Student A that right ("**Locker**

---

[1] Student A subjectively identifies as female. But it is his objective biological status as a male that is relevant to determining whether Plaintiffs' rights have been violated by Defendants' actions. To reflect the biological facts that are necessary for this Court's adjudication of Plaintiffs' claims, Plaintiffs use masculine pronouns to reference Student A.

1

**Room Agreement"**). *Id.* ¶¶ 3, 105.[2] The District had already let all students use restrooms according to their perceived gender identity. ("**Restroom Policy**").[3] *Id.* ¶ 4. Because of these decisions (the **"Policies"**), Student A now uses girls' locker rooms and restrooms with Girl Plaintiffs.[4] *Id.* ¶¶ 5, 72.

The Policies cause Girl Plaintiffs stress, anxiety, and embarrassment as they use, and anticipate having to use, private facilities with a biological male. *Id.* ¶ 7. Girl Plaintiffs fear being seen by him while undressed, and seeing him undressed. *Id.* ¶¶ 8-9. They dread having to attend to their most personal needs in a locker room or restroom with a male present. *Id.* ¶ 10. This creates an intimidating and hostile environment for Girl Plaintiffs. *Id.* ¶¶ 7, 12. It also has a profoundly negative effect on their access to educational opportunities, benefits, programs, and activities at their schools. *Id.* ¶ 12. Some Girl Plaintiffs avoid the locker rooms; one now wears gym clothes under her regular clothes all day, so she only has to peel off a layer instead of exposing her body; others change clothing as quickly as possible, while experiencing stress and anxiety and avoiding eye contact and conversation; some girls are trying to limit their use of the restroom, thus risking certain health problems; still others are risking tardiness by running to the opposite end of the school, during short passing periods, to try to find a restroom Student A is unlikely to be using. *Id.* Also, one Girl Plaintiff's parents decided to send her to private school next year because of these Policies. *Id.* ¶ 266.

The Policies are the direct result of DOE's enforcement of a new legislative rule, that the term "sex" in Title IX means, or includes, perceived gender identity. ("**Rule**"). *Id.* ¶ 13. This Rule requires schools to treat students consistently with their perceived gender identity, even when the biological differences between males and females raise strong privacy concerns. *Id.* ¶ 64. DOE announced this new Rule nationally in several guidance documents published over the last few years (the

---

[2] ***Decl. of V.W.*, ¶ 9, Exhibit 1** (U.S. Dep't of Educ. and Township High School Dist. 211, *Agreement to Resolve, OCR Case No. 05-14-1055* (December 2, 2015)).
[3] ***Decl. of V.W.*, ¶ 10, Exhibit 2** (District 211, *High School District 211 Protects Student Privacy Over Office of Civil Rights Mandate*); ***Id.*, ¶ 11, Exhibit 3** (Superintendent's Newsletter Update, *High School District 211 protects student privacy over Office of Civil Rights Mandate*).
[4] "**Girl Plaintiffs**" are all female members of Students and Parents for Privacy who attend Fremd High School, or will attend it next year.

"**Guidance**").[5] *Id.* ¶ 63. It also issued a letter of findings consistent with this Rule against District 211, finding that the District discriminated against Student A based on sex by refusing him access to the girls' locker and shower rooms (the "**Letter**").[6] *Id.* ¶¶ 65-66. But DOE's Rule did not undergo notice-and-comment rulemaking, nor was it approved by the President, as Title IX requires. *Id.* at ¶¶ 61, 70, 356. Nevertheless, DOE treats the Rule as binding on every public school district, college, and other recipient of federal education funds distributed by Congress each year. *Id.* at ¶ 68.

## ARGUMENT

Preliminary injunctions require (1) likely merits success; (2) irreparable harm; (3) a favorable equitable balance; and (4) furthering the public interest. *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014). Plaintiffs easily satisfy this standard.

**I.    The Plaintiffs Will Likely Succeed on the Merits.**

**A.    DOE's Action Violates the Requirements of the Administrative Procedure Act.**

The Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq., governs how federal agencies, like DOE, propose and establish regulations. 5 U.S.C. § 553. It also authorizes court review of agency actions, 5 U.S.C. § 702, including rules and sanctions. 5 U.S.C. § 701(2). Sanctions are agency-imposed prohibitions and requirements, like the Locker Room Agreement. 5 U.S.C. § 551(10)(A). Rules, meanwhile, implement, interpret, or prescribe statutes—in this case, Title IX. 5 U.S.C. § 551(4). Interpretive rules restate statutory provisions, *Zepik v. Tidewater Midwest, Inc.*, 856 F.2d 936, 940 (7th Cir. 1988), "only remind[ing] affected parties of existing duties." *Metro. Sch. Dist. of Wayne Twp., Marion Cty., Ind. v. Davila*, 969 F.2d 485, 489 (7th Cir. 1992) (citation omitted). But legislative rules "create new law, rights, or duties." *Id.* They are subject to the APA's

---

[5] ***Decl. of V.W.,* ¶ 4**, **Exhibit 4** (U.S. Dep't of Justice, Civil Rights Division, and U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter on Transgender Students*, *passim* (May 13, 2016)); ***Id.***, ¶ 5, **Exhibit 5** (U.S. Dep't of Educ., Office for Civil Rights, *Title IX Resource Guide*, 1, 15-16, 19, 22-23 (Apr. 2015)); ***Id.,* ¶ 6**, **Exhibit 6** (U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities*, 25 (Dec. 1, 2014)); ***Id.,* ¶ 7**, **Exhibit 7** (U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, 5 (Apr. 29, 2014)).

[6] ***Decl. of V.W.,* ¶ 8, Exhibit 8** (U.S. DOE., Office for Civil Rights, "*Letter of Findings,*" *OCR Case No. 05-14-1055*, 13 (Nov. 2, 2015)).

comment-and-notice provisions, which require publishing the proposed rule in the Federal Register and inviting public comment. 5 U.S.C. §§ 553(b), (c).

DOE's Guidance demands that schools treat students consistent with their gender identity. DOE enforced the Guidance on District 211 in the Letter that threatened revocation of funds if the District refused to treat Student A consistent with his perceived female identity. This agency action promulgated a new legislative rule with respect to Title IX. Indeed, in the Letter and Guidance, DOE said—for the very first time in the 44 year history of Title IX—that schools must give biological males access to the girls' locker room and restroom. DOE took this position, despite (1) Title IX's text and legislative history, which shows that Congress intended that schools could have biological sex-separated facilities;[7] (2) Title IX's implementing regulations, which allow schools to have biological sex-separated facilities;[8] and, (3) the unanimous agreement of courts that Title IX allows schools to have biological sex-separated facilities.[9]

Agency action is subject to judicial review if the statute allows it. 5 U.S.C. § 704. Title IX does. 20 U.S.C. § 1683. The rule must be set aside if it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or "without observance of [the rulemaking] procedure required by law." 5 U.S.C. § 706(2). DOE's new legislative rule fails each of these requirements. This Court should hold it unlawful. *Id.*

---

[7] 117 Cong. Rec. 30407 (1971); 118 Cong. Rec. 5807 (1972).

