IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STUDENTS AND PARENTS FOR PRIVACY, a voluntary unincorporated association; C.A., a minor, by and through her parent and guardian, N.A.; A.M, a minor, by and through her parents and guardians, S.M. and R.M.; N.G., a minor, by and through her parent and guardian, R.G.; A.V., a minor, by and through her parents and guardians, T.V. and A.T.V.; and B.W., a minor, by and through his parents and guardians, D.W. and V.W., <br><br>    Plaintiffs, <br><br>v. <br><br>UNITED STATES DEPARTMENT OF EDUCATION; JOHN B. KING, JR., in his official capacity as United States Secretary of Education; UNITED STATES DEPARTMENT OF JUSTICE; LORETTA E. LYNCH, in her official capacity as United States Attorney General; and SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS, <br><br>    Defendants. | No. 1:16 CV 4945 <br><br> The Hon. Jorge L. Alonso, *District Judge* |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE AS DEFENDANTS OF STUDENTS A, B, AND C, BY AND THROUGH THEIR PARENTS AND LEGAL GUARDIANS, AND OF THE ILLINOIS SAFE SCHOOLS ALLIANCE**

      Students A, B, and C, by and through their parents and legal guardians Parents A, B, and C, and the Illinois Safe Schools Alliance (together, "Movants") seek to intervene as defendants as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, alternatively, for permissive intervention under Rule 24(b)(1).[1] Federal Defendants oppose the motion to intervene as of right and take no

---

[1] The individual intervenors are minors and seek to proceed pseudonymously. If the Court grants Movants leave to intervene, Movants will file a motion to proceed pseudonymously setting out the basis for this request.

position on permissive intervention; the District Defendants take no position at this time; and Plaintiffs oppose this motion. In support of their motion, Movants state as follows:

## BACKGROUND

Movants are Students A, B, and C and the Illinois Safe Schools Alliance ("Alliance"). The facts below are supported by the declarations of parents and guardians of each student Movant and of Owen Daniel-McCarter as representative of the Alliance. *See* Exhs. 1-4.[2]

**Student A** is a junior at William Fremd High School ("Fremd") in Township High School District 211 (the "District") in Palatine, Illinois. As numerous references to her throughout Plaintiffs' Complaint attest, Student A has been at the very center of the events that are the subject of this lawsuit. The facts set forth here are described in the declaration of her mother and legal guardian, Parent A, attached as Exhibit 1.

Although designated male at birth, Student A is female. She came out to her family as transgender in 2011, when she was in seventh grade. She has been diagnosed with Gender Dysphoria, the medical diagnosis for the clinically significant distress that individuals whose gender identity differs from the sex they were assigned at birth can experience. With the support of her parents and medical providers, Student A transitioned to living as female at the beginning of eighth grade in 2012. Since then she has lived her life as a girl by dressing as a girl, using a traditionally female name and pronouns, and using the girls' restrooms when at restaurants, stores, and other public places. During 2013, Student A started hormone therapy to give her a more feminine appearance and voice, completed a legal name change, and obtained a passport listing her gender as female.

---

[2] This motion satisfies Movants' responsibilities under Rule 24(c) because no pleading from any Defendant asserting a claim or defense is currently due. Movants will file such a pleading at the appropriate time if they are granted leave to intervene.

Wanting her entry into high school to go smoothly, Student A and her parents, at times with the support and assistance of the Alliance, asked administrators at the District prior to the start of her freshman year in 2013 to treat her as a girl in all ways, including by allowing her to use the girls' restrooms and locker rooms. The District told Student A she could use the girls' restrooms and wear girls' uniforms for athletic activities but would not be allowed to use the girls' locker rooms to change for gym class. Instead, she would have to use a separate restroom remote from the gym to change her clothes. Following additional meetings, the District administration proposed that Student A could change in a separate restroom that was not as remote, but continued to bar her from using the locker rooms where the other girls in her class change. The American Civil Liberties Union of Illinois (ACLU), whose lawyers are among Student A's counsel here, made additional requests that Student A be permitted to use the girls' locker rooms, but the District refused to change its position.

The District's proposal that Student A use a separate facility ostracized her by banning her from facilities all of the other girls were allowed to use and isolated her in a separate space, labeling her as distinct from her fellow students, male or female. This caused her embarrassment and emotional trauma, as well as logistical problems not shared by students allowed to use gender-appropriate locker rooms.

