**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| STUDENTS AND PARENTS FOR PRIVACY, a voluntary unincorporated association; C.A., a minor, by and through her parent and guardian, N.A.; A.M., a minor, by and through her parents and guardians, S.M. and R.M.; N.G., a minor, by and through her parent and guardian, R.G.; A.V., a minor, by and through her parents and guardians, T.V. and A.T.V.; and B.W., a minor, by and through his parents and guardians, D.W. and V.W., | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:16 CV 4945  The Hon. Jeffrey T. Gilbert, *Magistrate Judge* |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF EDUCATION; JOHN B. KING, JR., in his official capacity as United States Secretary of Education; UNITED STATES DEPARTMENT OF JUSTICE; LORETTA E. LYNCH, in her official capacity as United States Attorney General; and SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, and | ) ) | |
| STUDENTS A, B, and C, by and through their parents and legal guardians Parents A, B, and C, and the ILLINOIS SAFE SCHOOLS ALLIANCE, | ) ) ) ) ) | |
| Intervenor-Defendants. | ) | |

**INTERVENOR-DEFENDANTS' BRIEF IN RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.  BACKGROUND ........................................................................................................ 1

    A.  Interests of the Intervenor-Defendants.................................................. 1

    B.  Gender Identity, Not Sex Assigned at Birth, Determines One's Sex ................... 2

II.  PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION .............. 4

    A.  Plaintiffs Are Unlikely To Succeed on the Merits of Their Claims, All
        Which Rest on a Factually and Legally Incorrect Definition of the Term
        "Sex." ........................................................................................................ 4

        1.  The term "sex" under federal law includes gender identity and
            transgender status..................................................................... 5

        2.  *Ulane* has been overruled by subsequent Supreme Court decisions
            and is no longer good law ....................................................... 7

        3.  Plaintiffs cannot succeed on the merits of their Title IX claim
            because the mere presence of a transgender person does not
            constitute severe or pervasive harassment ............................. 11

        4.  Plaintiffs have failed to show they will succeed on the merits of
            their constitutional privacy claim because private changing areas
            and showers are available for all female students.................. 12

    B.  Plaintiffs Cannot Satisfy the Other Requirements for a Preliminary
        Injunction ........................................................................................... 14

CONCLUSION............................................................................................................... 16

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott Labs. v. Mead Johnson & Co.*,
    971 F.2d 6 (7th Cir. 1992) ...................................................................15

*Cameo Convalescent Ctr., Inc. v. Percy*,
    800 F.2d 108 (7th Cir. 1986) ...........................................................10, 11

*Canedy v. Boardman*,
    16 F.3d 183 (7th Cir. 1994) .........................................................12, 13, 14

*Christiansen v. Omnicom Grp., Inc.*,
    No. 15 Civ. 3440, 2016 WL 951581 (S.D.N.Y. Mar. 9, 2016) .................9

*Christiansen v. Omnicom Grp., Inc.*,
    No. 16-748-cv, 2016 WL 3551468 (2d Cir. June 28, 2016) ...................10

*City of L.A., Dep't of Water & Power v. Manhart*,
    435 U.S. 702 (1978) ..............................................................................6

*Cruzan v. Special Sch. Dist., No. 1*,
    294 F.3d 981 (8th Cir. 2002) ...........................................................11, 12

*Doe v. Clark Cty. Sch. Dist.*,
    No. 2:06-CV-1074-JCM, 2008 WL 4372872 (D. Nev. Sept. 17, 2008)...............14

*Doe v. Wood Cty. Bd. of Educ.*,
    888 F. Supp. 2d 771 (S.D. W. Va. 2012)...............................................15

*Etsitty v. Utah Trans. Auth.*,
    502 F.3d 1215 (10th Cir. 2007) ..........................................................7, 8

*Fabian v. Hosp. of Cent. Conn.*,
    No. 3:12-cv-1154, 2016 WL 1089178 (D. Conn. Mar. 18, 2016) .........5, 8

*Finkle v. Howard Cty.*,
    12 F. Supp. 3d 780 (D. Md. 2014)......................................................7, 8

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
    549 F.3d 1079 (7th Cir. 2008) ...........................................................4, 14

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) .....................................................6, 7, 8, 9

*Hendrichsen v. Ball State Univ.*,
    107 F. App'x 680 (7th Cir. 2004) ........................................................................11

*Hughes v. William Beaumont Hosp.*,
    No. 13-cv-13806, 2014 WL 5511507 (E.D. Mich. Oct. 31, 2014) ..........................7

*Jeldness v. Pearce*,
    30 F.3d 1220 (9th Cir. 1994) .................................................................................14

*Johnston v. Univ. of Pittsburgh*,
    97 F. Supp. 3d 657 (W.D. Pa. 2015) .....................................................................14

*Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*,
    542 F. Supp. 2d. 653 (S.D. Tex. 2008) ...................................................................7

*Macy v. Holder*,
    EEOC Doc. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012) .....................6

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................................................4

*Michigan v. U.S. Army Corps of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) ..................................................................................4

*Norwood v. Dale Maintenance System, Inc.*,
    590 F. Supp. 1410 (N.D. Ill. 1984) ......................................................................13

*Oncale v. Sundowner Offshore Services, Inc.*,
    523 U.S. 75 (1998)....................................................................................9, 10, 11

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990)..............................................................................................10

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)..................................................................................... *passim*

*In re R.M.A.*,
    477 S.W.3d 185 (Mo. Ct. App. 2015)...................................................................14

*Radtke v. Misc. Drivers & Helpers Union*,
    867 F. Supp. 2d 1023 (D. Minn. 2012) ...................................................................8

*Rosa v. Park W. Bank & Trust Co.*,
    214 F.3d 213 (1st Cir. 2000) ...................................................................................6

*Schroer v. Billington*,
    424 F. Supp. 2d 203 (D.D.C. 2006) ........................................................................9

*Schroer v. Billington*,
577 F. Supp. 2d 293 (D.D.C. 2008) ...............................................................5, 7, 8

*Schwenk v. Hartford*,
204 F.3d 1187 (9th Cir. 2000) .............................................................................6, 8

*Smith v. City of Salem*,
378 F.3d 566 (6th Cir. 2004) ............................................................................6, 8, 9

*Sommers v. Budget Mktg., Inc.*,
667 F.2d 748 (8th Cir. 1982) ............................................................................9, 12

*Strautins v. Trustwave Holdings, Inc.*,
27 F. Supp. 3d 871 (N.D. Ill. 2014) .......................................................................11

*Tronetti v. TLC HealthNet Lakeshore Hosp.*,
No. 03-CV-0375E(SC), 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003) ...........7, 8

*Ulane v. Eastern Airlines, Inc.*,
742 F.2d 1081 (7th Cir. 1984) .................................................................... *passim*

*Villasenor v. Indus. Wire & Cable, Inc.*,
929 F. Supp. 310 (N.D. Ill. 1996) ..........................................................................11

**Statutes**

Title IX, 20 U.S.C. §§ 1681 et. seq. ................................................................. *passim*

Title VII of the Civil Rights Act of 1964 .......................................................... *passim*

**Other Authorities**

81 Fed. Reg. 31,376 (May 18, 2016) (to be codified at 45 C.F.R. Part 95) ....................................6

Jo Freeman, *How "Sex" Got Into Title VII: Persistent Opportunism as a Maker of Public Policy*, 9 Law & Ineq. 163 (1991) ...............................................................9

Robert C. Bird, *More Than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act*, 3 Wm. & Mary J. Women & L. 137 (1997)..............................................................................................9

Transgender girls are girls, and transgender boys are boys. Plaintiffs' request for the extraordinary remedy of a preliminary injunction is premised on the false notion that "sex" is limited to a person's sex assigned at birth. Plaintiffs do not even attempt to provide scientific evidence to support their theory, which is unsurprising given that it is now firmly established that gender identity, not sex assigned at birth, is determinative of sex when those factors are not congruent. More importantly, Plaintiffs' cramped reading of the term "sex" ignores nearly thirty years of precedent recognizing that "sex" under federal law means much more than chromosomal makeup or anatomy and encompasses other aspects of a person's sex, including gender identity and transgender status. These errors are fatal to Plaintiffs' claim that transgender students' use of facilities that correspond with their gender identities amounts to "cross-sex" use. The policies to which Plaintiffs object do not authorize "cross-sex" use of facilities, and the mere presence of transgender students in school facilities does not constitute severe or pervasive harassment or violate constitutional guarantees of privacy. Plaintiffs' motion should be denied.

## I. BACKGROUND

### A. Interests of the Intervenor-Defendants.

The Intervenor-Defendants are three transgender students in District 211 ("the District") as well as the Illinois Safe Schools Alliance ("the Alliance"). Student A, a transgender girl, is the subject of a December 2015 agreement between the District and the Department of Education's Office of Civil Rights (OCR) permitting Student A to use the girls' locker rooms at William Fremd High School ("the Agreement"). *See* Dkt. 21-3. The Agreement requires the District to "install[ ] and maintain[ ] sufficient privacy curtains (private changing stations) within the girls' locker rooms." *Id.* at 2. Student A has been using the girls' restrooms since the fall of 2013 and began changing in one of the private changing areas in March 2016. Dkt. 32-1, ¶¶ 7, 18. Students

1

B and C are transgender boys who will soon attend District high schools and wish to use boys' restrooms and locker rooms at their respective schools. Dkt. 32-2, ¶ 19; Dkt. 32-3, ¶ 10. The Alliance is an organization that supports lesbian, gay, bisexual, and transgender Illinois students through advocacy and training, including in the District following its Agreement with OCR. Dkt. 32-4, ¶¶ 2–15.

