## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **STUDENTS AND PARENTS FOR PRIVACY**, a voluntary unincorporated association; **C.A.**, a minor, by and through her parent and guardian, **N.A.**; **A.M.**, a minor, by and through her parents and guardians, **S.M.** and **R.M.**; **N.G.**, a minor, by and through her parent and guardian, **R.G.**; **A.V.**, a minor, by and through her parents and guardians, **T.V.** and **A.T.V.**; and **B.W.**, a minor, by and through his parents and guardians, **D.W.** and **V.W.**, | Case No. 1:16-cv-04945 |
| Plaintiffs, | |
| vs. | |
| **UNITED STATES DEPARTMENT OF EDUCATION**; **JOHN B. KING, JR.**, in his official capacity as United States Secretary of Education; **UNITED STATES DEPARTMENT OF JUSTICE**; **LORETTA E. LYNCH**, in her official capacity as United States Attorney General; and **SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS**, | The Honorable Jeffrey T. Gilbert, Magistrate Judge |
| Defendants, | |
| and | |
| **STUDENTS A**, **B**, and **C**, by and through their parents and legal guardians **Parents A**, **B**, and **C**, and the **ILLINOIS SAFE SCHOOLS ALLIANCE**, | |
| Intervenor-Defendants. | |

## Plaintiffs' Reply Memorandum
## In Support of Their Preliminary Injunction Motion

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

I.  Plaintiffs Are Likely to Prevail on the Merits. .................................................. 3

    A.  Plaintiffs Are Likely to Prevail on Their Procedural APA Claim. ........................ 3

        1.  The Rule is Legislative Because It Creates New Rights and Duties. ......... 4

        2.  Like Legislative Rules, the Rule Is Binding and Has Penalties. ................. 6

        3.  Notice and Comment Applies to Rules Cloaked As Guidance .................. 7

    B.  Plaintiffs Are Likely to Prevail on Their Substantive APA Claims. ..................... 9

        1.  The Rule Exceeds Statutory Authority. ..................................................... 9

        2.  The Rule Is Arbitrary and Capricious, Abuses Discretion and Is Not In Accord With Law ..................................................................................... 16

        3.  The Rule Is Contrary to Constitutional Right. ......................................... 17

        4.  The Rule Is Owed No Deference. ............................................................ 18

    C.  Plaintiffs Are Likely to Prevail on Their Privacy and Title IX Claims. .............. 19

II. Plaintiffs Satisfy the Other Requirements for Preliminary Injunction ............................. 24

III. Plaintiffs Have Not Unreasonably Delayed Their Lawsuit. .............................................. 24

CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

*Cases:*

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ................................................................................8, 9

*Arlington Central School District Board of Education v. Murphy*,
548 U.S. 291 (2006) ..................................................................................................17

*Bd. of Educ. of the Highland Local School District v. U.S. Dep't of Educ. et al*,
No. 16-524 (S.D. Ohio, filed June 10, 2016), *Compl.*, Dkt. 1 .............................7

*Califano v. Sanders*,
430 U.S. 99 (1977) ....................................................................................................19

*Christensen v. Harris County*,
529 U.S. 576 (2000) ............................................................................................18, 19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ..................................................................................................18

*Creed v. Family Express Corp.*,
No. 3:06-CV-465RM, 2009 WL 35237 (N.D. Ind. Jan. 5, 2009) .....................15

*Davis Next Friend LaShonda D. v. Monroe County Board of Education*,
526 U.S. 629 (1999) ..................................................................................................25

*Dawson v. Bumble & Bumble*,
398 F.3d 211 (2d Cir. 2005) .....................................................................................16

*Doe v. Clark County School District*,
No. 2:06-CV-1074-JCM-RJJ, 2008 WL 4372872 (D. Nev. Sept. 17, 2008)......................5

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ..............................................................................................19

*Etsitty v. Utah Transit Authority*,
No. 2:04–CV–616-DS, 2005 WL 1505610 (D. Utah June 24, 2005)...............15

*Etsitty v. Utah Transit Authority*,
502 F.3d 1215 (10th Cir.2007) ................................................................................15

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ....................................................................................................9

*Franklin v. Gwinnett County Public Schools*,
   503 U.S. 60 (1992)..................................................................................................25

*G.G. ex rel. Grimm v. Gloucester County School Board*,
   822 F.3d 709 (4th Cir. 2016) ...........................................................11, 12, 18

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) .......................................................................15

*Hoctor v. U.S. Department of Agriculture*,
   82 F.3d 165 (7th Cir. 1996) ........................................................................4, 6

*Holloway v. Arthur Andersen & Co.*,
   566 F.2d 659 (9th Cir. 1977) ...........................................................................15

*Kohler v. City of Wapakoneta*,
   381 F. Supp. 2d 692 (N.D. Ohio 2005)....................................................21, 22

*Livingwell (North) Inc. v. Pennsylvania Human Relations Commission*,
   606 A.2d 1287 (1992).............................................................................21, 23

*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*,
   512 U.S. 218 (1994)...........................................................................................9

*Metropolitan School District of Wayne Township, Marion County, Indiana v. Davila*,
   969 F.2d 485 (7th Cir. 1992) .......................................................................4, 5

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance, Co.*,
   463 U.S. 29 (1983)......................................................................................9, 16

*Natural Resources Defense Council, Inc. v. Costle*,
   568 F.2d 1369 (D.C. Cir. 1977) ......................................................................10

*National Federation of Independent Business v. Sebelius*,
   132 S.Ct. 2566 (2012).....................................................................................17

*Norwood v. Dale Maintenance System, Inc.*,
   590 F. Supp. 1410 (N.D. Ill. 1984) ....................................................20, 21, 22

*Oiler v. Winn–Dixie Louisiana, Inc.*,
   No. Civ.A. 00-3114, 2002 WL 31098541 (E.D. La. Sept. 16, 2002) ...............15

*Oncale v Sundowner Offshore Services, Inc.*,
   523 U.S. 75 (1998)............................................................................................6

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989)...................................................................................12, 13, 14, 15, 16

*Rosa v. Park West Bank & Trust Co.*,
    214 F.3d 213 (1st Cir. 2000) ............................................................................................16

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) ....................................................................................14, 15

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944).........................................................................................................19

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ...........................................................................................16

*Smith v. Executive Director of Indiana War Memorials Commission*,
    742 F.3d 282 (7th Cir. 2014) .............................................................................................3

*Sommers v. Budget Marketing, Inc.*,
    667 F.2d 748 (8th Cir.1982) ............................................................................................15

*United States v. American National Can Co.*,
    126 F. Supp. 2d 521 (N.D. Ill. 2000) ................................................................................8

*United States v. Raupp*,
    677 F.3d 756 (7th Cir. 2012) ...........................................................................................19

*United States of America v. North Carolina*,
    No. 1:16-cv-00425-TDS-JEP (N.C.M.D., filed May 9, 2016), *Compl.*, Dkt. 1...................7

*Ulane v. Eastern Airlines, Inc.*,
    742 F.2d 1081 (7th Cir. 1984)  ............................................................................. *passim*

*Vickers v. Fairfield Medical Center*,
    453 F.3d 757 (6th Cir. 2006) ...........................................................................................16

***Statutes:***

5 U.S.C. § 553...........................................................................................................................4
5 U.S.C. § 553 (b)(3)(A)...........................................................................................................7
5 U.S.C. § 706(2) ..................................................................................................................4, 6
20 U.S.C. § 1681(a)(2).............................................................................................................10
20 U.S.C. § 1681(a)(8).............................................................................................................10
20 U.S.C. § 1682......................................................................................................................9
20 U.S.C. § 1686......................................................................................................................17
42 U.S.C. § 13925(b)(13)(A)....................................................................................................10

***Rules and Regulations:***

34 C.F.R. § 106.32(b)(2) ...............................................................................10
34 C.F.R. § 106.33 .......................................................................................17
34 C.F.R. § 106.37(a)(3) ..............................................................................10
34 C.F.R. § 106.41(b) ..................................................................................10
34 C.F.R. § 106.61 .........................................................................................4

