**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STUDENTS AND PARENTS FOR PRIVACY**, a voluntary unincorporated association; **C.A.**, a minor, by and through her parent and guardian, **N.A.**; **A.M.**, a minor, by and through her parents and guardians, **S.M.** and **R.M.**; **N.G.**, a minor, by and through her parent and guardian, **R.G.**; **A.V.**, a minor, by and through her parents and guardians, **T.V.** and **A.T.V.**; and **B.W.**, a minor, by and through his parents and guardians, **D.W.** and **V.W.**, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 16-cv-4945 |
| v. | ) ) ) | Jeffrey T. Gilbert Magistrate Judge |
| **UNITED STATES DEPARTMENT OF EDUCATION; JOHN B. KING, JR.**, in his official capacity as United States Secretary of Education; **UNITED STATES DEPARTMENT OF JUSTICE; LORETTA E. LYNCH**, in her official capacity as United States Attorney General; and **SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS**, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) ) | |
| **STUDENTS A, B, and C**, by and through their parents and guardians, **Parents A, B, and C**; and the **ILLINOIS SAFE SCHOOLS ALLIANCE**, | ) ) ) ) ) ) | |
| Intervenor-Defendants. | ) | |

**REPORT AND RECOMMENDATION**

## I.    EXECUTIVE SUMMARY

Plaintiffs Students and Parents for Privacy, an unincorporated association, and five current or prospective high school students who live in suburban Cook County, Illinois, by and through their parents and legal guardians, (collectively, "Plaintiffs") have filed a Motion for Preliminary Injunction that, if granted, would require Defendant School Directors of Township High School District 211 ("District 211" or "the District") to segregate restrooms and locker rooms on the basis of students' biological sex (which Plaintiffs consider to be sex assigned at birth). Plaintiffs also seek to enjoin a rule, adopted by Defendant United States Department of Education ("DOE") and enforced in conjunction with Defendant United States Department of Justice ("DOJ") (together with the Secretary of Education and the Attorney General, collectively "the Federal Defendants"), that requires all schools in the United States to allow students to use restrooms and locker rooms consistent with their gender identity. Last, Plaintiffs seek to enjoin the District's policy, implemented in August 2013, allowing transgender students to use restrooms consistent with their gender identity, and an agreement DOE entered into with District 211 in December 2015 in which the District agreed to allow Student A, a transgender girl, to use the girls' locker rooms at William Fremd High School ("Fremd High School"), a public high school in Palatine, Illinois.

District Judge Jorge Alonso referred Plaintiffs' Motion for Preliminary Injunction to this Magistrate Judge for a Report and Recommendation as to whether it should be granted or denied. A preliminary injunction is an extraordinary remedy. Granting a preliminary injunction in this case would change the status quo before a full determination on the merits of the claims and defenses raised in the lawsuit. Preliminary injunctive relief is granted only when the moving parties—here, Plaintiffs—make a clear showing that they have a likelihood of success on the

merits of their claims, they likely will suffer irreparable harm if an injunction is not issued pending a final determination of the matters at issue, and they lack an adequate remedy at law. If the moving parties make these three threshold showings, then they still must show, on balance, that they will suffer more harm if an injunction is not issued than the non-moving parties will suffer if it is issued, and that the public interest would be served by the issuance of an injunction.

The Court finds Plaintiffs have not shown they have a likelihood of success on the merits of their claim that DOE violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, by promulgating a rule that interprets Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, to require that schools permit transgender students to use restrooms and locker rooms consistent with their gender identity, and by entering into an agreement informed by that rule with District 211 under which the District is required to allow Student A to use the girls' locker rooms at Fremd High School. The law in the Seventh Circuit concerning the meaning of the term "sex" as used in Title IX may be in flux. Just last week, the Seventh Circuit vacated a decision by a panel of that court that adhered to a longstanding interpretation of the word "sex" in the almost identically worded Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as very narrow, traditional and biological. Plaintiffs relied heavily on the now vacated panel decision. The full court of appeals agreed to rehear that case next month. Recent rulings by courts around the country including a district court in the Seventh Circuit evince a trend toward a more expansive understanding of sex in Title IX as inclusive of gender identity. Therefore, the Court cannot say with confidence that Plaintiffs have a likelihood of success on the merits of their claim that DOE's interpretation of Title IX is not in accordance with law or entitled to deference.

The Court also finds Plaintiffs have not shown they have a likelihood of success on the merits of their claim that District 211 or the Federal Defendants are violating their right to privacy under the United States Constitution or that District 211 is violating Title IX because transgender students are permitted to use restrooms consistent with their gender identity and Student A is allowed to use the girls' locker rooms at Fremd High School. High school students do not have a constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs. In addition, sharing a restroom or locker room with a transgender student does not create a severe, pervasive, or objectively offensive hostile environment under Title IX given the privacy protections District 211 has put in place in those facilities and the alternative facilities available to students who do not want to share a restroom or locker room with a transgender student. Further, the facilities District 211 provides for its male and female students are comparable as is required by Title IX.

In addition, even if Plaintiffs were able to show they have a likelihood of success on the merits of their claims, they still would not be entitled to the injunctive relief they seek. Plaintiffs have not shown they are likely to suffer irreparable harm if the District's or the Federal Defendants' actions are not enjoined. Plaintiffs also have not shown they lack an adequate remedy at law against either District 211 or the Federal Defendants if they ultimately succeed on their claims. Therefore, Plaintiffs have not made the three required threshold showings at this early stage of the case that the law requires to change the status quo before a final decision on the parties' claims and defenses.

For all of these reasons, there is no legal reason why District 211 cannot continue to permit all students to use restrooms and Student A to use locker rooms consistent with their gender identity while this case proceeds. As discussed more fully below, District 211 balanced

the interests of all its students when it decided to permit transgender students to use restrooms consistent with their gender identity and to allow Student A to use the girls' locker rooms at her high school. Although the District decided to allow Student A to use the girls' locker rooms under threat of an enforcement action by DOE, it nevertheless agreed to resolve that action rather than litigate the issue, and it defends its decision to do so in this case. District 211 now offers all students reasonable accommodations to ensure their privacy is protected in restrooms and locker rooms. In addition, the District has made clear that any cisgender high school student who does not want to use a restroom or a locker room with a transgender student is not required to do so.

Accordingly, this Court respectfully recommends to Judge Alonso that Plaintiffs' Motion for Preliminary Injunction be denied.

## II.     BACKGROUND

### A.     Events That Preceded This Lawsuit

In August 2013, District 211 began allowing transgender students to use restrooms consistent with their gender identity ("the Restroom Policy"). Verified Complaint for Injunctive and Declaratory Relief ("Complaint"), [ECF No. 1, at ¶¶ 214-217].[1] But it did not allow transgender students to use locker rooms consistent with their gender identity. In December 2013, Student A, a transgender girl now in her senior year at Fremd High School, filed a

---

[1] At oral argument, District 211's counsel pointed out that the District allows transgender students to use restrooms consistent with their gender identity as a matter of practice but the District 211 Board never adopted a formal policy on that subject. Transcript of August 15, 2016 Preliminary Injunction Hearing ("Oral Argument Transcript"), [ECF No. 127, at 68]. According to the District's counsel, a "policy" is a term of art the District uses when it takes action in an open session and adopts a formal policy. *Id.* Plaintiffs characterize District 211's practice as "the Restroom Policy" in their Complaint. *See*, *e.g.*, Complaint, [ECF No. 1, at ¶¶ 211-237]. Although the Court uses the term "Restroom Policy" in this Report and Recommendation to mean District 211's practice of allowing transgender students to use restrooms consistent with their gender identity, it accepts District 211's position that the practice is not a formal policy adopted by the District's Board. It does not matter to the Court's analysis whether the undisputed fact that District 211 allows transgender students to use restrooms consistent with their gender identity is characterized as a practice or a policy.

complaint with DOE's Office of Civil Rights ("OCR"), alleging that District 211 was violating Title IX by denying her access to the girls' locker rooms. *Id.* at ¶¶ 71-75, 80.[2]

Title IX prohibits recipients of "Federal financial assistance" from discriminating on the basis of sex in education programs and activities. 20 U.S.C. § 1681(a). DOE and DOJ share responsibility for enforcing Title IX. *See id.* at § 1681; 34 C.F.R. pt. 106; 28 C.F.R. pt. 54. Under this grant of authority, OCR investigates complaints, conducts compliance reviews, promulgates regulations, and issues guidance. DOE's regulations implementing Title IX provide, in relevant part, that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any . . . education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.31(a). The regulations permit recipients to provide sex-segregated "toilet, locker room, and shower facilities," so long as "facilities provided for students of one sex [are] comparable to such facilities for students of the other sex." *Id.* at § 106.33. As a recipient of "Federal financial assistance" from DOE, District 211 is subject to Title IX. *See* 20 U.S.C. § 1681(a).

In a series of guidance documents issued in 2014 and 2015 (collectively, "Guidance Documents" or "Guidance"), DOE explained how schools that receive "Federal financial assistance" should comply with Title IX and its implementing regulations with respect to

---

[2] Student A, who was assigned the sex of male at birth, has identified as female from a young age. Letter of Findings, [ECF No. 21-10, at 2]. During her middle school years, Student A began living full-time as a female. *Id.* Since then, she has presented a female appearance and taken hormone therapy. *Id.* Student A also has changed her legal name and passport to reflect her gender identity. *Id.* Plaintiffs refer to Student A as a biological male throughout their written filings and consistently use the masculine pronouns "he" and "him" when referring to Student A. The Federal Defendants, District 211, and Intervenor-Defendants use the feminine pronouns "she" and "her" when referring to Student A. In this Report and Recommendation, the Court will identify Student A as a transgender girl and use female pronouns when referring to her, which is consistent with Student A's gender identity and the way she refers to herself.

transgender students. In April 2014, in response to requests for clarification from various funding recipients, DOE, through OCR, issued guidance stating that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity." Questions and Answers on Title IX and Sexual Violence ("Q&A on Sexual Violence"), [ECF No. 21-9, at 5]. In December 2014, DOE also said that "[u]nder Title IX, a recipient generally must treat transgender students consistent with their gender identity in all aspects of the planning, implementation, enrollment, operation, and evaluation of single-sex classes." Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities ("Q&A on Single-Sex Classes and Extracurricular Activities"), [ECF No. 21-8, at 25]. In April 2015, DOE reiterated this interpretation, stating that recipients must "help ensure that transgender students are treated consistent with their gender identity in the context of single-sex classes." Title IX Resource Guide, [ECF No. 21-7, at 21-22].[3]

The Guidance Documents were issued after Student A filed her complaint with OCR concerning locker room access but during the time that OCR was reviewing that complaint. After investigating Student A's complaint, OCR notified District 211 by a letter dated November 2, 2015—the "Letter of Findings" for short—that excluding Student A from the girls' locker rooms violated Title IX's implementing regulations. Letter of Findings, [ECF No. 21-10, at 13]. The Letter of Findings further explained that if OCR and District 211 were not able to negotiate

___

[3] Less than one week after Plaintiffs filed their Complaint in this case, DOE and DOJ issued a joint guidance dated May 13, 2016, in the form of a "Dear Colleague Letter," explaining that "[w]hen a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity." Dear Colleague Letter on Transgender Students ("Dear Colleague Letter"), [ECF No. 21-6, at 3]. Although the statements in and rationale for this Dear Colleague Letter are consistent with the Guidance Documents, the May 13 Dear Colleague Letter is not among the Guidance Documents directly at issue in this case because it was issued after this lawsuit was filed.

7

an agreement to bring the District into compliance with its obligations, OCR would issue a Letter of Impending Enforcement Action. *Id.*

On December 2, 2015, OCR and District 211 entered into an Agreement to Resolve, which will be referred to as the "Locker Room Agreement." Locker Room Agreement, [ECF No. 21-3]. The Locker Room Agreement provides, among other things:

> Based on Student A's representation that she will change in private changing stations in the girls' locker rooms, the District agrees to provide Student A access to locker room facilities designated for female students at school and to take steps to protect the privacy of its students by installing and maintaining sufficient privacy curtains (private changing stations) within the girls' locker rooms to accommodate Student A and any students who wish to be assured of privacy while changing.

*Id.* at 2. The Locker Room Agreement further provides:

> If any student requests additional privacy in the use of sex-specific facilities designed for female students beyond the private changing stations described [above], the District will provide that student with access to a reasonable alternative, such as assignment of a student locker in near proximity to the office of a teacher or coach; use of another private area (such as a restroom stall) within the public area; use of a nearby private area (such as a single-use facility); or a separate schedule of use.

*Id.*

## B. Plaintiffs' Complaint In This Case

On May 4, 2016, a little more than five months after the Locker Room Agreement was signed, Plaintiffs filed this lawsuit against the Federal Defendants and District 211, challenging the Restroom Policy, the Locker Room Agreement, and the Guidance Documents. Complaint, [ECF No. 1].[4] In Count I of their Complaint, Plaintiffs allege that DOE violated the APA by

---

[4] Plaintiffs filed a "Verified Complaint" in this case. There is no requirement in the Federal Rules of Civil Procedure that a complaint must be verified "[u]nless a rule or statute specifically states otherwise." FED. R. CIV. P. 11(a). The Court is unaware of any rule or statute that requires verification of a complaint seeking an injunction. Although a verified complaint may be treated as an affidavit when filed in support of a motion seeking an injunction, *Myers v. Thompson*, 2016 WL 3610431, at *5 (D. Mont. June 28, 2016), "a party's verification of a pleading that need not have been verified does not give the pleading

entering into the Locker Room Agreement with District 211 and by promulgating a rule, embodied in the Guidance Documents, requiring schools to treat students consistent with their gender identity. In Counts II and IV respectively, Plaintiffs allege that the Federal Defendants and District 211 are violating Plaintiffs' constitutional right to privacy, and that the District is violating their rights under Title IX, by allowing transgender students to use restrooms consistent with their gender identity and by allowing Student A, who Plaintiffs consider to be a biological male, to use the girls' locker rooms.

In addition, Plaintiffs assert claims for violations of their parental right to direct the education and upbringing of their children (Count III); the Illinois and Federal Religious Freedom Restoration Acts (Counts V and VI); and the Free Exercise Clause of the First Amendment (Count VII). Counts I and VI are against the Federal Defendants only; Counts IV and V are against District 211 only. The remaining counts are against all Defendants.

Plaintiffs are an unincorporated association and five individually named minor plaintiffs (four females and one male), identified only by their initials. Plaintiffs use the term "Girl Plaintiffs" to refer to "all girl students who attend Fremd, or will attend Fremd in fall 2016, and are part of the Students and Parents for Privacy [including the four female minor named plaintiffs]." *Id.* at ¶ 36. They use the term "Student Plaintiffs" to refer to "all students who are part of Students and Parents for Privacy [including the five individual minor named plaintiffs]." *Id.*[5] The only individual minor plaintiff who is male is identified as B.W. in paragraph 35 of the

---

any added weight or importance in the eyes of the district court," 5A Charles Alan Wright et al., *Federal Practice and Procedure* § 1339 (3d ed. 2004) (hereinafter "Wright"). Therefore, the allegations in Plaintiffs' Complaint are not entitled to any greater weight nor are they insulated from being characterized as speculative, vague, general, or overbroad, or from being contradicted by evidence submitted by Defendants. *Id.*

[5] The Court will use the terms "Student Plaintiffs" and "Girl Plaintiffs" as Plaintiffs have defined them. In addition, Plaintiffs refer to male and female students as boys and girls, and to the facilities at issue in

Complaint.  Plaintiffs allege B.W. is subject to the Restroom Policy but he is not referenced anywhere else in the Complaint.  Student Plaintiffs allege they are affected by the Restroom Policy, but only Girl Plaintiffs allege they are affected by the Locker Room Agreement.  The only transgender student who is alleged to have used a restroom or locker room at Fremd High School is Student A.

Plaintiffs allege, among other things, the Restroom Policy and the Locker Room Agreement cause Girl Plaintiffs to experience "embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity" because they use, and anticipate having to use, restrooms and locker rooms with Student A, who they label as a "biological male."  *Id.* at ¶¶ 7, 11; *see also id.* at ¶ 226 (adding the word "intimidation" to the list of emotions Girl Plaintiffs allege they are experiencing).  Plaintiffs allege Girl Plaintiffs are afraid, worried, and embarrassed about the possibility of seeing or being seen by Student A when either Girl Plaintiffs or Student A are in a state of undress.  *Id.* at ¶¶ 8, 9, 114, 126, 127, 186, 187.  Plaintiffs assert Girl Plaintiffs' distress is "ever-present" and "constant."  *Id.* at ¶¶ 114, 115, 125, 237.  Plaintiffs also say Girl Plaintiffs are fearful of having to attend to personal needs in restrooms and locker rooms when Student A is present.  *Id.* at ¶¶ 8, 10.  All Student Plaintiffs allege they "experience embarrassment, humiliation, anxiety, intimidation, fear, apprehension, stress, degradation, and loss of dignity" because of the Restroom Policy.  *Id.* at ¶ 226.

Plaintiffs generally allege the Restroom Policy and the Locker Room Agreement have a negative effect on Girl Plaintiffs' access to educational opportunities, benefits, programs, and activities at their schools.  *Id.* at ¶¶ 12-13.  Plaintiffs allege some Girl Plaintiffs risk tardiness by running to the opposite end of the school, during short passing periods, to find a restroom or

this case as boys' and girls' restrooms and locker rooms.  For the most part, the Court has adopted Plaintiffs' convention of referring to male and female high school students as "boys" and "girls."

locker room that Student A is not likely to be using, and change clothes as quickly as possible while experiencing stress and anxiety and avoiding eye contact and conversation. *Id.* at ¶ 12.

