## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **STUDENTS AND PARENTS FOR PRIVACY**, a voluntary unincorporated association; and **VICTORIA WILSON**, | **Case No. 1:16-cv-04945** |
| Plaintiffs, | **The Honorable Jorge L. Alonso** |
| vs. | **Magistrate Judge Jeffrey T. Gilbert** |
| **SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS,** | |
| Defendants, | |
| and | **FIRST AMENDED COMPLAINT** |
| **STUDENTS A, B, and C,** by and through their parents and legal guardians **Parents A, B, and C,** and the **ILLINOIS SAFE SCHOOLS ALLIANCE,** | |
| Intervenor-Defendants. | |

Plaintiff Students and Parents for Privacy and its president, Victoria Wilson, state as follows:

### INTRODUCTION

1.     This is a civil rights action to stop the Township High School District 211 ("District") from violating students' statutory rights under Title IX of the Education Amendments Act of 1972; students' rights to bodily privacy under the United States Constitution; and various other constitutional and statutory rights held by the SPP Students and Parents. [1]

_____

[1] The following conventions are used in this complaint: "SPP Students" refers generally to student members of Students and Parents for Privacy regardless of their sex, while "SPP

1

2.     Defendants injure the Plaintiffs through their application and enforcement of the District's policy ("Compelled Affirmation Policy") that among other things, authorizes students of one sex to enter multi-user locker rooms, restrooms, and showers (generally, "privacy facilities") of the opposite sex, as well as to share overnight accommodations with a member of the opposite sex on school activity trips. The current policy was preceded by a Restroom Policy and a Locker Room Agreement (described below) that also authorized opposite-sex access[2] to the District's privacy facilities.

3.     Such multi-user privacy facilities are reserved to the use of one sex to provide privacy from the other sex, pursuant to state and federal statutes and regulations, and constitutional authorities.

4.     Every District student has a legally protected reasonable expectation of privacy from the opposite sex within the District's multi-user privacy facilities.

5.     To protect student privacy from the opposite sex, the District by policy excludes males from female privacy facilities.

6.     To protect student privacy from the opposite sex, the District by policy excludes females from male privacy facilities.

7.     To protect District students' reasonable expectation of privacy, the District prohibits routine video surveillance of washrooms, gymnasium or swimming pool locker rooms, changing areas, or showers.

---

Girls" or "SPP Boys" respectively refer to female or male SPP Students. Similar conventions are followed to denote SPP Parents, and "Parent" means legal guardians as well as parents.

[2] "Access" as used herein means both access to, and use of, a given privacy space.

8. The District may discipline a student of one sex who enters a multi-user privacy facility of the other sex without the District's authorization if the facility is then in use.

9. The District may discipline a student of one sex who enters a multi-user privacy facility of the other sex without the District's authorization if the facility is not then in use.

10. The District admits that students have been authorized to "daily use bathrooms and locker rooms of their gender identity in multiple schools" and that every such student in District 211 "who has requested use of the locker room of their identified gender has been offered such access, along with other supports within an individual support plan." Exhibit A (*A Message from Superintendent Daniel Cates* (December 1, 2017), https://adc.d211.org/wp-content/uploads/2017/12/Sups-Message-12-1-2017.pdf).

11. The District has violated every District student's reasonable expectation of privacy by authorizing some students of one sex to access opposite-sex multi-user privacy facilities, so as to affirm those students' claimed genders.

12. Sex and gender are not the same thing.

13. Sex is to be either male or female as is determined by the union of male and female gametes at conception.[3]

---

[3] There are rare, objectively diagnosable disorders of sexual development (such as abnormal chromosomal complement or ambiguous primary or secondary sex characteristics), which are termed "intersex." This objective medical condition is not at issue in this case. "Primary sex characteristics" refers to those body organs essential to reproduction; "secondary sex characteristics" refer to features related to one's sex that develop through puberty.

14.     Sex is binary, objectively provable, and grounded in the fact that humans reproduce sexually.

15.     The physical differences between males and females are enduring.

16.     The sexes are not fungible.

17.     Gender is a social construct that comprises a malleable continuum of genders ranging from a very masculine gender to a very feminine gender, to genders which are ambiguous (e.g, one of a number of "nonbinary" genders), or a person may claim to have no gender at all (e.g., agender).[4]

18.     Gender may be established only by accepting a person's self-declaration of his or her self-perceived gender.

19.     Gender dysphoria describes when a person's perceived gender is discordant from the person's sex.

20.     Gender dysphoria may produce clinically significant distress in the dysphoric person.

21.     Applying the Compelled Affirmation Policy results in intermingling the two sexes within privacy facilities when the District authorizes, for example, a male student who claims a feminine gender (and thus believes himself to be female) to access the female multi-user privacy facilities that are otherwise lawfully reserved for exclusively female use.

---

[4] Plaintiffs use sex and gender herein as defined above, and use pronouns consistent with the sex of the person to whom the pronoun refers. Similarly, "girl" denotes a female and "boy" denotes a male.

22.     The District does not require a given student to be diagnosed as having any medical or psychological condition whatsoever as a condition of the student accessing opposite-sex multi-user privacy facilities under the Compelled Affirmation Policy.

23.     There are no controlled, randomized studies that demonstrate the efficacy or safety of students accessing the other sex's privacy facilities as a method of affirming a student's claimed gender.

24.     There is no known organic cause for a person to claim a gender discordant with his or her sex.

25.     The sole dispositive criterion that the District relies upon to authorize opposite sex access for a given student is that student's declaration of his or her gender.

26.     Consequently, the District's enforcement of the Compelled Affirmation Policy results in SPP Students—some of whom are as young as fourteen years old—experiencing embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity because the District has intentionally violated their reasonable expectation of privacy within the multi-user privacy facilities.

27.     Similarly, the Compelled Affirmation Policy puts SPP Students at continual risk of encountering, and in some instances actually encountering, members of the opposite sex within multi-user privacy facilities while students using the facility are disrobing, toileting, showering, and for some girls, while they are

dealing with highly personal feminine hygiene matters while in the throes of adolescence.

28.   SPP Students have not consented to this risk of encountering, or the actual encounters with members of the opposite sex within multi-user privacy facilities.

29.   The District's Compelled Affirmation Policy violates SPP Students' reasonable expectation of privacy in their multi-user privacy facilities.

30.   The impacts on SPP Students and Parents from the District enforcing the Compelled Affirmation Policy and its predecessor policies violate the Students' rights under Title IX and violate their bodily privacy rights under the Constitution of the United States. These impacts also deprive SPP Parents of their fundamental constitutional right to direct the education and upbringing of their children. Finally, enforcing the Compelled Affirmation Policy violates the right to the free exercise of religion of some Christian SPP Students and Parents under the United States Constitution and Illinois law.

31.   Plaintiffs therefore seek relief from this honorable Court.

## JURISDICTION AND VENUE

32.   This action arises under 42 U.S.C. §§ 1983 et seq. (the "Civil Rights Act"), 20 U.S.C. §§ 1681 et. seq. ("Title IX"), the First and Fourteenth Amendments to the United States Constitution, and the Illinois Religious Freedom Restoration Act, 775 Ill. Comp. Stat. Ann. §§ 35/1 et seq.

33.   The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1361, and 1367.

34. The Court has jurisdiction to issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

35. The Court has jurisdiction to award the requested injunctive relief under 5 U.S.C. §§ 702 and 703, 20 U.S.C. § 1683, 42 U.S.C. § 20000bb-1(c), 28 U.S.C. § 1343(a)(3), 775 Ill. Comp. Stat. Ann. § 35/20, and Federal Rule of Civil Procedure 65.

36. The Court has jurisdiction to award nominal and compensatory damages under 28 U.S.C. § 1343(a)(4).

37. The Court has jurisdiction to award reasonable attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412 and 42 U.S.C. § 1988.

38. Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and (e), because a substantial part of the events or omissions giving rise to all claims occurred in this district where Township High School District 211 is located.

## PLAINTIFFS

39. Plaintiff Students and Parents for Privacy is a voluntary unincorporated association comprised of students who currently attend, or will be attending, District high schools and their parents.

40. Plaintiff Victoria Wilson is the president of Students and Parents for Privacy, and is the mother of two students enrolled in District schools.

41. All Plaintiffs are citizens of the United States and residents of Cook County, Illinois.

**DEFENDANTS**

42.     Defendant School Directors of Township High School District 211 is a school district organized under the laws of the State of Illinois, and may be sued in this Court pursuant to 105 Ill. Comp. Stat. Ann. 5/10-2.

43.     The District is comprised of public educational institutions that provide a high school education to both male and female students.

44.     The District receives federal educational funds sufficient to bring it under the legal requirements of Title IX.

45.     Intervenor-Defendant Student A is a male student who claims a feminine gender and is an alumnus of Fremd High School.

46.     Intervenor-Defendants Students B and C are students who claim genders discordant with their sex and are currently enrolled in District schools.

