## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **STUDENTS AND PARENTS FOR PRIVACY**, a voluntary unincorporated association; and **VICTORIA WILSON**, <br><br> Plaintiffs, <br><br> vs. <br><br> **SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS**, <br><br> Defendants, <br><br> and <br><br> **STUDENTS A**, **B**, and **C**, by and through their parents and legal guardians, **Parents A**, **B**, and **C**, and the **ILLINOIS SAFE SCHOOLS ALLIANCE**, <br><br> Intervenor-Defendants. | **Case No. 1:16-cv-04945** <br><br> **The Honorable Jorge L. Alonso** |

## PLAINTIFFS' RESPONSE TO
## DEFENDANT BOARD OF EDUCATION OF TOWNSHIP HIGH SCHOOL DISTRICT 211'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT
## AND TO
## INTERVENOR-DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

# CONTENTS

INTRODUCTION ........................................................................................................... 1

I.     The legal standard for reviewing a motion to dismiss. ....................................................... 1

II.    Issues common to both Motions to Dismiss ...................................................................... 2

    A.    Sustaining the motion to dismiss would perpetuate Defendants' redefining sex absent any credible or admissible evidence supporting their redefinition. ............. 2

    B.    Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates Title IX. ........................................................................... 3

        1.    The discrimination against Plaintiffs is based on their sex. ........................ 4

        2.    Plaintiffs have alleged facts to plausibly show that they are subjected to sexual harassment that is pervasive or severe, and which alters the terms of their education. ...................................................................................... 5

            a.    Plaintiffs sufficiently pled pervasive discrimination. .................... 5

            b.    Plaintiffs sufficiently pled severe discrimination. .......................... 5

                i.    A reasonable person would objectively perceive a hostile environment when the government intermingles the sexes within a school privacy facility. ......................................... 6

                ii.    Plaintiffs subjectively perceive a hostile environment when the District intermingles the sexes within their privacy facilities. ........................................................................... 8

            c.    Plaintiffs have sufficiently pled that the Compelled Affirmation Policy alters their conditions of education. .................................. 10

    C.    Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates bodily privacy. ........................................................... 11

    D.    Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates 14th Amendment parental rights. ............................... 13

    E.    Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates the IRFRA. ................................................................. 14

F.      Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates the First Amendment's guarantee of the free exercise of religion. ...................................................................................................................... 16

G.      *Whitaker* is a preliminary injunction opinion that does not control this case. ....... 17

       1.      *Whitaker* did not consider Supreme Court authority explaining the Court's holding in *Price Waterhouse*. ................................................................. 17

       2.      *Whitaker* conflicts with *United States v. Virginia,* 518 U.S. 515 (1996) ("*VMI*") by conflating sex with gender. .................................................... 20

       3.      *Whitaker* conflicts with *Frontiero v. Richardson,* 411 U.S. 677 (1973) by rejecting sex as an immutable class established through birth. ................ 21

       4.      *Whitaker* is factually distinguished. ......................................................... 22

III.    Issues unique to District 211's Motion to Dismiss. ......................................................... 23

    A.      SPP has associational standing. ............................................................................ 24

       1.      SPP has members with standing to sue for themselves. ........................... 25

       2.      SPP protects interests germane to its purpose. .......................................... 27

       3.      Neither the claim asserted, nor the relief sought requires SPP to sue in their personal capacity. .............................................................................. 27

    B.      Victoria Wilson has standing to sue as a parent. .................................................. 29

    C.      The deliberate indifference standard is inapplicable to lawsuits seeking equitable relief. .................................................................................................................... 29

CONCLUSION ...................................................................................................................... 30

## TABLE OF AUTHORITIES

*Cases:*

*Adams v. School Board of St. Johns County,*
    No. 3:17−cv−00739 (M.D. Fla. June 28, 2017)....................................................7

*Albrecht v. Metropolitan Pier & Exposition Authority,*
    338 F. Supp. 2d 914 (N.D. Ill. 2004) ..................................................................3

*Armstrong v. Snyder,*
    103 F.R.D. 96 (E.D. Wis. 1984) .........................................................................1

*Ballard v. United States,*
    329 U.S. 187 (1946).........................................................................................20

*Bayer v. Neiman Marcus Group, Inc.,*
    861 F.3d 853 (9th Cir. 2017) ...........................................................................30

*Bell Atlantic Corporation v. Twombly,*
    550 U.S. 544 (2007)...........................................................................................1

*Bell v. City of Chicago,*
    835 F.3d 736 (7th Cir. 2016) .............................................................................1

*Berger v. National Collegiate Athletic Association,*
    843 F.3d 285 (7th Cir. 2016) .............................................................................1

*Board of Education of the Highland Local School District v. United States*
    *Department of Education,*
    208 F. Supp. 3d 850 (S.D. Ohio 2016) .............................................................7

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014).....................................................................................15

*Canedy v. Boardman,*
    16 F.3d 183 (7th Cir. 1994) .............................................................................11

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,*
    494 U.S. 558 (1990).........................................................................................30

*Chicago Regional Council of Carpenters v. Pepper Construction Co.,*
    32 F. Supp. 3d 918 (N.D. Ill. 2014) ....................................................25, 27, 28

*City of Cleburne v. Cleburne Living Center,*
    473 U.S. 432 (1985).........................................................................................21

*City of Philadelphia v. Pennsylvania Human Relations Commission*,
  300 A.2d 97 (Pa. Commw. Ct. 1973) ...............................................................6

*Cornfield by Lewis v. Consolidated High School District No. 230*,
  991 F.2d 1316 (7th Cir. 1993) .......................................................................12

*Diggs v. Snyder*,
  775 N.E.2d 40 (Ill. App. Ct. 2002) ................................................................15

*Disability Rights Wisconsin, Inc. v. Walworth County Board of Supervisors*,
  522 F.3d 796 (7th Cir. 2008) .........................................................................25

*Doe v. Boyertown Area School District*,
  276 F. Supp. 3d 324 (E.D. Pa. 2017) ..............................................................7

*Doe v. Luzerne County*,
  660 F.3d 169 (3d Cir. 2011)......................................................................11, 12

*Employment Division, Department of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990)........................................................................................16

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) .........................................................................26

*Fields v. Palmdale School District*,
  427 F.3d 1197 (9th Circ. 2005)......................................................................14

*Fleischfresser v. Directors of School District 200*,
  15 F.3d 680 (7th Cir. 1994) ...........................................................................15

*Fortner v. Thomas*,
  983 F.2d 1024 (11th Cir. 1993) .....................................................................12

*Franciscan Alliance, Inc. v. Burwell*,
  227 F. Supp. 3d 660 (N.D. Tex. 2016) .............................................................3

*Frazier v. Fairhaven School Committee*,
  122 F. Supp. 2d 104 (D. Mass. 2000) ..............................................................8

*Frederick v. Simpson College*,
  160 F. Supp. 2d 1033 (S.D. Iowa 2001) ...................................................29, 30

*Frontiero v. Richardson*,
  411 U.S. 677 (1973)....................................................................................2, 21

*Gebser v. Lago Vista Independent School District*,
  524 U.S. 274 (1998).......................................................................................29

*Gold v. City of Miami,*
    151 F.3d 1346 (11th Cir. 1998) ...................................................................30

*Gross v. FBL Financial Services, Inc.,*
    557 U.S. 167 (2009)...................................................................................18

*Hendrichsen v. Ball State University,*
    107 F. App'x 680 (7th Cir. 2004)..................................................................5

*Hendricks v. Commonwealth,*
    865 S.W.2d 332 (Ky. 1993)...........................................................................6

*Hopkins v. Baltimore Gas & Electric Co.,*
    77 F.3d 745 (4th Cir. 1996) ...................................................................18, 19

*Hospital Council of Western Pennsylvania v. City of Pittsburgh,*
    949 F.2d 83 (3d Cir. 1991).......................................................................28, 29

*Hunt v. Washington State Apple Advertising Commission,*
    432 U.S. 333 (1977)...................................................................24, 25, 27, 28

*International Union, United Automobile, Aerospace & Agricultural Implement Workers*
    *of America v. Brock,*
    477 U.S. 274 (1986)...................................................................................24

*Joint Anti-Fascist Refugee Committee v. McGrath,*
    341 U.S. 123 (1951)...................................................................................24

*Kenosha Unified School District No. 1 Board of Education v. Whitaker ex rel. Whitaker,*
    138 S. Ct. 1260 (mem) (2018)......................................................................17

*Lee v. Downs,*
    641 F.2d 1117 (4th Cir. 1981) .....................................................................12

*Leebaert v. Harrington,*
    332 F.3d. 134 (2d Cir. 2003).......................................................................14

*Lewis v. Triborough Bridge & Tunnel Auth.,*
    31 F. App'x 746 (2d Cir. 2002) .....................................................................9

*Local 194, Retail, Wholesale & Department Store Union v. Standard Brands, Inc.,*
    540 F.2d 864 (7th Cir.1976) ........................................................................28

*Mary M. v. North Lawrence Community School Corp.,*
    131 F.3d 1220 (7th Cir. 1997) ..................................................................4, 10

*McLain v. Board of Education of Georgetown Community Unit School District No. 3 of Vermilion County,*
384 N.E.2d 540 (Ill. App. Ct. 1978) ...................................................................6

*Mission Hills Condominium Association M-1 v. Corley,*
570 F. Supp. 453 (N.D. Ill. 1983) ....................................................................27

*N.K. v. St. Mary's Springs Academy of Fond Du Lac Wisconsin, Inc.,*
965 F. Supp. 2d 1025 (E.D. Wis. 2013) ...........................................................10

*NAACP v. Alabama ex rel. Patterson,*
357 U.S. 449 (1958) ........................................................................................24

