**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STUDENTS AND PARENTS FOR PRIVACY**, a voluntary unincorporated association; and **VICTORIA WILSON**, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | |
| **SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, COUNTY OF COOK AND STATE OF ILLINOIS**, | ) ) ) ) | Case No. 1:16-cv-04945    The Honorable Jorge L. Alonso |
| Defendants, | ) ) | |
| and | ) ) | |
| **STUDENTS A, B, AND C**, by and through their parents and legal guardians **Parents A, B, and C**, and the **ILLINOIS SAFE SCHOOLS ALLIANCE**, | ) ) ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

<u>**INTERVENOR-DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**</u>

Intervenor-Defendants Students A, B, and C, Parents A, B, and C, and the Illinois Safe Schools Alliance ("Intervenor-Defendants") submit this notice to alert the Court that on May 24, 2018, the Third Circuit issued a bench ruling and judgment in *Joel Doe, et al v. Boyertown Area School District, et al*, Case No. 17-3113, which bears on Intervenor-Defendants' Motion to Dismiss the First Amended Complaint. The judgment is attached as Exhibit 1. The district court's August 25, 2017, opinion is attached as Exhibit 2. Intervenor-Defendants will submit the Third Circuit's formal opinion when it becomes available.

Dated: June 4, 2018

John Knight
ROGER BALDWIN FOUNDATION OF
ACLU, INC.
150 North Michigan Avenue
Suite 600
Chicago, IL 60601
Telephone: (312) 201-9740 ext. 335
Facsimile: (312) 288-5225
jknight@aclu-il.org

- and -

Ria Tabacco Mar*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION

125 Broad St., 18th Floor
New York, NY 10004
Telephone: (212) 549-2627
Facsimile: (212) 549-2650
rmar@aclu.org

* Admitted pro hac vice

Respectfully submitted,

*/s/ Laura R. Hammargren*
Britt M. Miller
Timothy S. Bishop
Laura R. Hammargren
Linda X. Shi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
bmiller@mayerbrown.com
tbishop@mayerbrown.com
lhammargren@mayerbrown.com
lshi@mayerbrown.com

- and –

Catherine A. Bernard
Madeleine L. Hogue*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
cbernard@mayerbrown.com
mhogue@mayerbrown.com

* Admitted pro hac vice

*Counsel for Students A, B, and C, and the Illinois Safe Schools Alliance*

1

# Exhibit 1

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3113
_____

JOEL DOE, a Minor, by and through his Guardians
John Doe and Jane Doe; MACY ROE; MARY SMITH;
JACK JONES, a minor, by and through his Parents
John Jones and Jane Jones, *CHLOE JOHNSON, A minor
by and through her Parent Jane Johnson; *JAMES JONES, A Minor
by and through his Parents John Jones and Jane Jones
Appellants

v.

BOYERTOWN AREA SCHOOL DISTRICT;
DR. BRETT COOPER, In his official capacity as Principal;
DR. E. WAYNE FOLEY, In his official capacity as Assistant Principal;
DAVID KREM, Acting Superintendent

PENNSYLVANIA YOUTH CONGRESS FOUNDATION (Intervenor in D.C.)

*(Pursuant to Court Order dated 04/06/18)
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 5-17-cv-01249)
District Judge: Honorable Edward G. Smith
_____

Argued May 24, 2017
_____

Before: MCKEE, SHWARTZ and NYGAARD, Circuit Judges

_____

JUDGMENT
_____

We agree Plaintiffs have not demonstrated a likelihood of success on the merits and that they have not established that they will be irreparably harmed if their Motion to Enjoin the Boyertown School District's policy is denied.

We therefore Affirm the District Court's denial of a preliminary injunction substantially for the reasons that the Court explained in its exceptionally well reasoned Opinion of August 25, 2017.

A formal Opinion will follow. The mandate shall issue forthwith. The time for filing a petition for rehearing will run from the date that the Court's formal opinion is entered on the docket.

For the Court,

<u>Theodore A. McKee</u>
Circuit Judge

ATTEST:

<u>s/ Patricia S. Dodszuweit</u>
Clerk

DATED: May 24, 2018

OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**



UNITED STATES COURT OF APPEALS

21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA  19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE

215-597-2995

May 24, 2018

Maureen P. Alger
Cooley
3175 Hanover Street
Palo Alto, CA 94304

David W. Brown
Levin Legal Group
1800 Byberry Road
1301 Masons Mill Business Park
Huntingdon Valley, PA 19006

Matthew J. Clark
Foundation for Moral Law
1 Dexter Avenue
Montgomery, AL 36104

Leslie Cooper
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Mary J. Eaton
Willkie, Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

Nicholas S. Feltham
Drinker Biddle & Reath
One Logan Square
Suite 2000
Philadelphia, PA 19103

Kellie M. Fiedorek
Alliance Defending Freedom
440 First Street, N.W.
Suite 600
Washington, DC 20001

Terry L. Fromson
Women's Law Project
125 South 9th Street
Suite 300
Philadelphia, PA 19107

Omar Gonzalez-Pagan
Lambda Legal
120 Wall Street
19th Floor
New York, NY 10005

Cathy R. Gordon
Litchfield Cavo
420 Fort Duquesne Boulevard
One Gateway Center, Suite 600
Pittsburgh, PA 15222

Christiana M. Holcomb
Alliance Defending Freedom
440 First Street, N.W.
Suite 600
Washington, DC 20001

Michael I. Levin
Levin Legal Group
1800 Byberry Road
1301 Masons Mill Business Park
Huntingdon Valley, PA 19006

Jesse R. Loffler
Fried Frank Harris Shriver & Jacobson
One New York Plaza
New York, NY 10004

Janice Mac Avoy
Fried Frank Harris Shriver & Jacobson
One New York Plaza
New York, NY 10004

Gary S. McCaleb
Alliance Defending Freedom
15100 North 90th Street
Scottsdale, AZ 85260

Shannon P. Minter
National Center for Lesbian Rights
870 Market Street
Suite 370
San Francisco, CA 94102

Ryan M. Moore
Dechert
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

Amanda L. Nelson
Cozen O'Connor
45 Broadway
16th Floor
New York, NY 10006

Alice O'Brien
National Education Association
Office of General Counsel
1201 16th Street, N.W.
Washington
Washington, DC 20036

Aaron M. Panner
Kellogg Hansen Todd Figel & Frederick
1615 M Street NW
Suite 400
Washington, DC 20036

Wesley R. Powell
Willkie, Farr & Gallagher
787 Seventh Avenue
New York, NY 10019

Cynthia C. Robertson
Pillsbury Winthrop Shaw Pittman
1200 17th Street, N.W.
Washington, DC 20036

Mary Catherine Roper
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19106

Jeremy L. Samek
Independence Law Center
23 North Front Street
Harrisburg, PA 17101

Harper Seldin
Cozen O'Connor
1650 Market Street
One Liberty Place, Suite 2800
Philadelphia, PA 19103

Honorable Edward G. Smith
United States District Court for the Eastern District of Pennsylvania
Holmes Building
101 Larry Holmes Drive
4th Floor
Easton, PA 18042

Ria Tabacco Mar
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Randall L. Wenger
Independence Law Center
23 North Front Street
Harrisburg, PA 17101

Amy Whelan
National Center for Lesbian Rights
870 Market Street
Suite 370
San Francisco, CA 94102

Scott B. Wilkens
Jenner & Block
1099 New York Avenue
Suite 900
Washington, DC 20001

Kara C. Wilson
Cooley
3175 Hanover Street
Palo Alto, CA 94304


RE: Joel Doe, et al v. Boyertown Area School District, et al
Case Number: 17-3113
District Court Case Number: 5-17-cv-01249


ENTRY OF JUDGMENT

Today, **May 24, 2018** the Court issued a case dispositive order in the above-captioned matter which serves as this Court's judgment. Fed. R. App. P. 36.

If you wish to seek review of the Court's decision, you may file a petition for rehearing. The procedures for filing a petition for rehearing are set forth in Fed. R. App. P. 35 and 40, 3rd Cir. LAR 35 and 40, and summarized below.

Time for Filing:
14 days after entry of judgment.
45 days after entry of judgment in a civil case if the United States is a party.

Form Limits:
3900 words if produced by a computer, with a certificate of compliance pursuant to Fed. R. App. P. 32(g).
15 pages if hand or type written.

Attachments:
A copy of the panel's opinion and judgment only.
Certificate of service.
Certificate of compliance if petition is produced by a computer.
No other attachments are permitted without first obtaining leave from the Court.

Unless the petition specifies that the petition seeks only panel rehearing, the petition will be construed as requesting both panel and en banc rehearing. Pursuant to Fed. R. App. P. 35(b)(3), if separate petitions for panel rehearing and rehearing en banc are submitted, they will be treated as a single document and will be subject to the form limits as set forth in Fed. R. App. P. 35(b)(2). If only panel rehearing is sought, the Court's rules do not provide for the subsequent filing of a petition for rehearing en banc in the event that the petition seeking only panel rehearing is denied.

Please consult the Rules of the Supreme Court of the United States regarding the timing and requirements for filing a petition for writ of certiorari.

Very truly yours,
Patricia S. Dodszuweit, Clerk

By: s/ Carmella/cjg
Case Manager
267-299-4928

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOEL DOE, a minor, by and through his guardians, JOHN DOE and JANE DOE; MARY SMITH; JACK JONES, a Minor, by and through his parents, JOHN JONES and JANE JONES; and MACY ROE, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 17-1249 |
| | : | |
| v. | : | |
| | : | |
| BOYERTOWN AREA SCHOOL DISTRICT; DR. RICHARD FAIDLEY, in his official capacity as superintendent of the Boyertown Area School District; DR. BRETT COOPER, in his official capacity as principal; and DR. E. WAYNE FOLEY, in his official capacity as assistant principal, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| PENNSYLVANIA YOUTH CONGRESS FOUNDATION, | : | |
| | : | |
| Intervenor-Defendant. | : | |

## **MEMORANDUM OPINION**

Smith, J.                                                                     August 25, 2017

The current issue before the court – whether the court should issue a preliminary injunction prohibiting a school district from maintaining its practice that started in the 2016-17 school year of allowing transgender students to use the bathrooms and locker rooms of the sex to which they identify – involves intricate and genuine issues relating to, *inter alia*, the personal privacy of high school students, a school district's discretion and judgment relating to the conduct of students in its schools, the meaning of the word "sex" in Title IX, and the rights of all

students to complete access to educational opportunities, programs, and activities available at school. The general issue of transgender persons' access to privacy facilities such as bathrooms has recently received nationwide attention, and the issue of transgender students' access to educational institutions' bathrooms and locker rooms aligning to their gender identity has spurred litigation with unsurprisingly inconsistent results. With regard to cases involving transgender students, they have generally centered on whether precluding transgender students from using facilities consistent with their gender identity violates those students' rights under the Equal Protection Clause of the Fourteenth Amendment or Title IX. And as to Title IX, which generally precludes public schools receiving federal financial assistance from discriminating "on the basis of sex," this has resulted in a debate as to whether "sex" refers to biological sex (which the plaintiffs in this case define as a person's classification as male or female at birth based on the presence of external and internal reproductive organs) or a broader and arguably more contemporary definition of sex that could include sex stereotyping or gender identity.

Here, the court is presented with four students, three who will be seniors for the upcoming 2017-18 school year and one student who recently graduated, claiming that the defendant school district's practice of allowing transgender students (who the plaintiffs choose to identify as "members of the opposite sex" rather than as transgender students) to access bathrooms and locker rooms consistent with their gender identity violates (1) their constitutional right to privacy under the Fourteenth Amendment, (2) their right of access to educational opportunities, programs, benefits, and activities under Title IX because they are subject to a hostile environment, and (3) their Pennsylvania common law right of privacy preventing intrusion upon their seclusion while using bathrooms and locker rooms. The plaintiffs not only raise concerns with being in privacy facilities with transgender students regardless of whether the

2

transgender students actually view them in a state of partial undress, but they raise concerns with the possibility of viewing a transgender person in a state of undress or having a transgender person present to hear them while they are attending to their personal needs while in the bathroom.  At bottom, the plaintiffs are opposed to the mere presence of transgender students in locker rooms or bathrooms with them because they designate them as members of the opposite sex and note that, *inter alia*, society has historically separated bathrooms and locker rooms on the basis of biological sex to preserve the privacy of individuals from members of the opposite biological sex.

The plaintiffs now seek a preliminary injunction which would require the school district to cease its practice and return to the prior practice of requiring all students to only use the privacy facilities corresponding to their biological sex.  The plaintiffs have a heavy burden here because they are not seeking to preserve the status quo that has existed since the start of the 2016-17 school year and instead are seeking to have the school district cease its current practice.

The court has thoroughly reviewed all evidence in the record and has considered the parties' well-articulated arguments in support of their respective positions.  After reviewing the entire record, the court finds that the plaintiffs are not entitled to preliminary injunctive relief because they have not shown that they are likely to succeed on the merits on any of their causes of action and they have failed to show irreparable harm.  Accordingly, the court will deny the plaintiffs' motion for a preliminary injunction.

## I.      SUBJECT-MATTER JURISDICTION

The court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1367.[1]

---

[1] In the amended complaint, the plaintiffs reference 28 U.S.C. § 1361, the federal Mandamus Act, as a possible basis for subject-matter jurisdiction over this action against a school district and three school district administrators.  It

## II.     VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).[2]

## III.     PROCEDURAL HISTORY

The initial plaintiff in this matter, Joel Doe, a minor, by and through his guardians, John Doe and Jane Doe, commenced this action on March 21, 2017, by filing (1) a complaint against the defendants, Boyertown Area School District (the "School District"), Dr. Richard Faidley, in his official capacity, Dr. Brett Cooper, in his official capacity, and Dr. E. Wayne Foley, in his official capacity, and (2) a motion to proceed pseudonymously.  Doc. Nos. 1-4.  On April 3, 2017, Aidan DeStefano, who was then a senior at the Boyertown Area Senior High School, and the Pennsylvania Youth Congress Foundation ("PYC"), a youth-led, statewide LGBTQ advocacy organization, filed a motion to intervene in this litigation.  Doc. No. 7.

On April 18, 2017, the plaintiff filed an amended complaint in which three new plaintiffs were added to this litigation: (1) Mary Smith, (2) Jack Jones, a minor, by and through his parents, John Jones and Jane Jones, and (3) Macy Roe.  Doc. No. 8.  In the amended complaint, the plaintiffs generally complain that the defendants' policy and practice of permitting transgender individuals (who are identified as members of the "opposite sex" instead of being identified as "transgender") to use restrooms, locker rooms, and shower facilities designated for the biological sex to which they identify violates the plaintiffs' "fundamental right to bodily privacy contrary to constitutional and statutory principles, including the Fourteenth Amendment, Title IX, invasion of seclusion [under Pennsylvania state law], and Pennsylvania's Public School

---

does not appear that the court has jurisdiction under section 1361 because "by its terms, [section 1361] applies only to writs issued against an 'officer or employee of the United States.'"  *Weaver v. Wilcox*, 650 F.2d 22, 25 (3d Cir. 1981) (quoting 28 U.S.C. § 1361).  It does not appear that any defendant is an officer or employee of the United States.

[2] Again, the plaintiffs reference 28 U.S.C. § 1391(e) as a basis for venue, but that subsection only pertains to "[a]ctions where [a] defendant is officer or employee of the United States[.]" 28 U.S.C. § 1391(e).  As previously indicated, it does not appear that the plaintiffs include a claim against an officer or employee of the United States.

Code of 1949, which requires separate facilities on the basis of sex."[3]  Amended Compl. at ¶¶ 1, 2, 20, 41.  For relief, the plaintiffs seek, *inter alia*, (1) declarations that the defendants' policy and actions (a) violate their constitutional right to privacy, (b) violate the Pennsylvania School Code of 1949, (c) constitute an unlawful intrusion upon Joel Doe and Jack Jones's seclusion and bodily privacy rights, and (d) impermissibly burden their rights under Title IX to be free from discrimination on the basis of sex by creating a sexually harassing hostile environment, (2) an injunction "enjoining the District's policy and ordering the District to permit only females to enter and use the multi-user girls' private facilities, including locker rooms and restrooms, and only males to enter and use the multi-user boys' private facilities, including locker rooms and restrooms," (3) compensatory damages, and (4) costs and attorney's fees.  *Id.* at 38-39.

With regard to the specific factual allegations pertaining to each plaintiff, Joel Doe alleges that he was a junior at the Boyertown Area Senior High School on or about October 31, 2016, and was changing in the boys' locker room for his mandatory physical education course. *Id.* at ¶¶ 10, 43, 50.  While standing in his underwear and about to put on his gym clothes, he observed a "member of the opposite sex changing with him in the locker room."  *Id.* at ¶ 50. This "member of the opposite sex" was "wearing nothing but shorts and a bra."  *Id.*

Due to Joel Doe's "immediate confusion, embarrassment, humiliation, and loss of dignity," he "quickly put his clothes on and left the locker room."  *Id.* at ¶ 51.  Joel Doe, along with other classmates, then went to Dr. Foley, the assistant principal of the Boyertown Area

---

[3] The plaintiffs bring their Fourteenth Amendment claim under 42 U.S.C. § 1983.  Amended Compl. at ¶ 2. Additionally, although the plaintiffs claim that the defendants' actions violate the Pennsylvania Public School Code of 1949, there is no specific cause of action for this violation in the amended complaint and it is unclear whether the Public School Code provides for a private right of action.  *See Issa v. School Dist. of Lancaster*, 847 F.3d 121,141 (3d Cir. 2017) (indicating that there is no express cause of action under the Public School Code, but leaving issue unresolved as to whether there is an implied right of action).  Instead, the amended complaint asserts only causes of action for violations of the Fourteenth Amendment, Title IX, and Pennsylvania's common law tort of intrusion upon seclusion.  *See generally* Amended Compl. at 21-39.  The court notes that the plaintiffs sought declaratory relief that the defendants' actions violated the School Code.  *See id.* at 38.

Senior High School, to let him know what happened. *Id.* at ¶¶ 22, 52. When Joel Doe informed Dr. Foley that there had been a girl in the locker room, Dr. Foley indicated that although the legality of this was up in the air, students who mentally identified themselves with the opposite sex could choose the locker room and bathroom to use because their physical sex did not matter. *Id.* at ¶ 53. Dr. Foley also told Joel Doe that there was nothing he could do to protect him from this situation and that he needed to "'tolerate' it and make it as 'natural' as he possibly [could]." *Id.* at ¶¶ 54-56.

The plaintiffs assert that this action "marginalized and shamed Joel Doe, and unlawfully attempted to coerce and intimidate [him] into accepting continuing violations of his bodily privacy." *Id.* at ¶ 62. They further assert that the School District's "directive to Joel Doe was that he must change with students of the opposite sex and make it as natural as possible and that anything less would be intolerant and bullying against students who profess a gender identity with the opposite sex." *Id.* at ¶ 61.

Because the School District's policy of allowing persons of the opposite sex to use the boys' facilities causes him anxiety, embarrassment, and stress, Joel Doe has opted to hold his bladder and refrain from using restrooms as much about possible and, to the extent that he needs to use the restroom, he stresses about whether he could use a restroom without running into persons of the opposite sex. *Id.* at ¶ 63. Thus, the defendants' policy inhibits him from timely voiding, which has "direct and adverse physiological effects." *Id.* at ¶ 64.

Joel Doe's parents, John and Jane Doe, separately met with Dr. Foley, Dr. Cooper, and Dr. Faidley to discuss this issue.[4] *See id.* at ¶¶ 65-72. They met with Dr. Foley on or about

---

[4] The plaintiffs also allege that Joel Doe was a student for half of the day at the Berks Career and Technology School – Oley Campus ("BCTS"). Amended Compl. at ¶ 69. The plaintiffs allege that the School District "marginalized, intimidated, and shamed Joel Doe" by contacting the principal at BCTS to disclose Joel Doe's meeting with Dr. Foley over the locker room incident. *Id.* The BCTS principal then pulled Joel Doe out of class to

November 2, 2016, and, during this meeting, Dr. Foley informed them that the School District was "'all-inclusive'" and that if Joel Doe had an issue with the policy, Dr. Foley would get him permission to use the nurse's office to change. *Id.* at ¶ 66. Mr. and Mrs. Doe then met with Dr. Cooper, the principal of Boyertown Area Senior High School, and Dr. Cooper told them that he would not do anything since Joel Doe could change in the nurse's office if he did not want to change around people of the opposite sex. *Id.* at ¶ 67. Ultimately, they met with Dr. Faidley, who informed them that if Joel Doe was uncomfortable changing under the new policy or with using the nurse's office, he could withdraw from school to be home schooled while still attending BCTS if he wanted. *Id.* at ¶ 72.

As for Jack Jones, he was also a junior at the Boyertown Area Senior High School for the 2016-17 school year. *Id.* at ¶ 12. During the first week of November 2016, he was changing in the locker room for his physical education class and was in his underwear when he saw classmates gesturing and looking at something behind them. *Id.* at ¶ 86. Upon turning, he saw a member of the opposite sex in the locker room with him. *Id.* He then "experienced immediate confusion, embarrassment, humiliation, and loss of dignity," and put on his clothes and exited the locker room. *Id.* at ¶ 87.

Jack Jones informed his parents about the incident and his mother, Jane Jones, contacted and spoke to Dr. Cooper. *Id.* at ¶ 89. Jane Jones informed Dr. Cooper about the privacy violation and asked "for such infractions to stop." *Id.* Dr. Cooper informed her that the law required him to permit girls identifying as boys to use the private facilities with her son. *Id.* at ¶ 90. He did not offer any single-user facility for Jack Jones to use as an alternative. *Id.*

---

have a conversation with him. *Id.* at ¶ 70. During this conversation, the BCTS principal told Joel Doe that "'he wanted to make sure none of that negativity was going to happen at his school.'" *Id.*

Similar to Joel Doe, Jack Jones feels violated, humiliated, and embarrassed by the invasion of privacy. *Id.* at ¶ 91. He also opts to hold his bladder, refrains from using the restrooms as much as possible, and stresses about whether he can use a restroom without running into members of the opposite sex. *Id.* at ¶ 93. This causes him an "ever-present distraction throughout the day, including during class instructional time." *Id.* at ¶ 94.

Concerning Mary Smith, she was a junior at the Boyertown Area Senior High School for the 2016-17 school year. *Id.* at ¶ 11. In March 2017, she entered a girls' bathroom at the high school and saw a male student washing his hands in the sink. *Id.* at ¶ 99. After immediately experiencing shock, confusion, and embarrassment, she went to report the incident to the school office. *Id.* at ¶ 104. She eventually was able to report the incident to Dr. Foley, and during her conversation with him she learned for the first time that the school was permitting members of the opposite sex to use the girls' bathrooms. *Id.* at ¶¶ 105-07. Dr. Foley stated that even though the student's sex is male, the student could use the girls' restrooms and locker rooms because the student identified as a girl. *Id.* at ¶ 108. Dr. Foley also indicated that they had not told parents about this policy, but he noted that they might be working on that. *Id.* at ¶ 109. Dr. Foley did not offer Mary Smith the option to use restrooms or locker rooms outside the presence of male students, such as the nurse's office. *Id.* at ¶ 110.

As with the Joel Doe and Jack Jones, Mary Smith "feels violated, humiliated, and embarrassed by the invasion of her privacy." *Id.* at ¶ 112. She also opts to hold her bladder, refrains from using the restrooms as much as possible, and stresses about whether she can use a restroom without running into members of the opposite sex. *Id.* at ¶ 113. This causes her an "ever-present distraction throughout the day, including during class instructional time." *Id.* She has also alleged that due to the stress and anxiety caused by the new policy and the defendants'

actions, she is not returning to the School District for her senior year. *Id.* at ¶ 117. She would have returned for her senior year if the School District's policy was not in place. *Id.* at ¶ 118.

Regarding the final plaintiff, Macy Roe, she is an 18-year-old girl who was a senior at the Boyertown Area Senior High School for the 2016-17 school year. *Id.* at ¶ 13. It does not appear from the amended complaint that Macy Roe had any direct interaction with a member of the opposite biological sex in a locker room or restroom; yet, due to the defendants' policy and practice, she opts to hold her bladder, refrains from using the restrooms as much as possible, and stresses about whether she can use a restroom without running into members of the opposite sex. *Id.* at ¶ 126. She is also constantly distracted during the school day due to the aforementioned concerns, and asserts that the policy inhibits her from timely voiding. *Id.* at ¶ 127.

The plaintiffs filed an amended motion to proceed pseudonymously along with the amended complaint on April 18, 2017. Doc. No. 9. The plaintiffs then filed the instant motion for a preliminary injunction on May 17, 2017. Doc. No. 16. The court had a telephone conference to discuss the amended motion to proceed pseudonymously, the motion to intervene, and scheduling for the motion for a preliminary injunction on May 19, 2017. On May 24, 2017, the court entered an order which, *inter alia*, (1) granted the motion to intervene without objection insofar as PYC sought to intervene, (2) provided the parties with additional time to submit briefs on the motion to intervene by Aidan DeStefano insofar as the plaintiffs opposed his motion to intervene, (3) granted the amended motion to proceed pseudonymously without objection, (4) provided the parties with deadlines for filing submissions relating to the motion for a preliminary injunction, and (5) directed the parties to immediately commence with discovery related to the motion for a preliminary injunction. Order, Doc. No. 29.

9

PYC filed an answer to the amended complaint on May 26, 2016. Doc. No. 30. On the same date, PYC and Aidan DeStefano filed a supplemental memorandum in support of Aidan DeStefano's motion to intervene. Doc. No. 31. The plaintiffs then filed a brief in opposition to Aidan DeStefano's motion to intervene on June 2, 2017. Doc. No. 32.

The defendants and PYC separately filed memoranda of law in opposition to the motion for a preliminary injunction on June 9, 2017. Doc. Nos. 33, 34. The plaintiffs then filed a reply brief in support of the motion for a preliminary injunction on June 16, 2017. Doc. No. 36.

On July 13, 2017, the plaintiffs filed a motion to present the testimony of Joel Doe and Mary Smith *in camera* during the evidentiary hearing on July 17, 2017.[5] Doc. No. 45. The parties then separately filed proposed findings of fact and conclusions of law on July 14, 2017. Doc. Nos. 46-48. PYC filed a response to the plaintiffs' motion to present testimony *in camera* on July 15, 2017.[6] Doc. No. 49.

The court held evidentiary hearings in this matter on July 17, 2017, and July 31, 2017. On July 17, 2017, the plaintiffs presented the live testimony of Joel Doe and Mary Smith, and PYC presented the live testimony of its expert, Dr. Scott Leibowitz, and Aidan DeStefano. On July 31, 2017, the court heard the continued testimony of Dr. Leibowitz (via videoconferencing) and also heard live testimony from Dr. Cooper. Throughout the proceedings, the parties additionally provided the court with, *inter alia*, numerous exhibits, deposition transcripts of all four plaintiffs (including trial depositions of Macy Roe and Jack Jones) and other witnesses including Dr. Foley, Dr. Cooper, Dr. Faidley, and Dr. Leibowitz.

---

[5] Although omitted from the main text of the procedural history in this matter, the defendants filed a motion to dismiss the amended complaint and supporting memorandum of law on June 16, 2017. Doc. Nos. 38, 39. The plaintiffs filed a memorandum in opposition to the motion on June 30, 2017, and the defendants filed a reply brief in support of their motion on July 7, 2017. Doc. No. 41, 43.

[6] The court resolved this motion by clearing the courtroom and providing members of the public, including members of the press, with the opportunity to hear the testimony (except where necessary to protect the plaintiffs' anonymity) in the undersigned's chambers as the court's audio system allows for court proceedings to be heard in chambers.

The parties separately filed supplemental findings of fact and conclusions of law on August 10, 2017. Doc. Nos. 57-59. The court then heard oral argument on the motion for a preliminary injunction on August 11, 2017.[7]

During the oral argument, the plaintiffs' objected to exhibit 1 to the School District defendants' supplemental proposed findings of fact and conclusions of law insofar as they had attached purported public school district policies referencing transgender students. At the plaintiffs' request, the court provided them with an opportunity to submit a memorandum of law in support of their objection, and the plaintiffs filed a motion to strike this exhibit on August 16, 2017. Doc. No. 63. On the same date, the School District defendants filed a response in opposition to the motion to strike. Doc. No. 64.

On August 17, 2017, PYC submitted a supplement to its proposed findings of fact and conclusions of law in which it seeks to have the court consider the *Amici Curiae* brief submitted by school administrators from 33 states and the District of Columbia in support of the plaintiff/appellant in *G.G. ex rel. Grimm v. Gloucester County School Board*, No. 15-2056 (4th Cir. 2015). Doc. No. 65. On the same date, the plaintiffs filed a response to PYC's supplemental submission. Doc. No. 66.

## IV.    FINDINGS OF FACT

After carefully considering all of the evidence presented during the evidentiary hearings on July 17, 2017, and July 31, 2017, and the evidence introduced and admitted before the court closed the evidentiary record on August 11, 2017, after assigning such weight to the evidence as

---

[7] During oral argument, the parties indicated that they were submitting the various depositions as evidence without designations, and they also submitted (1) unredacted and redacted transcripts of the evidentiary hearings, (2) unredacted and redacted transcripts of the plaintiffs' depositions and trial depositions, (3) Dr. Faidley's deposition transcript, (4) the plaintiffs' redacted interrogatory responses, (5) a redacted November 16, 2016 email from Jane Doe, and (6) a redacted report relating to Mary Smith. The parties also provided the court with a stipulation of facts.

the court deemed proper and disregarding the testimony that the court found to lack credibility, the pertinent facts are as follows:

**A.     The School District Defendants, the School District's Practice, and the Facilities at the Boyertown Area Senior High School**

1.     The defendant, the Boyertown Area School District (the "School District"), is organized under the laws of the Commonwealth of Pennsylvania, and includes public educational institutions that provide students a kindergarten through twelfth grade education. Amended Compl. at ¶¶ 14, 15, Doc. No. 8.

2.     The School District receives "Federal financial assistance" potentially subjecting it to the requirements of Title IX.  Plaintiffs' Ex. P-42, Resp. to Pls.' First Set of Reqs. for Admis. to Defs. ("School Dist. Resp. to Requests for Admis.") at ¶ 1.

3.     The School District is an "educational institution" as defined under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681.  School Dist. Resp. to Requests for Admis. at ¶ 2.

4.     The School District's Board of Directors (the "School Board") establishes official policies for the School District.  Transcript of Evidentiary Hr'g on July 31, 2017 ("7-31-17 Tr.") at 108.

5.     The defendant, Dr. Richard H. Faidley, who has been working in the education field since 1990, served as the Superintendent of Schools for the School District from August 2013 until resigning as Superintendent no later than July 25, 2017.  June 21, 2017 Dep. of Dr. Richard H. Faidley ("Faidley Dep.") at 12; 7-31-17 Tr. at 107.[8]

---

[8] Although the School District defendants indicate in their second set of proposed findings of fact and conclusions of law that Dr. Faidley resigned as Superintendent on July 17, 2017, effective July 18, 2017, *see* Defendants' Second Set of Proposed Findings of Fact and Conclusions of Law Regarding Pls.' Mot. for Prelim. Inj. ("Defs.' Findings and Conclusions") at 2, ¶ 2, the court could not locate this fact in the record.  Instead, the only fact relating to the

6.     The defendant, Dr. Brett A. Cooper, is the Principal of the Boyertown Area Senior High School ("BASH"), and has worked in this role for the past eight-and-a-half years. 7-31-17 Tr. at 106, 130.  Prior to becoming Principal at BASH, Dr. Cooper was an Assistant Principal at BASH for three-and-a-half years.   July 7, 2017 Dep. of Dr. Brett A. Cooper ("Cooper Dep.") at 18.

7.     There were 1659 students at BASH during the 2016-17 school year.  June 21, 2017 Dep. of Dr. E. Wayne Foley ("Foley Dep.") at 15.

8.     As Principal of BASH, Dr. Cooper is responsible for all of BASH's operations, including, *inter alia*, responding to inquiries by parents, guardians, and community members, having final decision over disciplinary matters, supervising staff and faculty, implementing the curriculum approved by the School Board, and establishing, in conjunction with the School District office lead by the Superintendent, practices and procedures affecting BASH students. Cooper Dep. at 20, 21.

9.     Dr. Cooper reports directly to School District Assistant Superintendent of Operations Rob Scoboria ("Assistant Superintendent Scoboria").  Cooper Dep. at 21; 7-31-17 Tr. at 106.   Dr. Cooper often communicates with Assistant Superintendent Scoboria about operations, policies, and special education issues involving BASH.  Cooper Dep. at 22, 23.

10.     Assistant Superintendent Scoboria reports directly to Dr. Faidley.  Cooper Dep. at 21.

11.     BASH has grade-level Assistant Principals who report directly to Dr. Cooper. Cooper Dep. at 23; 7-31-17 Tr. at 110-11.

---

date of resignation is that it appears that the School Board named an Interim Superintendent, David Krem, to replace Dr. Faidley on July 25, 2017.  *See* 7-31-17 Tr. at 107.

12.   One of the BASH Assistant Principals is Dr. E. Wayne Foley, who is assigned to the graduating class of 2018.  Cooper Dep. at 24; Foley Dep. at 11, 12.  Dr. Foley has served in this role since April 30, 2012.  Foley Dep. at 11.

13.   Dr. Cooper meets regularly with the BASH Assistant Principals.  Cooper Dep. at 24.

14.   Prior to the 2016-17 school year, BASH students were to use the locker room or bathroom aligning with their biological sex.  7-31-17 Tr. at 131; Faidley Dep. at 34, 40.

