**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STUDENTS AND PARENTS FOR PRIVACY and VICTORIA WILSON, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 16 C 4945 |
| v. | ) ) | Judge Jorge L. Alonso |
| SCHOOL DIRECTORS OF TOWNSHIP HIGH SCHOOL DISTRICT 211, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| STUDENTS A, B and C, by and through their parents and legal guardians PARENTS A, B and C, and ILLINOIS SAFE SCHOOLS ALLIANCE, | ) ) ) ) ) | |
| Intervenor-Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

After defendants adopted a policy allowing transgender students to use the bathrooms and locker rooms of their choice, plaintiffs filed a first amended complaint against defendants School Directors of Township High School District 211 ("District 211"). District 211 and intervenor-defendants move to dismiss. For the reasons set forth below, the Court grants in part and denies in part the motions to dismiss.

**I.      BACKGROUND**

The following facts are from plaintiffs' complaint, and the Court takes them as true.[1]

Plaintiffs Students and Parents for Privacy ("SPP") is a voluntary, unincorporated association of:

---

[1] As lawyers understand, on a motion to dismiss, a Court accepts alleged facts as true. That does not mean the facts are true; that does not mean a plaintiff will ultimately be able to prove the

(1) students who are (or will be) attending District 211 high schools; and (2) their parents. Some SPP Students are as young as 14 years. Plaintiff Victoria Wilson ("Wilson") is the president of SPP and the mother of two students in District 211 schools. Intervenor Illinois Safe Schools Alliance is an organization that advocates on behalf of lesbian, gay, bisexual, transgender and questioning young people. Intervenor Student A is a graduate of District 211's Fremd High School, and Intervenor Students B and C are current students of a District 211 high school. Students A, B and C claim genders different from their sex at birth. For example, Student A is a male student with a feminine gender.

Plaintiffs allege that the words sex and gender mean different things. One's sex is either male or female, depending on the union of male and female gametes at one's conception. Gender, on the other hand, is a social construct and runs along a continuum from very masculine to very feminine. Plaintiffs allege that a person's perception of his or her own gender does not change his or her primary or secondary sex characteristics or his or her genes.

The crux of this suit is that defendants seek to affirm the claimed genders of students by allowing male students who claim female gender to use privacy facilities (i.e., bathrooms and locker rooms) designated for use by the female sex and female students who claim male gender to use privacy facilities designated for the male sex. Plaintiffs refer to the policy as District 211's "compelled affirmation policy." Plaintiffs allege District 211 did not adopt the policy based on students' manifesting behaviors or appearances stereotypical of genders different from their own. Rather, District 211 adopted the policy solely to affirm the claimed genders of those students claiming a gender different from their sex at birth.

---

facts. Many a plaintiff has failed to prove, at a subsequent stage of litigation, the facts alleged in a complaint. Plaintiffs, however, are, within the bounds of Rule 11, the masters of their complaint; and, the Court takes the allegations in plaintiffs' complaint as true.

District 211's enforcement of the compelled affirmation policy has caused SPP Students embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation and loss of dignity. SPP Students are at continual risk of encountering (and sometimes do encounter), without their consent, members of the opposite sex while disrobing, showering, urinating, defecating and while changing tampons and feminine napkins. When District 211 first allowed Student A to use female restrooms, SPP Girls were startled, shocked, embarrassed and frightened by the presence of a male in the girls' restroom.

At some point after District 211 first allowed Student A to use the girls' restrooms but before it allowed her to use the girls' locker rooms, Student A used a girls' locker room anyway. A female student (who is not a plaintiff but who had been sexually assaulted previously) was exposed to Student A's penis. District 211 failed to investigate or remediate the situation. Instead, by December 2015, District 211 allowed Student A to access the girls' locker rooms. At first, the policy applied only to Student A, who was required to change in private changing stations while in the girls' locker rooms. On one or more occasions, Student A failed to use a private changing station while changing. The reason District 211 allowed Student A to use the girls' locker rooms is because it was used by females. Had the girls' locker rooms not been limited to females, District 211 would not have been able to affirm Student A's gender by allowing her also to use the girls' locker rooms.

After District 211 allowed Student A to use the girls' locker rooms, an SPP Parent requested that her daughter be allowed to use a private locker room. The district refused.

Eventually, District 211 adopted the compelled affirmation policy allowing all transgender students to use the restrooms and locker rooms (including showers) of their choice. All other students must use the restrooms and locker rooms designated for their sex. Before

adopting the policy, District 211 did not investigate the reliability of the science underlying gender-affirmation treatments. Nor did it make any effort to understand the impacts such a policy would have on students exposed to opposite-sex, same-gendered students in locker rooms and restrooms.