[8] 34 C.F.R. § 106.33 (authorizing schools to provide "separate toilet, locker room, and shower facilities on the basis of sex").

[9] *Johnston v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 670 (W.D. Pa. 2015), *appeal docketed*, No. 15-2022 (3rd Cir. Apr. 24, 2015), *appeal dismissed* (March 30, 2016) (recognizing that Title IX allows "separating students by sex based on biological considerations—which involves the physical differences between men and women—for restroom and locker room use"); *Jeldness v. Pearce*, 30 F.3d 1220, 1228 (9th Cir. 1994) (finding it "clear" that Title IX and its regulations allow "separate toilet, shower and locker room facilities."); *Doe v. Clark Cty. Sch. Dist.*, No. 206-CV-1074-JCM-RJJ, 2008 WL 4372872, at *4 (D. Nev. Sept. 17, 2008) (noting that Title IX does not require letting students use restrooms that correspond with their gender identity); *In re R.M.A. v. Blue Springs R-IV Sch. Dist.*, 477 S.W.3d 185, 187 (Mo. Ct. App. 2015) (dismissing appeal on procedural grounds and noting that court below ruled that biological girl who identified as a boy has "no existing, clear, unconditional legal right which allows . . . [her] to access restrooms or locker rooms consistent with [her male] gender identity.").

### 1. DOE's Legislative Rule Is In Excess of Statutory Authority.

Title IX's plain language and legislative history confirm that Congress intended the term "sex" to refer to biological sex—not gender identity. DOE's new rule, which requires that "sex" mean, or at least include, "gender identity," changes the meaning of the specific term chosen by Congress. DOE's action is thus in excess of statutory authority and violates the APA. 5 U.S.C. § 706(2)(C).

When agency action is challenged as exceeding statutory authority, "the reviewing court must ensure that the agency action at issue comports with congressional intent; agency action inconsistent with congressional intent exceeds the limits of an agency's delegated authority." *Black Citizens for a Fair Media v. F.C.C.*, 719 F.2d 407, 423 (D.C. Cir. 1983) ("*BCFM*"). The court must ask whether Congress delegated to the agency "the task of supplying the meaning of a statutory term[.]" *Id.* If not, the agency is acting in excess of authority. But if Congress has delegated the task of supplying meanings of statutory terms, "the court must still ensure that the meaning supplied does not contravene congressional intent." *Id.* DOE's rule fails both tests.

### a. Congress Has Not Delegated DOE Authority to Define "Sex."

Title IX delegates to DOE the task of "issuing rules, regulations, or orders of general applicability *which shall be consistent with achievement of the objectives of the statute*." 20 U.S.C. § 1682 (emphasis added). Congress did not delegate authority to change the meaning of statutory terms. DOE's new legislative rule does just that. DOE has thus acted in excess of statutory authority.

### i. "Sex" in Title IX and Its Regulations Means Biological Sex.

The phrase at issue in Title IX (prohibiting discrimination "on the basis of sex"), and its regulation (allowing "separate toilet, locker room, and shower facilities on the basis of sex" (34 C.F.R § 106.33)), is "on the basis of sex." The key question is whether "sex" is a biological category or a subjective or cultural one. It is the former. *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984), is on point. It involved a claim by a male plaintiff that his employment was terminated because he identified as a woman. *Id.* at 1082. The Seventh Circuit ruled Title VII did not protect against gender identity discrimination for three reasons, all of which are directly applicable here.

First, "what Congress intended when it decided to outlaw discrimination based on "sex" was

biological sex discrimination. *Id.* at 1084. Applying the "maxim of statutory construction that, unless otherwise defined, words should be given their ordinary, common meaning[,]" the court concluded that "[t]he phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men." *Id.* at 1085. Simply put, "[t]he words of Title VII do not outlaw discrimination against … a person born with a male body who believes himself to be female[.]" *Id.* So "a prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination based on an individual's . . . discontent with the sex into which they were born." *Id.*

"Sex" in Title IX likewise means biological male and female. Title IX's language uses the phrases "one sex," "the other sex," and "both sexes," referring to male and female.[10] The regulations likewise require that facilities "of one sex" shall be comparable to those for "the other sex." 34 C.F.R. §§106.32-106.33. This language emphasizes the binary view of sex, not concepts of "gender identity." Also, dictionaries from when Title IX and its regulations were enacted define "sex" as referring to the physiological distinctions between males and females, particularly with respect to their reproductive functions.[11] And Title IX's legislative history leaves no doubt that Congress intended "sex" to mean *biological sex*. Title IX's sponsor stated that the bill would not require co-ed dormitories or locker rooms.[12] The legislative record also confirms that Title IX allows differential treatment among the biological sexes, such as "classes for pregnant girls …, in sport facilities *or*

---

[10] *See*, 28 U.S.C. § 1681(2) (some educational institutions admit "students of both sexes"); 28 U.S.C. § 1681(8) (if certain sex-specific activities are provided "for one sex," reasonably comparable ones must be provided to "the other sex"); 28 U.S.C. § 1686 (authorizing "separate living facilities for the different sexes").

[11] *See, e.g.*, *Random House College Dict.* 1206 (rev. ed. 1980) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); *Webster's New Collegiate Dict.* 1054 (1979) ("the sum of the structural, functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females"); *American Heritage Dict.* 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions"); *Webster's Third New Int'l Dict.* 2081 (1971) ("the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change ..."); *The American College Dict.* 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished ..."); 9 *Oxford English Dict.* 578 (1961) ("[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these.").

[12] 117 Cong. Rec. 30407 (1971) (emphasis added).

*other instances where personal privacy must be preserved.*"[13]

The Seventh Circuit's instruction, that courts construing statutory prohibitions on sex discrimination must "determine what Congress intended when it decided to outlaw discrimination based on sex," *Ulane*, 742 F.2d at 1084, is controlling. The plain language of Title IX, its legislative history, and contemporary dictionary definitions, leave no doubt: Congress intended to outlaw discrimination based on *biological sex*, not gender identity.