Student A (represented by the ACLU) filed a complaint with the U.S. Department of Education's ("ED") Office of Civil Rights ("OCR") in December 2013 alleging that the District was unlawfully discriminating against her. The District opposed her complaint. In June 2015, OCR informed Student A and the District of its findings that by prohibiting Student A from using female locker rooms the District had violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, which triggered a 90-day period to negotiate a resolution. Rather

3

than resolving the dispute, the District released a statement and held a press conference informing the public about Student A's complaint to ED and declaring that it would not permit transgender students to use the locker rooms consistent with their gender identity. *See* Dkt. 21-4 at 1; Dkt. 21-5 at 1. The District publicly defended its discriminatory actions, including in media appearances by District Superintendent Daniel Cates in which he addressed the "anatomy" of Student A. *See* Exh. 4. OCR publicly issued findings of a violation of Title IX on November 2, 2015. *See* Dkt. 21-10.

In December 2015, the District and OCR reached a resolution and signed an agreement which provides, in part, that "based on Student A's representation that she will change in private changing stations in the girls' locker rooms, the District agrees to provide Student A access to locker room facilities designated for female students" and "to take steps to protect the privacy of its students by installing and maintaining sufficient privacy curtains (private changing stations) within the girls' locker rooms to accommodate Student A and any students who wish to be assured of privacy while changing." The agreement is at Dkt. 21-3.

A dispute soon arose between the District and OCR in the media over the scope of the agreement (whether it applies District-wide or, as the District maintained, only to Student A) and what it requires (whether the District can compel Student A to change behind curtains while other students have an option to use those closed off areas, as the District maintained). Exh. 4.

Student A began using the private changing area in one of the girls' locker rooms in March 2016. This made a palpable difference in her life. She began to feel included in her school and athletic team, and felt fully accepted at her school for the first time. But as Plaintiffs' claims in this case arose, things have changed again. Aware that the controversy over her use of the locker rooms has again flared into public view, Student A has stopped using the girls' locker

4

rooms. She attends gym class in her street clothes rather than changing in the locker rooms. With Plaintiffs' claims hanging over her, Student A is concerned that not only her locker room access but her ability to use the girls' restrooms at school—which she has always had—are in jeopardy. *See* Exh. 1.

**Student B** is a twelve-year-old seventh-grade boy in junior high school. In the fall of 2017, Student B will begin ninth grade at the District's Fremd High School. Student B came out as transgender in August 2015 and since then has lived as a boy. He and his family anticipate that he will soon begin hormone therapy, which will give him a more masculine appearance and voice. *See* Exh. 2.

Student B informed the administration at his school that he identified as male and asked to be treated accordingly, including using a traditionally male name and pronouns. The school complied with this request. The school's acceptance of Student B as transgender in these respects has relieved much of the emotional distress he previously experienced. The school is also working to eliminate bullying that has been directed at Student B because he is transgender.

Student B uses the boys' restroom at school. He currently uses the girls' locker rooms to change for gym, but wishes to use the boys' locker rooms once he begins hormone therapy, which he expects to begin well in advance of entering Fremd. Because he is a boy, he anticipates that he will need to use the boys' restrooms and locker rooms there. Student B's mother believes that it would be emotionally devastating for him if he were not able to attend school at Fremd consistent with his gender identity, and that dismantling the resolution agreement or forcing District 211 to deny transgender students access to gender-appropriate restrooms would exacerbate and legitimize the bullying of Student B and other transgender students.

**Student C** is an eighth-grade boy who will attend the District's Hoffman Estates High School for the 2016-2017 academic year. Since coming out as transgender Student C has lived his life as a boy. He has legally changed his name to a traditionally male name, updated the gender marker on his state and other IDs to reflect that he is male, and refers to himself—and asks others to refer to him—using male pronouns. He plans to begin hormone therapy in the near future and will soon be exhibiting traditionally male characteristics. At his current junior high school, administrators, teachers and staff refer to him by his legal male name and male pronouns and treat him as they would any other boy at school. Other students have reacted well to, and are supportive of, his transition. Student C wants to use the boys' restrooms and locker rooms for gym when he attends high school. Student C's well-being has improved significantly now that he lives his life as a boy. He would feel extreme distress and discomfort if he were denied access to the boys' facilities at high school, which would separate him from the other boys and send him the message that he is different and should be ashamed of who he is. *See* Exh. 3.