### B.    Gender Identity, Not Sex Assigned at Birth, Determines One's Sex.

Contrary to Plaintiffs' repeated assertions that one's sex is limited to the sex assigned at birth, they are simply wrong on the facts. Without citing a single factual or scientific basis for their claim, Plaintiffs assert that Student A has an "objective biological status as a male," PI Mot. 1 n.1, based solely on the fact that Student A was assigned the sex male at birth. *See also* Ex. 1 at 3 (facts on which Plaintiffs rely limited to that Student A was "designated male at birth" or "born male"[1]); Ex. 2 at 2 (Plaintiffs admit they have not reviewed Student A's medical records or conducted medical examination of her). But the sex of a transgender student is determined by his or her gender identity. Ex. 3, ¶ 22. Research and the medical standards of care applicable to transgender students confirm that the sex of transgender students is determined by their gender identity, and that there is a biological basis showing that Plaintiffs have their "biological facts" wrong.

Transgender individuals have gender identities that differ from the sex they were assigned at birth. *Id.* ¶¶ 10–11. Assignments at birth are not definitive; in some cases they conflict with an individual's gender identity—a sense, internal to each and every human, of oneself as male, female, or something else. *Id.* ¶ 12. In addition, gender dysphoria—the medical diagnosis for the incongruence and accompanying distress when an individual's gender identity

---

[1]    Plaintiffs do not provide any factual basis for the conclusory statements attributed to the District that Student A is "biologically male"—statements that presumably also rest on the fact that Student A was assigned the sex male at birth.

differs from their birth-assigned sex—demonstrates that transgender status is grounded in medical research and clinical practice. *Id.* ¶ 15. The sole medically supported determinant of sex for individuals with gender dysphoria is gender identity. *Id.* ¶ 22. "Treatments" for gender dysphoria attempted in the past—which sought to force alignment of an individual's gender identity and birth-assigned sex—were destructive failures. *Id.* ¶¶ 17–18. The now firmly established medical standard of care for treating gender dysphoria involves alleviating distress through supporting outward expressions of a person's gender identity and bringing the body, gender expression, and gender presentation into alignment with gender identity to the extent that is medically appropriate. *Id.* ¶ 18.

In addition, contrary to Plaintiffs' assertions, medical research from the endocrine, neuroanatomical, and genetic disciplines indicates that a person's gender identity is firmly rooted in biology. *Id.* ¶ 14. For example, research shows transgender individuals possess a genetic factor that does not exist in cisgender persons; other studies have shown that persons with gender dysphoria have structural and connectivity differences in their brains as compared to other persons of their birth-assigned sex. *Id.* Even if gender identity were not grounded in biology, it would be determinative of a person's sex where there is not complete alignment among a person's sex-related characteristics. *Id.* ¶ 21.

Plaintiffs gloss over this research and the prevailing medical standards, but these facts disprove the central premise behind Plaintiffs' theory that Student A is male and, thus, that Student A's presence in the girls' locker rooms threatens other girls' privacy because there is "a biological male present." PI Mot. 5, 13. Modern science confirms that Student A is a girl, so her presence in girls' facilities is no more remarkable than any other girl's, and it does not create a "cross-sex" situation or threaten anyone.

3

## II.     PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.

Granting a preliminary injunction "is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008). Plaintiffs have not even come close to satisfying the demanding standards for this "extraordinary and drastic remedy," which "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs fall short of their burden, as they cannot demonstrate "that they are likely to succeed on the merits of their claims," "that the harm they would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants," or "that the injunction is in the public interest." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 769 (7th Cir. 2011).

### A.     Plaintiffs Are Unlikely To Succeed on the Merits of Their Claims, All Which Rest on a Factually and Legally Incorrect Definition of the Term "Sex."

Plaintiffs' claims are all premised upon a scientifically erroneous and legally outdated notion of what "sex" means under federal law. Each claim relies on Plaintiffs' insistence that "sex" means only "biological male and female," which Plaintiffs define narrowly and incorrectly as sex assigned at birth. PI Mot. at 6–7. It is on that theory that Plaintiffs maintain that the challenged Agreement between the District and OCR allows "cross-sex restroom and locker room use," which they assert violates Plaintiffs' privacy. *Id.* at 15–16. Plaintiffs' Title IX claim similarly asserts that Defendants have harassed them "based on sex" because they have "open[ed] restrooms and locker rooms to students of the opposite biological sex." *Id.* at 20–21. Plaintiffs' APA claim—the final claim they discuss in their motion—is likewise based on this definition. *E.g.*, *id.* at 5 (basing APA claim on assertion that "sex" in Title IX "means biological male and female"). As demonstrated above, this narrow and inaccurate view of sex is factually

and legally incorrect. It is also legally incorrect for the reasons explained below. Consequently, transgender students' use of facilities that correspond with their gender identities does not amount to "cross-sex restroom and locker room use," but rather, ordinary use by students of the sex for which the facilities are designated. Plaintiffs have no factual or legal basis for asserting that "cross-sex" use occurs, let alone use that could constitute severe or pervasive harassment or violate constitutional guarantees of privacy.