***Other Authorities:***

*American College Dictionary* (1970)...............................................................11

*Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) ................................1

Employment Non-Discrimination Act of 2013, H.R. 1755, 113th Cong. (2013-2014) ...............10

Final Bulletin for Agency Good Guidance Practices,
     72 Fed. Reg. 3432-01 (Jan. 25, 2007).....................................................4

*Merriam-Webster Online Dictionary* (2015),
     http://bit.ly/2a42qXr.............................................................................11

*Mosby's Medical Dictionary* (9th ed. 2013)........................................... 11-12

Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013).................................10

Student Non-Discrimination Act of 2015, S. 439, 114th Cong. (2015) .......................................10

*The American Heritage Medical Dictionary* (Rev. ed. 2007).........................................................11

U.S. Dep't of Educ., Office for Civ. Rights, *Dear Colleague Letter* (October 26, 2010),
     http://bit.ly/UswMva.............................................................................5

*Webster's Third New International Dictionary* (1971) ................................................................11

## INTRODUCTION

Defendants attack the very meaning of sex. They say that Student A's presence in the girls' locker room is unremarkable, because (they say) he is a girl, despite the fact that his sex is male. *Intervenor-Defs.' Br. in Resp. to Pls.' Mot. for Prelim. Inj.*, Dkt. 79 ("*I-D Brief*"), at 3. This motion for preliminary injunction is about whether it is legal under the Constitution and Title IX to allow Student A, and other genetic males, to use the girls' facilities with *genetic girls*. The motion hangs on a simple question: is one's sex determined by his chromosomes, anatomy, gametes, and reproductive system ("genetic sex"), which is objectively verifiable and immutable; or, is it determined by one's profession of his perceived internal, subjective sense of gender identity, which cannot be objectively verified, and which can change?

Defendants seek to subsume "sex" into "gender identity" and conflate the two. *I-D Brief* at 1; *Fed. Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj.*, Dkt. 80 ("*Fed. Mem.*"), at 20. *See also Expert Decl. of Robert Garofalo, M.D., M.P.H.*, Dkt 79-3 ("*Garofalo Decl.*"), ¶ 22 ("[F]or individuals with gender dysphoria, gender identity is the only medically supported determinant of sex when sex assignment as male or female is necessary."). But this contradicts modern science, which recognizes that "sex" is determined by "chromosomes, hormones, internal reproductive organs, external genitalia and secondary sex characteristics." *Expert Decl. of Josephson*, Ex. 1 ("*Josephson Decl.*"), ¶ 24. *See also*, Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) ("DSM-5") ("*[S]ex* and *sexual* refer to the biological indicators of male and female (understood in the context of reproductive capacity), such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia."). Because sex flows from unchanging characteristics, one's sex is immutable.

Gender identity is not immutable: children who profess a gender identity divergent to their sex will often profess one consistent with their sex by late adolescence or early adulthood. *Josephson Decl.* ¶ 35. Unlike one's sex, one's inward perception of "gender" cannot be observed or validated by others. Nor is gender identity limited to "male" and "female." *Garofalo Decl.* ¶ 12 (opining that one's gender identity may be "male or female *or something else*") (emphasis

added). *See also* Am. Psychological Ass'n, *Answers to Your Questions About Transgender People, Gender Identity, and Gender Expression* 2 (3rd ed. 2014), http://bit.ly/1mZQCsH (Ex. 4) (explaining that some "[g]enderqueer" people "identify their gender as falling outside the binary constructs of 'male' and 'female,'" and indicating that other gender identities include "androgynous, multigendered, gender nonconforming, third gender, and two-spirit").

One's gender identity does not determine one's sex. Most males have a male gender identity, and a small number claim a female (or some other) gender identity. But all males' "sex" remains *male*. This is true even for those who take female hormone supplements and have surgery to remove their male genitalia. They will always have XY (male), not XX (female), chromosomes. They will never possess a reproductive-capable uterus or ovaries nor experience menses, pregnancy, or menopause. Their bodies will always naturally produce male, not female, hormones. No matter their perception of their gender identity, they remain chromosomally, physiologically, and reproductively male. *Josephson Decl.* ¶¶ 20-25. *See also Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1083 (7th Cir. 1984) (explaining males' "chromosomes[] . . . are unaffected by the hormones and surgery[,]" and such "operation[s do] not create a biological female in the sense that [the male] would have a uterus and ovaries and be able to bear babies.") (internal quotation omitted). Defendants pretend that the science is "firmly established," *I-D Brief* at 1, and insist that gender identity is the determinative factor for one's sex. *I-D Brief* at 1; *Fed. Mem.* at 20. According to them, anatomy, physiology, reproductive organs, and even chromosomes are at most secondary factors. That, however, is not correct. *Josephson Decl.* ¶¶ 20-28 (explaining that the "sex" of a person with gender dysphoria is his genetic sex, and that there is disagreement among the psychological community regarding how best to treat such a person). Even the Intervenor-Defendants' expert, Dr. Garofalo, acknowledges this. In an interview published on June 8, 2015, he states that the "science" of gender dysphoria is uncertain. Discussing the hormone treatment he provides children suffering from gender dysphoria, Dr. Garofalo poignantly asks: "How can I know that I'm doing no harm in the absence of scientific data to support these interventions?" He then expresses: "I wish we had

generations of outcomes research to fall back on, but right now we don't." Dr. Garofalo admits that "there haven't been many studies on the long-term effects of estrogen on young people[,]" and "[t]here's just so much that we don't know yet."[1]

Contrary to Defendants' assertions, males who profess female gender identities are *male*, in objectively verifiable ways. That includes Student A, no matter how sincerely he believes himself to be female. Plaintiffs request a temporary injunction because the Locker Room Agreement and Restroom Policy (the "Policies") authorize a genetic male to be present in locker rooms and restrooms where girls disrobe and attend to personal hygiene. Plaintiffs ask that their modesty, privacy, and dignity be protected while the Court sorts out the merits of this matter. Should an injunction issue, the District can provide Student A access to a number of alternative facilities for his needs. While this may impact Student A emotionally, he is provided by the school with a dedicated, full-time support team which should largely mitigate such concerns—an educational benefit not offered to Plaintiffs. Simply put, Plaintiffs seek only an assurance that opposite-sex students cannot walk in on them or otherwise be present in their private spaces, where they have a reasonable expectation of, and need for, privacy from the opposite sex.

## ARGUMENT

Preliminary injunctions require (1) likely merits success; (2) irreparable harm; (3) a favorable equitable balance; and (4) furthering the public interest. *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014). Plaintiffs satisfy this standard.

## I.     Plaintiffs Are Likely to Prevail on the Merits.

### A.     Plaintiffs Are Likely to Prevail on Their Procedural APA Claim.

For over four decades, Title IX allowed schools to maintain separate locker rooms and restrooms for genetic girls and genetic boys. 34 C.F.R. § 106.33. Despite Title IX's prohibition on sex discrimination, its regulations even allowed schools to discriminate based on sex when it hired employees who must enter "locker room or toilet facilities used only by members of one

---

[1] Elly Fishman, "The Change Agent," *Chicago Politics and City Life*, June 8, 2015, http://chi.mg/2a0kqlE (Ex. 5).

sex." 34 C.F.R. § 106.61. Everyone knew and understood that Title IX allowed schools to protect the privacy and dignity of girls and boys by providing one set of facilities for the girls and a second set for the boys. But in 2014, forty-two years after Title IX was enacted, the Federal Defendants began announcing in various guidance documents a novel rule that the term "sex" in Title IX means or includes "gender identity," and so Title IX now supposedly prohibits discrimination based on gender identity, including the maintenance of sex-specific locker rooms and restrooms (the "Rule"). The Rule is no mere clarification of Title IX law, but a completely new legislative rule that has binding effect on federally-funded schools nationwide. The Administrative Procedure Act ("APA") requires agencies to follow certain notice-and-comment procedures when they enact legislative rules. 5 U.S.C. § 553. If they do not, the rules are invalid. *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 167 (7th Cir. 1996). Relying on the Rule, the Federal Defendants found that District 211 discriminated in violation of Title IX. But at no time did the Federal Defendants submit their Rule to the required notice and comment. The APA requires this Court to set the Rule aside. 5 U.S.C. § 706(2).