Plaintiffs allege the privacy protections District 211 provides in restrooms and locker rooms do not do enough to ameliorate Student Plaintiffs' concerns about sharing those facilities with a transgender student assigned a different sex than theirs at birth, or the risk that they may see or be seen by a transgender student when either is in an unclothed or partially clothed state. Plaintiffs allege there are "large gaps" above and below the doors on the stalls in both the boys' and girls' restrooms, *id.* ¶ 158, and "gaps along the sides of the door[] that another student could see through even inadvertently," *id.* at ¶ 228. Plaintiffs allege this "mean[s] that the Student Plaintiffs, both boys and girls, must risk exposing themselves to the opposite sex every time they use the restroom." *Id.* at ¶ 229. Plaintiffs allege the privacy stalls provided in the physical education locker room for changing clothes or showering are not adequate to address Girl Plaintiffs' fundamental concern with using the same facility as Student A. *Id.* at ¶¶ 259-260. Plaintiffs also allege Girl Plaintiffs are ridiculed and harassed by their classmates when they use the privacy stalls. *Id.* at ¶¶ 140-146. Plaintiffs allege there are no private stalls in the girls' swim locker room and the girls' gymnastics locker room for changing clothes or showering. *Id.* at ¶¶ 161, 172-174, 196-197. Plaintiffs allege the completely separate, private facilities District 211 provides for students who do not want to use the common facilities "are inadequate and inferior" to the common facilities and "unworkable in terms of the practical locker room needs of Girl Plaintiffs." *Id.* at ¶ 245; *see also id.* at ¶¶ 242-244.

## C. Plaintiffs' Motion For Preliminary Injunction

On May 23, 2016, Plaintiffs moved for a preliminary injunction on Counts I, II, and IV of their Complaint. Plaintiffs' Motion for Preliminary Injunction ("Plaintiffs' Motion"), [ECF No.

21].  As noted above, Count I is a claim against the Federal Defendants for violating the APA.

Count II is a claim against both the Federal Defendants and District 211 for violating Plaintiffs'

constitutional right to privacy.  Count IV is a claim against District 211 for violating Title IX.

Judge Alonso referred Plaintiffs' Motion for Preliminary Injunction to this Magistrate Judge for

a Report and Recommendation.  [ECF Nos. 24, 26].

In their Complaint, Plaintiffs ask the Court to "set aside" or enjoin DOE's "new rule that

redefines 'sex' in Title IX" and to enjoin the Federal Defendants from taking "any action" based

on this interpretation of Title IX and its implementing regulations as requiring schools to treat a

student's gender identity as the student's sex.  Complaint, [ECF No. 1, Prayer for Relief, at ¶¶ B

and C].  During oral argument on their Motion for Preliminary Injunction, however, Plaintiffs'

counsel clarified that Plaintiffs are asking the Court only to enter a preliminary injunction

restraining the Federal Defendants from "further application of the rule to force District 211 to

comply with it in the operation of its facilities."  Oral Argument Transcript, [ECF No. 127, at

155]; *see also id.* at 155-58.  In other words, Plaintiffs are not now asking the Court broadly to

"set aside" a rule or prevent the Federal Defendants from taking "any action" based on DOE's

interpretation of Title IX other than with respect to District 211.  *Id.*  Plaintiffs will seek broader

relief if they prevail on the merits of their claims at the conclusion of this case.  *Id.*  Plaintiffs

further seek to enjoin District 211 from enforcing the Restroom Policy and complying with the

Locker Room Agreement.  Complaint, [ECF No. 1, Prayer for Relief, at ¶ A].[6]

---

[6] After Plaintiffs filed their Motion, a federal district court in Texas issued a "nationwide" injunction
against several federal agencies and various officials, including the Federal Defendants in this case,
enjoining them from: (1) "enforcing" certain guidelines against the plaintiffs in that case and "their
respective schools, school boards, and other public, educationally-based institutions"; (2) "initiating,
continuing, or concluding any investigation based on [their] interpretation that the definition of sex
includes gender identity"; and (3) "using the Guidelines or asserting the Guidelines carry weight in any
litigation initiated following the date of [its] Order."  *Texas v. United States*, 2016 WL 4426495, at *17
(N.D. Tex. Aug. 21, 2016).  The court said that its injunction was not intended to interfere with litigation

**D.      District 211's Request For Early Discovery And The June 9, 2016 Hearing**

Shortly after Plaintiffs moved for a preliminary injunction, District 211 requested leave to conduct discovery before responding to Plaintiffs' Motion.  Plaintiffs opposed the District's request for early discovery.  They wanted a relatively quick (as the litigation timeline goes) decision on their request for injunctive relief and to avoid getting bogged down in fact-intensive, drawn-out discovery that potentially could delay a decision on their Motion.  On June 3, 2016, at the Court's direction, District 211 served the interrogatories it wanted Plaintiffs to answer and a short memorandum explaining why the District felt the discovery was necessary for a ruling on Plaintiffs' Motion.  [ECF No. 44].  Five days later, on June 8, 2016, Plaintiffs filed a Motion for Protective Order opposing the requested discovery.  [ECF No. 48].

On June 9, 2016, the Court held a hearing and granted Plaintiffs' Motion for Protective Order.  The Court found that responses to the interrogatories District 211 sought to serve were not necessary at this preliminary stage for the Court to make its recommendation on Plaintiffs' Motion.  [ECF No. 52].  The Court's ruling was based on Plaintiffs' representation that the thrust of their case in support of their Motion rests on facial challenges to the Restroom Policy and the Locker Room Agreement which, as Plaintiffs allege, is the result of DOE's interpretation of Title IX in the Guidance Documents.  In Plaintiffs' words:

> Plaintiffs' preliminary injunction motion places before this Court two questions of law related to the activities of the District.  First, does letting a biological male use the girls' locker rooms and restrooms, and so subjecting the Girl Plaintiffs to the risk of compelled exposure of their bodies to the opposite biological sex, violate the Girl Plaintiffs' constitutional right to privacy?  Second, does letting a biological male use these private female facilities create a hostile environment for the Girl Plaintiffs, in violation of Title IX, and does offering the Girl Plaintiffs incomparable facilities as compared to boy students violate Title IX?

---

before other courts involving the same issues.  *Id.*  For this and other reasons, the Texas injunction does not impact this case.  *See Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't. of Educ.*, --- F. Supp. 3d --- , 2016 WL 5372349, at *20 (S.D. Ohio Sept. 26, 2016).

Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Protective Order ("Plaintiffs' Protective Order Brief"), [ECF No. 50, at 3].

At the June 9 hearing, Plaintiffs' counsel elaborated on what Plaintiffs were and were not arguing in support of their Motion for Preliminary Injunction:

> What you need to know, Your Honor, is that the policy exists, nobody disputes that, that the policy allows a biological [male] student into a locker room and restroom, and that, of course, results in interactions in the locker room on a daily basis between girls and boys. . . . Inserting the biological male into those facilities is sufficient to show the violation.

Transcript of June 9, 2016 Hearing ("June 9 Hearing Transcript") [ECF No. 128, at 18].

District 211's proposed interrogatories (and depositions of certain Plaintiffs and others that might have followed) were focused on discovering the "who, what, where, when, etc."—in other words, the facts—underlying Plaintiffs' anonymous, general, and relatively conclusory allegations in their Complaint. *See* District 211's Proposed Interrogatories, [ECF No. 44-1]. Plaintiffs argued none of that discovery was necessary at this stage because they are not relying on the specifics of any interactions in either restrooms or locker rooms between any Plaintiff and Student A or anyone else in support of their Motion for Preliminary Injunction. According to Plaintiffs' counsel, "who saw who in the state of undress or naked . . . is not relevant . . . at the preliminary injunction stage. We don't need to prove that. We didn't allege that in the complaint, nor do we rely on it at the preliminary injunction stage." June 9 Hearing Transcript, [ECF No. 128, at 18]. Rather, Plaintiffs argued the simple fact that Student A, in Plaintiffs' words a biological boy, is or can be present in the girls' restrooms and locker rooms is what entitles them to the relief they seek:

> The District's policies allow Student A access to the girls' private facilities. . . .
> Student A has used the girls' facilities while some Girl Plaintiffs were present.
> Girl Plaintiffs know that any time they use the restroom or locker room, Student

A has the right to be present with them. They also know that, even if he is not present, he could walk in at any time. As a result, Girl Plaintiffs are suffering stress, anxiety, embarrassment, and intimidation.

Plaintiffs' Protective Order Brief, [ECF No. 50, at 3].[7]

The Court agreed Plaintiffs are entitled to frame the issues as they want in support of their Motion for Preliminary Injunction. The Court also recognized that, if it allowed District 211 to proceed with the discovery it wanted to take, that materially could delay a decision on Plaintiffs' Motion. In addition, District 211's counsel agreed that if Plaintiffs were resting their case in favor of a preliminary injunction on "the risk of exposure . . . in front of a biological male whose gender identity is female . . . [a] fact that I don't think anybody disputes[,] . . . as opposed to looking at what plaintiffs allege has actually happened in locker rooms and restrooms," then the District's proposed discovery could be deferred. June 9 Hearing Transcript, [ECF No. 128, at 15].

On May 25, 2016, Students A, B, and C, by and through their parents and legal guardians, and the Illinois Safe Schools Alliance (collectively, "Intervenor-Defendants") filed a Motion to Intervene in this case. [ECF No. 30]. As discussed above, Student A is the subject of the Locker Room Agreement entered into by DOE and District 211. Locker Room Agreement, [ECF No. 21-3]. Student C is a transgender boy who recently entered his freshman year at a high school in District 211 and wants to use the boys' restrooms and locker rooms at his school. Declaration of Parent C ("Parent C's Declaration"), [ECF No. 32-3, at ¶¶ 2, 10]. Student B is a transgender boy who soon will attend a high school in District 211 and wants to use the boys' restrooms and locker rooms at his high school. Declaration of Parent B ("Parent B's

---

[7] Plaintiffs also opposed the District's discovery because they intimated that if certain individual plaintiffs or members of the association plaintiff were forced to disclose their identities, as the District asked them to do in its interrogatories, they might drop out of the lawsuit, which was something Plaintiffs wanted to avoid. Plaintiffs' Protective Order Brief, [ECF No. 50, at 5].

Declaration"), [ECF No. 32-2, at ¶¶ 2, 19].  The Illinois Safe Schools Alliance is an organization that supports lesbian, gay, bisexual, and transgender students in Illinois through advocacy and training, including in District 211.  Declaration of Owen Daniel-McCarter, [ECF No. 32-4, at ¶¶ 2-15].  On June 15, 2016, Judge Alonso granted Intervenor-Defendants' Motion to Intervene. [ECF No. 56].  Intervenor-Defendants oppose Plaintiffs' Motion for Preliminary Injunction.

Plaintiffs' Motion for Preliminary Injunction is fully briefed, and this Court held oral argument on August 15, 2016.  The record before the Court on Plaintiffs' Motion consists of Plaintiffs' Complaint and the attached exhibits, the parties' respective briefs filed in support of and in opposition to Plaintiffs' Motion, the various declarations and other materials submitted with those briefs, and counsels' oral arguments during the hearing on Plaintiffs' Motion.  For all of the reasons set forth below, the Court respectfully recommends that Judge Alonso deny Plaintiffs' Motion for Preliminary Injunction.

## III.    LEGAL STANDARD

A preliminary injunction "'is an extraordinary and drastic remedy.'"  *Goodman v. Ill. Dep't of Fin.*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  In the Seventh Circuit, the court analyzes a request for such relief in two distinct phases: a threshold phase and a balancing phase.  *Girl Scouts of Manitou Council Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008).  During both phases, movants— here, Plaintiffs—bear the burden of proving "'*by a clear showing*'" that a preliminary injunction should be granted.  *Goodman*, 430 F.3d at 437 (quoting *Mazurek*, 520 U.S. at 972) (emphasis in the original).

During the first phase, Plaintiffs must make three threshold showings.  *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015).  Plaintiffs must show they have a

likelihood of success on the merits. *Id.* at 662. They must show, "absent preliminary injunctive relief, [they] will suffer irreparable harm in the interim prior to a final resolution." *Id.* And Plaintiffs must show there is no adequate remedy at law. *Id.* If Plaintiffs fail to make any of these showings, the court must deny injunctive relief. *Girl Scouts*, 549 F.3d at 1086.

If Plaintiffs carry their burden in the threshold phase, the court then proceeds to the balancing phase. During this stage of the analysis, the court first "weighs the irreparable harm that the moving part[ies] would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving part[ies] would suffer if the court were to grant the requested relief." *Id.* Then the court considers how granting or denying the injunction would affect the interests of non-parties—commonly called the "public interest." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). During the balancing phase, the court "weighs the balance of potential harms on a 'sliding scale' against the movant[s'] likelihood of success." *Turnell*, 796 F.3d at 662.

## IV.     ANALYSIS

### A.      Likelihood Of Success On The Merits

To satisfy the first threshold requirement for a preliminary injunction, Plaintiffs must show they have a likelihood of success on the merits. *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). "This 'likelihood' standard requires more than a 'mere possibility of relief' and more than a 'better than negligible' showing." *Truth Foundation Ministries, NFP v. Village of Romeoville*, --- F. Supp. 3d ---, 2016 WL 757982, at *8 (N.D. Ill. Feb. 26, 2016).

1. **Plaintiffs Have Not Shown They Have A Likelihood Of Success On The Merits Of Their APA Claim Against The Federal Defendants**

   a. <u>The Locker Room Agreement And The Federal Defendants' Interpretation Of The Word "Sex" In Title IX Are Subject To Judicial Review</u>

The APA vests "the courts with the power to 'interpret . . . statutory provisions' and overturn agency action inconsistent with those interpretations." *Gutierrez-Brizuela v. Lynch*, --- F.3d --- , 2016 WL 4436309, at *7 (10th Cir. Aug. 23, 2016) (Gorsuch, J., concurring) (quoting 5 U.S.C. § 706). But the APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704; *see also Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016). Therefore, "[w]hether there has been 'agency action' or 'final agency action' within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006).

The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Only two of these types of actions—sanction and rule—are relevant to this case. A sanction is, in pertinent part, "the whole or a part of an agency . . . prohibition, requirement, limitation, or other condition affecting the freedom of a person." *Id.* at § 551(10). And a "rule" is, again in pertinent part, "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* at § 551(4).

This case involves a sanction and a rule. Plaintiffs argue and the Federal Defendants agree the Locker Room Agreement is a sanction because it imposes "concrete consequences" on District 211. *See* Oral Argument Transcript, [ECF No. 127, at 48, 141, 143, 151]. The rule is

the Federal Defendants' "interpretation of Title IX," stated in the Guidance, "as requiring schools to treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations." Federal Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction ("Federal Defendants' Response Brief"), [ECF No. 80, at 1]. The Federal Defendants agree with Plaintiffs that this "interpretation," which the Court will refer to as "the Rule," is a rule. *See id.* at 15 ("Here, the Guidance has all the indicia of an interpretive rule.").

Generally, an agency action is final when the action marks the consummation of the agency's decision-making process, and has legal consequences or, phrased another way, directly affects a party. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 800, 806 (D.C. Cir. 2006); *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers*, 335 F.3d 607, 614 (7th Cir. 2003). Under this standard, an agency's behavior may indicate that an action is final even when the agency has not observed "'the conventional procedural accoutrements of finality.'" *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189 (10th Cir. 2014) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001)). In the end, the finality requirement must be interpreted pragmatically. *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016); *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1027 (D.C. Cir. 2016).

The Federal Defendants do "not contest[]" that the Locker Room Agreement constitutes final agency action. Oral Argument Transcript, [ECF No. 127, at 48, 139]; *see also id.* at 141, 143. The Locker Room Agreement marked the conclusion of DOE's administrative action against District 211, and DOE did not contemplate any further proceedings. The Locker Room Agreement imposes on District 211 concrete obligations that, according to the Federal

Defendants, are legally enforceable. *See id.* at 48, 141, 143, 151. At least some of these legal obligations exceed what Title IX and its implementing regulations would require the District to do if the Locker Room Agreement did not exist. The Court thus is satisfied that the Locker Room Agreement constitutes final agency action because it represents the culmination of DOE's decision-making process and has concrete legal consequences that bind District 211 and impact Plaintiffs.

The Federal Defendants argue the Rule is not final agency action and, thus, not subject to judicial review. They do not dispute that the Rule is the culmination of DOE's decision-making process with respect to the issue of whether "sex" as used in Title IX includes gender identity. Instead, they assert in a footnote that the Rule "is not final agency action . . . because it does not determine rights or obligations and no 'legal consequences' flow from it." Federal Defendants' Response Brief, [ECF No. 80, at 16 n.9]. The Federal Defendants do not say why the Rule does not determine rights or obligations and has no legal consequences. Instead, the footnote references the corresponding text in the body of the brief, which explains why, in the Federal Defendants' view, the Rule is interpretive, not legislative. In essence, then, the Federal Defendants seem to be arguing the Rule is not a final agency action because it is an interpretive rule.

This argument is contrary to clear precedent holding that interpretive rules and guidance documents may be subject to judicial review. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014); *Oregon v. Ashcroft*, 368 F.3d 1118, 1147 (9th Cir. 2004), *aff'd sub nom.*, *Gonzales v. Oregon*, 546 U.S. 243 (2006). "'An agency may not avoid judicial review merely by choosing the form of'" a guidance document "'to express its definitive position on a general question of statutory interpretation.'" *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637

F.3d 408, 412 (D.C. Cir. 2011) (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986)). "Once [an] agency publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *Ciba-Geigy*, 801 F.2d at 436; *see also Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("'[A]n interpretative rule is subject to review when it is relied upon or applied to support an agency action in a particular case.'") (quoting Edwards, Elliott, & Levy, *Federal Standards of Review* 161 (2d ed. 2013)).[8]

For all practical purposes, the Rule gives schools across the country "marching orders" as to what DOE expects them to do. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). It does not describe what DOE thinks Title IX might mean or propose how schools possibly could interpret Title IX. The Guidance Documents state definitively that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity," Q&A on Sexual Violence, [ECF No. 21-9, at 5], and tell schools what they "must" do to comply with Title IX, *see*, *e.g.*, Q&A on Single-Sex Classes and Extracurricular Activities, [ECF No. 21-8, at 25]; Title IX Resource Guide, [ECF No. 21-7, at 21-22]. DOE has not expressed any uncertainty about the binding nature of its interpretation. To the contrary, even since the filing of this lawsuit, DOE has continued to maintain and advance its interpretation as binding on schools in the United States. On May 23, 2016, for example, DOE issued a Dear Colleague Letter saying that "[w]hen a school provides sex-segregated activities and facilities, transgender students must

---

[8] "If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding.'" *Appalachian Power*, 208 F.3d at 1021.

be allowed to participate in such activities and access such facilities consistent with their gender identity." Dear Colleague Letter, [ECF No. 21-6, at 3]. There is no indication in the record that, within DOE, agency officials consider the Rule to be a suggestion or an interim position. Rather, it guides DOE's review of complaints and pursuit of enforcement actions.