47.     Intervenor-Defendant Illinois Safe Schools Alliance is an advocacy organization that promotes the interests of "lesbian, gay, bisexual, transgender, and questioning" youth and provided training to the District. The Alliance assisted Student A in seeking access to female privacy facilities in the District.

**STATEMENT OF FACTS**

***How the Compelled Affirmation Policy developed.***

48.     When Plaintiffs filed this lawsuit on May 4, 2016, Student A was a male 11th grade student at Fremd High School.

49.     Student A was born a male.

50.     Student A is male.

51.     Until Student A was in middle school, Student A used male privacy facilities.

52.     At some point during middle school, Student A claimed a feminine gender.

53.     Before Student A began classes at Fremd, his parents communicated to District officials that Student A was to be treated as a girl once he was in high school.

54.     After entering high school, the District

    a.     created an individualized support plan to foster affirmation of Student A's claimed gender and mitigate any adverse impacts from the gender affirmation process;

    b.     formed a support team of District staff to facilitate affirming Student A's claimed gender and to minimize stresses to Student A;

    c.     changed some or all of Student A's school records to state that he was female;

    d.     required District staff to use Student A's preferred female name and pronouns;

    e.     allowed Student A to participate in girls' athletics; and

    f.     authorized Student A to use the girls' restrooms ("Restroom Policy").

55.     Prior to the 2013-14 school year, all District schools separated their multi-user restrooms by sex: only females were allowed to use girls' restrooms and only males were allowed to use boys' restrooms.

56.     The district separated the sexes in multi-user restrooms to protect each user's reasonable expectation of privacy from the opposite sex.

57.     Student A and his parents sought access to girls' privacy facilities because those facilities were reserved to the use of, and used by, female students.

58.     If female students did not use the girls' privacy facilities, Student A would not have sought access to those facilities.

59.     During the 2013-14 school year, the District authorized Student A to access all girls' restrooms at Fremd.

60.     The District authorized Student A to access the girls' restrooms so as to affirm his claimed gender.

61.     No Illinois law obligated the District to authorize Student A to access girls' restrooms.

62.     No federal law obligated the District to authorize Student A to access girls' restrooms.

63.     The District did not authorize Student A's access to the girls' restrooms based on Student A manifesting appearances or behaviors that would be stereotypical of females.

64.     The District did not prohibit Student A from accessing the boys' restrooms.

10

65.     The District did not authorize Student A's access to the girls' restrooms to protect his reasonable expectation of privacy from the opposite sex.

66.     The District did not authorize Student A's access to the girls' restrooms to protect the reasonable expectation of privacy from the opposite sex of the female students using the facility.

67.     The District did not authorize Student A's access to the girls' restrooms on the basis of his sex.

68.     The District did not notify parents or students that it had authorized a male student to access girls' restrooms.

69.     The District did not notify parents or students that the District was using its otherwise sex-separated restrooms to affirm a student's claimed gender.

70.     Some SPP Girls found out about the new policy when they walked into their restroom and encountered Student A.

71.     They were startled, shocked, embarrassed, and made afraid by finding a male in the girls' bathroom.

72.     At some time after authorizing Student A to access the girls' restrooms, the District applied the same standard for access to all restrooms at all schools in the District.

73.     Under this expanded policy ("Restroom Affirmation Policy"), any student seeking to affirm a claimed gender that was discordant from the student's sex was authorized to access restrooms consistent with his or her claimed gender.

11

74.     District Superintendent Daniel E. Cates later explained the District's rationale for the Restroom Affirmation Policy, saying that "[t]ransgender students who don't want separate private accommodations are allowed to use restrooms in accordance with their gender identity, as there are private stalls available." (V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 3, ECF No. 21-5 at 2 of 3.)

75.     Despite the District providing a dedicated support team for Student A and complying with every request Student A made to have his claimed gender affirmed other than access to the girls' locker rooms, Student A demanded access to the girls' locker rooms so as to affirm his claimed gender.

76.     Student A accessed one or more girls' locker rooms one or more times prior to the District creating a policy to authorize his access to girls' locker rooms.

77.     One female student, who had been previously sexually assaulted, was exposed to Student A's genitalia within a girls' locker room in January, 2014.

78.     Despite notice of that incident and subsequent incidents, the District failed to properly investigate or remediate the situation.

79.     The initial exposure to male genitalia, and subsequent similar incidents, traumatized the girl, who committed suicide in 2017.

80.     The District initially refused to grant Student A access to the girls' locker rooms after he began classes at Fremd.

81.     The District's refusal to grant Student A access to the girls' locker rooms was based on Student A being male.

82. The District's refusal to grant Student A access to the girls' locker rooms was intended to protect the reasonable expectation of privacy from the opposite sex of the females who used those facilities.

83. The District's refusal to grant Student A access to the girls' locker rooms was grounded in at least two constitutional privacy concerns:

    a.    Authorizing Student A to be in a girls' locker room would expose female students as young as fifteen years old to being observed in a state of undress by a biologically male individual; and

    b.    Authorizing Student A to be in a girls' locker room would expose girls as young as fifteen years old to a biologically male body.

(V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 8, ECF No. 21-10 at 11 of 15.)

84. The District's refusal to grant Student A access to the girls' locker rooms was not based on Student A manifesting appearances or behaviors that might be characterized as sex stereotypes.

85. In December 2013, Student A filed a complaint with the U.S. Department of Education Office of Civil Rights ("OCR") alleging that the District violated his rights under Title IX when it denied him use of the girls' locker rooms.

86. The OCR investigated the District's denial of access for Student A to the girls' locker rooms.

87.     Until December 2, 2015, when the District agreed with the OCR's position that Student A should have access to the girls' locker rooms, the District refused to authorize Student A to access the girls' locker rooms.

88.     In support of denying Student A access to the girls' locker rooms, the District stated:

      a.    "The goal of the District . . . is to protect the privacy rights of all students when changing clothes or showering before or after physical education and after-school activities, while also providing reasonable accommodations to meet the unique needs of individual students." (V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 3, ECF No. 21-5 at 2 of 3.)

      b.    "District 211 has supported – and continues to support – transgender students and their families while always balancing the rights and concerns of all students we serve." (*Id.*)

      c.    "[T]he District will continue to provide private accommodations for transgender students to ensure a respectful school environment[.]" (*Id.*; V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 2, ECF No. 21-4 at 2 of 3.)

      d.    "District 211 has provided individual accommodations in a manner that does not infringe on the privacy concerns of other students." (*Id.*)

     e.     "Our position throughout this ongoing matter has always centered on safeguarding student privacy and upholding dignity for all students in our district." Exhibit B (*Post-Board of Education Vote Statement by Township High School District 211 Superintendent of Schools Daniel Cates* (December 2, 2015), https://adc.d211.org/wp-content/uploads/2015/12/Cates-Public-Statements.pdf).

     f.     "[P]ermitting Student A to be present in the locker room would expose female students to being observed in a state of undress by a biologically male individual." (V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 8, ECF No. 21-10 at 11 of 15.)

     g.     "Granting Student A the option to change . . . clothes in the girls' locker room would expose students . . . to a biologically male body." (*Id.*)

89.    On November 2, 2015, the OCR issued its Letter of Findings in Student A's case, concluding

> that [the District], on the basis of sex, excluded Student A from participation in and denied [Student A] the benefits of its education program, provided [Student A] different benefits or benefits in a different manner, subjected [Student A] to different rules of behavior, and subjected [Student A] to different treatment in violation of the Title IX regulation, at 34 C.F.R. § 106.31.

(V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 8, ECF No. 21-10 at 14 of 15.)

90.    The Letter of Findings further provided "[i]f an agreement is not reached within 30 calendar days of the date of this [l]etter . . . OCR must follow the procedures

in its *Case Processing Manual*, at Section 305 for the issuance of a Letter of Impending Enforcement Action." (*Id.*)

91.     The OCR *Case Processing Manual* Section 305 details information that must be included in a Letter of Impending Enforcement Action if the recipient of the Letter of Findings "refuses to make a commitment to voluntarily resolve the identified areas of noncompliance[.]" Office for Civil Rights, U.S. Dep't. of Educ., *Case Processing Manual* 32 (2015), https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.

92.     The OCR *Case Processing Manual* at Article VI states that to "initiate enforcement action[,]" "OCR will either: (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance from, or with respect to the Boy Scouts Act, funds made available through the Department to the recipient; or (2) refer the case to DOJ for judicial proceedings to enforce any rights of the United States under any law of the United States." *Id.* at 28.

93.     The District's budget from July 1, 2015 to June 30, 2016 included receipts of approximately $6,160,700 in federal aid.

94.     Once the Letter of Findings issued, the District voluntarily decided to affirm Student A's claimed gender by authorizing his access to the girls' locker rooms.