*National Office Machine Dealers Association v. Monroe, The Calculator Co.,*
484 F. Supp. 1306 (N.D. Ill. 1980) ..................................................................25

*Norwood v. Dale Maintenance Systems, Inc.,*
590 F. Supp. 1410 (N.D. Ill. 1984) ................................................................8, 9

*Parents for Privacy v. Sessions,*
No. 3:17-cv-01813 (D. Or. Nov. 13, 2017) .......................................................7

*Parker v. Hurley,*
514 F.3d 87 (1st Cir. 2008) .............................................................................16

*Passananti v. Cook County,*
689 F.3d 655 (7th Cir. 2012) .........................................................................8, 9

*Peick v. Pension Benefit Guaranty Corp.,*
724 F.2d 1247 (7th Cir. 1983) .........................................................................24

*People v. Grunau,*
No. H015871, 2009 WL 5149857 (Cal. Ct. App. Dec. 29, 2009) ......................7

*Poe v. Leonard,*
282 F.3d 123 (2d Cir. 2002) ............................................................................11

*Price Waterhouse v. Hopkins,*
490 U.S. 228 (1989) ............................................................................18, 20, 21

*Privacy Matters v. United States Department of Education,*
No. 0:16-cv-03015 (D. Minn. Sept. 7, 2016) ....................................................7

*Reiser v. Residential Funding Corp.,*
380 F.3d 1027 (7th Cir. 2004) .........................................................................17

*Retired Chicago Police Association v. City of Chicago,*
7 F.3d 584 (7th Cir. 1993) ...............................................................................28

*Retired Chicago Police Association v. City of Chicago,*
    76 F.3d 856 (7th Cir. 1996) ...................................................................25

*Reynolds v. CB Sports Bar Inc.,*
    623 F.3d 1143 (7th Cir. 2010) ...................................................................1

*Safford Unified School District No. 1 v. Redding,*
    557 U.S. 364 (2009)...................................................................................12

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)....................................................................................1

*Schonauer v. DCR Entertainment, Inc.,*
    905 P.2d 392 (Wash. Ct. App. 1995).........................................................9

*Smith v. Metropolitan School District Perry Township,*
    128 F.3d 1014 (7th Cir. 1997) ....................................................................9

*Smith v. Northeastern Illinois University,*
    388 F.3d 559 (7th Cir. 2004) .................................................................5, 6

*Southwest Suburban Board of Realtors, Inc. v. Beverly Area Planning Association,*
    830 F.2d 1374 (7th Cir. 1987) ..................................................................27

*Sports Form, Inc. v. United Press International, Inc.,*
    686 F.2d 750 (9th Cir. 1982) ....................................................................17

*St. John's Home for Children v. West Virginia Human Rights Commission,*
    375 S.E.2d 769 (W. Va. 1988)....................................................................6

*State v. Beine,*
    162 S.W.3d 483 (Mo. 2005) .......................................................................6

*State v. Girardier,*
    484 S.W.3d 356 (Mo. Ct. App. 2015).....................................................6, 7

*State v. Lawson,*
    340 P.3d 979 (Wash. Ct. App. 2014).........................................................6

*Troxel v. Granville,*
    530 U.S. 57 (2000).....................................................................................14

*Tuan Anh Nguyen v. Immigration & Naturalization Service,*
    533 U.S. 53 (2001).....................................................................................19

*United States v. Beethoven Associates Limited Partnership,*
    843 F. Supp. 1257 (N.D. Ill. 1994) ..........................................................23

*United States v. Virginia,*
    518 U.S. 515 (1996) ................................................................................16, 20

*University of Texas v. Camenisch,*
    451 U.S. 390 (1981) .........................................................................................17

*Warth v. Seldin,*
    422 U.S. 490 (1975) .................................................................................24, 28

*Washington v. White,*
    231 F. Supp. 2d 71 (D.D.C. 2002) ..................................................................9

*Weber v. Aetna Casualty & Surety Co.,*
    406 U.S. 164 (1972) ...........................................................................................2

*Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education,*
    858 F.3d 1034 (7th Cir. 2017) ..............................................................*passim*

*Wisconsin Right to Life State Political Action Committee v. Barland,*
    664 F.3d 139 (7th Cir. 2011) .........................................................................25

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) .........................................................................................15

*World Outreach Conference Center v. City of Chicago,*
    591 F.3d 531 (7th Cir. 2009) .........................................................................15

*York v. Story,*
    324 F.2d 450 (9th Cir. 1963) .........................................................................12


**Statutes:**

20 U.S.C.A. § 1681 .................................................................................................3, 4

775 Ill. Comp. Stat. Ann. 35/15 .............................................................................14


**Other Authorities:**

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders
    (5th ed. 2013) ....................................................................................................2

Chuck Schilken, *Transgender boy wins Texas girls wrestling championship for the
    second year in a row,* Los Angeles Times (Feb. 26, 2018),
    https://lat.ms/2HJbMwD ................................................................................22

Juana Summers, *Education Department says it is no longer investigating transgender bathroom complaints*, CNN Politics (Feb. 12, 2018), https://www.cnn.com/2018/02/12/politics/education-department-transgender-bathroom-complaints/index.html ........................................................................10

Matthew Conyers, *At Cromwell High, Transgender Athlete Competes With Girls For First Time*, Hartford Courant (Apr. 7, 2017), https://cour.at/2HBBXp5 .........................22

Oxford Dictionary of Biology (7th ed. 2015) ...............................................................3

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, The Washington Post, April 7, 1975 .......................................................................................................7

Ruth Barrett, *Female Erasure: What You Need to Know About Gender Politics' War on Women, the Female Sex and Human Rights* (Tidal Time Publishing, 2016) ...................21

**INTRODUCTION**

This case presents a straightforward question: May Defendant Township High School District 211 lawfully authorize students of one sex to use multi-user privacy facilities reserved for the use of the other sex, when students are disrobing or attending to personal hygiene? Answering that question is equally straightforward so long as one keeps two very different things—sex and gender—distinct. To that end, the First Amended Complaint and this brief refer to "sex" as being either male or female, as grounded in reproductive biology. Sex is binary, fixed at conception, and objectively verifiable. "Gender" is used in the sense that Defendants use it: a malleable, subjectively discerned continuum of genders that range from masculine to feminine to something else. Although gender identity advocates sometimes denote gender as being "male" or "female," we use the terms "masculine" or "feminine" gender to avoid conflating sex with gender, and to avoid conveying the misimpression that gender is binary.

**I.      The legal standard for reviewing a motion to dismiss.**

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is "viewed with marked disfavor," *Armstrong v. Snyder*, 103 F.R.D. 96, 101 (E.D. Wis. 1984), and the court must construe the motion in "the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the party's] favor." *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016) (quoting *Reynolds v. CB Sports Bar Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010)). "Although a party need not plead 'detailed factual allegations' to survive a motion to dismiss, mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 290 (7th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A "well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Bell Atl.*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

1

## II.     Issues common to both Motions to Dismiss.

### A.     Sustaining the motion to dismiss would perpetuate Defendants' redefining sex absent any credible or admissible evidence supporting their redefinition.

Intervenor-Defendants have redefined sex to mean "gender" and not the status of being either male or female as defined by our reproductive system. Intervenor-Defendants classify Student A as "female" when in fact, Student A is male. Mem. of Law in Supp. of Mot. to Intervene as Defs. of Students A, B, and C 2, ECF No. 32 ("Although designated male at birth, Student A is female."); *see also* Mem. of Law in Supp. of Intervenor-Defs.' Mot. to Dismiss First Am. Compl. 3, ECF No. 205 ("I-D Memo") (deeming Student A to be "female"). The District relies on that redefinition to authorize access to single-sex privacy facilities "solely on a determination of the gender identity of the transgender individual." Def. Bd. of Educ. of Township High Sch. Dist. 211's Mem. in Supp. of Mot. to Dismiss Pls.' First Am. Compl. 11, ECF No. 203 ("Dist. Memo"). Defendants thereby reject being male or female as an immutable accident of birth—which under *Frontiero v. Richardson*, 411 U.S. 677 (1973) constitutes the constitutional basis for prohibiting invidious sex discrimination.[1] Instead, Defendants say that everyone determines their sex by claiming a subjectively perceived gender sometime after birth.[2]

But what sex is—male or female—is basic biologic science:[3] a person's sex is determined

---

[1] "Moreover, since sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility . . . .'" *Frontiero,* 411 U.S. at 686 (quoting *Weber v. Aetna Casualty & Surety Co*., 406 U.S. 164, 175 (1972)).

[2] This theory applies to those whose gender is discordant from their sex: "for individuals with gender dysphoria, gender identity is the only medically supported determinant of sex when sex assignment as male or female is necessary." Expert Decl. of Robert Garofalo, M.D., M.P.H. 6, ECF No. 79-3 ("Garofalo Decl."). And it applies for those whose gender <u>is</u> congruent with their sex: "For many people, gender identity aligns with their birth-assigned sex, so assigning sex based on sex characteristics such as external genitalia or chromosomes is a <u>proxy</u> for assigning sex based on one's gender identity." *Id.* (emphasis added). Nor is gender fixed or binary, but rather is "one's sense of oneself as male or female or something else." *Id.* at 4. That nonbinary option is evidenced in this case: where Student C is said to have been born female, C then identified as "gender queer" before transitioning again to present "in a masculine manner." Decl. of Parent C in Supp. of Mot. to Intervene 2, ECF No. 32-3. Dr. Garofalo has not yet been deposed or cross-examined, nor qualified by the Court as an expert.

[3] *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 451 (5th ed. 2013) (sex "refer[s] to the biological indicators of male and female (understood in the context of reproductive capacity), such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal and external

2

at conception and may be ascertained before or at birth, being evidenced by objective indicators such as gonads, chromosomes, and genitalia. First Am. Compl. 3-4, ECF No. 197.