15.   BASH students were previously separated on the basis of their biological sex in part to protect their personal privacy and safety from members of the opposite sex while using bathrooms and locker rooms.  7-31-17 Tr. at 131, 132; Cooper Dep. at 35; Foley Dep. at 23, 24, 26, 53-54.

16.   Under this practice, BASH administration would have disciplined and, in fact, disciplined, any students if they entered the opposite biological sex's bathroom or locker room.  Foley Dep. at 24, 25; 7-31-17 Tr. at 112; Cooper Dep. at 31.

17.   In the 2014-15 school year, a school counselor communicated to Dr. Cooper that Aidan DeStefano ("DeStefano"), a tenth grade student and biological female who was identifying as a male, *i.e.* a transgender male, was uncomfortable using the girls' bathrooms at BASH.  Cooper Dep. at 75-78; *see also* Faidley Dep. at 25, 26, 27.

18.   Dr. Cooper discussed this request, and the possibility of DeStefano using the single-user facility in the nurse's office, with Assistant Superintendent Scoboria.  7-31-17 Tr. at 109.

19.    The School District allowed DeStefano to use a private, single-user facility in the nurse's office for restroom and changing purposes.  Cooper Dep. at 79; Faidley Dep. at 28; Transcript of Evidentiary Hr'g on July 17, 2017 ("7-17-17 Tr.") at 216, 217.

20.    On May 13, 2016, the United States Department of Justice, Civil Rights Division, and the United States Department of Education, Office for Civil Rights, issued a "Dear Colleague Letter on Transgender Students" (the "May 2016 Dear Colleague Letter"). Defendants' Mem. in Opp. to the Mot. for Prelim. Inj. at Ex. 2, Doc. No. 34-2.

21.    The May 2016 Dear Colleague Letter stated, *inter alia*, that Title IX's prohibition of "sex discrimination in educational programs and activities operated by recipients of Federal financial assistance . . . encompasses discrimination based on a student's gender identity including discrimination based on a student's transgender status."  May 2016 Dear Colleague Letter at 1.

22.    The May 2016 Dear Colleague Letter indicated, *inter alia*, that the Department of Justice and Department of Education "have determined that this letter is *significant guidance*." May 2016 Dear Colleague Letter at 1 (emphasis in original; footnote omitted).

23.    The May 2016 Dear Colleague Letter stated, *inter alia*, as follows:

The Departments treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations.  This means that a school must not treat a transgender student differently from the way it treats other students of the same gender identity.  The Departments' interpretation is consistent with courts' and other agencies' interpretations of Federal laws prohibiting sex discrimination.

The Departments interpret Title IX to require that when a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, the school will begin treating the student consistent with the student's gender identity.  Under Title IX, there is no medical diagnosis or treatment requirement that students must meet as a prerequisite to being treated consistent with their gender identity.  Because transgender students often are unable to obtain identification documents that reflect their gender identity (*e.g.*, due to

15

restrictions imposed by state or local law in their place of birth or residence), requiring students to produce such identification documents in order to treat them consistent with their gender identity may violate Title IX when doing so has the practical effect of limiting or denying students equal access to an educational program or activity.

A school's Title IX obligation to ensure nondiscrimination on the basis of sex requires schools to provide transgender students equal access to educational programs and activities even in circumstances in which other students, parents, or community members raise objections or concerns. As is consistently recognized in civil rights cases, the desire to accommodate others' discomfort cannot justify a policy that singles out and disadvantages a particular class of students.

May 2016 Dear Colleague Letter at 2 (footnotes omitted).

24.     With regard to "Sex-Segregated Activities and Facilities," the May 2016 Dear Colleague Letter stated in pertinent part as follows:

Title IX's implementing regulations permit a school to provide sex-segregated restrooms, locker rooms, shower facilities, housing, and athletic teams, as well as single-sex classes under certain circumstances. When a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity.

[] **Restrooms and Locker Rooms**. A school may provide separate facilities on the basis of sex, but must allow transgender students access to such facilities consistent with their gender identity. A school may not require transgender students to use facilities inconsistent with their gender identity or to use individual-user facilities when other students are not required to do so. A school may, however, make individual-user options available to all students who voluntarily seek additional privacy.

May 2016 Dear Colleague Letter at 3 (footnotes omitted).

25.     The School District's receipt and awareness of the May 2016 Dear Colleague Letter prompted its administration, through consultation with the School District's solicitor, to first discuss the use of the locker rooms and bathrooms by transgender students. Faidley Dep. at 24, 25; Foley Dep. at 18, 19, 20.[9]

---

[9] Dr. Faidley referred to the May 2016 Dear Colleague Letter as an "Executive Order." Faidley Dep. at 24, 25.

26.     The School District's administration, in conjunction with consultation with the solicitor, treated the May 2016 Dear Colleague Letter as the "law of the land" and decided to follow it.  Faidley Dep. at 41; Foley Dep. at 21.

27.     The School District understood the direction by the Departments of Justice and Education required it to permit transgender students to use the restrooms and locker rooms aligned with their gender identity.  7-31-17 Tr. at 109; Faidley Dep. at 24-25.

28.     Based on the May 2016 Dear Colleague Letter and consultation with the School District's solicitor, since the beginning of the 2016-17 school year, the School District has, upon request, permitted transgender students to use restrooms and locker rooms aligned with their gender identity on a case-by-case basis.  7-31-17 Tr. at 108-10; Faidley Dep. at 23, 24, 25, 34, 83; Cooper Dep. at 84; Plaintiffs' Ex. P-49, Boyertown Area Sch. Dist. Frequently Asked Questions About Issues Regarding Doe vs. BASD ("BASD FAQ").

29.     The School District employs a case-by-case approach because "[t]here are different contexts.  Some students are at the beginning stages, some students are at the stage where they're going through surgical procedures. . . . Some students . . . want to use the locker room and restroom facilities of their gender identity.  Some students would prefer to use a private environment."  Faidley Dep. at 83-84.

30.     The School District's practice concerning transgender students and its implementation and the criteria the School District uses in reaching a decision have not been reduced to writing.  Faidley Dep. at 24; 7-31-17 Tr. at 138.

31.     Prior to the 2016-17 school year, Dr. Cooper was unaware of any BASH transgender student requesting to use a locker room or restroom consistent with their gender identity rather than their biological sex.  7-31-17 Tr. at 108, 109.

32.     At the start of the 2016-17 school year, DeStefano requested to cease using the single-user facility at the nurse's office and start using the boys' multi-user privacy facilities. Cooper Dep. at 80.

33.     Upon receiving this request, Dr. Cooper consulted with DeStefano's school counselor and Assistant Superintendent Scoboria.  Cooper Dep. at 80, 81.  Additionally, the School District's administration, including Dr. Faidley, and the School District's solicitor, discussed the request.  Faidley Dep. at 29, 30, 31.

34.     After discussions between the School District's central administration, including Dr. Faidley and Assistant Superintendent Scoboria, and the solicitor, Assistant Superintendent Scoboria informed Dr. Cooper that in light of the May 2016 Dear Colleague Letter, BASH should allow students who identify with the opposite sex to use the privacy facilities of the gender in which they identify if that makes them more comfortable.  Faidley Dep. at 31; Cooper Dep. at 107, 108.

35.     The School District approved DeStefano's request to use the boys' multi-user privacy facilities.  Cooper Dep. at 88-89.

36.     Dr. Cooper communicated the decision allowing DeStefano to use the boys' privacy facilities to his administrative team.  Cooper Dep. at 109, 110.

37.     During the 2016-17 school year, the School District, through Dr. Cooper, granted permission to another transgender male (Student A) permission to use the boys' restrooms and locker rooms, and one transgender female (Student B) to use the girls' restrooms because those facilities were aligned with their gender identity.  Cooper Dep. at 86-93.

38.     During the 2016-17 school year, three other transgender male students (Students FF, GG, and HH) requested permission and received permission to use different first names

18

aligned with their gender identity, and to be addressed by male pronouns.[10]  Cooper Dep. at 94-103.

39.     Thus, during the 2016-17 school year, BASH had six students who acknowledged identifying with the opposite biological sex.  Foley Dep. at 21; Cooper Dep. at 86-103.

40.     Dr. Cooper expects three of the six students to return to BASH for the 2017-18 school year.  7-31-17 Tr. at 111.  The other three students have graduated from BASH.  *Id.*

41.     Before the School District grants permission to a transgender student to use the restrooms and/or locker rooms consistent with the student's gender identity, the student has discussed the student's situation and desire with the student's school guidance counselor, the counselor has discussed this issue with the grade-level assistant principal, and the counselor and the grade-level assistant principal have conferred with Dr. Cooper.  Foley Dep. at 55, 56; School Dist.'s Interrogs. Resps. at p. 6; 7-31-17 Tr. at 144; Cooper Dep. at 83; Faidley Dep. at 23, 24.  Thus, the decision to grant a request by a transgender student to use the privacy facilities consistent with the student's gender identity is "not just a spur of the moment thing," and is not "automatic" upon receiving the request.  Cooper Dep. at 83; 7-31-17 Tr. at 144, 148.

42.     The School District attempts to make every BASH student, including transgender students, comfortable.  7-31-17 Tr. at 138, 139; *see also* Faidley Dep. at 63 (indicating that the School District's practice is "that any student, regardless of whether they're transgender or cisgender, would work with the Administration to provide . . . them an area where they could feel comfortable."  Faidley Dep. at 63.

---

[10] During his deposition, Dr. Cooper did not recall whether these three students requested to use the locker room or restrooms corresponding to their gender identity.  *See* Cooper Dep. at 94-103.  During the evidentiary hearing, Dr. Cooper stated that these students requested to use privacy facilities consistent with their gender identity.  7-31-17 Tr. at 109-11.  In the School District defendants' responses to the plaintiffs' first set of interrogatories, they did not indicate that they gave permission to Students FF, GG, and HH to use the bathrooms and locker room of the gender in which they identify.  *See* Plaintiffs' Ex. P-41, Objs. and Resps. to Pls.' First Set of Interrogs. to Defs. ("School Dist.'s Interrogs. Resps.") at pp. 5-6.  Based on this additional evidence, the court has not found that Students FF, GG, and HH received permission to use the boys' locker room and bathrooms during the 2016-17 school year.

43.     A student does not need to dress or groom in a particular manner consistent with the stereotypes of a particular sex for the School District to permit that student to use a particular privacy facility.  7-31-17 Tr. at 139; Faidley Dep. at 80, 81.  The student also does not need to change the student's name, have surgery, or receive hormone treatments.  7-31-17 Tr. at 138, 139, 140; Cooper Dep. at 115.

44.     When deciding whether to allow a student identifying with the opposite sex to use privacy facilities consistent with the student's gender identity, the School District is primarily concerned with what makes the requesting student comfortable.  Cooper Dep. at 114-15.

45.     None of the School District administrators are able to determine whether a student is gender nonconforming or gender dysphoric, and they cannot determine a student's gender identity.  7-31-17 Tr. at 130.  Instead, they rely on the reporting by the student.  7-31-17 Tr. at 131.

46.     To date, the School District has not turned down a request by a transgender student to use a privacy facility corresponding to the student's gender identity.  7-31-17 Tr. at 140.

47.     The School District did not initially inform parents or students of the decision to change the existing practice and permit transgender students at BASH to use facilities of the gender corresponding to their gender identity.  7-31-17 Tr. at 134; Faidley Dep. at 46, 47; Foley Dep. at 30; Cooper Dep. at 29.

48.     The School District's decision to change the existing practice to allow transgender students, if requested, to go into the locker room or bathroom facility corresponding to their gender identity was not made in conjunction with the School Board.  Faidley Dep. at 38, 43, 44.

49.     Prior to changing the practice at the School District with respect to transgender students' use of privacy facilities, the School District had not received complaints from students about sharing privacy facilities with persons of the same biological sex who identify with the opposite sex. 7-31-17 Tr. at 136; Faidley Dep. at 54; Foley Dep. at 28, 29. Thus, complaints from students were not part of the basis for the School District changing its practice. 7-31-17 Tr. at 136.

50.     Dr. Cooper is unaware of any instance where a transgender male student went into the boys' bathroom or locker room without first obtaining permission from Dr. Cooper. Cooper Dep. at 97, 98.

51.     Students who have not requested and received permission from the School District to use restrooms aligned with their gender identity are not allowed to use the restrooms or locker rooms of the opposite biological sex. 7-31-17 Tr. at 112; Foley Dep. at 37. If a student was to enter an opposite-sex restroom without permission and the administration was able to identify the offending student, the offending student would face consequences for doing so. 7-31-17 Tr. at 112, 131, 132. On five to ten occasions during Dr. Cooper's tenure, BASH students have wrongfully entered the opposing biological sex's locker room. *Id.* at 112.

52.     Dr. Cooper is unaware of any BASH student who has requested to use a privacy facility corresponding to the student's gender identity who was not already using an initial or a name that is aligned with the student's gender identity. 7-31-17 Tr. at 144.

53.     Dr. Cooper is unaware of any transgender male student who has asked to use the boys' facilities who grooms and dresses like a stereotypical girl; similarly, he is unaware of any transgender female student who has asked to use the girls' facilities who grooms and dresses like a stereotypical boy. 7-31-17 Tr. at 144, 145.

54.     Dr. Cooper is unaware of any transgender student at BASH who did not at first avoid using the facilities corresponding with the student's biological sex and then used the single-user facilities, before requesting to use the facilities corresponding with the student's gender identity.  7-31-17 Tr. at 145.

55.     Simply because a BASH student has requested and obtained a name change to correspond with the gender identity of the student does not mean that this student is precluded from using the facility consistent with the student's biological sex.  7-31-17 Tr. at 142, 143.

56.     If a BASH student changes for gym (or "physical education") class, the student is expected to store belongings in a gym locker or in their hall locker (depending on the proximity of the student's hall locker to the gymnasium).  Cooper Dep. at 43.  In general, students are permitted to bring their personal belongings into the gymnasium during class, but only if they are not changing for class.  Cooper Dep. at 43.

57.     BASH students are not assigned lockers in the locker room and, to the extent that the student desires to secure belongings in the locker room, the student must bring in a lock to secure it.  Cooper Dep. at 43.

58.     BASH has undergone significant renovations over the past one to two years. Cooper Dep. at 35-38, 41-42; Faidley Dep. at 18, 19, 21.

59.     The renovations to the existing locker rooms started in May 2016 and concluded at the end of October 2016.  Cooper Dep. at 41-42; Faidley Dep. at 18, 19, 21.  Both locker rooms received similar renovations.  Faidley Dep. at 20.

60.     During the locker room renovation period, BASH students were not required to dress for gym class.  Cooper Dep. at 42.

61.    During the renovations, the showers in the locker rooms were changed from "gang showers" to single-user showers which have curtains for privacy.  7-31-17 Tr. at 125-26; Cooper Dep. at 44; Faidley Dep. at 18.  Each locker room now contains four shower stalls.  7-31-17 Tr. at 126.

62.    The School District changed the shower areas of the locker rooms to individual shower stalls in part to provide for more privacy for BASH students and to allow the School District to allocate space elsewhere as the BASH shower rooms were infrequently used for showering and, as such, space was better used elsewhere.  Cooper Dep. at 44, 45; Faidley Dep. at 20, 22.

63.    Very few, if any, BASH students, take showers after gym class.  Faidley Dep. at 19; June 28, 2017 Dep. of Joel Doe ("Joel Doe Dep.") at 73; June 28, 2017 Dep. of Mary Smith ("Mary Smith Dep.") at 37-38; 7-17-17 Tr. at 58; June 29, 2017 Dep. of Jack Jones ("Jack Jones Dep.") at 35, 47, 142; June 29, 2017 Dep. of Macy Roe ("Macy Roe Dep.") at 39, 40, 44.

64.    The renovations included moving the lockers in the locker room to the outside walls and creating a large open space in the common area of the locker rooms.  Cooper Dep. at 38-39; Pls.' Exs. P1-P5, P-55; 7-17-17 Tr. at 87-88.

65.    In addition to the lockers around the perimeter of the common room of the locker room, there is a support wall with a row of approximately 24 lockers the lies in the middle of the common area of the boys' locker room.  Pls.' Exs. P-1, P-2, P-4, P-55.

66.    The renovations included the addition of several bathrooms – multi-user and single-user – for both students and staff.  7-31-17 Tr. at 118-22; Defs.' Exs. D-53, D-54.

67.    All of the multi-user bathrooms at BASH have individual toilet stalls, each with a locking door for privacy.  7-31-17 Tr. at 118-19; Faidley Dep at. 16, 17; Joel Doe Dep. at 114; Mary Smith Dep. at 47-48.

68.    There are approximately six to eight multi-user bathrooms for male students at BASH, and there is a similar number for female students.  Faidley Dep. at 16.

69.    The boys' and girls' locker rooms at BASH have individual bathroom stalls and shower stalls with curtains.  Cooper Dep. at 40; Mary Smith Dep. at 48.

70.    The individual toilet stalls in the boys' locker room have doors on them with functioning locks.  Joel Doe Dep. at 202, 203.

71.    The multi-user bathrooms are marked with signs using the universal symbols for men and women and/or the words "boys" or "girls."   Cooper Dep. at 60, 69, 70, 71; *see also* Faidley Dep. at 14-15 (indicating that the BASH bathrooms have signs identifying the sex of the students permitted to use them).

72.    Dr. Cooper agreed that toilet stalls, urinal dividers, and shower stalls provide some privacy from persons of the opposite sex.[11]  7-31-17 Tr. at 132; Cooper Dep. at 123, 124.

73.    The renovations included placing toilet dividers between urinals and toilet stalls in the new facilities.  Cooper Dep. at 39-40.  To the extent that the urinals in the existing boys' rooms did not have dividers, the renovations did not add dividers.  *Id.* at 45, 46.  For the new boys' multi-user bathrooms, there are individual stalls and the urinals in these bathrooms have dividers between them.  *Id.* at 68, 69.

---

[11] The plaintiffs' sought a finding of fact that the School District agreed that these items would "provide some added personal privacy from members of the ***same*** sex."  Plaintiffs' Supp. Findings of Fact and Conclusions of Law at ¶ 149 (emphasis added), Doc. No. 57.  The only testimony about those items providing privacy protection from the same sex pertained to toilet stalls.  *See* 7-31-17 Tr. at 132.  Nonetheless, it is obvious that toilet stalls, urinal dividers, and shower stalls would provide some level of privacy from anyone regardless of their sex.

74.     Although prior to the 2016-17 school year only grades ten through twelve attended school at BASH, after the renovations, BASH will include ninth through twelfth grades in 2017-18.  7-31-17 Tr. at 107.

75.     For the upcoming 2017-18 school year, there are eight potential single-user bathrooms available for use by BASH students.  7-31-17 Tr. at 119, 120, 121, 122 & Defs.' Exs. D-53, D-54.

76.     Approximately three or four of those eight single-user facilities are available depending on the business of the student at the time; for example, there is a single-user bathroom at the attendance office that would be available for anyone with business at the attendance office.  7-31-17 Tr. at 119, 121, 122 & Defs.' Ex. D-54.

77.     For the upcoming 2017-18 school year, there are two locker rooms (one for boys, one for girls) available for the BASH students' physical education classes.  7-31-17 Tr. at 122, 123; Defs.' Ex. D-54; Cooper Dep. at 39, 40.  Each locker room contains a team room, and a student could potentially change their clothes in the team rooms without being viewed by other students.  7-31-17 Tr. at 123.  The team rooms contain lockers for students to potentially store their belongings.  *Id.*

78.     BASH has two additional locker rooms, which also contain team rooms.  7-31-17 Tr. at 124; Defs.' Ex. D-54.  Students changing in the team rooms would not have to pass through the main locker rooms to get to the gymnasium.  7-31-17 Tr. at 124.  The team rooms have lockers where students could potentially store their belongings.  *Id.*

79.     The farthest team room is located approximately 150 feet (and down the hallway) from the gymnasium.  7-31-17 Tr. at 124.

80.     No BASH student is required to change clothes in a multi-user locker room; instead, if a student at BASH does not feel comfortable changing in a locker room with a transgender student, the uncomfortable student does not have to change in the locker room.  7-31-17 Tr. at 124-25.  The School District would allow the uncomfortable student to use one of the single-user facilities to change clothes.[12]  *Id.* at 125.  These facilities are equally available to transgender or cisgender (an individual that is not transgender) students if they feel uncomfortable changing in the locker room.  *Id.* at 141, 142, 147.

81.     There is a single-user bathroom facility located approximately 70 feet from the gym.  7-31-17 Tr. at 146.  If a BASH student chose to change in this room, the student could store any belongings with the gym teacher.  *Id.* at 146.  The School District plans on placing a locker inside this single-user facility.  *Id.* at 148.

82.     There is also a single-user facility in the nurse's office (which is in a new location for the 2017-18 school year), and the School District also plans on placing a locker in this single-user facility.  7-31-17 Tr. at 148, 149; Defs.' Ex. D-54.

83.     Students have been able to use the single-user bathroom in the nurse's office with the permission of the nurse.  Cooper Dep. at 62, 63, 67.

84.     The School District also plans on placing a locker in the single-user facilities located where the old nurse's office was located and in the "600s" area of BASH.  7-31-17 Tr. at 148, 149; Defs.' Exs. D-53, D-54.

---

[12] During the evidentiary hearing, Dr. Cooper testified that uncomfortable students could also change in the team rooms which are located inside of the general locker room area.  7-31-17 Tr. at 125, 141, 142, 147.  Although somewhat unclear, it appeared that Dr. Cooper testified during his deposition that the team rooms were unavailable to BASH students during the school day.  Cooper Dep. at 72-75.  Regardless, after reviewing the totality of Dr. Cooper's testimony and after considering the totality of Dr. Faidley's deposition testimony, the court finds that the School District is endeavoring to reasonably accommodate any uncomfortable student at BASH and it appears that uncomfortable students will be able to use the team rooms.  7-31-17 Tr. at 125, 141-42.  If a student uses the team locker room, the student would not need to walk through the gym locker rooms to get to the gym.  *Id.* at 124.

85.     Thus, four of the single-user restrooms for students will have lockers added for the 2017-18 school year so that students changing in those restrooms can store their belongings. 7-31-17 Tr. at 148-49.

86.     For BASH students who do not want to change in a locker room with a transgender student, the School District is committed to making facilities available for that student to change outside of the presence of the transgender student. 7-31-17 Tr. at 149.

87.     Dr. Faidley believes that all students can have an expectation of privacy and if a student is concerned about their environment, the School District would work with the concerned student to provide an alternative environment. Faidley Dep. at 65-66.

88.     Dr. Cooper believed that students changing in the common areas of the bathrooms had an expectation of privacy in those areas. 7-31-17 Tr. at 132.

89.     On May 23, 2017, the School District hired an architectural firm to "evaluate the feasibility of modifying existing, multi-user high school facilities to enhance the level of privacy for all students." 7-31-17 Tr. at 126, 127; Defs.' Ex. D-36, May 24, 2017 Release.  To date, this project has minimally moved forward insofar as the project is still identifying the relevant stakeholders. 7-31-17 Tr. at 127, 140, 141.

90.     The practice of allowing transgender students to use the restrooms and locker rooms aligned with their gender identity has not resulted in any disruption to the education program or activities of the School District. 7-31-17 Tr. at 116.  There have been no student or employee protests or walkouts regarding the practice. *Id.*  Per Dr. Cooper's experience, BASH students have accepted and integrated the transgender students into the student population. *Id.*

91.     The School District has not received any requests to use bathrooms or locker rooms from individuals identifying as gender fluid (meaning that the student identifies as male in

some situations and female in other situations) or third gender. 7-31-17 Tr. at 112, 113, 129, 130. Dr. Cooper is unaware of any gender fluid or third gender students being enrolled at BASH. 7-31-17 Tr. at 112, 113. The School District does not have a plan in place yet to consider such requests from gender fluid or third gender students. 7-31-17 Tr. at 130; Cooper Dep. at 84, 85.

92.     No transgender student has requested permission to shower in either of the BASH locker rooms, and Dr. Cooper is unaware of any transgender student ever showering in either of the BASH locker rooms. 7-31-17 Tr. at 125.

93.     The School District has an anti-bullying policy. Faidley Dep. at 82.

94.     The School District has an anti-discrimination policy and a sexual harassment policy. Defs.' Exs. D-44, D-46.

95.     Dr. Cooper indicated that the School District's position is that a female student at BASH has no expectation of privacy from a transgender female when using the common areas of the bathrooms or locker rooms. 7-31-17 Tr. at 133-34; Cooper Dep. at 126.

96.     Dr. Cooper believes that there are many ways that the School District could support transgender students without giving them access to privacy facilities corresponding to their gender identity. 7-31-17 Tr. at 138.

97.     The School District has been very supportive of all students, including transgender students, and even prior to the practice permitting transgender students to use the privacy facilities corresponding to their gender identity, the School District granted transgender students' requests to be called by an initial instead of their name; granted requests for name changes to align with the student's preferred gender; encouraged teachers and staff to use a student's preferred pronouns; gave students access to single-user bathrooms if they were

uncomfortable using bathrooms of their biological sex; and provided counseling support. 7-31-17 Tr. at 136-138.

98.     On February 22, 2017, the United States Department of Justice, Civil Rights Division, and the United States Department of Education, Office for Civil Rights, issued a Dear Colleague Letter in which they withdrew the guidance provided in (1) a letter from Emily Prince to James A. Ferg-Cadima, Acting Deputy Assistant Secretary for Policy, Office for Civil Rights at the Department of Education dated January 7, 2015, and (2) the May 2016 Dear Colleague Letter (the "February 2017 Dear Colleague Letter").  Defendants' Mem. in Opp. to the Mot. for Prelim. Inj. at Ex. 7, Feb. 22, 2017 Dear Colleague Letter; *see also id.* at Ex. 8, January 7, 2016 Letter from Emily Prince.

99.     In the February 2017 Dear Colleague Letter, the Departments explained that the aforementioned guidance documents "do not . . . contain extensive legal analysis or explain how the position is consistent with the express language of Title IX, nor did they undergo any public process."  Feb. 22, 2017 Dear Colleague Letter.

100.     In the February 2017 Dear Colleague Letter, the Departments further explained that

> [t]his interpretation has given rise to significant litigation regarding school restrooms and locker rooms.  The U.S. Court of Appeals for the Fourth Circuit concluded that the term "sex" in the regulations is ambiguous and deferred to what the court characterized as the "novel" interpretation advanced in the guidance.  By contrast, a federal district court in Texas held that the term "sex" unambiguously refers to biological sex and that, in any event, the guidance was "legislative and substantive" and thus formal rulemaking should have occurred prior to the adoption of any such policy.  In August of 2016, the Texas court preliminary enjoined enforcement of the interpretation, and that nationwide injunction has not been overturned.

> In addition, the Departments believe that, in this context, there must be due regard for the primary role of the States and local school districts in establishing educational policy.

Feb. 22, 2017 Dear Colleague Letter.

101. Based on the aforementioned explanation, the Departments indicated that they are "withdraw[ing] and rescind[ing] the above-referenced guidance documents in order to further and more completely consider the legal issues involved." Feb. 22, 2017 Dear Colleague Letter.

102. The School District received the February 22, 2017 Dear Colleague Letter. Plaintiffs' Ex. P-42, Resp. to Pls.' First Set of Reqs. for Admiss. to Defs.' at ¶ 8.

103. Despite the rescission of the guidance provided in the May 2016 Dear Colleague Letter, the School District continued and intends to maintain the current practice with respect to transgender students and requests to use privacy facilities corresponding to their gender identity because "the district believes that transgender students should have the right to use school bathroom and locker facilities on the same basis as non-transgender students." BASD FAQ; 7-31-17 Tr. at 134-35. The School District believes that its "position is consistent with guidance from the Pennsylvania School Boards Association, the National School Boards Association, our Solicitor and what the school district administration believe is fair and equitable under the circumstances." BASD FAQ.

104. The School Board voted to continue the practice implemented by the School District's administration by a vote of 6-3 on March 28, 2017.[13] Faidley Dep. at 45, 46.

**B. Plaintiff Joel Doe and his Guardians, John Doe and Jane Doe**

105. Joel Doe is, as of July 17, 2017, a 17-year-old boy who is going into his senior year of high school for the 2017-18 school year. 7-17-17 Tr. at 81, 82, 83; Joel Doe Dep. at 16.

106. Joel Doe was a junior student at BASH for the 2016-17 school year. 7-17-17 Tr. at 81, 82; Amended Compl. at ¶ 10; Joel Doe Dep. at 16.

---

[13] According to Dr. Faidley, this vote was to reject the plaintiffs' demand letter. Faidley Dep. at 45.

107.     During the 2016-17 school year, Joel Doe split his school day between BASH and the Berks Career and Technology Center ("BCTC").  7-17-17 Tr. at 84.

108.     During the 2016-17 school year, Joel Doe would spend his afternoons at BASH and would attend gym class once out of a six-day cycle.  7-17-17 Tr. at 84, 117.

109.     On October 31, 2016, Joel Doe was in the boys' locker room changing clothes for gym class along with approximately 15 other boys.  7-17-17 Tr. at 85, 88.

110.     Joel Doe took off his pants so that he could put on his gym shorts.  7-17-17 Tr. at 88.

111.     While Joel Doe was in his underwear and a shirt, another student tapped him on the shoulder and said "turn around." 7-17-17 Tr. at 88.

112.     Joel Doe then turned around and saw Student A standing there.  7-17-17 Tr. at 88. Student A was wearing shorts and a purple K Swiss sports bra.[14]  Joel Doe Dep. at 22-23, 116-17.

113.     Although Student A is a transgender boy, Joel Doe testified that he believed that Student A was a girl because he had middle school classes with Student A and believed Student A identified as a girl at that time.  7-17-17 Tr. at 89.

114.     Upon seeing Student A, Joel Doe asserts that he was embarrassed and humiliated and scrambled to finish putting on his shorts, place everything in his locker, and lock the locker so he could leave the locker room and get to gym class.  7-17-17 Tr. at 88; Joel Doe Dep. at 25-26.

---

[14] During Joel Doe's deposition, counsel were not using the same pseudonym for each student; nonetheless, Joel Doe identified the student in the locker room as Student A during his hearing testimony.  In addition, the court notes that some of the individual defendants disputed Joel Doe's assertion that he saw Student A in a sports bra insofar as to the best of their knowledge, Student A wore gym clothes underneath his school clothes.  *See, e.g.*, Faidley Dep. at 98; Pls.' Ex. P-50, Decl. of Dr. E. Wayne Foley ("Foley Decl.") at ¶ 6 ("Student A does not disrobe to change for gym class, but rather wears gym clothes under his regular clothes and then simply removes the outer layer of clothes.").

115. Joel Doe participated in gym class and returned to the locker room to change out of his gym clothes and into his school clothes. 7-17-17 Tr. at 90. Joel Doe retrieved his clothes from his locker and then moved to an area where he hoped that Student A, who was located in the same spot of the locker room prior to class, could not see him. *Id.* Joel Doe hurried to change and left the locker room. *Id.*

116. While in the locker room, Joel Doe overheard another unidentified student tell Student A, "You don't belong here, you B word." 7-17-17 Tr. at 90-91.

117. After exiting the locker room, Joel Doe and a few classmates decided to go to school administration to discuss what happened.[15] 7-17-17 Tr. at 91. They first went to the guidance counselor's office, but were directed to speak to their grade-level principal because the topic of their discussion was not an academic issue. *Id.* at 92.

118. Joel Doe and the other students then went to the office of the grade-level principals and asked to speak to a principal about an issue that occurred in the locker room. 7-17-17 Tr. at 92.

119. Dr. Foley came out to meet the boys, and they went into his office to talk. 7-17-17 Tr. at 92; Foley Dep. at 42. The door to Dr. Foley's office remained open throughout the conversation. 7-17-17 Tr. at 92, 93; Foley Dep. at 42. Dr. Foley indicated that he had no expectation of "confidentiality" during the meeting.[16] Foley Dep. at 42.

120. Joel Doe informed Dr. Foley that there was a "girl" in the locker room, and he questioned the legality of the "girl" being in the locker room. 7-17-17 Tr. at 92; Pls.' Ex. P-6.

---

[15] During his deposition, Joel Doe testified that he and the other students went to discuss what happened between fifth and sixth period. Joel Doe Dep. at 29-34. During the evidentiary hearing, Joel Doe testified that he and the other students went to discuss what happened during eighth period. 7-17-17 Tr. at 91.

[16] Without Dr. Foley's knowledge, Joel Doe recorded the conversation. 7-17-17 Tr. at 96; Pls.' Ex. P-6. It is unclear what Dr. Foley meant when he referenced "confidentiality."

121.    Dr. Foley explained that any transgender student could choose the bathroom and/or locker room in which they identify their gender.  7-17-17 Tr. at 92; Pls.' Ex. P-6.  He also stated that they were "trying to get another ruling on that too, because that law continues to change instantaneously."  Pls.' Ex. P-6.

122.    Joel Doe asked Dr. Foley to define transgender, and Dr. Foley defined it as "any mental state that a person has that they believe that they identify with" and stated that "[i]t does not have to be physical at this point."  Pls.' Ex. P-6; Joel Doe Dep. at 37, 38.

123.    Joel Doe then asked Dr. Foley if there was anything he could do to "separate" this group of boys from Student A in the locker room.  7-17-17 Tr. at 93, 118; Pls.' Ex. P-6.  Dr. Foley stated that there was nothing he could do "instantaneously," but he was waiting to get a "ruling" on it.  Pls.' Ex. P-6.  He indicated that "in the meantime I just need you to, unfortunately, tolerate it."  Pls.' Ex. P-6; 7-17-17 Tr. at 93, 118.  He further explained that they should "[y]ou know, try and make it as unnatural [sic] as possible.  You know, just make it as natural as you possibly can."  Pls.' Ex. P-6; 7-17-17 Tr. at 93.