Under the compelled affirmation policy, District 211 allows students to use the restroom and locker room facilities of their choice, regardless of how each student presents or whether the student manifests behaviors or characteristics stereotypical of his or her claimed gender. Affirming each students' gender under the policy requires the participation of third parties, including SPP Students, who are directed to enforce or conform to the District's actions. District 211 has conveyed to students that when a person objects to the compelled affirmation policy, the person is intolerant and bigoted. District 211 has told SPP Students that if they are uncomfortable using a restroom or locker room, they should leave. Currently, District 211 has male students claiming feminine gender and female students claiming masculine gender. At least one of these students has been allowed to use locker rooms without using privacy stations. District 211 also has students claiming to be non-binary and genderless.

District 211 students are required to take physical education ("PE"). Female students changing for PE and sports are sometimes topless in locker rooms. Students changing for swimming are sometimes naked. Few SPP Students have requested use of a private locker room, lest District 211 view them as bigoted. Use of a bathroom stall for changing is not a good alternative, because such stalls are cramped and less sanitary than a locker room. Thus, SPP Girls and SPP Boys have been denied their allegedly reasonable expectation of privacy while using locker rooms. They have been denied their expectation of privacy in restrooms, as well, because gaps in stall doors allow exposure to the opposite sex.

Plaintiffs allege that SPP Students risk and suffer actual exposure to the opposite sex, which causes them embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation and loss of dignity. The compelled affirmation policy has caused SPP Students to change their behavior to avoid the risk of exposure. For example, one SPP Girl began wearing gym clothes underneath her school clothes to avoid getting undressed in locker rooms. As a result, she wears soiled, sweaty gym clothes under her school clothes for the rest of the school day. One SPP Girl used a private changing stall in the girls' locker room, after which other girls began calling her "transphobic" and "homophobic." That SPP Girl has also been called slang words for female body parts. The taunts deterred the SPP Girl from using changing stalls. The swim and gymnastics locker rooms do not have private changing stalls. Student A, while she was a student at District 211's Fremd High School, was authorized to use the swim locker room at any time. Many SPP Girls shower after swim class in open showers that are visible to other students in the locker room. One SPP Girl is enrolled in swim class (which is mandatory for freshmen and sophomores), and she is fearful, uncomfortable and apprehensive about changing for swim class.

The compelled affirmation policy also has caused SPP Students to change their behavior with respect to their use of restrooms. After repeatedly encountering Student A in restrooms, some SPP Girls used the restroom as infrequently as possible, putting themselves at risk of urinary tract infections, dehydration and constipation. Some SPP Girls used the restroom during class time to reduce the risk of encountering a member of the opposite sex in a restroom. Thus, those students lose instructional time in class.

Based on these allegations, plaintiffs seek relief for alleged violations of Title IX (Count I), the Due Process Clause of the Fourteenth Amendment to the United States Constitution (Count II), the fundamental right of parents to direct the upbringing of their children (Count III),

the Illinois Religious Freedom Restoration Act (Count IV) and the right to free exercise of religion under the First Amendment to the United States Constitution (Count V). Defendants move to dismiss.

## II.    STANDARD ON A MOTION TO DISMISS

In considering a motion to dismiss, the Court accepts as true the factual allegations in the complaint and draws permissible inferences in favor of the plaintiff. *Boucher v. Finance Syst. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). The Court may dismiss a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure if the plaintiff fails "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Under the notice-pleading requirements of the Federal Rules of Civil Procedure, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Thus, a motion to dismiss tests whether a plaintiff has given sufficient notice of a claim, not whether plaintiff will ultimately prevail. A complaint need not provide detailed factual allegations, but mere conclusions and a "formulaic recitation of the elements of a cause of action" will generally not suffice. *Twombly*, 550 U.S. at 555. To survive a motion to dismiss, a claim must be plausible. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Allegations that are as consistent with lawful conduct as they are with unlawful conduct are not sufficient; rather, plaintiffs must include allegations that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

## III.    DISCUSSION

### A    Standing

District 211 (though not the intervenors) argues that plaintiffs lack standing to pursue this suit.  The Constitution limits a federal court's jurisdiction to cases and controversies, and "the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992).  Thus, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S.Ct. 1540, 1547 (2016).  A plaintiff must establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  Thus, here, at the pleading stage, allegations will suffice.

As the Supreme Court has explained, an association "has standing to bring suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n.*, 432 U.S. 333, 343 (1977); *see also Keep Chi. Livable v. City of Chi.*, 913 F.3d 618, 625 (7th Cir. 2019).  As to the second prong, in *Hunt*, the Supreme Court noted:

> If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.

*Hunt*, 432 U.S. at 343 (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)).