The second reason the *Ulane* court held that "sex" in Title VII referred only to biological sex was that Congress had repeatedly rejected attempts to expand Title VII protections beyond biological sex. *Id*. at 1085. Congress's rejection of these attempts, "even after courts have specifically held that Title VII does not protect transsexuals from [gender-identity] discrimination[,]" gave clear indication that "the phrase in the Civil Rights Act prohibiting discrimination on the basis of sex should be given a narrow, traditional interpretation[.]" *Id*. at 1086. The same is true for Title IX. In 2011, after courts had ruled that "sex" in Title IX means biological sex, Congress rejected the Student Non-Discrimination Act,[14] which would have provided remedies for gender identity discrimination in schools modeled on Title IX's prohibition of sex discrimination.[15] Congress rejected this bill, and the cross-sex restrooms and locker rooms it would lead to, again in 2013[16] and 2015.[17]

The third reason the Seventh Circuit concluded "sex" in Title VII did not include gender identity was the "dearth of legislative history" indicating "sex" meant more than biological sex. The absence of discussions about gender identity "strongly reinforces the view that that section means nothing more than its plain language implies." *Id*. at 1085 "Had Congress intended more, surely the legislative history would have at least mentioned its intended broad coverage of . . . transsexuals[.]" *Id*. But "[t]here is not the slightest suggestion in the legislative record to support an all-encompassing

---

[13] 118 Cong. Rec. 5807 (1972) (Statement of Sen. Bayh) (emphasis added).

[14] H.R. 998, 112th Cong. (2011), https://www.congress.gov/bill/112th-congress/house-bill/998; S. 555, 112th Cong., (2011), https://www.congress.gov/bill/112th-congress/senate-bill/555.

[15] 157 Cong. Rec. S1548-01 (2011) (statement of Sen. Franken).

[16] H.R. 1652, 113th Cong. (2013), https://www.congress.gov/bill/113th-congress/house-bill/1652; S. 1088, https://www.congress.gov/bill/113th-congress/senate-bill/1088.

[17] H.R. 848, 114th Cong. (2015), https://www.congress.gov/bill/114th-congress/house-bill/846/related-bills; S. 439, 114th Cong. (2015), https://www.congress.gov/bill/114th-congress/senate-bill/439.

interpretation." *Id*. The same is true of Title IX. "Gender identity" is not mentioned in the legislative history. Rather, the legislative statements show that Congress understood "sex" to mean biological sex, and intended the term to have its "ordinary, common meaning." *Id*. at 1085.

In *Ulane*, the court below wrongly redefined "sex" to include gender identity because "Congress never considered whether it should include or exclude transsexuals." *Id*. The Fourth Circuit likewise wrongly concluded that, since Title IX's regulations are "silent as to how a school should determine whether a transgender individual is a male or female for the purpose of access to sex-[specific] restrooms[,]" DOE could redefine "sex" to include gender identity. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, No. 15-2056, 2016 WL 1567467, at *6 (4th Cir. Apr. 19, 2016). But this is as misguided as the district court's attempt to redefine "sex" in Title VII. The regulations are not silent as to whether "sex" means biological sex or gender identity. Title IX's regulations were enacted in 1975, only three years after Title IX. The same dictionaries, supplying the same biological understanding of "sex," were still in use. Also, the regulations use the ordinary language of biological sex. They repeatedly discuss "one sex" and "the other sex," [18] including in the provision authorizing sex-specific restrooms and locker rooms. 34 C.F.R. § 106.33. Further, redefining "sex" in the regulations will of necessity redefine it in Title IX. Title IX prohibits discrimination because of sex, while the regulations specify what violates this statutory bar. If "sex" in the regulations now includes, or means, "gender identity," then the term in Title IX must as well. But, only Congress gets to define terms in statutes like Title IX, *Ulane*, 742 F.2d at 1087, and it defined "sex" as *biological* sex.

The *Grimm* decision was as misguided as the district court's decision regarding "sex" in Title VII. As the *Ulane* court explained, "a prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination based on an individual's [gender identity]." 742 F.2d at 1085. The same is true with regard to Title IX.

---

[18] *See*, 34 C.F.R. § 106.32(b)(2) (housing provided for one sex shall be comparable to housing provided to the other sex); 34 C.F.R. § 106.37(a)(3) (rules determining financial aid eligibility must treat one sex the same as the other sex); 34 C.F.R. § 106.41(b) (teams for one sex must offer tryouts to students of the other sex if no team is offered for them). And of course, 34 C.F.R. § 106.33 allows schools to "provide separate toilet, locker room, and shower facilities on the basis of sex" if "facilities provided for students of one sex [are] comparable to . . . facilities provided for students of the other sex."

### ii. DOE Lacks Statutory Authority to Issue Its Rule Redefining "Sex."

"[I]f the term 'sex' as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress." *Id.* at 1087. The same is true for Title IX. Congress has repeatedly refused to broaden Title IX's definition of "sex," and the legislative history and the period's dictionaries reveal that Congress understood "sex" to mean biological sex. Congress did not give DOE authority to redefine "sex." DOE's new legislative rule lacks statutory authority.

### b. DOE's Redefinition of "Sex" Contravenes Congressional Intent.

DOE's redefinition of "sex" in Title IX also contravenes congressional intent for restrooms and locker rooms. As just explained, the legislative history indicates Congress intended that schools could provide separate private facilities for each biological sex. DOE's new legislative rule requires the opposite result. Even where, unlike here, Congress delegates authority to agencies to define statutory terms, the definition must not contravene the enacting Congress's intent. *BCFM*, 719 F.2d at 423. Because DOE's new legislative rule does precisely that, it should be set aside.

### 2. DOE's Rule Is Arbitrary, Capricious, an Abuse of Discretion, and Not in Accordance with Law.

Rules are arbitrary or capricious when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). DOE offered no explanation for redefining "sex," failed to lay out the factors it considered, and ignored the statute's language, legislative history, and related Court rulings. Nor did it consider the practical or constitutional harms caused by banning sex-specific facilities. When the District told DOE that allowing Student A entry into the girls' locker room would implicate privacy concerns because the girls might be viewed undressed and exposed to male nudity, DOE replied that it "finds the concerns unavailing in this case."[19] DOE never adequately considered the problem caused by this constitutional privacy violation, nor offered an explanation for its decision. A reviewing court

---

[19] *Supra* n.7, Letter of Findings, at 13.

"should not attempt itself to make up for such deficiencies: [It] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* DOE's rule is arbitrary and capricious.

An agency rule is an abuse of discretion when it is "made without a rational explanation, inexplicably departed from established policies, or rested * * * on other considerations that Congress could not have intended to make relevant." *Littell v. Morton*, 445 F.2d 1207, 1211 (4th Cir. 1971) (quotation omitted). As already noted, DOE gave no explanation for redefining "sex." Doing so departed from established Title IX regulations allowing schools to separate private facilities by biological sex. And DOE relied on the concept of "gender identity," despite the fact that Congress intended biological sex. DOE's rule is thus an abuse of discretion.