**The Illinois Safe Schools Alliance** promotes safety, support, and healthy development for lesbian, gay, bisexual, transgender, and questioning (LGBTQ) youth in Illinois schools through advocacy, education, youth organizing, and research. In his capacity as the Policy and Advocacy Director of the Alliance, Owen Daniel-McCarter has worked with school districts in Illinois to draft transgender inclusion policies for school staff and administration. He has also conducted training for school staff and administration called "Transgender 101," which introduces transgender terminology, an overview of best practices for accommodating the legal rights of transgender students, and other types of training. In addition, the Alliance advocates for gender inclusivity in schools, LGBT-affirming curriculum, bullying prevention, and restorative school discipline practices to prevent student push-out from school. Alliance staff assisted

Student A in her efforts to use gender-appropriate facilities in the District and engaged in parent training in District high schools following entry of the resolution agreement. *See* Exh. 4.

**ARGUMENT**

**A.     Movants Satisfy the Requirements for Intervention as of Right.**

Intervention as of right under Rule 24(a) must be granted if: "(1) the motion to intervene is timely filed; (2) the proposed intervenors possess an interest related to the subject matter of the action; (3) disposition of the action threatens to impair that interest; and (4) the named parties inadequately represent that interest." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 657–58 (7th Cir. 2013). In evaluating a request to intervene, courts "must accept as true the non-conclusory allegations of the motion." *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995). Whether intervention as of right is warranted "is a highly fact-specific determination, making comparison to other cases of limited value." *Sec. Ins. Co. v. Schipporeit, Inc.*, 69 F.3d 1377, 1381 (7th Cir. 1995). Movants easily satisfy their burden to show that their entry into this case is warranted.

**1.     The motion to intervene is timely and causes no prejudice.**

Timeliness turns on "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; [and] (4) any other unusual circumstances." *Heartwood, Inc. v. U.S. Forest Serv.*, 316 F.3d 694, 701 (7th Cir. 2003). This test is "one of reasonableness." *Reich*, 64 F.3d at 321.

Intervention here is timely. Plaintiffs filed their Complaint on May 4, 2016, barely three weeks ago. Courts routinely grant intervention motions filed with similar promptness. *E.g.*, *Uesugi Farms v. Michael J. Navilio & Son*, 2015 WL 3962007, at *2 (N.D. Ill. June 25, 2015)

(one month after complaint); *Alarm Detection Sys. v. Bloomingdale Fire Prot. Dist.*, 2014 WL 4124251, at *2 (N.D. Ill. Aug. 20, 2014) (two months after amended complaint).

The short delay in filing this motion was necessary for Movants to consult with counsel (including Mayer Brown LLP counsel who are new to the matter), prepare declarations in support of intervention, and prepare intervention papers. During that period, the Court has not set any briefing schedule or issued any substantive decisions. *See Michigan v. U.S. Army Corps of Eng'rs*, 2010 WL 3324698, at *2–3 (N.D. Ill. Aug. 20, 2010) (motion to intervene timely when filed in "earliest stages" before court "issued any substantive decisions"). Thus no delay of the litigation or other prejudice to the parties will occur by allowing the intervenor defendants to participate. *See PAC for Middle Am. v. State Bd. of Elections*, 1995 WL 571893, at *4 (N.D. Ill. Sept. 22, 1995) (no prejudice when intervention occurs prior to the start of discovery). By contrast, denying intervention, as set forth below, would severely prejudice Movants.

> **2. Movants have a significant legal interest that would be impaired if ED's guidance were held unlawful or the District were ordered to stop allowing transgender students to use restrooms and locker rooms consistent with their gender identity.**

Whether proposed intervenors have a sufficient connection to the action must be evaluated in terms of "the issues to be resolved by the litigation and whether the potential intervenor has an interest in those issues." *Reich*, 64 F.3d at 322. Because Movants are within the zone of interests protected by Title IX they have ample interest to warrant intervention to defend the District's agreement under Title IX, its policy regarding restroom use by transgender students, and ED's guidance as to Title IX's application to gender identity discrimination. *E.g.*, *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011) (party "with an interest 'arguably [sought] to be protected by the statute'" has standing).