> **1.    The term "sex" under federal law includes gender identity and transgender status.**

Plaintiffs fail to account for two independent reasons why the term "sex" under federal law applies to transgender individuals. First, as a purely textual matter, the term "sex" plainly encompasses transgender status, because transgender people by definition are individuals who identify with a sex different from the sex assigned to them at birth. In other words, it is impossible to take into account a person's transgender status without taking into account their sex. *See Fabian v. Hosp. of Cent. Conn.*, No. 3:12-cv-1154, 2016 WL 1089178, at *12 (D. Conn. Mar. 18, 2016) (a person's transgender status is incontrovertibly based on sex itself—*i.e.*, "the property or characteristic (or group of properties or characteristics) by which individuals may be so distinguished"); *Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008) (discrimination against transgender woman because of her gender transition "was *literally* discrimination 'because of . . . sex'"); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 275 (1989) (O'Connor, J., concurring) (Title VII prohibits "the explicit consideration of . . . sex"). Several of Plaintiffs' own dictionary definitions of "sex" explicitly support this conclusion. *See* PI Mot. 6 n.11. Adverse actions affecting transgender people premised upon those properties and

characteristics that *make* them transgender quite literally "take gender into account," *Price Waterhouse*, 490 U.S. at 239, and are thus unlawful.[2]

Second, the Supreme Court's recognition in *Price Waterhouse* that employers may not discriminate based on sex stereotypes confirms that any definition of "sex" is not limited to a person's sex assigned at birth, chromosomal make-up or anatomy, but also includes other aspects of a person's sex, such as gender expression and an individual's conformity (or lack of conformity) with social gender roles. In *Price Waterhouse*, the Supreme Court recognized that employers discriminate "because of sex" when they make adverse employment decisions based on sex-specific stereotypical beliefs, such as the notion that "a woman cannot be aggressive, or that she must not be." *Id.* at 250. In holding that protection from discrimination "because of . . . sex" includes sex stereotyping, *Price Waterhouse* makes clear that the definition of "sex" extends beyond any "biological" differences among people. Rather, the "simple test" for discrimination because of sex is "treatment of a person in a manner which but for that person's sex would be different." *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978).

Every federal appellate court that has considered sex discrimination claims brought by transgender people post-*Price Waterhouse* has reaffirmed that laws prohibiting sex discrimination do not exclude transgender people from their protections. *Glenn v. Brumby*, 663 F.3d 1312, 1314 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d

---

[2]    Numerous federal agencies charged with enforcing our nation's sex discrimination laws have reached the same conclusion. *See, e.g.*, *Macy v. Holder*, EEOC Doc. 0120120821, 2012 WL 1435995, at *10 (EEOC Apr. 20, 2012) ("[I]f Complainant can prove that the reason that she did not get the job . . . is that the Director was willing to hire her when he thought she was a man, but was not willing to hire her once he found out that she was now a woman – she will have proven that the Director discriminated on the basis of sex."); Nondiscrimination in Health Programs and Activities Rule, 81 Fed. Reg. 31,376 (May 18, 2016) (to be codified at 45 C.F.R. Part 95) (defining discrimination "on the basis of sex" to include gender identity discrimination).

1187, 1199–1203 (9th Cir. 2000); *see also Etsitty v. Utah Trans. Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) (assuming without deciding that transgender employees may bring sex stereotyping claims under Title VII). Numerous other courts have allowed sex discrimination claims brought by transgender plaintiffs to proceed after *Price Waterhouse*.[3] As many courts have recognized, because "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes," discrimination based on transgender status is a form of impermissible sex stereotyping. *Glenn*, 663 F.3d at 1316–18 (collecting cases). Plaintiffs fail to account for this foundational aspect of federal discrimination law, which invalidates the narrow conception of "sex" at the heart of their claims. *See Finkle v. Howard Cty.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014) ("[A]ny discrimination against transsexuals (as transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is proscribed by Title VII's proscription of discrimination on the basis of sex as interpreted by *Price Waterhouse*").