### 1.     The Rule is Legislative Because It Creates New Rights and Duties.

Legislative rules "create new law, rights, or duties," *Metro. Sch. Dist. of Wayne Twp., Marion Cty., Ind. v. Davila*, 969 F.2d 485, 489 (7th Cir. 1992), and must go through notice-and-comment rulemaking. 5 U.S.C. § 553. This requires the agency to "issue[] a public notice of proposed rulemaking, describing the substance of the proposed rule, and give[] the public an opportunity to submit written comments[.]" *Hoctor*, 82 F.3d at 167. If the agency decides to promulgate its proposed rule, it must issue a public statement that details the purpose and basis of the rule. *Id*. The Federal Defendants did none of this when they created the Rule, which imposes new requirements on schools, and promulgated it in various "guidance" documents. But Federal regulations require that guidance documents be "non-binding [in] nature," *Final Bulletin for Agency Good Guidance Practices*, 72 Fed. Reg. 3432-01, 3435 (Jan. 25, 2007) (Ex. 6), and must not be "improperly treated as legally binding requirements[,]" *id*. at 3433, which is how the Federal Defendants have treated the Rule.

4

Undaunted, Federal Defendants soldier on, trumpeting that the Rule is merely interpretive. *Fed. Mem.* at 14. Yet interpretive rules create no new rights or duties, but "only remind[] affected parties of *existing* duties." *Metro. Sch. Dist.*, 969 F.2d at 489 (citation omitted, emphasis added). The Rule could be interpretive only if (1) "sex" in Title IX had always meant or included "gender identity," and (2) those who profess an opposite-sex gender identity always had the right to use facilities designated for the opposite sex.

But for over forty years, everyone understood that Title IX prohibited *sex* (not gender identity) discrimination, and allowed schools to separate locker rooms and restrooms by *sex* (not gender identity). Schools relied on that common understanding and reserved girls' facilities for *girls* (but not males who professed a female gender identity), and boys' facilities for *boys* (but not females who professed a male gender identity).

In years past, some students professed opposite-sex gender identities. But schools always declined to allow them use of opposite-sex facilities, providing reasonable accommodations instead. For example, in *Doe v. Clark Cty. Sch. Dist.*, No. 206-CV-1074-JCM-RJJ, 2008 WL 4372872 (D. Nev. Sept. 17, 2008), Clark County School District was sued because it would not allow a male who professed a female gender identity to use the girls' restrooms. *Id.* at *1. The court granted the school summary judgment. *Id.* at *4. It ruled that Title IX did not require schools to let males use the girls' facilities, no matter the males' professed gender identities. *Id.*

Tellingly, Federal Defendants did not file briefing in support of the student in *Doe*, nor investigate the school because it maintained sex-specific restrooms. Indeed, Plaintiffs are unaware of Federal Defendants investigating any school for maintaining sex-specific facilities prior to when they formulated the Rule.[2] Until 2014, the uniform understanding of Title IX and

---

[2] Shortly before the Federal Defendants announced the Rule in the 2014 guidance documents, but while they were obviously formulating it, DOE's Office for Civil Rights investigated two California school districts, Arcadia and Downey, for maintaining sex-specific facilities. Plaintiffs believe that the earliest DOE document that mentions "transgender" in conjunction with Title IX is a Dear Colleague Letter issued on October 26, 2010. It states, without elaboration: "Title IX does protect all students, including . . . transgender . . . students, from sex discrimination." U.S. Dep't of Educ., Office for Civ. Rights, *Dear Colleague Letter* 8 (October 26, 2010), http://bit.ly/UswMva. This statement may mean only that Title IX prohibits discrimination against a female because of her female sex, even if she claimed a

its regulations was that Title IX prohibited sex discrimination (not gender identity discrimination), and allowed (not forbade) sex-specific facilities.

Undeterred by this reality, the Federal Defendants claim that the Rule "does not alter the legal obligations of the regulated entities," *Fed. Mem*. at 17, despite the fact that the Rule forbids what Title IX always allowed (sex-specific facilities), requires what was never done (allowing students to use opposite-sex facilities), prohibits what Title IX never proscribed (gender identity discrimination), and mandates a violation of students' rights under Title IX (creating sex-based hostile environments in school locker rooms and restrooms). Indeed, the Rule created new rights (students whose professed gender identity is divergent to their sex now have the right to use the facilities of the opposite sex) and new responsibilities (schools must treat students consistent with their gender identity and compel objectors to conform). The Rule is thus legislative, and so is subject to the APA's notice-and-comment requirement, which it did not meet. It is therefore "invalid," *Hoctor*, 82 F.3d at 167, and this Court should set it aside as unlawful, 5 U.S.C. § 706.

### 2.     Like Legislative Rules, the Rule Is Binding and Has Penalties.

The Federal Defendants insist that the Dear Colleague Letters and other guidance documents announcing the Rule are "non-binding," "do[] not contain any threat to withhold funding[,]" and [are] not intended "to have the force of law." *Fed. Mem.* at 15. But that is not so. The District 211 Defendants correctly note "the District faced a loss of millions of dollars in federal funds from the DOE if it failed to enter into the Resolution Agreement" to allow Student A to use the girls' locker rooms. *Def. Bd. of Educ. of Twp. High Sch. Dist. No. 211's Resp. to Pls.' Mot. for Prelim. Inj.*, Dkt. 78 ("*District Mem.*"), at 11. The District, which fought to maintain sex-specific locker rooms, only entered the Resolution Agreement because the Federal Defendants threatened to revoke its federal funds if it refused. *Letter of Findings*, Dkt. 21-10, at 13 (letter from DOE stating that the District must let Student A use girls' locker rooms or else

---

male gender identity. This would parallel how the Supreme Court treated male-on-male discrimination in *Oncale v Sundowner Offshore Serv's, Inc.,* 523 U.S. 75 (1998), where the sex discrimination claim was allowed under Title VII without addressing whether sexual orientation was within the scope of Title VII.

DOE would issue a "Letter of Impending Enforcement Action[,]" which is the first step for revoking funds). Such is not the work of suggestion, but coercion.

With no less vigor, the Federal Defendants wielded their Rule to investigate the Highland Local School District in Highland, Ohio, and threaten it with funding revocation if it did not allow a male who professed a female gender identity to use the girls' facilities. *Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dep't of Educ. et al*, No. 16-524 (S.D. Ohio, filed June 10, 2016), *Compl.*, Dkt. 1 ¶¶ 1-4, 97-127 (Ex. 7). And it is using the Rule to attack North Carolina's law requiring government buildings (including schools) to maintain sex-specific locker rooms and restrooms. *United States of America v. North Carolina*, No. 1:16-cv-00425-TDS-JEP (N.C.M.D., filed May 9, 2016), *Compl.*, Dkt. 1, at ¶¶ 1, 47, 55 (Ex. 8). The investigation and threat directed at District 211, the proceeding against Highland, and the lawsuit against North Carolina, belie the claim that the Rule and guidance documents announcing it are non-binding.

### 3.     Notice and Comment Applies to Rules Cloaked As Guidance.

The Federal Defendants announced the Rule in various guidance documents. *See Mem. in Supp. of Pls.' Mot. for Prelim. Inj.* ("*Mem. in Support*"), Dkt 23, at 3 n.5 and Exs. 4-7, Dkt. 21-6 – 21-9. Guidance documents are not subject to notice-and-comment requirements. 5 U.S.C. § 553 (b)(3)(A).  But guidance documents must be "non-binding [in] nature," Ex. 6 at 3435, and must not be "improperly treated as legally binding requirements." *Id*. at 3433. Additionally, "significant guidance documents should not include mandatory language such as 'shall,' 'must,' 'required' or 'requirement.'" *Id*. at 3436.