In this particular case, the Rule "informed" DOE's "review" of Student A's complaint against District 211. Federal Defendants' Response Brief, [ECF No. 80, at 1-2]. After its review, DOE sent a Letter of Findings to District 211, saying the agency found the District to be in violation of Title IX, and that, if DOE and the District did not agree to resolve the matter, the agency would issue a Letter of Impending Enforcement Action within 30 days, initiating a process that ultimately could result in District 211 losing its federal funding. Letter of Findings, [ECF No. 21-10, at 13]. District 211 and DOE then entered into the Locker Room Agreement, a resolution that the Federal Defendants concede was "informed" by the Rule. Federal Defendants' Response Brief, [ECF No. 80, at 1-2]. The Federal Defendants concede the Locker Room Agreement has a direct and consequential effect on District 211 and, thus, in turn on Plaintiffs. *See* Oral Argument Transcript, [ECF No. 127, at 48, 141, 143, 151].

DOE says it issued the Rule in response to questions it was receiving from schools around the country confronted with how they should address transgender students' use of facilities denominated as single-sex. *See* Federal Defendants' Response Brief, [ECF No. 80, at 16]; Q&A on Sexual Violence, [ECF No. 21-9, at ii]; Q&A on Single-Sex Classes and Extracurricular Activities, [ECF No. 21-8, at 1]. As a practical matter, the Rule represents and has been treated by DOE as its definitive statement that "sex" as used in Title IX and its implementing regulations includes gender identity. This has led some schools, such as District 211, to acquiesce to DOE's view. For all of these reasons, the Rule constitutes final agency

22

action. *See Nat'l Envtl. Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1006-07 (D.C. Cir. 2014); *CSI*, 637 F.3d at 411-14; *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d, 215 F.3d 45, 47-50 (D.C. Cir. 2000); *Appalachian Power*, 208 F.3d at 1020-23; *Philip Morris USA Inc. v. United States Food & Drug Admin.*, --- F. Supp. 3d --- , 2016 WL 4378970, at *10-12 (D.D.C. Aug. 16, 2016); *Pharm. Research & Manufacturers of Am. v. United States Dep't of Health & Human Servs.*, 138 F. Supp. 3d 31, 39-47 (D.D.C. 2015).[9]

Moreover, even if the Rule were not a final agency action, it still would be reviewable in this case because it would be at least a preliminary or intermediate agency action that led to the Locker Room Agreement, which is a final agency action. The APA provides that a court may review preliminary and intermediate agency actions "on the review of the final agency action." 5 U.S.C. § 704. That means when a court is reviewing a final agency action, such as the Locker Room Agreement, it also can review any preliminary or intermediate agency actions that led to the final agency action. *See Benzman v. Whitman*, 523 F.3d 119, 132 (2d Cir. 2008); *Oliver v. U.S. Dep't of the Army*, 2015 WL 4561157, at *3 (D.N.J. July 28, 2015); *Souza v. California Dep't of Transp.*, 2014 WL 793644, at *4 (N.D. Cal. Feb. 26, 2014); *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 801 F. Supp. 2d 383, 404 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *cf. Com. of Mass. v. U.S. Nuclear Regulatory Comm'n*, 924 F.2d 311, 322 (D.C. Cir. 1991) ("Section 704 authorizes us to review only those preliminary, intermediate, or procedural rulings that relate to the final agency action presently before the court.").

For all of these reasons, the Rule is subject to judicial review in this case.

---

[9] In *Texas v. United States*, the court reviewed a different, but slightly overlapping, set of DOE guidance documents containing the same rule, and also concluded DOE's promulgation of the rule constituted a final agency action. 2016 WL 4426495, at *2 & n.4, 8-9.

b. <u>Plaintiffs Have Not Shown They Have A Likelihood Of Success On The Merits Of Their Argument That "Sex" As Used In Title IX Unambiguously Excludes Gender Identity</u>

Plaintiffs argue DOE violated the APA by promulgating the Rule and entering into the Locker Room Agreement which, according to Plaintiffs, conflict with the unambiguous meaning of the term "sex" in Title IX. Plaintiffs contend the statute and its implementing regulations unambiguously mean that one's "sex" is determined by his or her "chromosomes, anatomy, gametes, and reproductive system." Plaintiffs' Reply Memorandum in Support of Their Preliminary Injunction Motion ("Plaintiffs' Reply Brief"), [ECF No. 94, at 1]. Sex does not and cannot, Plaintiffs assert, include gender identity. Plaintiffs look to Seventh Circuit decisions interpreting Congress's intent when it used the word "sex" in the almost identically worded Title VII to support their position under Title IX.

The Federal Defendants argue the word "sex" as used in Title IX is ambiguous as to whether one's sex is determined "'with reference exclusively to genitalia'" or "'with reference to gender identity.'" Federal Defendants' Response Brief, [ECF No. 80, at 19] (quoting *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 720 (4th Cir. 2016)). They claim that, because of this ambiguity, courts should defer to DOE's interpretation of the term "sex" under *Auer v. Robbins*, 519 U.S. 452 (1997), and *Chevron U.S.A. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Intervenor-Defendants go a step further and argue that whenever there is not complete alignment among a student's sex-related characteristics, the unambiguous meaning of the term "sex" in Title IX requires that schools determine a student's sex based upon his or her gender identity because gender identity in those circumstances is the only way to determine sex. Intervenor-Defendants' Brief in Response to Plaintiffs' Motion for Preliminary Injunction ("Intervenor-Defendants' Response Brief"), [ECF No. 79, at 2-7].

24

The Seventh Circuit first addressed, to the extent relevant here, the meaning of "sex" as used in Title VII in *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081 (7th Cir. 1984). In that case, which involved a transsexual plaintiff alleging employment discrimination under Title VII, the court of appeals held Congress intended the term "sex" in Title VII to have a "narrow, traditional interpretation." *Id.* at 1086. *Ulane* was decided in 1984, more than 32 years ago, and a number of courts around the country since then have declined to follow its reasoning in light of more recent developments in the law including, among others, the Supreme Court's recognition in 1989 that discrimination claims based upon gender stereotypes and gender non-conformity are cognizable under Title VII. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."); *see also Glenn v. Brumby*, 663 F.3d 1312, 1316-17 (11th Cir. 2011); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 572-75 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000); *Roberts v. Clark Cty. Sch. Dist.*, 2016 WL 5843046, at \*6 (D. Nev. Oct. 4, 2016).[10]

On July 28, 2016, in *Hively v. Ivy Tech Community College, South Bend*, a panel of the Seventh Circuit had an opportunity to overrule *Ulane* but declined to do so. 830 F.3d 698 (7th Cir. 2016). Instead, it concluded *Ulane*'s holding that Congress intended a very narrow and traditional interpretation of the term "sex" in Title VII "so far, appears to be correct." *Id*. at 702. On October 11, 2016, however, the full Seventh Circuit vacated the panel's decision in *Hively* and granted a rehearing en banc in that case, with oral argument scheduled for November 30, 2016. Order Granting Rehearing En Banc and Vacating the Panel Opinion, *Hively v. Ivy Tech*

---

[10] Although not all of these cases are Title VII cases, they do evidence broad support for the proposition that the term "sex" in the context of statutes similarly designed to attack discrimination on the basis of sex should not be construed narrowly.

*Cmty. Coll., S. Bend*, No. 15-1720, Dkt. No. 60 (7th Cir. Oct. 11, 2016); Notice of En Banc Oral Argument, *Hively v. Ivy Tech Cmty. Coll., S. Bend*, No. 15-1720, Dkt. No. 61 (7th Cir. Oct. 11, 2016).

As a result of these recent developments, it appears the law in the Seventh Circuit concerning the interpretation of the term "sex" in Title VII, as relevant to the almost identically worded Title IX, may be in flux. When the Seventh Circuit rules after its en banc review of *Hively*, whether with one voice or otherwise, it very well could shed important new light on the question of whether the term "sex" as used in Title VII, and by implication in Title IX, encompasses gender identity.

To understand the parties' respective arguments as to the meaning of the term "sex" under Title VII and Title IX and the current state of the law in that respect in this Circuit and around the country, it is important to understand the Seventh Circuit's decisions in *Ulane* and its progeny through and including the recent panel decision, now vacated, in *Hively*.

i.    <u>*Ulane v. Eastern Airlines, Inc.* and its progeny</u>

The plaintiff in *Ulane*, Karen Frances Ulane, was an Army veteran who earned the Air Medal with eight clusters for her service in Vietnam. *Ulane*, 742 F.2d at 1082. When Ulane returned home, Eastern Airlines, Inc. hired her as a pilot, and she eventually reached the position of First Officer. *Id.* When it discovered that Ulane was transsexual, though, Eastern fired her. *Id.* at 1082-83. Ulane then filed suit, alleging that Eastern discriminated against her because of her sex in violation of Title VII. *Id.* at 1082. The district court, after a bench trial, found that "sex" "comprehend[s] 'sexual identity'" because "'sex is not a cut-and-dried matter of chromosomes,' but is in part a psychological question—a question of self-perception; and in part a social matter—a question of how society perceives the individual." *Id.* at 1084 (quoting *Ulane v. Eastern Airlines, Inc.*, 581 F. Supp. 821, 823-24 (N.D. Ill. 1983), *rev'd*, 742 F.2d 1081 (7th

Cir. 1984)).  The district court ruled in Ulane's favor, holding Title VII prohibits discrimination on the basis of transsexualism.  *Id.*  The court also ruled Eastern had discriminated against Ulane as a female.  *Id.* at 1087.

The Seventh Circuit disagreed with the district court's analysis and held Title VII does not prohibit discrimination on the basis of transsexualism.  *Id.* at 1084.  In doing so, the court of appeals attempted to discern Congress's intent when it enacted Title VII, and the court identified three adjectives that describe Congress's thinking about the plain meaning of "sex."  *See id.* at 1085, 1086 (discussing the "plain" and "common" meaning of Title VII).  The first adjective is "traditional."  *Id.* at 1085 (recognizing "Congress never considered nor intended that this 1964 legislation apply to anything other than the traditional concept of sex"); *id.* at 1085-86 (saying Congress's failure to amend Title VII "strongly indicates . . . sex should be given a . . . traditional interpretation"); *id.* at 1086 (determining only Congress can decide whether "sex" should encompasses "the untraditional"); *id.* (declining "to judicially expand the definition of sex as used in Title VII beyond its common and traditional interpretation").  The second is "narrow."  *Id.* at 1085-86 (concluding Congress's failure to amend Title VII "strongly indicates . . . sex should be given a narrow . . . interpretation"); *id.* at 1086 (explaining "Congress had a narrow view of sex in mind when it passed the Civil Rights Act").  And the third is "biological."  *Id.* at 1087 (agreeing "with the Eighth and Ninth Circuits that if the term 'sex' as it is used in Title VII is to mean more than biological male or biological female, the new definition must come from Congress").[11]

_____

[11] It is hard to reconcile the court of appeals' holding that "sex" under Title VII has a narrow, traditional, and biological meaning, and does not encompass sexual identity, with its statement in dicta that "[i]f Eastern had considered Ulane to be female and had discriminated against her because she was female . . . then the argument might be made that Title VII applied."  *Ulane*, 742 F.2d at 1087.  The court reversed the district court's finding that Eastern had discriminated against Ulane as a female because that finding was not supported by sufficient factual evidence in the record.  *Id.*  But the court's apparent willingness to

Based on its understanding of congressional intent, the Seventh Circuit in *Ulane* overruled the district court's conclusion that "sex" "comprehend[s] 'sexual identity.'" *Id.* at 1084. The court of appeals said that "even though some may define 'sex' in such a way as to mean an individual's 'sexual identity,' our responsibility is to . . . determine what Congress intended when it decided to outlaw discrimination based on sex." *Id.* In this context, the Seventh Circuit held discrimination because of "sex" does not encompass discrimination based on "a sexual identity disorder or discontent with the sex into which [one was] born." *Id.* at 1085.[12]

Between 1984 and 2015, the Seventh Circuit referenced *Ulane*'s holding that the word "sex" in Title VII is to be interpreted in a narrow, traditional, and biological sense in three opinions. In *Doe by Doe v. City of Belleville, Illinois*, a 1997 decision, the court of appeals said "Congress had nothing more than the traditional notion of 'sex' in mind when it voted to outlaw sex discrimination." 119 F.3d 563, 572 (7th Cir. 1997), *judgment vacated sub nom. City of Belleville v. Doe by Doe*, 523 U.S. 1001 (1998), and *abrogated by Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998).[13] Then, in a pair of opinions—*Hamner* and *Spearman*—released just two months apart in 2000, the Seventh Circuit, again relying on *Ulane*, reaffirmed that "Congress intended the term 'sex' to mean 'biological male or biological

---

consider a claim that Ulane was the victim of discrimination as a woman implies that the court would be considering her gender identity as relevant and potentially dispositive in the context of a Title VII claim.

[12] The court's use of language in *Ulane* and its reference to medical sources is somewhat dated today. For example, the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* recognizes that gender non-conformity is not a mental disorder; this is a change from prior editions of the DSM, including the Third Edition, which was in effect when *Ulane* was decided. American Psychiatric Association, *Gender Dysphoria* 1 (2013), *available* at http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf (discussing changes made in the Fifth Edition of the *DSM*).

[13] *But see Price Waterhouse*, 490 U.S. at 251 ("Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.").

female.'"  *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1084-85 (7th Cir. 2000) (quoting *Ulane*, 742 F.2d at 1087); *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 704 (7th Cir. 2000) (quoting *Ulane*, 742 F.2d at 1087).  Between 2001 and 2015, though, *Ulane* almost entirely faded from Seventh Circuit opinions.[14]

ii.    <u>*Hively* and the Seventh Circuit's decision to vacate the panel's ruling and rehear that case en banc</u>

As noted above, on July 28, 2016, *Ulane* re-emerged in the Seventh Circuit.  In *Hively*, a panel of the court of appeals said *Ulane* remained good law.  The plaintiff-appellant in that case, Kimberly Hively, was a former teacher who alleged Ivy Tech Community College denied her full-time employment and promotions on the basis of her sexual orientation.  *Hively*, 830 F.3d at 699.  On appeal, Hively argued, among other things, that *Ulane* and *Hamner* were wrong and should be reversed.  Appellant's Brief at 4-17, *Hively v. Ivy Tech Cmty. Coll., S. Bend*, 830 F.3d 698 (7th Cir. 2016) (No. 15-1720), Dkt. No. 10.  The panel in *Hively* rejected this argument. Instead, the panel said the "understanding in *Ulane* that Congress intended a very narrow reading of the term 'sex' when it passed Title VII of the Civil Rights Act, so far, appears to be correct." *Hively*, 830 F.3d at 702.

Plaintiffs, the Federal Defendants, and Intervenor-Defendants (District 211 did not brief the APA issue) submitted supplemental briefs after the panel's decision in *Hively*.  Plaintiffs argued *Ulane* and *Hively* were case dispositive in their favor: "[u]nder the law of *Hively* and *Ulane*, Plaintiffs should prevail on the merits of their APA claim, as well as their Title IX and privacy claims, and so Plaintiffs' Motion for Preliminary Injunction should be granted." Plaintiffs' Supplemental Brief Addressing *Hively v. Ivy Tech Cmty. Coll., S. Bend*, No. 15-1720,

---

[14] From 2001 through 2015, the Seventh Circuit cited *Ulane* in just one case.  *Davis v. Ruby Foods, Inc.*, 269 F.3d 818, 819 (7th Cir. 2001) (citing *Ulane* for the proposition that Title VII does not prohibit discrimination on the basis of transsexualism).

29

2016 WL 4039703 (7th Cir. July 28, 2016) ("Plaintiffs' Supplemental Brief"), [ECF No. 118, at 1]. The Federal Defendants and Intervenor-Defendants argued, on the other hand, that *Hively* should be limited to its facts, and only to Title VII and sexual orientation claims. *See generally* Federal Defendants' Supplemental Brief, [ECF No. 116]; Federal Defendants' Responsive Supplemental Brief, [ECF No. 121]; Intervenor-Defendants' Opening Brief on *Hively v. Ivy Tech Community College*, No. 15-1720 (7th Cir. 2016) ("Intervenor-Defendants' *Hively* Brief"), [ECF No. 117]; Intervenor-Defendants' Response Brief on *Hively v. Ivy Tech Community College*, No. 15-1720 (7th Cir. 2016) ("Intervenor-Defendants' Responsive Supplemental Brief"), [ECF No. 120].

The Federal Defendants also argued *Ulane* and *Hively*, both of which interpreted Title VII, are not relevant to, much less controlling of any resolution of the question presented in this case under Title IX. Title VII and Title IX are different statutes enacted at different times to address different discriminatory conduct. And while the court of appeals in *Ulane* found that Congress included the term "sex" in Title VII at the last minute as the resfult of an effort intended to kill the bill, *Ulane*, 742 F.2d at 1085, the entire purpose behind Title IX was to address discrimination on the basis of sex broadly in educational institutions, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Still, courts routinely rely on Title VII jurisprudence to determine the meaning of similar provisions in Title IX. *Carmichael v. Galbraith*, 574 F. App'x 286, 293 (5th Cir. 2014); *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 695 (4th Cir. 2007); *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 514 (6th Cir. 1996). Moreover, in this case, all parties rely on Title VII cases in support of their respective legal positions, and they effectively equate the meaning of "sex" in Title VII and Title IX. *See, e.g.*, Plaintiffs' Supplemental Brief, [ECF No. 118, at 3];

Federal Defendants' Responsive Supplemental Brief, [ECF No. 121, at 2]; Intervenor-Defendants' *Hively* Brief, [ECF No. 117, at 9]; Intervenor-Defendants' Responsive Supplemental Brief, [ECF No. 120, at 7].