95.     On December 2, 2015, the District signed an Agreement to Resolve OCR Case No. 05-14-1055 ("Locker Room Agreement"). (V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 1, ECF No. 21-3.)

96.    The Locker Room Agreement stated "For the duration of Student A's enrollment in the District . . . the District agrees to provide Student A access to locker room facilities designated for female students at school[.]" (*Id.* at 3 of 6.)

97.    Prior to December 2, 2015, all of the schools in the District separated their locker rooms and related shower areas by sex: only females were allowed to use the girls' locker rooms, and only males were allowed to use the boys' locker rooms.

98.    The district separated the locker rooms by sex to protect each user's reasonable expectation of privacy from the opposite sex.

99.    The Locker Room Agreement acknowledged that the privacy interests of the female students would be at risk when the District authorized access for Student A:

  a.    "Student A[] represent[ed] that she will change in private changing stations in the girls' locker rooms[.]" (*Id.*)

  b.    "[T]he District agrees to . . . take steps to protect the privacy of its students by installing and maintaining sufficient privacy curtains (private changing stations) within the girls' locker rooms to accommodate Student A and any students who wish to be assured of privacy while changing[.]" (*Id.*)

  c.    "If any student requests additional privacy in the use of sex-specific facilities designed for female students beyond the private changing stations described in item II.A.1, the District will provide that student with access to a reasonable

alternative, such as assignment of a student locker in near proximity to the office of a teacher or coach; use of another private area (such as a restroom stall) within the public area; use of a nearby private area (such as a single-use facility); or a separate schedule of use." (*Id.*)

100. District Superintendent Daniel Cates made the following public statements after the District voted to approve the Locker Room Agreement with OCR:

    a. "OCR threatened to pursue enforcement action against the District including withholding federal funding unless a resolution was reached within 30 days." Exhibit B.

    b. "By reaching this mutual agreement with OCR, the threat of further litigation specific to the initial complaint has ended, and the District will retain full access to its federal funds used primarily to serve at-risk students." *Id.*

101. District Superintendent Daniel Cates clarified that the Locker Room Agreement "pertains **solely** to this individual student and does not require a District-wide policy[.]" *Id.*

102. The Locker Room Agreement states that Student A represented that he would change in private changing stations in the locker rooms, but nothing in the agreement required him to do so.

103. The Locker Room Agreement did not provide any penalty if Student A did not use a private changing station in the girls' locker room.

104.    During his tenure in the girls' locker rooms, Student A failed to use a private changing station on one or more occasions.

105.    The District authorized Student A to access the girls' locker rooms so as to affirm his claimed gender.

106.    The District did not authorize Student A's access to the girls' locker rooms based on Student A manifesting appearances or behaviors that would be stereotypical of females.

107.    The District did not authorize Student A's access to the girls' locker rooms to protect his reasonable expectation of privacy from males.

108.    The District did not authorize Student A's access to the girls' locker rooms to protect the reasonable expectation of privacy from the opposite sex of female students using the facility.

109.    The District did not authorize Student A's access to the girls' locker rooms on the basis of his sex.

110.    The District did not prohibit Student A from accessing the boys' locker rooms.

111.    The District chose to affirm Student A's claimed gender by authorizing Student A to access the girls' locker rooms because those facilities were designated for, and were used only by, females.

112.    If females did not use the girls' locker rooms, the District would not have been able to affirm Student A's claimed gender by granting Student A the use of those facilities.

113.    After the Locker Room Agreement became effective, at least one SPP Parent requested that the District protect her daughter's privacy by providing her daughter access to the same private locker room that the District provided to Student A before the Locker Room Agreement was effective.

114.    The District refused to make that locker room available to the daughter.

115.    At some time after authorizing Student A to access the girls' locker rooms, the District applied the same standard for access to all locker rooms at all schools in the District.

116.    Under this new policy ("Locker Room Affirmation Policy"), any student seeking to affirm a claimed gender that is discordant from the student's sex would be authorized to access locker rooms consistent with his or her claimed gender.

117.    The Locker Room Affirmation Policy and the Restroom Affirmation Policy together comprise the District's current Compelled Affirmation Policy.

118.    Prior to enforcing the Compelled Affirmation Policy, the District made no intentional, systematic effort to examine the quality or reliability of the science underlying gender affirmation treatments.

119.    Prior to enforcing the Compelled Affirmation Policy, the District made no intentional, systematic effort to understand the psychological impacts on an adolescent student who is exposed to the opposite sex in a privacy facility where that adolescent has a reasonable expectation of privacy from the opposite sex.

120. The District currently enforces the Compelled Affirmation Policy on all of its students and on all of its campuses:

a. "[M]ultiple transgender students . . . daily use bathrooms and locker rooms of their gender identity" in "multiple" District schools. Exhibit C (*Media Statement from Superintendent Daniel Cates Regarding ACLU Lawsuit filed 11-30-2017* (November 30, 2017), https://adc.d211.org/wp-content/uploads/2017/11/D211-Statement-11-30-2017.pdf).

b. "Every transgender student in the District who has requested use of the locker room of their identified gender has been offered such access[.]" Exhibit A.

c. "Every day in our schools, transgender students have full access to the bathrooms of their identified gender. Each day, transgender students use the locker room of their identified gender." *Id.*

d. The District has explained that "accommodating access to all facilities" of the opposite sex is one of the supports the District "provide[s] to students experiencing transgender identity." *Id.*

e. The District did not explain how authorizing opposite-sex access to multi-user privacy facilities would mitigate the "unspoken discomfort" that many teenagers have when

"changing clothes or showering in the locker room." Exhibit D
(Statement of Daniel Cates, Superintendent, Township High
School District 211, *Judge rules in favor of balanced access to
locker room* (Jan. 25, 2018), https://adc.d211.org/wp-content/
uploads/2018/01/D211-Statement-1-25-2018.pdf).

121.    Contemporaneously with the course of events leading up to and through
the early stages of this case, federal officials issued two letters purporting to interpret
"sex" under Title IX to include gender identity:

> a.    Letter to Emily Prince from James A. Ferg-Cadima, Acting
> Deputy Assistant Secretary for Policy, Office for Civil Rights
> at the Department of Education dated January 7, 2015; and
>
> b.    Dear Colleague Letter on Transgender Students jointly issued
> by the Civil Rights Division of the Department of Justice
> (DOJ) and the Department of Education dated May 13, 2016.
> (V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 4, ECF 21-6.)

122.    Although the OCR and DOJ postured the federal letters as binding
guidance on the schools, neither were issued pursuant to notice-and-comment
rulemaking.

123.    Although the OCR and DOJ postured the federal letters as binding
guidance on the schools, neither letter adhered to the plain meaning of "sex" in Title
IX.

124. On February 22, 2017, the OCR and the DOJ jointly issued another Dear Colleague letter, stating that

> The purpose of this guidance is to inform you that the Department of Justice and the Department of Education are withdrawing the statements of policy and guidance reflected in:
>
> - Letter to Emily Prince from James A. Ferg-Cadima, Acting Deputy Assistant Secretary for Policy, Office for Civil Rights at the Department of Education dated January 7, 2015; and
>
> - Dear Colleague Letter on Transgender Students jointly issued by the Civil Rights Division of the Department of Justice and the Department of Education dated May 13, 2016.

(Fed. Defs.' Notice to Court Attach., ECF No. 165-1.)

125. That letter stated as follows:

a. "These guidance documents take the position that the prohibitions on discrimination 'on the basis of sex' in Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 et seq., and its implementing regulations, see, e.g., 34 C.F.R. § 106.33, require access to sex-segregated facilities based on gender identity." (*Id.* at 2 of 3.)

b. "[T]he Department of Education and the Department of Justice have decided to withdraw and rescind the above-referenced guidance documents . . . ." (*Id.*)

c. "The Departments thus will not rely on the views expressed within them." (*Id.*)

126.   In a letter dated June 7, 2017, OCR terminated the resolution agreement that had been entered into between OCR and the District on December 2, 2015.

127.   After the U.S. Department of Education rescinded its 2016 Dear Colleague Letter and the earlier Ferg-Cadima letter, repudiated further reliance upon the positions expressed in those letters, and terminated the resolution agreement with the District, plaintiffs voluntarily dismissed the federal defendants from the instant lawsuit. (Pls.' Notice Voluntary Dismissal, ECF No. 178; Min. Entry Dismiss Fed. Def.s Without Prej., ECF No. 179.)

128.   In February, 2018 the OCR announced that it would not process Title IX discrimination claims arising from a professed transgender student seeking access to opposite sex privacy facilities.

129.   Currently there is no federal or state authority that obligates the District to authorize students of one sex to access the multi-user privacy facilities of the other sex so as to affirm a student's claimed gender.