Where Defendants' factual predicate of what sex is varies so radically from established science, and their proffered expert's testimony is untested, it is premature to resolve this matter on a motion to dismiss and leave such a basic error intact by granting a motion to dismiss. *Albrecht v. Metropolitan Pier & Exposition Authority*, 338 F. Supp. 2d 914 (N.D. Ill. 2004) is instructive on this point. The issue in *Albrecht* was whether a particular locale qualified as a public forum under First Amendment speech doctrine, and that in turn "require[d] adjudication of specific facts" as to the actual use of the property. *Id*. at 924. Recognizing that there were "material fact[s]" that would inform the legal conclusion as to whether the property was a public forum, the court held that the "case cannot be decided on the basis of a motion to dismiss." *Id*. at 924-25. Similarly, this case should not be resolved until the Court clearly and unambiguously confirms that sex under Title IX means male or female, not a subjective perception of oneself being masculine, feminine, or something else. *See Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 687–88 (N.D. Tex. 2016) (holding that Title IX's sex nondiscrimination provision, as incorporated into the Affordable Care Act, protects the categories of male and female; issuing a nationwide injunction against, *inter alia*, redefining sex under Title IX to include gender identity).

B.     **Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates Title IX.**

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

---

genitalia"). Humans reproduce sexually, which is a "form of reproduction that involves the fusion of two reproductive cells (gametes) in the process of fertilization. Normally, especially in animals, it requires two parents, one male and the other female." Oxford Dictionary of Biology 542 (7th ed. 2015). "Male" is further defined as "an individual whose reproductive organs produce only male gametes," *id*. at 354, and "female" is "an individual organism whose reproductive organs produce only female gametes." *Id*. at 222. Thus, to be of one sex or the other is defined by one's role in reproduction: male and female reproductive tracts together form a whole reproductive system.

education program or activity receiving Federal financial assistance. . . ."[4] 20 U.S.C.A. § 1681. A Title IX sex harassment claim is sufficiently alleged when the plaintiff shows (1) membership in a protected group; (2) harassment; (3) based on sex; (4) that was so pervasive or severe, it altered the conditions of education; and (5) school officials knew about it. *Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1228 (7th Cir. 1997). Defendants challenge plaintiffs only as to (2) and (3), harassment based on sex, and (4) whether the harassment was either so severe or pervasive as to alter the terms of Plaintiffs' education.

### 1. The discrimination against Plaintiffs is based on their sex.

Defendants say that Plaintiffs were not targeted because of their sex, because the Compelled Affirmation Policy authorizes the intermingling of the sexes in both sexes' facilities, and therefore there is no disparate treatment based on sex. Dist. Memo 9-10, ECF No. 203; I-D Memo 6, ECF No. 205. This is slightly nonsensical, given Defendants' heavy reliance on *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034 (7th Cir. 2017), *cert. dismissed sub nom. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker ex rel. Whitaker,* 138 S. Ct. 1260 (mem) (2018). There, the defendant school properly argued that regulating privacy facility access on sex rather than gender treated both sexes equally. *Id.* at 1051. But the *Whitaker* court rejected that argument, saying that "the School District's policy cannot be stated without referencing sex," *id.*, and thus deemed the school's treatment of Whitaker to be sex discrimination. In the same way, the Compelled Affirmation Policy necessarily "references sex" because it authorizes access for a transgender student by referencing the sex of the users in the chosen opposite sex facility. Indeed, the Locker Room Agreement which precipitated this lawsuit specifically targeted females because they were females: Student A claimed a feminine gender and demanded that his perceived gender be affirmed by authorizing association with girls—not boys—in the girls' locker room. Decl. of Parent A in Supp. of Mot. to Intervene 7, ECF No. 32-1; Am. Compl. 19 ¶ 111-112, ECF No. 197.

The targeting of sex manifest in the Locker Room Agreement was perpetuated and

---

[4] The law has a few express exceptions to its coverage, none of which are relevant to the instant case. 20 U.S.C.A. § 1681 (a)(1)-(9).

expanded as the Compelled Affirmation Policy developed to systematically authorize opposite-sex access to a single-sex privacy facility so as to affirm students' claimed genders. *See* Am. Compl. 8-24, ECF No. 197 (describing Compelled Affirmation Policy development). To be sure, both sexes are impacted, but authorizing males to use girls' locker rooms is not justified by authorizing females to use boys' locker rooms, any more than an employer permitting men to post pornographic pictures at a job site would be justified by permitting women to do the same.

### 2. Plaintiffs have alleged facts to plausibly show that they are subjected to sexual harassment that is pervasive or severe, and which alters the terms of their education.

Courts "consider the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with, in the case of Title IX, the student's educational opportunities." *Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 684 (7th Cir. 2004).

#### a. Plaintiffs sufficiently pled pervasive discrimination.

Plaintiffs allege that the Compelled Affirmation Policy applies to every person on every campus at all times within the District. Am. Compl. 28 ¶¶ 146-48, ECF No. 197. The District largely admits that allegation. *Id.* at 21 ¶ 120a-d. These facts show that the Compelled Affirmation Policy creates "ongoing risks, and has resulted in actual instances, of exposure to the other sex within multi-user facilities reserved for either male or female use." *Id.* at 36 ¶ 208. Moreover, the harassment has been pervasive since the District first authorized a male to enter female facilities: no Students and Parents for Privacy ("SPP") student can enter any District multi-user privacy facility with any assurance whatsoever that their privacy will be protected. *Id.* at 47-48 ¶¶ 224-28. There is no safe haven in any single-sex privacy facility for any SPP student, which exemplifies "pervasive" discrimination.

#### b. Plaintiffs sufficiently pled severe discrimination.

To satisfy the severity prong, plaintiffs must show that the environment is "both subjectively and objectively offensive." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004).

This means that the environment is one that "a reasonable person would find hostile," and the victim did perceive it to be so. *Id.*

> ### i. A reasonable person would objectively perceive a hostile environment when the government intermingles the sexes within a school privacy facility.

The objective prong is easily satisfied when one pays heed to what the Defendants initially admitted:[5] privacy facilities exist to protect users' privacy from the opposite sex when they are disrobing or attending to personal hygiene—a fact which is woven into the law in myriad ways. Females "using a women's restroom expect[] a certain degree of privacy from . . . members of the opposite sex." *State v. Lawson*, 340 P.3d 979, 982 (Wash. Ct. App. 2014). Adolescents like the SPP students are "embarrass[ed] . . . when a member of the opposite sex intrudes upon them in the lavatory." *St. John's Home for Children v. W. Va. Human Rights Comm'n*, 375 S.E.2d 769, 771 (W. Va. 1988). Allowing opposite-sex persons to view adolescents when they are showering, for example, risks their "permanent emotional impairment" under the "guise of equality." *City of Philadelphia v. Pa. Human Relations Comm'n*, 300 A.2d 97, 102-103 (Pa. Commw. Ct. 1973). There are manifold other authorities making the same point. *Hendricks v. Commw.*, 865 S.W.2d 332, 336 (Ky. 1993) ("no mixing of the sexes" in school locker rooms or restrooms); *McLain v. Bd. of Educ. of Georgetown Cmty. Unit Sch. Dist. No. 3 of Vermilion Cty.,* 384 N.E.2d 540, 542 (Ill. App. Ct. 1978) (refusing to place male teacher as overseer of school girls' locker room). *Cf. State v. Beine*, 162 S.W.3d 483, 487 (Mo. 2005), *as modified on denial of reh'g* (May 31, 2005) (public restroom access is a fundamental right) with *State v. Girardier*, 484 S.W.3d 356, 361 (Mo. Ct. App. 2015) (limiting the *Beine* access right in sex-specific facilities to only "a license to use

---

[5] During the Department of Education investigation of Student A's complaint, the District maintained that "permitting Student A to be present in the locker room would expose female students to being observed in a state of undress by a biologically male individual" and that "it would be inappropriate for young female students to view a naked male in the locker room in a state of undress." V.W. Decl. in Supp. of Pls.' Mot. for Prelim. Inj. Ex. 8 p.11, ECF No. 21-10 ("V.W. Decl.") (Nov. 2, 2015 U.S. Department of Education, Office for Civil Rights ("OCR") letter reporting District resisting admission of Student A to girls' locker rooms).

only the facility designated for one's [sex]").[6] These cases strongly support that reasonable persons would reject opposite-sex access to multi-user privacy facilities. This is reinforced by lawsuits filed to defend student privacy since the Department of Education pursued Student A's complaint. *See, e.g., Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.,* 208 F. Supp. 3d 850 (S.D. Ohio 2016); *Privacy Matters v. United States Dep't of Educ*., No. 0:16-cv-03015 (D. Minn. Sept. 7, 2016); *Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324 (E.D. Pa. 2017); and *Parents for Privacy v. Sessions,* No. 3:17-cv-01813 (D. Or. Nov. 13, 2017); *see also, Adams v. Sch. Bd. of St. Johns Cty.,* No. 3:17−cv−00739 (M.D. Fla. June 28, 2017) (school district defending student privacy against student demanding opposite-sex facility use to affirm gender).

In sum, bodily privacy is why a girls' locker room has always been "a place that by definition is to be used exclusively by girls and where males are not allowed." *People v. Grunau*, No. H015871, 2009 WL 5149857, at *3 (Cal. Ct. App. Dec. 29, 2009). Or as Ruth Bader Ginsburg once put it, "[S]eparate places to disrobe, sleep, perform personal bodily functions are permitted, in some situations required, by regard for individual privacy. Individual privacy, a right of constitutional dimension, is appropriately harmonized with the equality principle." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, The Washington Post, April 7, 1975.