124.    Joel Doe asked Dr. Foley to let him know when he found out whether Student A would continue to use the locker room.  Pls.' Ex. P-6.  Dr. Foley told Joel Doe that he would know the answer because Student A either would stay in there or Student A would no longer be in there.  Pls.' Ex. P-6.

125.    As Joel Doe and the other students were leaving the office at the end of the conversation, Dr. Foley asked them to be "[a]s natural as possible . . . as kind as you can be."  Pls.' Ex. P-6.

126.   Before speaking with Dr. Foley, Joel Doe was not made aware of the School District's change in practice to allow students to use the bathrooms and locker rooms of the opposite sex if they identified with that sex.  7-17-17 Tr. at 110.

127.   Joel Doe testified that after speaking to Dr. Foley, he believed that he had to tolerate having Student A in the locker room with him as it was his "only option."  7-17-17 Tr. at 110.

128.   When Joel Doe returned home from school on October 31, 2016, he informed his guardians, John Doe and Jane Doe, that while changing in the locker room he had observed a "girl," Student A, in the locker room.  July 12, 2017 Dep. of Jane Doe ("Jane Doe Dep.") at 9, 10, 40; July 12, 2017 Dep. of John Doe ("John Doe Dep.") at 11.  Joel Doe told his guardians that he was in his underwear when he saw Student A wearing shorts and a "bra thingy."  Jane Doe Dep. at 9, 10, 11; John Doe Dep. at 11.

129.   Prior to Joel Doe reporting that he saw Student A in the locker room, Jane Doe and John Doe did not know that the School District was letting transgender students (whom they characterized as members of the opposite biological sex) into the locker rooms of the gender in which they identify.  Jane Doe Dep. at 13.

130.   Before Joel Doe had gym class again, Dr. Foley met with him.[17]  7-17-17 Tr. at 121.  Dr. Foley apologized for any mistake and offered Joel Doe two alternative places where he could change in private.  *Id.* at 121.  Dr. Foley told Joel Doe that he could use either the single-user facility in the nurse's office or the single-user facility near the locker room.  Foley Dep. at 48.  Dr. Foley asked Joel Doe to choose one of the options, which he did.  7-17-17 Tr. at 121.

---

[17] Dr. Foley also met with Jane Doe and John Doe one or two days after October 31, 2016.  Jane Doe Dep. at 12; John Doe Dep. at 13; Foley Dep. at 48.  It is unclear whether Dr. Foley's conversation with the Does occurred before or after this conversation with Joel Doe.

131.    Dr. Foley did not know whether either of the two locations had a place for Joel Doe to store his belongings and, in choosing the one alternative, Joel Doe did not tell Dr. Foley that this location was a problem because he could not store his belongings there. Foley Dep. at 48; 7-17-17 Tr. at 121.

132.    Joel Doe testified that subsequent to October 31, 2016, he did not get dressed in any other area for gym class because he did not have a place to safely secure his belongings. 7-17-17 Tr. at 111; Joel Doe Dep. at 105. Thus, he did not use the single-user areas offered by the School District's administration.

133.    Joel Doe could not explain how he would not be adequately protected if a locker was installed in the single-user facility. Joel Doe Dep. at 105-06.

134.    Dr. Foley indicated that Joel Doe could give his belongings to the gym teacher, who would have secured his belongings for him. Foley Dep. at 49.

135.    Joel Doe has never showered at school and has never seen anyone take a shower at school. Joel Doe Dep. at 73.

136.    Joel Doe is unaware of any time that the defendants allegedly violated his right to privacy other than on October 31, 2016. Joel Doe Tr. at 184.

137.    Joel Doe never saw another student's genitals while changing in the boys' locker room. 7-17-17 Tr. at 122. He also never saw another student remove his underwear in the locker room. Joel Doe Dep. at 213.

138.    Joel Doe has never had any of his intimate body parts exposed in a common area of the student bathrooms or the locker room. Joel Doe Dep. at 113, 231-32.

139.    In early November 2016, John and Jane Doe met with Dr. Cooper at BASH to discuss the locker room issue. Jane Doe Dep. at 15; John Doe Dep. at 17; 7-17-17 Tr. at 118-19;

7-31-17 Tr. at 114-15. During this conversation, Dr. Cooper explained the School District's practice of allowing students to use the facilities with which they identify, and said that if Joel Doe was uncomfortable changing in the locker room with a transgender male student, arrangements could be made for Joel Doe to change in the nurse's office bathroom or a single-user restroom near the gym. 7-31-17 Tr. at 114-15.

140.    On November 16, 2016, Jane Doe sent an e-mail to the gym teacher in which she indicated that per her and John Doe's decision, Joel Doe would not be attending gym class until further notice due to "unresolved issues with his safety in reference to the locker room."[18] Jane Doe Tr. at 18, 19-20; Pls.' Ex. P-52; 7-31-17 Tr. at 115. Jane Doe also indicated that she had been waiting for information and a "letter" from Dr. Cooper or Dr. Faidley, and had yet to receive the information or the letter despite her requests.[19] Pls.' Ex. P-52.

141.    When Joel Doe arrived at BASH after his morning at BCTC, instead of going to gym class he went to the assistant principals' office and asked to speak to Dr. Foley, Dr. Cooper, or any administrator. Joel Doe Dep. at 58. Dr. Foley and Dr. Cooper met with Joel Doe and he told them that he was not to go to class until one of them spoke to his legal guardian. Joel Doe Dep. at 58; John Doe Dep. at 27-28. Dr. Foley, Dr. Cooper, and Joel Doe then engaged in a conference call with Jane Doe. During this conversation, Dr. Cooper, who had finally heard from Assistant Superintendent Scoboria that the School District was not going to place anything in writing, informed Jane Doe that he was not going to provide her anything in writing.[20] Jane

---

[18] It is unclear whether Joel Doe attended gym class in between October 31, 2016, and November 16, 2016.
[19] Dr. Cooper testified that the Does had asked him for something in writing to confirm the School District's practice and that he had been waiting for direction from Assistant Superintendent Scoboria before speaking to the Does again. 7-31-17 Tr. at 115.
[20] Both Joel Doe and Jane Doe claim that Dr. Cooper yelled at Jane Doe during this conversation. Joel Doe Tr. at 58-59; Jane Doe Tr. at 21.

Doe Dep. at 21; Joel Doe Dep. at 56, 57, 58; 7-31-17 Tr. at 115.  Dr. Cooper again offered the alternative changing arrangements for Joel Doe.[21]  7-31-17 Tr. at 115.

142.    John and Jane Doe later met with Dr. Faidley and Assistant Superintendent Scoboria to discuss the locker room issue.  Jane Doe Dep. at 17, 23, 27; John Doe Dep. at 18, 19; Faidley Dep. at 85.  During this conversation, Dr. Faidley asked the Does if the administration had offered alternative arrangements for Joel Doe.  Faidley Dep. at 86.  The Does said that the administration had made such an offer, but the Does did not find the offer acceptable.[22]  Faidley Dep. at 86.  Dr. Foley indicated that he was not going to remove the transgender student from the locker room.[23]  Faidley Dep. at 86.

143.    Joel Doe knew from his parents that he could use a single-user bathroom as an alternative arrangement.  7-17-17 Tr. at 119.

144.    If Joel Doe used a single-user bathroom to change for gym, he acknowledged that he could have used his school locker in the hallway to store his belongings.  7-17-17 Tr. at 119.

145.    Although Joel Doe continued to participate in gym, a required course at BASH, he did not use the boys' locker room at BASH to change clothes after October 31, 2016.  7-17-17 Tr. at 110-11, 112; Joel Doe Dep. at 24.  He stated that he no longer changed in the locker room because a "girl," Student A, was in there.  7-17-17 Tr. at 112.

---

[21] Jane Doe claims that Dr. Cooper did not resolve her continuous concern that Joel Doe did not have a place to store his belongings if he used the alternative arrangements to change for gym class.  Jane Doe Tr. at 22.  She also testified that the gym teacher told Joel Doe that he had to use the locker room to store his belongings.  Jane Doe Tr. at 22.

[22] While somewhat unclear, it appears that the Does are claiming that the alternative arrangements were unacceptable due to uncertainty as to how Joel Doe would secure his belongings and Joel Doe's concerns about being separated from the other boys and that other boys would wonder why he was changing there.  Jane Doe Dep. at 24.

[23] Jane and John Doe assert that Dr. Faidley told them that if they were really unhappy, the School District had a cyber-school that Joel Doe could use and still attend BCTC.  Jane Doe Dep. at 25-26; John Doe Dep. at 19.  Dr. Faidley denied making such a statement to the Does.  Faidley Dep. at 86-87.

146.    Because Joel Doe did not change clothes for gym class as required, he only received partial credit for the class.[24]  7-17-17 Tr. at 111.

147.    Prior to October 31, 2016, Joel Doe used BASH restrooms approximately once per day.  7-17-17 Tr. at 112-13.  Subsequent to October 31, 2016, Joel Doe used the bathrooms approximately two to three times per week.  7-17-17 Tr. at 113.

148.    Joel Doe does not feel comfortable use the multi-user boys' restrooms because females can use the restrooms.  7-17-17 Tr. at 115.

149.    Joel Doe acknowledges that he could have used the single-user bathroom in the nurse's office.  7-17-17 Tr. at 113.

150.    If Joel Doe had to use a bathroom after October 31, 2016, he would generally use a single-user facility, but if it was an emergency, he would use the boys' multi-user restroom located in the "700s" hallway because this bathroom was closest to his last period class.  7-17-17 Tr. at 113-14, 121, 123; Pls.' Ex. P-30; Joel Doe Dep. at 18-19.  He usually waited until the last period to use the bathroom to the extent he was "holding it in all day." 7-17-17 Tr. at 123-24.

151.    The 700s hallway multi-user boys' bathroom contains four urinals and one or two bathroom stalls.  Pls.' Ex. P-30.  If Joel Doe was using one of the stalls, he is tall enough to look over the stall's walls to make eye contact with a student standing at one of the urinals.[25]  7-17-17 Tr. at 114.

152.    Joel Doe indicated that when he uses the boys' bathrooms at BASH, he feels uncomfortable.  7-17-17 Tr. at 115.

_____

[24] Dr. Foley explained that "[e]ven without changing into gym clothes, [Joel] Doe could receive 90% of a day's possible gym grade by participating in class while wearing sneakers."  Foley Decl. at ¶ 10.  "Similarly, [Joel] Doe could receive 75% of a day's possible gym grade by participating without changing into gym clothes and not wearing sneakers."  Id. at ¶ 11.  Dr. Foley further indicated that "[s]ince October 31, 2016, [Joel] Doe has sometimes chosen not to participate in gym class at all.  However, he received a passing grade overall for the combined health and physical education course for the year."  Id. at ¶ 12.
[25] Joel Doe acknowledged that other boys' bathrooms at BASH contained higher partitions in the stalls.  7-17-17 Tr. at 122.

153.    Joel Doe has never seen any student that he would call a "girl" in a boys' bathroom.  Joel Doe Dep. at 74.

154.    Joel Doe acknowledges that when he used a single-user bathroom, his privacy was protected.  7-17-17 Tr. at 121-22.

155.    Joel Doe does not find that the School District allowing him to use a single-user facility is acceptable because he believes that he has the right to use the boys' bathrooms and maintain his privacy there from individuals of the opposite biological sex.  7-17-17 Tr. at 115.

156.    Joel Doe was unaware of a biological girl ever using the boys' locker room other than Student A on October 31, 2016.[26]  Joel Doe Dep. at 74.

157.    Joel Doe believes that someone who is born a male is always male and that someone who is born a female is always female, regardless of any sex-change surgery or hormone replacement surgery.  Joel Doe Dep. at 87-88, 157-58, 168.  He bases his assessment on whether someone is male or female based on how they were born and the reproductive organs that the person has.  Joel Doe Dep. at 158-59, 168, 173, 221-22.

158.    Joel Doe would be satisfied if only individuals listed as male on their original birth certificates could use the boys' facilities.  Joel Doe Dep. at 229-30.  He maintains this position and would not object to an individual listed as male on the individual's birth certificate being in the locker room or bathroom with him even if this individual had his penis surgically removed and a vagina constructed.  Joel Doe Dep. at 85-88, 220-21, 229-230.

159.    Joe Doe is unopposed to sharing the boys' locker room with a student who has breasts and if a transgender girl underwent hormone therapy that caused her to develop breasts,

---

[26] Dr. Foley indicated that "[a]t some point during the 2016-2017 school year, Student A's schedule was changed, removing him from the physical education class shared with Joel Doe and Jack Jones.  There is no other known transgender student in that physical education class." Foley Decl. at ¶ 9.

he would not object to the transgender girl using the boys' locker room. Joel Doe Dep. at 233, 234, 235.

160.    Joel Doe does not recognize a transgender boy as male because the transgender boy was born female. Joel Doe Dep. at 86.

161.    Joel Doe acknowledges that he cannot tell if someone is biologically a male or if the person is transgender simply by their appearance. Joel Doe Dep. at 161, 233.

162.    Joel Doe is unopposed to sharing a bathroom with a transgender female student. 7-17-17 Tr. at 116. Joel Doe is unopposed to sharing a bathroom with a boy who dresses like a stereotypical girl. 7-17-17 Tr. at 115.

163.    Joel Doe has never filed an internal complaint with the School District pursuant to its sexual harassment policy. Joel Doe Dep. at 41.

164.    Joel Doe has not seen any doctor, psychologist, psychiatrist, or therapist since encountering Student A in the locker room on October 31, 2016. Joel Doe Dep. at 111.

165.    Joel Doe has not received any medical care for any anxiety, embarrassment, or stress. Joel Doe Dep. at 197.

166.    Joel Doe claims that he filed this lawsuit because a girl viewed him in his underwear in the boys' locker room and when he went to the School District administration for help they told him that he had to tolerate it and make it as natural as possible.[27]  7-17-17 Tr. at 85.

---

[27] There is, at best, an inconsistent record regarding precisely what happened with Student A in the locker room on October 31, 2016. The majority of the evidence provided by Joel Doe though his allegations in the amended complaint, his responses to the defendants' interrogatories, his deposition testimony, and his evidentiary hearing testimony was simply that he saw Student A in the locker room with him. *See, e.g.,* Amended Compl. at ¶ 50 (alleging that "[Joel Doe] was standing in his underwear about to put his gym clothes on, [when] he suddenly realized there was a member of the opposite sex[, Student A] changing with him in the locker room;" Amended Compl. at ¶ 53 (alleging that when Joel Doe went to see Dr. Foley, he "informed Dr. Foley that there was a girl in the [boys'] locker room"); Joel Doe Dep. at 20, 22-24 (describing incident on October 31, 2016 as involving him seeing Student A in the locker room); Joel Doe Dep. at 27 (describing when he was getting the group of boys

167.     Joel Doe's decision about whether he will return to BASH for his senior year depends on how the court resolves the plaintiffs' motion for a preliminary injunction.  7-17-17 Tr. at 84-85.

168.     Joel Doe is requesting that the court issue a preliminary injunction so he can continue to use the locker rooms and restrooms provided to males.  7-17-17 Tr. at 116.

### C.     Plaintiff Jack Jones and his Parents, John Jones and Jane Jones

169.     Jack Jones is, as of July 11, 2017, at 17-year-old boy who is going into his senior year of high school for the 2017-18 school year.  July 11, 2017 Trial Dep. of Jack Jones ("Jack Jones Trial Dep.") at 4; Jack Jones Dep. at 14.

170.     Jack Jones was a junior student at BASH for the 2016-17 school year, and he intends to complete high school at BASH.  Jack Jones Trial Dep. at 4; Jack Jones Dep. at 14, 127.

171.     During the first week of November 2016, Jack Jones was in the boys' locker room at BASH and was changing after gym class.  Jack Jones Trial Dep. at 17, 18, 22; Jack Jones Dep. at 16, 23, 135, 155-56.  After being in the locker room for approximately a minute-and-a-half to two minutes, another student, Student CC, who was standing to his right, tapped him on the shoulder and gestured at him to look behind him.  Jack Jones Trial Dep. at 17-18, 28; Jack Jones Dep. at 16, 17, 20-21, 135-36.  Jack Jones turned and saw Student A, a student who he identified as a "girl," who was wearing a short gray top and short shorts.[28]  Jack Jones Dep. at 23; Pls.' Ex.

together to see Dr. Foley because he "wanted to know why there was a girl in the locker room, how she got there"); 7-17-17 Tr. at 88-89 (indicating that he turned around and saw Student A standing there).  Even in the plaintiffs' proposed findings of fact and conclusions of law, they describe what happened to Joel Doe and not ask the court to specifically find that Student A saw Joel Doe in his underwear.  *See* Plaintiffs' Supplemental Findings of Fact and Conclusions of Law at ¶¶ 26-28.
    On the other hand, Joel Doe claimed that he filed this lawsuit because Student A saw him in his underwear, and the plaintiffs ask the court to enter a conclusion of law that Joel Doe's experience of being viewed in his underwear by Student A would be highly offensive to a reasonable person.
[28] Jack Jones also indicated that Student A was wearing a sports bra.  Jack Jones Dep. at 20-22; 135-38.

P-44, Pl. Jack Jones's Resp. to Defs.' First Set of Interrog. at 2. Student A was standing to the left of him and staring into Student A's locker. Jack Jones Dep. at 21, 22.

172. Jack Jones did not know Student A's name, and Student A was not in his gym class. Jack Jones Dep. at 17-18, 29.

173. At the time that Jack Jones saw Student A, he (Jack Jones) was wearing a shirt and he was in his underwear. Jack Jones Trial Dep. at 18, 22; Jack Jones Dep. at 16, 23, 135.

174. Upon seeing Student A, Jack Jones, who was at the middle row of lockers in the locker room, moved two or three feet away to an area of the locker room where he believed he was most hidden from Student A. Jack Jones Trial Dep. at 18, 19; Jack Jones Dep. at 23, 25, 27-28. Jack Jones then quickly put on his shorts, and then he saw Student A walk past him and out of the locker room. Jack Jones Trial Dep. at 18; Jack Jones Dep. at 23.

175. Jack Jones claims that when he saw Student A he was shocked and somewhat humiliated because he quickly moved upon seeing Student A. Jack Jones Trial Dep. at 19. Jack Jones claims that he was also ashamed and embarrassed because he was the one who moved and because he believes that his privacy was violated. Jack Jones Trial Dep. at 19-20; Jack Jones Dep. at 30.

176. Jack Jones did not see Student A's breasts or genitalia. Jack Jones Dep. at 39.

177. As Student A was moving to exit the locker room, Jack Jones overheard a boy yell, "if you don't have a dick, get the fuck out," and he heard boys laughing. Jack Jones Trial Dep. at 20, 30.

178. Jack Jones also heard another boy yell, "if you have a dick, raise your hand," which caused a bunch of boys to raise their hands. Jack Jones Trial Dep. at 20.

42

179.     Jack Jones left the locker room and texted his parents that he saw a "girl" in the locker room and shared with them what he heard the other boys saying in there.  Jack Jones Trial Dep. at 21-22, 31.

180.     Prior to this incident, Jack Jones had already shared with his parents that another student, Student E, who had joined Joel Doe when the group of boys met with Dr. Foley on October 31, 2016, told him that there was a girl who identifies as a boy in the locker room and some guys went to the office to complain about it.  Jack Jones Trial Dep. at 16, 21-22, 32; Jack Jones Dep. at 30-31, 38, 134-35; July 11, 2017 Dep. of John Jones ("John Jones Dep.") at 8.  Student E also indicated to Jack Jones that the school said that the boys had to deal with it.  Jack Jones Dep. at 135.

181.     Jack Jones' initial text to his parents stated: "Someone yelled if you don't have a d***, get the f*** out lol." Jack Jones Trial Dep. at 31; Intervenor's Ex. I-1; July 11, 2017 Dep. of Jane Jones ("Jane Jones Dep.") at 14; John Jones Dep. at 9-10.

182.     Jack Jones's mother, Jane Jones, responded to the text by saying, "Good."[29] Jack Jones Trial Dep. at 32, 33; Intervenor's Ex. I-1; Jane Jones Dep. at 15.

183.     Jack Jones's father, John Jones, responded to his son's text by saying, "Wow." Jack Jones Trial Dep. at 32, 33; Intervenor's Ex. 1; John Jones Dep. at 10.

184.     In the same text message conversation, Jack Jones told his parents that "[t]he whole thing is screwed up" and "[s]he doesn't even look like a guy.  She has short purple hair but was in short shorts and had breasts but was probably in [sic] sports bra."  Jack Jones Trial Dep. at 33; Intervenor's Ex. I-1.

---

[29] With regard to her response, Jane Jones stated that although she did not agree with the way the boys said it, she "liked that they were opposing what was going on" and that they "don't have to accept this."  Jane Jones Dep. at 15.

185.    Jack Jones did not tell Jane Jones that Student A was looking at him.  Jane Jones Dep. at 13.

186.    Jack Jones only saw Student A in the locker room on this one occasion.  Jack Jones Dep. at 18, 140-41.

187.    Jack Jones never saw Student A in a boys' bathroom.  Jack Jones Dep. at 42.

188.    Although Jack Jones had gym class every day for the first semester of the school year, he did not have gym in the second half because he had health class instead.  Jack Jones Dep. at 16-17.

189.    According to Jack Jones, BASH students were required to change their clothes for gym class and, if they did not change into appropriate clothes, they would lose points.  Jack Jones Trial Dep. at 23, 120-21.  Jack Jones believes that if a student does not pass gym, the student cannot graduate.  Jack Jones Trial Dep. at 23.

190.    When Jack Jones had gym class after the incident, he continued to use the locker room to change even though he changed his usual route through the locker room so he could explore the entire locker room (including the shower area) to see whether a "girl" was in there too.  Jack Jones Trial Dep. at 22-23, 29; Jack Jones Dep. at 32-34, 140.  After conducting his survey of the locker room, Jack Jones would quickly change and exit the locker room.  Jack Jones Trial Dep. at 23; Jack Jones Dep. at 140.

191.    Jack Jones did not feel that he was unable to use the boys' locker room to change after seeing Student A in there on one occasion.  Jack Jones Trial Dep. at 23, 29, 119.

192.    Jack Jones never used the shower area of the locker room, which he knew had individual stalls and shower curtains, to change, and that was regardless of whether he saw

Student A or another person he believed was a "girl," in the locker room with him.  Jack Jones Dep. at 35, 142.

193.     Subsequent to seeing Student A in the locker room, Jack Jones still used the boys' bathrooms, but only if he absolutely had to do so.  Jack Jones Trial Dep. at 23.  He tried to hold his bladder as much as possible and he used the restroom approximately once per week.  Jack Jones Trial Dep. at 23, 24; Jack Jones Dep. at 42-43.  Prior to seeing Student A in the locker room, he used the restrooms approximately once per day.  Jack Jones Trial Dep. at 23, 24; Jack Jones Dep. at 42.

194.     When Jack Jones would use the boys' bathrooms at school after seeing Student A, he would go into the toilet stall and lock the door because he did not want anyone in the bathroom to see him.  Jack Jones Dep. at 153-54.

195.     Jack Jones claims that he was distracted by holding in his bladder all day.  Jack Jones Trial Dep. at 24.  He did not get sick or need medical attention as a result of not using the bathrooms as much as he had previously.  Jack Jones Dep. at 43.

196.     Jack Jones obtained "good" grades in school (A's and B's) during his sophomore and junior years at BASH.  Jack Jones Dep. at 14, 130.

197.     If Jack Jones had a single-user bathroom at BASH available to him, it would protect his privacy, but still would not satisfy his concerns because he believes he should be able to go into "the male bathroom and male locker room and have [his] privacy protected from girls."  Jack Jones Trial Dep. at 25, 43.

198.     Jack Jones was unaware of the availability of single-user bathrooms, including one not far from the gym, as being available to students, and he did not ask about potentially using them.  Jack Jones Dep. at 43-44, 45, 119.

45

199.    Jack Jones is aware that there is a bathroom in the nurse's office, but he believed he could only use it in an emergency.  Jack Jones Dep. at 44.

200.    Jack Jones does not shower at BASH and has never seen a boy shower there.  Jack Jones Dep. at 47.

201.    Jack Jones acknowledged that he could have changed his clothes in an individual toilet stall, but he never used the toilet stalls to change for gym class.  Jack Jones Trial Dep. at 9; Jack Jones Dep. at 90.  Jack Jones noted that each stall has a door that can be closed and locked.  Jack Jones Dep. at 33.  He observed that there are cracks in the door and a person can see above and below the door.  Jack Jones Dep. at 33.  He has never observed someone peeking through the cracks.  Jack Jones Dep. at 33-34.

202.    Jack Jones has not viewed other boys' private areas in the locker room or bathroom other when he saw boys' buttocks when the boys were "mooning" other boys.  Jack Jones Trial Dep. at 9-10; Jack Jones Dep. at 87, 88, 89, 154.

203.    Jack Jones is unopposed to sharing a locker room with a homosexual boy or a biological boy who dresses like a stereotypical girl.  Jack Jones Trial Dep. at 25-26, 47.

204.    Through this litigation, Jack Jones wants policies put in place so that he can go into the male locker room and bathroom and not get viewed by members of the opposite sex.  Jack Jones Trial Dep. at 26.

205.    Jack Jones defines a male as someone having internal and external reproductive systems that are consistent with males.  Jack Jones Trial Dep. at 35-36.  At bottom, the individual must be designated as male at birth and it does matter if that individual has different anatomy than he has.  Jack Jones Trial Dep. at 36, 40.

206.    Jack Jones acknowledges that he could not determine whether someone was designated as male at birth simply by the person's appearance now.  Jack Jones Trial Dep. at 40-42; Jack Jones Dep. at 85, 144-45.

207.    Jack Jones acknowledged that there could be situations in which a transgender male student uses a restroom or locker room, but he would not know it because he would have no way to verify the person's biological sex.  Jack Jones Dep. at 79-80.

208.    Jack Jones is unopposed to a transgender girl, even if the transgender girl had modifications to look more like a stereotypical girl, using the boys' locker room.  Jack Jones Trial Dep. at 45.

209.    Jack Jones is unopposed to students with penises using the girls' locker room if those students were designated as females at birth; similarly, if a transgender boy had surgery to construct a penis, Jack Jones believes that transgender boy should use the girls' locker room. Jack Jones Trial Dep. at 36-37, 39-40, 45-46, 50.

210.    When Jack Jones changes in the locker room, he did so in a more secluded part of the locker room because he did not want the other boys in the locker room to see him undressed. Jack Jones Trial Dep. at 56.

211.    Jack Jones considers transgender males to be of the opposite sex from him.  Jack Jones Dep. at 58-59.

212.    Jane Jones discussed her concerns about the School District's practice and Jack Jones having been in the locker room with Student A with Dr. Cooper.  Jane Jones Dep. at 19-21, 23-24.  During this conversation, Jane Jones did not ask Dr. Cooper whether there were available alternatives for Jack Jones to use when changing for gym.  Jane Jones Dep. at 23.

213.    John and Jane Jones have no objection to Jack Jones sharing a locker room with students who have different anatomy from him, as long as the students were designated as male at birth.  John Jones Dep. at 19, 20-21; Jane Jones Dep. at 33-34.  This would include Jack Jones's possible exposure to breasts or a vagina, as long as the person with the breasts and/or vagina is a male.  John Jones Dep. at 19, 20.

214.    Jane Jones would not oppose Jack Jones sharing the boys' locker room with a transgender girl with breasts and a vagina, as long as the transgender girl was assigned male at birth.  Jane Jones Dep. at 15-16, 33.

215.    To Jane Jones, allowing Jack Jones to use a single-user facility would not alleviate her privacy concerns for him because she believes he has "the right to go to the bathroom in the bathroom and locker room he chooses with people of the same sex."  Jane Jones Dep. at 40.

216.    John Jones acknowledges that Jack Jones's ability to use a single-user restroom at BASH would protect his privacy, but he believes that Jack Jones should have privacy when he is using a multi-user bathroom.  John Jones Dep. at 22, 23.

217.    John Jones would not oppose his daughter sharing the girls' locker room with a transgender boy who has a penis, as long as the student was assigned female at birth.  John Jones Dep. at 20-21.

218.    Jack Jones acknowledges that he could have changed his clothes in the locker room by using a shower stall with the curtain drawn or a bathroom stall with the door closed, but this would not have satisfied his privacy concerns because he would still have to walk through the common area to get to these locations and he might have to walk past members of the opposite biological sex while doing so.  Jack Jones Trial Dep. at 49, 50; Jack Jones Dep. at 151-

48

52. So even if the "girl" did not see him undress, he might still see her undressing when he does not want to do so. Jack Jones Dep. at 152.

219. Jack Jones has not filed a complaint pursuant to the School District's unlawful harassment policy. Jack Jones Trial Dep. at 51, 52.

220. Jack Jones has never discussed any concerns about transgender students and issues associated with transgender students' use of locker rooms or bathrooms with any of the individual defendants. Jack Jones Dep. at 62-63.

221. Jack Jones is unaware of any student who pretended to be transgender simply to get access to a locker room or bathroom, and is unaware of any student acting as a Peeping Tom in a locker room or restroom. Jack Jones Dep. at 86, 95-96.

222. Despite being uncomfortable in the locker room, Jack Jones has not visited a counselor, doctor, psychologist, or psychiatrist, to seek medical attention or get treatment. Jack Jones Dep. at 41-42, 124, 125.

223. Other than the one incident with Student A in the locker room, Jack Jones is unaware of any fights or disturbances resulting from the School District's practice concerning transgender students. Jack Jones Dep. at 96-97.

224. As far as Jack Jones is aware, the other boys in his gym class continued to use the locker room as they normally did after the first week of November 2016. Jack Jones Dep. at 158. Jack Jones does not know of any other boy that avoided using the boys' restroom because of the possibility that a transgender student might be in there. Jack Jones Dep. at 158.

225. Jack Jones admitted that some beachwear is more revealing than underwear, but that has not stopped him from going to beaches or pools. Jack Jones Dep. at 45-46.

226.    Jack Jones claims that he is suffering irreparable harm insofar as "it's embarrassing to be the guy who has to go and say that there was a girl in the locker room. Most of the guys try to play it off like, oh, I don't care. Like that's cool. But to be the guy who has to stand up and say that's wrong." Jack Jones Dep. at 125, 129.

### D.    Plaintiff Mary Smith

227.    Mary Smith, as of July 17, 2017, is an 18-year-old female who is going into her senior year of high school for the 2017-18 school year. 7-17-17 Tr. at 31, 32; Mary Smith Dep. at 14, 15, 16.

228.    Mary Smith was a junior student at BASH for the 2016-17 school year. 7-17-17 Tr. at 31, 32; Mary Smith Dep. at 14, 15.

229.    It is unclear whether Mary Smith is returning to BASH for her senior year.[30]

230.    As part of her participation in a fall sport at BASH, Mary Smith would occasionally change into her uniform using the multi-user girls' bathroom located near the large group instruction ("LGI") room in the 700s hallway (the "700s Bathroom"). 7-17-17 Tr. at 35, 37, 38, 39; Pls.' Ex. P-33, P-34, P-58, P-59; Mary Smith Dep. at 53, 54.

231.    Other girls at BASH change in the 700s Bathroom, and Mary Smith has been in that bathroom with three to five girls changing for sports at once. 7-17-17 Tr. at 35; Mary Smith Dep. at 53, 54, 56, 57, 58.

232.    When Mary Smith changed for her sport, she generally changed in the common area and not in one of the stalls. 7-17-17 Tr. at 41. If she was menstruating, she would change

---

[30] The plaintiffs have provided conflicting evidence as to Mary Smith's intentions for the 2017-18 school year. At her deposition, Mary Smith testified that she would be attending a Pennsylvania Virtual Charter School for her senior year. Mary Smith Dep. at 126, 127. During the evidentiary hearing on July 17, 2017, she testified that she had not decided whether she was returning to BASH and would base her decision on the outcome of the motion for a preliminary injunction. 7-17-17 Tr. at 32. In the amended complaint, the plaintiffs allege that because of the School District's practice, Mary Smith will not return to BASH for her senior year. Amended Compl. at ¶ 117. In her responses to the defendants' first set of interrogatories, Mary Smith indicated that she had not decided what she was doing yet. Pls.' Ex. P-47, Pl. Mary Smith's Resp. to Defs.' First Set of Interrogs. at 2.

in one of the five toilet stalls for privacy.  *Id.*  She generally would not change in the stalls because she thought they were "tiny" and "disgusting."[31]  *Id.* at 41, 42.  When she changed, Mary Smith would generally take off her top and put on a sports bra because she usually was not wearing one during the day.  *Id.* at 39.  If she was menstruating, Mary Smith would change her underwear and put on a skirt.  *Id.*

233.    While changing in the 700s Bathroom, Mary Smith has observed other girls in their bras and has observed girls' bare chests and their bare buttocks.  7-17-17 Tr. at 39, 40.

234.    On March 22, 2017, Mary Smith went to use the 700s Bathroom and, as she was in the entryway, she looked in the mirror and saw the reflection of a then-unknown male student, Student B, washing hands at the sink.[32]  7-17-17 Tr. at 43, 44; Mary Smith Dep. at 17, 18, 19; Pls.' Ex. P-62.  At this time, both Mary Smith and Student B were fully clothed.  7-17-17 Tr. at 64, 65; Mary Smith Dep. at 77-78.  Mary Smith does not recall what Student B was wearing, and she did not observe Student B doing anything other than washing hands.  Mary Smith Dep. at 24, 25.