Those first two prongs "arise from Article III," but the "third prong is prudential," which is to say it is a matter of "administrative convenience and efficiency." *Milwaukee Police Assoc. v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017). With respect to the third prong, in *Hunt*, the Supreme Court quoted *Warth v. Seldin*, where the Supreme Court said, "so long as the nature of the claim and of the relief sought does not make the individual participation of *each* injured party indispensable to proper resolution of the case, the association may be an appropriate representative." *Hunt*, 432 U.S. at 342-43 (quoting *Warth*, 422 U.S. at 511 (emphasis added)); *see also Retired Chi. Police Assoc. of Chi. v. City of Chi.*, 7 F.3d 584, 602-603 (7th Cir. 1993) ("Th[e] evidence might be supplied by *some* of the members. Each [member's] presence as a party would not be required.").

## 1. SPP

District 211 argues that SPP does not have associational standing to sue on behalf of its members. The Court disagrees. District 211 first argues that SPP lacks associational standing, because it has not named any individual members. It need not do so. *Disability Rights of Wisc., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (Associational standing "allows for the members on whose behalf the suit is filed to remain unnamed by the organization."). District 211 also argues that plaintiffs "make no allegations as to the number of 'SPP Students' who share the viewpoints of SPP, which makes their allegations even more deficient for standing purposes." (District 211's Reply Brief/Docket 212 at 3 n. 1). The Court disagrees. Federal courts have a long history of considering (and protecting) the rights of minorities, even those who hold views that the majority of society considers politically incorrect. Neither the number of injured parties nor the magnitude of the injury has any bearing on whether a case is justiciable. *Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 925 (7th Cir.

2008) ("The defendants claim that [plaintiff's] injury is insubstantial, but the 'injury-in-fact necessary for standing 'need not be large, an identifiable trifle will suffice.'") (quoting *LaFleur v. Whitman*, 300 F.3d 256, 270-71 (2d Cir. 2002)); *ACLU v. City of St. Charles*, 794 F.2d 265, 269 (7th Cir. 1986) ("one plaintiff is all that is needed to enable the suit to be maintained").

What matters is whether SPP alleges that at least one of its members was injured. It has. Plaintiffs allege SPP Girls have been startled, shocked, embarrassed and frightened by the presence of Student A in the girls' restroom. These types of injuries are sufficient to establish standing. *See Nixon v. Warner Comm., Inc.*, 435 U.S. 589, 599 n. 11 (1978) ("his allegations of further embarrassment . . . establish injury in fact"); *Kindle v. Fifth Third Bank*, Case No. 14-cv-6502, 2015 WL 5159890 at * 2 (N.D. Ill. Sept. 1, 2015) ("Plaintiff alleges that Defendant caused him to soil himself in public, resulting in pain and suffering, humiliation, alienation, and emotional distress. These alleged injuries are specific to Plaintiff and are sufficient to establish injury in fact."); *Hizer v. Pulaski Cty., Ind.*, Case No. 3:16-cv-885-JD-MGG, 2017 WL 3977004 at *3 (N.D. Ind. Sept. 11, 2017) (embarrassment and burden of having to use inaccessible restrooms was injury in fact that supported standing). Plaintiffs also allege that the compelled affirmation policy puts SPP Students at risk of exposure to the opposite sex, which causes them embarrassment, humiliation, anxiety, fear, apprehension, stress, degradation and loss of dignity. District 211 argues that some of the injury is merely threatened, but "threatened injury can satisfy Article III standing requirements." *Sierra Club*, 546 F.3d at 926. In any case, plaintiffs have alleged that the compelled affirmation policy has caused SPP Students to change their behavior: one SPP Girl wears her gym clothes under her school clothes (which means she walks around all day in sweaty, dirty gym clothes); some SPP Girls used restrooms as infrequently as possible (which put them at risk of urinary tract infections, dehydration and constipation); and

some SPP Girls use the restroom during class periods (which means they miss instructional time). These are injuries in fact. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 183-184 (2000) ("we see nothing 'improbable' about the proposition that [defendant's discharge of] pollutants into a river would cause nearby residents to curtail their recreational use of that waterway . . . and that is enough for injury in fact"); *Sierra Club*, 546 F.3d at 925-26 ("[I]f [plaintiff] foregoes her regular visits to the lake because of these pollutants, that would also constitute injury-in-fact.").

Finally, District 211 argues that SPP's claims cannot proceed under associational standing, because the nature of the claims is such that individual members will need to testify. The Court disagrees. Although it is true that SPP will likely need the testimony of *some* of its members to establish its claims, the question is whether it will need the participation of *every* member. *Hunt*, 432 U.S. at 342-43 ("so long as the nature of the claim and of the relief sought does not make the individual participation of *each* injured party indispensable to proper resolution of the case, the association may be an appropriate representative") (quoting *Warth*, 422 U.S. at 511 (emphasis added)); *see also Retired Chi. Police*, 7 F.3d at 603 ("Th[e] evidence might be supplied by *some* of the members. Each [member's] presence as a party would not be required."). It is not clear that plaintiff would need the testimony of every member. Accordingly, District 211 has not convinced the Court that this prudential rule should keep this case out of federal court. SPP has adequately alleged that it has standing, and District 211's motion to dismiss is denied as to this issue.