Agency rules are also set aside if they are "contrary to law or regulation." *Ind. Family & Soc. Servs. Admin. v. Thompson*, 286 F.3d 476, 479 (7th Cir. 2002). DOE's rule redefining Title IX violates that statute as it applies to the very group Title IX was created to protect, female students, by creating a hostile environment for the Girl Plaintiffs. *See* discussion *infra*, at Part I, Section C. It also violates Title IX's implementing regulations that permit schools to separate living facilities, restrooms, locker rooms, and similar facilities on the basis of biological sex. It further violates the federal Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*. *See* V. Compl., Count 6.

### 3. DOE's Legislative Rule Is Contrary to Constitutional Right.

Agency rules must not violate constitutional rights. *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188 (D.C. Cir. 2006). DOE's rule violates constitutional privacy rights, *see* Part I, Section B, the parental right to direct one's children's upbringing, and free exercise rights. *See* V. Compl., Counts 3, 7. It also violates the Spending Clause, under which it was enacted. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd.of Edu.*, 526 U.S. 629, 640 (1999). Congress must clearly state the conditions of Spending Clause legislation, so States can knowingly decide whether to accept funding. *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003). Congress must speak "so clearly that [one] can fairly say that the State could make an informed choice." *Id*. Courts look to the plain language of statutes to decide the conditions Congress imposed. *Id.* Title IX's plain language and legislative history are clear that Title IX (1) bans discrimination based on biological sex, but (2) allows biological sex-

specific restrooms and locker rooms. 34 C.F.R. § 106.33. For 44 years, schools and colleges have understood that Title IX allows sex-specific facilities. None could have known that the funds were conditioned on *prohibiting* biological sex-specific restrooms and locker rooms. DOE's rule thus violates the Spending Clause requirements and should be declared unlawful. 5 U.S.C. § 706(2)(B).

### 4. DOE's Legislative Rule Is Without Observance of Procedural Requirements.

Legislative rules "create new rights, impose new obligations, or change existing law[,]" *Equity in Athletics v. DOE*, 639 F.3d 91, 105 (4th Cir. 2011), and must go through notice-and-comment rulemaking. 5 U.S.C. § 553; *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015). They must be published in the Federal Register, and public comment must be considered before the rule is enacted. 5 U.S.C. § 553. In the Letter, DOE gave its rule the "force and effect of law" by threatening to revoke federal funding, and imposed on District 211 "new obligations" of cross-sex locker rooms. This shows DOE's rule is legislative. So too does the fact that DOE's rule contradicts four decades of unbroken authority allowing schools to maintain sex-specific facilities. Interpretive rules are usually based on court cases, statutory language, implementing regulations, and legislative history. *Metro. Sch. Dist.*, 969 F.2d at 490. DOE's rule runs counter to all those considerations. As already explained, *every* court to consider the question before the 2014 Guidance held that Title IX does not require cross-sex facilities, even when students who perceive themselves as the opposite sex are involved, because "sex" in Title IX means biological sex. Also, *biological* sex is the plain meaning of Title IX's text and implementing regulations. The legislative history indicates this as well.

What is more, DOE's new rule repudiated 34 C.F.R § 106.33, which explicitly allows biological sex-specific restrooms and locker rooms. "[I]f a second rule repudiates or is irreconcilable with [a prior legislative rule], the second rule must be an amendment of the first; and . . . must itself be legislative." *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992) ("*NFP*"). Such rules must go through notice and comment rulemaking. *NFP* involved a regulation banning all abortion counseling in Title X programs. A new rule, which did not go through notice-and-comment, allowed *doctors* in those programs to provide such counseling. *Id.* at 228-29. The court held the rule was legislative and violated APA rulemaking requirements. *Id.* at

229. There was "no hint in the agency's statement of basis and purpose accompanying the [original] regulation, and certainly not in the regulation itself, to suggest that doctors would be exempt from the Title X abortion counseling ban." *Id*. at 232. Agency actions are not mere interpretative rules unless they are "consistent with its language and original purpose." *Id*. at 234. When "an agency … pronounces that for purposes of its regulation war is peace, it has made a substantive change" that requires notice-and-comment. *Id*. at 235.

DOE did the same. It dictated to District 211 that "sex" in Title IX and its regulations means gender identity. But as in *NFP*, there was no hint in Title IX or the regulations that "sex" meant that. Rather, terms indicating binary, biological sex are used in Title IX and the regulations. DOE turned this straightforward language on its head. The regulations specifically allow separate facilities for each biological sex, but DOE's new rule forbids it. This is legislative rulemaking. *NFP*, 979 F.2d at 229. Because DOE did not follow the required rulemaking procedures, its new rule violates the APA.

### 5. DOE's Rule Is Also Unlawful Under the Test for Interpretive Rules.

DOE's rule also fails the test for interpretive rules. Such rules are given deference, unless they "violate the Constitution or a federal statute," or are "plainly erroneous or inconsistent with the regulation." *U.S. v. Raupp*, 677 F.3d 756, 758-59 (7th Cir. 2012) (citation omitted). This includes rules that are arbitrary, capricious, or an abuse of discretion. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (explaining that "*[i]n all cases* agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.") (emphasis added) (citations omitted). As explained, DOE's rule violates the Constitution, federal statutes, is arbitrary and capricious, and is an abuse of discretion. It is thus plainly erroneous. It also is inconsistent with the language of Title IX and the implementing regulations, which allow facilities separated by biological sex. Even if DOE's rule were interpretive, it should be given no deference. The Court should declare it unlawful.

**B. The Policies Violate The Fundamental Right to Privacy In One's Unclothed Body and Also Minors' Fundamental Right to Be Free From State Compelled Risk of Intimate Exposure to the Opposite Sex.**

The Policies require girls to undress, and attend to feminine hygiene needs, in locker rooms with a biological male present. They also require students to risk being exposed to the opposite sex when they use the restroom. This is demeaning. "Most people . . . have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981). That feeling is magnified for teens, who are "extremely self-conscious about their bodies[.]" *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1323 (7th Cir. 1993). Their "adolescent vulnerability intensifies the . . . intrusiveness of the exposure." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375 (2009). Forcing minors to risk exposing their bodies to the opposite sex is an "embarrassing, frightening, and humiliating" experience. *Id.* at 366.

The Policies violate the well-established right to privacy in one's unclothed body. *See, e.g.*, *Doe v. Luzerne Cty.*, 660 F.3d 169, 176-77 (3d Cir. 2011) (recognizing a "constitutionally protected privacy interest in . . . [one's] partially clothed body" and that a "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex[]"); *accord Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (recognizing privacy right). This privacy right includes a right to be free from State compelled risk of intimate exposure to the opposite sex. Put simply, the Constitution prohibits the State from placing Student Plaintiffs in situations where their bodies or private, intimate activities may be exposed to the opposite sex. Fundamental rights like these are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty[.]" *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). It is impossible to conceive of ordered liberty if the government can force children to shower, change clothing, or use the restroom in the presence of the opposite sex. This would violate their dignity, autonomy, and self-respect, and cause them to experience shame, fear, and humiliation. Our history and tradition, along with our concept of ordered liberty, does not give government such intrusive and demeaning power.