This case concerns a significant issue in the daily lives of the individual intervenors, each of whom has a "direct, significant and legally protectable interest" in the question whether, despite Title IX's prohibition against sex discrimination, schools can treat transgender boys and girls differently than other boys and girls when using school facilities. *See Flying J, Inc. v. Van Hollen*, 578 F.3d 569, 572 (7th Cir. 2009) (loss of statutorily-conferred benefits by persons whose interests the law was intended to protect is a sufficient interest to satisfy Rule 24(a)). Student A is the student at the center of the controversy that has resulted in this lawsuit. A substantial portion of her family's time and energy has been devoted to achieving a just result that allows her to use school facilities alongside other girls, including filing the ED complaint that led to the resolution agreement. Reflecting her central role in this case, Plaintiffs' Complaint is full of allegations about Student A personally and the District's dealings with her specifically. The challenged agreement between OCR and the District references her and establishes the terms of her access to the girls' locker rooms.

Student B will attend Fremd next year and will need to use the boys' restrooms and locker rooms. Student C will attend a District high school for the 2016-2017 academic year and will need to use the boys' restrooms and locker rooms. This case directly impacts Fremd's and other District schools' restroom and locker room policies applicable to transgender students like Students A, B, and C.

The Alliance has an interest in the issues to be resolved because Alliance staff assisted Student A and her family in their dealings with the District prior to her filing of a complaint with ED and later participated in implementation of the resolution agreement trainings for the District. Furthermore, the Alliance has been involved in the development of transgender inclusion policies at other schools throughout Illinois, and its mission includes assisting transgender

students in using appropriate facilities. It too has a direct and substantial interest in Plaintiffs' challenge to Title IX's application to discrimination on the basis of gender identity.

Resolution of this suit certainly could impair Movants' interests. *See Reid L.*, 289 F.3d at 1017 (intervenor must show "at least potential impairment of [its] interest if the action is resolved without the intervenor"); *WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1199 (10th Cir. 2010) (this requirement "presents a minimal burden"). If Plaintiffs prevail on their claims, years of struggle by Student A to gain the right to use the locker rooms that correspond to her gender identity will have been to no avail. She will lose a critical protection that allows her to function as an integrated student without the stigma of separate changing facilities. Given that Plaintiffs' lawsuit has already begun to undo that psychological protection, Student A's interests are undeniably in the balance. Students B's and C's future ability to use gender-appropriate facilities, including restrooms, in the District is at issue. And the Alliance's efforts to assist students in using school facilities consistent with their gender identity will be undermined, if not prevented entirely, if ED's guidance is held unlawful.

### 3. Defendants do not adequately represent Movants' interests.

An intervenor can meet the third requirement under Rule 24(a) by showing "that representation of his interest 'may be' inadequate, and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972). Although governmental bodies ordinarily are presumed to adequately represent those they are charged by law to protect, *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 774 (7th Cir. 2007), that presumption may be rebutted based on the history between the parties, *Ligas v. Maram*, 2010 WL 1418583, at *3 (N.D. Ill. Apr. 7, 2010), or where the intervenor does not have "the same

interest as" the governmental party, *United States v. S. Bend Cmty. Sch.*, 710 F.2d 394, 396 (7th Cir. 1983).

Thus, the Seventh Circuit has permitted intervention as defendants by students who had a personal stake in the outcome of their university's lawsuit against federal agencies charged with enforcing the law the university challenged. *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 558 (7th Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1528 (2015). After Notre Dame sued the United States over the contraception provisions of the Affordable Care Act, the students moved to intervene with the "concern that the university is seeking to obtain a ruling from this court that may thwart their right to contraception." *Id.* The court called this concern "exaggerated," but nonetheless decided that it "was sufficient to warrant intervention." *Id.* Thus, the Seventh Circuit allowed individuals with a clear stake in the litigation to enter the case despite existing government defendants. Likewise, in *Trbovich*, the Supreme Court allowed intervention by a union member on the same side as the U.S. Secretary of Labor, citing "sufficient doubt about the adequacy of representation to warrant intervention." 404 U.S. at 538. The same is true here.