### 2. *Ulane* has been overruled by subsequent Supreme Court decisions and is no longer good law.

The primary case to which Plaintiffs repeatedly turn for their cramped understanding of "sex" is *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984). The *Ulane* plaintiff was a transgender pilot who sued her employer under Title VII for discriminatory termination. *Id.* at 1082. The court erroneously concluded "that Title VII does not protect transsexuals" despite that statute's protection against discrimination "because of . . . sex," based on its understanding that Congress did not intend for the statute to "apply to anything other than the traditional concept of sex." *Id.* at 1085.

---

[3]     *See, e.g.*, *Hughes v. William Beaumont Hosp.*, No. 13-cv-13806, 2014 WL 5511507 (E.D. Mich. Oct. 31, 2014); *Finkle v. Howard Cty.*, 12 F. Supp. 3d 780 (D. Md. 2014); *Schroer*, 577 F. Supp. 2d 293; *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d. 653 (S.D. Tex. 2008); *Tronetti v. TLC HealthNet Lakeshore Hosp.*, No. 03-CV-0375E(SC), 2003 WL 22757935 (W.D.N.Y. Sept. 26, 2003).

*Ulane* rests on two fundamental legal errors that make it no longer good law. First, it limits the definition of "sex" to the "traditional" concept of being male or female. As already discussed, *Price Waterhouse* did away with such a limited notion of what "sex" means. Multiple courts of appeals and district courts have flatly contradicted Plaintiffs' claim that "most courts agree with the Seventh Circuit's *Ulane* decision." PI Mot. at 17. Rather, "since the decision in *Price Waterhouse*, federal courts have recognized *with near-total uniformity*" that *Ulane*'s approach is no longer good law. *Glenn*, 663 F.3d at 1318 n.5 (emphasis added). *Ulane* "has been eviscerated by *Price Waterhouse*," under which the federal antidiscrimination statutes' "reference to 'sex' encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms." *Smith*, 378 F.3d at 573; *see also Schwenk*, 204 F.3d at 1201–02 (the "narrow[ ]" construction and "judicial approach" in *Ulane* "ha[ve] been overruled by the logic and language of *Price Waterhouse*"); *Fabian*, 2016 WL 1089178, at *8–12 ("*Price Waterhouse* abrogates" *Ulane*); *Finkle*, 12 F. Supp. 3d at 788; *Radtke v. Misc. Drivers & Helpers Union*, 867 F. Supp. 2d 1023, 1032 (D. Minn. 2012) (rejecting "reliance on decades-old Title VII cases" including *Ulane*); *Schroer*, 577 F. Supp. 2d at 307; *Tronetti v. TLC HealthNet Lakeshore Hosp.*, No. 03-CV-0375E(SC), 2003 WL 22757935, at *4 & n.15 (W.D.N.Y. Sept. 26, 2003). The sole post-*Price Waterhouse* case on which Plaintiffs rely for the assertion that *Ulane* is still followed, *Etsitty v. Utah Transit Authority*, 502 F.3d at 1224, is inconsistent with both the logic and the result in *Price Waterhouse*. Moreover, even the *Etsitty* decision assumed that transgender employees may bring sex discrimination claims under Title VII when they can present specific evidence of sex stereotyping, undercutting Plaintiffs' theory that "sex" means only the fact of being male or female. *See Id.*

Notably, Plaintiffs fail even to mention *Price Waterhouse*, let alone attempt to reconcile *Ulane* with this subsequent binding authority or other legal developments in the more than 30 years since *Ulane* was decided.[4] More recently, "[t]he broader legal landscape has undergone significant changes" in the area of sex and gender discrimination, as well as other areas of human behavior that have long been subject to stereotyping and discrimination, such as sexual orientation. *E.g.*, *Christiansen v. Omnicom Grp., Inc.*, No. 15 Civ. 3440, 2016 WL 951581, at *13 (S.D.N.Y. Mar. 9, 2016). As these developments illustrate, age-old errors of legal analysis need not tie the hands of modern courts with better evidence, better understanding, and decades more case law as guidance. *See Schroer v. Billington*, 424 F. Supp. 2d 203, 212 (D.D.C. 2006) (*Ulane*'s arguments "have lost their power after twenty years of changing jurisprudence on the nature and importance *vel non* of legislative history").

*Ulane*'s second critical legal error was to rely on Title VII's murky legislative history to support its holding that transgender individuals are not entitled to Title VII's protections. The *Ulane* court inconsistently concluded both that there is a "total lack of legislative history supporting the sex amendment" to Title VII and that "Congress had a narrow view of sex in mind when it passed the Civil Rights Act." 742 F.2d at 1085–86. Regardless of the truth or weight of these conflicting statements,[5] any reliance on congressional intent behind Title VII to determine its reach was squarely rejected in *Oncale v. Sundowner Offshore Services, Inc.*,

---

[4]     Plaintiffs also cite a 1982 decision, *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982), that mirrors *Ulane*'s mistaken textual analysis and erroneous parsing of legislative intent and has similarly been overruled by *Price Waterhouse*. *See Glenn*, 663 F.3d 1318 at n.5; *Smith*, 378 F.3d at 573.