The Federal Defendants treat their guidance documents, and the Rule they announced, as *binding*, in violation of this requirement. For example, the December 2014 "Questions and Answers on Title IX and Single Sex Classes and Activities" guidance document states that schools receiving federal funds "must treat transgender students consistent with their gender identity" for purposes of single-sex classes. Dkt. 21-8 at 25. The April 2015 "Title IX Resource Guide," meanwhile, states that recipients of federal funds "must" investigate and respond to

complaints of gender identity discrimination. Dkt. 21-7 at 15-16. The "guidance" was never really guidance at all, because it imposed on schools mandatory requirements that had never previously existed. But the early guidance did so somewhat surreptitiously, with an occasional new command related to gender identity interposed within pages upon pages of true interpretive guidance related to prohibited sex discrimination. The May 13, 2016 Dear Colleague Letter, however, dispensed with all pretense of being guidance. It "reads like a ukase[—i]t commands, it requires, it orders, it dictates." *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). It uses the word "must," for example, at least fifteen times to describe the obligations of schools. *See Dear Colleague Letter* (May 13, 2016), Dkt. 21-6, at 2-5. The Federal Defendants' aggressive, consistent use of obligatory language destroys their claim that their "guidance" letters are interpretive guidance as opposed to a legislative rule.

This type of attempted manipulation of the procedural requirements is a too-frequent occurrence in the administrative state. As Harvard Law School professors Jacob Gersen and Jeannie Suk note, "[s]ometimes agencies prefer to avoid the costs and time associated with using notice-and-comment procedures[.]" Jacob Gersen & Jeannie Suk, *The Sex Bureaucracy*, 104 Calif. L. Rev. ___ (forthcoming August 2016), http://bit.ly/29J8Wcb, Ex. 9, at 24. *See also Appalachian Power Co.,* 208 F.3d at 1020 (explaining that agencies have incentive to promulgate legislative rules cloaked as interpretive ones because it is quicker and less expensive than following the proper statutory procedures). But this is not lawful. "The legislative rule doctrine . . . requires that even if an agency announces a policy that it declares to be nonbinding, if the agency treats it as, or it has the effect of, binding the regulated parties, then the policy is deemed a legislative rule, and therefore unlawfully promulgated without notice and comment." Ex. 9 at 24. And it "is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation." *Appalachian Power Co.*, 208 F.3d at 1024; *see also United States v. Am. Nat. Can Co.*, 126 F. Supp. 2d 521, 530 (N.D. Ill. 2000) ("[An agency] cannot escape the strictures of the notice-and-comment process by cloaking a substantive addition to [the statute] in the guise of a mere

interpretation of an extant regulation.").

The Federal Defendants claim the Rule and the documents announcing it are but a non-binding interpretation that creates no requirements beyond those already contained in the text of Title IX. *Fed. Mem.* at 15. As shown above, that is not correct. The Rule creates new rights and responsibilities that are binding upon the schools subject to Title IX. It carries substantial penalties, which the Federal Defendants sought to enforce against schools that "refuse to bend to [the Federal Defendants'] will." *Appalachian Power Co.*, 208 F.3d at 1024. "In practical effect, [the Rule and the guidance promulgating it] creates a new regime, a new legal system governing [schools], and as such it should have been, but was not, promulgated in compliance with notice and comment rulemaking procedures." *Id*. Plaintiffs are thus likely to prevail on the merits.

### B.     Plaintiffs Are Likely to Prevail on Their Substantive APA Claims.

Plaintiffs are also likely to prevail on their substantive APA claims. Federal Defendants cite *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("*Motor Vehicle*") for the proposition that "rationally based" rules must be upheld. *Fed. Mem.* at 13. But that misstates *Motor Vehicle*. It held that rules challenged under the arbitrary and capricious standard must be upheld if they are *both* rationally based *and* meet certain other requirements (which the Rule does not; *see infra*, "The Rule Is Arbitrary and Capricious," at 16). *Motor Vehicle* does not apply when rules exceed statutory authority, infringe the Constitution or federal law, or abuse agency discretion. The Rule does all these things.

### 1.     The Rule Exceeds Statutory Authority.

An "agency's power to regulate . . . must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000). Congress authorized agencies implementing Title IX to "issu[e] rules, regulations, or orders of general applicability which shall be *consistent with achievement of the objectives of the statute*." 20 U.S.C.A. § 1682 (emphasis added); *see also MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994) (noting that every congressional delegation of power implies that the agency is "bound . . . by the ultimate purposes" of the statute). Because the Rule is not

consistent with Title IX's objectives, as explained below, the Federal Defendants' actions exceeded their express grant of statutory authority.

### a. "Sex" in Title IX Is Not Ambiguous.

Title IX's objective is to prohibit federally funded schools from discriminating based on sex, which refers to *genetic* sex. Other federal legislative action clearly shows that Congress understands gender identity to be distinct from sex. Notably, Congress recently added "gender identity"—right next to the word "sex"—in the Violence Against Women Act. 42 U.S.C. § 13925(b)(13)(A). But in contrast, Congress has repeatedly refused to add gender identity to Title VII or Title IX. *See*, *e.g.*, Employment Non-Discrimination Act of 2013, H.R. 1755, 113th Cong. (2013-2014); Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013); Student Non-Discrimination Act of 2015, S. 439, 114th Cong. (2015). *See also Pls.' Mem.* at 7 (discussing in more detail). Congress's voice thus could not be clearer: sex means sex and does not include gender identity. That "is the natural reading" of Title IX, and it alone "retains the fundamental logic of the statute." *Nat. Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1375-76 (D.C. Cir. 1977). Thus, the first part of Defendants' rule exceeds their statutory authority.

That Congress intended a binary understanding of the term "sex" is confirmed by the text of Title IX and its implementing regulations, which repeatedly reference "both sexes" and "students of one sex" as compared with "students of the other sex." *See, e.g.*,  20 U.S.C. § 1681(a)(2) (discussing "students of both sexes"); *id.* § 1681(a)(8) (discussing activities "provided for students of one sex" and "for students of the other sex"); 34 C.F.R. § 106.32(b)(2) (housing provided for "one sex" shall be comparable to housing provided to "the other sex"); 34 C.F.R. § 106.37(a)(3) (rules determining financial aid eligibility must treat "one sex" the same as "the other sex"); 34 C.F.R. § 106.41(b) (teams for "one sex" must offer tryouts to students of "the other sex" if no team is offered for them). During the period when Title IX was debated by Congress, through the period when its implementing regulations were adopted, dictionaries defined "sex" as referring to males and females based on physical distinctions between the sexes that allow reproduction to occur. *Pls.' Mem.* at 6 and n.11. The Federal Defendants resist this obvious

conclusion by citing *G.G. ex rel. v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, at 721-22 (4th Cir. 2016), which purported to find that dictionaries from "the drafting era" of Title IX suggest that sex was not always defined with reference to the reproductive organs. *Fed. Mem.* at 20 n.13. But a closer examination reveals that the *G.G.* court misunderstood the dictionaries it consulted.

The Fourth Circuit cited *Webster's Third New International Dictionary*, published in 1971, and the *American College Dictionary*, published in 1970. *G.G.*, 922 F.3d at 721. *Webster's* defined "sex" as "the sum of the morphological, physiological, and behavioral peculiarities of living beings *that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change*, that in its typical dichotomous occurrence is usu[ally] genetically controlled and associated with special sex chromosomes, and that is typically manifested as maleness and femaleness." *Id.* (emphasis added). That definition ties "sex" to the "sum" of those qualities that "subserve[]" "biparental reproduction" (i.e., male-female mating) "with its concomitant genetic segregation and recombination which underlie most evolutionary change" (i.e., the union of the male sperm with the female egg, producing a new life with evolutionary distinctions from both parents). It is "usually" (i.e., in most species) "genetically controlled and associated with special sex chromosomes"—as is true with human beings. The "morphological" (shape), "physiological" (function), and "behavioral" qualities all *subserve*[3] just one thing: human reproduction. Nothing in the foregoing definition suggests that sex is determined by one's subjective, changeable sense of gender identity.