Therefore, had the Seventh Circuit not vacated *Hively*, the panel's decision certainly would have been relevant to this Court's analysis of the issues raised by Plaintiffs under Title IX. When the Seventh Circuit vacated the panel's decision, however, it called into serious question whether the narrow, traditional, and biological interpretation of the term "sex" announced in *Ulane* remains good law in this Circuit with respect to Title VII and Title IX. Moreover, although the panel in *Hively* relied on *Ulane*'s reading of congressional intent underlying Title VII, courts throughout the country for years have questioned and discounted the continued vitality of *Ulane*, particularly since the Supreme Court's decision in *Price Waterhouse*. *See Smith*, 378 F.3d at 573 ("[T]he approach in . . . *Ulane* . . . has been eviscerated by *Price Waterhouse*."). As the Sixth Circuit noted in *Smith*, "the Supreme Court established that Title VII's reference to 'sex' encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms." *Id.*

In addition, two of the three judges on the *Hively* panel said the distinction between discrimination claims based on gender stereotypes or gender non-conformity, which are cognizable under Title VII but only if a person does not conform to the stereotypes associated with his or her gender assigned at birth, and sexual orientation claims, which are not cognizable under Title VII, "seems illogical," and "[p]erhaps the writing is on the wall" that this legal paradox should be corrected. *Hively*, 730 F.3d at 718.[15] In this Circuit, the distinction between

---

[15] *See also Hively*, 730 F.3d at 715 ("As things stand now . . . our understanding of Title VII leaves us with a somewhat odd body of case law that protects a lesbian who faces discrimination because she fails

these two kinds of claims flows in no small part from the narrow, traditional, and biological interpretation of the term "sex" announced in *Ulane*. The same two judges on the *Hively* panel also recognized that "precedent can be overturned when principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine . . . or whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification." *Id.* at 718 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 33, 854-55 (1992)). [16]

In language that seems to invite the kind of re-examination that will now take place in the form of an en banc rehearing, two of the three judges on the *Hively* panel also said:

> [W]e can see no rational reason to entertain sex discrimination claims for those who defy gender norms by looking or acting stereotypically gay or lesbian (even if they are not), but not for those who are openly gay but otherwise comply with gender norms. We allow two women or two men to marry, but allow employers to terminate them for doing so. Perchance, in time, these inconsistencies will come to be seen as defying practical workability and will lead us to reconsider our precedent.

*Id.* [17]

---

to meet some superficial gender norms—wearing pants instead of dresses, having short hair, not wearing makeup—but not a lesbian who meets cosmetic gender norms, but violates the most essential of gender stereotypes by marrying another woman. . . . It seems likely that neither the proponents nor the opponents of protecting employees from sexual orientation discrimination would be satisfied with a body of case law that protects 'flamboyant' gay men and 'butch' lesbians but not the lesbian or gay employees who act and appear straight.").

[16] Ironically, Karen Ulane likely could prevail today on a claim against her employer based on a gender non-conformity theory. In other words, if Karen Ulane alleged today that she was fired not because she was a transsexual or because she was a woman, but because she failed to conform to Eastern's stereotype of how a man should look or act, she might prevail even if the term "sex" in Title VII is defined in a narrow, traditional, and biological way. Under the same law, however, if Ulane alleged that she was fired because she did not conform to Eastern's stereotype of how a woman should look or act, or because she was a woman, Ulane would not have a claim.

[17] As Intervenor-Defendants argue, "[t]ransgender persons *by definition* violate 'gender norms.'" Intervenor-Defendants' *Hively* Brief, [ECF No. 117, at 4] (emphasis in original).

In this Court's view, the Seventh Circuit's en banc review of *Hively* also may delve into the underlying basis for the *Hively* decision, which is whether *Ulane* correctly divined that Congress intended a very narrow, traditional, and biological interpretation of the term "sex" in Title VII. *See Easley v. Reuss*, 532 F.3d 592, 594 (7th Cir. 2008) (per curiam) (explaining that the Seventh Circuit usually only hears cases en banc to address an intra-circuit split, not involved here, or a question of exceptional importance). Whether or not the court of appeals does so, however, its en banc decision could have an important impact on Plaintiffs' argument about the meaning of the term "sex" in Title VII and, by implication, in Title IX. In this respect, that decision could affect materially Plaintiffs' likelihood of success on the merits of their APA claim as this case proceeds.

In light of this uncertainty in the Seventh Circuit, it is useful to look to decisions by other courts concerning the issues raised in this case. To date, only one court of appeals has addressed whether "sex" in Title IX can or must include gender identity. In a case known as *G.G.*, a district court in Virginia found one of Title IX's implementing regulations allowed a local school board "'to limit bathroom access 'on the basis of sex,' including birth or biological sex.'" *G.G.*, 822 F.3d at 719 (quoting *G.G. v. Gloucester Cty. Sch. Bd.*, 132 F. Supp. 3d 736, 745-46 (E.D. Va. Sept. 17, 2015)). The Fourth Circuit disagreed. *See id.* at 727. In its decision reversing the district court, the court of appeals explained that "sex" is ambiguous as it "is susceptible to more than one plausible reading because it permits . . . determining maleness or femaleness with reference exclusively to genitalia . . . [and] determining maleness or femaleness with reference to gender identity." *Id.* at 720. The court of appeals concluded DOE's interpretation of the term "sex" at issue in that case, which is the same interpretation challenged in this case, is not plainly erroneous or inconsistent with Title IX because various dictionaries from the time when the

statute was enacted and its implementing regulations were promulgated "suggest that a hard-and-fast binary division on the basis of reproductive organs—although useful in most cases—was not universally descriptive." *Id.* at 721. The Fourth Circuit therefore found DOE's interpretation of "sex" as used in Title IX must be given deference under *Auer v. Robbins*, 519 U.S. 452 (1997). *G.G.*, 822 F.3d at 723; *see also Carcano v. McCrory Berger*, --- F. Supp. 3d --- , 2016 WL 4508192, at *13-17 (M.D.N.C. Aug. 26, 2016) (recognizing *G.G.* cannot be limited to its facts and deferring to DOE's interpretation of "sex").[18]

In *Whitaker v. Kenosha Unified School District No. 1 Board of Education*, a district court in the Seventh Circuit reached the same conclusion under Title IX notwithstanding *Ulane* or *Hively*. Court Minutes from the Oral Argument Hearing on 9/6/2016 ("*Whitaker* Court Minutes"), *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 16-cv-00943-PP, Dkt. No. 26 (Sept. 6, 2016). The court recognized none of the relevant dictionary definitions "are helpful" in determining one's sex "when . . . genes, or chromosomes, or character, or attributes . . . point toward male identity, and others toward female." *Id.* at 3. Then it identified some of the problems with a narrow definition of "sex." *Id.* at 3-4. Finally, the court found *Ulane* did not control the issue because it was a Title VII case decided before *Price Waterhouse*. *Id.* at 4-5. For these reasons, the court held the term "sex" as used in Title IX is ambiguous and it deferred to DOE's interpretation under *Auer*. *Id.* at 6-7.

A district court in Ohio also recently decided "sex" as used in Title IX is ambiguous and, therefore, DOE's interpretation should be given deference under *Auer*. *Highland*, 2016 WL 5372349, at *15. The court recognized dictionaries at the time Title IX was enacted "defined

---

[18] Although the Supreme Court stayed the mandate of the Fourth Circuit and the preliminary injunction issued by the district court in *G.G.*, pending a petition for a writ of certiorari, *Gloucester Cty. Sch. Bd. v. G.G. ex rel. Grimm*, 136 S. Ct. 2442 (2016), *G.G.*, unlike *Hively*, has not been vacated and still remains good law, *Highland*, 2016 WL 5372349, at *11 n.5.

'sex' in a myriad of ways." *Id.* at *11. Relying in part on *G.G.*, the court concluded that "neither Title IX nor the implementing regulations define the term 'sex' or mandate how to determine who is male and who is female when a school provides sex-segregated facilities." *Id.* The court also acknowledged Title IX allows transgender people to bring claims when they are discriminated against because of their gender non-conformity. *Id.* at *12-13. The court concluded Title IX is ambiguous and then found DOE's interpretation is not plainly erroneous or inconsistent with Title IX. *Id.* at *13-14. Based on these determinations, the court gave *Auer* deference to DOE's rule. *Id.* at *14.

These decisions holding "sex" is ambiguous in the context of Title IX and, therefore, that it can encompass gender identity are well-reasoned and persuasive.[19] They provide another basis for questioning whether *Ulane*, a Title VII case, has continued validity and should be applied in the context of Title IX. While the Seventh Circuit's decision to vacate the panel's decision in *Hively* and to rehear that case en banc technically leaves *Ulane* in place as the law in this Circuit, it does so only barely, in this Court's view, particularly with respect to the interpretation of Title IX. Unconstrained by *Hively*'s recent affirmation of *Ulane*, and with the continued vitality of the narrow, traditional, and biological view of the term "sex" articulated in *Ulane* subject to question, this Court believes the better reasoned recent decisions hold that the term "sex" in Title IX can be interpreted to encompass gender identity as DOE has interpreted it.

---

[19] Only two district courts have held that one's "sex" must be determined biologically under Title IX. *Texas*, 2016 WL 4426495; *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 676 (W.D. Pa. 2015), *appeal dismissed* (Mar. 30, 2016). In *Johnson*, however, the court did not consider whether DOE's interpretation was entitled to deference and, therefore, that decision is of limited persuasive value in this case. *See Highland*, 2016 WL 5372349, at *13 n.9. In *Texas*, the court decided DOE's interpretation should not be given deference based on a relatively conclusory analysis that this Court finds unpersuasive. *See Texas*, 2016 WL 4426495, at *14-15.

Under the APA, a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA also says a court must "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* at § 706(2)(C). Plaintiffs argue that the Rule and the Locker Room Agreement violate the APA because they are based on an interpretation of Title IX that is "not accordance with" Congress's intent regarding the unambiguous meaning of "sex" and because they likely are "in excess of" DOE's jurisdiction and authority because DOE is not empowered to interpret Title IX contrary to congressional intent.

The foundation for each of Plaintiffs' arguments, in the Seventh Circuit, is *Ulane* and *Hively*. Plaintiffs' rely heavily on these two cases for the premise that Congress intended a very narrow and traditional interpretation of the term "sex" in Title VII and, by implication, in Title IX. Given the discussion above, the Court cannot say that Plaintiffs have a likelihood of success on the merits of these arguments. It is far from clear that the narrow interpretation of the term "sex" articulated 32 years ago in *Ulane* will continue to inform the Seventh Circuit's jurisprudence generally after its en banc review of *Hively* or, in particular, with respect to whether that term as used in Title IX includes gender identity.

Accordingly, against this legal backdrop and at this early stage of this case, the Court cannot say with confidence that Plaintiffs have a likelihood of success on the merits of their claim that the Federal Defendants violated the APA by promulgating the Rule or entering into the Locker Room Agreement based on an interpretation of Title IX that includes gender identity within the term "sex."

36

c. Plaintiffs Have Not Shown A Likelihood Of Success On The Merits Of Their Other APA Claims

Plaintiffs argue the Rule is legislative in nature and, thus, DOE was required to observe the notice-and-comment process. Plaintiffs' Opening Brief, [ECF No. 23, at 11-12]; Plaintiffs' Reply Brief, [ECF No. 94, at 4-9]. This argument relies in large part on Plaintiffs' contention that "sex" in Title IX means biological sex. Because they have not shown this premise is sound, that flaw significantly undermines the assertion that the Rule is legislative.

Plaintiffs also contend the Rule is legislative because it "contradicts four decades of unbroken authority." Plaintiffs' Opening Brief, [ECF No. 23, at 11]. A rule is not legislative, though, simply because it reflects a new position of the agency. *Twp., Marion Cty., Ind. v. Davila*, 969 F.2d 485, 492 (7th Cir. 1992). Rather, "the APA 'permit[s] agencies to promulgate freely [interpretive] rules—whether or not they are consistent with earlier interpretations' of the agency's regulations." *Ass'n of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 719 (D.C. Cir. 2015) (quoting *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015)); *see also Dismas Charities, Inc. v. U.S. Dep't of Justice*, 401 F.3d 666, 681 (6th Cir. 2005).

Plaintiffs also argue the Rule must be legislative because it impacts legal rights and obligations. An interpretive rule, though, may have a substantial impact on the rights of individuals because "'[t]he impact of a rule has no bearing on whether it is legislative or interpretative; interpretative rules may have a substantial impact on the rights of individuals.'" *Davila*, 969 F.2d at 493 (quoting *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 707 F.2d 548, 560 (D.C. Cir. 1983)). If a rule "cannot be independently legally enforced [because] there must be some external legal basis supporting its implementation," than it is interpretive. *Iowa League of Cities v. EPA*, 711 F.3d 844, 874 (8th Cir. 2013). The "critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's

37

construction of the statutes and rules which it administers.'" *Perez*, 135 S. Ct. at 1204 (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)).

It is undisputed that DOE issued the Guidance that contains the Rule in response to questions from school administrators, teachers, and parents. *See* Federal Defendants' Response Brief, [ECF No. 80, at 16]; Q&A on Sexual Violence, [ECF No. 21-9, at ii]; Q&A on Single-Sex Classes and Extracurricular Activities, [ECF No. 21-8, at 1]. The Guidance details what DOE thinks Title IX means. It does not provide an independent basis for an enforcement action. Instead, any action would have to be grounded in Title IX itself. Moreover, the specific facts of this case demonstrate DOE does not treat the Guidance as giving rise to the legal obligation to treat transgender students consistent with their gender identity. DOE began its review of Student A's complaint before any of the challenged Guidance Documents were issued. And its Letter of Findings does not reference or cite the Guidance. Therefore, the record shows the Guidance was issued in response to questions received by DOE to inform schools and the public in general as to what schools must do to comply with DOE's understanding of Title IX.

For these reasons, the Rule is interpretive and need not have been promulgated through the notice-and-comment process.[20]

In addition, Plaintiffs contend the Rule conflicts with Title IX and Plaintiffs' constitutional right to privacy. Plaintiffs' Opening Brief, [ECF No. 23, at 10]. As discussed in the subsequent sections of this Report and Recommendation, the Court finds Plaintiffs do not

---

[20] Plaintiffs note at one point in their briefs that "20 U.S.C. § 1682 provides in part that any 'rule, regulation, or order' issued by a federal agency to effectuate Title IX must be approved by the President in order to become effective." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 106 (4th Cir. 2011). Although this argument was not developed and supported, the Court notes that, "[a]s with the APA's notice and comment requirements, courts have held that the requirement of presidential approval does not apply to the issuance of interpretive guidelines." *Id.*

have a likelihood of success on either of these claims. This, in turn, undermines that aspect of Plaintiffs' APA claim.[21]

Plaintiffs assert the Rule violates the Spending Clause of the Constitution because it permits the Federal Defendants to pull federal funds for discrimination based on a student's gender identity. Plaintiffs' Opening Brief, [ECF No. 23, at 10-11]; Plaintiffs' Reply Brief, [ECF No. 94, at 17-18]. Plaintiffs do not dispute that Congress has provided adequate notice that federal funds may be withheld from a school that discriminates in violation of Title IX. Instead, Plaintiffs argue Title IX only prohibits discrimination based on biological sex and, therefore, that Title IX does not provide notice that funding may be withheld for discrimination based on gender identity. As with many of Plaintiffs arguments, this one rests on the meaning of "sex" in Title IX. And, as the Court already has explained, Plaintiffs have not carried their burden, at this stage, to establish clearly they have a probability of success on the merits of that claim.

Title IX does not explicitly state that a school may lose its federal funding if it does not take adequate steps to stop discrimination against transgender students. But a spending condition is not unconstitutional simply because its application may be unclear in certain contexts. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665-66 (1985). Moreover, Congress need not "specifically" identify and prescribe "each condition in the legislation." *Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 921 (7th Cir. 2012). Simply put, "it does not matter that the manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004).

---

[21] Plaintiffs also assert that DOE's actions violate the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, and various additional constitutional rights, including the parental right to direct a child's upbringing and the right to free exercise of religion. Plaintiffs' Opening Brief, [ECF No. 23, at 10]. They never develop or support these arguments. Instead, Plaintiffs raise them in a conclusory sentence or two. That is not enough. *See United States v. Hook*, 471 F.3d 766, 775 (7th Cir. 2006) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).") (quoting *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000)).

Finally, Plaintiffs argue DOE acted arbitrarily and capriciously by promulgating the Rule because the agency did not provide a rational explanation for its action. Plaintiffs' Opening Brief, [ECF No. 23, at 9-10]; Plaintiffs' Reply Brief, [ECF No. 94, at 16-17]. In the Guidance and the Letter of Findings, however, DOE extensively cited the provisions of Title IX, its regulations, and relevant court decisions. In the Letter of Findings, DOE also acknowledged the privacy concerns of the various parties; described in detail the layout of the various restrooms and locker rooms, with a particular emphasis on the resulting privacy risks; and laid out the alternative privacy options. Letter of Findings, [ECF No. 21-10, at 3-13]. In the "Conclusion" section of the Letter of Findings, DOE dedicated a lengthy paragraph solely to explaining how a privacy curtain, coupled with Student A's stated intention to use the curtain, could adequately protect all "potential or actual student privacy interests." *Id.* at 13. Plaintiffs have not done enough to overcome the "highly deferential" standard of review for arbitrary and capricious claims, under which agency actions are presumed valid. *See Am. Trucking Associations, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013); *see also Judulang v. Holder*, 132 S. Ct. 476, 483 (2011) (noting that a court must not "'substitute its judgment for that of the agency'") (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)).

For all of these reasons, Plaintiffs do not have a likelihood of success on the merits of their claim that the Rule and the Locker Room Agreement violate the APA.