### _How the Compelled Affirmation Policy operates._

130.   Under the Compelled Affirmation Policy, the District may affirm a student who claims a gender discordant with his or her sex via such official acts as

  a.   Using the student's preferred name(s);

  b.   Using the student's preferred pronouns;

  c.   Changing at least some school records to report the student's claimed gender in lieu of the student's sex;

d.   Permitting the student to dress in accord with the student's claimed gender;

e.   Instructing District staff to use the student's preferred names and pronouns;

f.   Instructing other District students to use the student's preferred names and pronouns;

g.   Authorizing access to multi-user restrooms in accord with the student's claimed gender rather than the student's sex;

h.   Authorizing access to multi-user locker rooms in accord with the student's claimed gender rather than the student's sex, subject to the student agreeing to take additional privacy measures—such as changing in a screened area or within a stall enclosure—while in the multi-user facility;

i.   In some cases, authorizing unrestricted access to a multi-user locker room in accord with the student's claimed gender rather than their sex; and

j.   Authorizing a student to room with one or more students of the other sex while engaged in authorized school activities involving overnight travel, contingent upon some element of parental consent to the arrangement.

131.  In respect to the overnight arrangements described in ¶ 130(j), the District disclaims any obligation to ascertain the sexes of any particular student involved in the rooming arrangement.

132.  In respect to the overnight arrangements described in ¶ 130(j), the District disclaims any obligation to notify any of the parents of the sexes of the students involved in the arrangement.

133.  In respect to the overnight arrangements described in ¶ 130(j), the District disclaims any obligation to notify any of the students of the sexes of the other students involved in the arrangement.

134.  The District may or may not provide all forms of affirmation to a particular student, but typically affirms the student in the manner a student requests of the District.

135.  Some or all of the methods described in ¶¶ 130(a)-(j) have been used in various combinations by the District to affirm students' claimed genders.

136.  Affirming a student's claimed gender under the Compelled Affirmation Policy requires the active participation and cooperation of third parties, including the SPP Students.

137.  Pursuant to the Compelled Affirmation Policy, the District may direct other students to endorse or conform to actions taken by the District to affirm a particular student's claimed gender.

138.  The District disclaims any duty or authority to notify any student of another student's claimed gender.

26

139.    The District disclaims any duty or authority to notify any student using a multi-user privacy facility that a student of the other sex has been authorized to access that facility.

140.    A student who claims a feminine or masculine gender may exhibit some set of behaviors and appearances reflecting the claimed gender, but the District does not require a student to present in any particular way as a condition of accessing a multi-user privacy facility reserved to the use of a single sex, when that student is seeking affirmation of his or her gender.

141.    The sole dispositive criterion upon which the District relies to determine a student's gender is what that student declares his or her gender to be.

142.    Unless the District has some legitimate basis to suspect a student's declaration of gender is fraudulent or motivated by improper purposes (e.g., voyeurism), it would not challenge a student's claimed gender.

143.    Other than reliance on a student's declaration of the student's gender, the District has no objective criteria by which it may determine the gender of a student.

144.    Under the Compelled Affirmation Policy a student may request access to a multi-user privacy facility that accords with the student's claimed gender, or that accords with the student's sex, regardless of whether the student manifests behaviors or appearances characteristic of the gender that the student claims.

145.    Once a student requests access to an opposite-sex privacy facility based upon that student's claimed gender, under the Compelled Affirmation Policy the District will authorize that access.

146.    The Compelled Affirmation Policy applies to all enrolled students on all District campuses.

147.    The Compelled Affirmation Policy applies to all visiting students on all District campuses.

148.    The Compelled Affirmation Policy applies to all lawful visitors to all District campuses.

149.    The Compelled Affirmation Policy applies to all District staff.

150.    Currently, there are male students who claim a feminine gender at one or more schools in the District.

151.    Currently, there are female students who claim a masculine gender at one or more schools in the District.

152.    During the pendency of this litigation, one or more District students have identified as a non-binary gender or as genderless.

153.    One or more District students have identified as being of one or more different genders over some period of time.[5]

---

[5] This is termed "gender fluidity" which "conveys a wider, more flexible range of gender expression, with interests and behaviors that may even change from day to day. Gender fluid people do not feel confined by restrictive boundaries of stereotypical expectations of women and men. For some people, gender fluidity extends beyond behavior and interests, and actually serves to specifically define their gender identity. In other words, a person may feel they are more female on some days and more male on others, or possibly feel that neither term describes them accurately. Their identity is seen as being gender fluid." Gender

154.    The District does not provide multi-user privacy facilities reserved for the exclusive use of students claiming

      a.    a non-binary gender;

      b.    claiming to be genderless; or

      c.    claiming to be gender fluid.

155.    Upon information and belief, one or more students of one sex are or were authorized access to multi-user locker rooms reserved to the use of the other sex based upon those students' claimed genders, without availing themselves of additional privacy measures pursuant to the Compelled Affirmation Policy or its predecessor policies.

156.    Upon information and belief, one or more students of one sex are or were authorized under the Compelled Affirmation Policy or its predecessor policies to access multi-user restrooms reserved to the use of the other sex based upon those students' claimed genders.

157.    The Compelled Affirmation Policy authorizes any District student of one sex, who claims a gender identity of the other sex, to access a group shower facility reserved to the use of the other sex.

158.    The District takes the position that a male student who claims a feminine gender is a member of the female sex.

------

Diversity, *Gender Terminology*, November 25, 2014, www.nwais.org/uploaded/conferences/Gender_Identity/GD_Terminology_2014.pdf.

159.    The District takes the position that a male student who claims a feminine gender is legally indistinguishable from any member of the female sex.

160.    The District takes the position that a female student who claims a masculine gender is a member of the male sex.

161.    The District takes the position that a female student who claims a masculine gender is legally indistinguishable from any member of the male sex.

162.    The District takes the position that for a person whose sex and gender align with one another, then that person's primary sex characteristics serve as a proxy for assigning his or her sex based upon his or her gender identity.

163.    The District has, through various announcements to its students, conveyed that a student's objection to the Compelled Affirmation Policy implies intolerance or even bigotry on behalf of the objector.

164.    The District has, through various public meetings, conveyed that objections to the Compelled Affirmation Policy imply intolerance or even bigotry on behalf of the objector.

165.    The Compelled Affirmation Policy is particularly likely to cause emotional and psychological trauma to female students who have been sexually assaulted, and for whom the presence of a male in their privacy facilities is likely terrifying and may result in further psychological trauma.

166.    The Centers for Disease Control and Prevention (the "CDC") has observed that some 10.3% of high school girls reported that they had already suffered forced intercourse. Laura Kann, et al., CDC, *Youth Risk Behavior Surveillance —*

*United States, 2015*, 65 Morbidity & Mortality Wkly. Rep. Surveillance Summs. No. SS-6, 1 (June 10, 2016), https://www.cdc.gov/healthyyouth/data/yrbs/pdf/2015/ss6506_updated.pdf.

167.   This means that more than one out of every ten high school girls has likely suffered sexual assault.

***Risks to student's privacy in locker rooms generally.***

168.   All District high schools have PE locker rooms restricted to the exclusive use of one sex or the other.

169.   Completing PE is a requirement to graduate, excepting situations where the District may have waived the requirement for a student.

170.   A PE class is a mandatory daily class for all four years of school in the District.

171.   It is normative for PE students to change into PE clothes within their respective single-sex locker rooms.

172.   Females changing for PE, gymnastics, and other sports activities sometimes change into sports bras during which time their breasts may be fully exposed.

173.   Students changing for swim class may be fully nude while changing to or from their swimsuits.

174.   Some girls showering after swim class turn down the top of their swimsuits while rinsing off, during which time their breasts may be fully exposed.

175.   As described in ¶¶ 163-164, the District's thematic message delivered to students was that objections to sharing a multi-user privacy facility with a person of

the opposite sex, who was authorized to access that facility under the Compelled Affirmation Policy, imply bigotry, ignorance, and a lack of education on behalf of the objector.

176.    Because of the District's message that differing views will not be tolerated, few SPP Students have sought to use a single-user privacy facility, lest they be viewed as bigoted, ignorant, or uneducated.

177.    SPP Girls and SPP Boys have been denied their reasonable expectation of privacy from the opposite sex consequent to the Compelled Affirmation Policy, and are daily at risk of having their multi-user privacy facilities compromised by an opposite-sex student accessing the facility.

### *Privacy risks related to restroom use.*

178.    District students have a reasonable expectation of privacy from the opposite sex within a multi-user restroom whether they are in the common area of a restroom, using a urinal, or using a commode stall.

179.    In male facilities, wall-mounted urinals increase the risk of exposure of genitalia to other users of multi-user privacy facilities as compared to a commode stall.

180.    Using a commode stall does not provide full privacy, as in both the boys' and girls' restrooms, there are gaps above and below the stall doors, and gaps along the sides of the door allowing those outside the stall to see into the stall, whether purposefully or inadvertently. Thus, there is an ongoing risk of unconsented exposure to the other sex when the stall occupant is fully or partially disrobed and/or conducting personal hygiene.