*Grunau* is particularly instructive, in that it considered a criminal charge against a man who had looked through an open high school girls' locker room door and briefly stared at a showering, swimsuit-clad teenaged girl. No. H015871, 2009 WL 5149857, at *1. He was charged under a state law prohibiting conduct that would annoy or molest any child under 18 years of age. The court's response to the defendants' argument is illuminating:

> Defendant claims that his conduct was not comparable to the conduct in these cases and argues that "[b]riefly viewing a teenager showering in a full swim suit is not conduct which would cause the average person to be unhesitatingly irritated or offended, an essential element of the crime." We disagree.

---

[6] Although the *Girardier* court used "gender" here, in footnote 2 it pointed to federal workplace sanitation regulations that mandated sex-separated group restrooms and washrooms and noted that such sex-separated facilities were the overwhelming norm among the states. *Girardier*, 484 S.W.3d at 361 n.2. Thus, the *Girardier* panel meant "sex" when it used "gender."

. . . .

> Here, defendant blithely ignores an important fact: where his conduct took place. D. was not simply rinsing off under an outdoor shower at a public pool. She was on a high school campus, out of general public view, and inside a girls' locker room, a place that by definition is to be used exclusively by girls and where males are not allowed. Unquestionably, a girls['] locker room is a place where a normal female should, and would, reasonably expect privacy, especially when she is performing quintessentially personal activities like undressing, changing clothes, and bathing. Under the circumstances, jurors reasonably could find that a normal female who was showering in a girls['] locker room would unhesitatingly be shocked, irritated, and disturbed to see a man gazing at her, no matter how briefly he did so.

*Id.* at *3. This uniform understanding of the nature of multi-user privacy facilities supports an objective perception that intentionally intermingling adolescent students within public school privacy facilities creates a hostile environment.

### ii. Plaintiffs subjectively perceive a hostile environment when the District intermingles the sexes within their privacy facilities.

Similarly, Plaintiffs alleged that they subjectively perceive a hostile environment, tracking what this Court found when considering opposite-sex cleaning staff in restrooms, which "would cause embarrassment and increased stress in both male and female washroom users." *Norwood v. Dale Maint. Sys., Inc.,* 590 F. Supp. 1410, 1417 (N.D. Ill. 1984). The *Norwood* court noted "privacy would be invaded . . . under *any* opposite sex system." *Id.* at 1422. This is consistent with what SPP students have pled. Am. Compl. 5 ¶ 26; 37 ¶ 212; 45 ¶ 216, ECF No. 197 (SPP students experience "embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation, and loss of dignity" consequent to Compelled Affirmation Policy.); *id.* at 11 ¶ 71 (SPP girls encountering male Student A were "startled, shocked, embarrassed, and made afraid.").[7]

Importantly, "[t]o be actionable as sexual harassment, the unwelcome treatment need not be based on unwelcome sexual advances, requests for sexual favors or other verbal or physical

---

[7] District 211 cites *Frazier v. Fairhaven School Committee*, 122 F. Supp. 2d 104, 112 (D. Mass. 2000) where Title IX was not violated when a school's discipline matron "did peek, leer, and stair [sic]" into a female student's stall while she used the toilet in an effort to deflect Plaintiffs' arguments. Dist. Memo 10, ECF No. 203. But *Frazier* is no shield at all: a female student being observed by a female official may prompt an intrusion upon seclusion claim, but it in no way trenches upon the student's privacy from the opposite sex.

conduct of a sexual nature." *Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012) (internal citation omitted).[8] It is well-settled that opposite-sex intrusion into single-sex privacy facilities is sexually harassing. This Court held so in *Norwood*, 590 F. Supp. at 1417, saying that opposite-sex restroom attendants violate privacy and cause embarrassment and stress. Similarly, the Second Circuit affirmed a ruling that a company created a hostile environment by allowing males to clean the women's locker room while female employees were changing clothes. *Lewis v. Triborough Bridge & Tunnel Auth.*, 31 F. App'x 746 (2d Cir. 2002). The Washington Appeals Court held that an employer created a hostile environment partly because he entered the women's restroom while an employee was using the toilet. *Schonauer v. DCR Entm't, Inc.*, 905 P.2d 392, 401 (Wash. Ct. App. 1995). Notably, he never observed her unclothed: she testified that she was securely in a stall. *Id*. at 396. Still, the employer's intrusion "intensified" "the hostile and offensive nature of that environment." *Id*. at 401. Similarly, a female entering the men's locker room "on five to ten occasions" created a hostile environment, resulting in sexual harassment. *Washington v. White*, 231 F. Supp. 2d 71, 80 (D.D.C. 2002).

The *Norwood* court noted that even if an opposite-sex maintenance worker were to knock before entering an in-use restroom, the users still might be stressed. 590 F. Supp. at 1422. In the instant case, Defendants refuse even that courtesy to the students. Am. Compl. 47-48 ¶ 227, ECF No. 197 (District refuses to warn about granting opposite sex access generally, or upon actual entry to a privacy facility.). *Norwood* also shows that the opposite-sex person's state of mind when entering a single-sex facility is irrelevant to the potential privacy violation—the maintenance workers would be in the facility to focus on their job. Thus, contra the District's argument, Dist. Memo 11, ECF No. 203, Plaintiffs need not demonstrate that either the District or the transgender students were motivated by animus when opposite-sex access was demanded and authorized.

SPP has sufficiently pleaded subjective severity by pointing to the no-knock, no-warning Compelled Affirmation Policy that leaves them feeling "embarrassment, humiliation, anxiety, fear,

---

[8] *Passananti* and other cases Plaintiffs rely upon are Title VII cases. Courts look to such cases when interpreting and applying Title IX. *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1023 (7th Cir. 1997).

apprehension, stress, degradation, and loss of dignity" due to the impacts of that policy.

### c. Plaintiffs have sufficiently pled that the Compelled Affirmation Policy alters their conditions of education.

To show altered conditions of education, a student need not withdraw from school, *Mary M.,* 131 F.3d at 1226 (noting that "it is virtually impossible for children to leave their assigned school" (internal citation omitted)), nor is it required to show that a student's grades have suffered at this point in the litigation. *N.K. v. St. Mary's Springs Acad. of Fond Du Lac Wis., Inc.*, 965 F. Supp. 2d 1025, 1034 (E.D. Wis. 2013) (whether a student with good grades may have "excelled" absent the hostile environment was a question of fact for trial).

The District has altered the terms of SPP students' education by converting all District multi-user privacy facilities into non-private spaces: every such space under District control is now open to opposite-sex use. Am. Compl. 21 ¶ 120a-c, ECF No. 197 (transgender students daily using the facility of their choice on multiple campuses); *id.* at 27-28 ¶¶ 141-149 (transgender persons, student or not, are automatically authorized by the Compelled Affirmation Policy to access opposite-sex privacy facilities on all District campuses). Previously the District recognized that authorizing Student A's access to the girls' locker rooms would violate girl students' privacy. V.W. Decl. 11, ECF No. 21-10. But that changed after the DOE threatened to cut off the District's substantial federal funding. Faced with that financial threat, the District yielded on student privacy. Am. Compl. 18 ¶ 100, ECF No. 197 (District adopted Locker Room Agreement to protect federal funding); *id.* Ex. B, *Post-Board of Education Vote Statement*, ECF No. 197-2 ("By reaching this mutual agreement with OCR . . . the District will retain full access to its federal funds . . . .").

Yet rather than restore privacy after the Locker Room Agreement lapsed, the District imposed the Locker Room Agreement principles on all of its students and all of its multi-user privacy facilities.[9] This denies SPP students access to any truly sex-separated facilities,

---

[9] Note that the OCR stopped processing Title IX claims based on a school denying student access to opposite-sex bathrooms because Title IX protects sex, not gender identity. Am. Compl. 24 ¶ 128, ECF No. 197; Juana Summers, *Education Department says it is no longer investigating transgender bathroom complaints*, CNN Politics (Feb. 12, 2018), https://www.cnn.com/2018/02/12/politics/education-department-transgender-bathroom-complaints/index.html.

particularly when a situation virtually identical to that of Student A now exists with Nova Maday, posing a risk of imminent injury. *See* § 3.A.1, *infra*. Moreover, in light of the District's admissions that multiple transgender students daily use privacy facilities on multiple campuses, Am. Compl. 3 ¶ 10, ECF No. 197, and that SPP has student members in all District high schools, *id.* at 7 ¶ 39, Plaintiffs face imminent harm to their privacy and other legal interests.

Despite the Intervenor-Defendants contention that the District's Policy JFJK/GBMB is irrelevant to the action, I-D Memo 7 n.3, ECF No. 205, it is highly relevant: all students are entitled to a harassment-free environment, and the behaviors which Plaintiffs have suffered are by the District's own policy defined as "harassing." *See* Am. Compl. 45-46 ¶¶ 217-220, ECF No. 197 (alleging deprivation of Policy JFJK's protections).

Finally, Plaintiffs alleged that they have been harassed by other students for seeking to preserve their privacy, *id.* at 50 ¶ 239, and lose instructional time by asking to use the restroom during class time to avoid encountering an opposite-sex student, *id.* ¶ 240, which is a direct denial of an educational benefit.

### C. Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates bodily privacy.

Everyone has a "constitutionally protected privacy interest in his or her *partially* clothed body." *Doe v. Luzerne Cty.,* 660 F.3d 169, 176 (3d Cir. 2011) (emphasis added). *Accord, Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (recognizing that the "right to privacy is now firmly ensconced among the individual liberties protected by our Constitution");[10] *Poe v. Leonard*, 282 F.3d 123, 138 (2d Cir. 2002) (recognizing a "right to privacy in one's unclothed or partially unclothed body"). There is no "requirement that certain anatomical areas of one's body, such as genitalia, must have been exposed for that person to maintain a [constitutional] privacy claim."