235.    Prior to March 22, 2017, Mary Smith had not observed any biological male students in the girls' bathrooms.  7-17-17 Tr. at 43, 64, 65.

236.    Mary Smith does not recall whether she and Student B saw each other.  Mary Smith Dep. at 105.

---

[31] During her deposition, Mary Smith testified that she knew of no reason why students could not go into the individual toilet stalls to change instead of changing in the common area.  Mary Smith Dep. at 58.

[32] During her evidentiary hearing testimony, Mary Smith stated that she was in the entryway when she saw this student, but during her deposition she testified that she had entered the common area of the bathroom.  7-17-17 Tr. at 43, 44; Mary Smith Dep. at 18.  Also, although Mary Smith was unable to identify the student, it appears that the School District investigated the incident (which appears to have included a review of video from cameras) and later identified this student as Student B.  Pls.' Ex. P-62.  Student B is the same individual referenced as Student M during Mary Smith's deposition.  The video also confirmed that Mary Smith hurriedly exited the bathroom and went the LGI room.  Pls.' Ex. P-62.

237.    Upon seeing Student B in the bathroom, Mary Smith immediately ran away and went to the LGI room.  7-17-17 Tr. at 44; Mary Smith Dep. at 19, 20; Pls.' Ex. P-62.  She then told the LGI "administrat[or]" or aide that she saw a male in the bathroom and, shortly thereafter, this individual escorted her to the office.  7-17-17 Tr. at 44, 45; Mary Smith Dep. at 20; Pls.' Ex. P-62.

238.    While Mary Smith was telling the LGI instructor about the person in the bathroom, another male student came into the LGI room and stated that he saw a male leaving the girls' bathroom, which confirmed the story for the LGI instructor.  7-17-17 Tr. at 45.

239.    While at the office, Mary Smith spoke to an individual at the front desk, who told her that Dr. Foley was in a meeting but would get back to her.  Mary Smith Dep. at 21.

240.    Mary Smith reported the incident in the bathroom and the School District investigated it.  7-17-17 Tr. at 47, 48; Pls.' Ex. P-62.

241.    Mary Smith believes that Student B is a boy because she had gone to school with Student B for two years, although she acknowledges that she does not know if Student B is actually a biological boy.  Mary Smith Dep. at 23.

242.    As a result of seeing Student B in the bathroom, Mary Smith indicated that she was humiliated and embarrassed and, since then, she has been uncomfortable using the bathrooms at BASH.  Mary Smith Dep. at 132.

243.    On March 23, 2017, Mary Smith met with Dr. Foley and told him what happened to her the previous day in the 700s Bathroom.[33]  7-17-17 Tr. at 48, 49, 59; Mary Smith Dep. at 16, 17, 28.

---

[33] During Mary Smith's deposition, defense counsel (without being corrected by Mary Smith) referred to March 23rd and March 24th as the date Mary Smith spoke to Dr. Foley.  *See* Mary Smith Dep. at 16, 27.  As the more persuasive evidence shows that this conversation occurred on March 23, 2017, the court has used this date as the date of the meeting.  In addition, the court notes that defense counsel (again without being corrected by Mary Smith)

244. Dr. Foley told Mary Smith that the School District had a "policy at BASH that anyone who identifies as the opposite sex are allowed to use the bathrooms that they identify with." 7-17-17 Tr. at 49; *see also* Mary Smith Dep. at 16.

245. This was the first time that Mary Smith heard that the School District was permitting members of the opposite biological sex, or boys who identify as girls, to use the girls' bathrooms and locker rooms at BASH. 7-17-17 Tr. at 59; Mary Smith Dep. at 16.

246. When Mary Smith informed Dr. Foley that she had never heard about this and asked whether the school had told parents about it, Dr. Foley stated that they had not, but believed that the school was in the process of communicating it to the public. 7-17-17 Tr. at 49; Mary Smith Dep. at 16, 29, 30.

247. Mary Smith indicated that Dr. Foley did not mention the option of her using restrooms or locker rooms outside of the presence of male students, such as a single-user restroom in the nurse's office. 7-17-17 Tr. at 49.

248. Dr. Foley did not follow-up with Mary Smith after this conversation. 7-17-17 Tr. at 49.

249. Mary Smith has never discussed the general issue of transgender students using the facilities corresponding to their gender identity with Dr. Faidley or Dr. Cooper. Mary Smith Dep. at 74, 75.

250. Other than on March 22, 2017, Mary Smith is unaware of any other instance when she was in a bathroom with a boy identifying as a girl. 7-17-17 Tr. at 49, 50; Mary Smith Dep. at 30.

---

also referred to March 21, 2017, as the date of the incident in the 700s Bathroom. *See, e.g.*, Mary Smith Dep. at 76. Since it appears that the more persuasive evidence shows that this incident occurred on March 22, 2017, the court has used this date as the date Mary Smith saw Student B in the bathroom. *See* Pl. Mary Smith's Response to Defs.' First Set of Interrog. at 2. Either way, the precise date of this meeting is of limited relevance in addressing the merits of the instant motion.

251. Mary Smith does not oppose homosexuals using the bathroom or locker room with her. 7-17-17 Tr. at 60; Mary Smith Dep. at 43.

252. Mary Smith is familiar with DeStefano and would not have opposed DeStefano, a transgender male, from using the girls' locker rooms or bathrooms. 7-17-17 Tr. at 60.

253. Mary Smith is opposed to having boys who identify as girls in the bathroom with her because it makes her feel uncomfortable. 7-17-17 Tr. at 50.

254. Prior to March 22, 2017, Mary Smith would use the BASH bathrooms approximately three or four times per day. 7-17-17 Tr. at 50; Mary Smith Dep. at 106, 107. After March 22, 2017, Mary Smith's bathroom usage "significantly declined" and she avoided using the main bathrooms. 7-17-17 Tr. at 50. She would use the bathrooms two to four times per week. *Id.* at 50, 51; Mary Smith Dep. at 108. Mary Smith changed her bathroom usage because she felt that she needed to protect herself more. *Id.* at 51.

255. If Mary Smith used the bathroom, she would use a two-stall girls' bathroom near the nurse's office. 7-17-17 Tr. at 73, 74.

256. During the second half of the 2016-17 school year, Mary Smith had gym class and would use the gym locker room to change every day. 7-17-17 Tr. at 51; Mary Smith Dep. at 39, 40.

257. When Mary Smith changed for gym class, there were approximately 30-40 girls in the locker room with her. 7-17-17 Tr. at 55. Typically, she would change for gym by removing her school clothes and putting on shorts and a t-shirt. Mary Smith Dep. at 42. This could have included changing her shirt, bra, pants, or underwear if she needed to do so. 7-17-17 Tr. at 56; Mary Smith Dep. at 42.

258.    On about three occasions, Mary Smith claims that she was completely undressed while in the locker room.  Mary Smith Dep. at 40, 41.

259.    While in the locker room, Mary Smith would see other girls changing and would see their bare buttocks and bare chests.  7-17-17 Tr. at 56, 57.  She has also viewed about five other girls' genitalia in the locker room.  Mary Smith Dep. at 141, 142.  Mary Smith stated that she had not observed any other girls' genitalia in the girls' bathrooms.  *Id.* at 140.

260.    Although the locker room had three bathroom stalls, Mary Smith did not change in there because of the "tight fit," there were girls constantly going in and out of the stalls, and the stalls were "disgusting."  7-17-17 Tr. at 51; Pls.' Ex. P-56.

261.    Mary Smith has never seen a girl using the showers in the girls' locker room, and she has never showered after gym class.  7-17-17 Tr. at 58; Mary Smith Dep. at 37-38.

262.    Mary Smith has used a shower stall to change her clothes when she was menstruating because it allowed her more privacy to change her menstruation-related products.  7-17-17 Tr. at 58.  Nonetheless, she has been in the shower stall when other girls have opened the curtain to see if the shower stall was occupied.  *Id.*

263.    Even if the School District offered Mary Smith the use of the single-user bathrooms at BASH, this would not resolve her privacy concerns because she "should be allowed to use any bathroom that has the sign that a female can, a girl."[34]  7-17-17 Tr. at 61.  She believes that she "shouldn't have to go to different bathrooms.  [She] should be able to use the ones . . . that say girls and know that there are only girls in there."  *Id.*

---

[34] Mary Smith provided conflicting testimony as to whether she knew about the single-user bathrooms at BASH being available to her.  *Compare* 7-17-17 Tr. at 60 (stating that she was unaware that there were single-user bathrooms available at BASH during the 2016-17 school year), *with* Mary Smith Dep. at 46 (stating that she was aware of the single-user bathrooms and she believed she could use those bathrooms).  In addition, Mary Smith stated during her deposition that she understood that the School District would allow her to use the private bathrooms at BASH because of her privacy concerns.  Mary Smith Dep. at 48-49.

264.     During the 2016-17 school year, Mary Smith used the single-user bathroom at the nurse's office to relieve herself and obtain items to assist with her menstruation issues.  7-17-17 Tr. at 71; Mary Smith Dep. at 111.  When she used the nurse's office bathroom to change menstruation-related products, the door was thick enough that she believed that others could not hear what she was doing in the room.  7-17-17 Tr. at 73.

265.     Mary Smith does not believe that the stalls in the multi-user bathrooms provide her with her desired privacy because (1) they only provide protection from the same sex, (2) she has to take care of her menstruation issues by opening pads or tampons so people could hear her opening those items, (3) her underwear and pants are on the floor when she is changing (which could especially be an issue during a menstruation cycle), and (4) there are gaps in the sides of the stalls where you can make eye contact with other people.  7-17-17 Tr. at 61, 72.

266.     Mary Smith wants the court to allow only girls, or individuals of the same sex as her, to be in the bathrooms and locker rooms.  7-17-17 Tr. at 62, 67.  She defines someone as having the same sex as her based on "[w]hether they were born male or female, if they have a vagina or a penis, [and] if they are able to reproduce as a female." *Id.* at 67, 68.

267.     Mary Smith is opposed to a biological boy, who gets hormone therapy and/or surgery on the genitalia to look more like a girl, from using the girls' room.  Mary Smith Dep. at 65-66.

268.     Mary Smith does not know whether she has seen a transgender girl in the locker room.  7-17-17 Tr. at 65; Mary Smith Dep. at 31.

269.     Mary Smith is opposed to transgender girls using the bathrooms.  Mary Smith Dep. at 64.

270.    Mary Smith could not identify someone as transgender simply by the persons' appearance.  7-17-17 Tr. at 76.

271.    Mary Smith's grades at BASH have been "good," and they remained about the same this past year as they had over time.  Mary Smith Dep. at 73.

272.    Since March 21, 2017, Mary Smith has not been treated by any doctors, psychiatrists, guidance counselors, or psychologists.  Mary Smith Dep. at 73, 74.  She has not received any treatment from a healthcare professional relating to the embarrassment and humiliation she suffered on March 22, 2017.  *Id.* at 104-05.

273.    Mary Smith could not identify any student who pretends to be transgender so they can use the other sex's bathrooms or act as a Peeping Tom.  Mary Smith Dep. at 80.

274.    Other than her experience in the bathroom on March 22, 2017, Mary Smith could not identify any threat, disturbance, or other disruption of school activities caused by transgender students using bathrooms and locker rooms that correspond to their gender identity.  Mary Smith Dep. at 87, 88.

275.    Mary Smith would like the court in this case to "accommodate everyone," but she does not know how that can be achieved.  Mary Smith Dep. at 45-46.

276.    Mary Smith seeks to have the court prohibit a transgender girl from the girls' bathroom regardless of what is indicated on the student's birth certificate, how the teachers and other students treat the person, and how the person is dressed.  Mary Smith Dep. at 65-66.  She wants the court to "allow only girls to be in the bathrooms and the locker rooms."  7-17-17 Tr. at 62.

277.    Mary Smith brought this lawsuit because "my privacy was violated . . . the school didn't protect me."  7-17-17 Tr. at 61.

### E.     **Plaintiff Macy Roe**

278.    Macy Roe is, as of July 11, 2017, an 18-year-old female who was a senior at BASH for the 2016-17 school year and recently graduated from BASH. July 11, 2017 Trial Dep. of Macy Roe ("Macy Roe Trial Dep.") at 5; Macy Roe Dep. at 26.

279.    Since she graduated Macy Roe will not be attending BASH in the fall of the 2017-18 school year. Macy Roe Dep. at 10.

280.    While at BASH, Macy Roe obtained A's and B's for her grades, had a 3.9 grade point average upon graduation, and was ranked in the top 100 students in her class year. Macy Roe Trial Dep. at 5, 6; Macy Roe Dep. at 59.

281.    Macy Roe "enjoyed" attending school at BASH until learning from Jack Jones that he was in his underwear when he saw a girl getting dressed in the boys' locker room. Macy Roe Trial Dep. at 9, 20; Macy Roe Dep. at 59.

282.    Once she heard this from Jack Jones, she stopped using the girls' bathrooms as much as possible. Macy Roe Trial Dep. at 10. She did not completely stop using the bathrooms; instead, she would use them perhaps once a day when she previously used them two or three times per day. Macy Roe Trial Dep. at 10; Macy Roe Dep. at 144.

283.    Macy Roe would use the bathroom to relieve herself and tend to her period. Macy Roe Trial Dep. at 11.

284.    Macy Roe indicated that she felt that it was "terrifying that a boy could walk in" during a time that she was opening a pad or a tampon. Macy Roe Trial Dep. at 11. She was particularly concerned because she was aware of a boy who started to wear stereotypical girls' clothing and asked for a name change. *Id.* at 10. She was afraid that this student would come into the bathroom when she was in there. *Id.*

285.    No matter when she would use the bathroom, Macy Roe would go into one of the toilet stalls and lock the door because she would be uncomfortable using the toilet in front of anyone, boys or girls.  Macy Roe Dep. at 139, 140.

286.    If she had to use the bathroom during the day, Macy Roe would have been less anxious to use the bathroom in the nurse's office or somewhere else private.  Macy Roe Dep. at 145.

287.    Macy Roe had observed girls changing their shirts (so they would show their bras) or their pants (so they would show their underwear) in the girls' multi-user bathrooms. Macy Roe Trial Dep. at 12; Macy Roe Dep. at 49, 50, 51.  During times when Macy Roe observed students changing, she did not observe anyone's intimate parts, just their underwear. Macy Roe Dep. at 51.

288.    Macy Roe has never changed in the common area of the girls' bathrooms.  Macy Roe Dep. at 51.

289.    Although Macy Roe changed for gym during the first month the locker room was reopened, she stopped doing so for a reason unrelated to the litigation.  Macy Roe Trial Dep. at 13, 19, 20.  When she changed, she would change the shirt she was wearing to a gym shirt or change her pants to shorts.  Macy Roe Trial Dep. at 14; Macy Roe Dep. at 39.  There could have been anywhere from 30 to 60 girls in the locker room when Macy Roe changed.  Macy Roe Trial Dep. at 13.  She observed other girls changing their bras to sport bras or changing their regular underwear to thongs if the girls wanted to wear leggings.  *Id.* at 14.  Practically each time that Macy Roe changed in the locker room, she would see other students' chests or genitalia if those students changed their bras or underwear.  Macy Roe Dep. at 65.

290.     Macy Roe never took a shower after gym and never saw another student taking a shower.  Macy Roe Dep. at 39, 40, 44.

291.     Macy Roe does not know whether any transgender student showers at BASH.  Macy Roe Dep. at 44.

292.     Macy Roe is unaware of ever seeing a transgender student in the girls' locker room.  Macy Roe Dep. at 20, 39, 49.

293.     Macy Roe is unaware of a transgender girl using the bathroom while she was in there.  Macy Roe Trial Dep. at 14-15, 18; Macy Roe Dep. at 20, 31.

294.     Macy Roe cannot tell if someone is male or female, which she believes is based on their internal and external reproductive systems at birth, simply by looking at the person's appearance.  Macy Roe Trial Dep. at 18; Macy Roe Dep. at 73, 46, 145.

295.     Macy Roe was unaware of the single-user bathrooms at BASH being available to her last year.  Macy Roe Trial Dep. at 15; Macy Roe Dep. at 48.  Macy Roe acknowledged that a single-user facility would have protected her privacy when using the restroom or changing.  Macy Roe Trial Dep. at 19.  Nonetheless, even if the single-user bathrooms had been available to her, it would not have resolved her privacy concerns at BASH because she should "be able to use the bathroom of [her] sex without the opposite sex coming in." *Id.* at 15, 19; Macy Roe Dep. at 48 ("I should be able to use the bathroom of my sex without my privacy being violated.").

296.     Macy Roe noted that in the open space of the locker room, "there wasn't a lot of privacy. . . . You could see everyone."  Macy Roe Trial Dep. at 13.

297.     Macy Roe was unable to identify any time that her privacy was actually violated while at BASH.  Macy Roe Dep. at 49, 105, 106.

298. Macy Roe indicated that the bathroom stalls at BASH would not give her the privacy she needed because she could "still be heard going to the bathroom or attending [her] period, and there are large gaps in the stalls that [she has] made eye contact through before." Macy Roe Trial Dep. at 15; *see also* Macy Roe Dep. at 98, 99 (indicating that in the bathroom stalls that she used, the gaps are large enough to make eye contact with another student).

299. Macy Roe has never seen anyone purposefully try to look through the gaps in the stall doors. Macy Roe Dep. at 105.

300. Macy Roe does not object to homosexual students using the girls' locker rooms, even if those students were sexually attracted to her, since they would have the same sex as her. Macy Roe Dep. at 45.

301. Macy Roe does not object to sharing a restroom or locker room with a student who has a different anatomy than her if, in her opinion, that student was "born female." Macy Roe Trial Dep. at 17-18.

302. Macy Roe would not object to sharing a locker room with a transgender boy who had surgery to construct a penis. Macy Roe Trial Dep. at 17-18.

303. Macy Roe did not file an internal complaint about the School District's practice, and she did not speak to Dr. Cooper, Dr. Faidley, or Dr. Foley about it. Macy Roe Dep. at 52, 53.

304. Although she alleges and asserts having suffered anxiety, stress, humiliation, embarrassment, apprehension, and distress, Macy Roe has not received any medical attention, counseling, or therapy since learning about the School District's practice. Macy Roe Dep. at 60, 101, 102, 103, 104. She has also not spoken to her guidance counselor, other administrators, or any teachers about transgender issues at BASH or about any anxiety or stress she was

experiencing at the time.  Macy Roe Dep. at. 60, 61, 102.  The stress or anxiety did not affect her grades.  Macy Roe Dep. at 102.

305.    Macy Roe does not know any student who has pretended to be transgender just to use the locker room or bathroom contrary to their gender at birth or to be a Peeping Tom.  Macy Roe Dep. at 63, 64, 71.

306.    Macy Roe believes that the use of bathrooms and locker rooms by transgender students disrupted her school activities because she held in her bladder all day until she really needed to use the bathroom.  Macy Roe Dep. at 72.  She did this because she was in fear of encountering transgender students (whom she describes as students of the opposite sex).  Macy Roe Dep. at 72.

307.    Macy Roe did not suffer from any bladder infections or other medical conditions due to having to refrain from using the bathrooms until she absolutely had to do so.  Macy Roe Dep. at 102.

308.    Macy Roe claims that she suffered and continues to suffer irreparable harm because "every time [she] went to the bathroom [she] had to look around.  And now it's just become a habit to have to look around.  And while I'm in the stall it's uncomfortable because you don't know who's in there."  Macy Roe Dep. at 104.

309.    Macy Roe is unaware of physical altercations or kids walking out of class because of the transgender practice at BASH.  Macy Roe Dep. at 75.

310.    If Macy Roe entered a public bathroom (outside of school) and noticed someone that looked like a male, she would leave the restroom.  Macy Roe Dep. at 143.  She would base this decision on whether the person was wearing stereotypical male clothing or had facial hair.  Macy Roe Dep. at 143.

62

311.    Macy Roe indicated that swimwear is sometimes more revealing that underwear; nonetheless, it does not bother her for men and boys to see her in a swimsuit or bikini at a public pool or beach.  Macy Roe Dep. at 42.

### F.    Dr. Scott Leibowitz

312.    Dr. Scott Leibowitz received his undergraduate degree from Cornell University and his Doctor of Medicine degree from Sackler School of Medicine.  7-17-17 Tr. at 133; Intervenor's Ex. I-6.  He completed his general adult psychiatry residency training at Albert Einstein College of Medicine, stayed for an extra year there to be chief resident, and then moved to complete his child and adolescent psychiatry fellowship at Harvard Medical School.  7-17-17 Tr. at 133; Intervenor's Ex. I-6.

313.    During his fellowship at Harvard Medical School, Dr. Leibowitz received training from a psychologist who was part of the first gender identity multidisciplinary clinic in the United States.  7-17-17 Tr. at 133-34; 7-31-17 Tr. at 8, 9, 10.  This particular psychologist, along with Dr. Leibowitz, had, at different points in time, received training from the Dutch Clinic in the Netherlands, which is "widely known in the world as the most leading research and clinical gender identity program."  7-17-17 Tr. at 134.

314.    This first gender identity multidisciplinary clinic in the United States focusing on adolescents is about ten years old, and eight of the top ten children's hospitals as ranked by U.S. News and World Report now have clinics similar to it.  7-31-17 Tr. at 9.

315.    Dr. Leibowitz is currently licensed to practice medicine in Ohio.[35] 7-17-17 Tr. at 185 & Intervenor's Ex. I-6.

---

[35] Dr. Leibowitz also believed that he was still licensed to practice medicine in Illinois; yet, he noted that his "license expires any day." 7-17-17 Tr. at 185.

316. Dr. Leibowitz is currently the medical director for the behavioral health component of the THRIVE gender and sex development program at Nationwide Children's Hospital in Columbus, Ohio, which is affiliated with Ohio State University. 7-17-17 Tr. at 134. In this position, he treats young people with gender identity issues. *Id.* at 134-35.

317. Since November 2016, approximately 55% of Dr. Leibowitz's time is spent in clinical practice. 7-17-17 Tr. at 187; 7-31-17 Tr. at 28.

318. Dr. Leibowitz is also an associate clinical professor at Ohio State.[36] 7-17-17 Tr. at 136.

319. Dr. Leibowitz has significant experience devoted to youth with gender issues. 7-17-17 Tr. at 135, 136. This experience includes directly treating approximately 300 youth and, through his indirect involvement as part of the multidisciplinary team consisting of endocrinologists, pediatric psychologists, social workers, and adolescent medical physicians, hundreds of additional youth. *Id.* at 136. This experience also includes an under-estimation of having spent a minimum of 4,000 hours over the past almost nine years directly addressing, face-to-face, gender identity issues with youth. 7-31-17 Tr. at 29, 30.

320. Dr. Leibowitz has authored numerous publications on the subject of gender identity issues in children and adolescents, with approximately 40%-50% of those publications having been subject to peer review. 7-17-17 Tr. at 136, 137 & Intervenor's Ex. I-6.

321. Dr. Leibowitz is a member of numerous professional associations including, among others (1) the American Academy of Child and Adolescent Psychiatry, in which he serves as the co-chairman of the Sexual Orientation and Gender Identity Issues Committee, and (2) the

---

[36] Dr. Leibowitz had other faculty appointments and, since none of those appointments were at institutions that provide clinicians with a tenure-track option, he has not served as a tenured full professor or a tenured associate professor at those institutions because he was a clinician and not a researcher. 7-17-17 Tr. at 197, 202-03.

World Professional Association of Transgender Health ("WPATH"), which serves individuals with gender identity concerns or professionals who treat those concerns. 7-17-17 Tr. at 138.

322. The term "transgender" is an "identity term that people use" where individuals whose sex assigned at birth is not congruent with their gender identity. 7-17-17 Tr. at 143. An individual's "gender identity" is "one's subjective, deep-core conviction sense of self as a particular gender. In most situations, male or female, but maybe [sic] some aspect of both, or in between." *Id.* at 143. It is also described as "one's personal sense of self as a particular gender, whether that be male or female, in most cases, or a combination thereof in select individuals." 7-31-17 Tr. at 5-6.

323. Transgender refers to a person's self-assertion of their identity. 7-31-17 Tr. at 85, 97.

324. Typically, sex is assigned at birth when doctors examine a baby after birth and, based on the presence of a penis or a vagina, assign a sex of male if the baby has a penis or female if the baby has a vagina. 7-17-17 Tr. at 143.

325. Dr. Leibowitz would define "sex" "in a medical sense as being the anatomical and physiological processes that lead to or denote male and female, typically." 7-31-17 Tr. at 6.

326. Dr. Leibowitz would define "gender" as "a broader societal construct that really encompasses gender rule, which is [how] society defines what male or female is within a certain cultural context[, and] [i]t also encompasses gender identity." 7-31-17 Tr. at 6.

327. There are 1.4 million American adults identifying as transgender, which is 0.6% of the adult population. 7-17-17 Tr. at 143-44. Dr. Leibowitz does not have the precise number, but he believes that it is possible that there are more children who identify as transgender. *Id.* at 144.

65

328.    A transgender boy is a person who has a lasting, persistent male gender identity but was assigned the sex female at birth.  Intervenor's Ex. I-13, Expert Decl. of Scott F. Leibowitz, M.D. ("Leibowitz Decl.") at ¶ 5.  A transgender girl is a person who has a lasting, persistent female gender identity but was assigned the sex male at birth.  *Id.*

329.    "Cisgender" is a term used to refer to someone that is not transgender.  7-17-17 Tr. at 161.

330.    According to Dr. Leibowitz, the term "transsexual" is "a term that had previously been used to indicate individuals who had gone through the complete transition.  So those who have gone through what some call sex reassignment surgery[.]" 7-31-17 Tr. at 81.  Dr. Leibowitz further explained that "from the term transsexual, the [term] transgender has evolved to indicate largely the larger overwhelming group of people, whether they've pursued some degree of transition or not, socially, medically, or surgically, and is more acceptable because people can't afford the surgeries." *Id.*

331.    Dr. Leibowitz noted that "gender fluid" is not a clinical term, but it "describes kind of feeling a certain gender at a certain moment in time, and then switching, and then switching, perhaps, back." 7-17-17 Tr. at 169.  It is a "temporal relationship with gender." *Id.*

332.    Gender dysphoria is "both a clinical phenomen[on]" and a reference to "clinical distress that one experiences when their birth-assigned sex and their gender identity are at odds with one another, with the stipulation that there are no perceived cultural advantages to the gender identity that one experiences." 7-17-17 Tr. at 144-45.  This distress must last at least six months.  *Id.* at 145.

333.    Gender dysphoria was added to the DSM-V when it was released four years ago. 7-17-17 Tr. at 144, 145; 7-31-17 Tr. at 11.  Within the DSM-V, the clinical classification

changed from "gender identity disorder" to gender dysphoria. 7-17-17 Tr. at 145; 7-31-17 Tr. at 11. This change occurred in part because (1) by changing the terminology, it pertained more to the clinical experience and distress experienced by some individuals identifying as transgender, and (2) the prior terminology "didn't accurately capture individuals who experienced gender dysphoria, the insistence of being another gender[, and i]t was more capturing kids who were gender nonconforming." 7-17-17 Tr. at 145, 146; 7-31-17 Tr. at 11.

334.    There is a "variability of time in which it can take . . . to appropriately diagnose whether someone meets the criteria for gender dysphoria," and this could on occasion, take about half of a year to determine that a person did not have gender dysphoria and even more time to determine if the person had gender dysphoria. 7-31-17 Tr. at 52, 53; *see also* Pls.' Ex. P-65, July 7, 2017 Deposition of Scott Leibowitz, M.D. ("Leibowitz Dep.") at 41-42.

335.    Dr. Leibowitz indicated that the newer, better "psychometric instruments" he uses to diagnose gender dysphoria are in the process of, but have not yet been, scientifically validated as "we're in a field in evolution." 7-31-17 Tr. at 46.

336.    Someone who is gender dysphoric may ultimately identify with a non-binary gender. 7-31-17 Tr. at 57. Someone who is "gender non-binary" is "an individual whose gender does not fall into the dichotomous male/female categories" and "identif[ies] somewhere in the middle." 7-17-17 Tr. at 170. Of those individuals identifying as "gender non-binary" whom Dr. Leibowitz has treated, these patients generally do not discuss with him a desire to use a specific bathroom. *Id.* at 171, 172.

337.    "Gender nonconforming" is a broader term that refers to a person whose gender expression is different from what is traditionally associated with their sex assigned at birth; for example, a girl may be said to be gender nonconforming when she rejects the clothes or

behaviors that our society associates with young females, but that does not mean that she will, or will not, identify herself with something other than female. 7-31-17 Tr. at 82. Gender nonconformity is not a diagnosis. *Id.* at 84.

338. Being transgender is not a medical or psychiatric condition, but many people who are transgender experience a clinically significant level of distress because of the incongruence between their gender identity and their sex assigned at birth. 7-31-17 Tr. at 148. Also, all transgender people do not have gender dysphoria because the incongruence they experience is insufficient for them to feel distressed in a manner that leads them to seek reassignment of their gender or to transition their genders. 7-17-17 Tr. at 147, 148; 7-31-17 Tr. at 96, 97.

339. Dr. Leibowitz indicated that the issue of whether transgender is a mental illness or mental condition is "a big debate that many scholars have spent hours and papers writing about." 7-31-17 Tr. at 85.

340. There are accepted standards in the medical and mental health fields for treating gender dysphoria in adolescents, with these standards being documented in the Endocrine Society Guidelines and in the WPATH Standards of Care (currently in its seventh edition). 7-17-17 Tr. at 150, 151, 198; Intervenor's Ex. I-19, WPATH Standards of Care. Dr. Leibowitz follows those standards when treating patients at his clinic. 7-31-17 Tr. at 61-62.

341. With regard to the WPATH Standards of Care, both the American Academy of Child and Adolescents in Psychiatry and the American Psychological Association have guidelines and practice parameters that cite to and adhere to the WPATH Standards of Care. 7-17-17 Tr. at 152. Many major medical or mental health professional organizations, including the American Medical Association, the American Psychological Association, and the American

Psychiatric Association, accept the WPATH Standards of Care as the appropriate protocols. 7-31-17 Tr. at 63.

342. The WPATH Standards of Care are widely used and accepted in the field by clinicians dealing with youth with gender identity issues. 7-17-17 Tr. at 151.

343. The risk of not treating a "gender dysphoric adolescent has significant and substantially higher psychiatric outcomes, poor psychiatric outcomes," which include suicide, self-injury, suicidal ideation, and suicidal behavior. 7-17-17 Tr. at 158.

344. "Transgender youth are at [a] much higher risk for suicidal behavior when compared to youth who are not transgender." Leibowitz Decl. at ¶ 25. "Peer reviewed research demonstrates that as many as 45% of gender dysphoric adolescents have had thoughts of suicide compared to 17% in this age group in 2015." *Id.*; *see also* 7-31-17 Tr. at 77 (explaining studies).

345. "Numerous data from gender clinic referred samples indicate that co-occurring psychiatric diagnoses occur in much higher rates in youths with gender dysphoria, such as depression, anxiety, self-injurious behavior, and suicidal ideation." Leibowitz Decl. at ¶ 25.

346. Dr. Leibowitz acknowledged that "[i]t is impossible to know the rate of suicide for transgender people" in part because it is impossible to know the number of transgender people in the population since "transgender people are largely a hidden population." 7-31-17 Tr. at 45.

347. "The goal of treatment in gender dysphoria in adolescents is to help one not experience that internal sense of chaos that they live day-to-day, being and feeling as though they were born with a sex assigned at birth that differs from their core sense of self, that deep conviction of who they are." 7-17-17 Tr. at 159.

69

348.    It is unethical to treat gender dysphoria by attempting to align an adolescent's gender identity with the adolescent's sex assigned at birth.  7-17-17 Tr. at 159, 160; 7-31-17 Tr. at 78-79 & Intervenor's Ex. I-19 at p. 16 ("Treatment aimed at trying to change a person's gender identity and expression to become more congruent with sex assigned at birth has been attempted in the past without success . . ., particularly in the long term.  Such treatment is no longer considered ethical." (citations omitted)).  The "consensus among different disciplines suggests that it is harmful to try to change someone's gender identity, gender expression, and/or sexual orientation for that matter."  7-17-17 Tr. at 160.

349.    Among the accepted clinical interventions to treat adolescents with gender dysphoria include, independently or in combination:  social transition, pubertal suppression, hormone therapy, and, in some cases, surgery.  Leibowitz Decl. at ¶ 13; 7-17-17 Tr. at 152-59; 7-31-17 Tr. at 46, 47, 48, 65, 66; Intervenor's Ex. I-19 at pp. 15-16, 18-21.  The WPATH Standards of Care require parental consent before beginning hormone therapy or other physical interventions when treating adolescents who are under 18 years of age.  7-31-17 Tr. at 67.

350.    Adolescents treated with puberty suppressing drugs do not go through puberty of their assigned sex at birth; as examples, (1) an adolescent who was assigned female at birth will not develop breasts or widening of the hips, and (2) an adolescent who was assigned male at birth will not develop an Adam's apple, facial hair, chest hair, broadening of the shoulders, increase in muscle mass, squaring of the jaw, or a deepening of the voice.  Leibowitz Decl. at ¶ 27.

351.    Hormone therapy – providing testosterone for transgender boys and estrogen for transgender girls – produces secondary sex characteristics that match one's gender identity.  7-17-17 Tr. at 155, 156; Leibowitz Decl. at ¶ 28.  "Transgender females receiving estrogen will

70

develop breasts and the muscle mass and fat distribution typical of females. Transgender males receiving testosterone will develop facial and body hair, a deeper voice, and muscle mass typical of males." Leibowitz Decl. at ¶ 28.