### 2. Victoria Wilson

District 211 also argues that plaintiff Wilson lacks standing. Wilson's response consists of one sentence and cites to Count III. (SPP Brief/Docket 211 at 29) ("She does have standing in

her individual capacity as a parent."). Count III seeks relief based on the parents' right to direct the education of their children.

The Court agrees that parents generally have standing to pursue such claims, *Fleishfresser v. Directors of School District 200*, 15 F.3d 680, 684 (7th Cir. 1994), and that SPP has standing to bring the claim on behalf of SPP Parents. The first amended complaint alleges injury to at least one SPP Parent who sent his child to private school and others who were denied private locker rooms for their children (First Am. Complt./Docket 197 at ¶¶ 279, 284), not to mention the injuries to the SPP Students themselves. The first amended complaint, however, includes no allegations of an injury to Victoria Wilson particularly or to her children particularly. Accordingly, the Court agrees with District 211 that plaintiffs have not adequately alleged that plaintiff Victoria Wilson has standing. Accordingly, District 211's motion to dismiss is granted as to her claims. Victoria Wilson's claims are dismissed without prejudice.

## B.      Title IX

In Count I, SPP asserts that SPP Students were subjected to harassment in violation of Title IX of the Education Amendments of 1972. Under that statute, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). As is true under Title VII, the Supreme Court has found a private right of action for sexual harassment under Title IX. *Davis v. Monroe Cty. Bd. of Ed.*, 526 U.S. 629 (1999). A school district may be liable for sexual harassment if the district was "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650; *see*

*also Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010). District 211 and intervenors argue that plaintiffs have not alleged sufficient facts to state a claim. They dispute, among other things, whether what SPP alleges is sufficiently severe, pervasive and objectively unreasonable.

SPP has alleged that SPP Students have been subjected to sexual harassment due to the compelled affirmation policy. Were this a case of sexual harassment in employment brought under Title VII of the Civil Rights Act of 1964, such allegations would be enough to put defendant on notice of the claim and to survive a motion to dismiss under Rule 12(b)(6). *Tate v. SCR Medical Transp.*, 809 F.3d 343, 346 (7th Cir. 2015). In *Tate*, the Seventh Circuit reversed dismissal for failure to state a claim of a complaint in which the plaintiff alleged, "[d]uring my employment, I was subjected to sexual harassment. I complained to no avail." *Tate*, 809 F.3d at 345-346. The Seventh Circuit said the sexual harassment claim was "adequately alleged," because "to prevent dismissal under Rule 12(b)(6), a complaint alleging sex discrimination need only aver that the employer [had] instituted a (specified) adverse employment action against the plaintiff on the basis of her [or his] sex.'" *Tate*, 809 F.3d at 346 (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084-85 (7th Cir. 2008)). Count I, however, is a claim under Title IX rather than Title VII.

Title IX claims have similarities to Title VII claims, and the Seventh Circuit "has looked to Title VII when construing Title IX." *Whitaker v. Kenosha Unified School Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1047 (7th Cir. 2017). Claims under Title IX are even more similar to claims under Title VI of the Civil Rights Act of 1964. Basically, Title VI is to race, color and national origin what Title IX is to sex. *See Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) ("Title IX of the Education Amendments of 1972 makes the same guarantee [as Title VI] but substitutes 'on the basis of sex' for 'on the ground of race, color, or national origin.'"). Thus, the Seventh

Circuit has said, "Title VI and Title IX are so similar that a decision interpreting one generally applies to the other." *Galster*, 768 F.3d at 617. As is true of claims under Title VII, the Seventh Circuit has emphasized in a Title VI case that "there is no heightened pleading requirement in Rule 8 for discrimination cases." *Su v. Eastern Ill. Univ.*, 565 Fed.Appx. 520, 521-22 (7th Cir. 2014) (reversing decision to dismiss Title VI claim for failure to allege "actual knowledge of the discrimination" or that defendant "had the authority to address the discrimination").

The Court concludes that the standards for pleading discrimination (including harassment) described in *Tate*, *Tamayo* and *Su* apply equally to the Title IX claim asserted here. SPP has pleaded far more than is necessary under *Tate* to state a claim for sexual harassment. Whether SPP can ultimately prevail on this claim is a question for another day, but the allegations in the complaint suffice to put District 211 on notice. Accordingly, the motions to dismiss are denied as to Count I.