13

### 1. Our History and Tradition: We Protect Minors from Risk of Intimate Exposure.

Our law has always protected against having one's partially or fully unclothed body unwillingly exposed to the opposite sex. Civil lawsuits against "Peeping Toms" date from colonial times,[20] and the law criminalizes surreptitiously viewing others while they reasonably expect privacy.[21] Such protections are heightened for minors. For example, while an adult woman can pose topless, a 17-year old girl cannot. It is a crime for adults to distribute, possess, or view images of naked minors.[22] Minors also commit a crime—"sexting"—if they send a picture of their nude body.[23]

This helps explain sex-separated restrooms and locker rooms in public places: "[t]he need for privacy [in public restrooms] justifies separation" by biological sex. *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). When women began working in factories, the law began mandating sex-specific facilities. Massachusetts adopted the first such law, in 1887.[24] Later, when public buildings began offering multi-toilet restrooms, they designated one for men and one for women. The separation of restrooms and locker rooms by biological sex is an American norm. So "same-sex restrooms [and] dressing rooms" are allowed "to accommodate privacy needs," even though "white only rooms" are illegal. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010). Females "using a women's restroom expect[] a certain degree of privacy from . . . members of the opposite sex." *State v. Lawson*, 340 P.3d 979, 982 (Wash. App. 2014). Children also expect such privacy. Teenagers are "embarrass[ed] . . . when a member of the opposite sex intrudes upon them in the lavatory." *St. John's Home for Children v. W. Va. Human Rights Comm'n*, 375 S.E.2d 769, 771 (Vir. 1988).

Students "have a significant privacy interest in their unclothed bodies" at school. *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005). The privacy right is implicated *anytime* the government forces one to undress, but the invasion is greatest when the State forces one "to have

---

[20] *See*, Christopher Slobogin, *Peeping Techno-Toms and the Fourth Amendment: Seeing Through Kyllo's Rules Governing Technological Surveillance*, 86 MINN. L. REV. 1393, 1420 (2002).

[21] *See, e.g.*, 720 Ill. Comp. Stat. Ann. 5/26-1(a)(11) ("A person commits disorderly conduct when he or she knowingly[] ... [e]nters ... the property of another and for a lewd or unlawful purpose deliberately looks into a dwelling on the property through any window or other opening in it").

[22] 18 U.S.C.A. § 2251 *et seq.*

[23] *See, e.g.*, 720 Ill. Comp. Stat. Ann. 5/11-21 (crime to transmit nude photo to minor).

[24] Terry Kogan, *Sex-Separation in Public Restrooms*, 14 Mich. J. Gender. & L. 1, 39-49 (2007).

[her] naked body viewed by a member of the opposite sex." *Canedy*, 16 F.3d at 185. Thus, while students may be strip searched by same-sex teachers, opposite-sex teachers may not conduct the search. *Cornfield*, 991 F.2d at 1320. Government cannot force minors to endure the risk of intimate exposure to the opposite sex. "[P]rivacy matters" to children and is "central to their development and integrity."[25] Allowing opposite-sex persons to view adolescents in intimate situations, such as showering, risks their "permanent emotional impairment" under the mere "guise of equality." *City of Phila. v. Pa. Human Relations Comm'n*, 300 A.2d 97, 103 (Pa. Commw. Ct. 1973).

Students' right to privacy explains why a girl's locker room has always been "a place that by definition is to be used exclusively by girls and where males are not allowed." *People v. Grunau*, No. H015871, 2009 WL 5149857, *3 (Cal. Ct. App. Dec. 29, 2009). Title IX regulations clarify that restrooms and locker rooms may continue to be separated by biological sex. 34 C.F.R. § 106.33. And they have been: as the Kentucky Supreme Court observed, "there is no mixing of the sexes" in school locker rooms and restrooms. *Hendricks v. Com.*, 865 S.W.2d 332, 336 (Ky. 1993).

### 2. The Policies Infringe Student Plaintiffs' Fundamental Privacy Rights.

#### a. Compelled Cross-Sex Restroom and Locker Room Use Violates Privacy.

In *Norwood v. Dale Maint. Sys., Inc.*, 590 F. Supp. 1410, 1415-16 (N.D. Ill. 1984), this Court held that the privacy violation arising from compelled risk of intimate exposure trumps Title VII's bar on sex-based employment discrimination. Women in men's restrooms, and vice versa, "would cause embarrassment and increased stress" and would be an "extreme" privacy invasion. *Id.* at 1417. The privacy violation caused by encountering an opposite-sex person in one's restroom thus justified the employer instituting a biological sex requirement for restroom attendants. *Id.*

This Court's *Norwood* analysis reflects many of Student Plaintiffs' concerns. They too feel embarrassment and increased stress when opposite-sex students are in their facilities. School officials' instruction, that they vacate the restroom if opposite-sex students enter, V. Compl. ¶ 252,

---

[25] Samuel T. Summers, Jr., *Keeping Vermont's Public Libraries Safe*, 34 Vt. L. Rev. 655, 674 (2010) (*quoting* Ferdinand Schoeman, *Adolescent Confidentiality and Family Privacy*, in PERSON TO PERSON 213, 219 (George Graham & Hugh Lafollette eds., 1989)).

does not solve the problem. This "force[s them] to conduct an inconvenient, time consuming and sometimes difficult search for a washroom when the need to use a washroom [is] acute." *Norwood*, 590 F. Supp. at 1418. Further, unlike the customers in *Norwood*, Student Plaintiffs face a daunting time limit: there are only five minutes between classes in which to use the restroom. As the *Norwood* Court found, cross-sex restrooms and locker rooms are an "extreme" privacy invasion. *Id*. at 1417.

In *Livingwell (North) Inc. v. Pa. Human Relations Comm'n*, 606 A.2d 1287, 1288 (Pa. Commw. Ct. 1992), the court similarly ruled that constitutional privacy rights prevail over public accommodations nondiscrimination law. Such laws must yield in situations "where there is a distinctly private activity involving exposure of intimate body parts." *Id*. at 1291. Otherwise "accommodations such as bathrooms, showers and locker rooms, would have to be open to the" opposite sex. *Id*. Precisely because of these privacy concerns, many state public accommodation laws, including that of Illinois, provide broad exemptions for restrooms and locker rooms.[26]

"[T]he presence of unrelated males in [areas] where intimate bodily functions take place is a cause of stress to females." *Torres v. Wis. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1531 (7th Cir. 1988) (citation omitted). This is because of the "real . . . differences between men and women." *Id*. at 1527. The Policies do not respect those differences. Rather, they demean Girl Plaintiffs, forcing them to use restrooms, attend to feminine hygiene needs, and change their clothes in the presence of males. They trample dignity interests, strip away modesty and privacy, and leave them humiliated and vulnerable in intimate spaces where they should feel safe. They do the same to boy Student Plaintiffs. Because the Policies infringe the fundamental right to privacy in one's unclothed body and minors' right to be free from state compelled risk of intimate exposure to the opposite sex, they are unconstitutional unless they can survive strict scrutiny. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).