    **a.**    **The District does not adequately represent Movants' interests.**

The District's history of recalcitrance with regard to Student A's use of locker rooms consistent with her gender identity establishes that the District does not adequately represent the interests of Movants. For over two school years, despite Student A's filing of a complaint with ED, the District refused to allow Student A access to the locker rooms that matched the gender she lives every day, announcing publicly that it would "not allow unrestricted access to its locker rooms as directed by OCR." Dkt. 21-4 at 1. As the ED noted in its November 2015 letter to the District, the district refused to allow Student A to use the girls' locker rooms even after constructing privacy curtains in one of the girls' locker rooms at Fremd. This refusal, ED noted,

deprived Student A of equal opportunity within her school and gave her "an ongoing sense of isolation and ostracism." Because of the District's actions, Student A had "to accept being treated differently," "changed separately from other students in a restroom down a 75-foot hallway," and "took a long and circuitous route daily in an attempt to enter the gymnasium unnoticed" among other slights and embarrassments. Dkt. 21-10 at 10.

The District's actions establish that its interests are aligned with Plaintiffs, not Federal Defendants or Movants. The District agreed to comply with Title IX only after being threatened with the loss of federal funding—and the District later threatened to back out of that agreement. *Deal for Transgender Student Now in Question Amid 'Bad Faith' Claims*, Chicago Tribune (Dec. 4, 2015), http://tiny.cc/e8rnby.

Moreover, the District announced in April 2016 that it would not adopt a policy allowing all students to use restrooms and locker rooms consistent with their gender identity. Peterson, *District 211 Decides Against Written Policy on Transgender Access*, Daily Herald (Apr. 29, 2016, 6:51 PM), http://tiny.cc/ vg5mby. In doing so, the District's policy board president stated that the board "found no way of having a written policy that would please everyone." *Id.* Accordingly, it is clear that, rather than representing Movants' interests, the District is focused on "pleas[ing] everyone," which includes appeasing those students and parents, including Plaintiffs in this suit, who oppose equal access for transgender students to gender-appropriate facilities. *See* Eldeib, *District 211 Keeps Deal on Transgender Student After Heated Debate*, Chicago Tribune (Dec. 8, 2015), http://tiny.cc/sasnby. Because the District represents many people whose interests conflict with those of Movants, it cannot adequately represent Movants' interests. *See Builders Ass'n v. City of Chicago*, 170 F.R.D. 435, 441 (N.D. Ill. 1996) (city was an inadequate representative of intervenors' who had direct stake in the outcome of the litigation).

**b.      Federal Defendants do not adequately represent Movants' interests.**

Movants' interests in this case are acutely personal and differ in degree and kind from the interests of Federal Defendants. First, ED has taken the position that the resolution agreement applies only to Student A's use of the girls' locker rooms, *see* Eldeib, *supra*, while Movants take the position that the agreement applies to all students in the District. Transgender students such as Students B and C who will attend schools in the District receive no protection from ED's settlement with the District, and there has been no sign ED has re-engaged with the District to attain additional protections. Thus, Federal Defendants cannot be expected to adequately represent Movants' personal interests in equal access to the District's facilities. *See Ind. Petr. Marketers Ass'n v. Huskey*, 2013 WL 6507002, at *6 (S.D. Ind. Dec. 11, 2013) (a "conflict between [intervenors] and the State" may "rende[r] the State's representation inadequate").

Second, ED's recent brief in a case involving a transgender student's use of restrooms corresponding to his gender identity argues only that prohibiting such use violates Title IX. *Am. Cur.* Br. of the U.S., *GG v. Gloucester Cty Sch. Bd.*, No. 15-2056 (4th Cir., filed Oct. 28, 2015). Movants will argue that there is a still more fundamental *constitutional* defect with the prohibitions Plaintiffs seek, because they deny equal protection on the basis of sex. *See City of Chicago v. FEMA*, 660 F.3d 980, 985-86 (7th Cir. 2011) ("Cases allow intervention as a matter of right when an original party does not advance a ground that if upheld by the court would confer a tangible benefit on an intervenor who wants to litigate that ground"). Unless this constitutional issue is raised by a party it will not be available on appeal or on certiorari.