[5]     *Ulane*'s recounting of how Title VII's sex provision came into being, for example, is the subject of academic dispute. The *Ulane* court stated that the "sex amendment was the gambit of a congressman seeking to scuttle adoption of the Civil Rights Act." 742 F.2d at 1085. That account of the origins of the amendment, however, has been discredited by more recent scholarship. *See, e.g.*, Robert C. Bird, *More Than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act*, 3 Wm. & Mary J. Women & L. 137, 138, 143–44 (1997) (*Ulane*'s history of the amendment is wrong because the amendment was the "result of subtle political pressure from individuals, who for varying reasons, were serious about protecting the rights of women"); Jo Freeman, *How "Sex" Got Into Title VII: Persistent Opportunism as a Maker of Public Policy*, 9 Law & Ineq. 163 (1991).

9

523 U.S. 75, 79–80 (1998). In recognizing that Title VII protects against male-on-male sexual harassment, the Court observed that such behavior was "assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Id.* at 79.

The Supreme Court has likewise rejected *Ulane*'s reliance on subsequent Congress' rejection of amendments to Title VII that would have explicitly prohibited discrimination based on sexual orientation (but *not* transgender status) to support its claim that Congress took a narrow view of the concept of "sex." *Ulane*, 742 F.2d at 1085–86. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("subsequent legislative history is . . . a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns . . . a proposal that does not become law"). Congressional inaction as to sexual orientation is irrelevant to what "sex" means in the statute—it has nothing to do with gender identity. And congressional failure to act could just as easily establish the opposite conclusion from that of the *Ulane* court—*i.e.*, Congress may have concluded that Title VII already covered sexual orientation and gender identity discrimination through its "because of . . . sex" language. *See* Br. *Amici Curiae* of 128 Members of Congress, *Christiansen v. Omnicom Grp., Inc.*, No. 16-748-cv, 2016 WL 3551468, at *7 (2d Cir. June 28, 2016).

*Ulane* thus rests on two legal errors that have subsequently been exposed, as well as on the attitudes and knowledge of the very different era in which it was decided three decades ago. To be sure, the Seventh Circuit has not yet had the opportunity explicitly to overrule *Ulane*. But district courts in this circuit are not bound by Seventh Circuit precedent that has been overtaken by an "intervening change in the controlling authority." *Cameo Convalescent Ctr., Inc.*

*v. Percy*, 800 F.2d 108, 110 (7th Cir. 1986); *see also Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 879 (N.D. Ill. 2014) ("If existing circuit precedent cannot be reconciled with a subsequent ruling from the Supreme Court, then the latter governs."); *Villasenor v. Indus. Wire & Cable, Inc.*, 929 F. Supp. 310, 313 (N.D. Ill. 1996) ("[W]e are bound by Seventh Circuit precedent unless and until a subsequent decision by that court or the Supreme Court undermines its holding."). This Court is not bound by *Ulane*'s outmoded view of the definition of "sex," which cannot be reconciled with *Price Waterhouse* or *Oncale*.

> **3.** **Plaintiffs cannot succeed on the merits of their Title IX claim because the mere presence of a transgender person does not constitute severe or pervasive harassment.**

The foregoing discussion makes clear that Plaintiffs' definition of "sex," which is crucial to their Title IX claim, is wrong. Title IX prohibits sex-based harassment that is severe or pervasive. *See Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 684 (7th Cir. 2004). Plaintiffs go so far as to argue that Student A's mere presence in the girls' facilities amounts to such "harassment" because "[t]he biological differences between the sexes create a hostile environment when a male enters the girls' facilities." PI Mot. at 21. Plaintiffs provide zero scientific support for their cramped interpretation of a person's "sex" and, as explained above, Student A's presence in the girls' facilities does not amount to a "male enter[ing] the girls' facilities." In any event, Plaintiffs' "hostile environment" claim based on the mere presence of a transgender person in a sex-specific space is not cognizable under federal law. *See Cruzan v. Special Sch. Dist., No. 1*, 294 F.3d 981 (8th Cir. 2002). In *Cruzan*, the Eighth Circuit rejected the claim that allowing a transgender woman to use the women's restroom created a hostile environment for a non-transgender woman in the absence of "any inappropriate conduct other than merely being present." *Id.* at 984. Notably, the Eighth Circuit reached this conclusion despite having drawn an erroneous distinction between anatomical "sex" and behavioral

"gender" in *Sommers*. While *Sommers* is no longer good law in light of *Price Waterhouse*, the result in *Cruzan* illustrates that, regardless of one's view of the proper determinant of sex, the mere presence of a transgender person, without more, does not constitute sex-based harassment, let alone harassment that is "severe or pervasive," as required to prove a Title IX or Title VII violation. *Id.* Plaintiffs' Title IX claim must fail.