The *American College Dictionary*, meanwhile, defined "sex" as "the character of being either male or female" or "the sum of those anatomical and physiological differences with reference to which the male and female are distinguished . . . ." *Id.* (ellipsis in original). "Anatomical differences" are differences between male and female genitalia and reproductive organs. Physiology is the study of normal functions within living creatures,[4] such as hormone

---

[3] *Subserve* means: "(1) to promote the welfare or purposes of; (2) to serve as an instrument or means in carrying out." *Merriam-Webster Online Dictionary* (2015), http://bit.ly/2a42qXr.

[4] *The American Heritage Medical Dictionary* 633 (Rev. ed. 2007) (defining *physiology* as "the biological study of the functions of living organisms and their parts"); *Mosby's Medical Dictionary* 1393

production, muscle growth, and development of secondary sex characteristics. So, "physiological differences" referred to bodily functions that are different for males and females—hormone production, facial hair growth for boys, widening of the hips and breast development for girls, along with male sperm production and female ovulation.

Both definitions cited by the Fourth Circuit define "sex" in terms of differences in anatomy and physiology inextricably linked to human reproduction. What is glaringly absent in both definitions is any hint that "sex" is defined by psychology or one's subjective perception of gender identity. Despite this, the Fourth Circuit panel (over a withering dissent) found that these definitions were fuzzy, and concluded that "a hard-and-fast binary division on the basis of reproductive organs—although useful in most cases—was not universally descriptive." *Id*. But this *ipse dixit* statement is not a fair reading of the sources cited. Nor do the sources support the Fourth Circuit's contention that definitions of sex during Title IX's drafting period were unclear about how to classify someone who suffered from gender dysphoria. *Id*. at 721-22. On the contrary, Title IX reasonably, properly, and unambiguously relied on objective criteria which define male and female, regardless of any psychological condition, to focus the law on its object: eliminating discrimination on the basis of sex, not psychological conditions. The Federal Defendants' reliance upon the Fourth Circuit's decision is therefore misplaced.

### b. *Ulane* Remains Good Law and Is Dispositive For This Case.

The Seventh Circuit's *Ulane* decision, 742 F.2d 1081, is dispositive for the question of what Congress meant when it enacted federal protections against "sex discrimination." As Plaintiffs explain in their opening brief, *Pls.' Mem.* at 5-8, the *Ulane* court ruled that "transsexuals" are not a protected class under Title VII, because Congress intended the term "sex" to mean genetic sex, not gender identity. In response, Defendants assert that *Ulane*'s ruling was undermined by *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), which, Defendants

---

(9th ed. 2013) (defining *physiology* as first, "the study of the processes and function of the human body," and second, "the study of the physical and chemical processes involved in the functioning of organisms and their parts.").

claim, broadened Title VII's prohibition on sex discrimination to include gender identity discrimination. *Fed. Mem.* at 21-25; *I-D Brief* at 7-11. But *Price Waterhouse* did nothing of the sort. On the contrary, the *Price Waterhouse* Court noted that Congress enacted Title VII to prohibit *only* sex, race, religion, and national origin discrimination in employment matters, *Price Waterhouse*, 490 U.S. at 239, explaining that "[a]ny other criterion or qualification for employment is not affected" by Title VII. *Id*. at 244; *compare Ulane*, 742 F.2d at 1085 (rejecting an expansion of Title VII's protections beyond the "ordinary, common meaning" of the terms used in the statute). So Title VII's requirement that a complainant show that her employer "relied upon sex-based considerations," *Price Waterhouse*, 490 U.S. at 242, refers to considerations related to the complainant's genetic sex, not a professed perception of subjective gender identity.

     *Price Waterhouse* was about Title VII standards of proof and burden shifting, as is made clear by its conclusion, which deals solely with those two factors. *Id.* at 258. But advocates of gender identity theory have tried to transmute the mention of sex stereotyping into gender identity, usually by citing this short passage: "As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.'" *Id.* at 251 (citations omitted). Of course, they ignore the following sentences : "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." *Id.* This clarifies that stereotyping is merely evidence of traditional Title VII sex discrimination. It was relevant in *Price Waterhouse* because the stereotyping, 'she's too aggressive; she needs to wear makeup; she needs to go to charm school,' *id.* at 235, provided evidence that the candidate was evaluated not on a sex-neutral standard, but on a woman-specific standard. "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on

the basis of gender." *Id.* at 250.[5] This is classic, genetic sex-based sex discrimination analysis.

There are additional reasons to reject Defendants' transmutation claim. First, Justice Kennedy bluntly observed "I think it important to stress that Title VII creates no independent cause of action for sex stereotyping. Evidence of use by decisionmakers of sex stereotypes is, of course, quite relevant to the question of discriminatory intent. The ultimate question, however, is whether discrimination caused the plaintiff's harm." *Id.* at 294 (Kennedy, J dissenting (joined by Rehnquist, CJ and Scalia, J)). Moreover, the case was decided by a plurality comprised of Justices Brennan, Marshall, Blackmun, and Stevens, with Justices O'Connor and White concurring only in the judgment. Thus, little weight should be accorded the importance of *Price Waterhouse* to our case, and certainly none to the radical idea that "sex stereotypes" was code for a new protected continuum of "male, female, or something else" gender identity, *Garofalo Decl.* ¶ 12, as Defendants would have us believe.

Permitting only genetic female students to use female facilities is *not* sex stereotyping. Properly read, *Price Waterhouse* is consistent with the Seventh Circuit's holding in *Ulane* that Title VII does not protect on the basis of gender identity, nor require employers to treat males who profess female gender identities as female. Again, *Price Waterhouse* settled questions of burden shifting and evidentiary standards, and only incidentally accepted sex stereotyping as evidence of classic Title VII sex discrimination. Thus *Ulane* remains controlling precedent.

Defendants attempt to weaken *Ulane*'s binding authority by citing inapposite cases. *I-D Brief* at 6-8; *Fed. Mem.* at 23-34. *Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000), which is not a Title VII case, ruled that the Gender Motivated Violence Act protected "transsexuals" because of the language of the Act, which said that it applies "to all persons within the United States[.]" *Id*. at 1200. The court opined in dicta that, after *Price Waterhouse*, Title VII protects against both sex and "gender" discrimination, which the court defined in sex stereotyping terms. *Id*. at 1201-02. But that does not disturb *Ulane*'s holding that "sex" in Title VII refers only to

---

[5] Further undercutting Defendants' use of *Price Waterhouse* is the indiscriminate interchanging of "sex" and "gender," where both clearly relate to genetic sex, throughout the opinion.

genetic sex.

In *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), also not a Title VII case, the court held that discriminating against a male who professes a female identity, because he is a male who wears 'women's clothing' and so does not conform to male stereotypes, is sex stereotyping. 663 F.3d at 1320. That decision, though, does not create new protections based on "transgender status," nor does it undermine *Ulane*'s holding that "sex" in Title VII refers only to genetic sex, not to gender identity.

Federal Defendants seize upon one footnote in *Glenn* which asserts that cases like *Ulane*, which held that "transsexuals" are not protected as a class under Title VII, were "eviscerated" by *Price Waterhouse*.  *Fed Mem.* at 23, citing *Glenn*, 663 F.3d at 1318 n.5. But *Glenn* should not be credited on that point. First, the panel in *Glenn* was so uncertain in its reasoning that it refused to firmly say whether it was analyzing the case based on sex, or gender. 663 F.3d at 1317. Second, the panel apparently considered sex stereotyping the same as gender identity, *id.* at 1316, and reasoned that discriminating against gender identity was actionable sex discrimination under Title VII. But *Price Waterhouse* does not support that contention. *See supra*. Further, *Glenn*'s Footnote 5 includes "but see" authorities that were decided after *Price Waterhouse* and support *Ulane*. [6] This Court should follow *Ulane*'s clear holding.