**2. Plaintiffs Have Not Shown They Have A Likelihood Of Success On The Merits Of Their Constitutional Claim Against Either The Federal Defendants Or District 211**

Plaintiffs allege a violation of their right to substantive due process. There is a "basic framework" for evaluating substantive due process claims. *Christensen v. Cty. of Boone, Ill.*,

483 F.3d 454, 461 (7th Cir. 2007). The analysis begins with "a 'careful description' of the [right] said to have been violated." *Id.* at 462 (quoting *Doe v. City of Lafayette*, 377 F.3d 757, 768 (7th Cir. 2004)); *see also Second Amendment Arms v. City of Chicago*, 135 F. Supp. 3d 743, 763 (N.D. Ill. 2015). Then the inquiry turns to whether that right is "fundamental." *Christensen*, 483 F.3d at 462; *Second Amendment Arms*, 135 F. Supp. 3d at 763. If it is, the question becomes whether there is a "direct" and "substantial" interference with a fundamental right. *Christensen*, 483 F.3d at 462; *Second Amendment Arms*, 135 F. Supp. 3d at 763. Even if there is such an interference, the challenged action still must "shock[] the conscience" for there to be a constitutional violation. *Christensen*, 483 F.3d at 462; *Second Amendment Arms*, 135 F. Supp. 3d at 763.

### a. There Is No General Constitutional Right To Privacy

Plaintiffs assert a claim against the Federal Defendants and District 211 for violating their "fundamental right to privacy." Complaint, [ECF No. 1, at p.53].[22] In *Griswold v. Connecticut*, the Supreme Court acknowledged for the first time that the "penumbras" of the "specific guarantees in the Bill of Rights" protect certain privacy interests. 381 U.S. 479, 484 (1965). But the Supreme Court never has recognized "a generalized right" to privacy in the substantive due process context. *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 178 (3d Cir. 2005); *see also*

---

[22] Plaintiffs describe the "fundamental right to privacy" they seek to vindicate in this case as "grounded in the Fourteenth Amendment's Due Process Clause. Complaint, [ECF No. 1, at ¶ 359]. But the Fourteenth Amendment does not apply to the federal government. The Federal Defendants, therefore, couch their response to Plaintiffs' claim in the context of the Fifth Amendment's Due Process Clause. Federal Defendants' Response Brief, [ECF No. 80, at 26]. The Court will read the Complaint as asserting a claim under both the Fifth and Fourteenth Amendments. Both due process clauses "'guarantee more than fair process'" and "cover a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997); *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). They also protect the same fundamental rights and are governed by the same legal standards. *See United States v. Al-Hamdi*, 356 F.3d 564, 575 n.11 (4th Cir. 2004); *Molina-Aviles v. D.C.*, 824 F. Supp. 2d 4, 9 n.8 (D.D.C. 2011).

*Katz v. United States*, 389 U.S. 347, 350 (1967) (explaining that the Fourth Amendment also does not encompass a "general constitutional 'right to privacy'"). Instead, it has extended substantive due process protection to privacy interests only in limited circumstances. *See*, *e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (recognizing that "'individual decisions . . . concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment'") (quoting *Bowers v. Hardwick*, 478 U.S. 186, 188 (1986)); *Whalen v. Roe*, 429 U.S. 558, 578 (1977) (holding that a New York law, which established a database of names and addresses of persons who received prescriptions for certain drugs sold on the black market, did not pose an unconstitutional invasion of privacy); *Roe v. Wade*, 410 U.S. 113, 153 (1973) (finding that the right to privacy "found[] in the Fourteenth Amendment's concept of personal liberty . . . is broad enough to encompass a woman's decision" to terminate a pregnancy); *Griswold*, 381 U.S. at 485-86 (holding that the Fourteenth Amendment confers a right to privacy in one's marital relations and use of contraceptives).

The Supreme Court "always [has] been reluctant to expand the concept of substantive due process because guide posts for responsible decision making in this area are scarce and open-ended." *Glucksberg*, 521 U.S. at 720. "The doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Accordingly, the "Supreme Court of the United States has made clear, and [the Seventh Circuit] similarly cautioned, that the scope of substantive due process is very limited." *Belcher v. Norton*, 497 F.3d 742, 753 (7th Cir. 2007).

b.  <u>Plaintiffs Too Broadly Define The Right At Issue In This Case</u>

The first step in the substantive due process analysis is to define carefully the right (or rights) at issue in this case.  As the Seventh Circuit has observed, the definition of a substantive due process right is "constrained by the factual record before [the court], which sets the boundaries of the liberty interests *truly* at issue in the case."  *Lafayette*, 377 F.3d at 769 (emphasis in original); *see also Williams v. Attorney Gen. of Ala.*, 378 F.3d 1232, 1240 (11th Cir. 2004).  The definition must be "specific and concrete," avoiding "sweeping abstractions and generalities."  *Lafayette*, 377 F.3d at 769.  Crafting a narrow, focused definition ensures that courts "do not stray into broader 'constitutional vistas than are called for by the facts of the case at hand.'"  *Doe v. Moore*, 410 F.3d 1337, 1344 (11th Cir. 2005) (quoting *Williams*, 378 F.3d at 1240).  This in turn "tends to rein in the subjective elements that are necessarily present in due-process judicial review."  *Glucksberg*, 521 U.S. at 722.

An example is helpful.  In *Washington v. Glucksberg*, the plaintiff asserted as a fundamental right the "liberty to choose how to die," "a right to control of one's final days," and "the liberty to shape death."  *Id.*  The court of appeals framed the right at issue as "a liberty interest in determining the time and manner of one's death" and "a right to die."  *Id.*  The Supreme Court, however, rejected all of these formulations as not specific enough.  Instead, the Supreme Court asked whether there was a "right to commit suicide which itself includes a right to assistance in doing so."  *Id.* at 723; *see also Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008) (expressing doubt that the definition of a right "to engage in a private act of consensual sex" is narrow enough).

43

Plaintiffs assert generally that the Restroom Policy and the Locker Room Agreement violate their constitutional "right to privacy."[23] They identify two broad privacy interests they contend are protected by substantive due process. The first is the "right to privacy in one's fully or partially unclothed body." Complaint, [ECF No. 1, at ¶ 362]; *see also id.* at ¶ 393. The second is "the right to be free from State-compelled risk of intimate exposure of oneself to the opposite sex." *Id.* at ¶ 363; *see also id.* at ¶ 393. Plaintiffs' framing of these rights is not tied to the facts of the case and, therefore, is inconsistent with the Seventh Circuit's admonition to avoid "sweeping abstractions and generalities" in the context of substantive due process analysis. *Lafayette*, 377 F.3d at 769.

For this reason, the Federal Defendants argue Plaintiffs' articulation of the fundamental rights at issue in this case "grossly overstates the interest that they actually seek to vindicate, which is an alleged right to change [clothes] in a locker room from which transgender students are excluded." Federal Defendants' Response Brief, [ECF No. 80, at 3]. When opposing District 211's request for discovery, Plaintiffs also framed their constitutional argument more narrowly than they do in their Motion for Preliminary Injunction. In their brief in support of their Motion for Protective Order, Plaintiffs identified the issue to be decided as: "does letting a biological male use the girls' locker room and restrooms, and so subjecting Girl Plaintiffs to the

---

[23] Count II of Plaintiffs' Complaint, which asserts Plaintiffs' claim that the Federal Defendants and District 211 are violating Plaintiffs' constitutional rights, does not mention DOE's Rule. Complaint, [ECF No. 1, at ¶¶ 358-396]. In Count I of the Complaint against the Federal Defendants, Plaintiffs do allege the Rule violates Plaintiffs' constitutional right to privacy, *id.* at ¶ 332, and Plaintiffs' incorporate by reference all of their prior allegations into Count II. In their Motion for Preliminary Injunction, Plaintiffs seek to enjoin the Restroom Policy and the Locker Room Agreement. They acknowledged at oral argument on that Motion that they are only seeking at this time to enjoin the Federal Defendants "from further application of the rule to force District 211 to comply with it in the operation of its facilities." Oral Argument Transcript, [ECF No. 127, at 155]. The Rule, however, only impacts District 211 in the context of the Locker Room Agreement. District 211 put its Restroom Policy into place years before it heard from OCR in connection with Student A's complaint about locker room access. Plaintiffs' written arguments in support of their constitutional claims focus on the Restroom Policy and the Locker Room Agreement, and do not reference the Rule at all. Therefore, the Court need not address in this Report and Recommendation whether the Rule, standing alone, violates Plaintiffs' constitutional rights.

risk of compelled exposure of their bodies to the opposite biological sex, violate Girl Plaintiffs' constitutional right to privacy?" Plaintiffs' Protective Order Brief, [ECF No. 50, at 3]. This is a better attempt at framing the issue, and it encompasses Plaintiffs' main claim in this case which revolves around Student A's access to restrooms and locker rooms also used by Girl Plaintiffs, but it does not account for Plaintiffs' claim that allowing transgender students to use restrooms consistent with their gender identity violates the privacy rights of both male and female Student Plaintiffs.

Essentially, in the Court's view, Plaintiffs' constitutional claim posits this question: do high school students have a constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs? The Court will analyze Plaintiffs' constitutional claims in this context. *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1087 (9th Cir. 2015) (refining the definition of the right at issue to account for the fact that the challenged conduct applied "only to persons in specific circumstances," not "generally to the population as a whole").

c. <u>High School Students Do Not Have A Constitutional Right Not To Share Restrooms Or Locker Rooms With Transgender Students Whose Sex Assigned At Birth Is Different Than Theirs</u>

Initially, it is important to note that, for purposes of the constitutional analysis, the Court is not bound by the narrow, traditional, and biological understanding of "sex" that the Seventh Circuit held in *Ulane* that Congress codified in Title VII. Congress's intent in enacting that statute is irrelevant to the analysis of Plaintiffs' asserted constitutional right to privacy. Further, in the Court's view, sex assigned at birth is not the only data point relevant to the question of whether the Constitution precludes a school from choosing to allow transgender students to use restrooms or locker rooms consistent with their gender identity. Rather, as the Federal

Defendants and Intervenor-Defendants point out, a transgender person's gender identity is an important factor to be considered in determining whether his or her needs, as well as those of cisgender people, can be accommodated in the course of allocating or regulating the use of restrooms and locker rooms. So, to frame the constitutional question in the sense of sex assigned at birth while ignoring gender identity frames it too narrowly for the constitutional analysis.

In addition, it also is important to note Plaintiffs are not required—"compelled" in their words, Plaintiffs' Opening Brief, [ECF No. 23, at 15]—by any state actor to use restrooms or locker rooms with Student A or any other transgender student. The District's Restroom Policy allows transgender students to use restrooms consistent with their gender identity. No cisgender student is compelled to use a restroom with a transgender student if he or she does not want to do so. In addition, District 211 does not require any cisgender girl student to use a locker room with Student A if she does not want to do so. As discussed more fully below, District 211 has made clear that any cisgender high school student who does not want to use a restroom or a locker room with a transgender student is not required to do so.

If the privacy stalls and protections the District provides in restrooms and locker rooms are not sufficient for the comfort of any student, whether cisgender, transgender, or otherwise, he or she can use an alternative facility that satisfies his or her privacy needs. *See* Declaration of Mark Kovack ("Kovack's Declaration"), [ECF No. 78-1, at ¶¶ 15-17] (explaining available privacy alternatives include separate, single-use facilities). In addition, District 211 notified all parents that "[s]tudents who seek additional levels of privacy [other than the stalls provided in the communal locker rooms] may request the use of an alternate changing area by contacting their school counselor." *Id.* at ¶ 15(b). The absence of any compulsion distinguishes this case

from others Plaintiffs cite which, as discussed below, involve involuntary invasions of someone's privacy.

Generally speaking, the penumbral rights of privacy the Supreme Court has recognized in other contexts protect certain aspects of a person's private space and decision-making from governmental intrusion. Even in the context of the right to privacy in one's own body, the cases deal with compelled intrusion into or with respect to a person's intimate space or exposed body. No case recognizes a right to privacy that insulates a person from coming into contact with someone who is different than they are, or who they fear will act in a way that causes them to be embarrassed or uncomfortable, when there are alternative means for both individuals to protect themselves from such contact, embarrassment, or discomfort.

Again, courts are very careful in extending constitutional protection in the area of personal privacy. "Although the Supreme Court has recognized fundamental rights in regard to some special . . . privacy interests, it has not created a broad category where any alleged infringement on privacy . . . will be subject to substantive due process protection." *Moore*, 410 F.3d at 1343-44. In other words, "privacy" is not a magic term that automatically triggers constitutional protection. Instead, the same rules that govern every other substantive due process analysis apply in the privacy context. *See Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 591 (6th Cir. 2008). That means an asserted privacy right is not fundamental unless it is "'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed.'" *Khan v. Bland*, 630 F.3d 519, 535 (7th Cir. 2010) (quoting *Glucksberg*, 521 U.S. at 720-21). The list of rights that rise to this level is "a short one." *Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012). This list "'for the most part'" has been limited to "'matters relating to

47

marriage, family, procreation, and the right to bodily integrity.'" *Gibson v. Am. Cyanamid Co.*, 760 F.3d 600, 615 (7th Cir. 2014) (quoting *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plurality opinion)); *see also Kraushaar v. Flanigan*, 45 F.3d 1040, 1047 (7th Cir. 1995).

In assessing the nature and scope of Plaintiffs' constitutional rights, and whether those rights have been infringed, the Court also must consider the need to preserve the discretion of schools to craft individualized approaches to difficult issues that are appropriate for their respective communities. Schools "have the difficult task of teaching 'the shared values of a civilized social order.'" *Doninger v. Niehoff*, 527 F.3d 41, 54 (2d Cir. 2008) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 683 (1986)). Our public education system "has evolved" to rely "necessarily upon the discretion and judgment of school administrators and school board members." *Wood v. Strickland*, 420 U.S. 308, 326 (1975); *see also Jeffrey v. Bd. of Trustees of Bells ISD*, 261 F. Supp. 2d 719, 728 (E.D. Tex. 2003), *aff'd*, 96 F. App'x 248 (5th Cir. 2004) ("Local school boards have broad discretion in the management of school affairs."). The Supreme Court "has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969).

Even when confronting segregation, perhaps the most intractable problem ever to afflict our public schools, the Supreme Court emphasized that schools "have the primary responsibility for elucidating, assessing, and solving" problems that arise during desegregation. *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 299 (1955); *see also Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198, 2214 (2016) ("Considerable deference is owed to a university in defining those intangible characteristics, like student body diversity, that are central to its identity and

educational mission."). Therefore, our Nation's deeply rooted history and tradition of protecting school administrators' discretion require that this Court not "unduly constrain[] [schools] from fulfilling their role as a principal instrument in awakening the child to cultural values, in preparing him [or her] for later professional training, and in helping him [or her] to adjust normally to his [or her] environment." *Bannon v. Sch. Dist. of Palm Beach Cty.*, 387 F.3d 1208, 1220 (11th Cir. 2004) (Black, J., specially concurring) (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 287 (1988)).

It also is important to remember that constitutional privacy rights, whether rooted in the Fourth Amendment or the Fourteenth Amendment, "are different in public schools than elsewhere." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995). "[I]t is well established that public school students enjoy a reduced expectation of privacy in comparison to the public at large." *Dominic J. v. Wyoming Valley W. High Sch.*, 362 F. Supp. 2d 560, 570 (M.D. Pa. 2005). Of particular relevance to this case, public school locker rooms in this country traditionally have been and remain "not notable for the privacy they afford." *Vernonia*, 515 U.S. at 657.

Contemporary notions of liberty and justice are inconsistent with the existence of the right to privacy asserted by Plaintiffs and properly framed by this Court. A transgender boy or girl, man or woman, does not live his or her life in conformance with his or her sex assigned at birth. The record in this case provides ample evidence of this point. Intervenor-Defendants Students A, B, and C live, for all intents and purposes, consistent with their gender identity. Student A "live[s] her life full-time as a girl." Declaration of Parent A ("Parent A's Declaration"), [ECF No. 32-1, at ¶ 5]. She dresses in girls' clothes. *Id.* She maintains "a traditionally female hair style . . . and overall appearance." Kovack's Declaration, [ECF No. 78-1, at ¶ 7]. She plays on girls' athletic teams. Parent A's Declaration, [ECF No. 32-1, at ¶ 7].

Her legal name is female, and she uses female pronouns to refer to herself. *Id.* at ¶ 5. Her passport lists her gender as female. *Id.* Likewise, Student B "live[s] his life full-time as a boy." Parent B's Declaration, [ECF No. 32-2, at ¶ 5]. He dresses in boys' clothing and cuts his hair short. *Id.* His legal name is a "traditionally male name," and he uses male pronouns to refer to himself. *Id.* Student C also lives "life as a boy." Parent C's Declaration, [ECF No. 32-3, at ¶ 5]. He uses male restrooms in public. *Id.* at ¶ 10. His legal name is a "traditionally male name," and he uses male pronouns to refer to himself. *Id.* at ¶ 5. His state identification card lists his gender as male, and his Social Security records do the same. *Id.*

Further, people who interact with Students A, B, and C largely treat them consistent with their gender identity. In fact, many people who interact with Students A, B, and C on a daily basis may have no idea, and may not care, what sex they were assigned at birth. Even before OCR got involved, District 211 "honored Student A's request to be treated as female" in every respect other than locker room access. Letter of Findings, [ECF No. 21-10, at 2]. The District allowed her to use the girls' restrooms. Kovack's Declaration, [ECF No. 78-1, at ¶ 9]. All of Student B's friends and most of his family use male pronouns to refer to him. Parent B's Declaration, [ECF No. 32-2, at ¶ 5]. The teachers, administrators, and staff at Student B's school "have made an effort to treat" him "consistent with his gender identity." *Id.* at ¶ 8. The school employees and Student B's friends support his use of the boys' restrooms. *Id.* at ¶ 13. Similarly, the administrators, teachers, and staff at Student C's school "treat him as they would treat any other boy at the school." Parent C's Declaration, [ECF No. 32-3, at ¶ 6]. That includes using his legal, male name and male pronouns to refer to him. *Id.* Other students at Student C's school also "are supportive of" Student C. *Id.* at ¶ 7.