181. Commode stalls enclose commodes and are inherently less suitable for changing than a dedicated changing stall: commode stalls are less sanitary, more cramped (posing physical safety risks), and have a built-in water hazard that may soak clothing or swallow dropped personal items.

182. Even when using a commode or changing stall within a multi-user privacy facility, a District student retains their reasonable expectation of privacy that a member of the opposite sex will not enter that facility.

## ALLEGATIONS OF LAW

183. Defendant District is responsible for the adoption, implementation, and enforcement of its Compelled Affirmation Policy and its predecessor policies within its schools.

184. Defendant District is responsible for the enforcement of its policies by its Superintendent, administrators, teachers, and other of its agents and employees.

185. The District has authority to terminate or amend the Compelled Affirmation Policy.

186. No federal law obligates the District to maintain the Compelled Affirmation Policy insofar as it regulates access to multi-user privacy facilities.

187. No state law obligates the District to maintain the Compelled Affirmation Policy insofar as it regulates access to multi-user privacy facilities.

188. Despite being on notice of the harassing environment and aware of specific instances of harassment, the District has not amended the Compelled Affirmation Policy to eliminate the harassing environment.

## FIRST CAUSE OF ACTION:
## VIOLATION OF TITLE IX

189.  Plaintiffs reallege all matters set forth in paragraphs 1 through 188 and incorporate them herein.

190.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

191.  Title IX implementing regulations further explain in relevant part that "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular . . . or other education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.31(a).

192.  The District receives federal funding that brings it under the coverage of Title IX.

193.  The provision of privacy facilities to protect students' reasonable expectation of privacy from the opposite sex is one of the District's educational programs, activities, benefits, or services.

194.  For the Fiscal Year beginning July 1, 2017 and ending June 30, 2018, the District was budgeted to receive approximately $6,955,000 in federal aid.

195.  Courts have given Title IX broad effect in order to combat sex discrimination in the educational setting.

196.    There is a private cause of action against the District available under Title IX.

197.    There is no requirement that a claimant exhaust administrative remedies before bringing a Title IX cause of action.

198.    The Title IX implementing regulations provide that

> a [funding] recipient shall not, on the basis of sex: 1) Treat one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; 2) Provide different aid, benefits, or services or provide aid, benefits, or services in a different manner; 3) Deny any person any such aid, benefit, or service; 4) Subject any person to separate or different rules of behavior, sanctions, or other treatment; . . . [or] 7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.

34 C.F.R. § 106.31(b).

199.    Title IX states that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes[,]" 20 U.S.C. § 1686, indicating that Congress intended that Title IX should respect student privacy rights, and not violate them by compelling introduction of students of one sex into private areas designated for one sex.

200.    Title IX's implementing regulations authorize schools to "provide separate toilet, locker room, and shower facilities on the basis of sex, [as long as] such facilities provided for students of one sex [are] comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

201.    Federal regulation 34 C.F.R. § 106.33 does not authorize the District to maintain separate multi-user privacy facilities for each gender.

35

202.    Federal regulation 34 C.F.R. § 106.33 does not authorize the District to regulate access to multi-user privacy facilities based upon a student's gender.

203.    Federal regulation 34 C.F.R. § 106.33 authorizes the District to regulate access to multi-user privacy facilities based upon a student's sex.

204.    Similarly, Illinois permits the District to discriminate on the basis of sex in multi-user privacy facilities by expressly exempting distinctly private facilities from coverage by its Illinois Human Rights Act (IHRA).[6]

205.    The foregoing statutory and regulatory provisions are consistent with the holding in *United States v. Virginia*, 518 U.S. 515 (1996), in which the Supreme Court instructed that while the two sexes may be appropriately integrated within a student body, it is "undoubtedly . . . necessary to afford members of each sex privacy from the other sex in living arrangements. . . ." *Id*. at 550 n.19.

206.    The term "sex" in Title IX and its implementing regulations means male or female, as grounded in the fact that humans reproduce sexually.

207.    Sexual reproduction in humans requires a male and a female to each contribute their sex-specific gametes to form a zygote.

208.    The Compelled Affirmation Policy violates Title IX because it creates ongoing risks, and has resulted in actual instances, of exposure to the other sex within multi-user facilities reserved for either male or female use.

---

[6] The IHRA deems public schools to be public accommodations at 775 ILCS 5/5-101(A)(11) and requires that schools not deny access to facilities under 775 ILCS 5/5-102.2. While the IHRA expressly protects gender identity under sections 775 ILCS 5/1-102(A) and 775 ILCS 5/1-103(O-1), distinctly private facilities such as the locker rooms, rest rooms, and showers are expressly excluded from coverage by the IHRA. 775 ILCS 5/5-103(B).

209. The elements of a Title IX claim are

    a.    plaintiff belongs to a protected group;

    b.    plaintiff was subjected to harassment;

    c.    the harassment was based on sex;

    d.    the harassment was so pervasive, or alternatively is so severe, that it altered the conditions of plaintiff's education; and

    e.    knowledge of the harassment by school officials.

210. The SPP Students satisfy all five elements.

### *SPP Students are a protected group.*

211. The SPP Students belong to a protected group because they are students at an educational institution that receives federal financial assistance.

### *SPP Students were and are being harassed.*

212. The SPP Students are subjected to harassment because the Compelled Affirmation Policy authorizes males to use female multi-user privacy facilities and females to use male multi-user privacy facilities. The risk and actual instances of exposure to the opposite sex within multi-user privacy facilities cause embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity in SPP members who access the facility for the lawful purpose of protecting their privacy from the opposite sex.

213. The Compelled Affirmation Policy violates the SPP Students' reasonable expectation of privacy from the opposite sex in all District multi-user privacy facilities.

214. The following are some of the impacts on SPP Students:

    a.    Pursuant to the Locker Room Agreement, Student A gained access to all Fremd girls' locker rooms: the PE locker room near the main gymnasium; the gymnastics locker room (which also served other sports); and the swim locker room near the pool.

    b.    One female student, who had been previously sexually assaulted, was initially exposed to Student A's genitalia within a girls' locker room in January, 2014.

    c.    Despite notice of the initial incident and subsequent events, the District failed to properly investigate or remediate the situation.

    d.    The initial exposure, and subsequent similar incidents, traumatized the girl, who committed suicide in 2017.

    e.    The Fremd girls' PE locker room is long and rectangular, with banks of lockers in the middle and along its periphery.

    f.    Approximately 130 PE students change for each PE class, about 65 of whom are girls.

    g.    Students are allocated approximately 5 minutes of PE class time to change before and after class, in addition to the 5 minutes that are allowed between classes.

h.    During Student A's tenure in the Fremd girls' locker room under the Locker Room Agreement, one SPP Girl began wearing her gym clothes underneath her regular clothes to avoid actually undressing in the locker room—which left her wearing soiled, sweaty gym clothes underneath her regular clothes for the balance of the day.

i.    During Student A's tenure in the Fremd PE locker room under the Locker Room Agreement, one SPP Girl sought privacy by using one of five available changing stalls.

j.    While using the stall, other girls in the locker room began calling her names such as "transphobic" and "homophobic."

k.    She was thereafter harassed in the hallways as other students yelled derogatory slang words for female body parts at her, and accused her of being transphobic or homophobic.

l.    Intimidated by this experience, she has not tried to use a changing stall again, but rather resorted to wearing gym clothes underneath her regular clothes as described above.

m.    Word of the incident spread, and few students will brave the risk of such harassment to use the changing stalls.

n.    Even absent harassment for using the changing stalls, the stalls are not adequate alternatives to protect privacy to the PE locker room.

o.  There are too few changing stalls to provide privacy for all of the girls who are changing clothes before and after gym class.

p.  The stalls are located within the room's common area where dozens of girls will be changing their clothes before or after PE class. Therefore, if a female-identifying male student is in the common area, a female desiring to use a stall will have to pass through the area where the male is changing, and the reverse would be true: a male student seeking to access a stall would have to walk through the roomful of girls in various states of undress.

q.  The stall doors have gaps above and below them, with additional gaps along the sides of the door. These gaps render the stall less than fully private from viewing, or being viewed by, other students.

r.  The girls' gymnastic locker room at Fremd is small and open, with a few banks of lockers and an open shower area with two gang shower poles.

s.  Girls in the Fremd girls' gymnastic locker room must change in the open, within view of one another.

t.  There are no changing stalls in the girls' gymnastic locker room.

u.  SPP Girls who take part in gymnastics must strip down to change into leotards, which at times results in exposing undergarments or intimate parts to others in the locker room.

v.  The girls' gymnastics locker room is also used by participants in a number of extracurricular activities and sports.

w.  SPP Girls currently participate in some of the extracurricular sports and change in the girls' gymnastic locker room for those activities.

x.  Under the Compelled Affirmation Policy, a male student may gain access to the gymnastic locker room for extracurricular sports.