---

[10] Defendants criticize citing bodily privacy cases involving inmates, but such cases are strong precedents affirming the right of bodily privacy: Even where the government has "justifiable reasons for invading an inmate's privacy" that "are both obvious and easily established," the "surrender of privacy is not total and that some residuum meriting [constitutional protection] survives the transfer into custody." *Canedy*, 16 F.3d at 186 (internal citation omitted).Yet Defendants willfully deprive Plaintiffs of their bodily privacy in the very facilities that normatively would preserve Plaintiffs' (and all students') privacy from the opposite sex.

*Luzerne Cty.*, 660 F.3d at 176. A "reasonable expectation of privacy" exists "particularly while in the presence of members of the *opposite sex*." *Id.* at 177 (emphasis added). "The desire to shield one's unclothed figure[] from view of strangers, and *particularly* strangers *of the opposite sex*, is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) (emphasis added). "[M]ost people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)). That feeling is magnified for teens, who are "extremely self-conscious about their bodies." *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1323 (7th Cir. 1993). "[A]dolescent vulnerability intensifies the . . . intrusiveness of the exposure." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375 (2009). These cases demonstrate in varied settings the Plaintiffs' point: unconsented opposite-sex exposure fostered by government policies trenches on a person's right to bodily privacy.

If, as Defendants argue, "Common sense tells us that in communal facilities individuals act in a discreet manner to protect their privacy and that those who have true privacy concerns can adapt their behavior so as not to punish all other users of the facilities for their personal views on what is appropriate," I-D Memo 2, ECF No. 205 (internal quotations omitted), then there would be no point to sex-separated privacy facilities at all. Simply being "discreet" within a locker room or restroom will trump everyone else's bodily privacy in the Defendants' view.[11] And the argument that one might "adapt their behavior so as not to punish all other users of the facilities," *id.* applies with more force to the Intervenor-Defendants, whose interest is in compelling the school to use privacy facilities to affirm their subjectively perceived gender, and who cannot plausibly argue any interest in protecting their privacy from the opposite sex—which is the very purpose of the

---

[11] It bears noting that if the District is correct in saying that bodily privacy concerns are eliminated by having stalls or curtains available within a multi-user privacy facility, then it has no principled basis to exclude the opposite sex from such a facility: any male entering the girls' locker room could simply change behind a curtain or in a commode stall.

privacy facilities.[12] This is a critical point, because as Nova Maday demonstrates, violating the other sex's privacy is necessary for full affirmation of one's perceived gender. *See* Am. Compl. Ex. I 2 ¶ 9, ECF No. 197-2 (Maday Compl. alleging that gender affirmation is inadequate if Maday is not given unhindered access to the girls' communal changing area).

The foregoing authorities demonstrate a constitutional interest in bodily privacy that would forbid government-fostered, unconsented cross-sex exposure in privacy facilities. Plaintiffs have alleged facts to demonstrate both past injury, see § II.B.2.b.ii, *supra*; and that concrete, predictable future injury is likely to occur because of the Compelled Affirmation Policy, § III.A.1, *infra.* The District can scarcely refute that likelihood when it admits to authorizing multiple transgender students to daily use privacy facilities in multiple District schools. Am. Compl. 21 ¶ 120a-c, ECF No. 197. Thus, Plaintiffs have sufficiently pled a claim for violating their bodily privacy.

### D. Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates 14th Amendment parental rights.

The United States Supreme Court describes parents' liberty interest in this manner:

> The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer v. Nebraska,* we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce v. Society of Sisters,* we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." We returned to the subject in *Prince v. Massachusetts*, and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

---

[12] This self-affirmation interest is evidenced in this case. Decl. Parent A 7 ¶22, ECF No. 32-1; Decl. Parent B 3 ¶ 8; at 4 ¶ 12; at 5 ¶ 17, and at 6 ¶ 21, ECF No. 32-2; Decl. Parent C 2 ¶ 6; at 3 ¶ 10; and at 4 ¶ 12, ECF No. 32-3. While each affiant asserted an interest to affirm their claimed genders by accessing opposite-sex facilities, none asserted any interest in privacy from the opposite sex.

*Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (internal citations omitted; alteration in original). Defendants respond that parental rights do not extend to control of school curriculum, citing such cases as *Leebaert v. Harrington*, 332 F.3d. 134 (2d Cir. 2003) (upholding mandatory health classes against parental objection), Dist. Memo 20, ECF No. 203, and *Fields v. Palmdale School District*, 427 F.3d 1197, 1206 (9th Circ. 2005), Dist. Memo 18-19, ECF No. 203; I-D Memo 11, ECF No. 205, to say that constitutional parental rights do not permit parents to compel schools to adopt "idiosyncratic views" as to curriculum content.

But the District shared the Plaintiffs' "idiosyncratic view" about intermingling the sexes within girls' privacy facilities at the outset of this litigation, V.W. Decl. 11, ECF No. 21-10, and the plethora of authorities showing that multi-user privacy facilities are intended to provide privacy from the opposite sex demonstrates that keeping sexes separate in such places is scarcely "idiosyncratic." Moreover, Defendants' cases are inapposite: parents are not seeking to control *any* curriculum content—they seek to preserve their parental right to teach modesty (and in some instances, religious tenets) to their children without having the government create "privacy facilities" that are going to expose their children to the opposite sex while one or the other sex is disrobing or attending to personal hygiene. Am. Compl. 54-57 ¶¶ 272-283, ECF No. 197. All parents seek is to restrain unlawful government conduct, not dictate the curriculum of any class.

### E. Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates the ILRFRA.

The Illinois Religious Freedom Restoration Act provides that:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 Ill. Comp. Stat. Ann. 35/15. Defendants argue that even if Plaintiffs prevail on this state claim, it would be preempted by *Whitaker* and its interpretation of sex. Dist. Memo 22, ECF No. 203; I-D Memo 20, ECF No. 205. But *Whitaker* is not binding on this case per Section II.G., *infra*.

Both also argue that the Compelled Affirmation Policy poses no substantial burden—a coercive choice—on Plaintiffs. Dist. Memo 22-24, ECF No. 203; I-D Memo 17-20, ECF No. 205. First, determining whether a burden is substantial is "ordinarily an issue of fact," *World Outreach Conference Ctr. v. City of Chicago*, 591 F.3d 531, 539 (7th Cir. 2009), so it is premature to reject this claim on a motion to dismiss. Furthermore, "the hallmark of a substantial burden on one's free exercise of religion is the presentation of a coercive choice of either abandoning one's religious convictions or complying with the governmental regulation." *Diggs v. Snyder*, 775 N.E.2d 40, 45 (Ill. App. Ct. 2002) (citing *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). That choice is presented here: SPP students who believe as an article of faith that they should not be in the company of the opposite sex while disrobing or engaging in personal hygiene, Am. Compl. 59-60 ¶¶ 295-296, ECF No. 197, cannot maintain that behavior when the Compelled Affirmation Policy has opened all multi-user privacy facilities to the opposite sex, and that is not resolved by the District suggesting that they abandon the facility provided for their privacy. *Id.* at 49 ¶¶ 236-238 (explaining that Plaintiffs abandoning their privacy facilities does not resolve their injury). This leaves the religious Plaintiffs having to choose between faith, privacy, or their right to access privacy facilities designated for the use of their sex.

Defendants claim a compelling interest in eliminating discrimination against transgender students justifies burdening religion. Dist. Memo 24, ECF No. 203; I-D Memo 12, ECF No. 205. But simply claiming a broad government interest is not enough. The Defendants must show that applying the resulting burden to the Plaintiffs is the "least restrictive means" of furthering that interest. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014). That is a steep climb in this case, when Plaintiffs have at least six alternative means of affirming a student's sex-discordant gender that do not trench on privacy rights. *See* Am. Compl. 24-25 ¶ 130a-f, ECF No. 197 (listing affirmation methods). The District suggests that keeping boys out of the girls' rooms, and vice versa, will "leave public schools in shreds," Dist. Memo 27, ECF No. 203 (quoting *Fleischfresser v. Dirs. of Sch. Dist. 200*, 15 F.3d 680, 690 (7th Cir. 1994)), which is belied by the District using and defending that practice right up until its federal funding was threatened. In sum,

Plaintiffs have adequately pled a religious freedom claim under the ILRFRA, and it would be premature to dismiss that claim without a hearing on the merits.

      **F.**    **Plaintiffs have alleged facts to plausibly show that intermingling the sexes in privacy facilities violates the First Amendment's guarantee of the free exercise of religion.**

Defendants' arguments on the free exercise of religion as guaranteed by the First Amendment to the United States Constitution track their arguments under the ILRFRA (rebutted above). The only additional factor Defendants raise is whether strict scrutiny applies under the First Amendment, which turns on whether the Compelled Affirmation Policy is facially neutral toward religion, and generally applicable.

This case is not about shielding religious believers from ideas, as the Defendants suggest. Dist. Memo 26, ECF No. 203; I-D Memo 13, ECF No. 205 (both citing *Parker v. Hurley,* 514 F.3d 87, 106 (1st Cir. 2008)). It is about protecting religious believers from the opposite sex when they are disrobing or attending to personal hygiene within facilities uniquely dedicated to protecting their privacy. The school has a duty to protect that privacy in its *in loco parentis* capacity and as directed in *United States v. Virginia,* 518 U.S. 515 (1996) (*"VMI"*) per § II.E, *infra.*

That said, a law must be facially neutral and generally applicable to escape strict scrutiny under the First Amendment. *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–79 (1990). In this instance, the Compelled Affirmation Policy is not generally applicable as it serves only those students claiming a gender discordant from their sex, Am. Compl. 61 ¶ 308, ECF No. 197, and apparently only those who claim masculine or feminine genders.[13] The Compelled Affirmation Policy is subject to strict scrutiny because the free exercise claim is brought in tandem with the constitutional bodily privacy and parental rights claims, both of which are colorable as demonstrated above. *See Smith*, 494 U.S. at 881 (describing hybrid rights principles).