352.    A transgender boy who has been treated with puberty blockers and testosterone treatment could be virtually indistinguishable when clothed from a cisgender boy. 7-17-17 Tr. at 161, 162; 7-31-17 Tr. at 65, 66, 67; *see also* Leibowitz Decl. at ¶ 27. Similarly, a transgender girl who has been treated with puberty blockers and hormone therapy could be virtually indistinguishable when clothed from a cisgender girl. 7-17-17 Tr. at 161, 162; *see also* Leibowitz Decl. at ¶ 27. Nonetheless, "[a]s a result of the [different types of available] medical treatments . . . for gender dysphoria in adolescents, transgender adolescent males will not necessarily align physically with cisgender girls, and transgender adolescent females will not necessarily align physically with cisgender males. Leibowitz Decl. at ¶ 29.

353.    For transgender boys, another clinical intervention that may be used in adolescents is "top surgery," *i.e.* a mastectomy to remove the breast tissue and create a male chest. 7-17-17 Tr. at 159.

354.    Very few persons in any high school have undergone surgery of their reproductive anatomy. 7-31-17 Tr. at 86.

355.    Determining the proper intervention for a particular adolescent is a case-by-case determination resulting from a collaborative process and considering the advantages and disadvantages of a particular intervention. 7-31-17 Tr. at 46-47.

356.    Social transition refers to the process of living in accordance with one's gender identity, such as where a transgender girl might adopt a name traditionally associated with girls, use feminine pronouns, grow her hair, or change the pitch of her voice. Leibowitz Decl. at ¶ 14;

71

7-17-17 Tr. at 153-54. Social transition could also involve using single-sex facilities, like restrooms or locker rooms, consistent with one's gender identity. 7-17-17 Tr. at 154, 162; 7-31-17 Tr. at 50.

357. Social transitioning is in part a diagnostic tool and a remedial tool to determine whether and to what extent living in the affirmed gender improves the psychological and emotional functioning of the individual. 7-31-17 Tr. at 52. Thus, social transitioning can be used to diagnose whether an individual has gender dysphoria. 7-31-17 Tr. at 47, 48, 50, 56.

358. Social transitioning can occur in increments, such as where the adolescent starts living in the affirmed gender at home or on vacation. 7-31-17 Tr. at 47. After the incremental social transition, Dr. Leibowitz would confer with the patient again to see whether the transition helped alleviate the patient's distress. *Id.* at 48. In other words, "in certain situations, that type of intervention could lead one to feeling better about oneself and more willing and more able to pursue this further. And in other situations, it would lead that person to feeling, you know, perhaps this is something that I am purely just not ready for." *Id.*

359. Dr. Leibowitz explained that when determining whether social transitioning is an appropriate treatment for a particular individual, it is not his "role as a clinician to determine a preset course for a specific individual." 7-17-17 Tr. at 154. He acknowledged that there is "limited evidence" on this issue and, as such, "we want to be cautious in how we approach these issues."[37] *Id.* Thus, he does not dictate when a patient should do something; instead, "there's a careful risk-benefit analysis that happens step-by-step, and sometimes it even starts with just a simple change in a home environment, in the privacy of their home." *Id.* at 154, 155.

---

[37] Regarding the "limited evidence," Dr. Leibowitz explained that although there was limited "level one evidence," such as a randomized control study with a placebo, but there is "actually plenty of level two evidence." 7-31-17 Tr. at 54. Dr. Leibowitz notes that there are "plenty of aspects of emotional health and psychological health," which do not have level one evidence such as randomized control studies and yet have courses of treatment that are generally accepted in the field of psychiatry. *Id.* at 67, 68.

360.    With regard to social transition involving using sex-segregated spaces, such as a
bathroom or locker room, consistent with one's gender identity, and the significance of it, Dr.
Leibowitz explained that for "an individual where their gender identity and their sex anatomy are
incongruent, particularly, of course, those who meet criteria for gender dysphoria, it chips away
and it erodes at your psychological wellbeing and your wholeness."  7-17-17 Tr. at 163.
Additionally, if an adolescent with gender dysphoria is prohibited from using facilities matching
the adolescent's gender identity, "it sends a message to them that what they're [sic] experience
is, who they are is not . . . valid.  It's not an identity that is appreciated.  It is society reducing
them to their genital[s]." *Id.* at 164; *see* 7-31-17 Tr. at 72 ("[W]hen someone forces or society
forces an individual to use a restroom based on the sex that they were assigned at birth, operative
word being 'forced,' that can erode their psychological wellbeing and it can reduce them to the
presence of a genital.").

361.    If an adolescent is barred from a sex-segregated facility matching their gender
identity the barred adolescent will more frequently refrain from urinating; in addition, "certain
data suggests that there are much higher rates of not going to school, leaving school, cutting
class, leaving the school to find a bathroom . . . that they feel comfortable using where nobody
knows them."  7-17-17 Tr. at 164; *see also id.* at 177-78; 7-31-17 Tr. at 71, 72; Leibowitz Decl.
at ¶ 22.  Thus, "educational effect, self-esteem and depression are, perhaps, not a direct effect,
but all part of the general gestalt of not being able to use any type of facility that's consistent
with your deep conviction and sense of self as to who you are." 7-17-17 Tr. at 164-65; *see also*
Leibowitz Decl. at ¶ 20 (explaining that forbidding adolescents from using restrooms and other
sex-segregated facilities consistent with their gender identity "often negatively impacts their self-

73

esteem and self-worth, ability to trust others, and willingness to go out into the world, during a critical aspect of development").  Additionally,

> these youth are hampered in their ability to access opportunities traditionally associated with growing up and maturing into an adult, such as getting a job or exploring educational enrichment opportunities.  The loss of these activities during an important developmental stage of youth can have long term consequences on an individual's financial and employment prospects later in life, which can lead to many other psychiatric concerns.

Leibowitz Decl. at ¶ 22.

362.    Dr. Leibowitz acknowledged that he could not state that an adolescent will "automatically" have a particular type of distress if forced to use facilities not aligning with the adolescent's gender identity; yet, he indicated that "it can exacerbate psychiatric illness.  And there is plenty of level two evidence, cohort studies, prospective studies that demonstrate that harm."  7-31-17 Tr. at 72, 73.

363.    When adolescents with gender dysphoria are able to use the restrooms and locker rooms corresponding to their gender identity it can have a positive effect on their mental wellbeing.  7-31-17 Tr. at 70.  In this regard, the burden of being unable to use the facility consistent with their gender identity is lifted.  *Id.*  Also, these adolescents "feel this sense of relief, this sense of emotional alignment, [and] this sense of happiness." *Id.* at 71; *see also* Intervenor's Ex. I-14, Decl. of Aidan DeStefano in Supp. of Mot. for Leave to Intervene ("DeStefano Decl.") at ¶ 11 (indicating that being able to use the male facilities at BASH "feels so good – I am finally 'one of the guys', something I have waited for my whole life"); *id.* at ¶ 12 ("Being able to be my true self is more important than I can describe.  I am on track to make the Honor Roll for the third marking period in a row, something I have never done before because I was too distracted and stressed.").

364. Forcing transgender youth to use a "separate single-user restroom could undermine the benefits of their social gender transition by sending the message that they are not really who they identify as." Leibowitz Decl. at ¶ 23. It is also "stigmatizing for the individuals required to use them by reinforcing a sense of 'otherness.'" *Id.*

365. Most of the young people treated by Dr. Leibowitz have chosen to use a single stall or single-user restroom or facility. 7-17-17 Tr. at 172. Dr. Leibowitz indicated that in his experience, transgender youth are choosing to use private facilities rather than group settings "because they have not yet beg[u]n to feel comfortable living fully . . . in the gender role of their gender identity." 7-31-17 Tr. at 51. To the extent that transgender students would feel uncomfortable changing in a group setting, such as in a sex-segregated facility, Dr. Leibowitz finds it reasonable that the patient would choose a separate, private facility to be comfortable. 7-31-17 Tr. at 58.

366. Transgender youth who meet the clinical criteria for gender dysphoria are far more likely to want to conceal their physical anatomy and are typically extremely hypervigilant within sex-segregated situations. Leibowitz Decl. at ¶ 21; 7-17-17 Tr. at 180, 181. Also, "[o]ne of the criteria of the diagnostic classification Gender Dysphoria in Adolescence and Adulthood is a desire to be perceived as another gender and a rejection of aspects of their body that connote their assigned sex at birth." Leibowitz Decl. at ¶ 21.

367. Transgender patients are also particularly modest about exposing themselves while using privacy facilities. 7-31-17 Tr. at 58.

368. A number of professional organizations, which include, among others, the American Medical Association, the American Psychological Association, the American Psychiatric Association, the National Association for Social Work, and the American Academy

of Child and Adolescent Psychiatry, have taken the position that individuals with gender dysphoria should not be forced to use a restroom that is not in accordance with their gender identity. 7-17-17 Tr. at 165; Leibowitz Decl. at ¶ 26.

369. As a clinician, Dr. Leibowitz does not decide which bathroom a person should use, or decide a person's gender; instead, "[i]t's up to me to determine whether [the person] meet[s] criteria for gender dysphoria." 7-17-17 Tr. at 171.

370. Some of Dr. Leibowitz's patients have received permission from schools to use facilities consistent with their gender identity and some have not. 7-17-17 Tr. at 166, 167. Dr. Leibowitz believes that the reason that schools have not allowed students to use facilities consistent with their gender identity is a "lack of education" insofar as "[s]ociety has not caught up" with the medical community and he does not "believe that there is a pervasive, prevailing comfort with individuals who differ in terms of their gender identity and their sex anatomy." 7-17-17 Tr. at 168.

371. Although Dr. Leibowitz has not conducted or published any 30-year, 10-year, or 5-year follow-up studies on his patients who went through gender affirmation using his treatment methods, he noted that he is not obligated to conduct research on patients when providing clinical care. 7-17-17 Tr. at 197. Dr. Leibowitz also pointed out that his treatment and therapies are Standard of Care recommended therapies. *Id.* at 198.

372. Dr. Leibowitz believes that transgender students "need to have accommodations provided to them that don't discriminate against them and exacerbate the very harm that we in clinical practice are trying to address." 7-31-17 Tr. at 91.

373. Dr. Leibowitz indicated that there have not been any results from the first-of-its-kind (in the United States) study by the United States National Institutes of Health, which was

studying adolescents and the safety of the medical treatments offered for gender dysphoric patients.[38]  7-31-17 Tr. at 18-19.

374.    Dr. Leibowitz could not provide statistical information about the probability that his gender dysphoric patients might eventually be harmed by him following the Standards of Care when treating them.  7-31-17 Tr. at 32-34.  Dr. Leibowitz indicted that he could not quantify the risks of harm, but noted that the WPATH Standards of Care discuss the levels of potential risk that one may encounter with certain interventions.  *Id.* at 33.

375.    When Dr. Leibowitz is treating a patient, he is only advocating for and medically treating that patient and is not considering the reaction of others to the treatment (unless a Tarasoff obligation arises).  7-31-17 Tr. at 59-60.

376.    Dr. Leibowitz believes it would be unethical (because it is unethical to drive toward affirmation of sex) to conduct a randomized controlled study to compare social reinforcement through access to sex-segregated facilities versus not allowing access.  Leibowitz Dep. at 83-84.  In addition, no such study exists.  *Id.*

377.    Dr. Leibowitz stated that he was untrained to make school policy decisions about how a school is supposed to know whether an individual is gender nonconforming or gender dysphoric.  7-31-17 Tr. at 92.

378.    In Dr. Leibowitz's opinion, society needs to have private facilities "for all individuals who are uncomfortable with all bodies," in other words, "schools should provide . . . a private bathroom for kids, non-transgender or transgender, to use should differing body types evoke or elicit discomfort."[39]  7-31-17 Tr. at 93, 94.

---

[38] Dr. Leibowitz noted that there was a European study as well, and results have come in from that study.  7-31-17 Tr. at 18, 19.

[39] Dr. Leibowitz briefly discussed adolescents' exposure to different sex nudity, and indicated that anyone can be uncomfortable with nudity including, for example, a boy being uncomfortable with another boy's nudity.  7-17-17

379.    Dr. Leibowitz acknowledged that the issue before the court was "complex," and the medical field dealing with gender identity issues is "a field in evolution."  7-31-17 Tr. at 94.

380.    Dr. Leibowitz is qualified as an expert in gender dysphoria and gender identity issues in children and adolescents and the court accepted him as an expert in those areas.[40]  7-31-17 Tr. at 103.  Dr. Leibowitz's testimony was reliable and relevant.[41]

### G.    Aidan DeStefano

381.    DeStefano is, as of July 17, 2017, an 18-year-old transgender male who graduated from BASH after the 2016-17 school year.  7-17-17 Tr. at 211, 212, 213, 237.  DeStefano always attended school in the School District.  *Id.* at 212.

382.    Despite being designated as female at birth, DeStefano has always identified as male.  7-17-17 Tr. at 213.

---

Tr. at 178, 179.  In addition, he believes that if a treated transgender boy, with a beard, a deep voice, and a changed musculature was placed into a girls' locker room and exposed some nudity to the cisgender girls, this could be discomforting to them too.  *Id.* at 179.  Since the discomfort could "happen for anybody anywhere," Dr. Leibowitz believes that "this is . . . not about a matter of discomfort with the nudity and more about forcing an individual to be somewhere . . . that's just incongruent with their deep conviction of who they are, and not about giving people the choice should they feel uncomfortable with nudity in general."  7-31-17 Tr. at 180.

[40] The court overruled the plaintiffs' objection to the court accepting Dr. Leibowitz as an expert.

[41] Rule 702 of the Federal Rules of Evidence requires that (1) an expert witness is qualified, (2) the testimony is reliable, and (3) the testimony assist the fact-finder.  Fed. R. Evid. 702.  The court acts as a gatekeeper to determine whether the proffered evidence satisfies Rule 702.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  As illustrated by Dr. Leibowitz' extensive education and experience in the field dealing with gender dysphoria and gender identity issues with youth, he is well qualified to provide expert testimony in this case.

Dr. Leibowitz's testimony is reliable because he follows the WPATH Standards of Care, which are accepted treatment protocols and recognized by major medical organizations such as the American Medical Association and the American Psychological Association.  *See De'lonta v. Johnson*, 708 F.3d 520, 522-23 (4th Cir. 2013) ("The Standards of Care, published by [WPATH], are the generally accepted protocols for the treatment of [gender identity disorder].").  Although the plaintiffs objected to Dr. Leibowitz's testimony because, *inter alia*, the scientific support for the discussed treatment for gender dysphoria was not yet subjected to randomized, controlled trials, the court found Dr. Leibowitz's testimony that he followed the Standards of Care credible and persuasive as to the reliability of his testimony.  Additionally, Dr. Leibowitz noted an inability due to ethical considerations to placebo-control studies in certain areas.  Despite those types of studies being unavailable, his testimony was still reliable.  *See, e.g.*, *In re Tylenol (Acetaminophen) Mktg. Sales Practices & Prod. Liab. Litig.*, 198 F. Supp. 3d 446, 454-58 (E.D. Pa. 2016).  Dr. Leibowitz appeared to be well-versed on the studies and research that was available and spoke extensively about his significant experience dealing with patients.

As for the final requirement for admissibility, Dr. Leibowitz's testimony was relevant to provide background on gender identity issues and the types of treatments patients may receive for gender dysphoria and other gender identity issues.

383.  DeStefano dresses like a male, has a deep voice like a stereotypical male, and styles his hair like a male.[42]  7-17-17 Tr. at 234 & Intervenor's Ex. I-4.

384.  At his recent graduation, DeStefano wore a black gown like the other male BASH students.  7-17-17 Tr. at 234.

385.  DeStefano started identifying as male while attending junior high school in the School District.  7-17-17 Tr. at 213.

386.  DeStefano attempted to use the girls' bathroom in seventh grade and the reaction that he received from the girls "wasn't good."  7-17-17 Tr. at 213.  The girls told DeStefano never to return to the bathroom because they thought he was a male.  *Id.*

387.  From seventh through ninth grade at the junior high school, DeStefano used the nurse's bathroom because that was where he felt he could go.  7-17-17 Tr. at 213-14, 225.

388.  DeStefano played on the girls' basketball and track and field teams during junior high and changed in the girls' locker room when preparing for games and practices.  7-17-17 Tr. at 214, 215.

389.  When DeStefano started at BASH for tenth grade, he again initially attempted to use the girls' bathroom just to see what it was like.  7-17-17 Tr. at 216.  The girls' reaction to DeStefano "was beyond what [he] expected.  It was worse.  [He] got yelled at by literally everyone that was in there."  *Id.*  They told him not to come back.  *Id.*  The girls also "stared at [him], because [he] did not look like the girls in that bathroom."  DeStefano Decl. at ¶ 4.

390.  Although DeStefano wanted to use the boys' bathroom, he was concerned for his safety.  7-17-17 Tr. at 216.  After speaking to his counselor, they decided that DeStefano would again use the nurse's office to use the bathroom.  *Id.* at 216, 217.  He used the nurse's bathroom

---

[42] As the court observed DeStefano testify, the court can confirm that he appears like a stereotypical male.

for tenth and eleventh grades. *Id.* at 218, 219. That was where he "was the most comfortable." *Id.* at 219.

391. DeStefano was "fine" using the nurse' bathroom because he had used it throughout junior high school. 7-17-17 Tr. at 216.

392. In 2015, DeStefano started hormone replacement therapy and started testosterone. 7-17-17 Tr. at 217.

393. In May 2016, DeStefano legally changed his first name to Aidan. 7-17-17 Tr. at 217.

394. In tenth grade at BASH, DeStefano played on the girls' cross-country and track and field teams. 7-17-17 Tr. at 218. During his senior year at BASH, DeStefano ran as a member of the boys' cross-country team. *Id.* at 218, 221.

395. DeStefano decided not to participate in girls' sports after beginning to take hormones. 7-17-17 Tr. at 245.

396. DeStefano was named to BASH's homecoming court as a male member, and was almost named homecoming king. 7-17-17 Tr. at 222, 223, 224.

397. During his senior year, DeStefano's counselor stated that he could use the bathroom and locker room corresponding to his gender identity, *i.e.* the boys' bathroom and locker room. 7-17-17 Tr. at 219, 220.

398. DeStefano "loved hearing" that he was allowed to use the boys' facilities as a senior. 7-17-17 Tr. at 229, 246. He could not put into words how it felt to be able to go into the bathroom "[he was] supposed to go into." *Id.* at 229. He was "speechless." *Id.* at 243, 246.

399. During the beginning of the school year when the locker room was still under construction, DeStefano took it upon himself to check with his peers to see if they were ok with

him using the facilities because he did not want to create a problem.  7-17-17 Tr. at 219, 220, 225.  He did not receive any opposition, so he used the male facilities.  *Id.* at 220.

400.    If DeStefano had received opposition to using the boys' facilities, he "probably would have just changed in the nurse's bathroom" to avoid a confrontation.  7-17-17 Tr. at 220.

401.    When DeStefano changed for gym class, he would take off all clothes except for his boxers.  7-17-17 Tr. at 227.

402.    Regarding his experience in the boys' locker room and bathrooms, DeStefano indicated that he has "no trouble in the bathrooms or locker room.  Sometimes someone stares, but usually I am treated just like all of the other guys.  No one harasses me or questions me.  The support from the students is really amazing."  DeStefano Decl. at ¶ 13.

403.    Although DeStefano had permission to use the boys' bathroom, he still used the nurse's bathroom "quite frequently."  7-17-17 Tr. at 224.

404.    DeStefano went on the senior trip to Disney World during which he stayed overnight with his cousin, who is a female.  7-17-17 Tr. at 226, 227.  There was some discussion about DeStefano staying with other girls, but in the end the girls' parents would not consent to those overnight accommodations.  *Id.* at 226, 227, 230, 231.

405.    Although he would have liked to room with boys, he accepted staying with a girl because those were the school rules.  7-17-17 Tr. at 231.

406.    DeStefano has never been questioned when he used the men's room in public and had used the men's room in the courthouse on the date of his testimony in this case.  7-17-17 Tr. at 234, 235.

407.    Throughout his life, DeStefano has not experienced any bullying, questioning, or physical altercations, and he "didn't get discriminated" against.  7-17-17 Tr. at 237, 241, 242.

81

408.    If the School District had ceased allowing him to use the boys' facilities while at BASH, it would have been "disheartening" to him.  7-17-17 Tr. at 229.

409.    When indicating what advice he would give other transgender students at BASH, DeStefano referenced his success with making sure that the people in the locker room accepted him before he went in, and then, if the others did not like it, he recommended that the transgender students (1) use the nurse's office, (2) change in a stall, or (3) wear gym clothes under school clothes.  7-17-17 Tr. at 244-245.

410.    DeStefano "see[s] both sides" of the issue at BASH.  7-17-17 Tr. at 243. DeStefano heard from some students saying that they were uncomfortable before with a transgender dressing in the locker room, but upon hearing this, he told them to "maybe change into [sic] a stall."  *Id.* at 243.

### H.    Miscellaneous

411.    A male student, Student G, was an 11th grade student at BASH during the 2016-17 school year.  Joint Stip. of Facts at ¶ 1.

412.    In the spring semester, shortly after the filing of the lawsuit in this case, Student G was in the boys' bathroom near the new high school auditorium when he observed two students enter the bathroom.  Joint Stip. of Facts at ¶ 2.  Student G believed that the two students were 10th grade girls.  *Id.*

413.    A male student, Student H, was an 11th grade student at BASH during the 2016-17 school year.  Joint Stip. of Facts at ¶ 3.

414.    Student H also observed two students he identified as girls in a boys' bathroom during the spring semester.  Joint Stip. of Facts at ¶ 3.

415.    Students G and H jointly met with Dr. Foley to report their respective experiences in the boys' bathrooms at BASH.  Joint Stip. of Facts at ¶ 4.

416.    Dr. Foley advised Students G and H that he intended to check the school's surveillance cameras and investigate.  Joint Stip. of Facts at ¶ 5.

417.    The results of Dr. Foley's investigation, if any, are unknown.  Joint Stip. of Facts at ¶ 6.

## V.    DISCUSSION

### A.    Standard – Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008); *see Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ("Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." (citation and internal quotation marks omitted)).  A district court should not grant a motion for preliminary injunctive relief unless the moving party shows "(1) a likelihood of success on the merits; (2) that [the moving party] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Kos Pharm., Inc.* 369 F.3d at 708 (citing *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999)).  Additionally, to obtain a preliminary injunction, the moving party must establish its entitlement to such relief by clear evidence on the merits of its claim.  *See Winter*, 555 U.S. at 22 (explaining that "a preliminary injunction . . . is . . . an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

Regarding the application of the four factors referenced above,

> a movant for preliminary equitable relief must meet the threshold for the first two "most critical" factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief. In assessing these factors, Judge Easterbrook's observation bears repeating: "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief. [*Hoosier Energy Rural Elec. Corp., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, C.J.).]

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (internal footnotes omitted).[43]

Also, a party's failure to demonstrate a likelihood of success in the litigation *or* an irreparable injury "must necessarily result in the denial of a preliminary injunction." *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982). Nonetheless, and as indicated above, "there may be circumstances when the plaintiff satisfies the first two factors, but the

---

[43] Both the defendants and PYC cite to *Nutrasweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151 (3d Cir. 1999) for the proposition that "the [movant's] failure to establish any element in its favor renders a preliminary injunction inappropriate." *See* Intervenor-Def. Pa. Youth Cong. Found.'s Proposed Findings of Fact and Conclusions of Law ("PYC's Findings and Conclusions") at p. 18, ¶ 96 (quoting *Nutrasweet*), Doc. No. 58; Defendants' Second Set of Proposed Findings of Fact and Conclusions of Law Regarding Pls.' Mot. for Prelim. Inj. ("Defs.' Findings and Conclusions") at p. 24 (quoting *Nutrasweet*), Doc. No. 59. In *Reilly*, the Third Circuit noted that starting in *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191-92 (3d Cir. 1990), various Third Circuit panels "held that a district court 'must consider four factors' and that '[o]nly if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue.'" 858 F.3d at 177 (quoting *Opticians Ass'n of Am.*, 920 F.2d at 191-92). The court pointed out that the *Opticians Ass'n of America* line of cases conflicted with the other decisions, going back to a decision in *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974), which called for a balancing of the four factors. *Id.* The court then explained that "the conflicting line of cases and corresponding confusion in our Court appear to be the product of compounded subtle misinterpretations of our longstanding jurisprudence." *Id.*

The court went on to explain that Third Circuit panels are required to follow prior precedential decisions unless the court *en banc* does not do so, and that no *en banc* court overruled *Transamerican Trailer*. *Id.* Thus, all subsequent Third Circuit panels should have followed the balancing of the four factors approach enunciated in *Transamerican Trailer*. *Id.* In addition, the court explained that the Supreme Court's decision in *Winter* "did not overrule our balancing-of-the-factors standard" and, instead, supported this standard upon a more in depth review of the Court's reasoning in that case. *Id.*

For purposes of this opinion, the court follows the standard set forth in *Reilly* as it appears to be the proper recitation of the standard for parties to satisfy before the court may issue preliminary injunctive relief.

balance of the equities and/or the public interest militate against granting a preliminary injunction." *Fres-co Sys. USA, Inc. v. Hawkins*, No. 16-3591, -- F. App'x --, 2017 WL 2376568, at *3 (3d Cir. June 1, 2017) (citations omitted).

Generally, "[a] primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994); *see also University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."). Thus, "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Acierno*, 40 F.3d at 647 (citation omitted).

### B. Likelihood of Success on the Merits

#### 1. Plaintiffs' Section 1983 Constitutional Privacy Claims

##### a. Summary of the Parties' Arguments

The plaintiffs contend that the defendants' practice of allowing transgender students to use the locker rooms and bathrooms corresponding to their gender identities violates the plaintiffs' "fundamental right to bodily privacy from persons of the opposite sex" under the Fourteenth Amendment to the United States Constitution. *See* Memorandum of Law in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Mem.") at 10, 11 & n.6, Doc. No. 16-1. The practice violates their right to bodily privacy because it departs from "our universal tradition," which separates privacy facilities such as locker rooms and rest rooms based on biological sex rather than on an individual's "subjective perception" of their own gender.[44] *Id.* at 10. They believe that "[t]he

---

[44] The plaintiffs contend that "[a] policy that separates our privacy facilities on the basis of gender identity rather than sex also suffers from absolute unworkability." Pls.' Mem. at 10 n.5; *see also* Reply Br. in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Reply") at 4; Plaintiffs' Suppl. Findings of Fact and Conclusions of Law ("Pls.' Findings and Conclusions") at ECF p. 27, ¶ 146. In support of this assertion, the plaintiffs refer to the spectrum of possible

Constitution prohibits Defendants from placing students in situations where their bodies or private, intimate activities may be exposed to the opposite sex or where the students will use privacy facilities with someone of the opposite sex." *Id.* at 13.

With regard to their assertion that they have identified a fundamental right at issue in this case, the plaintiffs indicate that the right to bodily privacy from members of the opposite sex is "'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).[45] They note that various Pennsylvania

---

gender identities, such as genderqueer or third gender, that fall outside of individuals identifying with the binary constructs of "male" and "female." *Id.* While it appears to be undeniable that sex-segregated privacy facilities such as restrooms and bathrooms appear to be incompatible with being able to accommodate the entire spectrum of possible gender identities (particularly for an individual that does not identify with either sex/gender), it is not as if dividing privacy facilities based on biological sex covers the entire spectrum of biological sex assignments. *See, e.g.*, Jennifer Rellis, *"Please Write 'E' in This Box" Toward Self-Identification and Recognition of a Third Gender: Approaches in the United States and India*, 14 Mich. J. Gender & L. 223, 223 (2008) (explaining that "[o]ne to four percent of the world population is intersexed, not fully male or female." (citation omitted)). Thus, one could argue that separating privacy facilities based on biological sex (which the plaintiffs define by a person's internal and external reproductive organs) is "absolute[ly] unworkabl[e]" as well. As such, certain groups of individuals could be excluded under either method of designating the use of restrooms, locker rooms, and other privacy facilities. For those individuals "for whom there is no safe, accessible restroom in public places," some commentators have suggested replacing sex-segregated public restrooms with "all-gender, multi-user facilities that protect the privacy and safety concerns of all patrons, while discriminating against no one." Terry S. Kogan, *Public Restrooms and the Distorting of Transgender Identity*, 95 N.C. L. Rev. 1205, 1205 (2017); *see also* Alanna M. Jereb, *The Bathroom Right for Transgender Students and How the Entire LGBT Community Can Align to Guarantee This*, 7 Wake Forest J.L. & Pol'y 585, 606 (2017) (discussing two possible solutions to transgender students' bathroom issue, including the provision of unisex bathrooms)

    Regardless, the court is not faced with having to determine the wisdom of the School District's practice or whether it is unworkable in this case. The facts of this case do not involve any of the potential scenarios contemplated by the plaintiffs as there is no evidence that any student at BASH who has received permission to use a facility corresponding to the student's gender identity falls into these other gender identities and, as the defendants have indicated that they do not necessarily have a plan in place for dealing with requests from students other than students identifying with the binary gender/sexes of male and female, it is unclear how the "workability" of the School District's practice as to students outside of the binary genders/sexes of male and female affect the plaintiffs in this case.

[45] Interestingly, while the plaintiffs only mention it by name once in their supporting memorandum of law and fail to mention it at all in their supplemental proposed findings of fact and conclusions of law, it is apparent that the plaintiffs are asserting their privacy right under substantive due process principles. The court reaches this conclusion based upon (1) the plaintiffs' assertion that the defendants violated a "fundamental right," (2) the plaintiffs' citation to *Glucksberg*, which discussed, *inter alia*, how the Supreme Court identified "fundamental rights" as part of the substantive due process analysis, and (3) the plaintiffs' reference to the need to apply strict scrutiny to the defendants' practice and the plaintiffs' reference to the standard for substantive due process set forth in *Reno v. Flores*, 507 U.S. 292, 301-02 (1993), *see* Pls.' Mem. at 23.

laws, including the Pennsylvania's Public School Code of 1949 "require[s] the use of separate facilities on the basis of sex in a myriad of contexts." *Id.* at 14 & n.7 (citing various sections of the Pennsylvania Code). They also point out that even nationally, various courts recognize that sex-segregated facilities historically accommodate privacy needs from the opposite sex. *Id.* at 14-15 (citing cases). Further, when it comes to students, the plaintiffs argue that the government cannot force minors to "endure the risk of intimate exposure to the opposite sex." *Id.* at 16. Moreover, they point out that the law protects against conduct involving violations of privacy from the opposite sex and exposure to another person's unclothed body, and this includes, *inter alia*, (1) civil lawsuits against Peeping Toms, (2) criminalizing (a) open lewdness, (b) viewing or filming another person in a state of undress when that person had a reasonable expectation of privacy, (c) indecent exposure, and (d) minors "sexting," *i.e.* when a minor sends a naked picture of himself or herself via electronic means. *Id.* (citing cases and statutes).

Regarding the defendants' violation(s) of the plaintiffs' fundamental rights, the plaintiffs contend that the defendants' practice of allowing transgender students (again, classified by the plaintiffs as "persons of the opposite sex") to use the bathrooms and locker rooms corresponding to their gender identity violates their privacy. *Id.* at 18. They assert that the defendants' practice violates their privacy even if intimate areas of their bodies are not exposed as even their (in particular, the girls') "modesty" is protected from intrusion. *Id.* at 18-20 (citing *Livingwell (North) Inc. v. Pennsylvania Human Relations Comm'n*, 606 A.2d 1287 (Pa. Commw. 1992)).

Also, while the Third Circuit has focused on the Fourteenth Amendment when discussing the right to privacy outside of the search and seizure context, the court has not always explicitly correlated that right with the Fourteenth Amendment right to substantive due process. Nonetheless, it appears that to the extent that the Third Circuit has recognized this right, the court has characterized it as the "Fourteenth Amendment's substantive due process right to privacy." *See Doe v. Delie*, 257 F.3d 309, 323 (3d Cir. 2001) ("[W]e hold today that prison inmates retain a Fourteenth Amendment substantive due process right to privacy in their medical information."); *see also Nunez v. Pachman*, 578 F.3d 228, 231 n.7 (3d Cir. 2009) ("The Supreme Court has recognized that notions of substantive due process contained within the Fourteenth Amendment safeguard individuals from unwarranted governmental intrusions into their personal lives. This right to privacy actually encompasses two distinct interests[, including] . . . the individual interest in avoiding disclosure of personal matters[.]").

Furthermore, the plaintiffs assert that even though they are the only plaintiffs in this lawsuit, all BASH students' "rights are violated by this policy that tramples students' dignity interest, strips away modesty and privacy, and leaves them humiliated and vulnerable in privacy facilities." *Id.* at 23.

The plaintiffs further assert that self-identity with the opposite sex does not alter the analysis and a number of courts have rejected claims that allowing transgender individuals into the bathroom or locker room of the gender in which the individual identifies violates the other students' privacy to use the restroom. *Id.* at 23-25 (citing cases). Finally, the plaintiffs argue that the defendants' practice does not pass strict scrutiny insofar as there is no compelling interest which could "justif[y] obligating students to accept members of the opposite sex into locker rooms, showers, and restrooms that are properly reserved to the use of one sex under federal and state law." *Id.* at 25-26. In fact, the defendants' interest is to maintain sex-segregated spaces because Pennsylvania law, including the School Code, requires as such. *Id.* at 26. Even if there was a compelling interest, the defendants' practice is not the least restrictive means to accomplish that interest because the defendants could permit those uncomfortable with using a multi-user facility with others of the same sex to use a single-user facility. *Id.* at 26-27.