### C.     Right to bodily privacy

In Count II, SPP asserts that SPP Students have a fundamental right to bodily privacy that protects their partially- or fully-unclothed bodies. They assert that this right includes a right to be free from government-enforced, unconsented risk of exposure to the opposite sex when they or members of the opposite sex are partially or fully unclothed.

Because this right is not explicitly found in the Constitution, it must be located, if at all, in the Due Process Clause of the Fourteenth Amendment to the Constitution. On that subject, the Supreme Court has explained:

> The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests. In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the rights to marry, to

have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); and to abortion. We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted medical treatment.

*Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997) (most internal citations omitted). The

Supreme Court has since recognized the right to same-sex marriage. *Obergefell v. Hodges*, __

U.S. __, 135 S.Ct. 2584 (2015).

In *Glucksberg*, the Supreme Court went on say:

But, we 'ha[ve] always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.' By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore, 'exercise the utmost care whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court.

*Glucksberg*, 521 U.S. at 720. In a sense, that makes this Court's job easier, as the Seventh

Circuit has explained:

[Plaintiff] also asserts that [defendant] violated her rights to substantive due process. We can quickly dispose of this argument. . . . The list of [substantive due process] rights and interests is, however, a short one, including things like the right to marry, the right to have children, the right to marital privacy, the right to contraception, and the right to bodily integrity. Conspicuously missing on this list is the right to follow any particular career. Indeed, no court could recognize such a right without acting in the teeth of the many cautions that the Supreme Court has given against expanding the concept of substantive due process[.]

*Park v. Indiana Univ. School of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012) (internal citations

omitted).

So far, the right not to be seen unclothed by the opposite sex is not on the Supreme

Court's list. By bodily integrity, the Supreme Court was talking about physical bodily integrity,

not visual bodily privacy. *Rochin v. California*, 342 U.S. 165, 172 (1952) (a "struggle to open

[plaintiff's] mouth and remove what was there" as well as "the forcible extraction of his stomach's contents" constituted a violation of his substantive due process rights). That is why *Canedy v. Boardman*, 16 F.3d 183 (7th Cir. 1994), does not help plaintiff. There, the plaintiff's allegation that he was strip searched "by female guards, and that no effort has been made to accommodate his privacy interests" stated a claim for violation of bodily integrity. *Canedy*, 16 F.3d at 188. That, though, was a "tactile" search, as the Seventh Circuit later described it when distinguishing *Canedy* from a visual search. *Johnson v. Phelan*, 69 F.3d 144, 145 (7th Cir. 1995) (*Canedy* "holds that a right of privacy limits the ability of wardens to subject men to body searches by women, or the reverse. Our case involves visual rather than tactile inspections[.]").

On a number of occasions, the Supreme Court and the Seventh Circuit have discussed bodily privacy in the context of rights under other amendments. *See Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995) ("For their own good and that of their classmates, public school children are routinely required to submit to various physical examinations, and to be vaccinated against various diseases. . . . Legitimate privacy expectations are even less with regard to student athletes. School sports are not for the bashful. They require 'suiting up' before each practice or event, and showering and changing afterwards. Public school locker rooms, the usual sites for these activities, are not notable for the privacy they afford.") (holding that mandatory urine-testing for drugs did not violate the Fourth Amendment); *Johnson*, 69 F.3d at 148 & 150 ("How odd it would be to find in the eighth amendment a right not to be seen by the other sex. Physicians and nurses of one sex routinely examine the other. In exotic places such as California people regularly sit in saunas and hot tubs with unclothed strangers.") (Holding "[t]he fourth amendment does not protect privacy interests within prisons. Moving to other amendments does not change the outcome."); *Id*. at 152 ("The nudity taboo retains great strength

in the United States. . . . Ours is a morally diverse populace and the nudity taboo is not of uniform strength across it. It is strongest among professing Christians, because of the historical antipathy of the Church to nudity . . . The taboo is particularly strong when the stranger belongs to the opposite sex.") (Posner, J., concurring); *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1321 & 1323 (7th Cir. 1993) ("no one would seriously dispute that a nude search of a child is traumatic") (holding strip search of high school student was not unreasonable search); *Schaill v. Tippecanoe Cty. School Corp.*, 864 F.2d 1309, 1312 & 1313 (7th Cir. 1988) ("There can be little doubt that a person engaging in the act of urination possesses a reasonable expectation of privacy as to that act, and as to the urine which is excreted. In our society, it is expected that urination be performed in private, that urine be disposed of in private and that the act, if mentioned at all, be described in euphemistic terms.") (holding that urine drug test constitutes search). While these cases recognize some level of societal appreciation for adult privacy (though less so for students) in urination and in being naked in front of the opposite sex, none of these cases compels a conclusion that the right SPP asserts in this case is within the bounds of substantive due process; nor do they synthesize to support a substantive due process right.