### b. Transgender Identification Does Not Alter the Analysis.

Courts have almost uniformly agreed that requiring students to use private facilities with opposite-sex students who identify as transgender violates privacy rights. For example, in 2015 a

---

[26] *See, e.g.*, 775 Ill. Comp. Stat. Ann. 5/5-103 (exempting "restrooms, shower rooms, bath houses, health clubs and other similar facilities").

court ruled against a female who identified as male and challenged a school policy barring her from men's locker rooms and restrooms. *Johnston*, 97 F. Supp. 3d at 661. The court noted that, while the question of whether students may use opposite-sex facilities is new, "the applicable legal principles are well-settled." *Id*. at 668. The University had an interest "in providing its students with a safe and comfortable environment for [using the restroom and locker room] . . . consistent with society's long-held tradition of performing such functions in sex-segregated spaces based on biological or birth sex[,]" *id*. at 668, as well as in ensuring "the privacy of its students to disrobe and shower outside of the presence of members of the opposite sex." *Id*. at 669. "[S]eparating students by sex based on biological considerations—which involves the physical differences between men and women—for restroom and locker room use" does not violate Equal Protection, *id*. at 670, or Title IX, *id*. at 673.[27]

Similarly, most courts agree with the Seventh Circuit's *Ulane* decision that Title VII analysis is unchanged when the claimant identifies as transgender, because "sex" in Title VII means "biological male or biological female." 742 F.2d at 1087. The Tenth Circuit found no Title VII violation when a female-identifying male was fired because he used women's restrooms. *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007). The employee argued that "the use of women's restrooms is an inherent part of [his] status [as transgender]." *Id*. But the court noted other restroom users' interests, and ruled Title VII does not require allowing biological males who identify as female to use the women's restroom. *Id*. The Eighth Circuit concluded likewise in *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 748-50 (8th Cir. 1982), finding no Title VII violation when an employer discharged a female-identifying man who insisted on using the women's restroom. *Id*. at 748-50. The court agreed that his presence in the women's restroom threatened the female employees' privacy rights. *Id.*

Permitting restroom and locker room access based on gender identity requires Student Plaintiffs to attend to intimate bodily needs and change clothing in the presence of opposite-sex persons "at a

---

[27] *See also Jeldness*, 30 F.3d at 1228 (finding that Title IX and its regulations allow biological sex-separate toilet, shower and locker room facilities); *Clark Cty. Sch. Dist.*, 2008 WL 4372872, at *4 (D. Nev. Sept. 17, 2008) (same); *In re R.M.A.*, 477 S.W.3d at 187 (same). There is only one outlier—*G.G. ex rel. Grimm*, 2016 WL 1567467, at *8 (holding, over a withering dissent, that courts must give deference to DOE's new, unlawful rule, but noting that Defendant had not advanced any competing privacy claim).

time in life when sex is a mysterious and often troubling force." *Rider v. Com. of Pa.*, 850 F.2d 982, 986 n.6 (3d Cir. 1988). The right to privacy does not allow this outcome.

### 3. The Policies Fail Strict Scrutiny Review.

Because the Policies infringe fundamental rights, they must survive strict scrutiny: Defendants must show that the Policies serve a compelling interest, and use the least restrictive means. *Reno*, 507 U.S. at 301-02. No compelling interest justifies forcing children to share restrooms and locker rooms with the opposite sex. Also, Defendants could provide single-stall or other private accommodations to students who identify as the opposite sex, as the District did for several years. *See* V. Compl. ¶¶ 86-87. This would meet this small number of students' needs without violating the rights of the other students. Because the Policies serve no compelling interest, and do not use the least restrictive means, they fail strict scrutiny. Student Plaintiffs are likely to succeed on the merits.

### C. The Policies Violate Title IX.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Ironically, the District violates Title IX by doing what DOE says it must do to comply with Title IX. Granting students access to restrooms and locker rooms based on gender identity creates a hostile environment, and also provides unequal locker room facilities to girls at Fremd. Put simply, DOE's redefinition of the term "sex" in Title IX makes it impossible for schools to comply with the statute.

### 1. Objecting Girls at Fremd Lack Comparable Facilities To Boys.

34 C.F.R. § 106.33 provides that federally-funded schools "may provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex." The Locker Room Agreement requires girls to share a locker room with a biologically-male student and undergo the attendant humiliation, embarrassment, stress, and privacy violations, while boys enjoy locker rooms free of the opposite sex. Boys thus have far more favorable locker room facilities than girls.

Also, girls who object to sharing a locker room with a male have no option but to walk to the alternate facilities, change, walk back to the PE locker room, stow their clothes, and get to PE class; and, they must accomplish all this in approximately 5 minutes. V. Compl. ¶¶ 242-51. The alternate facilities are thus inferior to the facilities available to boys, and also violate 34 C.F.R. § 106.33.

### 2. The Policies Create A Hostile Environment.

Title IX also protects students' right to a hostile-environment-free education. *Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1228 (7th Cir. 1997). Hostile environment claims require plaintiffs to prove: (1) membership in a protected group; (2) harassment; (3) based on sex; (4) that was so pervasive or severe, it altered the conditions of education; and (5) school officials knew about it. *Id.* Student Plaintiffs satisfy each of the elements.

#### a. Student Plaintiffs Belong to a Protected Group.

Student Plaintiffs are biological male and female students at federally-funded schools. V. Compl. ¶¶ 26-29. Student Plaintiffs thus belong to a protected group. 20 U.S.C. § 1681(a).