Furthermore, beyond Administrative Procedure Act claims, Plaintiffs' Complaint raises other federal and state constitutional and statutory claims based on the right to privacy and to control the upbringing of children as well as the freedom of religion. There is no reason to

believe Federal Defendants' views on these issues mirror those of Movants, let alone that Federal Defendants will adequately represent Movants' interests in areas far beyond ED's core expertise. Movants intend to provide their own arguments regarding these novel claims and to introduce evidence of their personal experiences in the District, which Movants believe will assist the Court in resolving the issues in this case. *See Builders Ass'n of Greater Chi. v. City of Chicago*, 170 F.R.D. 435, 441 (N.D. Ill. 1996).

### B. Alternatively, Permissive Intervention Should Be Granted.

Movants easily satisfy the standard for permissive intervention under Rule 24(b)(1). Permissive intervention lies in the sound discretion of the trial court. *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). Indeed, "the court may permit anyone to intervene" who has a "defense that shares with the main action a common question of law or fact." Rule 24(b)(1)(B). Courts in this district have exercised their discretion liberally to grant permissive intervention, and here too permissive intervention is warranted.[3]

Movants include the student at the center of this controversy, students who will be in the same position in the near future, and an organization with a mission to promote the interests of transgender students in Illinois. Because their interests are at stake—dismantling the resolution agreement, the District's transgender restroom policy, and ED's guidance would fundamentally change the individual Movants' lives and the Alliance's advocacy work—Movants are uniquely qualified to illuminate the relevant facts and tie them to their legal arguments. Their participation would enable this Court to "address important issues in this case once, with fairness and finality." *Sec. Ins. Co.*, 69 F.3d at 1381; *see United States v. Bd. of Sch. Comm'rs*, 466 F.2d 573, 576 (7th

---

[3] *E.g.*, *Hanover Ins. Co. v. L&K Dev't*, 2013 WL 1283823, at *3 (N.D. Ill. Mar. 25, 2013) (intervention "perfectly appropriate" as intervenors sought to present same defense as defendant and avoidance of separate litigation promoted judicial economy); *Select Retrieval, LLC v. ABT Elecs.*, 2013 WL 6576861, at *3 (N.D. Ill. Dec. 13, 2013); *FDIC v. FBOP Corp.*, 2014 WL 4344655 (N.D. Ill. Sept. 2, 2014); *United States v. Metro. Water Recl. Dist.*, 2012 WL 3260427 (N.D. Ill. Aug. 7, 2012).

Cir. 1972) (intervention by particularly affected persons promotes "consideration of all aspects of [a] societally affected legal problem").

## CONCLUSION

For the foregoing reasons, Movants respectfully ask this Court to GRANT their Motion to Intervene.

Dated: May 25, 2016

Respectfully submitted,

/s/ *Britt M. Miller*

| | |
|---|---|
| John Knight<br>ROGER BALDWIN FOUNDATION OF ACLU, INC.<br>180 North Michigan Avenue<br>Suite 2300<br>Chicago, IL 60601<br>Telephone: (312) 201-9740 ext. 335<br>Facsimile: (312) 288-5225<br>jknight@aclu-il.org<br><br>- and –<br><br>Ria Tabacco Mar*<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad St., 18th Floor<br>New York, NY 10004<br>Telephone: (212) 549-2627<br>Facsimile: (212) 549-2650<br>rmar@aclu.org<br><br>*\* application for pro hac vice admission forthcoming* | Britt M. Miller<br>Timothy S. Bishop<br>Laura R. Hammargren<br>Linda X. Shi<br>MAYER BROWN LLP<br>71 South Wacker Drive<br>Chicago, IL 60606<br>Telephone: (312) 782-0600<br>Facsimile: (312) 701-7711<br>bmiller@mayerbrown.com<br>tbishop@mayerbrown.com<br>lhammargren@mayerbrown.com<br>lshi@mayerbrown.com<br><br>- and –<br><br>Catherine A. Bernard<br>MAYER BROWN LLP<br>1999 K Street, N.W.<br>Washington, DC 20006-1101<br>Telephone: (202) 263-3000<br>Facsimile: (202) 263-3300<br>cbernard@mayerbrown.com |

*Counsel for Students A, B, and C, and the Illinois Safe Schools Alliance*