4. **Plaintiffs have failed to show they will succeed on the merits of their constitutional privacy claim because private changing areas and showers are available for all female students.**

Even apart from the factual and legal shortcomings of their arguments about "sex," Plaintiffs cannot show they will prevail on their privacy claim. That claim ignores provisions of the Agreement between the District and OCR that Plaintiffs are attacking, which establish a private changing area for "*any students* who wish to be assured of privacy while changing." Dkt. 21-3 at 2 (emphasis added), as well as the District's decision to make available private shower facilities for students who wish to use them. Dkt. 21-8 at 9. Specifically, the District agreed "to take steps to protect the privacy of its students by installing and maintaining sufficient privacy curtains (private changing stations) within the girls' locker rooms." *Id.* Student A herself said she would change within such private changing stations. *Id.*[6]

Plaintiffs argue that "Defendants could provide single-stall or other private accommodations to students who identify as the opposite sex." PI Mot. 18. But the Agreement between OCR and the District does make "private accommodations" for *all* female students in the form of privacy curtains; accordingly, it mandates no "forced observations or inspections of the naked body" by anyone, let alone "a member of the opposite sex." *Canedy v. Boardman*, 16

---

[6]      Additionally, Plaintiffs fail to explain why the mere presence of a transgender girl in the restroom, where there are assuredly individual, private stalls for each user, would implicate constitutional privacy interests. And while they assert that male student plaintiffs "typically use urinals without stalls," Dkt. 23 at 21, they fail to explain why they are required to do so.

F.3d 183, 185 (7th Cir. 1994). Plaintiffs incorrectly contend that the Agreement "*require[s]* girls to undress, and attend to feminine hygiene needs, in locker rooms with a biological male present" and otherwise "*force[s]* children to shower, change clothing, or use the restroom in the presence of the opposite sex." PI Mot. 13 (emphasis added). This is untrue. Plaintiffs' historical ruminations about privacy—which egregiously conflate the mere presence of a transgender student in the locker room with "lawsuits against 'Peeping Toms,'" sexting, and distribution of child pornography (*id.* at 13–14)—is premised upon the claim that students cannot avoid unclothed interaction with Student A. Under the Agreement, they can. Regardless, the premise of Plaintiffs' claim is wrong; as already discussed, Student A's presence in the girls' restrooms or locker rooms is not that of an "opposite-sex student." *Id.* at 15. She is a girl.

Furthermore, the cases Plaintiffs cite do not help them. For example, Plaintiffs cite *Norwood v. Dale Maintenance System, Inc.*, 590 F. Supp. 1410 (N.D. Ill. 1984), for the proposition "that the privacy violation arising from compelled risk of intimate exposure trumps Title VII's bar on sex-based employment discrimination." PI Mot. 15. But *Norwood* held no such thing. Both the plaintiff and the defendant in *Norwood* conceded that entry of a non-transgender female janitor into a men's restroom would violate the privacy rights of any man who happened to be inside. Thus, the only question before the court was whether the bona fide occupational qualification exception to Title VII applied and whether the defendant provided reasonable alternatives for the plaintiff. *Norwood*, 590 F. Supp. 2d at 1417–23. Importantly, there is no indication that the facilities in *Norwood* offered privacy areas similar to those available at Fremd High School.

*Canedy* likewise involved facts and claims far afield from the case at bar. The plaintiff in *Canedy* was a male prisoner who did not want female guards strip-searching him "during a

shakedown" and requested "that shower curtains be installed" as well as temporary privacy coverings on cell windows. 16 F.3d at 184, 188. The Seventh Circuit reversed dismissal of the plaintiff's complaint, which asserted a privacy interest in avoiding nude strip-searches from female guards that "particularly burden[ed] him because he is a Muslim." *Id.* at 186 n.2. Students changing for gym class presents entirely different circumstances from forcible strip-searches of prisoners at a secure penal institution. And the privacy screens the *Canedy* plaintiff requested are *already in place* under the District's agreement with OCR.

Plaintiffs cite *one case* for their sweeping assertion that courts "almost uniformly agre[e]" that "requiring students to use private facilities with opposite-sex students who identify as transgender violates privacy rights." PI Mot. 16–17. *See Johnston v. Univ. of Pittsburgh*, 97 F. Supp. 3d 657 (W.D. Pa. 2015).[7] However, *Johnston* involved an equal protection claim brought by a transgender college student; it did not involve privacy claims of transgender or non-transgender students. Moreover, *Johnston* relied on the now-discredited reasoning in *Ulane*, *id.* at 675–78, and is flawed for the same reasons.

### B. Plaintiffs Cannot Satisfy the Other Requirements for a Preliminary Injunction.

Plaintiffs' failure to demonstrate a likelihood of success on the merits of their claims should end the Court's consideration of their motion. Without such a showing, the Court "must deny the injunction." *Girl Scouts of Manitou Council*, 549 F.3d at 1086. Plaintiffs also fail to meet the public interest or balance-of-hardships elements necessary to obtain a preliminary

---

[7]    In a footnote to their *Johnston* discussion, Plaintiffs mention three cases with a "see also" cite as if each had holdings similar to *Johnston*. They do not. *Jeldness v. Pearce*, 30 F.3d 1220 (9th Cir. 1994), did not involve transgender people at all; rather, the case was brought by female prisoners demanding equal opportunities within the prison system to those of men. *Id.* at 1222–23. The two other cases Plaintiffs cite also do not support their claims. In one, the plaintiff's claim was dismissed on entirely procedural grounds without reaching the merits and without any reference to Title IX or privacy. *In re R.M.A.*, 477 S.W.3d 185, 186–87 (Mo. Ct. App. 2015). In the other, the court found that the plaintiff failed to establish standing but went on to state in dicta that she could not show that she was subject to sex discrimination; the case did not involve harassment or privacy claims. *Doe v. Clark Cty. Sch. Dist.*, No. 2:06-CV-1074-JCM, 2008 WL 4372872, at *3–4 (D. Nev. Sept. 17, 2008).

injunction. Plaintiffs peg both these elements to the merits of their claims, which, as already shown, are unlikely to succeed. As a result, Plaintiffs fail to satisfy the public interest and balance-of-hardships elements as well.

Conversely, granting a preliminary injunction would cause immediate and irreparable injury to Intervenor-Defendants. Student A would face immediate harm if an injunction were to suspend the very agreement that she has fought for over the course of two years, during which she experienced substantial stress and anxiety. Dkt. 32-1, ¶¶ 6–17. Losing gender-appropriate restroom and locker room use would be traumatizing and embarrassing. *Id.* ¶ 20. Student A has already lost years of her high school experience—years she will experience "only once during [her] life"—and, if a preliminary injunction were to issue, she will irrevocably lose her senior year as well. *Doe v. Wood Cty. Bd. of Educ.*, 888 F. Supp. 2d 771, 778 (S.D. W. Va. 2012). Similarly, Students B and C will suffer significant discomfort, embarrassment and psychological harm if they are unable to use gender-appropriate restrooms when they enter District schools. Dkt. 32-2, ¶¶ 19–21; Dkt. 32-3, ¶¶ 10–12. And the Alliance's work in assisting Student A will be undone and its advocacy efforts on behalf of transgender students damaged. Dkt. 32-4, ¶¶ 14–19.

Further, a preliminary injunction would damage the public interest, that is, the interest of non-parties. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992). The public has an interest in providing equal educational opportunity to all students. If a preliminary injunction were to issue, every transgender student in the District would suddenly lose the ability to use the gender-appropriate restroom, which could result in anxiety, learning difficulties, stigmatization, depression, and even suicidality for those students. Ex. 3, ¶¶ 23–29. An injunction would also create serious confusion and uncertainty for *all* families with students in the District over the status of the District's Agreement with OCR just as a new school year

approaches—an Agreement finally reached this past December after years of negotiations and public hearings and debate.

## CONCLUSION

For the reasons stated above, the Intervenor-Defendants urge the Court to deny Plaintiffs' motion for a preliminary injunction.

Dated:  July 8, 2016

Respectfully submitted,

/s/ *Britt M. Miller*
Britt M. Miller
Timothy S. Bishop
Laura R. Hammargren
Linda X. Shi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
bmiller@mayerbrown.com
tbishop@mayerbrown.com
lhammargren@mayerbrown.com
lshi@mayerbrown.com

John Knight
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
180 North Michigan Avenue
Suite 2300
Chicago, IL  60601
Telephone:  (312) 201-9740 ext. 335
Facsimile:  (312) 288-5225
jknight@aclu-il.org

- and -

Ria Tabacco Mar*
American Civil Liberties Union
    FOUNDATION
125 Broad St., 18th Floor
New York, NY  10004
Telephone:  (212) 549-2627
Facsimile: (212) 549-2650
rmar@aclu.org

*Admitted pro hac vice*

- and –

Catherine A. Bernard
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC  20006-1101
Telephone:  (202) 263-3000
Facsimile:  (202) 263-3300
cbernard@mayerbrown.com

*Counsel for Students A, B, and C, and the Illinois Safe Schools Alliance*

16