---

[6] *See, e.g.*, *Etsitty v. Utah Trans. Auth.*, No. 2:04–CV–616-DS, 2005 WL 1505610, at *4–5 (D. Utah June 24, 2005), *aff'd* 502 F.3d 1215 (10th Cir.2007) (*Price Waterhouse* inapplicable to transsexuals); *Creed v. Family Exp. Corp.*, No. 3:06-CV-465RM, 2009 WL 35237 (N.D. Ind. Jan. 5, 2009) (no Title VII violation when employer fired male employee who professed a female gender identity because he refused to conform to the male dress code); *Oiler v. Winn–Dixie La., Inc.*, 2002 WL 31098541, at *6 (E.D.La. Sept. 16, 2002) (distinguishing *Price Waterhouse* on the basis that "[t]he plaintiff in that case may not have behaved as the partners thought a woman should have, but she never pretended to be a man ...").

In addition to the Seventh Circuit, it is the law of three other Circuits that Title VII does not protect on the basis of one's professed gender identity. *See Etsitty v. Utah Trans. Auth.*, 502 F.3d 1215 (10th Cir.2007) (concluding that *Price Waterhouse* is inapplicable to transsexuals); *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir.1982) (rejecting transgender plaintiff's claim as falling outside "the traditional definition" of sex under Title VII); *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 664 (9th Cir. 1977) ("A transsexual individual's decision to undergo sex change surgery does not bring that individual, nor transsexuals as a class, within the scope of Title VII"). The *Holloway* holding was challenged in *Schwenk*, 204 F.3d at 1201-02, which opined in dicta that *Holloway* had been overruled by *Price Waterhouse*. But *Schwenk* arose under the Gender Motivated Violence Act, not Title VII. As a result, despite *Schwenk*'s criticism of *Holloway*, it remains good law in the Ninth Circuit.

*Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000), also cited by Defendants, undermines their position. It held that "sex" in the Equal Credit Opportunity Act meant sex in the traditional sense, so the Act only protects against "sex" discrimination, not "style of dress or sexual orientation discrimination." *Id*. at 215. This comports with *Ulane* regarding the meaning of "sex" in Title VII. The court noted that if a male proved that the bank treats "a woman who dresses like a man differently than a man who dresses like a woman[,]" he may have a claim for sex discrimination. *Id*. at 215-16. Still, that claim would be based on treating males differently than females, not on "transgender status." *Id*.

*Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) held that a male professing a female identity may state a Title VII sex stereotyping claim if he demonstrates he was discriminated against because he did not act or appear 'masculine enough.' *Id*. at 572-73. But this claim is still stated because of the man's *sex* as a male, not because of his "transgender status." *Id*. So, *Smith* did not dispute that "sex" in Title VII means genetic sex. Indeed, a subsequent Sixth Circuit case heeded Justice Kennedy's warning that *Price Waterhouse* does not provide an independent sex stereotyping claim, warning plaintiffs not to "bootstrap protection" for other classifications into Title VII. *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006) (*quoting Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005)). No Court of Appeal has yet bootstrapped "transgender status" into Title VII or directly called into question *Ulane*'s holding that "sex" in Title VII refers to genetic sex. *Ulane* remains good law and is binding on this Court. "Sex" in Title IX is as unambiguous as in Title VII; so, the Federal Defendants lack authority to redefine the term to mean or include gender identity. The Rule thus violates the APA.

### 2. The Rule Is Arbitrary and Capricious, Abuses Discretion and Is Not In Accord With Law.

While "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency[,] . . . the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43.

Federal Defendants rely on the first part of that statement (the court should not substitute its judgment for the agency's), *Fed. Mem.* at 13, but ignore the part requiring the agency to "examine the relevant data" and "articulate a satisfactory explanation for its action[,]" which they did not do. Indeed, Federal Defendants still have offered *no* reason for why their ostensibly non-legislative "clarification" *eviscerates* the discretionary authority of schools to provide sex-segregated facilities pursuant to 20 U.S.C. § 1686 and 34 C.F.R. § 106.33.

Additionally, the Rule is not "rationally based," but is irrational, violating common sense, modesty, and decency. It also ignored over four decades of court rulings regarding Title IX, as well as the statute's language and legislative history. *Pls.' Mem.* at 9-10. Despite Federal Defendants protestations to the contrary, the Rule is arbitrary and capricious.

### 3.    The Rule Is Contrary to Constitutional Right.

Legislation enacted pursuant to the Spending Clause must provide funding recipients with clear notice of their obligations. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). It also must leave them free to choose whether to accept funding in exchange for the obligations. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S.Ct. 2566, 2602 (2012). When a substantial percentage of a local governmental entity's budget is conditioned on adopting a federal policy, the Supreme Court has recognized that "the financial 'inducement'" leaves "no real choice" but acquiescence, in violation of this requirement. *Id*. at 2604-05, 2608. The Federal Defendants assert that Spending Clause requirements are inapplicable here for two reasons. First, schools know they must comply with Title IX. *Fed. Mem.* at 25. True enough, but no school could have foreseen that a statutory scheme that specifically allowed sex-specific facilities would someday be arbitrarily amended by a bureaucrat's letters to withdraw that right. Second, the Federal Defendants assert that "there has never been a threat" by them to force the District to repay its federal funds. *Id*. That does not square, however, with the Letter of Findings, which specifically threatened to begin proceedings to revoke funding if the District did not sign the Locker Room Agreement. *Letter of Findings*, Dkt. 21-10, at 13. In truth, the Federal Defendants threatened to revoke millions of dollars of federal funding, as District Defendants correctly state.

17

*Dist. Mem.* at 11 ("the District faced a loss of millions of dollars in federal funds from the DOE if it failed to enter into the Resolution Agreement"). Because the Rule violates both the clear notice and coercion requirements of the Spending Clause, it should be found to violate the APA.

### 4. The Rule Is Owed No Deference.

The Federal Defendants argue that the Rule is entitled to nigh-total deference under *Auer Fed. Mem.* at 18. This is wrong for four reasons. First, *Auer* deference only applies to "an agency's interpretation of its own regulation." *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000). But the Rule redefines "sex" in Title IX itself. The Fourth Circuit (upon which Federal Defendants rely), *Fed. Mem.* at 19, mistakenly thought that the Rule was an interpretation of the regulation that authorized schools to maintain sex-specific restrooms. *G.G.*, 822 F.3d at 719-20. To the contrary, Federal Defendants always maintained that the Rule redefines "sex" in Title IX, not just the regulations. *See, e.g.*, *Title IX Resource Guide* (April 2015), Dkt. 21-7, at 15 ("Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity"); *Questions and Answers on Title IX and Single-Sex Classes*, Dkt. 21-8, at 25 ("transgender students . . . are protected from sex-based discrimination under Title IX. Under Title IX, a recipient generally must treat transgender students consistent with their gender identity"); *Dear Colleague Letter* (May 13, 2016), Dkt. 21-6, at 1 ("Title IX . . . and its implementing regulations prohibit sex discrimination in educational programs and activities . . . . [t]his prohibition encompasses discrimination based on a student's gender identity, including discrimination based on a student's transgender status."). Bluntly put, bureaucratic amendment of a Congressional statute merits no deference, ever, from any court, under any doctrine.

Second, Congress did not grant authority to redefine the unambiguous term "sex" in Title IX, *see Pls'. Mem.* at 5-9, so no deference is owed, *Christensen*, 529 U.S. at 588 ("To defer to the agency's position [when it interprets an unambiguous regulation] would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.").

Third, no deference is owed to rules that are: (1) arbitrary, capricious or abuses of discretion, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413-14 (1971) *abrogated*

*on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); (2) contrary to the Constitution or federal law; or (3) plainly erroneous and inconsistent with the underlying statute. *U.S. v. Raupp*, 677 F.3d 756, 758-59 (7th Cir. 2012). The Rule is all those things. *See Pls.' Mem.* at 5-12.