50

In addition, the military, which historically has served a vital role as a melting pot in our society, allows transgender personnel to serve openly and fully integrated in all military services. Matthew Rosenberg, *Transgender People Will Be Allowed to Serve Openly in Military*, N.Y. Times, July 1, 2016, at A3, *available at* http://www.nytimes.com/2016/07/01/us/transgender-military.html; *see also* Rand Corporation, *Assessing the Implications of Allowing Transgender Personnel to Serve Openly* 44 (2016), *available at* http://www.rand.org/content/dam/rand/pubs/research_reports/RR1500/RR1530/ RAND_RR1530.pdf (citing as precedent the successful integration of transgender service members in the armed forces of Australia, Canada, Israel, and the United Kingdom); Palm Center, *Report of the Planning Commission on Transgender Military Service* (2014), *available at* http://www.palmcenter.org/wpcontent/uploads/2014/08/Report-of-Planning-Commission-on-Transgender-Military-Service_0-2.pdf (finding publically-available data indicates that allowing transgender service members to serve openly does not have a significant effect on unit cohesion, operational effectiveness, or readiness). The National Collegiate Athletic Association includes transgender student-athletes in collegiate sports consistent with their gender identity. Nat'l Collegiate Athletic Ass'n, *NCAA Inclusion of Transgender Student-Athletes* (2011), *available at* https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf.

More directly relevant to this case, the General Services Administration ("GSA") has issued a federal management regulation requiring that "[f]ederal agencies occupying space under the jurisdiction, custody, or control of GSA must allow individuals to use restroom facilities and related areas consistent with their gender identity." 81 Fed. Reg. 55148-01, 2016 WL 4377076. Cities across the country have implemented various requirements for gender-neutral bathrooms. *See* Office of the New York City Comptroller, *Restrooms for All: A Plan to Expand Gender*

51

*Neutral Restrooms in NYC* 2-3 (2015), *available at* https://comptroller.nyc.gov/wp-content/uploads/documents/Gender_Neutral_Bathrooms.pdf (discussing such laws in Washington, D.C., Philadelphia, and Delaware); The Associated Press, *California Governor Approves Gender-Neutral Restrooms*, N.Y. Times (Sept. 29, 2016), http://www.nytimes.com/aponline/2016/09/29/us/ap-us-xgr-gender-neutral-restrooms-.html?_r=0 (describing a California law requiring all single-stall toilets in California be designated gender-neutral). Likewise, major retailers allow employees and customers to use restrooms that correspond to their gender identity. *See*, *e.g.*, Abrams Rachel, *Target Steps Out in Front of Bathroom Choice Debate*, N.Y. Times, Apr. 28, 2016, at B1, *available at* http://www.nytimes.com/2016/04/28/business/target-steps-out-in-front-of-bathrchoice-debate.html?_r=0.

Finally, although Plaintiffs raise the specter that all cisgender boys will be able to use the girls' restrooms and locker rooms at-will if District 211 continues to allow transgender students to use restrooms consistent with their gender identity and Student A to use the girls' locker rooms, Plaintiffs' Opening Brief, [ECF No. 23, at 20], District 211 does not permit all boys to enter the girls' restrooms and locker rooms or all girls to enter the boys' restrooms and locker rooms. The Restroom Policy permits all students to use restrooms consistent with their gender identity, and the Locker Room Agreement allows only Student A, who identifies and presents as a female, to use the girls' locker rooms. This is not the same as allowing all cisgender boys to use the girls' facilities or all cisgender girls to use the boys' facilities. District 211 has no such policy, and there is no indication it plans to institute such a policy. Further, speculation that someone will abuse or violate a school policy, and presumably be subject to discipline for doing so, is not a reason to invalidate policies that do not, by their terms, condone such conduct.[24]

---

[24] In a similar vein is Plaintiffs' allegation in their Complaint that one out of eight high school girls reports being a victim of rape according to the Centers for Disease Control. Complaint, [ECF No. 1, at ¶¶

52

For all these reasons, high school students do not have a fundamental constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs.

> d. Plaintiffs Also Have Not Shown The Broad Constitutional Rights They Allege Exist Have Been Infringed By The Actions Of District 211 Or The Federal Defendants

Even if the Court were to accept that the broad rights to privacy asserted by Plaintiffs—the right to privacy in their fully or partially unclothed bodies and the right to be free from State-compelled risk of intimate exposure of oneself to the opposite sex—are fundamental, Plaintiffs still have not shown those rights have been "directly" and "substantially" infringed in this case. *See Christensen*, 483 F.3d at 462; *Second Amendment Arms*, 135 F. Supp. 3d at 763; *Presley v. Bd. of Sch. Directors of Rankin Sch. Dist. No. 98*, 2014 WL 1468087, at *2 (C.D. Ill. Apr. 15, 2014). The cases upon which Plaintiffs rely to establish that the facts in this case rise to the level of a constitutional violation involve starkly different operative facts, law, and analysis. None of the cases stand for the proposition that the risk of bodily exposure to a transgender student in a high school restroom or locker room, particularly given the privacy protections put in place by District 211, infringes upon a fundamental right and thereby violates the Constitution.

For instance, Plaintiffs cite *Doe v. Luzerne County*, 660 F.3d 169 (3d Cir. 2011), for the proposition that Defendants are violating Plaintiffs' right to privacy in their unclothed and partially clothed bodies. Plaintiffs' Opening Brief, [ECF No. 23, at 13]. In that case, the plaintiff, a female deputy sheriff went to a local hospital to use a decontamination shower.

---

270-271]. There is absolutely no evidence in this record that allowing transgender high school students to use restrooms or locker rooms consistent with their gender identity increases the risk of sexual assault. Further, there are no allegations that during the more than three years transgender students have been using District 211 restrooms consistent with their gender identity, and the portions of two academic years during which Student A has been using the girls' locker room, there have been any actual or threatened sexual assaults as a result of District 211's policies. Again, the entirely speculative risk that someone will commit a criminal act is not a reason to invalidate otherwise valid policies.

*Luzerne*, 660 F.3d at 172.  She took every possible precaution to make sure that no one saw her naked by using a showering room in which no one else was present and closing the door completely before undressing.  *Id.* at 172-73.  When she got out of the shower, she realized that there were no towels in the room and wrapped herself in some paper that normally was used to cover doctors' examination tables.  *Id.* at 173.  Then, while wrapped in the paper, she allowed another female deputy to inspect her to see if any fleas survived the decontamination process.  *Id.* Unbeknownst to either female deputy, two of their male colleagues opened the closed door and surreptitiously recorded the plaintiff.  *Id.*  These men later showed the video to other people in their department and saved the images to a public work computer.  *Id.* at 173-74.

On appeal, the Third Circuit did not find the plaintiff's constitutional rights were violated.  Instead, the court of appeals explained that "[p]rivacy claims under the Fourteenth Amendment necessarily require fact-intensive and context-specific analyses."  *Id.* at 176.  The Third Circuit explicitly recognized there is no "rule that a nonconsensual exposure of certain anatomical areas constitutes a *per se* violation."  *Id.*  The court of appeals then said that, even in light of the egregious facts in *Doe*, it still was not clear whether the plaintiff had suffered a constitutional violation.   Instead, the Third Circuit determined a material question of fact remained as to whether certain sensitive parts of the plaintiff's body were exposed, which could have affected her claim, and it reversed and remanded for further proceedings consistent with its opinion.  *Id.* at 178.

Plaintiffs also rely heavily on *Norwood v. Dale Maintenance System, Incorporated*, 590 F. Supp. 1410 (N.D. Ill. 1984), for the proposition that "compelled cross-sex restroom and locker room use violates" the Constitution.  Plaintiffs' Opening Brief, [ECF No. 23, at 15-16.]   In *Norwood*, the female plaintiff, who worked as a restroom attendant on the night shift, sought a

job working in a men's restroom during the day shift. *Norwood*, 590 F. Supp. at 1413-14. Based solely on her gender, she was denied that position. *Id.* at 1414-15. In challenging that decision, she argued she was subjected to sex discrimination in violation of Title VII. *Id.* at 1414. *Norwood* did not raise any constitutional issue. Instead, the case turned solely on whether sex was a "bona fide occupational qualification" ("BFOQ") under Title VII for the sought-after restroom attendant job. *Id.* at 1415. While the court's inquiry regarding this issue involved privacy issues in a vernacular sense, the relevant standard required only a "showing that the clients or guests of a particular business would not consent to service by a member of the opposite sex, and that the clients or guests would stop patronizing the business if members of the opposite sex were allowed to perform the service." *Id.* at 1416. The burden on an employer to establish a BFOQ defense based on the level of privacy it wants to afford to its clientele is different, and substantially less demanding, than the burden on Plaintiffs here to establish the existence of a constitutionally protected right. Therefore, *Norwood* simply does not shed any light on Plaintiffs' constitutional rights.

This Court also is not persuaded by Plaintiffs' reliance on *Kohler v. City of Wapakoneta*, 381 F. Supp. 2d 692 (N.D. Ohio 2005). Plaintiffs' Reply Brief, [ECF No. 94, at 21.] In *Kohler*, the plaintiff, a police dispatcher, was shown a pornographic picture by a colleague who later became the Chief of Police and found another pornographic image anonymously left on her computer. *Kohler*, 381 F. Supp. 2d at 697. The future Chief of Police also told the plaintiff that she could buy used women's underwear online, sent her multiple offensive emails, hid a tape recorder in a toilet stall in the women's restroom, and circulated an old photo of the plaintiff to numerous people. *Id.* After being victimized by this misconduct, the plaintiff filed a lawsuit asserting, in part, that she suffered a violation of her substantive due process right to privacy. *Id.*

at 698. The court, however, never addressed the merits of this claim. Instead, the court discussed various procedural grounds related to Plaintiffs' constitutional privacy claim. *Id.* at 710-13. And, in the end, the court actually granted summary judgment in favor of all the defendants on that claim. *Id.* at 713.

Plaintiffs further cite cases that involve unwarranted aggressive touching of unclothed body parts by members of the opposite sex. Plaintiffs' Opening Brief [ECF No. 23, at 13] (citing *Safford Unified Sch. District No. 1 v. Redding*, 557 U.S. 364 (2009) (search of a student's bra and underpants); *Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981) (forceful removal of a student's underwear)). They also rely upon cases holding that governmentally-compelled exposure of one's body to members of the opposite sex, such as school administrators and prison guards, may violate the Fourth Amendment's prohibition against unreasonable searches and seizures. Plaintiffs' Opening Brief, [ECF No. 23, at 13-14] (citing *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (strip search by members of the opposite sex); *Cornfield v. Consolidated High School District 230*, 991 F.3d 1316, 1320 (7th Cir. 1993) (same)).

The Fourth Amendment cases cited by Plaintiffs simply are not relevant to this case. Plaintiffs do not allege, nor can they, that the Restroom Policy or the Locker Room Agreement results in any search or seizure that implicates Fourth Amendment privacy interests. Rather, Plaintiffs' constitutional claim is premised solely on the substantive due process clauses. While the Fourth Amendment generally requires that a government's intrusion on privacy through a search or a seizure must be reasonable, substantive due process does not impose a similar restriction. Instead, substantive due process applies in very limited circumstances when fundamental rights are implicated.

This case, moreover, does not involve the extreme invasions of privacy that the courts confronted in the cases cited by Plaintiffs. Plaintiffs have not alleged any students, whether Student A, any other transgender student, or any Student Plaintiff, ever were in each other's presence in an unclothed state. In fact, Plaintiffs' counsel disclaimed that is central or even relevant to Plaintiffs' case: "who saw who in the state of undress or naked . . . is not relevant . . . at the preliminary injunction stage. We don't need to prove that. We didn't allege that in the complaint, nor do we rely on it at the preliminary injunction stage." June 9 Hearing Transcript, [ECF No. 128, at 18]. Plaintiffs also do not allege that any transgender student, including Student A, and any Student Plaintiff ever saw an intimate part of the other's body. The underlying facts of this case are entirely unlike the surreptitious recordings, strip searches, and aggressive body touchings that courts have found unconstitutional in certain circumstances.[25]

This case also does not involve the type of forced invasion of privacy that animated the cases cited by Plaintiffs. The restrooms and the physical education locker room at Fremd High School have traditional privacy stalls that can be used when toileting, changing clothes, and showering. Kovack's Declaration, [ECF No. 78-1, at ¶¶ 8, 15]. There is no reason why a student who does not want to do so would have to take off clothing or reveal an intimate part of his or her body outside of the private stalls. Inside the stalls, there is no meaningful risk that any part of a student's unclothed body would be seen by another person. Therefore, these protections

---

[25] The only allegations in Plaintiffs' Complaint that even remotely touch on the risk of actual exposure of any body part are the vague references to Student A lifting up her shirt one time in a common area of the girls' locker rooms and her changing clothes in the gymnastics locker room when one or more girls (not necessarily Girl Plaintiffs, which is not alleged) "were present." Complaint, [ECF No. 1, at ¶¶ 96, 135]. No details are provided about what part of Student A's body, if any, was revealed on either of these occasions. And, when District 211 sought discovery into these incidents, Plaintiffs successful opposed it, arguing that for purposes of their preliminary injunction motion, actual locker room or restroom interactions were irrelevant.

almost entirely mitigate any potential risk of unwanted exposure either by or to any Student Plaintiff.

Further, District 211 has informed parents and students that additional privacy alternatives, beyond the stalls, are available upon request. *Id.* at ¶ 15(b). These include separate, single-use facilities for male and female students who do not want to use the common locker rooms or restrooms. *Id.* at ¶ 17. Any Student Plaintiff who uses the alternative facilities has no meaningful risk of either seeing or being seen by a student in a state of undress or seeing an intimate part of his or her body. In light of these privacy protections and alternatives, any Student Plaintiff who does not want to risk exposure of his or her body to a transgender student has the ability to change clothes and shower in a private space. Put simply, this case does not involve any forced or involuntary exposure of a student's body to or by a transgender person assigned a different sex at birth.

For all of these reasons, the Court finds that Plaintiffs are not suffering a "direct" and "substantial" infringement on any substantive due process right.

e. Defendants' Actions Do Not Shock The Conscience

Even if the Restroom Policy and the Locker Room Agreement did directly and substantially infringe upon a fundamental right, that alone would not render them unconstitutional under the Fifth or Fourteenth Amendments. The Restroom Policy and the Locker Room Agreement would not be unconstitutional unless they require something that "shock[s] the conscience." *Christensen*, 483 F.3d at 462 n.2. "[T]he meaning of this standard varies depending on the factual context." *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392, 400 (3d Cir. 2003). Courts variously have described conscience-shocking conduct as that which "violates the decencies of civilized conduct; . . . is so brutal and

offensive that it does not comport with traditional ideas of fair play and decency; . . . interferes with rights implicit in the concept of ordered liberty; [or] . . . is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 867 (5th Cir. 2012) (quoting *City of Sacramento*, 523 U.S. at 846-47 & n. 8) (internal quotation marks omitted).  Under all of these formulations, the conduct must go "beyond merely 'offending some fastidious squeamishness or private sentimentalism.'" *Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 n.6 (2d Cir. 1973), *partially abrogated on other grounds by Graham v. Connor*, 490 U.S. 386 (1989)).  "Only 'the most egregious official conduct' will satisfy this stringent inquiry." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011) (quoting *Cty. of Sacramento*, 523 U.S. at 846); *see also Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) ("Cases abound in which the government action—though thoroughly disapproved of—was found not to shock the conscience.").

Plaintiffs never address whether the Restroom Policy and the Locker Room Agreement shock the conscience.  Instead, Plaintiffs argue those policies cannot pass muster under a strict scrutiny test.  As noted above, that standard applies to legislative enactments. *Christensen*, 483 F.3d at 462 n.2.  The executive actions at issue in this case must shock the conscience to violate substantive due process. *Id.*  And the Fourth Amendment cases cited throughout Plaintiffs' briefs, and upon which they rely, simply are not relevant to this issue because "the Fourth Amendment invokes the less stringent reasonableness standard." *Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 171 (3d Cir. 2001).

Neither the Restroom Policy nor the Locker Room Agreement shocks the conscience. District 211 is legally responsible for providing an effective learning environment for over 12,000 students. *See* Defendant Board of Education of Township High School District No. 211's Response to Plaintiffs' Motion for Preliminary Injunction ("District 211's Response Brief"), [ECF No. 78, at 1, 10]  It determined that allowing all students to use restrooms consistent with their gender identity would improve the educational environment of its students.  In reaching this conclusion, District 211 recognized isolating transgender students in separate facilities against their will could, and did, at least in the case of Student A, negatively impact their experience in school.  The District decided that remedying this harm by offering appropriate restroom access would not infringe on the privacy of other students because the privacy protections and alternatives sufficiently protected all students' privacy in the restrooms.  Kovack's Declaration, [ECF No. 78-1, at ¶ 9].

After District 211 instituted the Restroom Policy, roughly three years elapsed before Plaintiffs challenged it.  If Student Plaintiffs did not know they were using restrooms with transgender students during this three-year period, it is hard to say this is a conscience shocking policy. Alternatively, if some Student Plaintiffs were aware transgender students were using restrooms consistent with their gender identity during that time and did not complain about it, then it also is hard to say that state of affairs shocks the conscience.[26]

The Locker Room Agreement represents the same balancing of interests as the Restroom Policy.  Before District 211 and DOE entered into the Agreement, DOE conducted a lengthy

---

[26] Girl Plaintiffs allege they "frequently run into Student A when they use the schools' restrooms." Complaint, [ECF No. 1, at ¶ 231]; *see also id.* at ¶¶ 232-234].  It is not clear from the Complaint whether this occurred before or only after District 211 publicly announced in October 2015 that transgender students had been using restrooms consistent with their gender identity since 2013.  In any event, the seven-month delay between the District's announcement that transgender students were being permitted to use restrooms consistent with their gender identity and the filing of this lawsuit in May 2016, also militates against a finding that this state of affairs shocks the conscience.

factual investigation. The resulting Letter of Findings describes in great detail what harm Student A was suffering because of her lack of access to the girls' locker rooms. *See generally* Letter of Findings, [ECF No. 21-10]. The Letter also discusses what facilities are available at Fremd High School, when and how students use those facilities, and what can be done to protect their privacy. *Id.* The Locker Room Agreement requires District 211 to provide significant privacy protections, and District 211 has promised to provide alternative facilities already mentioned upon request. Ultimately, District 211 and DOE, both of which are tasked with advancing and protecting the health, safety and educational environment of all students, at a time when they were potential litigation adversaries, decided that the Locker Room Agreement served the students at Fremd High School well enough to justify entering into it. Therefore, the Court finds that neither the Restroom Policy nor the Locker Room Agreement shocks the conscience because they represent a careful and sensitive balancing of the interests of all the students in District 211.