y.  At least one SPP Girl is currently enrolled in swim class at Fremd.

z.  That student is fearful, uncomfortable, and apprehensive to be changing for swim class; changing clothes for PE class, or attending to feminine hygiene needs in restrooms when a male may be present or enter at any time.

aa.  Swimming is a required part of PE class for District freshman and sophomore students, and junior and senior students may take elective swim classes.

bb.  The Fremd girls' swim locker room consists of a common area with lockers in the middle and mirrors, shelves, dryers, and benches along the periphery of the room.

cc.  There are no private changing stalls in the Fremd girls' swim locker room, so girls changing for swim class or other activities involving the pool must either.

     i.  change into and out of their swimsuits in the common area while their classmates are changing;

     ii.  use the single handicapped accessible shower stall that has a curtain; or

     iii.  change in a commode stall.

dd.  SPP Girls in swimming activities must fully disrobe at some point so as to change into or out of their swimsuits.

ee.  Many girls, including SPP Girls in swim class, shower after swimming.

ff.  When showering after swimming, some girls pull the top half of their bathing suits down to their waists in an effort to rinse off the chlorinated pool water.

gg.  Showering takes place in open showers that are visible to other students in the locker room.

hh.   The District does not prohibit students who are not taking swim class or other swimming activities from accessing the swim locker room.

ii.   While the Locker Room Agreement was in effect, Student A was authorized to access the Fremd girls' swim locker room at any time.

jj.   While the Locker Room Agreement was in effect, some SPP Girls repeatedly encountered Student A when they used the Fremd girls' restrooms, up to four times in a week.

kk.   Using a commode stall does not resolve the privacy issue as set forth in ¶¶ 180-182.

ll.   Consequent to Student A's use of girls' restrooms, some SPP Girls used the girls' restrooms as little as possible to avoid encountering a male in the facility.

mm.   Failing to timely urinate increases the risk of various health conditions including urinary tract infections, dehydration, and constipation in both males and females.

nn.   One or more SPP Girls use the restroom during class time to reduce the risk of encountering a member of the opposite sex in the facility.

oo.    One or more SPP Girls use the restroom during class time to reduce the risk of being tardy entailed by trying to find a male-free facility in the limited time available between classes.

pp.    Similar events are playing out at Palatine High School, where one or more SPP Girls attend and are enrolled in mandatory PE classes that include a required swimming component.

qq.    The SPP Girls use the girls PE locker room to change into gym clothes for PE class, and into swimsuits when swimming is scheduled.

rr.    On November 30, 2017, Nova Maday, an adult male senior student at Palatine who claims a feminine gender, sued the District to gain unrestricted access to the girls' PE locker room.

ss.    Maday was already authorized to access the girls' locker rooms pursuant to the Compelled Affirmation Policy, subject to Maday taking additional privacy measures should he change clothes in the locker room.[7]

---

[7] Although the Compelled Affirmation Policy authorized Maday (aka "N.S.") access to the girls' PE locker room subject to taking some additional privacy measures such as changing behind a screen or in a stall, he unsuccessfully pursued a complaint, *In re N.S., a minor, and Township High School District 211*, Charge No. 2017 CP 0498, with the Illinois Department of Human Rights ("IDHR") to obtain unrestricted access to the Palatine girls' locker rooms. The complaint was denied for lack of evidence to substantiate his claim. *See* Exhibit E (complainant's letter transmitting charge); Exhibit F (Charge of Discrimination filed on behalf of N.S.); Exhibit G (IDHR's Investigation Report); and Exhibit H (IDHR's Notice of Dismissal for Lack of Substantial Evidence). On November 30, 2017, Maday filed *Nova Maday v. Township High School District 211*, No. 17 CH 15791, in the Circuit Court of Cook

tt.   No District policy prohibits Maday from accessing the girls' locker rooms for purposes other than changing clothes.

uu.   One female SPP Student at Palatine participates in after-school sports and regularly uses the girls' PE locker room to change for those activities.

215.   Thus, just as it has at Fremd, the Compelled Affirmation Policy operates to deny girls at Palatine their reasonable expectation of privacy from the opposite sex and they are at constant risk of opposite-sex students entering their multi-user privacy facilities.

216.   The consequence of the foregoing impacts resulting from the District enforcing the Compelled Affirmation Policy is that SPP Girls at Palatine suffer embarrassment, humiliation, anxiety, fear, apprehension, stress degradation, and loss of dignity.

217.   In respect to sexual harassment, District Board Policy JFJK/GBMB Prohibition of Sexual Harassment (last revised Nov. 12, 1998) states that

> [a]lthough harassment may take many different forms, examples include name-calling and other derogatory comments, jokes, gestures, posting or distribution of derogatory pictures, notes or graffiti and pushing or hitting or other forms of physical aggression. Sexual harassment may also include persistent

---

County, Illinois, Chancery Division. In that suit, Maday raised a single claim of gender identity discrimination under the Illinois Human Rights Act ("IHRA"), and again demands unrestricted access to the girls' locker rooms. Exhibit I (Maday Complaint). Upon learning of the Maday Complaint, SPP successfully moved to intervene and lodged a motion to dismiss because distinctly private facilities such as the girls' locker room are excluded from coverage by the IHRA. Exhibit J (Maday MTD). On January 25, 2018, the Cook County Circuit Court denied Maday's motion for a preliminary injunction, holding that the IHRA did not mandate "full and equal" access in the context of privacy facilities. Exhibit K (MPI Order). SPP's motion to dismiss is pending, with a status conference scheduled for February 22, 2018.

unwelcome attempts to interact with someone, spreading of rumors of a sexual nature, and aggressive physical contact such as kissing, touching, or pulling at clothes in a sexual way.

The terms "intimidating", "hostile", or "offensive" include, but are not limited to, conduct which has the effect of humiliation, embarrassment or discomfort.

218.    By the District's own standards, the intentional violation of SPP Students' reasonable expectation of privacy; the constant and continuing risk of opposite-sex exposure; the intimidation of SPP Students by third parties when they attempted to protect their privacy; and the repeated instances of exposure to members of the opposite sex within their multi-user privacy facilities results in sexual harassment of SPP Students.

219.    Rather than protect the SPP Students' reasonable expectation of privacy from the opposite sex, District officials instead direct SPP Students to leave the facility if they wish to have their privacy protected.

220.    By being directed to leave the facility to protect their privacy, the District is violating the unconstitutional conditions doctrine and engaging in retaliation.

221.    The foregoing facts establish sexual harassment and a hostile sexual environment under Title IX.

### ***The harassment is based on SPP Students' sex.***

222.    The harassment is based on sex:

a.    The reason that a female student who claims a masculine gender (i.e., asserts that she is male) pursues access to a male privacy facility is to affirm that student's claimed gender.

b.   For that female student, accessing a female privacy facility would not affirm the student's claimed gender.

c.   The reason that a male student who claims a feminine gender (i.e., asserts that he is female) pursues access to a female privacy facility is to affirm that student's claimed gender.

d.   For that male student, accessing a male privacy facility would not affirm the student's claimed gender.

223.   Therefore, the District targets a multi-user privacy facility for access by the opposite sex under the Compelled Affirmation Policy specifically because of the sex of the students who normally use the facility, i.e., but for the fact that females use girls' facilities, the District would not authorize a male access under the Compelled Affirmation Policy to affirm his claimed feminine gender.

### *The harassment is pervasive.*

224.   SPP Students are subjected to the Compelled Affirmation Policy at all times that they are on campus or otherwise under the authority of the District.

225.   SPP Students no longer have a protected reasonable expectation of privacy from the opposite sex in any multi-user privacy facility within the District.

226.   Prior to the District adopting the Locker Room Agreement, Student A was able to enter girls' locker rooms without being challenged by District staff upon his entry to the facility.

227.   The District refuses to provide any warning to SPP Students that a member of one sex has been authorized to access the multi-user privacy facilities of

the other sex, nor will it warn SPP Students when such a person enters the privacy areas.

228.   The District refuses to take any action to protect the SPP Students' reasonable expectation of privacy from the opposite sex within multi-user privacy facilities other than telling the SPP Students that they should seek alternative facilities to preserve their privacy.

### ***The harassment is severe.***

229.   The factors that demonstrate pervasiveness also demonstrate the severity of the harassment: despite state and federal law establishing facilities to respect the real physical differences between the sexes resulting from a person's sexual reproductive capacity as a male or a female, SPP Students have no safe haven for privacy unless they waive their constitutional bodily privacy rights and risk the exposure to the opposite sex within a multi-user privacy facility, or abandon the very facility lawfully provided to protect their privacy from the opposite sex.

230.   This is despite the District admitting that the anatomical differences between boys and girls are the reason for sex-separated facilities when students change or shower in open areas. Exhibit L (Email from Daniel E. Cates, Superintendent, Township High School District 211, to District listserv, *District Response to Office of Civil Rights* (Nov. 2, 2015, 17:57 EST.); *see also supra* at ¶¶ 83, 88 (District's defense of students' bodily privacy).