---

[13] It is unclear how the Compelled Affirmation Policy might apply to non-binary genders.

**G.** ***Whitaker* is a preliminary injunction opinion that does not control this case.**

To be sure, in general the "decisions of a superior court are authoritative on inferior courts,"

*Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004). But that general rule

does not hold true for the interlocutory review of a preliminary injunction:

> The purpose of a preliminary injunction is merely to preserve the relative positions
> of the parties until a trial on the merits can be held. Given this limited purpose, and
> given the haste that is often necessary if those positions are to be preserved, a
> preliminary injunction is customarily granted on the basis of procedures that are
> less formal and evidence that is less complete than in a trial on the merits. A party
> thus is not required to prove his case in full at a preliminary-injunction hearing[,]
> and the findings of fact and conclusions of law made by a court granting a
> preliminary injunction are not binding at trial on the merits.

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted), *accord Sports*

*Form, Inc. v. United Press Int'l, Inc.,* 686 F.2d 750, 753 (9th Cir. 1982) (noting that preliminary

injunction disposition on appeal "may provide little guidance as to the appropriate disposition on

the merits" due the limited legal review and factual record at the preliminary injunction stage).[14]

The appellate decision in *Whitaker* would not even have bound the parties in that case, much less

bind parties in another case. Moreover, the *Whitaker* panel failed to consider several key Supreme

Court decisions bearing directly on the issues.

**1.** ***Whitaker* did not consider Supreme Court authority explaining the
Court's holding in *Price Waterhouse*.**

The *Whitaker* court's reading of *Price Waterhouse* centers on the phrase "In forbidding

employers to discriminate against individuals because of their sex, Congress intended to strike at

the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." 858

F.3d at 1047-48 (internal citation omitted). Yet rather than examine whether there was "disparate

---

[14] Note that when preliminary injunctive relief is mooted because it was fully carried out during the course
of the appellate process, the high court vacates and remands the court of appeals decision. *See, e.g.*,
*Camenisch*, 451 U.S. at 398. This may have been the outcome in *Whitaker* had it not settled while pending
a certiorari decision. *See Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker ex rel. Whitaker*, 138
S. Ct. 1260 (2018) (dismissing petition); *see also* Br. of Amicus Curiae Alliance Defending Freedom in
Support of Petitioners, *Kenosha Unified School Dist. No. 1 Bd. of Educ. v. Whitaker*, 2017 WL 4350718
(U.S.) at *5, n.8 (explaining that Whitaker had graduated and the preliminary injunction has been fully
carried out before reaching the Court).

treatment of men and women" resulting from the defendant school's even-handed sex-based access policy, it took *Price Waterhouse's* holding to create categorical protection of transgender persons under Title VII. *Id.* at 1049. That reading of *Price Waterhouse* is completely outside its holding as expressly explained by the Supreme Court:

> [W]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds. . . . *Price Waterhouse* garnered five votes for a single rationale: Justice White agreed with the plurality as to the motivating-factor test, . . . he disagreed only as to the type of evidence an employer was required to submit to prove that the same result would have occurred absent the unlawful motivation. Taking the plurality to demand objective evidence, he wrote separately to express his view that an employer's credible testimony could suffice. . . . Because Justice White provided a fifth vote for the rationale explaining the result of the *Price Waterhouse* decision, . . . his concurrence is properly understood as controlling, and he, like the plurality, did not require the introduction of direct evidence.

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 188–89 (2009) (internal quotations and citations omitted). What *Gross* demonstrates is that the "sex stereotyping" language from *Price Waterhouse* was not the Court rewriting Title VII to create a new protected category for gender. Rather, sex stereotyping was discussed because it was indirect evidence of sex discrimination.

Justice Kennedy reinforced this point by carefully noting that "I think it important to stress that Title VII creates no independent cause of action for sex stereotyping. Evidence of use by decisionmakers of sex stereotypes is, of course, quite relevant to the question of discriminatory intent. The ultimate question, however, is whether discrimination caused the plaintiff's harm." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 294 (1989) (Kennedy, J, dissenting, joined by Rehnquist, CJ and Scalia, J). And other circuits confirm that *Price Waterhouse* did not create a per se "gender" protection:

> Because Congress intended that the term "sex" in Title VII mean simply "man" or "woman," there is no need to distinguish between the terms "sex" and "gender" in Title VII cases. Consequently, courts, speaking in the context of Title VII, have used the term "sex" and "gender" interchangeably to refer simply to the fact that an employee is male or female. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 239-41, 109 S.Ct. 1775, 1784-86, 104 L.Ed.2d 268 (1989) (using "gender" and "sex" interchangeably). Indeed, the use of "sex" and "gender" interchangeably may

impose a useful limit on the term "sex," which otherwise might be interpreted to include sexual behavior.

*Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 749 n.1 (4th Cir. 1996). Here, *Tuan Anh Nguyen v. I.N.S.,* 533 U.S. 53 (2001) is instructive. That case challenged a statute governing the acquisition of U.S. citizenship when the child whose citizenship was in question had one United States citizen parent, while the other parent was not a citizen. *Id.* at 56-57. Nguyen was to be deported, *id.* at 57, but raised an equal protection challenge against the deportation statute, arguing that the law impermissibly provided "different rules for attainment of citizenship . . . depending upon whether the one parent with American citizenship is the mother or the father." *Id.* at 58. Deportation law held that a child in Nguyen's circumstances could automatically acquire at birth the mother's nationality status, whereas the father had to establish by clear and convincing evidence that he had a blood relationship with the child, among other factors. *Id.* at 59. The Court rejected Nguyen's argument, saying that:

> Petitioners and their *amici* argue in addition that, rather than fulfilling an important governmental interest, § 1409 merely embodies a gender-based stereotype. Although the above discussion should illustrate that, contrary to petitioners' assertions, § 1409 addresses an undeniable difference in the circumstance of the parents at the time a child is born, it should be noted, furthermore, that the difference does not result from some stereotype, defined as a frame of mind resulting from irrational or uncritical analysis. There is nothing irrational or improper in the recognition that at the moment of birth—a critical event in the statutory scheme and in the whole tradition of citizenship law—the mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father. This is not a stereotype. See *Virginia,* 518 U.S. at 533, 116 S. Ct. 2264 ("The heightened review standard our precedent establishes does not make sex a proscribed classification .... Physical differences between men and women ... are enduring").

*Id.* at 68. Mr. Nguyen's argument was flawed because he characterized childbirth as being stereotypical of the female sex, not definitional as to parentage as a matter of biological fact. Under *Nguyen,* Defendants' arguments fail, as they treat being male and female as mere stereotypes, not as definitional as to sex as a matter of biological fact.[15]

---

[15] Treating reproductive facts as mere stereotypes was evidenced in a colloquy in another case, when the court pressed counsel for a fifth grade boy—who claimed a feminine gender—to admit what the record unequivocally demonstrated: that the boy was still anatomically male. The student's counsel responded that

2. ***Whitaker*** **conflicts with** ***United States v. Virginia*,** **518 U.S. 515 (1996)** **(*"VMI"*) by conflating sex with gender.**

The *Whitaker* court cited to *VMI* in finding that Whitaker was being discriminated against on the basis of sex:

> Here, the School District's policy cannot be stated without referencing sex, as the School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate. This policy is inherently based upon a sex-classification and heightened review applies. Further, the School District argues that since it treats all boys and girls the same, it does not violate the Equal Protection Clause. This is untrue. Rather, the School District treats transgender students like Ash, who fail to conform to the sex-based stereotypes associated with their assigned sex at birth, differently. These students are disciplined under the School District's bathroom policy if they choose to use a bathroom that conforms to their gender identity. This places the burden on the School District to demonstrate that its justification for its bathroom policy is not only genuine, but also "exceedingly persuasive."

*Whitaker,* 858 F.3d at 1051-52 (citing to *VMI*, 518 U.S. at 533). There are two errors in this application of *VMI*: First, the *Whitaker* panel found impermissible sex discrimination because the defendant school separated privacy facilities by sex. But *VMI* explicitly rejects that conclusion, saying that "[a]dmitting women to [Virginia Military Institute] would <u>undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements</u>, and to adjust aspects of the physical training programs." *VMI*, 518 U.S. at 550 n.19 (emphasis added). As the Court explained, "[p]hysical differences between men and women, however, are enduring: '[T]he two sexes are not fungible . . . .'" *Id*. at 533 (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)). Thus, the *Whitaker* court ignored binding authority that would have led to a different outcome had it been followed.

Second, the defendant district in no way considered any stereotypes in regulating access: it looked only to the student's sex. *Whitaker*, 858 F.3d at 1049. This turns *Price Waterhouse* inside

---

it was "inappropriate to label any part of [the student's] body as male." *See* Amicus Curiae Br. of Alliance Defending Freedom in Supp. of Defs.-Appellants at Ex. 3, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), ECF No. 31-4 (Transcript excerpt). But if the primary sex characteristic of the male reproductive tract cannot be recognized as "male," then there is no basis to claim that secondary sex characteristics such as an Adam's apple and facial hair are masculine, or that lactating breasts are feminine.

out: there the firm looked at Ms. Hopkin's profanity, need to attend charm school, lack of makeup, and "macho" behavior in deciding not to promote her. *Price Waterhouse,* 490 U.S. at 235. In turn, this provided indirect evidence of discrimination against Hopkins because she was a woman. *Id.* at 242. It is one thing to hold the firm accountable for sex discrimination based on the indirect evidence of sex stereotyping, and quite another for the *Whitaker* court to hold the school liable for factors it did not even consider.

### 3. *Whitaker* conflicts with *Frontiero v. Richardson,* 411 U.S. 677 (1973) by rejecting sex as an immutable class established through birth.