In contending that the plaintiffs have failed to establish a likelihood of success on the merits on their section 1983 invasion of privacy claim, the defendants do not devote a significant portion of their submissions to attacking the plaintiffs' assertion of the right allegedly infringed in this case. To the extent that there are objections to the characterization of the right at issue, the School District asserts that

> [n]o case recognizes a right to privacy such as the one Plaintiffs assert here that insulates a person from ever coming into any contact at all with someone who is different than they are, or who they fear will act in a way that causes them to be embarrassed or uncomfortable, when there are alternative means – in this case,

single-user bathrooms – for both individuals to protect themselves from such
contact, embarrassment or discomfort.

Defendants' Mem. in Opp. to the Mot. for Prelim. Inj. ("Defs.' Mem.") at 8-9, Doc. No. 34. In addition, the defendants argue that the plaintiffs' claims do not fit into the categories of fundamental rights previously recognized by the courts, such as marriage, family, procreation, and the right to bodily integrity, and are not sufficiently fundamental to qualify as a new fundamental right. *Id.* at 9.

The defendants also assert that the plaintiffs cannot show a likelihood of success on the merits of their section 1983 claim because there is no government compulsion in this case. *Id.* at 8; *see also* Defs.' Findings and Conclusions at 27-28, ¶ 7 ("Plaintiffs . . . are not required by a state actor – in this case the School District – to use restrooms or locker rooms with any transgender student."). The defendants note that no students – transgender or cisgender – are required to use a bathroom or locker room as there are (1) individual toilet stalls (with doors and locks) and individual shower stalls (with curtains) for use in the locker rooms, (2) individual toilet stalls (with doors and locks) in the multi-user bathrooms, (3) single-user facilities (at least five that students can use generally and three more than are available depending on the student's business at the time) available for students who do not want to use the multi-user bathrooms and the toilet stalls therein or the common area of the locker room and the individual toilet and shower stalls therein, and (4) team rooms that Dr. Cooper has indicated that the School District is willing to allow students to use. *Id.*

For their final arguments relating to the plaintiffs' constitutional invasion of privacy claim, the defendants generally assert that the plaintiffs' privacy rights must be balanced with the School District's need "to preserve the discretion of schools to craft individualized approaches to difficult issues that are appropriate for their respective communities." *Id.* at 30-31, ¶ 10. The

defendants seek to have the court not constrain them from fulfilling their duties to serving as "a principal instrument in awakening the child to cultural values," which is deeply rooted in this nation's history and tradition. *Id.* (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 287 (1988) (internal quotation marks and citation omitted)). The defendants also contend that public policy supports their practice as "[c]ontemporary notions of liberty and justice," which support transgender students using restrooms and locker rooms aligned with their gender identities, "are inconsistent with the exceedingly broad right to privacy asserted by Plaintiffs." *Id.* at 33, ¶ 15.

As for PYC, it contends that the plaintiffs are unlikely to succeed on their constitutional invasion of privacy claims because the School District has not actually invaded their privacy insofar as the School District does not compel them to use the common restrooms and locker rooms. Intervenor-Def. Pa. Youth Congress Found.'s Resp. in Opp. to Pls.' Mot. for Prelim. Inj. ("PYC's Mem.") at 4, Doc. No. 33. In addition, PYC notes that (1) the "mere presence" of transgender students in the opposite biological sex's facilities does not constitute an invasion of any student's constitutional right to privacy, and (2) the plaintiffs cite to no case supporting the proposition that there is an invasion of their privacy through their viewing other students in a state of undress. *Id.* at 5. Further, even if the defendants' practice intruded on the plaintiffs' (and other BASH students') constitutional right to privacy, PYC contends that the School District has a legitimate interest in permitting transgender students to use facilities matching their gender identity to ensure that they can "fully participate in school life without being singled out for unequal treatment and stigma." *Id.* at 8-9.

b.      Analysis

In addressing whether the plaintiffs are likely to succeed on the merits of their constitutional invasion of privacy claim, the court must first address whether the plaintiffs are asserting a fundamental right as they claim and the precise contours of that right.  To analyze whether the plaintiffs are asserting such a fundamental right and the contours of the right as defined by the facts of this case, the court is guided by the Third Circuit's decision in *Doe v. Luzerne County*, 660 F.3d 169 (2011).[46]  In *Doe*, the Third Circuit described the law applicable to claims about purported violations of a constitutional right to privacy under the Fourteenth Amendment as follows:

> "The United States Constitution does not mention an explicit right to privacy and the United States Supreme Court has never proclaimed that such a generalized right exists." *C.N. v. Ridgewood Bd. of Educ.,* 430 F.3d 159, 178 (3d Cir. 2005). *But see Sterling v. Borough of Minersville,* 232 F.3d 190, 193 (3d Cir. 2000) (stating that the Supreme Court "acknowledged the individual's constitutional right to privacy" in *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct.

---

[46] In relying on *Doe*, the court recognizes that the facts underlying the purported constitutional violation in that case are not remotely analogous to the facts in this case. *Doe* involved a female police officer plaintiff who was subjected to a flea infestation after entering a disarrayed and unsanitary residence while serving a bench warrant. 660 F.3d at 171.  During the flea decontamination process, Doe went to a hospital decontamination area and showered using chemical shampoo. *Id.* at 172.  After completing her shower, Doe found that the decontamination area lacked towels and the only item that she could use to cover her naked body was "a roll of thin paper of the type that typically covers a doctor's examination table." *Id.*  Doe claimed that this paper was semi-transparent or at least became semi-transparent when she covered her wet body with it. *Id.*

At the request of another female police officer who was assisting her with the decontamination, Doe covered her private areas with the paper and this other officer entered the room, closed the door behind her, and began inspecting Doe for any remaining fleas. *Id.* at 173.  While Doe's back was facing the door to the room, and with Doe having "most of her back, shoulders and legs . . . completely exposed . . . [with] the thin paper, which could have been semi-transparent, . . . wrapped around her buttocks and breasts[,]" two male police officers opened the door approximately a foot and observed Doe. *Id.*  One of the male officers had a video camera and was recording Doe. *Id.*  After a comment by one of the male officers, Doe turned her head toward the sound and noticed the male officers. *Id.*  Without turning around, Doe yelled at the male officers to leave the room. *Id.*  The parties disputed how much of Doe's body the two male officers observed in the decontamination area. *Id.*

To make matters worse, the male officer who was filming Doe – he had also filmed portions of Doe's entire ordeal from the reporting of the contamination at the residence to Doe entering the hospital, purportedly for "training purposes" – uploaded pictures and video of Doe (and another officer that had also entered the residence with Doe) onto his work computer and apparently stored some of the pictures and video on a public computer folder accessible to anyone on the county network. *Id.* at 173-74.  This same male officer shared photos and videos of the incident with other members of the police department, although it was unknown who saw them and exactly what they saw. *Id.*  Nonetheless, apparently the files saved on the public computer contained a photo of Doe's bare back and a photo of Doe's bare back and bare shoulders, with both photos showing "the outline of Doe's buttocks—covered only by thin, wet hospital paper." *Id.* at 174.

91

1678, 14 L.Ed.2d 510 (1965)). The Supreme Court, however, has found certain constitutional "zones of privacy." *C.N.,* 430 F.3d at 178 (citing *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)). From these zones of privacy, we have articulated two types of privacy interests rooted in the Fourteenth Amendment. *Nunez v. Pachman,* 578 F.3d 228, 231 n.7 (3d Cir. 2009); *see also Malleus v. George,* 641 F.3d 560, 564 (3d Cir. 2011); *C.N.,* 430 F.3d at 178. The first privacy interest is the "individual interest in avoiding disclosure of personal matters," and the second is the "interest in independence in making certain kinds of important decisions." *C.N.,* 430 F.3d at 178; *see also Malleus,* 641 F.3d at 564; *Hedges v. Musco,* 204 F.3d 109, 121 (3d Cir. 2000). The first privacy interest is at issue in this matter.

"'The right not to have intimate facts concerning one's life disclosed without one's consent' is 'a venerable [right] whose constitutional significance we have recognized in the past.'" *C.N.,* 430 F.3d at 179 (quoting *Bartnicki v. Vopper,* 200 F.3d 109, 122 (3d Cir. 1999)). Justice Brandeis, in dissent, famously referred to this as "the right to be let alone." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

The touchstone of constitutional privacy protection is whether the information at issue is "within an individual's reasonable expectations of confidentiality." *Malleus,* 641 F.3d at 564; *see also C.N.,* 430 F.3d at 179; *Fraternal Order of Police, Lodge No. 5 v. City of Phila.,* 812 F.2d 105, 112 (3d Cir.1987) ("*Fraternal Order of Police*"). The more intimate or personal the information, the more reasonable the expectation is that it will remain confidential. *Fraternal Order of Police,* 812 F.2d at 112–13 (citing *United States v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 & n. 5 (3d Cir. 1980)); *see also Malleus,* 641 F.3d at 564; *C.N.,* 430 F.3d at 179. Indeed, the "federal constitution ... protects against public disclosure [of] only highly personal matters representing the most intimate aspects of human affairs," thereby shielding from public scrutiny "only that information which involves deeply rooted notions of fundamental personal interests derived from the Constitution." *Nunez,* 578 F.3d at 232 (emphasis omitted) (citation and quotation marks omitted).

We have found the following types of information to be protected: a private employee's medical information that was sought by the government; medical, financial and behavioral information relevant to a police investigator; a public employee's prescription record; a minor student's pregnancy status; sexual orientation; and an inmate's HIV-positive status. *Malleus,* 641 F.3d at 565 (citing cases and explaining that information encompassed by the constitutional right to privacy may be separated into categories reflecting sexual, medical and some financial information).

660 F.3d at 175-76.

The Third Circuit went on to conclude that "Doe had a reasonable expectation of privacy while in the [d]econtamination [a]rea, particularly while in the presence of members of the opposite sex." *Id.* at 177 (alteration to original). In reaching this conclusion, the court also pointed out that "[p]rivacy claims under the Fourteenth Amendment necessarily require fact-intensive and context-specific analyses, and unfortunately, bright lines generally cannot be drawn." *Id.* at 176. The court further explained that

> [t]he difficulty in drawing a bright line is evident as we are not aware of any court of appeals that has adopted either a requirement that certain anatomical areas of one's body, such as genitalia, must have been exposed for that person to maintain a privacy claim under the Fourteenth Amendment or a rule that a nonconsensual exposure of certain anatomical areas constitutes a *per se* violation.

*Id.* The court also "refuse[d] to draw bright lines based on anatomical parts or regions," and explained that courts must "analyze the specific circumstances under which the alleged violation occurred." *Id.* at 176-77.

The plaintiffs cite to *Doe* for the proposition that "[o]ne has a 'constitutionally protected privacy interest in his or her partially clothed body,'" *see* Pls.' Mem. at 11 (quoting *Doe*, 660 F.3d at 175-76), and it appears that the other parties do not dispute that *Doe* recognized that particular constitutional privacy interest.[47] If this right is the end of the inquiry, there is no likelihood of the plaintiffs prevailing in this case.

---

[47] While the Third Circuit in *Doe* indicated that "[a]lthough the issue of whether one may have a constitutionally protected privacy interest in his or her partially clothed body is a matter of first impression in this circuit, other circuits—including the Second, Sixth and Ninth Circuits—have held that such a right exists," the court did not explicitly state that such a privacy right existed. *Id.* at 176. Nonetheless, in finding that Doe, who was partially clothed at the time of the purported initial violation, had a reasonable expectation of privacy while she was in the decontamination area, the court seemingly had to find that this privacy interest existed although it is apparent that the precise contours of that right are case determinative insofar as the Third Circuit remanded the case to the district court because of factual issues concerning the parts of Doe's body that the male officers actually viewed. In this regard, the Third Circuit found that there existed disputed issues of fact "as to which of Doe's body parts were exposed to members of the opposite sex and/or filmed while she was in the [d]econtamination [a]rea" insofar as "the issues of whether Doe's breasts or buttocks were exposed would affect the outcome of the suit." *Id.* at 177-78.

In this regard, the plaintiffs have yet to prove that the defendants violated their constitutionally protected privacy interest in their partially clothed bodies.[48] Mary Smith entered a bathroom and saw Student B while both students were fully clothed. As such, Mary Smith's constitutionally protected privacy interest in her partially clothed body was not violated.

Regarding Joel Doe, he was in his underwear and a t-shirt when he saw Student A. As explained in the findings of fact, there is conflicting evidence as to whether Student A saw Joel Doe in his underwear. There surely is not enough credible evidence that the court would conclude that Joel Doe was likely to prove that Student A saw him in his underwear.

Finally, Jack Jones testified that he was in his underwear and initially had his back turned to Student A. When he turned around, Student A was staring into Student A's locker and Jack Jones quickly moved away so Student A could not see him. While it appears that Student A was in close proximity to Jack Jones, the court cannot infer that Student A saw Jack Jones in his underwear and would not find that Jack Jones would be likely to succeed on such a claim if presented to a jury based solely on the evidence currently before the court. The court also notes that Jane Jones testified that when Jack Jones reported the incident to her, he did not tell her that Student A saw him in his underwear. Therefore, while it is unclear whether Joel Doe and Jack Jones are claiming that Student A saw them in their underwear because they inconsistently assert this point (which would seem to be extremely important to their claim), to the extent they are asserting as such, the court finds that they are not likely to succeed on any claim that involves them being wrongfully viewed while in a state of partial undress because of the conflicting evidence in the record.[49]

---

[48] Macy Roe testified that, as far as she knew, she never encountered a transgender student while in a locker room or bathroom at BASH.
[49] Yet another example of this inconsistency is illustrated by the plaintiffs' statement in their reply brief that the defendants and PYC "conveniently ignore the fact that both Joel Doe and Jack Jones were already caught in the

Nonetheless, it is evident by the plaintiffs' description of the fundamental right in this case – the fundamental right to bodily privacy from members of the opposite sex – that the plaintiffs are seeking to include additional conduct as violating their right to privacy. It appears that these additional forms of conduct include (1) males being able to hear females when females are opening products to deal with menstruation issues or using the restrooms, (2) males being around females with the opportunity to view females where they could discern that the girls are having menstruation issues, (3) members of the opposite sex being in locker rooms or bathrooms with each other regardless of anyone being in a state of undress, and (4) having to view a transgender person in a state of undress since that student is actually a member of the opposite sex.

Generally, a fundamental right is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). The Supreme Court has "'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended'" and because doing so "place[s] the matter outside the arena of public debate and legislative action." *Id.* at 720 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). Thus, "[t]he doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993).

The plaintiffs have not identified and this court has not located any court that has recognized a constitutional right of privacy as broadly defined by the plaintiffs. The only court that seemingly has addressed a similar if not identical constitutional privacy claim was the

objectively offensive and embarrassing circumstance of standing in their underwear **when a classmate of the opposite sex was with them**." Reply Br. in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Reply") at 2 (emphasis added).

95

United States District Court for the Northern District of Illinois in *Students and Parents for Privacy v. United States Dep't of Education*, No. 16-cv-4945, 2016 WL 6134121 (Oct. 18, 2016) (hereinafter referred to as "*Students*"). In *Students*, United States Magistrate Judge Jeffrey T. Gilbert issued a report and recommendation which recommended denying the plaintiffs' motion for a preliminary injunction. The plaintiffs in that case had sued, among others, the Department of Education and school directors of a school district. 2016 WL 6134121 at *1. In the action, the plaintiffs sought a preliminary injunction that would have ceased the school directors' existing policies that allowed transgender students to use locker rooms and restrooms on the basis of their gender identity and required the school district to segregate restrooms and locker rooms on the basis of the students' biological sex. *Id.* Thus, on its face, the plaintiffs in *Students* were seeking the same relief as the plaintiffs in this case.[50]

One of the plaintiffs' claims in *Students* was that the school directors' policy (there were written policies with respect to bathrooms and locker rooms) violated their constitutional rights "'to privacy in one's fully or partially unclothed body'" and "'to be free from State-compelled risk of intimate exposure to oneself to the opposite sex.'" *Id.* at *22 (citation omitted). The court determined that the plaintiffs had too broadly defined the right at issue in the case because it was not tied to the facts of the case and there is no generalized constitutional right to privacy "in the substantive due process context." *Id.* at *21-22 (citations omitted). The court then rephrased the right at issue and the question for the court to resolve as: "do high school students have a constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs?" *Id.* at *23.

---

[50] The plaintiffs in *Students* were also represented by multiple counsel, including attorneys from Alliance Defending Freedom, which is also one of the legal groups representing the plaintiffs in the instant case.

The court concluded that the plaintiff high school students did not have a constitutional right not to share restrooms or locker rooms with transgender students whose sex assigned at birth is different than theirs. *Id.* In reaching this conclusion, Magistrate Judge Gilbert explained that the court did not have to limit the definition of "sex" to an individual's sex at birth as the Seventh Circuit Court of Appeals had in the Title VII context in *Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1084 (1984), and could address gender identity without being limited to having to frame the issue by the students' sex assigned at birth. *Id.* The court also pointed out that the school directors' policies did not require the plaintiffs to use locker rooms or bathrooms with transgender students because (1) they could use the private stalls and protections in the bathrooms and locker rooms and, (2) if those protections did not provide sufficient comfort for a particular student, the uncomfortable student could use an alternative facility to ensure the student's privacy needs. *Id.* This lack of compulsion by the school district distinguished the school directors' policies from the cases referenced by the plaintiffs.[51] *Id.*

The court also pointed out that "[i]n assessing the nature and scope of Plaintiffs' constitutional rights, and whether those rights have been infringed, the Court also must consider the need to preserve the discretion of schools to craft individualized approaches to difficult issues that are appropriate for their respective communities." *Id.* at *24. In addition, the court indicated that students have less constitutional privacy rights in public schools than they would elsewhere. *Id.* at *25.

The court further explained that "[c]ontemporary notions of liberty and justice are inconsistent with the existence of the right to privacy asserted by Plaintiffs and properly framed by this Court" insofar as transgender students do not "live [their] lives in conformance with [their] sex assigned at birth." *Id.* The intervenors, three transgender students who attended

---

[51] The plaintiffs refer to many of the same cases here.

school in the school district, provided declarations showing how they lived their lives in accordance with their gender identity and were consistently recognized as such by the community. *Id.*

As a final reason for concluding that the high school students lacked the constitutional right at issue, the court pointed out that the school directors' policy did not and would not (as feared by the plaintiffs) allow all cisgender students to go into the locker room of the opposite sex; instead, it allows students to use the facilities consistent with their gender identity. *Id.* at *26. In addition, the school district had an agreement with one of the students, a transgender female, to use the girls' locker rooms. *Id.* The court further noted that speculation as to cisgender students possibly seeking to gain entrance to the opposing sex's bathroom and locker room was not a reason to invalidate the school directors' policy. *Id.*

The court went on to conclude that even if the court accepted the broad constitutional privacy rights asserted by the plaintiffs, the school directors did not substantially or directly infringe upon the plaintiffs' rights because, *inter alia*, (1) none of the cases cited by the plaintiffs were applicable or "st[ood] for the proposition that the risk of bodily exposure to a transgender student in a high school restroom or locker room, particularly given the privacy protections put in place by [the school directors] infringes upon a fundamental right and thereby violates the Constitution[;]" (2) the plaintiffs' cited cases involving the Fourth Amendment were inapplicable because the Fourth Amendment requires the government to show reasonableness before invading a person's privacy via a search and seizure and "substantive due process does not impose a similar restriction[;]" (3) the case did not involve the "extreme invasions of privacy that the courts confronted in the cases cited by Plaintiffs;" and (4) the case did not involve the "type of forced invasion of privacy that animated the cases cited by Plaintiffs." *Id.* at *27-29.

98

This court recognizes that *Students* is not binding authority and, as of this moment, is a report and recommendation that has not been adopted by the referring District Court Judge.[52] Nevertheless, portions of the court's opinion are persuasive in addressing the issues presented in this case despite various subtle differences in the factual record.

In the first instance, as in *Students*, the plaintiffs here have argued for the recognition of a very broad constitutional privacy right that has never been recognized by another court even though courts have recognized that sex-segregated bathrooms provide for privacy protection from the opposite sex. In fact, if such a broad right was to exist, the Third Circuit in *Doe* would not have had to limit the right to one's partially clothed body, because the plaintiff would have had a general right to bodily privacy from the opposite sex. There would have been no need to remand the case to the district court to resolve the issue of whether the defendants actually violated the plaintiff's right to privacy (as the court did not conclude that a violation occurred) because the male officers would have violated her right to privacy merely by entering the decontamination room while she was in there once the court determined that Doe had a reasonable expectation of privacy in the room. The plaintiffs' proposed right is so expansive that it would be a constitutional violation for a female to be in the presence of a male inside of a locker room or bathroom and vice versa, and it would be a violation of one's constitutional right of privacy to view a member of the opposite sex in a state of undress even if the viewing party was fully clothed at the time. There is no support for such a broad right of privacy that has yet to be recognized.

---

[52] *Students* also involved claims against the Department of Education based on the guidance provided in the May 2016 Dear Colleague Letter. Counsel represented to this court during oral argument that the rescission of that guidance by the current administration has caused delays in the disposition of objections to the report and recommendation. In addition, the plaintiffs have pointed out that the Department of Education, Office for Civil Rights withdrew from the matter and terminated its enforcement efforts. *See* Pls.' Reply at 3, n.4.

The plaintiffs have also not demonstrated that such an expansive right of privacy is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721. Even if this right was limited to a right to bodily privacy from the opposite sex in bathrooms and locker rooms, or even if the right was limited to a student's right of bodily privacy from the opposite sex in bathrooms and locker rooms at schools, these rights are not such that "neither liberty nor justice would exist if they were sacrificed." *Id.* Despite these possible limitations to the broad right asserted by the plaintiffs, these are not the contours of the underlying right in this case because this case does not merely involve members of the opposite sex. *See Leamer v. Fauver*, 288 F.3d 532, 546 (3d Cir. 2002) (indicating that the first step of any substantive due process analysis is to "define the 'exact contours of the underlying right said to have been violated'" (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998)). Instead, although the plaintiffs refuse to refer to them as such, this case involves transgender students and whether it violates cisgender students' right to privacy for transgender students to be in the locker room or bathroom that does not correspond to the transgender student's biological sex at birth.

As in *Students*, the School District's practice here does not allow cisgender boys to go into the girls' bathrooms and locker rooms or allow cisgender girls to go into the boys' bathrooms and locker rooms.[53] Instead, the School District permits students who indicate that they identify with a gender different than the sex assigned to them at birth to use the bathrooms and locker rooms which correspond to their gender identity. Despite the plaintiffs' concerns

---

[53] The parties entered into a stipulation in which two male students at BASH reported that two purportedly female students entered the boys' bathroom (it was unclear if there was more than one instance). Even though two female students entered the boys' bathroom, these acts do not mean that the School District's practice regarding use of the restrooms and requiring permission before gaining access to a restroom corresponding to the student's gender identity extends to all cisgender students. As Dr. Cooper testified, there were five to ten reported incidents with students improperly entering into bathrooms of the opposite sex before the new practice started so it is not as if this new practice opened the door to numerous students wrongfully going into restrooms or locker rooms.

about gender fluidity, gender nonconformity, or other gender identity issues that fall along the spectrum described by Dr. Leibowitz and referenced in the WPATH Standards of Care, there is no evidence in the record that any of the students that have requested and received permission from the School District have done anything other than live in a manner consistent with their gender identity.  In this regard, Dr. Cooper indicated that all of the transgender students that have received permission to use the bathrooms and locker rooms corresponding to their gender identity have requested to have the School District refer to them as an initial or another name rather than their given name, and have asked to be referred to by the pronouns corresponding to their gender identity instead of their sex assigned at birth.  There is also no evidence that these students do not also outwardly portray themselves in accordance with their gender identity or are not known by the community in the same regard.  Furthermore, once the transgender students have received permission to go into the locker rooms and bathrooms consistent with their gender identity, the School District has prohibited them from going into the bathroom corresponding with their birth sex.

This court agrees with *Students* that high school students such as the plaintiffs here (or at least the plaintiffs when they commenced this litigation, as Macy Roe has already graduated from BASH) have no constitutional right not to share restrooms and locker rooms with transgender students whose sex assigned at birth is different from theirs.  Also, as the defendants note, there is no requirement at BASH that the plaintiffs (or any student for that matter) get changed in the locker room for gym class (although they do have to change depending on the gym activity and if they desire to try to obtain as high of a grade as possible) or use the multi-user restrooms.  Thus, no cisgender student is compelled to use a restroom with a transgender student.  If cisgender students decide to use the locker rooms, there are privacy stalls in the

shower area with curtains and toilet stalls with doors and locks for students use if the student desires to not be viewed by a transgender student while changing. If cisgender students are uncomfortable even viewing a transgender student while they are changing for gym, the cisgender students could use the team room in the locker room that does not require them to go through the common area of the locker room, or the cisgender students could use a single-user facility to change. Similarly, any cisgender student concerned with running into a transgender student in a bathroom and who does not think that urinal dividers or toilet stalls provide the requisite protection of their privacy can access one of the single-user facilities. At bottom, no student at BASH is compelled to use a privacy facility in which he or she feels uncomfortable.

When discussing the need for students to be protected from exposure to the members of the opposite sex, the plaintiffs cite to numerous cases that simply have no application here. For example, the plaintiffs cite to *Fortner v. Thomas*, 983 F. 2d 1024, 1030 (11th Cir. 1993) for the proposition that "[m]ost people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of other people of the other sex may be especially demeaning and humiliating." Pls.' Findings and Conclusions at ECF p. 34, ¶ 11. *Fortner* involves male inmates complaining about female correctional officers being assigned to locations that allow them to view inmates in the showers and on the toilet. 983 F.2d at 1026. Although unclear, the reference to the term "involuntary" appears to indicate that the inmates lacked the ability to prevent the female guards from seeing them naked. As already indicated, there is no requirement at BASH that would compel a student to involuntarily expose himself or herself to another student. The facilities there can address all students' privacy needs.

Another example of citing to seemingly inapplicable cases is the plaintiffs' references to cases involving strip searches of students by members of the opposite sex, which is significantly

more egregious than merely being in the presence of a transgender student. *See* Pls.' Findings and Conclusions at 35 & ¶¶ 12-14, 38 & ¶ 27 (citing *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) (involving female teacher aide's strip search of male student); *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364 (2009) (involving strip search of 13-year-old female student's bra and underpants); *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598 (6th Cir. 2005) (involving strip searches of high school students)).[54] A further example is cases involving bona fide occupational qualifications that would preclude individuals from one sex from being in an area that would violate the opposite sex's privacy interests. Although these cases reference having sex-segregated areas to accommodate privacy needs, none of the cases address whether the privacy interest mentioned is a constitutional right of privacy. *See, e.g.*, Pls.' Findings and Conclusions at ECF p. 38, ¶ 26 (citing *St. John's Home for Children v. West Va. Human Rights Comm'n*, 375 S.E.2d 769, 771 (Vir. 1998) (referencing bona fide occupational qualification for female child care worker in a "school for disturbed adolescent[] boys")).

Two other points bear mentioning. First, even if the right articulated by the plaintiff could be extended to support the existence of a constitutional right of bodily privacy from members of the opposite sex, the plaintiffs have not identified any basis for that right extending to a prohibition of seeing a member of the opposite sex in a state of undress such as Joel Doe and Jack Jones experienced with Student A in October and November 2016. To recognize, for example, that a male's constitutional privacy rights are violated by merely viewing a female in a

---

[54] The plaintiffs cite to *Redding* for two propositions: (1) that "adolescent vulnerability intensifies the . . . intrusiveness of the exposure," and (2) "[f]orcing minors to risk exposing their bodies to the opposite sex is an 'embarrassing, frightening, and humiliating' experience." Pls.' Mem. at 13 (quoting *Redding*, 557 U.S. at 375); Pls.' Findings and Conclusions at ¶¶ 13-14 (same). As for this second proposition, the plaintiffs' have mischaracterized *Redding* because the "opposite sex" was not involved in the strip search. Instead, the facts show that the school employees conducting the search of the 13-year-old girl student were an administrative assistant named "Helen Romero" and the school nurse named "Peggy Schwallier." While one's name is not automatically determinative of one's gender or sex (as the instant case makes clear), it appears that female school employees conducted the search of the female student.

locker room or even by seeing a female in a state of undress in a locker room, would extend constitutional privacy rights beyond acceptable bounds. Second, the plaintiffs reference a right to privacy by cisgender girls to not have transgender girls hear them when they are in the restroom (particularly when they are tending to menstruation issues). The plaintiffs cite to *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611 (3d Cir. 1992) in support of the proposition that an individual's use of their senses (which would presumably include hearing) to invade the seclusion of another is a privacy violation. Pls.' Findings and Conclusions at 34, ¶ 11. The *Borse* case discussed this type of intrusion with respect to a common law intrusion upon seclusion tort claim and did not discuss it as if it was a constitutional invasion of privacy claim. Further, to the extent that it would even reach the status of a fundamental right of privacy, there is no indication that this would be extended to being heard by a member of the opposite sex when the student is in an area such as a locker room or multi-user bathroom where there is a limited amount of auditory privacy from anyone.

Since this matter does not involve any forced or involuntary exposure of a student's body to or by a transgender person, and the School District has instituted numerous privacy protections and available alternatives for uncomfortable students or to protect against the involuntary exposure of a student's partially clothed or unclothed body, the plaintiffs have not shown that the defendants infringed upon their constitutional privacy rights. As a final issue, PYC and the plaintiffs disagree over the level of scrutiny to apply to the defendants' practice regarding transgender students' use of the bathrooms and locker rooms at BASH.[55] The plaintiffs argue that the practice is subject to strict scrutiny insofar as it infringes upon a fundamental constitutional right. Pls.' Mem. at 25-26. PYC contends that strict scrutiny does not apply because the Third Circuit in *Doe* indicated that "'[a] person's right to avoid disclosure

---

[55] As far as the court can tell, the defendants do not address this issue.

of personal matters is not absolute,' and '[d]isclosure may be required if the government interest in disclosure outweighs the individual's privacy interest.'" PYC's Mem. at 8 n.4 (quoting *Doe v. Luzerne Cty.*, 660 F.3d 169, 178 (3d Cir. 2011)).

As already discussed, the Third Circuit in *Doe* was analyzing a matter in which the plaintiff was raising a claim that her constitutional right to privacy was violated when the two male police officers entered the decontamination room and saw her in a state of undress. But, the case also involved the one male officer filming her, showing pictures and videos of her to other employees, and saving photos and videos to the office computer server. When the Third Circuit discussed the seven-factor "flexible balancing test" used to see if the government's interest in disclosure outweighed the individual's privacy interest, it appears that the Third Circuit was examining only the alleged invasion of privacy with respect to the photos and videos and not the invasion for the male officers viewing the plaintiff in the decontamination room. Further, the language of the balancing test does not seem to be applicable to a constitutional right of privacy claim like the one presented here, and applying the test to the plaintiffs' privacy claims here appears to be nonsensical. Instead, the balancing test appears to be concerned with compelling disclosure of private information contained or sought to be included in records as the test repeatedly references "record[s]." *See Doe*, 660 F.3d at 178 (conducting balancing test and evaluating the "type of records at issue [which] include photographs of Doe while she is partially dressed and an edited video of Doe that may include images of, among other things, Doe's exposed breasts and/or buttocks").[56] Thus, it would not appear that this flexible balancing test is

---

[56] The flexible balancing test requires a court to consider the following factors:

> [1] the type of record requested, [2] the information it does or might contain, [3] the potential for harm in any subsequent nonconsensual disclosure, [4] the injury from disclosure to the relationship in which the record was generated, [5] the adequacy of safeguards to prevent unauthorized disclosure, [6] the degree of need for access, and [7] whether there is an express

appropriate to examine the constitutionality of the School District's practice because the disclosure of private information in a record is not at issue here.

As such, the court must determine, to the extent that the defendants' practice infringes upon the plaintiffs' privacy rights regarding the involuntary exposure of the intimate parts of the body (or even the possible disclosure of their partially clothed bodies), whether the infringement is narrowly tailored to serve a compelling state interest. *Reno*, 507 U.S. at 302. The court finds that it is. More specifically, the defendants have a compelling state interest not to discriminate against transgender students. Even with the revocation of the guidance that initiated the School District to change its practice for the 2016-17 school year, there have been recent cases determining that School Districts have violated the Equal Protection Clause and Title IX by precluding transgender students from using the restrooms. *See, e.g.*, *Whitaker by Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) (Title IX) and *Evancho v. Pine-Richland School District*, No. CIV. A. 2:16-1537, 2017 WL 770619 (W.D. Pa. Feb. 27, 2017) (Equal Protection Clause). While there have been other cases deciding to the contrary, *see, e.g.*, *Johnston v. University of Pittsburgh of Commonwealth System of Higher Education*, 97 F. Supp. 3d 657, 678 (W.D. Pa. 2015) (determining transgender university student failed to state claim that university discriminated against him in violation of Title IX and the Equal Protection Clause when it refused to allow him to use sex-segregated bathrooms and

statutory mandate, articulated public policy, or other recognizable public interest militating toward access.