In any case, this Court takes seriously the cautions of the superior courts not to expand substantive due process. *Glucksberg*, 521 U.S. at 720 ("[W]e 'have always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended.'") (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)); *Park*, 692 F.3d at 832 ("Indeed, no court could recognize such a right without acting in the teeth of the many cautions that the Supreme Court has given against expanding the concept of substantive due process[.]") (internal citations omitted).

Although it would not shock the Court if the Seventh Circuit or Supreme Court one day

recognizes the right to bodily privacy that the plaintiff seeks to enforce,[2] this Court is not at

liberty to expand the substantive rights protected by the Due Process Clause.

Accordingly, Count II fails to state a claim. Defendants' motions to dismiss are granted

as to Count II, and Count II is dismissed with prejudice.

### D. Right to direct the education of their children

In Count III, on behalf of the SPP Parents, plaintiff SPP asserts a claim for infringement

of SPP Parents' right to direct the education of their children. They argue that the right to direct

the education of their children encompasses a right to determine whether their children will be

exposed to opposite-sex children in restrooms and locker rooms. The Court does not agree that

the right can be stretched that far.

The right to direct the education of one's child traces back to the 1920s, when, relying on

the Due Process Clause of the Fourteenth Amendment, the Supreme Court, in *Meyer v.

Nebraska*, 262 U.S. 390 (1923), declared unconstitutional a state statute prohibiting the teaching

of modern foreign language to students who had not yet passed the eighth grade and, in *Pierce v.

Society of the Sisters of Holy Names of Jesus and Mary*, 268 U.S. 510 (1925), affirmed an

injunction against enforcement of compulsory public education. In *Pierce*, the Supreme Court

explained:

---

[2] Indeed, the Third Circuit has recognized such a right. *Doe v. Boyertown Area School Dist.*, 897 F.3d 518, 527 n. 53 (3rd Cir. 2018) ("If there were any doubt after *Doe v. Luzerne County* that the constitution recognizes a right to privacy in a person's unclothed or partially clothed body, we hold today that such a right exists."), *petition for cert. filed* Nov. 21, 2018. The Third Circuit went on to hold that a school district's policy of allowing transgender students access to opposite-sex bathrooms and locker rooms "'served a compelling state interest in not discriminating against transgender students' and was narrowly tailored to that interest." *Boyertown*, 897 F.3d at 528.

> The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Pierce*, 268 U.S. at 535. In each case, the Supreme Court also noted the lack of challenge to the state's significant power over the provision of education. *Meyer*, 262 U.S. at 402 ("The power of the state to compel attendance at *some* school and to make reasonable regulations for all schools, including a requirement that they shall give instructions in English, is not questioned. Nor has challenge been made of the state's power to prescribe a curriculum for institutions which it supports") (emphasis added); *Pierce*, 268 U.S. at 534 ("No question is raised concerning the power of the state reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils, to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship be taught, and that nothing be taught which is manifestly inimical to the public welfare.").

These cases have been interpreted to mean only that the state could not make its own education mandatory or exclusive. In *Runyon v. McCrary*, 427 U.S. 160 (1976), private schools argued that to force them to integrate would, among other things, violate parents' rights to direct the education of their children. The Supreme Court rejected the argument, noting that the right was limited. *Runyon*, 427 U.S. at 177. It explained:

> It is clear that the present application of s 1981 infringes no parental right recognized [in our cases]. No challenge is made to the petitioner schools' right to operate or the right of parents to send their children to a particular private school rather than public school. Nor do these cases involve a challenge to the subject matter which is taught at any private school. [The private schools] remain presumptively free to inculcate whatever values and standards they deem desirable. Meyer and its progeny entitle them to no more.

*Runyon*, 427 U.S. at 177.

Attempts to stretch the right to direct education beyond providing supplemental education or choosing private school as an alternative have not been successful. *Thomas v. Evansville-Vanderburgh School Corp.*, 258 Fed.Appx. 50, 53-54 (7th Cir. 2007) ("We agree that [plaintiff] has a fundamental right, secured by the due process clause, to direct the upbringing and education of her child. . . . But a right to choose the type of school one's child attends, or to direct the *private* instruction of one's child, does not imply a parent's right to control every aspect of her child's education at a public school.") (citing *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204-07 (9th Cir. 2005); *Leebaert v. Harrington*, 332 F.3d 134, 140-42 (2d Cir. 2003); *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 533-34 (1st Cir.1995); *cf. Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972)). In *Fields*, parents were (rightly) horrified to learn the school district had allowed children as young as first grade to participate in a survey that asked such questions as how much time they spent "thinking about touching other peoples' private parts." *Fields*, 427 F.3d at 1200. The Ninth Circuit rejected the parents' argument that the survey had violated their right to direct the education of their children, noting that "[s]chools cannot be expected to accommodate the personal, moral or religious concerns of every parent" and holding that "the *Meyer-Pierce* right does not extend beyond the threshold of the school door." *Fields*, 427 F.3d at 1206 & 1207. Likewise, in *Brown*, the First Circuit rejected parents' claim that the district had violated their right to direct education when it held a mandatory AIDS-awareness assembly, during which the hired speaker, among other things, "simulated masturbation," "had a male lick an oversized condom with her, after which she had a female minor pull it over the male minor's entire head and blow it up," "encouraged a male minor to

display his 'orgasm face,'" and "informed a male minor he was not having enough orgasms."