#### b. Student Plaintiffs Are Subjected to Unwelcome Sexual Harassment.

"To be actionable as sexual harassment, the unwelcome treatment need not be based on unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." *Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012) (internal citation omitted).[28] The Policies force Student Plaintiffs to use restrooms and locker rooms available to the opposite sex. It is well-settled that such cross-sex facilities are sexually harassing. This Court held so in *Norwood*, 590 F. Supp. at 1417, ruling that opposite-sex restroom attendants violate privacy and cause embarrassment and stress. Similarly, the Second Circuit affirmed a ruling that a company created a hostile environment when it allowed male cleaners inside the women's locker room while female employees were changing clothes. *Lewis v. Triborough Bridge & Tunnel Auth.*, 31 F. App'x 746 (2d Cir. 2002). The Washington Appeals Court held that an employer created a hostile

---

[28] *Passananti* and other cases Plaintiffs rely upon are Title VII cases. Courts look to such cases for guidance for Title IX. *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir. 1997).

environment partly because he entered the women's restroom while an employee was using the toilet. *Schonauer v. DCR Entm't, Inc.*, 905 P.2d 392, 401 (Wash. Ct. App. 1995). Notably, he never observed her unclothed: she testified that she was securely in a stall. *Id.* at 396. Still, the employer's intrusion "intensified" "the hostile and offensive nature of that environment." *Id.* at 401. Similarly, a female entering the men's locker room "on five to ten occasions" created a hostile environment, resulting in sexual harassment. *Washington v. White*, 231 F. Supp. 2d 71, 80-81 (D.D.C. 2002).

Student Plaintiffs are likewise subject to a hostile environment—and, far more frequently than in the cases just cited. Every time they use the restroom, or Girl Plaintiffs use the locker room, an opposite sex student may enter or be present. V. Compl. at ¶¶ 114, 225-26. Some have encountered opposite-sex students in the restroom. *Id.* at ¶¶ 231-34. And some Girl Plaintiffs have encountered a biological male in the locker room. *Id.* at ¶¶ 134-35. The Policies cause Student Plaintiffs humiliation, loss of dignity, stress, apprehension, fear, and anxiety. *Id.* at ¶¶ 129, 226.

### c. The Harassment Is Based On Sex.

The differences between girls' and boys' locker rooms and restrooms are minimal. Title IX requires that they be "comparable." 34 C.F.R. § 106.33. The difference that matters to students claiming access based on gender identity is the biological sex of the persons using the facilities. Thus, the harassment resulting from the Policies is based on sex. If the Girl Plaintiffs were male, Student A would not want access to their locker room or restroom. So, but for their sex, they would not face the harassing environment of having an opposite-sex student present in their private areas.

Moreover, as this Court explained, there are significant "physiological differences between men and women." *Bullock v. Dart*, 599 F. Supp. 2d 947, 956 (N.D. Ill. 2009); *see also*, *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 (1978) ("real" differences between the biological sexes); *Com. v. Daniel*, 243 A.2d 400, 403 (Penn. 1968) ("significant" differences between the biological sexes). These "real" and "significant" differences do not disappear when biological males identify as female, or vice versa. With regard to physiology, skeletal structure, muscle mass, chromosomes, and anatomy, biological males remain male, while biological females

remain female. Because of these differences, opening restrooms and locker rooms to students of the opposite biological sex is sexually harassing, in ways that are similar and different for male and female students. All Student Plaintiffs experience humiliation, anxiety, intimidation, fear, stress, and loss of dignity as a result. But Girl Plaintiffs experience added anxiety as a result of feminine changes occurring during adolescence. With the onset of menstruation, girls have feminine hygiene needs that many teenage girls prefer not to share even with those of their own sex. Attending to these needs with males present is humiliating. Also, females are far more likely to be victims of sexual assault than males. A recent study, cited by the Centers for Disease Control, reveals that nearly 12% of high school girls reported having been sexually assaulted.[29] Girl Plaintiffs are concerned that, because of the Restroom Policy, males might enter their private areas for lewd purposes. And because the Restroom policy removes the longstanding societal assumption that biological males should not be in girls' restrooms, Girl Plaintiffs cannot even question the presence of a biological male in their restrooms. There is thus no method for excluding males who have lewd intentions until *after* the damage is done. Girl Plaintiffs experience that threat to a greater degree than their male classmates, precisely because of their sex. The male Student Plaintiffs, meanwhile, typically use urinals without stalls. They bear a heightened risk of exposure if female students enter their restrooms. The biological differences between the sexes create a hostile environment when a male enters the girls' facilities, or when a female enters the boys' facilities. The harassment is thus based on sex.

### d. The Harassment Is Sufficiently Severe Or Pervasive.

To satisfy the severe or pervasive prong, plaintiffs must show that the environment is "both subjectively and objectively offensive." *Smith v. Ne. Ill.Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). A reasonable person, as well as the victim, must thus find the environment hostile or abusive. *Id*. Courts "consider the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with, in the case of Title IX, the student's educational opportunities." *Hendrichsen v. Ball State*

---

[29] Centers for Disease Control, *Sexual Violence: Facts at a Glance* (2012), http://www.cdc.gov/violenceprevention/pdf/sv-datasheet-a.pdf.

*Univ.*, 107 F. App'x 680, 684 (7th Cir. 2004). Student Plaintiffs satisfy this standard.

### i.   The Conduct Was Frequent and Severe.

Whether harassment is "severe or pervasive" turns on how egregious or frequent the offending conduct is. *Id.* at 684-85. Conduct need not be *both* severe *and* pervasive: one or the other suffices, yet both are present here. The Policies force Student Plaintiffs to use restrooms knowing opposite-sex students may be present. Girl Plaintiffs must also use locker rooms, where they change clothes and sometimes shower, knowing an opposite-sex student may be present. This violates their privacy rights and places them at risk of "permanent emotional impairment." *City of Philadelphia*, 300 A.2d at 103; *see also New Jersey Div. of Youth & Family Servs. v. M.R.*, No. A-5931-11T3, 2014 WL 1977014, at *6 (N.J. Super. Ct. App. Div. May 16, 2014) (allowing teen girl to be unclothed and shower with a biological male risked mental and emotional injury). Every day of the school year, Student Plaintiffs suffer the humiliation, fear, anxiety, stress, and dignity loss caused by the Policies.

### ii.   The Conduct Was Threatening Or Humiliating.

Student Plaintiffs felt humiliation as a result of the Policies. V. Compl. ¶ 275. Some Girl Plaintiffs also felt intimidated and threatened as a result of the Policies. *Id.* ¶ 431.

### iii.   The Conduct Altered the Conditions of Education.

Students need not withdraw from school or have their grades suffer for altered conditions to exist. *Mary M.,* 131 F.3d at 1226 (noting that "it is virtually impossible for children to leave their assigned school"); *N.K. v. St. Mary's Springs Acad. of Fond Du Lac Wis., Inc.*, 965 F. Supp. 2d 1025, 1034 (E.D. Wis. 2013) (finding altered conditions may exist when good grades are maintained). Conditions of education are altered by increased "tension," making the environment hard to endure. *Dauven v. George Fox Univ.*, No. CV.09-305-PK, 2010 WL 6089077, at *13 (D. Or. Dec. 3, 2010).