Fourth, no deference is warranted for rules that are "procedurally defective…where the agency errs by failing to follow the correct procedures in issuing the [rule]." *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016). The Federal Defendant's legislative Rule is procedurally defective, so it can receive no deference. *See infra.*

Finally, *if* the Rule were an interpretation entitled to deference, it would be *Skidmore* deference, not *Auer*. The Rule did not go through notice and comment, but was announced in guidance documents. The *Christenson* Court explained that such interpretations are at most allowed *Skidmore* deference. *Christenson*, 529 U.S. at 587. Under *Skidmore* deference, the Rule is not "controlling upon" the Court. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Rather, courts consider the agency's position mere "guidance," which is accepted (or rejected) based on "the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade[.]" *Id*. As amply demonstrated in Plaintiff's primary brief and herein, the Rule is irrational, inconsistent with forty years of regulating every educational institution in the United States subject to Title IX, and its persuasive force boils down to whatever is merited by an unelected, low-level Executive Branch official writing a letter that lacks any valid legal grounds. Such does not merit *Skidmore* deference.

Plaintiffs prevail even under *Auer* deference. The Seventh Circuit explained that *Auer* deference cannot save rules that create constitutional violations, violate federal statutes, or are plainly erroneous or inconsistent with the regulation they purport to interpret. *Raupp*, 677 F.3d at 758-59. As already explained, the Rule is all those things. *Pls.' Mem.* at 9-12; *see also supra*.

### C. Plaintiffs Are Likely to Prevail on Their Privacy and Title IX Claims.

Defendants devoted a large portion of their briefing to try to refute that Plaintiffs suffer a privacy violation and hostile environment because of the presence of opposite-sex persons in their private facilities. But really, these arguments boil down to two propositions, which are

stated in various ways and repeated throughout their briefing. First, Defendants assert that Student A is a girl; so, his presence in facilities designated for girls can create no privacy violation or hostile environment. But Student A's sex is male, as has been demonstrated above.

The second proposition Defendants repeatedly assert is that, because there are privacy stalls in restrooms and in the P.E. locker room, no one need see anyone else undressed. This, they argue, eliminates any privacy or hostile environment claim. That, however, is not correct, for reasons explained in the Plaintiffs' principal brief, *see Pls.' Mem.* at 13-23, and below.

Under the Rule, Plaintiffs must accept the ongoing risk—and the fact—of a member of the opposite sex entering their sex-specific locker rooms and restrooms. This is sex discrimination and a hostile environment on its face, driven by this novel deployment of government power to authorize an adolescent male to enter the private space of females, where they disrobe or attend to private bodily hygiene needs. The Rule gives Girl Plaintiffs an option which boils down to "accept it or be silent." Raising an objection is manifestly futile. If they challenge the male, they will likely be disciplined for improper "discrimination." If they leave, in many instances they will miss class time while searching for an alternate facility. And if they simply stay, they suffer the violation of privacy and consequential emotional harm. The Rule transforms campus into one large hostile educational environment for the Plaintiffs.

The zone of protected privacy in locker rooms and restrooms is not "behind a curtain," but at the entrance door. This Court agrees: in *Norwood v. Dale Maint. Sys., Inc.*, 590 F. Supp. 1410, 1415-17 (N.D. Ill. 1984), it held that adult men would suffer an "extreme" invasion of privacy, and be subjected to unacceptable levels of stress, if women were allowed in their restrooms. This would be true even if the women did not actually see the men engaged in restroom activities—just their knocking on the door, to determine if the restroom was in use, "would still cause stress" to the men inside, who would fear that they might be intruded upon. *Id.* at 1422. If this is true for adult men, how much more must it be true for adolescent girls?

Intervenor-Defendants dismiss *Norwood*, stating that it is unknown whether the restrooms at issue "offered privacy areas" like Fremd High School's privacy stalls. *I-D Brief* at

13. But the restrooms in *Norwood* were in a modern professional office building with 82 floors and a daytime population of between 8,000 and 12,000. *Norwood*, 590 F.Supp at 1412. It is far-fetched to think that the restrooms lacked stalls. Moreover, the Court held that actually viewing the men within the bathroom was not necessary to violate their privacy or create a stressful environment for them—the mere knock at the entrance door, with nothing more, would do that.

This Court's holding in *Norwood* is buttressed by *Kohler v. City of Wapakoneta,* 381 F. Supp. 2d 692 (N.D. Ohio 2005). *Kohler* involved a male who tape-recorded females using stall-enclosed toilets in the women's room. In finding a privacy violation, the court held that "it is appropriate to consider that even if Kohler did not expect privacy from other women in the women-only restroom, she reasonably expected her activities to be secluded from perception by men." *Id.* at 704. If a woman is protected from a male hearing, after the fact and remotely, her conduct of personal hygiene inside the lady's room even when she is enclosed in a stall, she is certainly protected from a male being physically present in such a facility.

*Norwood* is buttressed too by *Livingwell (N.) Inc. v. Pennsylvania Human Relations Comm'n*, 606 A.2d 1287, 1293 (1992), which held that privacy rights prevail over public accommodations nondiscrimination law, so an all-female fitness club could not be held liable for discrimination when it denied males membership. The court explained that "[j]ust because 'intimate areas' of . . . women's bodies are not exposed does not mean that they do not have a privacy interest worthy of recognition." *Id.* "The standard for recognizing a privacy interest as it relates to one's body is not limited to protecting one where there is an exposure of an 'intimate area,' but such a right may also be recognized where one has a reasonable basis to be protected against embarrassment or suffer a loss of dignity because of the activity taking place." *Id.*

At bottom, all Defendants rest their opposition to Plaintiffs' privacy and Title IX claims on the false statement that Student A is a girl, indistinguishable in every respect from a genetic female. *Fed. Mem.* at 28 (describing Student A as a female student); *Dist. Mem.* at 11 (same); *I-D Brief* at 13 ("Student A's presence in the girls' restrooms or locker rooms is not that of an 'opposite-sex student.' . . . She is a girl.").



REDACTED

The District asserts that it "does not allow males in the girls' locker room or restrooms . . . . It allows Student A, who identifies and presents as a girl" such access. *Dist. Mem.* at 6. But this assumes that the privacy invasion created by a male in the girls' facilities is obviated if the male believes he is a girl. It is not. A male remains a male, no matter how he "identifies and presents," and his presence in girls' private areas violates their privacy and creates a hostile environment, for the reasons Plaintiffs explained. *See Pls.' Mem.* at 15-24.

Resorting to insinuating bigotry, Federal Defendants mischaracterize Plaintiffs' desire for privacy as a demand "to change in a locker room from which transgender students are excluded." *Def. Mem.* at 3. But Plaintiff Girls only want to use the restroom, and change their clothing in the locker room, free from the presence of males. The Girl Plaintiffs suffer constant anxiety, fear, and apprehension that a male will walk in on them in the locker room and see them undressed. *V. Compl.* ¶ 114-15. The real risk—that a male might see them undressing, or that they might see him doing so, embarrasses them, just as it would embarrass most girls. *Id.* ¶ 126. The Defendants want to pretend that the privacy stalls solve the problem. *Fed. Mem.* at 28; *Dist. Mem.* at 10; *I-D Brief* at 12. But as set forth above, *Norwood* and *Kohler* reject that "hide behind a curtain" excuse. Moreover, Girl Plaintiffs have learned that the privacy stalls only invite a new attack— bullying by other students—if used. *Id.* ¶¶ 139-46. Worse, the District and the speakers it

presented communicated that those who object to Student A's presence in the girls' private areas are intolerant or bigots. *Id.* ¶¶ 148-53. Even if the girls did not fear using the privacy stalls, there are not enough for all the girls: during a typical P.E. period at Fremd High School, 65 girls use the locker room, *V. Compl.* ¶ 119, but there are only five privacy stalls, *id.* ¶ 138. At the end of the day—or rather, throughout the school day as well as at extracurricular events after school, nothing changes the fact that a male is present with them while they are using the toilets and changing their clothing. In sum, as set forth above, the Girl Plaintiffs' privacy is violated, and a hostile environment is created, the minute a male opens the door to their private facilities.

The Federal Defendants say that a male's "incidental viewing" of girls changing their clothing does not violate privacy rights or create a hostile environment. *Fed. Mem.* at 28. But as the *Livingwell* court recognized, "The standard for recognizing a privacy interest as it relates to one's body is not limited to protecting one where there is an exposure of an 'intimate area,' but such a right may also be recognized where one has a reasonable basis to be protected against embarrassment or suffer a loss of dignity because of the activity taking place." *Livingwell*, 606 A. 2d at 1293. The court recognized that "in relation to one's body, there are societal norms, i.e., a spectrum of modesty, which one either follows or respects, and if one is required to breach a modesty value, one becomes humiliated or mortified." *Id.* at 1292. Such is the case here. The opinion of an adult federal bureaucrat does not supplant the relevant view on that issue: the adolescent girls who would suffer that exposure. It is their injury, not a self-serving claim by Federal Defendants, that counts.

District Defendants claim Plaintiffs conceded they had no "evidence of actual offensive conduct occurring in the locker room[,]" so Plaintiffs cannot prevail on their Title IX claim. *Dist. Mem.* at 16 (citing transcript of the June 9, 2016, oral argument). *Id.* But that's a red herring. Plaintiffs' counsel stated that "[i]nserting the biological male into those facilities is sufficient to show the violation." *Transcript*, Dkt. 78-2, at 18:23-24. Authorizing a male to enter the girls' private locker rooms and restrooms, where they change their clothing, shower, and attend to their private bodily needs, is offensive, sexually hostile conduct in itself.

## II.     Plaintiffs Satisfy the Other Requirements for Preliminary Injunction.

Student A is not "a girl" as the Intervenor-Defendants claim. *I-D Brief* at 13. His use of girls' facilities is not "ordinary use by students of the sex for which the facilities are designated." *Id.* at 5. Contrary to Intervenor-Defendants' blithe assertion that his presence in the girls' facilities is "no more remarkable than any other girls," *Id*. at 3, his presence is painfully remarkable and patently offensive. Plaintiffs resist his presence not because the girls want "to change in a locker room from which transgender students are excluded[,]" as Federal Defendants wrongly claim. *Def. Mem.* at 3. Plaintiffs simply seek what was said at the beginning: temporary relief that returns to the status quo ante litigation; a solution which allows all students, including Student A, privacy from the opposite sex for these necessarily private acts.

Absent an injunction, Girl Plaintiffs will continue to be exposed to privacy violations and a *per se* hostile educational environment; continue to suffer reduced access to federally funded educational opportunities; and suffer emotional harm. These harms are clear, concrete, and irreparable. *Pls.' Mem.* at 24. The public interest warrants an injunction, *id*. at 25, and the balance of hardships favors Plaintiffs, *id*. at 24-25. District Defendants would suffer no hardship. They would return to precisely the locker room solution they previously crafted and to a restroom policy that permits reasonable access to all parties, while protecting everyone's privacy. Likewise, Federal Defendants will suffer no hardship: they will be litigating this lawsuit regardless. Certainly, the Court must weigh the hardships claimed by Student A, and Plaintiffs acknowledge that this case raises issues that are difficult for an adolescent to deal with. But the "balancing of hardships test" recognizes that cases do have hardships on both sides, and in this instance the serious privacy, dignity, and harassment harms wrought upon Girl Plaintiffs causes the hardship they are experiencing to weigh heavier in the balance.

## III.    Plaintiffs Have Not Unreasonably Delayed Their Lawsuit.

The Federal Defendants fault Plaintiffs for a "long and unexplained delay in filing this lawsuit." *Fed. Mem.* at 2. First, it is a little astonishing that the Federal Defendants—who enforce Title IX and are aware of Title IX case law—would allege undue delay in a Title IX case, when

their own prosecutions follow a similar timeline. For example, the plaintiff in *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), which is the landmark case establishing "student-on-student" sexual harassment as a cause of action under Title IX, was filed on almost the exact same time-line as this case. The harassment began in December, 1992, and the plaintiff filed her lawsuit in May, 1993—a gap of five months. *Id.* at 633-35. The plaintiff in *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 63, (1992), which established that damages are available under Title IX, waited *two years* after she was first sexually harassed to file her complaint. *Id.* at 63. That the Federal Defendants would accuse girls and boys of unreasonable delay, for taking a mere four months to get their lawsuit filed, is remarkable.

Look again at the facts. The District first announced in October 2015 that its policy of maintaining sex-specific locker rooms was in danger. *District 211 Newsletter Update* (October 2015), Dkt. 21-5. In that announcement, the District vowed to resist the Federal Defendants' demand that it let a male student into the girls' locker rooms. *Id.* The Plaintiffs reasonably relied on the District and trusted in the political process. The District, however, capitulated in December, 2015. *V. Compl.*, Dkt. 1, ¶ 105. The Plaintiffs, who had been pursuing a political solution, began considering options for a lawsuit. Finding the right attorneys, and preparing a lawsuit of this magnitude, takes time. The Locker Room Agreement took effect in January, 2016. The Plaintiffs filed their lawsuit on May 4, 2016, a mere four months later, and filed their motion for preliminary injunction two weeks after that. There was no unreasonable delay: It takes time for parents and children who never imagined that they would have to sue their government and school to come to terms with the violation; organize and seek counsel; collect and validate information, and for counsel to prepare and file the action.

## CONCLUSION

As demonstrated, the Plaintiffs are likely to succeed on the merits and will be irreparably harmed if an injunction does not issue. The balance of hardships favors them, and the public interest favors an injunction. This Court should grant Plaintiffs' motion.

Respectfully submitted this the 26th day of July, 2016.

By: /s/ Joseph E. La Rue

THOMAS L. BREJCHA, IL 0288446
PETER BREEN, IL 6271981
JOCELYN FLOYD, IL 6303312
**THOMAS MORE SOCIETY**
19 S. La Salle Street, Suite 603
Chicago, IL 60603
(312) 782-1680
(312) 782 -1887 Fax
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
jfloyd@thomasmoresociety.org

JEREMY D. TEDESCO, AZ 023497*
JOSEPH E. LARUE, AZ 031348*
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
jtedesco@adflegal.org
jlarue@adflegal.org

J. MATTHEW SHARP, GA 607842*
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@adflegal.org

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

THIS DOCUMENT HAS BEEN ELECTRONICALLY FILED

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2016, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record who are registered users of the ECF system:

Patrick M. DePoy
Erin D. Fowler
Sally J. Scott
Jennifer A. Smith
Michael A. Warner, Jr.
FRANCZEK RADELET P.C.
300 S. Wacker Drive, Suite 3400
Chicago, IL 60606

*Attorneys for Defendant Board of Education of Township High School District No. 211*

Megan Anne Crowley
UNITED STATES DEPARTMENT OF JUSTICE,
CIVIL DIVISION, FEDERAL PROGRAMS BRANCH
20 Massachusetts Ave., N.W.
Washington, DC 20001

*Attorney for Defendants United States Department of Education, John B. King, Jr., United States Department of Justice, and Loretta E. Lynch*

Britt M. Miller
Laura R. Hammargren
Linda X. Shi
Timothy S. Bishop
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606

Catherine A. Bernard
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006

John A. Knight
ROGER BALDWIN FOUNDATION OF ACLU, INC.
180 N. Michigan, Suite 2300
Chicago, IL 60601

Ria Tabacco Mar
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004-2400

*Attorneys for Intervenor Defendants Students A, B,and C, and the Illinois Safe Schools Alliance*

By: /s/ Joseph E. La Rue

JOSEPH E. LA RUE
*Attorney for Plaintiffs*

27