For all of these reasons, Plaintiffs have not shown they have a likelihood of success on the merits of their claim that the Restroom Policy and the Locker Room Agreement violate their constitutional right to privacy.

### 3. Plaintiffs Have Not Shown They Have A Likelihood Of Success On The Merits Of Their Title IX Claims

Plaintiffs' argument for preliminary injunctive relief under Title IX focuses on two issues: (1) whether the Restroom Policy and the Locker Room Agreement create a hostile environment for Student Plaintiffs in violation of Title IX; and (2) whether District 211's decision to allow Student A to use the girls' locker rooms when boys do not have to share access to the boys' locker rooms with a transgender student, even with the alternative facilities the District offers for girls seeking additional privacy, violates a regulation promulgated to

implement Title IX that provides that sex-segregated facilities must be comparable. *See* Plaintiffs' Opening Brief, [ECF No. 23, at 18]; Plaintiffs' Protective Order Brief, [ECF No. 50, at 3]. As discussed below, Plaintiffs have not shown they are likely to prevail on either of these arguments.

> a. <u>Plaintiffs Have Not Shown They Are Suffering Discrimination On The Basis Of Sex</u>

There is a threshold question under Title IX—whether the harassment Plaintiffs allege they are suffering properly can be characterized as *sexual* harassment, or discrimination on the basis of sex. *See Burwell v. Pekin Community High Sch. Dist. 303*, 213 F. Supp. 2d 917, 930 (C.D. Ill. 2002); s*ee also C.R.K. v. U.S.D.,* 176 F. Supp. 2d 1145, 1163 (D. Kan. 2001); *Manfredi v. Mount Vernon Bd. of Educ.,* 94 F. Supp. 2d 447, 453-56 (S.D.N.Y. 2000). To be actionable under Title IX, the offensive behavior must be "on the basis of sex." *See Frazier v. Fairhaven School Community,* 276 F.3d 52, 66 (1st Cir. 2002); *Benjamin v. Metropolitan Sch. Dist. of Lawrence Township,* 2002 WL 977661, at *3 (S.D. Ind. 2002).

Here, Plaintiffs complain that the Restroom Policy and the Locker Room Agreement create a hostile environment. But Girl Plaintiffs are not being targeted or singled out by District 211 on the basis of their sex, nor are they being treated any different than boys who attend school within District 211. The Restroom Policy applies to <u>all</u> restrooms. That means cisgender boys use the boys' restrooms with transgender boys just like cisgender girls use the girls' restrooms with transgender girls. District 211 also has made clear that it will allow transgender boys to use the boys' locker rooms and will provide the same privacy protections in the boys' locker rooms as exist in the girls' locker rooms, if requested. *See* District 211's Response Brief, [ECF No. 78, at 22 n.9]. Therefore, the alleged discrimination and hostile environment that Girl Plaintiffs claim to experience is not on the basis of their sex, and any discomfort Girl Plaintiffs allege they

feel is not the result of conduct that is directed at them because they are female. All of Plaintiffs' Title IX claims suffer from this threshold problem.

   b.   Plaintiffs Have Not Shown The Alleged Harassment Is Severe, Pervasive Or Objectively Offensive

In addition, to establish a hostile environment under Title IX, "a plaintiff must establish sexual harassment . . . that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis, Next Friend LaShona D. v. Monroe County Board of Education*, 526 U.S. 629, 651-52 (1999); *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). Plaintiffs argue that the presence of and risk of exposure to transgender students in restrooms and Student A's presence, and the risk of exposure to or by Student A, in the girls' locker rooms, is severe, pervasive, and objectively offensive conduct that subjects them to a hostile environment in violation of Title IX. The facts of record do not support these propositions, and Plaintiffs do not cite any persuasive authority for this legal conclusion.

Plaintiffs' Complaint is long on conclusory statements but sparse on specific facts. As noted above, Plaintiffs allege generally and repeatedly that District 211's Restroom Policy and the Locker Room Agreement cause Student Plaintiffs "embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity." Complaint, [ECF No. 1, at ¶¶ 11, 124, 129, 136, 191, 205, 208, 210, 226]. Girl Plaintiffs say they are fearful of sharing facilities with and attending to personal needs in the presence of transgender students. *Id.* at ¶¶ 8, 10. Girl Plaintiffs also say they are afraid, worried and embarrassed about the possibility of seeing or being seen by Student A while in a state of undress. *Id.* at ¶¶ 8, 9, 114, 126, 127, 186, 187. They assert that their distress is "ever-present" and constant." *Id.* at ¶¶ 114, 115, 125, 237. Nowhere,

however, do Plaintiffs allege they ever have seen Student A undressed or that Student A has seen any Girl Plaintiff undressed if that Student Plaintiff wanted not to be seen in that state. Moreover, the risk of that occurring is very low given the privacy protections put in place by District 211, the alternative facilities available for any student who does not want to use the common restrooms or locker rooms, and Student A's undertakings in the locker room agreement concerning her use of the girls' locker room.

Generalized statements of fear and humiliation are not enough to establish severe, pervasive or objectively offensive conduct. General allegations have been held to be insufficient to establish a Title IX violation. *See*, *e.g.*, *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (finding undeveloped allegations of student-on-student harassment cannot establish a Title IX claim); *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) (finding accusation that a student did "nasty stuff" is insufficient to state a Title IX).

                i.      The mere presence of transgender students in restrooms or locker rooms is not severe, pervasive, or objectively offensive conduct

It is important to recognize that Title IX does not say schools cannot allow males and females to use the same restrooms or locker rooms under any circumstances. "Title IX is a broadly written general prohibition on [sex] discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson*, 544 U.S. at 175. One of those exceptions says that a school "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Nowhere does Title IX or its regulations say that schools must provide single-sex facilities. During oral argument on Plaintiffs' Motion for Preliminary Injunction, Plaintiffs' counsel conceded that Title IX is written

permissively with respect to single-sex facilities. Oral Argument Transcript, [ECF No. 127, at 34]. Title IX does not require schools to provide separate facilities; it allows schools to do so as long as they provide comparable facilities for males and females. In other words, Title IX permits schools to decide whether to have sex-segregated restrooms, and gender-neutral restrooms do not *per se* violate Title IX as long as all students' privacy interests are protected. Therefore, the foundation upon which Plaintiffs build much of their Title IX argument—that it is a violation of Title IX for a biological boy to use a restroom also used by a biological girl under any circumstances—does not hold the weight Plaintiffs place on it.

The mere presence of a transgender student in a restroom or locker room does not rise to the level of conduct that has been found to be objectively offensive, and therefore hostile, in other cases. *See*, *e.g.*, *Davis*, 526 U.S. at 653 (holding that over a period of five months, a fifth-grade male student harassed the plaintiff, a fifth-grade female student, by engaging in sexually suggestive behavior, including attempting to touch the plaintiff's breasts and genital area, rubbing against the plaintiff and making vulgar statements); *Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 259-60 (6th Cir. 2000) (finding that a female student was repeatedly propositioned, groped and threatened and was also stabbed in the hand; during one incident, two boys held her hands while other male students grabbed her hair and started yanking off her shirt); *Murrell v. School Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1243-44 (10th Cir. 1999) (finding that a disabled female student was sexually assaulted by a male student on multiple occasions); *Seiwert v. Spencer-Owen Community School Corporation*, 497 F. Supp. 2d 942, 953 (S.D. Ind. 2007) (holding that the alleged harassment suffered by a male eighth-grade student, which included being called "faggot," being kicked by several boys during a dodge ball game, and receiving death threats, if proven, amounted to severe and pervasive conduct that was objectively

65

offensive); *Bruning ex rel. v. Carrol County Sch. Dist.*, 486 F. Supp. 2d 892, 917 (N.D. Iowa 2007) (finding repeated acts of touching and sexual groping were objectively offensive); *Snelling v. Fall Mountain Regional Sch. Dist.,* 2001 WL 276975, at *1-3 (D.N.H. 2001) (finding widespread peer harassment, both verbal and physical, which involved referring to the plaintiff as a homosexual, as well as some harassment by coaches); *see also Cruzan v. Special Sch. Dist. No. 1.*, 294 F.3d 981, 983 (8th Cir. 2002) (finding mere presence of transgender female teacher in women's faculty restroom did not create a hostile environment for cisgender female teachers).

Plaintiffs rely on *People v. Grunau*, 2009 WL 5149857 (Cal. Ct. App. Dec. 29, 2009), which Plaintiffs acknowledge is an unpublished opinion that is not to be cited under the California Rules of Courts. In that case, a man with two previous convictions for sexually molesting a 5-year-old girl and a 10-year-old girl was caught staring at a teenager showering in a locker room. *Grunau* has absolutely nothing in common with this case.

In addition, Plaintiffs cite *New Jersey Division of Youth & Family Services v. M.R.*, 2014 WL 1977014 (N.J. Super. Ct. App. Div. Feb. 25, 2014), for the proposition that "allowing [a] teen girl to be unclothed and shower with a biological male risked mental and emotional injury." Plaintiffs' Opening Brief, [ECF No. 23, at 22]. In that case, however, the biological male who showered with the girl was her father, who also was accused of having sexual relations with his under-aged niece. *M.R.*, 2014 WL 1977014, at *1. Again, this case is not remotely similar.

Plaintiffs' Title VII cases similarly are inapposite and improperly equate allowing transgender students to use restrooms consistent with their gender identity and a transgender girl to use the girls' locker rooms with sexual deviancy. Plaintiffs cite *Lewis v. Triborough Bridge and Tunnel Authority*, 31 F. App'x 746 (2nd Cir. 2002), which is another decision that is unpublished and does not have any precedential effect, for the proposition that the defendant

company created a hostile environment when it allowed male cleaners inside the women's locker room while female employees were changing clothes.  Plaintiffs, however, omit that the cleaning service employees were leering at the female plaintiff and would crowd the entrance of the locker room, forcing her to "run the gauntlet" and physically brush up against them.  *Lewis v. Triborough Bridge and Tunnel Authority*, 77 F. Supp. 2d 376, 377 (S.D.N.Y. 1999).  And the supervisor used lewd and objectively offensive words when referring to the employees who complained of the conduct.  *Id.* at 378.  Nothing of that sort is alleged to have occurred in this case.

    ii.  <u>Any risk of unwanted exposure is mitigated effectively by the privacy protections and alternatives provided by District 211</u>

   Plaintiffs maintain that the presence of a transgender student in a restroom or locker room with cisgender students violates Title IX because it creates a risk that students will see each other in an unclothed or partially clothed state by virtue of their sharing these facilities, and that is a severe, pervasive and objectively offensive hostile environment.  The risk of unwanted exposure in this case, however, is substantively mitigated and reduced by the privacy protections that District 211 provides in the restrooms and locker rooms, and by the alternative facilities it provides for students who do not want to use the common facilities.

   District 211 agreed in the Locker Room Agreement to install and maintain "sufficient privacy curtains (private changing stations) within the girls' locker rooms to accommodate . . . any students who wish to be assured of privacy while changing."  Locker Room Agreement, [ECF No. 21-3, at 3].  The District has installed 13 private stalls, a curtained shower, and privacy curtains on two pre-existing private changing and showering stalls in the girls' physical education locker room at Fremd High School.  Kovack's Declaration, [ECF No. 78-1, at ¶

15(a)].[27]   The record shows that District 211 also has installed private changing stalls in the boys' locker room at Fremd High School.   *Id.*   The District agreed to provide "reasonable alternative[s]" to female students who request "additional privacy . . . beyond the private changing stations," including use of a single-use facility.   Locker Room Agreement, [ECF No. 21-3, at 3].   Separate from the Locker Room Agreement, District 211 has informed parents that "an alternative changing area" will be made available upon request.   Kovack's Declaration, [ECF No. 78-1, at ¶ 15(b)].

Plaintiffs allege there are no privacy stalls for changing clothes or showering in the girls' swim or gymnastics locker rooms.   Complaint, [ECF No. 1, at ¶¶ 172, 174].   The District does not appear to dispute this fact.   But Student A has completed her swim requirements for graduation, and she informed OCR that she did not intend to take any more physical education classes that include swimming.   Letter of Findings, [ECF No. 21-10, at 6].   Therefore, the fact that there are no privacy options available in the swim locker room is not enough for Plaintiffs to satisfy their burden of showing a likelihood of success that the District's failure to provide privacy options in that locker room is severe, pervasive or objectively offensive conduct.   There are no allegations, let alone evidence, that Student A is using or intends to use the swim locker room to change her clothes or that other students are forced to change their clothes in the swim locker room when Student A is or will be present.   The mere risk that Student A might change clothes or shower in the girls' swim locker room when she has no reason to be there and is not

---

[27] Plaintiffs allege that there are five privacy stalls in the physical education locker room for students to change their clothes.  Complaint, [ECF No. 1, at ¶ 138].  The conflict appears to be that the District's reference is to privacy stalls for changing clothes and showering while Plaintiffs' reference only is to privacy stalls for changing clothes.

enrolled in any required swim class does not create or contribute to a severe, pervasive or objectively offensive hostile environment.[28]

In addition, although Plaintiffs allege there are open pole showers and no privacy curtains for changing clothes in the girls' gymnastics locker room, they do not allege that any girls, or more specifically Girl Plaintiffs, use the showers, or want to use the showers but cannot do so because Student A is present. To the contrary, in the Letter of Findings, OCR said girls on the gymnastics team do not shower in the gymnastics locker room. Letter of Findings, [ECF No. 21-10, at 7]. So, the only issue in the gymnastics locker rooms appears to be that there are no privacy stalls available for students to use when changing into or out of their uniforms. Girl Plaintiffs allege Student A changed clothes in the gymnastics locker room once "while girls were present." Complaint, [ECF No. 1, at ¶ 96]. Plaintiffs, however, do not allege any Girl Plaintiff was present on this occasion nor do they allege any Girl Plaintiff, or any other girl, saw any private part of Student A's body or even that any part of her body was visible on that occasion. This is not evidence of a severe, pervasive, or objectively offensive hostile environment. Moreover, students who do not want to change or shower in the swim or gymnastics locker rooms can use the physical education locker room, which provides privacy protections, or an alternative facility, including a single-use space.

Plaintiffs also allege a number of other girls' athletic team locker rooms in the high school "are open to a male student's use." *Id.* at ¶ 190. But there is nothing specific pled in the Complaint or anywhere in the record to indicate that District 211 would allow cisgender boy students to have access to the girls' team locker rooms or that any transgender girl wants or intends to use any of those locker rooms. A hostile environment and allegations of severe,

---

[28] There is no allegation, evidence or argument that any other transgender girl student uses or intends to use the swimming locker room.

pervasive and objectively offensive conduct have to be based on something more than speculation and conjecture.

Finally, according to Girl Plaintiffs, they are ridiculed and harassed by their classmates if they choose to change clothes in the privacy stalls provided in the girls' physical education locker room.  *Id.* at ¶¶ 140-147.  Plaintiffs do not allege that District 211 was aware of this inappropriate conduct before the Complaint was filed (no complaint to the administration, for example, is alleged) nor is it clear that the District's policies are responsible for this alleged conduct by Girl Plaintiffs' classmates.  In any event, this isolated or sporadic conduct is not the kind of severe, pervasive, objectively offensive conduct that has been held to violate Title IX.

Plaintiffs' challenge to the Restroom Policy also is short on facts necessary to show a hostile environment.  There are private toilet stalls in the restrooms.  Even considering the alleged gaps in the stalls above and below the doors, and on the sides of the doors, there is nothing objectively offensive about Girl Plaintiffs having to use the restroom when Student A also is using the restroom, or about any Student Plaintiff using the same restroom as a transgender student whose sex assigned at birth is different than theirs.  There is nothing to indicate that the gaps in the stalls make it likely or even possible for someone to observe anything that occurs in the stall if the person inside the stall does not want that to happen.  There are no allegations that Student A, or any other transgender student, has harassed anyone in the restroom other than by her mere presence.  Moreover, there undoubtedly are remedies within the schools for situations when any student acts in a threatening, harassing, or inappropriate way in a restroom.  *See also Cruzan,* 294 F.3d at 984 ("We agree with the district court that Cruzan failed to show the school district's policy allowing [a transgender female teacher] to use the women's

faculty restroom created a working environment that rose to the level of [sexual harassment or a hostile environment].").

In summary, the allegations in Plaintiffs' Complaint are not comparable to the type of conduct that has been found to be severe, pervasive and objectively offensive in violation of Title IX. The Court is not persuaded that there is anything objectively offensive about a transgender student being present in a restroom or Student A being present in a locker room when at no time is his or her unclothed body exposed to any Student Plaintiff, the risk of that happening is substantially mitigated by the various privacy protection put in place by District 211 and Student A's undertakings in the Locker Room Agreement, and any Student Plaintiff who does not want to expose his or her body to a transgender student or anyone else is not compelled to do so. The risk of an unwanted exposure under these circumstances is minimal and not so severe, pervasive, or objectively offensive as to constitute a hostile environment much less a hostile environment that denies any Student Plaintiff access to any educational benefits.

      iii.      There is no evidence Girl Plaintiffs have been denied access to any educational opportunities or benefits

Finally, Plaintiffs assert in a conclusory and generalized manner that the Locker Room Agreement and the Restroom Policy "have had and continue to have a profoundly negative effect of the girls' access to educational opportunities, benefits, programs, and activities at their schools." Complaint, [ECF No. 1, at ¶ 12]. Plaintiffs give five examples: (1) some girls avoid the locker rooms; (2) one girl wears her gym clothes underneath her regular clothes; (3) other girls change quickly in the locker rooms and avoiding all conversation and eye contact; (4) some girls avoid the restrooms as long as possible; and (5) other girls spend time trying to find an empty restroom and therefore risk being tardy to class. *Id.* There are, however, no specific

allegations that Plaintiffs have been excluded from "participation in" or "denied the benefits of" any education opportunity, class or program as required by Title IX. *See* 20 U.S.C. § 1681(a).

An action under Title IX lies only when the behavior at issue denies a victim equal access to education. *Davis*, 526 U.S. at 652. The harassment must have a "concrete, negative effect" on the victim's education. *Id.* at 654. Examples of a negative impact on access to education may include dropping grades, *id.* at 634, becoming homebound or hospitalized due to harassment, *see Murrell,* 186 F.3d at 1248-49, and suffering physical violence, *see Vance,* 231 F.3d at 259.

Here, there is no evidence Girl Plaintiffs have been denied access to any educational opportunity or benefit. Plaintiffs do not allege, for instance, they have stopped going to gym class, quit an extracurricular activity, started getting lower grades, or struggled to focus during class. Instead, the only effect on their educational opportunities they identify is the risk of running late to class when using more remote restrooms and locker rooms they think will not be used by a transgender student. Complaint, [ECF No. 1, at ¶¶ 12(e), 236]. There is no indication Plaintiffs actually have missed meaningful class time and that this in turn has negatively impacted their education. Therefore, they have not shown they have been denied equal access to any educational activities or programs.

Accordingly, for all of these reasons, the Court is not persuaded Plaintiffs have a likelihood of success in establishing a hostile environment in violation of Title IX based on transgender students use of the same high school restrooms as Student Plaintiffs, or Student A's use of the girls' locker rooms.

### c. Plaintiffs Have Not Shown The Facilities Are Not Comparable

By allowing Student A to use the girls' locker rooms at Fremd High School, Plaintiffs argue the locker room facilities for the girls provided by District 211 are inferior to the facilities

provided for the boys in violation of Title IX.  Plaintiffs argue that the girls' locker rooms are inferior to the boys' locker rooms for two reasons: (1) the girls have to share a locker room with a biological boy while the boys do not have to share a locker room with a biological girl; and (2) the alternate private single-use facilities for girls to use if they do not want to use the common locker room are inferior to the boys' locker room.  Plaintiffs' Opening Brief, [ECF No. 23, at 18-19].

Plaintiffs do not dispute that the physical facilities provided for the boys' and girls' restrooms and locker rooms are comparable.  Plaintiffs' argument is based on the fact the Locker Room Agreement allegedly creates inferior facilities for girls because of who is permitted to use the girls' locker rooms, *i.e.*, the girls have to share a locker room with a transgender student and the boys do not.  However, even though Plaintiffs allege the boys do not have to share a locker room with a transgender student, District 211 has represented it will provide similar access for a transgender boy wanting to use the boys' locker room with the same privacy accommodations. *See* District 211's Response Brief, [ECF No. 78, at 22 n.9].

When Plaintiffs filed their Motion for Preliminary Injunction, Student A was the only transgender student who had asked District 211 to allow her to use locker rooms consistent with her gender identity.  At oral argument on Plaintiffs' Motion, Intervenor-Defendants' counsel stated that Student C, a transgender boy, recently began his freshman year at a District 211 high school.  Based on District 211's representation that it would provide similar access to the boys' locker rooms for transgender boys, the Court is not persuaded Plaintiffs have a likelihood of success in establishing that District 211 is violating Title IX by not providing comparable facilities for all students.  District 211's Response Brief, [ECF No. 78, at 22 n.9].

The Court also is not persuaded that the alternate single-use facilities District 211 provides for students who do not want to use common restrooms or locker rooms have to be comparable to the common facilities. Plaintiffs do not cite any case to support that proposition. District 211 provides comparable locker room facilities for boys and girls, and the fact that District 211 provides alternate single-use facilities that offer greater privacy options for students who want additional privacy does not change the fact that the District offers comparable common facilities for all students. As far as the Court can tell on this record, the boys' and girls' locker rooms at Fremd High School are comparable in all respects. Student Plaintiffs who choose to use the alternate single-use facilities with additional privacy protections cannot complain that the alternate facilities are not "comparable" to the main facilities offered to boys and girls, which they have chosen not to use. There is no allegation that the alternative facilities made available for boys and girls are not comparable.

Accordingly, for all of these reasons, the Court finds Plaintiffs do not have a likelihood of success on the merits of their claims that District 211 is violating Title IX.

**B.      Irreparable Harm**

To satisfy the second threshold requirement for a preliminary injunction, Plaintiffs must show there is a likelihood—more than a mere possibility—they will suffer irreparable harm. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). Harm "is 'irreparable' where it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Girl Scouts*, 549 F.3d at 1089 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). Phrased another way, harm is irreparable when it is "difficult—if not impossible—to reverse." *Michigan*, 667 F.3d at 788.

Plaintiffs devote scant space—just three short paragraphs out of 50-plus pages of briefing in support of their Motion for Preliminary Injunction—to irreparable harm. Plaintiffs raise two undeveloped arguments. They contend that irreparable harm is presumed when a party establishes a likely constitutional violation. Plaintiffs' Reply Brief, [EFC No. 94], at 24. And they assert that Student Plaintiffs are being forced to endure a "per se hostile educational environment." *Id.* Both of these arguments rely on the premise that Plaintiffs' underlying constitutional and Title IX claims have merit. As already explained, however, Plaintiffs have not shown they are likely to prevail on either their constitutional claim or their Title IX claims.

Plaintiffs also assert in a conclusory and generalized manner that Girl Plaintiffs are suffering from an impaired "access to educational opportunities, benefits, programs, and activities." Complaint, [ECF No. 1, at ¶ 13]. "[L]ack of access to classes and related programs, services, and activities can constitute irreparable injury for purposes of a preliminary injunction." *P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1148 (C.D. Cal. 2015). Even when access is denied, though, movants may be required to show more to establish irreparable harm. *Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677, 687 (S.D. Ohio 2012) (noting that there is "some authority for the proposition that an interruption in an educational program is not, of itself, an irreparable injury" and also "contrary case law" that finds irreparable harm "especially when the denial of an educational opportunity is coupled with other types of harm").

As discussed above, Plaintiffs do not allege that Girls Plaintiffs have stopped going to physical education class, quit an extracurricular activity, received lower grades, or struggled to focus during class. Instead, the only effect on Girl Plaintiffs' educational opportunities that Plaintiffs identify is the risk of running late to class if they use more remote restrooms and locker rooms in the school to avoid using a restroom or locker room with a transgender student.

Complaint, [ECF No. 1, at ¶¶ 12(e), 236]. There is no indication that anything has negatively impacted Girl Plaintiffs' education. Therefore, Plaintiffs have not shown this speculative harm is irreparable.

Student Plaintiffs' main irreparable harm argument boils down to their contention that they are suffering "embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity," which the Court will refer to as "emotional distress" for short, when they use restrooms in the presence of a transgender student or locker rooms in the presence of Student A who they label a biological boy. *Id.* at ¶ 11 123, 124, 220, 226, 237. Sometimes, emotional harm can be serious enough to rise to the level of irreparable harm. *Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005); *Kennedy v. Sec'y of Army*, 191 F.3d 460, 460 n.5 (9th Cir. 1999); *Caspar v. Snyder*, 77 F. Supp. 3d 616, 640 (E.D. Mich. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015). But "emotional suffering is commonly compensated by monetary awards" in our legal system. *Bhd. of Locomotive Engineers & Trainmen v. Union Pac. R.R. Co.*, 2011 WL 221823, at *5 (N.D. Ill. Jan. 24, 2011); *see also The Great Tennessee Pizza Co. Inc. v. Bellsouth Commc'ns*, 2010 WL 3806145, at *2 (E.D. Tenn. Sept. 23, 2010). It is the "extraordinary circumstance[]" when emotional harm, standing alone, is so severe that money damages cannot rectify the harm after a final judgment. *Lore v. City of Syracuse*, 2001 WL 263051, at *5 (N.D.N.Y. Mar. 9, 2001); *see also Colorado Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220 (D.D.C. 2015) ("Therefore, Plaintiffs' observation or contemplation of the stress and small risk of physical harm that the horses might suffer while being gathered—sincere as it might be—does not rise to the level of a cognizable, irreparable injury.").

In this case, Plaintiffs' allegations of emotional distress do not show Student Plaintiffs are suffering from distress that is so severe it is incapable of being rectified by money damages after a final judgment. Plaintiffs' general and conclusory claims to the contrary are insufficient to carry their burden. *See Lane v. Buckley*, --- Fed. App'x. --- , 2016 WL 1055840, at *3 (10th Cir. Mar. 17, 2016) ("'As a general rule, . . . a district court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff.'") (quoting *Atari Games Corp. v. Nintendo of Am., Inc.,* 897 F.2d 1572, 1575 (Fed. Cir. 1990)); *Gatsinaris v. ART Corp. Sols., Inc.*, 2015 WL 3453454, at *8 (C.D. Cal. May 29, 2015); *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 749 (N.D. Ill. 2010). In addition, Plaintiffs' conclusory allegations of discomfort and distress, unsupported by the "who, what, where, when, why, and how" of what Student Plaintiffs are experiencing, are too speculative to justify injunctive relief. *See Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1204 (7th Cir. 1996) (recognizing that it is an abuse of discretion to grant an junction "based on nothing but speculation and conjecture"); *see also Moore*, 409 F.3d at 511 ("We affirm the district court's conclusion[] . . . that the claim of psychological harm was too speculative to warrant preliminary relief."); *Holcomb v. California Bd. of Psychology*, 2015 WL 7430625, at *4 (E.D. Cal. Nov. 23, 2015) ("Plaintiff likewise provides no factual support showing she is likely to suffer irreparable reputational or emotional harm."); *Aune v. Ludeman*, 2009 WL 1586739, at *5 (D. Minn. June 3, 2009) ("Plaintiff argues that excessive stress 'may' induce or aggravate physical illness and mental or emotional disturbance, without a showing of any real threat of irreparable harm to himself.").

The fact that District 211 provides significant privacy protections and alternate facilities for students who, like Student Plaintiffs, are uncomfortable at the risk of encountering a transgender student in a state of undress also undermines Plaintiffs' ability to establish

irreparable injury. In the context of a request for preliminary injunctive relief, the movants' failure to investigate potentially mitigating alternatives undermines any claim of irreparable harm. *Orth v. Wisconsin State Employees Union Council 24*, 2007 WL 1029220, at *2 (E.D. Wis. Mar. 29, 2007). Further, harm is not irreparable if the moving parties fail to take advantage of readily available alternatives and thereby effectively inflict the harm on themselves. *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 679 (7th Cir. 2012); *see also Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809, 818 (E.D. Mich. 2013) ("'[I]rreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary.'") (quoting *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1248 (N.D. Iowa 1995)).

Plaintiffs contend Student Plaintiffs are not using the privacy stalls because they are inadequate. Plaintiffs assert the stalls do not guarantee that Student Plaintiffs will not see or be seen by a transgender student in a state of undress. Complaint, [ECF No. 1, at ¶¶ 162-168, 228-230]. Plaintiffs also point out that even if Student Plaintiffs use the stalls, they still will be sharing an intimate environment with a student who they perceive to be of the opposite sex. *Id.* at ¶¶ 155-161, 227, 259-261. None of these assertions is accurate with respect to the single-use alternatives that are available to both female and male students. Moreover, even if Plaintiffs were correct, that would not change the fact that the privacy stalls substantially reduce the risk Student Plaintiffs will see or be seen by a transgender student in a state of undress in the restrooms or locker rooms.

In addition, there is no evidence that the risk of being late to class and extracurricular activities, *id.* at ¶¶ 250-251, 254-257, will have a meaningful negative impact on Student Plaintiffs' education. Moreover, the mere inconvenience of walking to a facility that is farther

away does not constitute irreparable harm. *See Mclean v. Aurora Loan Servicing*, 2011 WL 4635027, at *1 (S.D. Cal. Oct. 5, 2011); *Corbett v. United States*, 2011 WL 1226074, at *5 (S.D. Fla. Mar. 2, 2011) (both stating that mere inconveniences are not irreparable harms).

Plaintiffs further contend all of the privacy protections and alternatives available to them to mitigate the risk of exposure to or by a transgender student are inadequate because of pressure from District 211 and other students. Plaintiffs assert the District has "conveyed to the Student Plaintiffs the message that any objection to the Locker Room Agreement (or the Restroom Policy) will be viewed by the District administration as intolerance and bigotry." Complaint, [ECF No. 1, at ¶ 148]; *see also id.* at ¶¶ 149-154. There also are very general allegations District 211 has conveyed the message that "differing views will not be tolerated." *Id.* at ¶ 153. Plaintiffs say this message has deterred Student Plaintiffs from requesting privacy options. *Id.* Even assuming this is true, the discomfort Plaintiffs (both parents and students) feel at the District's perceived disapproval of their position does not constitute irreparable injury.

As discussed above, Girl Plaintiffs also say students who take advantage of the privacy options in the main physical education locker room are "ridicule[d]" by their classmates. *Id.* at ¶ 140; *see also id.* at ¶¶ 141-146. Plaintiffs allege that, in the locker room and in the hallways, male and female students called one Girl Plaintiff names, yelled derogatory slang words for female body parts at her, and accused her of being transphobic and homophobic. *Id.* at ¶ 145. There is no justification for that kind of conduct by other students. But the pain and pressure these other students have brought upon a Girl Plaintiff is not necessarily the District's fault, and there is no allegation that District 211 was aware of any such conduct and willfully ignored or disregarded it. And, again, Plaintiffs stymied District 211's attempt to discover the specifics underlying these allegations, including whether the District was informed of this misconduct.

79

Also, importantly, there is no indication in the record that any student was bullied or risks being bullied if she were to use a single-use facility to change clothes or shower.

Finally, the Restroom Policy, in particular, is neither causing nor likely to cause Plaintiffs irreparable harm. District 211 implemented the Restroom Policy during August 2013. *See id.* at ¶¶ 211, 214-217; Federal Defendants' Response Brief, [ECF No. 80, at 13]. Plaintiffs did not file this lawsuit until May 2016, almost three years later. Either Student Plaintiffs did not notice that transgender students were using restrooms consistent with their gender identity, or they knew about the Restroom Policy and tolerated it for years. Further, Plaintiffs acknowledge they were aware of the Restroom Policy at least as of October 2015 when it was announced publicly by District 211, and they waited almost seven months after that before filing this lawsuit.

Under these circumstances, it is likely that the impetus for this lawsuit was the Locker Room Agreement signed in December 2015, not the Restroom Policy standing alone. For all of these reasons, Plaintiffs' delay in challenging the Restroom Policy strongly indicates that the Restroom Policy is not causing them irreparable harm. *See Tap Pharm. Products, Inc. v. Atrix Labs., Inc.*, 2004 WL 2034073, at *1 (N.D. Ill. Aug. 26, 2004) (recognizing that an unjustified delay in seeking relief "can be fatal to claims of irreparable harm"); *see also Traffic Tech, Inc. v. Kreiter*, 2015 WL 9259544, at *22 (N.D. Ill. Dec. 18, 2015); *Ixmation, Inc. v. Switch Bulb Co., Inc.*, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014); *Celebration Int'l, Inc. v. Chosun Int'l, Inc.*, 234 F. Supp. 2d 905, 920 (S.D. Ind. 2002).

Accordingly, the Court finds Plaintiffs have not shown they are likely to suffer irreparable harm that cannot be rectified after a final judgment, even if they prevail on the merits of their claims.

### C.       Adequate Remedy At Law

To satisfy the third and final threshold showing, Plaintiffs must show they do not have an adequate remedy at law.  *Girl Scouts*, 549 F.3d at 1095.  In other words, Plaintiffs must show money damages would be inadequate compensation for the harm they have suffered if they win this lawsuit.  *Id.*  Plaintiffs need not show traditional legal remedies would be "wholly ineffectual," but, rather, that they would be "seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).  "[S]howing irreparable harm is '[p]robably the most common method of demonstrating that there is no adequate legal remedy.'"  *Campbell v. Miller*, 373 F.3d 834, 840 (7th Cir. 2004) (Williams, J., dissenting) (quoting 11A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2944 (2d ed. 1995)); *see also Fleet Wholesale Supply Co. v. Remington Arms Co.*, 846 F.2d 1095, 1098 (7th Cir. 1988); *Wil-Kar, Inc. v. Vill. of Germantown*, 153 F. Supp. 2d 982, 987 (E.D. Wis. 2001).

Plaintiffs do not address or even touch on this threshold requirement for the issuance of a preliminary injunction.  As previously stated, "emotional suffering is commonly compensated by monetary awards" in our legal system.  *Bhd. of Locomotive Engineers & Trainmen*, 2011 WL 221823, at *5; *see also The Great Tennessee Pizza Co.*, 2010 WL 3806145, at *2.  In this case, Plaintiffs seek nominal and compensatory money damages as a remedy.  Complaint, [ECF No. 1, Prayer for Relief, at ¶ E].  They have not shown why these damages would be a seriously deficient or inadequate remedy.  Therefore, Plaintiffs have not carried their burden to show they lack an adequate remedy at law.

**D.  The Court Need Not Engage In A Balancing Analysis In Light Of Its Recommendation Concerning The First Three Threshold Showings For Preliminary Injunctive Relief**

When the parties seeking a preliminary injunction have not made "any one of" the three threshold showings—likelihood of success on the merits, likelihood of irreparable harm, and inadequate remedy at law—the court "must deny the injunction." *Girl Scouts*, 549 F.3d at 1086. In this case, Plaintiffs have not made any of the required three showings with respect to either the Federal Defendants or District 211.  Because of these failures, the Court need not address the balancing phase of the preliminary injunction analysis.  *See id.* (explaining that only after the court finds that the movants have "passed this initial threshold" does the court "then proceed[] to the balancing phase"); *see also Ctr. For Individual Freedom v. Madigan*, 735 F. Supp. 2d 994, 1000 (N.D. Ill. 2010) ("Plaintiff has failed to establish some likelihood of succeeding on the merits.  Therefore, it is unnecessary to also consider the balance of harms.").

## V.  CONCLUSION

For all of the reasons discussed in this Report and Recommendation, the Court respectfully recommends that Judge Alonso deny Plaintiffs' Motion for Preliminary Injunction [ECF No. 21].  Written objections to this Report and Recommendation may be served and filed within 14 days from the date of this Report and Recommendation. FED. R. CIV. P. 72(b).  Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made in this Report and Recommendation. *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011).

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: October 18, 2016

82