231.   What is seen cannot be unseen: while monetary damages might redress the embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity that students suffer when unconsented cross-sex exposure is not

only a constant risk but becomes a reality, nothing can reverse the psychological impacts of adolescents being exposed to members of the opposite sex in a state of undress or when conducting extremely personal hygiene matters.

232. A female's bodily privacy is hers and hers alone. Unconsented exposure to the opposite sex within privacy facilities is not mitigated by what that member of the opposite sex is thinking.

233. A male's bodily privacy is his and his alone. Unconsented exposure to the opposite sex within privacy facilities is not mitigated by what that member of the opposite sex is thinking.

234. A person's perception of his or her gender does not in itself alter his or her primary or secondary sex characteristics.

235. A person's state of mind cannot alter his or her genetic complement.

236. Although authorized by law to do so, the District not only fails to protect the privacy of SPP Students under Title IX, but rather intentionally violates Title IX by creating and enforcing its Compelled Affirmation Policy.

237. SPP Students thus are forced to abandon multi-user privacy facilities that are lawfully provided for protecting their privacy, or waive their fundamental bodily privacy rights as the condition of using those facilities.

238. Under Title IX case law, the victim of sexual harassment is not obligated to self-cure the situation by foregoing educational rights and benefits, or altering the terms of the students' education.

239.   When SPP Students have sought to preserve their privacy by seeking alternate facilities, they have been harassed by other students using terms that characterize the SPP Students as being transphobic or bigoted.

240.   SPP Students have lost instructional time because the safest option some have found is to ask to use the restroom during class time rather than during scheduled breaks, so as to minimize the risk of being exposed to the opposite sex consequent to the Compelled Affirmation Policy.

241.   The foregoing factors demonstrate that the harassment is sufficiently severe and pervasive so as to violate Title IX.

### *Officials are on notice of the harassment.*

242.   Prior to and during the development of the Compelled Affirmation Policy, SPP Students notified District officials that privacy violations would result from intermingling the sexes in multi-user privacy facilities.

243.   District officials have admitted that authorizing students of one sex to access multi-user privacy facilities of the other sex would infringe upon the constitutional right to bodily privacy.

244.   Some SPP Parents have directly notified school officials of the privacy violations and sought assurances that their children would be provided protection for their privacy.

245.   Prior to the Locker Room Agreement taking effect, some District students and at least one parent notified the District that Student A was accessing girls' locker rooms. (V.W. Decl. Supp. Pls.' Mot. Prelim. Inj. Ex. 8, ECF No. 21-10 at 8 of 15.)

246.    Ms. Wilson recounted the substance of the events leading to the suicide of the Fremd female student and identified the risks of opposite-sex access to multi-user privacy facilities in a public school board meeting in January, 2016.

247.    Whereas notice may be an issue in cases where students violate school policies to engage in student-on-student sexual harassment, in this instance the sexually harassing conduct among students results directly from the District intentionally designing the hostile environment and authorizing the harassing conduct.

248.    SPP Students therefore satisfy every element of a Title IX violation.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

**SECOND CAUSE OF ACTION:**
**VIOLATION OF THE FUNDAMENTAL RIGHT TO PRIVACY**

249.    Plaintiffs reallege all matters set forth in paragraphs 1 through 248 and incorporate them herein.

250.    Fundamental rights are grounded in the Fourteenth Amendment's Due Process Clause.

251.    They are rights that are deeply rooted in this Nation's history and tradition and are implicit in the concept of ordered liberty.

252.    Included within those rights is the right to privacy in one's fully or partially unclothed body.

253.    The right to privacy also encompasses the right to be free from government-enforced, unconsented risk of cross-sex exposure when either sex is partially or fully unclothed.

254.    The right to be free from government-enforced, unconsented risk of cross-sex exposure when either sex is partially or fully unclothed is deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty.

255.    Throughout its history, American law and society has had a national commitment to protecting citizens, and especially children, from unconsented exposure involving partial or full nudity of either sex, and protecting them when they are conducting personal hygiene.

256.    Because of that national commitment, sex-specific restrooms and locker rooms are ubiquitous in public places.

257.    Sex-separated privacy facilities are the norm in Illinois public schools.

258.    The ability to be clothed in the presence of the opposite sex, along with the freedom to use the restroom and locker room away from the presence of the opposite sex, is fundamental to most people's sense of self-respect and personal dignity.

259.    The government may not infringe fundamental rights, unless the infringement satisfies strict scrutiny review, which requires that the government demonstrate that the law or regulation furthers a compelling government interest in the least restrictive means available.

260.    The Compelled Affirmation Policy authorizes male students who claim a feminine gender to access female restrooms.

261.    The Compelled Affirmation Policy authorizes female students who claim a masculine gender to access male restrooms.

262.    The Compelled Affirmation Policy requires the SPP Students to risk being exposed to those of the opposite sex in multi-user privacy facilities, where students are necessarily disrobing for various classes or activities and may be nude or semi-nude, absent the SPP Students' consent.

263.    The Compelled Affirmation Policy violates the SPP Students' reasonable expectation of privacy from the opposite sex within multi-user privacy facilities.

264.    The Compelled Affirmation Policy infringes the SPP Students' fundamental right to privacy in their unclothed bodies, as well as their fundamental right to be free from government-compelled risk of being exposed to unclothed members of the opposite sex, without any compelling justification.

265.    The District has no compelling government interest in using its privacy facilities to affirm an individual student's state of mind regarding that student's gender.

266.    The District has no compelling government interest in intermingling the sexes within privacy facilities lawfully established specifically to protect students' reasonable expectation of privacy from the opposite sex.

267.    The District has not used the least restrictive means of serving any interest they may have in intermingling the sexes within multi-user privacy facilities.

268.    Accordingly, the Compelled Affirmation Policy fails the required strict scrutiny review and is unconstitutional as applied to any student, including the SPP Students.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## THIRD CAUSE OF ACTION:
## VIOLATION OF PARENTS' FUNDAMENTAL RIGHT TO DIRECT THE EDUCATION AND UPBRINGING OF THEIR CHILDREN

269.    Plaintiffs reallege all matters set forth in paragraphs 1 through 268 and incorporate them herein.

270.    The right of parents to make decisions concerning the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment's Due Process Clause.

271.    Included within that fundamental parental right is the power to direct the education and upbringing of one's children.

272.    Parents hold a fundamental right to instill moral standards and values in their children.

273.    Parents' right to instill moral standards and values in their children, and to direct their education and upbringing, encompasses the right to determine whether, and when, their minor children endure the risk of being exposed to members of the opposite sex in privacy facilities.

274.    Parents have a fundamental right to determine whether their children will have to risk being exposed to the undressed or partially clothed bodies of the opposite sex while at school, and a fundamental right to determine whether their

children, while at school, will have to risk exposing their own undressed or partially unclothed bodies to members of the opposite sex.

275.    The District lacks authority under the *in loco parentis* doctrine to decide when to put children under its care at risk of unconsented exposure to the opposite sex when either sex is fully or partially unclothed or is conducting personal hygiene.

276.    All SPP Parents adamantly and conscientiously hold moral objections to their children using multi-user privacy facilities when a member of the other sex is present within the facility.

277.    All SPP Parents do not want their children to view a student of the other sex while that student is in a state of undress.

278.    All SPP Parents do not want their children's bodies to be exposed to a student of the other sex while naked or otherwise in a state of undress, nor do they want their children to attend to their personal hygiene in the presence of the other sex while their children are under the District's control.

279.    When some SPP Parents requested a private locker room facility for their daughters, the Fremd Principal told them that their daughters could use the stalls in the PE locker room, the swimming or athletic locker rooms, or the nurses' office.

280.    None of these were or are acceptable alternatives:

    a.    Commode stalls are not an adequate alternative as set forth at ¶¶ 180-182.

     b.    The changing stalls in the PE locker room are not an adequate alternative as set forth at ¶¶ 214(n)-(q).

     c.    The swimming and gymnastics locker rooms are not adequate alternatives because Student A was authorized to access them at all times, and any male student who claims a feminine gender currently may access them at any time, including when the SPP Girls use them to change clothes.

     d.    Even were the swim or gymnastics locker rooms viable alternatives (i.e., off limits to males), in which girls could change for PE class, SPP Girls would have to go pick up their gym clothes from the PE locker room, retire to the alternative facility (each of which is some distance away), then return to the PE locker room, drop off their regular clothes, attend class, then repeat the process in reverse at the end of class.

281.   In response to the request for a private restroom facility, the Fremd Principal told some SPP Parents that if their daughters walk into a multi-user restroom when a male student is present, their daughters' option is to leave the facility and use a different restroom in the school.

282.   This suggested solution is not acceptable for several reasons:

     a.    It obligates the students to self-cure the District's intentional intermingling of the sexes within a facility that is reserved for the use of girls under state and federal law.

    b.    Seeking an alternative facility is not feasible when a male enters the restroom after a girl has already begun using the facility, a situation that is exacerbated because the District refuses to give any advance notice that a male student has been authorized to access the facility.

    c.    Similarly, a girl who urgently needs to use the facility may not have time to reach a single-user facility, even if it is nearby.

    d.    In some instances, even were a girl to seek a single-user facility, some restrooms are so distant from an alternative facility that SPP Girls could not access the facility within the five minutes allowed between classes.

    e.    At Fremd the issue is exacerbated in the music wing and applied technology wing, as both wings lack restrooms.

283.   SPP Boys are at no less risk of having their reasonable expectation of privacy violated by the District enforcing the Compelled Affirmation Policy: as with SPP Girls, a member of the opposite sex can appear at any time, on any campus, in any multi-user privacy facility that is lawfully reserved to male use only.

284.   Because of the Compelled Affirmation Policy, at least one SPP Parent sent his daughter to private school, instead of a District school, after she had attended Fremd in the 2016-17 school year.

285.    The Compelled Affirmation Policy, instituted and enforced by the Defendants, make it impossible for the SPP Parents to direct the upbringing and education of their children.

286.    Accordingly, the Compelled Affirmation Policy infringes the SPP Parents' fundamental right to direct the education and upbringing of their children.

287.    Defendants may not infringe fundamental rights, including parents' fundamental right to direct the education and upbringing of their children, unless the infringement satisfies strict scrutiny review, which requires that Defendants demonstrate that the law or regulation furthers a compelling government interest in the least restrictive manner available.

288.    The District has no compelling government interest in using its privacy facilities to affirm an individual student's state of mind regarding that student's gender.

289.    The District has no compelling government interest in intermingling the sexes within privacy facilities lawfully established specifically to protect students' reasonable expectation of privacy from the opposite sex.

290.    The District has not used the least restrictive means of serving any legal interest they may have.

291.    Accordingly, the Compelled Affirmation Policy fails strict scrutiny review and is an unconstitutional infringement on parents' fundamental right to direct the education and upbringing of their children.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## FOURTH CAUSE OF ACTION:
### VIOLATION OF THE
### ILLINOIS RELIGIOUS FREEDOM RESTORATION ACT

292.    Plaintiffs reallege all matters set forth in paragraphs 1 through 291 and incorporate them herein.

293.    The Illinois Religious Freedom Restoration Act ("RFRA") provides in pertinent part:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 ILCS 35/15.

294.    Many of the SPP Students hold strong religious tenets to practice personal modesty. These students have the sincere religious belief that they must not undress, or use the restroom, in the presence of the opposite sex, and also that they must not be in the presence of the opposite sex while the opposite sex is undressing or using the restroom.

295.    Many of the SPP Parents have the sincere religious belief that they must teach their children to practice modesty in respect to the opposite sex. Their religious faith also requires them to protect the modesty of their children. These parents have the sincere religious belief that their children must not undress, or use the restroom, in the presence of a member of the opposite sex, and that they must not be in the

presence of the opposite sex while the opposite sex is undressing or using the restroom.

296.   The Compelled Affirmation Policy prevents the SPP Students from practicing the modesty that their faith requires of them.

297.   The Compelled Affirmation Policy contradicts the SPP Parents' sincerely-held religious beliefs relative to teaching their children sexual modesty consistent with their religious beliefs.

298.   The Compelled Affirmation Policy inhibits the SPP Parents' ability to set standards for their children's behavior in respect to sexual modesty that are consistent with their religious beliefs.

299.   Complying with the requirements of the Compelled Affirmation Policy thus places a substantial burden on the SPP Parents' and Students' exercise of religion.

300.   It is a substantial burden to require SPP Parents and Students to choose between the benefit of a free public education and violating their religious beliefs.

301.   The District has no compelling government interest that would justify burdening the SPP Parents' and Students' exercise of religion in this manner.

302.   Additionally, the District has not used the least restrictive means to achieve its purported interest in burdening the SPP Parents' and Students' exercise of religion in this manner.

303.   The Compelled Affirmation Policy accordingly violates the SPP Parents' and Students' rights under the Illinois Religious Freedom Restoration Act.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

### FIFTH CAUSE OF ACTION:
### VIOLATION OF THE FIRST AMENDMENT'S GUARANTEE OF
### FREE EXERCISE OF RELIGION

304.    Plaintiffs reallege all matters set forth in paragraphs 1 through 303 and incorporate them herein.

305.    The First Amendment provides that Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

306.    The Compelled Affirmation Policy burdens the free exercise rights of some of the SPP Parents and Students. *See supra*, Fourth Cause of Action.

307.    Laws that burden free exercise, but are not neutral or generally applicable, are presumptively unconstitutional under strict scrutiny.

308.    The Compelled Affirmation Policy is not generally applicable because it does not allow all students to use the opposite-sex restrooms, but only students who claim to have a gender discordant with their sex.

309.    The predecessor Restroom Policy was not generally applicable.

310.    The Locker Room Agreement applied only to one student, Student A.

311.    The Locker Room Agreement did not apply to all students, allowing them to access whichever locker or shower rooms they requested.

312.    The Locker Room Agreement did not apply to all students who claim a gender that is discordant with their sex.

61

313.    Because the Compelled Affirmation Policy and its predecessor policies were and are not generally applicable, they are subject to strict scrutiny, which they fail. *See supra*, Second and Third Causes of Action.

314.    Additionally, the Compelled Affirmation Policy is subject to strict scrutiny under hybrid rights principles because it burdens free exercise rights in combination with bodily privacy rights and parental rights and is therefore presumptively unconstitutional under strict scrutiny.

WHEREFORE, Plaintiffs respectfully pray that the Court grant the relief set forth hereinafter in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows and request the following relief:

A.    That this Court enter a declaratory judgment declaring that as applied to Plaintiffs, the Compelled Affirmation Policy violates Title IX by creating a sexually hostile environment and results in sexual harassment; violates the SPP Students' constitutional right to privacy; impermissibly burdens the SPP Parents' constitutional right to direct the upbringing and education of their children; violates the rights of some of the SPP Students and Parents under the Illinois Religious Freedom Restoration Act; and violates the constitutional guarantee to free exercise of religion for some of the SPP Students and Parents under the Free Exercise Clause.

B.    That this Court enter a declaratory judgment declaring that on its face, the Compelled Affirmation Policy violates Title IX by creating a sexually hostile environment and results in sexual harassment; violates the constitutional right to

privacy; impermissibly burdens the SPP Parents' constitutional right to direct the upbringing and education of their children; violates the rights of some of the SPP Students and Parents under the Illinois Religious Freedom Restoration Act; and violates the constitutional guarantee to free exercise of religion for some of the SPP Students and Parents under the Free Exercise Clause.

C.      That this Court permanently enjoin Defendants, their officers, agents, employees, and all other persons acting in concert with them, from enforcing the Compelled Affirmation Policy insofar as it may authorize any student of one sex to access the multi-user privacy facilities of the other sex;

D.      That this Court award nominal damages in the amount of one hundred, thirty-six ($136)[8] dollars for the violation of Plaintiffs' constitutional and statutory rights;

E.      That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders;

F.      That this Court award Plaintiffs costs and expenses of this action, including a reasonable attorneys' fees award, in accordance with 775 ILCS 35/20, 28 U.S.C. § 2412, and 42 U.S.C § 1988;

G.      That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiffs; and

H.      That this Court grant such other and further relief as the Court deems equitable and just in the circumstances.

---

[8] That would equate to a ceremonial award of one dollar to each original SPP member.

Respectfully submitted this 15th day of February, 2018.


|                                          | By: /s/ Gary S. McCaleb                 |
| THOMAS L. BREJCHA, IL 0288446            | GARY S. MCCALEB, AZ 018848*             |
| PETER BREEN, IL 6271981                  | JEANA HALLOCK, AZ 032678*               |
| **THOMAS MORE SOCIETY**                  | **ALLIANCE DEFENDING FREEDOM**          |
| 19 S. La Salle Street, Suite 603         | 15100 N. 90th Street                    |
| Chicago, Illinois 60603                  | Scottsdale, Arizona 85260               |
| (312) 782-1680                           | (480) 444-0020                          |
| (312) 782-1887 Fax                       | (480) 444-0028 Fax                      |
| tbrejcha@thomasmoresociety.org           | gmccaleb@adflegal.org                   |
| pbreen@thomasmoresociety.org             | jhallock@adflegal.org                   |

J. MATTHEW SHARP, GA 607842*
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@adflegal.org

DOUGLAS G. WARDLOW, AZ 032028*
14033 Commerce Avenue NE
#300-310
Prior Lake, Minnesota 55372
(612) 840-8073
dwardlowlaw@gmail.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: /s/ Gary S. McCaleb