The reason that a sex-based classification is subject to heightened scrutiny is that sex "frequently bears no relation to the ability to perform or contribute to society." *Whitaker,* 858 F.3d at 1050 (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440-41 (1985) (quoting *Frontiero,* 411 U.S. at 686). Sex as a class is protected because it, "like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Frontiero,* 411 U.S. at 686. Against this, gender identity develops well after birth, and while Defendants assert (on the flimsiest of evidence) that biology is a factor in gender identity, their expert admits that "environment, culture, and socialization" unequivocally influence that identity. Garofalo Decl. 4, ECF No. 79-3. *Whitaker* conflicts with *Frontiero* because it authorizes a person to enter or exit the immutable class of sex based upon a post-birth, subjective and malleable perception of gender which may or may not be manifest by voluntarily adopting some set of sex stereotypes or secondary sex characteristics. Am. Compl. 5 ¶ 25, ECF No. 197 (sole dispositive criterion to authorize opposite sex access is student's declaration of gender). It is fair to say that gender identity theory erases women.[16] Here, gender identity theory eliminates their privacy in locker rooms and restrooms; as seen elsewhere, it leaves women—who fought so hard for athletic equality under

---

[16] As a noted feminist author puts it, the "current trend of gender identity politics is a continuation of female erasure and silencing as old as patriarchy itself." Ruth Barrett, *Female Erasure: What You Need to Know About Gender Politics' War on Women, the Female Sex and Human Rights*, p. xxv (Tidal Time Publishing, 2016).

Title IX—competing with males[17] (or testosterone-dosed females[18]) in their athletic competitions. *Whitaker* completely failed to consider the impact on sex discrimination law that is grounded in *Frontiero*, and this Court would be remiss to replicate that failure.

### 4. *Whitaker* is factually distinguished.

In addition to *Whitaker* disregarding relevant Supreme Court authorities, it is factually distinguished on several material points. Although the defendant district in Whitaker argued that allowing Whitaker to use the boys' restrooms would violate the privacy rights of other students, "[t]hey provided no affidavits or other evidence in support of this argument." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-CV-943-PP, 2016 WL 5239829, at *6 (E.D. Wis. Sept. 22, 2016), *aff'd sub nom. Whitaker,* 858 F.3d 1034. The appellate court expanded on that:

> The School District has not produced any evidence that any students have ever complained about Ash's presence in the boys' restroom. Nor have they demonstrated that Ash's presence has actually caused an invasion of any other student's privacy. And while the School District claims that preliminary injunctive relief infringes upon parents' ability to direct the education of their children, it offers no evidence that a parent has ever asserted this right. These claims are all speculative.

*Whitaker,* 858 F.3d at 1054. In contrast, 51 families comprising 63 district students and 73 of their parents, together with SPP, initiated this lawsuit. *See* Verified Compl. for Inj. and Decl. Relief 7 ¶ 23, ECF No. 1. Plaintiffs raised five legal claims, each turning largely on the privacy implications resulting from the government intermingling the sexes within students' multi-user privacy facilities. *Id.* at 53 (bodily privacy claims); *id.* at 58 (parental rights claims); *id.* at 61 (violations of Title IX); *id.* at 68 (violation of the Illinois Religious Freedom Restoration Act); and *id.* at 72 (violation of First Amendment free exercise rights). Each of these claims is perpetuated in the First Amended Complaint. Am. Compl. 34, ECF No. 197 (Title IX claims); *id.* at 51 (bodily privacy claims); *id.* at 54 (parental rights claims); *id.* at 59 (Illinois religious freedom claims); and *id.* at

---

[17] Matthew Conyers, *At Cromwell High, Transgender Athlete Competes With Girls For First Time*, Hartford Courant (Apr. 7, 2017), https://cour.at/2HBBXp5.

[18] Chuck Schilken, *Transgender boy wins Texas girls wrestling championship for the second year in a row,* Los Angeles Times (Feb. 26, 2018), https://lat.ms/2HJbMwD.

61 (federal religious freedom claims). *Whitaker* considered no such direct claims from injured parties.

Although restrooms are involved in both cases, the instant case also challenges intermingling the sexes in school locker rooms—which were not at issue in *Whitaker*—and the District admitted that allowing a male claiming a feminine gender into girls' locker rooms "would expose female students to being observed in a state of undress by a biologically male individual." V.W. Decl. Ex. 8 p.11, ECF No. 21-10 (emphasis added). Given that there was no evidence whatsoever of privacy violations put on by the defendant school in *Whitaker*, versus the District here admitting that privacy violations "would" happen from transgender students entering opposite sex facilities, *id.*; the District admitting multiple transgender students are daily using multiple privacy facilities on multiple campuses at which SPP students attend, Am. Compl. 21 ¶¶ 120 a-c, ECF No. 197; that the Plaintiffs act to avoid those encounters, *id.* at 50 ¶¶ 239-40; and the current presence of at least one male student demanding use of female privacy facilities at Palatine, where at least one SPP student would be using the female facilities, *id.* at 44-45 ¶¶ 214rr-uu, there is strong basis for this Court to analyze privacy rights well beyond the attention that was given in the evidence-free *Whitaker* case. Similarly, *Whitaker* had no religious freedom nor parental rights claims raised. These issues would weigh heavily in balancing the harms to privacy and may lead to a different result than was reached in *Whitaker's* preliminary injunction litigation if the merits are reached via summary judgment or trial.

In sum, *Camenisch* precludes assigning *Whitaker* controlling weight, and *Whitaker's* conflicts with relevant Supreme Court authority and factual distinctions further limit its application to this case.

## III.   Issues unique to District 211's Motion to Dismiss.

District 211 challenges the standing of SPP and its president, Victoria Wilson, to bring suit, Dist. Memo 2-3, ECF No. 203, under Fed. R. Civ. P. 12(b)(1). Such "motions to dismiss in the civil rights context are scrutinized with special care, and are disfavored." *United States v. Beethoven Assocs. Ltd. P'ship*, 843 F. Supp. 1257, 1260 (N.D. Ill. 1994) (internal citation omitted).

### A.     SPP has associational standing.

Standing for an association to sue in defense of its members' rights was addressed in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), in which the Court announced that an association "and its members are in every practical sense identical." *Id*. at 459.  Consequently, the Court allowed the NAACP as an association to assert its members' First Amendment claims.  *Id.* at 458-59.  Associational standing does not require that the association itself suffer injury from the challenged activity.  *Warth v. Seldin*, 422 U.S. 490, 511 (1975). After all, "the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986). "The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 187 (1951) (Jackson, J., concurring).

Indeed, "[a]ssociational standing is particularly appropriate when the association is seeking to represent interests which are central to the purpose of the organization . . . and where the relief sought is some form of prospective remedy, such as a declaratory judgment, which will inure to the benefit of the organization's membership." *Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247, 1259 (7th Cir. 1983) (internal citations omitted). And that is precisely SPP's purpose: it is comprised of students currently (or soon to be) subject to the Compelled Affirmation Policy and their parents, Am. Compl. 7 ¶ 39, ECF No. 197, and those members plainly assert their Title IX sex discrimination interests, *id.* at 34-50; in constitutionally protected bodily privacy, *id.* at 51-54; in parental rights, *id.* at 54-59; in state-protected religious freedom, *id.* at 59-60 and in constitutionally protected religious freedom, *id.* at 61-62. The relief sought is declaratory or injunctive, *id.* at 62-63, which is well within *Peick's* standard.

The Supreme Court sets forth three elements to be satisfied for associational standing: (1) A member or members of the association must have standing to sue for themselves if they wanted to do so; (2) The interests that the association seeks to protect must be germane to its purpose; and

(3) Neither the claim asserted, nor the relief sought, requires the association's member to sue in his personal capacity. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), *see also Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 862-63 (7th Cir. 1996) (setting forth the *Hunt* elements).

### 1.    SPP has members with standing to sue for themselves.

District 211 protests that "SPP fails to identify or describe which students or parents are included in its membership and does not identify or allege any facts establishing that any SPP members have standing to sue in their own right." Dist. Memo 5, ECF No. 203.

As to the identity of SPP members, the "first *Hunt* factor satisfies Article III standing concerns by 'requiring an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association.'"[19] *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (internal citation omitted). This requirement, however, still allows for the member on whose behalf the suit is filed to remain unnamed by the organization. *Id.*, *see also Chic. Reg'l Council of Carpenters v. Pepper Constr. Co.*, 32 F. Supp. 3d 918, 925 (N.D. Ill. 2014) ("[A]n association does not need to specifically identify the member on whose behalf the suit is filed."). Both sides have noted risks of untoward behavior by peers and others toward their clients in this litigation, so it should come as no surprise that SPP is protecting its members' identities.

As to members having standing to sue in their own right, a member has standing to sue for himself when he has a "direct . . . injury" as a result of the challenged law or policy. *Nat'l Office Mach. Dealers Ass'n v. Monroe, The Calculator Co.*, 484 F. Supp. 1306, 1307 (N.D. Ill. 1980). So long as that requirement is met, an association can press the claims of its members, including

---

[19] Article III standing requires: (1) injury in fact that is concrete and particularized, and actual or imminent, but not conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's action; and (3) the injury is likely redressed by a favorable decision. *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 146-47 (7th Cir. 2011). Plaintiffs satisfy the first element as discussed in this memo, and the second two elements are easily met: none of the privacy issues alleged would arise but for the Compelled Affirmation Policy, and enjoining the Compelled Affirmation Policy and declaring it unlawful would obviously redress Plaintiffs' claims.

constitutional rights that the members enjoy as natural persons, but the organization itself would not enjoy. *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) is helpful here. *Ezell* held that an association had standing to assert a Second Amendment right of access to shooting ranges within Chicago city limits (which was necessary to obtain a firearm permit). The Seventh Circuit reversed the lower court's holding that associational standing failed because there was no evidence that its members were unable to travel outside of the city to fulfill the requirement. Rather, the appellate court said "the point is irrelevant . . . . The question is not whether or how easily Chicago residents can comply with the range-training requirement . . . . The pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city. . . ." *Id.* at 696-97. That is a strong parallel to the instant case, where the Association seeks to enjoin the Compelled Affirmation Policy which effectively prohibits single-sex multi-user privacy facilities within the District.

Plaintiffs have sufficiently pled direct injury to students. At Palatine High School, male student Nova Maday is authorized to access the girls' locker rooms, subject only to using unspecified privacy measures, Am. Compl. 44 ¶ 214ss, ECF No. 197, where SPP girls change clothes for PE class, and into swimsuits when swimming is scheduled. *Id.* at ¶ 214qq. At Fremd High School where Student A used the girls' locker rooms, *id.* at 38 ¶ 214a, at least one girl was exposed to male genitalia, *id.* at ¶ 214b, and an SPP girl who sought privacy from Student A was harassed, *id.* at 39 ¶¶ 214i-l. While the past is not necessarily prologue, that history informs SPP students that their privacy rights are at imminent risk today, particularly when District 211 admits that multiple transgender students daily use privacy facilities in multiple schools, Am. Compl. 21 ¶ 120(a); admits that every transgender student requesting opposite sex locker room has been granted access, *id.* at ¶120(b); and confirms that transgender students have full access to opposite sex bathrooms, *id.* at ¶ 120(c). There is nothing conjectural or hypothetical about that risk: it is the predictable outcome of the Compelled Affirmation Policy. Thus, SPP fulfills the first *Hunt* element.

### 2.    SPP protects interests germane to its purpose.

An interest is "germane" to an association's purpose when the vindication of that interest will protect the association's members' interests. *Mission Hills Condo. Ass'n M-1 v. Corley*, 570 F. Supp. 453, 458 (N.D. Ill. 1983), *see also Chic. Reg'l Council of Carpenters*, 32 F. Supp. 3d at 925 (the second associational standing element is met where an association seeks to protect its members interest in not being subjected to unlawful practices).[20] SPP formed when it became evident that the District would no longer protect student privacy, Pls.' Reply Mem. in Supp. of Mot. for Prelim. Inj. 25, ECF No. 94, and its name reflects its primary purpose—protecting student privacy. Although the causes of action advance different legal theories, each serves the purpose of restoring privacy from the opposite sex that is the purpose of single-sex multi-user privacy facilities pursuant to the authority conveyed under 34 C.F.R. §106.33, and as is required in *VMI*, 518 U.S. at 550 n.19 (holding that it would be "undoubtedly require[d]" for a school to provide privacy between the sexes in living arrangements). By serving as plaintiff in this case, SPP is unequivocally advancing the privacy interests of its members.

### 3.    Neither the claim asserted, nor the relief sought requires SPP to sue in their personal capacity.

Finally, the District argues SPP lacks associational standing because the claim asserted "requires the participation of individual members in the lawsuit." Dist. Memo 6, ECF No. 203 (citing *Hunt*, 432 U.S. at 343). But the *Hunt* Court went on to say on the same page:

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

---

[20] An interest is not germane to the association's purpose when the lawsuit produces a "serious conflict" of interest between the organization's members. *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1380 (7th Cir. 1987) (finding conflict of interest where "at least three" of the association's members were defendants to the action). No such conflicts are likely to arise in the instant case.

*Hunt,* 432 U.S. at 343, citing *Warth*, 422 U.S. at 515; *see also Chi. Reg'l Council of Carpenters*, 32 F. Supp. 3d at 925 ("[T]he participation of individual members of CRCC is not required for declaratory and injunctive relief."); *Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, Inc.*, 540 F.2d 864, 865 (7th Cir.1976) (finding the third associational standing element satisfied with respect to the plaintiff's claims for injunctive and declaratory relief as such relief inherently does not require participation by individual members).

In *Warth*, 422 U.S. 490, an organization of construction firms brought suit against a New York town, alleging that the town's zoning ordinance caused the member firms to lose business, and hence, profits. *Id.* at 497. The Supreme Court ruled that the organization could not assert representational standing because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Id.* at 515-16. In other words, each construction firm had a separate damage claim, the dollar value of which was particularized to that particular firm. In such situations, the relief sought requires the member to actually be a party to the lawsuit.

The instant case does not require the participation of individual SPP members because it seeks only declaratory and injunctive relief that would serve the privacy interests of all SPP members, and there are no damage claims particular to any specific SPP member—indeed, there are no compensatory damage claims whatsoever.

Moreover, even if discovery of particular SPP members eventually becomes necessary, that does not change the analysis: associational standing is appropriate if the claim or relief requires *some* members to actively participate, so long as it does not require *all* the members to do so. *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 601 (7th Cir. 1993) (*citing Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991)). As a result, representational standing is appropriate even when it is necessary "to take . . . evidence from individual members of an association." *Id.* at 602. In explaining its decision, the Seventh Circuit Court of Appeals opined:

> We can discern no indication in *Warth*, *Hunt*, or *Brock* that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association. Such a stringent limitation on representational standing cannot be squared with the Court's assessment in *Brock* of the efficiencies for both the litigant and the judicial system from the use of representational standing. Rather, the third prong of *Hunt* is more plausibly read as dealing with situations in which it is necessary to establish "individualized proof," for litigants not before the court in order to support the cause of action.

*Id.* at 601-02 (internal citation omitted). As the case is currently postured, it is not about "unringing" the bell—the incidents and injury resulting from cross-sex exposure in the past cannot be undone, and while they might be redressed via compensatory damages, SPP and its members chose to seek only prospective, equitable relief such that their privacy will be protected within the privacy facilities that are supposed to serve that end. In sum, SPP has standing under *Hunt* and binding Seventh Circuit authority.

### B.      Victoria Wilson has standing to sue as a parent.

The District argues that Ms. Wilson does not have standing. Dist. Memo 3, ECF No. 203. She does have standing in her individual capacity as a parent. Am. Compl. 7 ¶ 40; 54-55 ¶¶ 270-278, ECF No. 197.

### C.      The deliberate indifference standard is inapplicable to lawsuits seeking equitable relief.

District 211 argues that Plaintiffs failed to establish that it was "deliberately indifferent to sex discrimination" which is defined as the institute's actions being "clearly unreasonable." While Plaintiffs certainly see intermingling adolescent boys and girls within privacy facilities as unreasonable, the deliberate indifference standard applies only to claims for monetary damages under Title IX, and then only where the violation did "not involve the official policy" of the school. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998).[21] But "the heightened *Gebser*

---

[21] The judicially-created deliberate indifference test reflected the Court's concern that under the Spending Clause authority used to establish Title IX, schools should not be liable for matters for which they had no notice when accepting federal funding. *Gebser*, 524 U.S. at 290-91. "Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to

29

standard is not to be applied when addressing a plaintiff's claims for equitable relief." *Frederick v. Simpson Coll.*, 160 F. Supp. 2d 1033, 1036 (S.D. Iowa 2001). In the instant case, the harm results directly from the Compelled Affirmation Policy, and Plaintiffs seek only injunctive and declaratory relief, not compensatory damages. Nor would any nominal damages sought trigger the deliberate indifference standard, as a "monetary award may be equitable when it is merely incidental to or intertwined with injunctive relief." *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 866 (9th Cir. 2017) (citing *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 571 (1990). *See* Am. Compl. 62-63 (Prayer for Relief), ECF No. 197.

Even if the deliberate indifference standard applied, the District was indeed indifferent to the rights of SPP students, particularly privacy rights. The District publicly admitted that student privacy merited sex-separated facilities before it yielded to the threat to its federal funding, *see* § II.B.2.c, *supra*, and was afterward publicly noticed of cross-sex exposure by Ms. Wilson, Am. Compl. 51 ¶ 246, ECF No. 197, but did nothing to restore students' privacy from the opposite sex in its privacy facilities, even after being sued. By disregarding student privacy rights and intentionally intermingling the sexes via its Compelled Affirmation Policy, the District was "deliberately indifferent." *See Gold v. City of Miami*, 151 F.3d 1346, 1350-51 (11th Cir. 1998) (finding deliberate indifference when city made a "deliberate choice" to not address a need to supervise its employees). Although deliberate indifference need not be shown to obtain injunctive or declaratory relief, the District nonetheless has been deliberately indifferent to Plaintiffs' (and all students') bodily privacy and related legal rights.

## CONCLUSION

For the reasons set forth above, the motions to dismiss should be denied.

---

institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290.

Respectfully submitted this 30th day of April, 2018.


By: /s/ Gary S. McCaleb

THOMAS L. BREJCHA, IL 0288446
PETER BREEN, IL 6271981
THOMAS OLP, IL 3122703
**THOMAS MORE SOCIETY**
19 S. La Salle Street, Suite 603
Chicago, Illinois 60603
(312) 782-1680
(312) 782-1887 Fax
tbrejcha@thomasmoresociety.org
pbreen@thomasmoresociety.org
tolp@thomasmoresociety.org

GARY S. MCCALEB, AZ 018848*
JEANA HALLOCK, AZ 032678*
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 Fax
gmccaleb@adflegal.org
jhallock@adflegal.org

J. MATTHEW SHARP, GA 607842*
**ALLIANCE DEFENDING FREEDOM**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, Georgia 30043
(770) 339-0774
(770) 339-6744 Fax
msharp@adflegal.org

DOUGLAS G. WARDLOW, AZ 032028*
14033 Commerce Avenue NE
#300-310
Prior Lake, Minnesota 55372
(612) 840-8073
dwardlowlaw@gmail.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: /s/ Gary S. McCaleb _____

GARY S. MCCALEB
*Attorney for Plaintiffs*