*Doe*, 660 F.3d at 178 (citations omitted). In addition, all of the cases the Third Circuit cites to concerning the flexible balancing test involve disclosure of documents. *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159 (3d Cir. 2005) (involving school district administering a survey about the personal lives of students in seventh through twelfth grade, which included, *inter alia*, the students' drug and alcohol use, sexual activity, and attempts at suicide); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 104 (3d Cir. 1987) (involving challenge to questionnaire Philadelphia Police Department used to select applicants for its special investigations unit because questionnaire sought information about, *inter alia*, applicants' gambling habits, alcohol consumption, and family's financial status); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570 (3d Cir. 1980) (involving a subpoena directing an employer to produce medical records of employees that had been working in a hazardous area).

106

locker rooms designated for men), this does not mean that the School District does not have a compelling state interest in not discriminating against transgender students with regard to the use of privacy facilities at BASH.

As for whether the practice is narrowly tailored, the School District's practice is narrowly tailored because the School District, *inter alia*, (1) does not coerce students to use the multi-user bathrooms and locker rooms, (2) requires students seeking to use the facilities corresponding to their gender identity to first consult with the counselor and administration and receive permission before gaining access, (3) provides privacy protections in the nature of areas in the locker rooms and bathrooms where students can go if those students are uncomfortable seeing or being seen by transgender students, and (4) provides alternative single-user facilities that would provide uncomfortable students with complete privacy and security for changing or taking care of bodily needs. The School District has attempted to provide transgender students with the opportunity to live their lives in a manner consistent with their gender identity, while attempting to minimize as much as possible any discomfort felt by other students by offering various forms of privacy protection and alternative arrangements for their use if they feel uncomfortable or need additional privacy.

Accordingly, the court finds that the plaintiffs have failed to establish that they are likely to succeed on the merits of their section 1983 action for invasion of privacy against the defendants.

### 2. Title IX

#### a. Summary of the Parties' Arguments

For their second claim, the plaintiffs contend that the defendants' practice of allowing transgender students to use the privacy facilities corresponding to their gender identity violates

Title IX "by no longer having locker rooms, showers, and restroom [sic] separated on the basis of sex, because allowing biological girls into boys' facilities and biological boys into girls' facilities creates a hostile environment on the basis of sex." Pls.' Mem. at 27. They argue that Title IX, as illustrated by the February 2017 Dear Colleague Letter, pertains to discrimination by "sex," "a term we have long understood to refer to our biological sex and reproductive nature." *Id.* at 28. Thus, Title IX preserves distinct privacy facilities on the basis of sex and not on theories of gender identity. *Id.* at 27-30.

With regard to hostile environment sexual harassment, the plaintiffs assert that simply by allowing transgender students into the locker rooms of the opposite biological sex, the defendants have created a hostile environment for the cisgender students. *Id.* at 30. They point out that the *EEOC Policy Guidance on Current Issues of Sexual Harassment* shows that the EEOC believes that "'displays of "girlie" pictures [] and other offensive conduct can constitute a hostile work environment even if many people deem it to be harmless or insignificant.'" *Id.* (citing https://www.eeoc.gov/policy/docs/currentissues.html). They argue that if the EEOC would find a pin-up girl to be sufficient to establish sexual harassment, then placing a transgender boy (who they again describe as a female) in the male locker room is as much or more significantly offensive. *Id.* The plaintiffs also point out that a number of cases have found that the intrusion upon a locker room by a member of the opposite sex constitutes sexual harassment and a hostile environment. *Id.* at 31-32 (citing cases).

The plaintiffs further assert that the harassment is based on sex. The School District's policy causes the harassment because the School District allows students to use the privacy facility of the opposite biological sex.[57] The plaintiffs also note that the female plaintiffs have an

---

[57] The plaintiffs claim that Dr. Foley "seemed to understand the shocking nature of what he was asking Joel Doe and the other students visiting him to do when he told them to make using the locker room with a biological girl wearing

additional issue because of having to deal with menstruation issues, and "[a]ttending to these needs with males present is humiliating." *Id.* at 34. The plaintiffs also point out that the School District's policy puts the female plaintiffs at risk since females are more likely to be victims of sexual assault and (1) males can now enter the female privacy facilities with lewd intentions but under the guise that they are identifying as female, (2) the female plaintiffs cannot question the presence of a biological male in their restrooms and locker rooms now, and (3) there is no method of excluding males with lewd intentions "until *after* the damage is done." *Id.* All of this causes the plaintiffs to feel "vulnerable and violated" because of their sex. *Id.*

Finally, the plaintiffs argue that the harassment at issue is severe, pervasive, and objectively offensive. *Id.* at 35. The plaintiffs assert that the evidence shows that they satisfy the "subjective" first prong of a hostile environment claim because they suffer humiliation, fear, anxiety, stress, and dignity loss with the current School District policy, and they fear being faced with similar situations in the future. *Id.* As for the objective prong, the plaintiffs contend as follows: (1) the situation is "severe" because they recognize that to use the multi-user rooms at BASH they must be prepared to see or have members of the opposite sex enter the room; (2) the plaintiffs' situation is pervasive because the practice sanctions the harassing activity and it is ongoing; (3) the School District's practice is humiliating and threatening because they either need to give up the right to use facilities designed for them or face the possibility of being confronted with someone of the opposite sex in that facility; and (4) the practice undermines their educational experience because it effectively denies them access to the multi-user facilities

---

a bra as natural as possible." Pls.' Mem. at 33. While Dr. Foley's discussion with Joel Doe and the other male students was somewhat puzzling, especially insofar as he stated that he was investigating whether Student A could be in the locker room when he was already aware of the School District's policy that would have allowed Student A in the locker room, there is no indication that he found Student A being in the locker room to be "shocking." Instead, a fairer interpretation of what happened was that Dr. Foley understood that this practice was new and not something that the boys had experienced in the past. He was encouraging them to adjust to having Student A in the locker room with them, in part for Student A's wellbeing. Obviously, Joel Doe did not feel comfortable with Student A being in the locker room with him.

unless they want to be in a harassing environment. Pls.' Findings and Conclusions at pp. 47-48, ¶¶ 74-76, 79. They further contend that the defendants have been deliberately indifferent to the sexual harassment through the use of the unlawful practice. *Id.* at p. 48, ¶ 80.

In response to the plaintiffs' arguments, the defendants contend that the plaintiffs have failed to establish a likelihood of success on the merits of their Title IX claim because (1) they have failed to show that the harassment was on the basis of sex insofar as the School District's policy applies to both the boys' and girls' privacy facilities and Title IX does not define the term "sex" or mandate how a school district is supposed to determine who is male and female regarding sex-segregated facilities, (2) they have failed to show that the defendants' purportedly harassing conduct is pervasive insofar as one plaintiff did not testify about any instance where she encountered a transgender student in a privacy facility and the other three plaintiffs each testified to only one such instance, and (3) they have failed to satisfy the subjective prong of a hostile environment claim because they have only referenced generalized fear and humiliation Defs.' Mem. at 15-17. The defendants also assert that the risk of humiliation or harassment is minimized for future instances because of the privacy protections in place and the alternative facilities available to all students at BASH. *Id.* at 17.

The defendants further claim that the mere presence of transgender students in restrooms and locker rooms is not severe, pervasive, and objectively offensive. *Id.* In this regard, the defendants contend that Title IX does not prohibit the sharing of restroom facilities; instead, it merely states that they can create single-sex locker rooms and bathrooms for males and females so long as the facilities are comparable. *Id.* (citing 34 C.F.R. § 106.33). As long as the School District provides privacy protection for all students, the defendants believe that they cannot violate Title IX. *Id.* at 17-18.

PYC asserts arguments similar to the defendants in support of their overall contention that the plaintiffs have failed to show a likelihood of success on the merits of their Title IX claim. PYC argues that the plaintiffs have failed to establish that the transgender students' use of the shared privacy facilities is severe, pervasive, or objectively offensive. PYC points to the decision in *Students* in support of the proposition that the mere presence of transgender students in a locker room or bathroom corresponding to their gender identity "'does not rise to the level of conduct that has been found to be objectively offensive, and therefore hostile, in other cases.'" PYC Mem. at 11 (quoting *Students*, 2016 WL 6134121, at *32, and other cases). PYC also asserts that the plaintiffs mischaracterize the cases they cite in support of the proposition that the mere presence of a person of the opposite sex (PYC objects to the plaintiffs' characterization of transgender students as members of the opposite sex) constitutes a hostile environment under Title IX. *Id.* at 12-13 (discussing cases cited by plaintiffs).

PYC goes on to argue that even if the plaintiffs were to persuade the court that the presence of a transgender student in a locker room or bathroom, without more, is objectively offensive, the plaintiffs' claim still lacks a likelihood of success on the merits because they have not shown that they were targeted on the basis of sex. *Id.* at 13-14. More specifically, the School District's policy targets all students, so the discomfort Joel Doe or Jack Jones feels is not because of their male sex and the discomfort Mary Smith or Macy Roe feels is not because of their female sex. *Id.*

As its final point, PYC points to *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017) in support of its claim that the plaintiffs' argument would "turn[] Title IX on its head." *Id.* at 14. PYC notes that the Seventh Circuit in *Whitaker* "joined every other federal appellate court that has considered sex

111

discrimination claims brought by transgender people after *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), to affirm that laws prohibiting sex discrimination do not exclude transgender people from their protections." *Id.* Moreover, *Whitaker* determined that a public school's policy requiring individuals to use bathrooms that do not confirm the individual's gender identity discriminates against the individual because of the individual's gender non-conformity, which violates Title IX. *Id.* (citing *Whitaker*).

b.     Analysis

Title IX provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).[58] "[A] public school student may bring suit against a school under Title IX for so-called 'hostile environment' harassment."[59] *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 205 (3d Cir. 2001) (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 74-75 (1992)). To prevail in a Title IX sexual harassment claim,

> a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim students are effectively denied equal access to an institution's resources and opportunities.

---

[58] This matter involves an "education program or activity" under § 1681(a). *See* 20 U.S.C § 1687 (stating that "the term 'program or activity' and 'program' mean *all of the operations of--* . . . **(2)** . . . **(B)** a local educational agency . . ., system of vocational education, or other school system" (emphasis added)); *see also Evancho v. Pine-Richland Sch. Dist.*, No. CIV. A. 2:16-1537, 2017 WL 770619, at *18 (W.D. Pa. Feb. 27, 2017) ("No party appears to contest that Title IX applies to the [school district] and its decisions about its educational programs. . . . As other courts have concluded, the use by students of school restrooms is part and parcel of the provision of educational services covered by Title IX, and neither party takes issue with that." (citation omitted)). In addition, it appears at this stage that the plaintiffs will be able to show that the School District receives "Federal financial assistance."
[59] The Third Circuit has explained that although Title IX claims against schools were originally limited to "cases involving harassment of a student by a teacher or other agent of the school," "[t]he Supreme Court has extended an analogous cause of action to students [for student-on-student sexual harassment] under Title IX." *Saxe*, 240 F.3d at 205 (citation omitted).

112

[*Davis*, 526 U.S. at 651], 119 S.Ct. 1661. This determination "'depends on a constellation of surrounding circumstances, expectations, and relationships,' including, but not limited to, the ages of the harasser and the victim, and the number of individuals involved." *Id.* (quoting *Oncale* [*v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).] The Court stressed that "[d]amages are not available for simple acts of teasing and name-calling among school children, even where these comments target differences in gender." *Id.* at 652, 119 S.Ct. 1661. Rather, private damages actions against the school are limited to cases in which the school "acts with deliberate indifference to known acts of harassment," and those acts have "a systemic effect on educational programs and activities." *Id.* at 633, 653, 119 S.Ct. 1661.

*Id.* at 205-06 (third alteration in original) (footnote omitted).

Although there have been a number of cases brought by transgender students claiming that school districts violate Title IX by maintaining separate privacy facilities based on biological sex and refusing to permit the transgender students to use the privacy facility corresponding to the student's gender identity, *Students* is the only case similar to the instant case where cisgender students (and their parents) have sued a school district based in part on a Title IX sexual harassment hostile environment claim. In *Students*, Magistrate Judge Gilbert determined that the plaintiffs did not have a likelihood of success on the merits with respect to their Title IX sexual harassment hostile environment claim. 2016 WL 6134121, at *30-36. The court again finds persuasive much of the rationale set forth by Magistrate Judge Gilbert in determining that the plaintiffs did not establish a likelihood of success on the merits of their Title IX claim.

In the first instance, as in *Students*, this court finds that the plaintiffs have failed to demonstrate a likelihood of success on the merits because they have not met the "threshold question," *i.e.* that they have suffered discrimination "on the basis of sex." *Id.* at *31; *see* 20 U.S.C. § 1681(a). As noted by the defendants and PYC, the School District treats all students at school similarly. Under the current practice, the plaintiffs (and the other students at BASH) are not targeted on the basis of their sex because the School District treats both male and female

113

students similarly. The practice applies to both the boys' and girls' locker rooms and bathrooms, meaning that cisgender boys potentially may use the boys' locker room and bathrooms with transgender boys and cisgender girls potentially may use the girls' locker room and bathrooms with transgender girls. In addition, with regard to the transgender students, both transgender boys and transgender girls are treated similarly insofar as they, upon receiving permission from the School District, may use the locker rooms and bathrooms corresponding with their gender identity. Moreover, the School District is not discriminating against students regarding the use of alternative facilities if students are uncomfortable with the current practice insofar as those facilities are open to all students who may be uncomfortable using the locker rooms or multi-user facilities at BASH. The School District's similar treatment of all students is fatal to the plaintiffs' Title IX claim. *See Moeck v. Pleasant Valley Sch. Dist.*, 179 F. Supp. 3d 442, 448 (M.D. Pa. 2016) (concluding that plaintiff failed to support sexual harassment hostile educational environment action where even though "the actions of the coaching staff were vulgar and inappropriate," "[t]he record establishes that the coaching staff were not discriminatory—they 'harassed' everyone on the team, male and female. They did not harass because of sex but rather, harassed everyone regardless of their sex. . . . The coaches treated [the plaintiff] like everyone else, poorly and immaturely"); *see also Pasqua v. Metropolitan Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996) ("Harassment that is inflicted without regard to gender, that is, where males and females in the same setting do not receive disparate treatment, is not actionable because the harassment is not based on sex."); *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) (explaining that in the Title VII context that "there may be cases in which a supervisor makes sexual overtures of both sexes or where the conduct complained of is equally offensive to male and female workers. In such cases, sexual harassment would not be based on

sex because men and women are accorded like treatment . . . [and] the plaintiff would have no remedy under Title VII"); *Connell v. Principi*, No. CIV. A. 04-1356, 2007 WL 3274185, at *11-15 (W.D. Pa. Nov. 5, 2007) (concluding that plaintiff employee could not maintain sexual harassment hostile work environment claim because "the record evidence shows that [the allegedly harassing supervisor's] offensive and harassing conduct was either directed at both men and women or lacked the necessary gender based discriminatory animus").[60]

The plaintiffs have failed to cite to any case holding that a plaintiff can maintain a sexual harassment hostile environment claim when the allegedly sexually harassing party treats all individuals similarly and there is, as such, no evidence of gender/sex animus. Simply because the plaintiffs feel a particular way which they equate to their sex does not take away from the fact that the School District's practice is not targeting any group or individual because of their sex. Even if the court were to find that that the practice is based on sex, the plaintiffs ignore that Title IX deals with "discrimination" based on sex and there can be no discrimination when everyone is treated the same.[61]

---

[60] The cases addressing claims brought under Title VII are strongly persuasive insofar as the Third Circuit has noted that Title IX sexual harassment hostile environment claims are "analogous" to similar claims under Title VII. *See Saxe*, 240 F.3d at 205 (describing Title VII hostile environment sexual harassment claim and explaining that "[t]he Supreme Court has extended an analogous cause of action to students under Title IX").

[61] The court is compelled to address a few of the plaintiffs' additional arguments in support of the belief that the defendants discriminated on the basis of sex insofar as these arguments are somewhat overstated. These statements are (1) the female plaintiffs are concerned about males entering the girls' privacy facilities for lewd purposes, (2) the female plaintiffs cannot even question the presence of a biological male in their locker room, and (3) there are no methods for excluding males who have lewd intentions until after the damage is done. Pls.' Mem. at 34. The court addresses this latter point first. Even in sex-segregated restrooms, the School District does not have a method of excluding males who have lewd intentions until after the damage is done. There is no evidence in the record that a police officer or gatekeeper is patrolling the students' privacy facilities and even if teachers or other school employees are near these areas, there is simply nothing stopping someone with truly lewd intentions from entering the privacy facilities. The School District's pre-2016-17 practice regarding the restrooms and locker rooms was dependent on the students following the rules and, if they did not, the School District using its surveillance systems and other tools of investigation to catch the perpetrators of any rule violations (all of which occur *after* the violation). At bottom, there is nothing to physically stop an individual with bad intentions no matter how the School District assigns bathroom and locker room usage.

Secondly, as for a purported inability of a female student to question the presence of a "male" student in the locker room or bathroom, all of the plaintiffs testified that they had no basis of knowing whether someone was designated a male or female at birth simply by looking at them. Their knowledge about the purported biological sex

Presuming the plaintiffs were able to maintain this claim because they could show that the School District discriminated against them on the basis of their sex, the plaintiffs have still failed to show a likelihood of success on the merits of their Title IX claim because they have not shown that they can establish the elements of a hostile environment claim. In the first instance, while the court has some doubts as to the level and reasonableness of the humiliation, fear, anxiety, stress, and dignity loss caused by the School District's practice, the court will presume for purposes of this opinion that the plaintiffs have shown that they subjectively viewed the School District's practice as harassment.[62] The plaintiffs have nonetheless failed to show that they are likely to demonstrate that the School District's practice is so severe, pervasive, and objectively offensive that it undermined and detracted from their educational experience.

---

of Students A and B were based on having known the students for a period of time and their belief that the student was a girl or boy based on that prior knowledge but without any particular knowledge of the transgender student's anatomy. In addition, and as an example, Mary Smith will accept someone that looks like a stereotypical boy in the locker room or bathroom with her as long as that person has a female external and internal reproductive system. The court finds it more than reasonable to infer from her testimony that if she saw someone that she perceived to be a boy (but who was assigned female at birth), Mary Smith would have reacted the same way when she fled the 700s bathroom upon seeing Student B. Regardless, there is nothing in the record supporting the plaintiffs' statement that Mary Smith (or any other student at BASH) would not be able to go to school administration to report the presence of someone they perceive to be of the opposite biological sex as it is still the School District's policy that only students who receive permission to use the locker room and/or bathroom corresponding to their gender identity are permitted in those areas.

    As the final point, the plaintiffs use the fear of sexual assault as a basis to justify the continued separation of privacy facilities on the basis of biological sex and they cite to statistics by the Centers for Disease Control showing that nearly 12% of high school girls reported having been sexually assaulted. Pls.' Mem. at 34 (citing Centers for Disease Control, *Sexual Violence: Facts at a Glance* (2012), http://www.cdc.gov/violenceprevention/pdf/sv-datasheet-a.pdf). While is it highly alarming and troubling to know that such a high percentage of high school female students have reported being the victim of sexual assault, considering that the percentage does not reflect those students who do not report being assaulted, the plaintiffs provide no statistics as to how many of those sexual assaults have occurred in a locker room or bathroom at a school or how many of those sexual assaults have occurred in locker rooms and bathrooms in public places or schools that have decided to permit bathroom and locker room usage on the basis of gender identity. There is no evidence of any such horrendous misconduct occurring at BASH since the School District changed the policy there and the fear of harm is purely speculative.

[62] The facts of this case differ from *Students* because the court there noted that "[n]owhere . . . do Plaintiffs allege that they ever have seen Student A undressed or that Student A has seen any Girl Plaintiff undressed or that Student A has seen any Girl Plaintiff undressed if that Student Plaintiff wanted not to be seen in that state." 2016 WL 6134141 at *31. Here, both Joel Doe and Jack Jones claim that they saw Student A in a bra (which appears to have been a sports bra) and, at the time, they were both in their underwear. While there is conflicting information about whether Student A saw the male plaintiffs in their underwear, the evidence in this matter seemingly goes beyond "[g]eneralized statements of fear and humiliation." *Id.* at *32 (citing cases in support of proposition that "[g]eneral allegations have been held to be insufficient to establish a Title IX violation").

The "objective prong" of the hostile environment inquiry "must be evaluated by looking at the totality of the circumstances[] [which] . . . may include . . . the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it [so undermines and detracts from the victims' educational experience, that [he or she is] effectively denied equal access to an institution's resources and opportunities]." *Saxe*, 240 F.3d at 205 (citations omitted and internal quotation marks omitted) (alterations to original). Regarding the frequency of the allegedly discriminatory conduct in this case, each plaintiff testified as to a single instance in which they viewed a transgender student in a locker room or bathroom. Mary Smith saw Student B in the 700s bathroom common area while both of them were clothed and it is unclear if Student B even saw Mary Smith before she exited the bathroom. Joel Doe and Jack Jones saw Student A in the locker room while they were in their underwear and while she was in shorts and a sports bra. To the best of her knowledge, Macy Roe never saw any transgender student in a bathroom or locker room before she graduated. Based on their testimony, none of these plaintiffs were subjected to pervasive sexual harassment in regard to their actual interaction with transgender students in the privacy facilities at BASH.

Nonetheless, the plaintiffs point to the impact of the School District's practice as establishing pervasive conduct because the practice permits transgender students who receive permission from the School District to use the privacy facilities corresponding to their gender identity. As a result of this practice Joel Doe has ceased using the locker room to change for gym class, has ceased changing for gym class, and uses the restrooms less frequently than he had previously. It does not appear that the other three plaintiffs have changed their usage of the locker room (except to the extent that Jack Jones indicated that he would conduct locker-room-wide searches for "girls" each time that he would change for gym class), but they all testified that

117

their bathroom usage significantly diminished and, when they did use the multi-user bathrooms, they were uncomfortable and concerned about the potential presence of a transgender student. The plaintiffs have not cited to any case stating that the mere possibility of future exposure to the alleged harassment can render a single instance of harassment pervasive.

To the extent that the court could find that the School District's practice constituted pervasive harassment of the plaintiffs, the plaintiffs have still failed to show that it is likely that such harassment was severe or objectively offensive.[63]  Essentially, the plaintiffs' position is that the presence of "members of the opposite sex," meaning transgender students, creates a hostile environment for the plaintiffs and other cisgender students at BASH.  Although the plaintiffs cite a number of cases to support their position that having members of the opposite sex in a privacy facility creates a hostile environment, none of the cited cases are applicable here.  The first case cited by the plaintiffs is *Lewis v. Triborough Bridge & Tunnel Authority*, 31 F. App'x 746 (2d Cir. 2002), an unpublished Second Circuit Court of Appeals decision, because the court purportedly held that an employer created a hostile work environment when it allowed a third-party cleaning company to have its male employees inside of the locker room while the female employee plaintiffs were undressed.  Pls.' Mem. at 31.  *Lewis* is easily distinguishable from the facts of this case insofar as (1) the female plaintiffs complained to their employer for two years

---

[63] The parties debate whether the plaintiffs have to establish whether the harassment is "severe *and* pervasive" or "severe *or* pervasive."  *Compare* Pls.' Mem. at 36 ("Conduct need not be *both* severe *and* pervasive." (emphasis in original)), *with* PYC Mem. at 11 n.6 ("In the Title IX context . . . student-on-student sexual harassment can be actionable only if it is severe, pervasive, *and* objectively offensive." (emphasis in original)).  PYC is correct that when the Third Circuit set forth the elements of a hostile environment claim, the court did not use the disjunctive "or" when referencing the requirements that the conduct be severe and pervasive.  *See Saxe*, 240 F.3d at 205 (stating that the harassment must be "so severe, pervasive, and objectively offensive").  Interestingly, while the plain language used in *Saxe* appears to contemplate a plaintiff needing to show that the harassment was severe and pervasive, the Third Circuit has also used the disjunctive when referencing this standard.  *See DeJohn v. Temple Univ.*, 537 F.3d 301, 320 (3d Cir. 2008) ("[U]nless harassment is qualified with a standard akin to a severe *or* pervasive requirement, a harassment policy may suppress core protected speech." (emphasis added)).  Also, in the Title VII context, a plaintiff can establish a hostile work environment by showing harassing behavior "sufficiently severe *or* pervasive to alter the conditions of [the plaintiff's] employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks omitted).  Here, the court need not resolve this issue because, as explained herein, the practice was not objectively offensive.

about the sexual harassment by the male cleaners, and (2) they alleged that the male cleaners "engaged in a variety of specific acts of sexual harassment, including entering the . . . women's locker room when female employees were undressed."  31 F. App'x at 747.  Further, the "variety of specific acts of sexual harassment" not mentioned in the Second Circuit's opinion also included allegations from one of the female plaintiffs that the male cleaners were "leering at her and would crowd the entrance to the locker room, forcing her to 'run the gauntlet' and brush up against them." *Lewis v. Triborough Bridge and Tunnel Auth.*, 77 F. Supp. 2d 376, 377 (S.D.N.Y. 1999).  Additionally, the general manager of the plaintiffs' employer, during an inspection of the women's locker room, also referred to other female employees as "cunts" and "fucking crybabies" and reportedly stated "'[b]oss man don't want no women with tiny hinnies [sic] on this job.'" *Id.* at 378 (alteration and mistakes in original).   This conduct is not similar to the facts in this case.

The second case cited is *Schonauer v. DCR Entertainment, Inc.*, 905 P.2d 392 (Wash. Ct. App. 1995), which the plaintiffs reference to support the proposition that a hostile environment is created when a male employer at a nude dance club entered a dressing room while a female waitress was clothed and in a dressing room and restroom.  Pls.' Mem. at 31.  Once again, the plaintiffs focus on one aspect of the case and ignore the totality of the plaintiff's evidence as to the purported hostile environment.   In *Schonauer*, the plaintiff alleged that (1) during the approximately one month that she worked at the topless nightclub, a manager regularly and almost daily entered the women's bathroom/locker/dressing room area, even on one occasion when the plaintiff was inside of a restroom stall, and this conduct made her "extremely uncomfortable;" (2) she refused to participate in the club's nude waitress contest; (3) in preparation for the contest, the manager told the plaintiff to fill out a card that asked about

various sexual information that would have been broadcast to the audience during the contest; (4) while attempting to persuade the plaintiff to enter the contest, the manager placed his arm around her and told her that he needed her to enter the contest; and (5) the manager and another male employee at the club tried to get the plaintiff to enter the contest (even telling her that she had to enter it) on three occasions before eventually firing her in part because she did not enter the contest.  905 P.2d at 813-15.  The court concluded that the plaintiff set forth enough facts to establish a claim for a hostile work environment insofar as, *inter alia*, (1) she was hired as a waitress and not as a dancer, (2) she wanted to be a waitress and not a dancer and informed her employer and management as such, and (3) the manager and the other employee "pressured her, repeatedly and intentionally, to provide fantasized sexual information and to dance on stage in sexually provocative ways.  *Id.* at 822.  Regarding the manager's intrusions into the dressing room and bathroom, the court stated that "the hostile and offensive nature of th[e] environment [at the club] was arguably intensified by [the manager's] intrusions into the women's dressing room and bathroom."  *Id.*  Thus, the allegations of sexual harassment went well beyond the manager's presence in the dressing room and bathroom.

The third case cited is *Washington v. White*, 231 F. Supp. 2d 71 (D.D.C. 2002), for the proposition that individuals of the opposite sex entering a locker room can create a hostile work environment.  Pls.' Mem. at 31-32.  The plaintiff in *White* alleged that he was a custodial worker at the Walter Reed Army Medical Center and would go into a men's locker room to remove his uniform and change into his street clothes at the conclusion of his shift.  231 F. Supp. 2d at 73. The plaintiff alleged that a female supervisor (it is unclear if she was the plaintiff's supervisor), in violation of the employer's written policy, entered the men's locker room on five to ten occasions without knocking.  *Id.* at 73, 74.  On one occasion when she came in, the plaintiff was

taking off his shirt.  *Id.* at 73.  After the plaintiff complained to his supervisor and another member of management and filed a written complaint, the female supervisor "entered the locker room, went over to plaintiff, and (without asking) reached in and took a pen out of his shirt pocket."  *Id.*  The plaintiff again complained and the female supervisor received a written warning.  *Id.*  Apparently, the female supervisor was undeterred as she "'returned to the locker room and stood over [plaintiff] saying "I'm back.  What are you going to do about it?"'"  *Id.* (citation omitted).

The plaintiff claimed that the female supervisor's conduct caused him to become "embarrassed and uncomfortable" and, as a result, he would change in bathrooms and vacant areas on other floors.  *Id.* at 73.  The court found that the plaintiff had set forth sufficient evidence "to establish that [the female supervisor's] conduct turned his work place into a hostile work environment and the court could not grant summary judgment in favor of the defendant. *Id.* at 80-81.  Again, there are no allegations of improper conduct by the transgender students while in the locker room or bathroom.  As such, *White* is inapplicable.

The fourth case cited is *People v. Grunau*, No. H015871, 2009 WL 5149857 (Cal. Ct. App. Dec. 29, 2009), for the proposition that girls should expect privacy in a girls' locker room and that a biological male staring at a girl in a locker room would shock or disturb the viewed-upon girl.  Pls.' Mem. at 32.  This matter involved a criminal defendant charged with loitering on school grounds and violating a California law prohibiting individuals from annoying a child under 18.  *Grunau*, 2009 WL 51498457 at *1.  The victim, a 14-year-old girl who was wearing her swimsuit after swimming practice, was showering in the girls' locker room when she saw the defendant standing in the exit doorway.  *Id.*  The defendant "made eye contact with [the victim], stared for about five seconds, closed the door, and left."  *Id.*

On appeal from the jury's verdict convicting the defendant, the defendant claimed that "briefly viewing a teenager showering in a full swim suit is not conduct which would cause the average person to be unhesitatingly irritated or offended, and [sic] essential element of the crime." *Id.* at *3 (mistake in original).  In concluding that the evidence was sufficient to convict the defendant, the California appellate court explained:

> Here, defendant blithely ignores an important fact: where his conduct took place. [The victim] was not simply rinsing off under an outdoor shower at a public pool. She was on a high school campus, out of general public view, and inside a girls' locker room, a place that by definition is to be used exclusively by girls and where males are not allowed.  Unquestionably, a girls['] locker room is a place where a normal female should, and would, reasonably expect privacy, especially when she is performing quintessentially personal activities like undressing, changing clothes, and bathing.  Under the circumstances, jurors reasonably could find that a normal female who was showering in a girls['] locker room would unhesitatingly be shocked, irritated, and disturbed to see a man gazing at her, no matter how briefly he did so.

*Id.* (alterations to original).

*Grunau* is also inapplicable because even though the court discussed that girls would expect privacy in a girls' locker room, *Grunau* involved an adult man who was actually leering at a 14-year-old girl while she was in a locker room.[64]  It is inconceivable how this case sheds light on a transgender student being present in the locker room, especially here where there are no allegations of any transgender student at BASH staring at another student (and, the court would be remiss if it was not pointed out that the defendant in *Grunau* had been convicted of prior sex offenses) or doing anything remotely improper.  Instead, the only testimony relating to the transgender students is that they were in either the locker room or the bathroom with the plaintiffs.

---

[64] To reinforce a point made earlier in this opinion, apparently the sex-segregated bathrooms and locker rooms were unable to prevent the defendant from entering them in the first place.

The final case referenced by the plaintiffs is *Norwood v. Dale Maintenance System, Inc.*, 590 F. Supp. 1410 (N.D. Ill. 1984) because it supposedly supports their position that a hostile environment is created by simply allowing a member of the opposite sex into a restroom. Pls.' Mem. at 32. *Norwood* is clearly inapplicable here.[65] In this regard, *Norwood* involved a female employee's complaint that her employer violated Title VII when it refused to hire her to work as a day shift washroom attendant in a men's washroom. 590 F. Supp. at 1412-14. The employer claimed that it could base the decision on sex because it was a bona fide occupational qualification. *Id.* at 1415. The court concluded that since the employer produced sufficient evidence that the occupants of the building in which the washroom was located "would object to a member of the opposite sex entering their washrooms during the day to perform cleaning duties, and that if such a procedure were instituted the procedure would have a detrimental effect on the building." *Id.* at 1417. Thus, the court concluded "that the intrusion on personal privacy which would occur if opposite sex attendants were allowed access into the washrooms while in use is sufficiently substantial so as to constitute a factual basis for defendants['] sex-based policy." *Id.*

Norwood does not involve a claim for hostile environment under Title IX. While it, and other cases throughout the United States have found bona fide occupational qualifications on the

---

[65] The court notes that two of the plaintiffs' four citations to *Norwood* are actually not to statements by the court; instead, the court was summarizing the testimony of the employer's expert witness. *Compare* Pls.' Mem. at 32 (citing to *Norwood*, 590 F. Supp. at 1417), *with Norwood*, 590 F. Supp. at 1417 (explaining testimony of employer's expert in which he concluded that having opposite sex members in the washrooms "would cause embarrassment and increased stress in both male and female washroom users" and "the invasion of privacy that would be created by an opposite sex procedure would be extreme"). Similarly, the plaintiffs' reference page 1418 of the *Norwood* decision because the court supposedly "not[ed] that many [individuals in the building] search for another restroom if an opposite-sex person is present." Yet, that portion of the court's opinion actually dealt with whether the employer closing the washrooms while opposite-sex employees serviced them was a reasonable alternative that would have allowed the employer to hire the plaintiff to work in the men's washroom. 590 F. Supp. at 1418. In discussing this alternative, the court noted that it was not feasible because during the closures "tenants would be forced to conduct an inconvenient, time consuming and sometimes difficult search for a washroom when the need to use a washroom may be acute." *Id.* Thus, to the extent that the tenants would be searching for a different washroom, they were doing so because the washroom was closed. *Id.*

123

basis of sex permissible in certain circumstances, including those when privacy is an issue, they do not support a conclusion that the presence of transgender students in the BASH locker rooms and bathrooms is, in itself, a hostile environment under Title IX.[66]

The plaintiffs have not referenced and the court has not found any case determining that the mere presence of transgender students in a high school locker room or bathroom, the viewing of a transgender student in a state of partial undress in a high school locker room or bathroom, or a transgender student viewing a cisgender student (which does not appear to have not happened in this case) in a high school locker rooms or bathroom constitutes severe, pervasive and objectively offensive conduct that would state a cause of action under Title IX. In addition, the court does not find that the plaintiffs have shown that they are likely to prove that the School District's conduct is objectively offensive because a reasonable person would not find the practice of allowing transgender students to use the locker rooms and bathrooms corresponding to their gender identity to be hostile, threatening, or humiliating. There is no evidence that these students have committed any lewd acts in the locker room or bathrooms or that they have even interacted with the plaintiffs in any way whatsoever. There is no evidence that the transgender students have harassed the plaintiffs or any other student. All the evidence showed was that the

---

[66] The plaintiffs also briefly mention two other cases in support of their argument that they were subjected to severe harassment that warrant brief mention, namely *New Jersey Division of Youth & Family Services v. M.R.*, FN-04-344-12, 2014 WL 1977014 (N.J. Super. App. May 16, 2014) and *City of Phila. v. Pennsylvania Human Relations Commission*, 300 A.2d 97 (Pa. Commw. 1973). The plaintiffs claim that these cases support a finding that their exposure to transgender students in locker rooms and bathrooms "violates students' privacy rights and places them at risk of 'permanent emotional impairment.'" Neither case is "remotely similar" to this case. *See Students*, 2016 WL 6134121, at *33. More specifically, the Commonwealth Court in *City of Philadelphia* concluded – in another bona fide occupational qualification case – that "[t]o subject a girl [between the ages of seven to sixteen] to a thorough search of her body by a male [adult] supervisor could cause not only a temporary traumatic condition, but also permanent irreparable harm to her psyche. [In addition,] [t]o have a woman supervisor observe daily showers of the boys at a time in life when sex is a mysterious and often troubling force is to risk a permanent emotional impairment under the guise of equality." *City of Phila.*, 300 A.2d at 102-03. In *M.R.*, the court was faced with a finding of abuse and neglect by a mother with respect to her fourteen-year-old daughter. 2014 WL 1977014 at *1. The abuse came to light after the girl's father was investigated for sexually abusing his fifteen-year-old niece. *Id.* As part of the investigation, the daughter reported her father having recently showered her (and in fact, he had regularly taken showers with all of the children (boys and girls) since the children were young). *Id.*

It is apparent from even a cursory review of these cases that they have no application here.

transgender students were in the facilities for their intended purposes and they conducted themselves appropriately while in those areas.

The plaintiffs are clearly opposed to having themselves viewed by a transgender student in a state of undress or potentially viewing a transgender student in a state of undress. They are apparently opposed to the transgender student being in the locker room even if no one is getting dressed or undressed. They are opposed to transgender girls being in the girls' bathroom and locker room to the extent that female students are tending to menstruation-related issues and do not want those issues known to boys, even boys identifying as girls. As in *Students*, there are numerous privacy protections for students at the school that significantly reduce or eliminate any potential issues. 2016 WL 6134121, at *33-35 (discussing privacy protections and alternatives).

As explained above, the School District has four shower stalls in each of the locker rooms that have curtains. While it is possible that a student could attempt to open those privacy curtains as happened with Mary Smith, it is purely speculation that a transgender student is going to do so. Other than that speculative possibility, there is no indication that the privacy curtains do not provide the requisite privacy while in the locker room. In addition, the School District provided sufficient evidence to show that they are committed to providing all students with as comfortable of an environment as possible while at BASH and Dr. Cooper indicated that the locker rooms have team rooms that could be used by requesting students to change for this upcoming year.

With regard to the restrooms, the restrooms have stalls with locking doors that provide privacy even in the boys' bathrooms to the extent that those bathrooms lack dividers between urinals. The plaintiffs focus on some of the partitions not being high enough or low enough to provide for complete protection while in there. Despite the gaps, there is no indication that

125

individuals while in the stalls cannot ensure that their privacy is maintained while inside of the stalls. Nonetheless, even with gaps along the edges of the doors and the gaps above and below the partitions, the plaintiffs have not shown that there is anything objectively offensive about the plaintiffs having to use the bathrooms with a transgender student, even to the extent that it is remotely possible that a transgender girl could potentially overhear a female student tending to menstruation issues while in the locker room. Further, once again, as with any student's use of the locker rooms or bathrooms at BASH, if the student is uncomfortable, the students can use a single-user facility to change or use the restroom and obtain the desired privacy there.[67]

Accordingly, for all of the above reasons, the plaintiffs have failed to establish a likelihood of success on their Title IX sexual harassment hostile environment claim.[68]

---

[67] The court notes that the plaintiffs contend that the defendants cannot "escape liability by requiring victims to remove themselves from the environment." Pls.' Mem. at 38. The plaintiffs cite to *Seiwert v. Spencer-Own Community School Corp.*, 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007) in support of this statement. In *Seiwert*, the court determined that a jury could conclude that a school district's actions in response to pervasive and serious bullying from other students was clearly unreasonable when (1) the school district did not even discipline one of the students even though that student had twice threatened to kill the bullied student, (2) the school district minimized the threats when discussing them with the bullied student, (3) the school district took action, but only in the nature of moving the bullied student to another classroom instead of dealing with the bullying itself, and (4) the school district disciplined both the bullied student and the bully when the bully decided to physically assault the bullied student. 497 F. Supp. 2d at 954.

The *Seiwert* court did not determine that it was improper under Title IX, in itself, to try to remove the bullied student from class with the bully. Instead, the court noted that the school district took virtually no action to eliminate the bullying and it was apparent that simply moving the bullied student to another classroom was insufficient to resolve the bullying. Here, we are dealing with students' use of locker rooms and bathrooms. Providing the students with alternative places to get changed and use the restrooms should they be uncomfortable in the current arrangements (which may or may not actually involve a transgender student) is not even remotely comparable to the bullying situation in *Seiwert* and the school district's undeniably unreasonable response to the bullying in that case, which included removing the bullied student from the classroom.

[68] Because of the court's resolution of the other elements to a hostile environment claim, the court has not addressed whether the plaintiffs were denied the benefits of any educational opportunity, class, or program as required by Title IX because the plaintiffs have not shown any actionable harassment. Nonetheless, from a grades perspective, only Joel Doe has identified that he was negatively affected insofar as his gym class grade dropped when he declined to dress for gym class. It is unclear whether the plaintiffs' decision not to use the multi-user bathrooms as much (or at all) when they all indicated that they could still access bathrooms at BASH if they needed to do so (and that they did access the bathrooms albeit less often) would constitute a denial of an educational program or activity under Title IX.

### 3.     Pennsylvania Tort of Invasion of Privacy – Intrusion Upon Seclusion

#### a.     The Parties' Arguments

For their final cause of action, the plaintiffs contend that the defendants have violated Pennsylvania's common law by intruding upon their seclusion.  Pls.' Mem. at 39-43.  More specifically, the plaintiffs argue that by virtue of the School District's policy the defendants are intruding upon their seclusion, such as when Joel Doe and Jack Jones used the bathrooms and locker rooms, by allowing members of the opposite sex to enter into the bathrooms and locker rooms corresponding to their gender.  *Id.* at 40.  In addition to the physical intrusion, the plaintiffs claim that there is a visual intrusion insofar as Student A viewed Joel Doe and Jack Jones in their underwear, and this risk will continue as long as the current practice remains.  *Id.* at 40-41.  Further, even hearing urination or the female plaintiffs (or other female students) tending to menstruation issues and the sounds commonly associated with that (such as the opening of wrapping for pads and tampons) is a violation of that privacy and an intrusion into the plaintiffs' seclusion.  *Id.* at 42.

The plaintiffs point out again that society has long recognized the need for separate facilities for the biological sexes and this need for minors in school is reflected in the Pennsylvania School Code's requirement that there be separate facilities for boys and girls.  *Id.* at 41-42. They argue that the School Code's requirement, in itself, shows that the Pennsylvania General Assembly recognizes the need to have privacy from the opposite sex.  *Id.*

The defendants argue that the plaintiffs are unlikely to prevail on their common law invasion of privacy claim against them because they are entitled to immunity under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. C.S. § 8541.  Defs.' Mem. at 22. They point out that their actions do not fall into any of the eight categories of negligence that

constitute an exception to immunity, and the plaintiffs have not alleged that they engaged in a crime, actual fraud, or willful misconduct. *Id.* at 23. Even if the court was to determine that the defendants are not entitled to immunity, they assert that the plaintiffs have still failed to show a likelihood of success on the merits because the defendants did not personally intrude upon the plaintiffs' seclusion. *Id.* at 23-24. Thus, the only possible claim is that the defendants are indirectly intruding upon their seclusion by allowing transgender students into restrooms and locker rooms consistent with their gender identity and there is no basis for finding them liable under such a theory. *Id.* at 24. Finally, the defendants contend that any intrusion was insubstantial and would not have been highly offensive to an ordinary reasonable person because the overwhelming majority of cisgender students have shared school locker rooms and bathrooms with transgender students since the beginning of the 2016-17 school year without incident. *Id.*

As for PYC, it focuses on the lack of intrusion and offensive conduct by merely having transgender students in locker rooms and bathrooms with the plaintiffs and other cisgender students. PYC's Mem. at 9. Instead of there being an "intrusion," the facts merely show that individual students, including transgender students, are using the communal facilities in the BASH locker rooms and restrooms. *Id.* at 10. To the extent that the plaintiffs seek additional privacy, there are individual toilet and shower stalls in the locker room and toilet stalls in the multi-user bathrooms. *Id.*

PYC also argues that even if the presence of transgender students in the shared facilities could constitute a privacy intrusion, the intrusion is not substantial because other people are always in communal facilities. *Id.* The fact that there are additional students in these areas is not

128

substantial.  *Id.*  Moreover, there is no evidence of a transgender student behaving improperly in those communal areas.  *Id.*

b. <u>Analysis</u>

With the common law tort of invasion of privacy, intrusion upon seclusion, Pennsylvania follows section 652B of the Restatement (Second) of Torts, which defines this tort as follows: "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."  *Harris by Harris v. Easton Pub. Co.*, 483 A.2d 1377, 1383 (Pa. Super. 1984) (citing Restatement (Second) of Torts § 652B).  This invasion can occur "(1) by physical intrusion into a place where the plaintiff has secluded himself, (2) by the use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or (3) some other form of investigation or examination into the plaintiff's private concerns."  *Id.* (citing Restatement (Second) of Torts § 652B, cmt. b).  This "cause of action also requires that the plaintiff has a reasonable expectation of privacy."  *Kline v. Security Guards, Inc.*, 386 F.3d 246, 260 (3d Cir. 2004).  In addition, the intrusion must "cause mental suffering, shame, or humiliation to a person of ordinary sensibilities."  *Harris by Harris*, 483 A.2d at 1384-85 (citation omitted).

The court will first address the defendants' claim that this tort action is barred against them under the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. C.S. §§ 8541-8564 ("PSTCA").  Although the defendants have included this claim in their memorandum of law in response to the motion for a preliminary injunction and a motion to dismiss that they have filed in this case, they did not reference this argument in their most recent filing of their proposed findings of fact and conclusions of law.  To the extent that the defendants are still asserting this

claim with respect to this motion, the court notes that the PSTCA provides that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable *for any damages* on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[69] 42 Pa. C.S. § 8541 (emphasis added). Here, however, as the court is dealing with a claim for injunctive relief, the PSTCA would not apply to the plaintiffs' claims. *See E-Z Parks, Inc. v. Larson*, 498 A.2d 1364, 1369 (Pa. Commw. 1985) ("Since governmental immunity under Section 8541 of the Judicial Code extends only to liability for *damages*, Petitioner must be permitted to pursue his claim against the [Philadelphia Parking Authority] for injunctive relief.").

This particular cause of action, by its very nature, raises a concern that the defendants raise in passing, but without citing to any legal support. Out of the three different ways that a defendant could intrude upon the seclusion of another person as described in section 652B of the Restatement, only the first two situations are potentially applicable here. Therefore, the plaintiffs could only show a likelihood of success on the merits if the defendants (1) physically intruded into a place where the plaintiffs secluded themselves, or (2) used their senses to oversee or overhear the plaintiffs' private affairs.

The plaintiffs' claim is premised on the defendants' practice of allowing transgender students to use the privacy facilities corresponding to their gender. The plaintiffs do not allege and have introduced no evidence that any of the individual defendants or any employees or agents of the School District ever personally invaded their privacy insofar as there are no allegations or evidence that any School District employees or agents were in the locker rooms or

---

[69] The School District would appear to fall with the definition of a "local agency" under the PSTCA and would be entitled to governmental immunity unless the particular claim fell within one of the exceptions to governmental immunity contained in the Act. *See Wells v. Harrisburg Area Sch. Dist.*, 884 A.2d 946, 847 (Pa. Commw. 2005) ("We note that local government agencies, such as school districts, are generally immune from tort liability under the . . . Political Subdivision Tort Claims Act[.]").

bathrooms with the plaintiffs. The individuals that purportedly invaded the seclusion of the plaintiffs were the transgender students, Students A and B.

The defendants briefly assert that they cannot be liable for this common law invasion of privacy claim because they did not actually commit the tort. Defs.' Mem. at 23-24. The defendants do not actually cite a case in support of this argument and do not even discuss the plaintiffs' state law cause of action at all in their supplemental proposed findings of fact and conclusions of law. On the other hand, the plaintiffs do not cite to a case in which any court recognized a cause of action against a governmental entity for an intentional tort when third parties (and not agents or employees of the governmental entity) are the ones that commit the intentional tort. The court has not located such a case in the Third Circuit or in the Commonwealth of Pennsylvania.[70] The uncertainty as to whether the plaintiffs have a viable cause of action under Pennsylvania law for this type of invasion of privacy would alone serve as a basis for the court to find that the plaintiffs have failed to demonstrate a likelihood of success

---

[70] The closest case that the court located that was potentially similar to the facts and claim here was a decision by the Supreme Court of Alabama in *Carter v. Innisfree Hotel, Inc.*, 661 So. 2d 1174 (1995). In *Carter*, the plaintiffs, a husband and wife, were staying in a hotel room when they heard knocking and scratching sounds that "appeared to emanate from behind a wall near the bathroom; the wall was covered by a mirror." 661 So. 2d at 1177. The plaintiffs presumed that the sound was coming from the adjacent room and they proceeded to go about their activities in the hotel room that afternoon, which included having sexual intercourse. *Id.* Later that evening, the plaintiffs found a hole in a wall that appeared to allow someone to spy on them through a mirror that was in the room. *Id.* There was no identification of the individual that possibly spied on the plaintiffs.

    The plaintiffs sued the company that managed the hotel for, *inter alia*, the invasion of their privacy. *Id.* at 1178. The trial court entered summary judgment in favor of the management company, and the plaintiffs appealed. *Id.*

    In reversing the trial court, the Supreme Court of Alabama determined that there was an issue of fact whether an agent of the management company spied on the plaintiffs. *Id.* at 1178-79. The Court also concluded that "[t]here can be no doubt that the possible intrusion of foreign eyes into the private seclusion of a customer's hotel room is an invasion of that customer's privacy[.]" *Id.* at 1179. Most important to the instant case, however, the Court further determined that

> [e]ven if it is proven that a third party, someone other than an agent of [the management company], caused the holes and scratches, [the management company] may be held liable for the invasion of the [plaintiffs'] privacy. It had an affirmative duty, stemming from a guest's rights of privacy and peaceful possession not to allow unregistered and unauthorized third parties to gain access to the rooms of its guests.

*Id.*

131

on the merits. Nonetheless, for sake of completeness the court will presume that such a cause of action exists and now determine whether the plaintiffs have established a likelihood of success on this claim.

The court does not deny that an individual seeks seclusion in a bathroom toilet stall from being viewed by other people outside of the stall. The cases cited by the plaintiff, *Koeppel v. Speirs*, No. CIV. A. 08-1927, 2010 WL 200417 (Iowa Ct. App. Jan. 22, 2010) and *Kohler v. City of Wapakoneta*, 381 F. Supp. 2d 692 (N.D. Ohio), in support of their contention that the transgender students invaded their privacy when they were in the common areas of the bathroom and locker room, involve alleged invasions of privacy in bathroom stalls. *See Kohler*, 381 F. Supp. 2d at 697 (indicating plaintiff female police officer's allegation that she discovered a running tape recorder behind a trash can in a toilet stall in the police department's women's room, which was left there by the chief of police); *Koeppel*, 2010 WL 200417, at *1 (explaining that the plaintiff discovered a digital surveillance camera hidden inside the "small (4' x 7') bathroom"). Here, there are no allegations and the plaintiffs presented no evidence that any transgender student invaded their seclusion while they were in a bathroom stall. And similarly, although the plaintiffs indicate that viewing a person while in a bathroom would be "considered 'highly offensive' by any reasonable person," *see* Pls.' Mem. at 40-41 (quoting *Koeppel*, 2010 WL 200417 at *3), the case cited involved an intrusion into a single bathroom stall and not the presence of someone in the common area of a multi-user facility.

The plaintiffs claim that

[t]he objective offensiveness to the reasonable person [by having a member of the opposite sex, *i.e.* a transgender person, in the bathroom or locker room with them] is evident in the fact that we have long recognized the right to a private setting, free from persons of the opposite sex in restrooms and locker rooms, which are only made necessary since we often enter into a state of undress or perform

private functions therein, which require a buffer from members of the opposite sex that we do not require from members of the same sex.

Pls.' Mem. at 41. As indicated earlier, the plaintiffs then point to the School Code's requirement of separate facilities for the sexes as Pennsylvania's recognition of the need for privacy from the opposite sex in facilities. Pls.' Mem. at 41 (citing 24 P.S. § 7-740).[71]

The plaintiffs do not argue that by entering the multi-user bathrooms and the locker rooms at BASH that they attempted to seclude themselves from all students at BASH, nor could they insofar as those areas are shared common areas with other students. As for locker rooms generally, "[p]ublic school locker rooms . . . are not notable for the privacy they afford." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995). Nonetheless, they believe that it is objectively reasonable to have their activities secluded from observation by members of the opposite sex when in the common areas of the locker rooms and bathrooms. *See* Pls.' Findings and Conclusions at ECF p. 50 ¶ 92 (citing *Kohler*, 318 F. Supp. 2d at 704).

As indicated earlier in this opinion, the court does not find that it is more likely than not (or even just likely) that Student A viewed either Jack Jones or Joel Doe while they were in their underwear based on the evidence currently before the court because both plaintiffs have made conflicting statements and it appears that the weight of evidence at this early stage shows that they saw Student A and reacted only to seeing Student A on one occasion (each). Regardless, the court does not find that a reasonable person would be offended by the presence of a transgender student in the bathroom or locker room with them, despite the possibility that the transgender student could possibly be in a state of undress more significant than Student A was in this case when the male plaintiffs saw him. In addition, the mere presence of a transgender

---

[71] While the plaintiffs referred to this section of the School Code as applying to privacy facilities generally, the language of this section applies only to "water-closets or out-houses," which are what we think of as bathrooms. There is a question as to whether this section would apply to a locker room, but if the locker room contains bathrooms, one could argue that this section of the code could apply.

133

student in the common area of the girls' bathroom washing hands, as experienced by Mary Smith, is also not objectively offensive to a reasonable person. Moreover, the fact that the Public School Code calls for sex-segregated water-closets and out-houses does not necessitate a finding that the presence of the transgender student is objectively offensive to a reasonable person because it is not determinative as to whether a reasonable person would object to the presence of a transgender student in the locker room or bathroom. Furthermore, even though Joel Doe, Mary Smith, and Jack Jones stated that their sole experiences with transgender students at BASH caused them embarrassment and humiliation, it is definitely not clear that the conduct they experienced or could experience at BASH in the future, especially considering the privacy protections and alternative arrangements available at BASH, would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. Accordingly, even if the plaintiffs could maintain this type of invasion of privacy claim against the defendants, even though they did not personally invade their seclusion while in any bathroom or locker room, the court does not find that they have demonstrated a likelihood of success on the merits.

### C.      Irreparable Harm

### 1.      The Parties' Arguments

With respect to irreparable harm, the plaintiffs assert that the School District's practice "has stolen their right to privacy, is altering the conditions of their education by subjecting them to sexual harassment, and constitutes an invasion of seclusion." Pls.' Mem. at 43. They argue that the court should presume irreparable harm since they are able to show a violation of their constitutional right to privacy. Pls.' Findings and Conclusions at ECF p. 53, ¶ 108 (citations omitted); Pls.' Mem. at 43 (citations omitted). As for their Title IX and intrusion upon seclusion claims, the plaintiffs claim that they will suffer irreparable harm because the sexual harassment

and the violations of their privacy are not compensable through money damages. Pls.' Findings and Conclusions at ECF p. 54, ¶¶ 111, 112.

The defendants contend that the plaintiffs' purported harm, namely the exposure of their bodies and intimate activities to members of the opposite sex and the viewing of members of the opposite sex in areas where they expect privacy (from members of the opposite sex), is not irreparable because they have the opportunity to use single-user restroom and changing facilities if they are uncomfortable. Defs.' Mem. at 25; Defs.' Findings and Conclusions at 42. PYC raises a similar argument: The plaintiffs will not suffer irreparable harm because the School District does not require them to use the common rooms of the bathrooms or the locker rooms and can use the single-user facilities. PYC's Findings and Conclusions at 19, ¶ 101. PYC points out that the plaintiffs can "avoid all of the claimed harm if this Court denies their request for preliminary injunctive relief while the case runs its course." *Id.* PYC also encourages the court to follow the reasoning in *Students*, which rejected a similar request for injunctive relief and found that the plaintiffs had failed to show irreparable harm. *Id.* at 19, ¶ 102 (citing *Students*, 2016 WL 6134121, at *37, *38). PYC also notes that the court should consider the delay in filing the complaint and motion for a preliminary injunction, considering that Joel Doe knew about the practice on October 31, 2016, his parents learned of the practice shortly thereafter, and yet he did not file a complaint in this case until March 31, 2017, and did not file the motion for a preliminary injunction until May 17, 2017. *Id.* at 20, ¶ 103.

### 2. Analysis

Concerning a showing of irreparable harm, "the plaintiff must demonstrate potential harm which cannot be redressed by a legal or equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co.*

*v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Thus, to support the issuance of a preliminary injunction, a plaintiff must demonstrate a "clear showing of immediate irreparable injury . . . or a presently existing actual threat; (an injunction) may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law." *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (internal citations and quotations omitted). The "risk of irreparable harm [also] must not be speculative." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) (citation omitted). Further, if the threatened harm is compensable with money damages, a movant seeking preliminary injunctive relief has not demonstrated irreparable harm and the court should not issue a preliminary injunction. *See Frank's GMC Truck Ctr., Inc. v. G.M.C.*, 847 F.2d 100, 102-03 (3d Cir. 1998) ("The availability of adequate monetary damages belies a claim of irreparable injury."); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief might be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *A.O. Smith Corp. v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976) (explaining that the word irreparable connotes "'that which cannot be repaired, retrieved, put down again, atoned for . . ..'" (quoting *Gause v. Perkins*, 3 Jones Eq. 177, 69 Am.Dec. 728 (1857)). Additionally, a "'delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action.'" *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 118 (3d Cir. 2013) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985)); *see FMC Corp. v. Control Solutions, Inc.*, 369 F. Supp. 2d 539, 582 (E.D. Pa. 2005) ("An unreasonable delay in seeking an injunction negates the presumption of irreparable harm.").

136

The court has already determined that the plaintiffs' have not shown a likelihood of success on the merits on any of their claims, so to the extent that they argue that the court should presume irreparable harm because of the existence of a constitutional invasion of privacy or a Title IX violation, this court need not consider this argument. Regarding PYC's argument about the plaintiffs' delay in filing this action and in seeking preliminary injunctive relief, as far as the court can tell the plaintiffs have not addressed the timing of the filing of this action or the timing of filing the instant motion for a preliminary injunction in their submissions. PYC did not raise this argument until submitting its supplemental proposed findings of fact and conclusions of law on the day before the argument on August 11, 2017.

Although Joel Doe and his parents knew about the practice no later than the first couple of days in November 2016, Jane and John Doe testified during their depositions about their attempts to resolve their concerns by talking to Dr. Faidley in December 2016 and Jane Doe's conversations with a School Board member. While unclear as to when Joel Doe sought counsel for assistance in this matter, it appears that Joel Doe had attempted to resolve this matter with the School District outside of court and prior to filing suit, which is why Dr. Faidley referenced the School Board's vote to not accept the plaintiffs' demands and to keep the current practice in place.[72] The School Board's vote occurred on March 28, 2017, and Joel Doe and his parents filed the complaint three days later. The additional plaintiffs then joined the litigation on April 18, 2017. The parties did not file the motion seeking a preliminary injunction until May 17, 2017. Considering that the plaintiffs are asserting that the defendants' practice violated their constitutional right to privacy, their access to educational opportunities under Title IX, and their right to seclusion, this one-month delay might, in itself, weigh against a finding of irreparable

---

[72] It is unclear if any of the other plaintiffs, who were not parties to the suit when originally filed, were part of any settlement negotiations.

harm. Nonetheless, it is completely understandable why the plaintiffs did not file this action until efforts to resolve the issue with the School District failed and the plaintiffs did not file the instant motion until a month later. Thus, it would be unreasonable under the circumstances for the court to find that the plaintiffs were not promptly pursuing their claims so as to weigh against a finding of irreparable harm.[73]

On a practical level, the court finds that the privacy protections that are in place at BASH, which include the bathroom stalls and shower stalls in the locker rooms, the bathroom stalls in the multi-user bathrooms, the availability of a number of single-user bathrooms (a few of which will have lockers for storing items), the availability of students to store personal items in their locker or leave those items with the gym teacher, and the availability of the team rooms in the locker rooms (which would not involve students passing through the common area of the locker room), and the overall willingness of the defendants to work with the students and their families to assure that the students are comfortable at BASH, mitigates against a finding of irreparable harm. At this point in the litigation, the court is concerned with the privacy protections available at BASH for the upcoming school year and not whatever past protections were available to students and whether the students knew about all of the available options or were advised of them by the School District for the last completed school year.[74] The privacy protections available to students in 2017-18 are more than suitable to address any privacy concerns relating to the presence of transgender students in the locker rooms and bathrooms at BASH.

---

[73] Although PYC encourages the court to follow the *Students* court on this issue, *Students* involved a delay of a minimum of seven months before the plaintiffs in that case filed a lawsuit and there is no discussion from the court as to what the plaintiffs were doing between notice of the policy and the filing of the action insofar as whether they were actively pursuing avenues for relief outside of court. *See Students*, 2016 WL 6134121 at *39.
[74] It does not appear that Jack Jones, Mary Smith, or Macy Roe inquired about alternative accommodations with the defendants. Macy Roe never even discussed any concerns with the defendants, and it is unclear that Mary Smith discussed the practice with the defendants other than reporting having seen Student B in the girls' bathroom.

The court recognizes that during oral argument and as noted elsewhere in their submissions, the plaintiffs argue that the court cannot refuse to find irreparable harm based on these alternative arrangements because the "[g]overnment may not condition a benefit on someone waiving a constitutional right." Pls.' Findings and Conclusions at ECF p. 42, ¶ 44 (citing *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S.Ct. 2586 (2013)); *see also id.* at ECF p. 41, ¶¶ 42, 43. This is "known as the unconstitutional conditions doctrine, [which] vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz*, 133 S.Ct. at 2594. This argument misses the mark.

There is no evidence that the School District is coercing the students to give up their constitutional right to privacy by providing them with additional facilities if they are uncomfortable in the locker room for any reason, including because of the presence of transgender students. The School District is also not denying any benefit to the plaintiffs because they are exercising a constitutional right. They may still use the locker rooms and multi-user bathrooms at BASH without limitation. In addition, the plaintiffs (at least the three that could be returning to BASH this year) may use the single-user facilities at BASH (to the extent there was an uncertainty about availability for use during the 2016-17 school year). This also is not a particular benefit conferred upon them because all students can use the single-user facilities, including the nurse's office with permission from the nurse. The only possible "benefit" being conferred is the use of the team rooms, but again, as with everything else, Dr. Cooper indicated that the use of the team rooms would be available to any student at BASH. There is no evidence supporting a conclusion that the School District is denying a benefit to the plaintiffs because they are attempting to exercise a constitutional right, and there is no evidence that the School District is attempting to coerce the plaintiffs into giving up such a right. As such,

this argument lacks merit and the privacy protections available at BASH fully mitigate against any harm the plaintiffs could suffer here.

On the Title IX claim, only Joel Doe indicated that his grades suffered last year because of the defendants' practice insofar as he refused to dress for gym class because he believed that he did not have a suitable place to secure his belongings and he lost points toward his grade (although he did not fail the course).[75]  This concern appears to be resolved for the upcoming school year because at least a few of the single-user facilities, including the one in the nurse's office and the one near gym, will have a locker for students to secure belongings and the defendants have indicated that Joel Doe can store his belongings in his hall locker or with the gym teacher if he decides to change in a single-user facility without a locker.  Additionally, the plaintiffs know there are numerous alternatives for them to use the bathroom, so they should not have to refrain from using the restroom to the extent that they did so in 2016-17 without seeking out possibly available alternatives.

Accordingly, the court finds that the plaintiffs have not established that they would be irreparably harmed.[76]

---

[75] In *Students*, the court noted the following with respect to irreparable harm showings in Title IX cases:

> "[L]ack of access to classes and related programs, services, and activities can constitute irreparable injury for purposes of a preliminary injunction."  *P.P. v. Compton Unified Sch. Dist.*, 135 F. Supp. 3d 1126, 1148 (C.D. Cal. 2015).  Even when access is denied, though, movants may be required to show more to establish irreparable harm.  *Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677, 687 (S.D. Ohio 2012) (noting that there is "some authority for the proposition that an interruption in an educational program is not, in itself, an irreparable injury" and also "contrary case law" that finds irreparable harm "especially when the denial of an educational opportunity is coupled with other types of harm").

2016 WL 6134121 at *37.

[76] There is also an undercurrent of speculation that permeates this litigation.  While BASH could have additional transgender students seek and receive approval to use the privacy facilities corresponding to their gender identity for the upcoming school year, the evidence in the record is that the School District is aware of three transgender students, including Student A, who are returning to BASH for 2017-18, with at least Student A having already received permission to use the boys' bathrooms and locker room.  Nonetheless, it is unclear whether Student A will even have gym class with Jack Jones or Joel Doe, or whether a transgender female student will have gym class with Mary Smith (if she is even returning to BASH for her senior year).  If there is not a transgender student in gym with

140

### D.  Balance of Harm/Whether Non-Moving Party Will Suffer Greater Harm

Because the court has determined that the plaintiffs have failed to establish a likelihood of success on the merits or irreparable harm, the court need not address the final two factors because the plaintiffs' failure "must necessarily result in the denial of a preliminary injunction." *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982). As such, the court will not analyze whether granting a preliminary injunction here would cause greater harm to a non-moving party or whether the injunction would be in the public interest.[77]

## VI.  CONCLUSION

The plaintiffs here are required to clearly show that they are entitled to the extraordinary remedy of a preliminary injunction.  In addition, they have a particularly heavy burden because they are seeking to change the status quo insofar as the practice in place at BASH over the past year has been to allow transgender students to use the restrooms and locker rooms consistent with their gender identity.  With regard to their section 1983 invasion of privacy claim brought under the Fourteenth Amendment, their sexual harassment hostile environment claim under Title IX, and their state law invasion of privacy claim, at this early juncture and upon the current

---

them, there is no potential issue.  To the extent that Jack Jones and Joel Doe used the multi-user bathrooms at BASH, there was no testimony that they interacted with a transgender male in the bathroom and it is possible that they will go the entirety of 2017-18 without doing so as well.

[77] The court recognizes that in balancing the harms, the court must examine "the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson—Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002).  As the plaintiffs have failed to establish a likelihood of success on the merits of those claims, the court notes that the balance of the harms would have favored the defendants because the effect of changing the current practice on the transgender students would be that they will be forced to use the bathroom of their birth sex, of which they do not identify, or end up being one of the limited number of students using the single-user facilities.  Dr. Leibowitz credibly testified as to the negative effect on the transgender students if they are unable to use the facilities corresponding with their gender.  As an additional note, and as mentioned by the School District, a preliminary injunction ceasing the current practice could presumably lead to litigation brought by the transgender students for a violation of the Equal Protection Clause or Title IX in light of the *Evancho* and *Whitaker* decisions.  There is also precedent in this district that gender dysphoria can be a disability under the Americans with Disabilities Act, and there could be an issue with providing the requisite reasonable accommodations or the School District could be in violation of the Act.  *See* Defs.' Mem. at 44 (citing *Blatt v. Cabela's Retail, Inc.*, No. CIV. A. 14-4822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017).

record, the plaintiffs have not clearly shown that they are entitled to relief. In particular, they have not demonstrated that they are likely to succeed on the merits of these claims. Additionally, the plaintiffs have not demonstrated that they are likely to suffer irreparable injury if the court does not issue a preliminary injunction. Since the plaintiffs failed to satisfy either of these "gateway" factors, the court need not balance the parties' respective harms or consider whether a preliminary injunction is in the public interest. Accordingly, the court will deny the motion for a preliminary injunction.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.