*Brown*, 68 F.3d at 529 & 534. The First Circuit explained:

> The *Meyer* and *Pierce* cases, we think, evince the principle that the state cannot prevent parents from choosing a specific educational program—whether it be religious instruction at a private school or instruction in foreign language. That is, the state does not have the power to 'standardize its children' or 'foster a homogenous people' by completely foreclosing the opportunity of individuals and groups to choose a different path of education. We do not think, however, that this freedom encompasses a fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children.

*Brown*, 68 F.3d at 533 (internal citations omitted).

In its brief, SPP argues that SPP Parents do not seek to control curriculum but rather to "preserve their parental right to teach modesty." (Plaintiffs' Brief/Docket 211 at 14). The alleged compelled affirmation policy, however, does not prevent SPP Parents from teaching their children modesty. To be sure, the compelled affirmation policy might undercut that teaching, but plaintiffs have cited no case that suggests the right to direct education includes a right not to have their teachings undermined by public school (beyond, of course, the right to choose private school instead). *Brown* and *Fields* suggest the absence of such a right, and the Seventh Circuit has cited those cases with approval.

Because the right to direct the education of one's children is a right to provide supplemental education or to choose an alternative to public education rather than a right to overrule aspects of public education, it does not encompass the right SPP Parents assert. Accordingly, Count III is dismissed. Because the defect is not curable, the claim is dismissed with prejudice.

### E. Illinois Religious Freedom Restoration Act

In Count IV, SPP asserts that District 211 has violated the Illinois Religious Freedom Restoration Act ("IRFRA"), 775 ILCS 35/15. The IRFRA provides:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless *it demonstrates* that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 ILCS 35/15 (emphasis added). The IRFRA defines "demonstrates" to mean "meets the burden of going forward with the evidence and of persuasion." 775 ILCS 35/5. The IRFRA, thus, explicitly places on the government the burden of establishing that a burden to religion both serves a compelling interest and is the least restrictive means of compelling the interest, thereby giving government an affirmative defense. 775 ILCS 35/5; *see also Shatner v. Page*, Case No. 00-0251, 2009 WL 260788 at *21 (S.D. Ill. Feb. 4, 2009).

Defendants move to dismiss this count on several grounds, but two are non-starters. Specifically, defendants move to dismiss on the basis of two affirmative defenses. A plaintiff need not anticipate and plead around an affirmative defense, so an affirmative defense is not an appropriate basis on which to dismiss a claim under Rule 12(b)(6). *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010); *Carr v. Tillery*, 591 F.3d 909, 913 (7th Cir. 2010). First, defendants argue that District 211 has a compelling interest in its policy, which, as noted above, is an affirmative defense. Second, defendants argue that SPP's IRFRA claim is preempted. Preemption, too, is an affirmative defense around which a plaintiff need not plead. *Bausch*, 591 F.3d at 561 ("Preemption is an affirmative defense, and pleadings need to anticipate or attempt to circumvent affirmative defenses."). The Court, accordingly, will not dismiss Count IV based on those affirmative defenses.

The Court also notes that District 211 is wrong to complain that SPP has not adequately alleged membership in or adherence to a particular religion. Plaintiffs are not required to do so. The IRFRA defines "exercise of religion" as "an act or refusal to act that is substantially

motivated by religious belief, whether or not the religious exercise is compulsory or central to a larger system of belief." 775 ILCS 35/5; *cf. Korte v. Sebellius*, 735 F.3d 654, 683 (7th Cir. 2013) ("[T]he substantial burden inquiry does *not* invite the court to determine the centrality of the religious practice to the adherent's faith; RFRA is explicit about that. And free-exercise doctrine makes it clear that the test for substantial burden does not ask whether the claimant has correctly interpreted his religious obligations."). It is enough that plaintiffs allege SPP Parents and SPP Students have sincere religious beliefs that they should not undress or use the bathroom in front of members of the opposite sex and that SPP Parents have a sincere religious belief that they should teach such modesty to their children.

Defendants also argue that SPP fails to allege adequately a substantial burden to their exercise of religion. For purposes of the IRFRA (like the federal Religious Freedom Restoration Act ("RFRA") before it), "the hallmark of a substantial burden on one's free exercise of religion is the presentation of a coercive choice of either abandoning one's religious convictions or complying with the government regulation." *Diggs v. Snyder*, 333 Ill.App.3d 189, 194-95 (5th Dist. 2002) (citing *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). The Court disagrees with defendants' arguments that plaintiffs have not included sufficient facts. The Court concludes that SPP's allegations provide sufficient notice of the claim. Plaintiffs have alleged that District 211 maintains a policy allowing male students with female genders to use the girls' locker rooms and restrooms and female students with male genders to use the boys' locker rooms and restrooms. Thus, SPP Students are at risk of exposure to opposite-sex individuals while they are undressing or using the restroom, in violation of their sincerely-held religious beliefs. If that were all plaintiffs had alleged, defendants might have a better argument about the absence of coercion. Plaintiffs, though, have alleged more. Plaintiffs have alleged that District 211 requires

students to take physical education, which, often, requires students to change and/or shower between classes. In addition, plaintiffs have alleged that District 211 requires students to take swim class and that the swim locker rooms do not have private changing stalls or private showers. Plaintiffs also allege that District 211 has conveyed to students that if a person objects to the compelled affirmation policy, the person is bigoted and intolerant. That, combined with actual heckling by students, has dissuaded some SPP Students from asking to use a private locker room. Furthermore, some SPP Parents have had their requests that their children be allowed to use a private locker room denied. Although the Court is not deciding today whether SPP can prevail on this claim, the Court concludes that SPP has included sufficient facts to provide notice to District 211 of a plausible claim under the IRFRA. *Cf. Stanley v. Carrier Mills-Stonefront School Dist. No. 2*, 459 F. Supp.2d 766, 773 (S.D. Ill. Sept. 21, 2006) (holding parent challenging school's "opposite sex day" stated free exercise claim and noting "peer pressure accompanied by tacit approval from the administration could certainly amount to coercion").

Defendants' motions to dismiss are denied as to Count IV.

**F.  Free exercise under the First Amendment**

In Count V, SPP asserts that its members' right to free exercise of religion under the First Amendment to the United States Constitution has been burdened.

The First Amendment to the United States Constitution provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the *free exercise thereof* . . ." U.S. Const. Amdt. 1 (emphasis added). It applies to the states by incorporation into the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The Supreme Court has said the right to free exercise includes "the right to believe and profess whatever religious doctrine one desires." *Employment Division, Dep't. of HR of Oregon v. Smith*, 494 U.S. 872, 877 (1990).

The government, among other things, "may not compel affirmation of religious beliefs, punish expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Smith*, 494 U.S. at 877 (internal citations omitted).

As the Seventh Circuit has explained, the "Free Exercise Clause prohibits the government from 'plac[ing]' a substantial burden on the observation of a central religious belief or practice' without first demonstrating that a 'compelling governmental interest' justifies the burden." *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 631 (7th Cir. 2007) (quoting *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989)); *see also Fleishfresser*, 15 F.3d at 689. Here, again, a substantial burden means a coercive effect. *Fleishfresser*, 15 F.3d at 689-90. "Neutral laws of general applicability," however, "do not run afoul of the Free Exercise Clause, even if these laws have the incidental effect of burdening a religious practice." *St. John's*, 502 F.3d at 631 (citing *Smith*, 494 U.S. at 883). The Supreme Court has explained:

> Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause 'forbids subtle departures from neutrality,' and 'covert suppression of particular religious beliefs.'

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

The Court agrees with defendants that the compelled affirmative policy is facially neutral. The allegations in the complaint do not suggest that the policy targets religion. *See Illinois Bible Colleges Assoc. v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017) ("The statutes in this case conform to the strictures of the Free Exercise Clause. First, they are neutral: They do not target religion or religious institutions. There is no allegation of underlying religious animus."). What distinguishes this case from *Illinois Bible Colleges*, though, is that plaintiffs have alleged that District 211 conveyed to students that anyone who objects to the compelled

affirmation policy is a bigot or intolerant. That sounds like the sort of "subtle departure" from neutrality that might support a claim under the Free Exercise Clause.

Thus, the Court concludes that plaintiff SPP has given District 211 sufficient notice of a plausible claim under the Free Exercise Clause of the First Amendment. Defendants' motions to dismiss are denied as to Count V.

## IV. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part District 211's motion to dismiss [202]. The Court grants in part and denies in part intervenors' motion to dismiss [204]. Plaintiff Victoria Wilson's claims are dismissed without prejudice for lack of standing. Plaintiff Students and Parents for Privacy's Counts II and III are dismissed with prejudice. This case is set for status on April 9, 2019 at 9:30 a.m.


SO ORDERED.                               ENTERED:   March 29, 2019



                                          _____
                                          JORGE L. ALONSO
                                          United States District Judge