Student Plaintiffs experience anxiety, embarrassment, stress, and loss of dignity because of the Policies. V. Compl. ¶ 428. As a result, some Student Plaintiffs have trouble concentrating in class. *Id.* ¶ 430. Some avoid using the restroom. *Id.* ¶ 429. This causes them discomfort and places them at greater risk for certain infections. *Id.* ¶ 235. One Girl Plaintiff will not undress in the locker room because of embarrassment. Instead, she wears her gym clothes under her school clothes so she will

not have to disrobe, forcing herself to endure the discomfort of wearing two sets of clothing. *Id.* ¶¶ 131-34. Another Girl Plaintiff will attend private school because of the Policies. *Id.* ¶ 266. The challenged Policies have rendered school an intimidating place for Student Plaintiffs. *Id.* ¶ 431.

### iv. Reasonable Students Would Find a Hostile Environment.

A reasonable student would find the environment hostile and harassing. "Unquestionably, a girls locker room is a place where a normal female should, and would, reasonably expect privacy, especially when she is performing quintessentially personal activities like undressing, changing clothes, and bathing." *Grunau*, 2009 WL 5149857, at *3. So "a normal female who was showering in a girls locker room would unhesitatingly be shocked, irritated, and disturbed" if she saw a biological male "gazing at her, no matter how briefly he did so." *Id.* This Court concluded the same regarding restrooms. *Norwood*, 590 F. Supp. at 1417 (opposite-sex persons in restrooms "would cause embarrassment and increased stress in both male and female washroom users"); *id.* at 1418 (noting that many search for another restroom if an opposite-sex person is present); *id.* at 1422 (holding that "privacy would be invaded" if women are allowed into men's restrooms).

### e. School Officials Have Requisite Knowledge of the Hostile Environment.

The final prong—knowledge—is easily met because the hostile environment is created by the District's policies. While plaintiffs typically must show that those with authority to fix the hostile situation know about it and did not remedy it, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), here no such showing need be made other than pointing to the District's Policies. Yet, various Plaintiffs also notified District officials about the hostile environment. V. Compl. ¶¶ 459-61. They advised Student Plaintiffs to leave the hostile environment by accepting an "accommodation." *Id.* ¶ 463. They also suggested it is wrong to perceive the environment as hostile. *Id.* ¶ 152.

Schools do not escape liability by requiring the victim to remove herself from the harassment or suggesting she is responsible for it. A school that responded to allegations of harassment by moving the victim to a different class, rather than addressing the harassment, violated Title IX. *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007). And a hostile environment resulted when a school suggested the victim was to blame for sexual harassment. *Rouse*

*v. Duke Univ.*, 869 F. Supp. 2d 674, 684-85 (M.D.N.C. 2012). The District made the same fatal error. It refused to remove the male from the girls' locker room. Instead, it told Girl Plaintiffs that, if they are embarrassed or fearful undressing with a biological male present, they may remove themselves, or use a so-called "privacy stall" (that provides inadequate privacy and also subjects them to being called "transphobic," "homophobic," and even slang, derogatory words for female body parts). V. Compl. ¶¶ 138-45, 246. The District prevented Girl Plaintiffs from utilizing *the girls*' locker room in a non-hostile environment. It also refused to remove biological males from girls' restrooms, and biological females from boys' restrooms. Instead, it told the Student Plaintiffs that, if they encounter an opposite-sex student in their restroom, *the Student Plaintiffs* should leave. *Id.* ¶ 252.

Student Plaintiffs establish all five elements of a Title IX claim and thus are likely to succeed.

## II.     Plaintiffs Will Suffer Irreparable Harm Without an Injunction of the Policies.

Irreparable harm is harm that cannot be rectified by final judgment after trial. *Roland Machinery Co. v. Dresser Indus., Inc*., 749 F.2d 380, 386 (7th Cir. 1984). It is presumed when plaintiffs establish likelihood of success that privacy rights are violated. *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). *See also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("the right of privacy must be carefully guarded for once an infringement has occurred it cannot be undone by monetary relief"). Student Plaintiffs are suffering humiliation, dignity loss, stress, apprehension, fear, and anxiety because of the Policies. These Policies are altering the conditions of their education, and interfering with their ability to receive an education. No final judgment can undo that harm and no amount of money can rectify it.

## III.     The Balance of Hardships Sharply Favors the Plaintiffs.

Student Plaintiffs have established likely merits success on their constitutional right to privacy and statutory Title IX claims. The balance of hardships always favors preventing such violations. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Only an injunction will stop the irreparable harm experienced by Student Plaintiffs. But an injunction does no harm to the Defendants because the Policies are unconstitutional, and the government is not harmed when it is prevented from enforcing unconstitutional laws. *Joelner v. Village of Wash. Park*, 378 F.3d 613, 620

(7th Cir. 2004).The balance of hardships favors Student Plaintiffs.

## IV.     The Public Interest Favors a Preliminary Injunction.

"[T]here is the highest public interest in the due observance of all the constitutional guarantees[.]" *U.S. v. Raines*, 362 U.S. 17, at *27 (1960). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). It is also in the public interest to prevent the government from "violat[ing] the requirements of federal law," *Ariz. Dream Act Coal.*, 757 F.3d at 1069, such as Title IX. Because Student Plaintiffs established likely merits success, public policy favors the granting of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the preliminary injunction issue.

Respectfully submitted this 23rd day of May, 2016.

By: /s/ Jeremy D. Tedesco

THOMAS L. BREJCHA, IL 0288446
PETER BREEN, IL 6271981
JOCELYN FLOYD, IL 6303312
**THOMAS MORE SOCIETY**
19 S. La Salle Street, Suite 603
Chicago, IL 60603
(312) 782-1680
(312) 782 -1887 Fax
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
jfloyd@thomasmoresociety.org

JEREMY D. TEDESCO, AZ 023497*
JOSEPH E. LARUE, AZ 031348*
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jtedesco@ADFlegal.org
jlarue@ADFlegal.org

J. MATTHEW SHARP, GA 607842*
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774 | (770) 339-6744 Fax
msharp@ADFlegal.org

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

25

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2016, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record who are registered users of the ECF system:

Patrick M. DePoy
Erin D. Fowler
Sally J. Scott
Jennifer A. Smith
Michael A. Warner, Jr.
FRANCZEK RADELET P.C.
300 S. Wacker Drive, Suite 3400
Chicago, IL 60606

*Attorneys for Defendant Board of Education of*
*Township High School District No. 211*

I hereby certify that I sent the foregoing document via Certified Mail to the following Defendants who have not yet appeared:

United States Department of Education
John B. King, Jr., U.S. Secretary of Education
United States Department of Justice
Loretta E. Lynch, U.S. Attorney General

By: /s/ Jeremy D. Tedesco

JEREMY D. TEDESCO
*Attorney for Plaintiffs*

THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED